# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 24-60193
_____

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA
CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED
STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO
CHEMISTRY TECHNOLOGY COUNCIL,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*,

CONSOLIDATED WITH

_____

## No. 24-60281
_____

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116
(VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF
FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS),
INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION;
HENRY A. ANDERSON, *Medical Doctor*; BRAD BLACK, *Medical Doctor*; BARRY
CASTLEMAN, *DOCTOR* OF SCIENCE; RAJA FLORES, *Medical Doctor*; ARTHUR FRANK,
*Medical Doctor,* DOCTOR OF PHILOSOPHY; PHIL LANDRIGAN, *Medical Doctor*,
MASTER OF SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF
SCIENCE IN PUBLIC HEALTH; STEVEN MARKOWITZ, *Medical Doctor,* DOCTOR OF
PUBLIC HEALTH; JACQUELINE MOLINE, *Medical Doctor*, MASTER OF SCIENCE;

CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, *Medical Doctor*, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE; ANDREA WOLF, *Medical Doctor*, MASTER OF PUBLIC HEALTH,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, *Administrator, United States Environmental Protection Agency*,

*Respondents*,

CONSOLIDATED WITH

―――――――――

NO. 24-60333

―――――――――

OLIN CORPORATION,

*Petitioner*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, *ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY*,

*Respondent.*

Petitions for Review of an Order of the
Environmental Protection Agency
Agency No. 40 CFR Part 751
Agency No. 80 Fed. Reg. 21970

―――――――――――

**OPENING BRIEF OF PETITIONERS ASBESTOS DISEASE AWARENESS
ORGANIZATION et al**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

(1)   Asbestos Disease Awareness Organization (ADAO) (petitioner in No. 24-60193)

(2)   Linda Reinstein (President ADAO)

(3)   Henry A. Anderson, MD (petitioner in No. 24-60281)

(4)   Brad Black, MD (petitioner in No. 24-60281)

(5)   Barry Castleman, ScD (petitioner in No. 24-60281)

(6)   Raja Flores, MD (petitioner in No. 24-60281)

(7)   Arthur Frank, MD, PhD (petitioner in No. 24-60281)

(8)   Phil Landrigan, MD, MSc (petitioner in No. 24-60281)

(9)   Richard Lemen, PhD, MSPH (petitioner in No. 24-60281)

(10)  Steven Markowitz, MD, DrPH (petitioner in No. 24-60281)

(11)  Jacqueline Moline, MD, MSc (petitioner in No. 24-60281)

(12)  Celeste Monforton, DrPH, MPH (petitioner in No. 24-60281)

(13)  Christine Oliver, MD, MPH, MSc (petitioner in No. 24-60281)

(14)  Andrea Wolf, MD, MPH (petitioner in No. 24-60281)

(15)     American Public Health Association (petitioner in No. 24-60281)

(16)     Dr. Georges Benjamin (Executive Director of APHA)

(17)     Collegium Ramazzini (petitioner in No. 24-60281)

(18)     IAFF Local F-116 (Vandenberg Professional Firefighters)(petitioner
         in 24-60193)

(19)     IAFF Local F-253 (Fort Myer Professional Firefighters)(petitioner in
         No. 24-6028)

(20)     Mike Jackson. President of IAFF Local F-253

(21)     The FealGood Foundation (petitioner in No. 24-60281)

(22)     Robert M. Sussman, Sussman & Associates (Counsel for petitioner
         ADAO in Nos. 24-60193 and petitioners in24-60281)

(23)     United Steel, Paper and Forestry, Rubber, Manufacturing,
         Energy, Allied Industrial and Service Workers International Union,
         AFL- CIO/CLC  (USW)(Petitioner in 24-60193)

(24)     Occupational Safety & Health Law Project, LLC (Counsel for USW)

(25)     Randy S. Rabinowitz (Counsel for USW)

(26)     Victoria L. Bor (Counsel for USW)

(27)     Nathan Finch (Counsel for USW)

(28)     Motley Rice (Counsel for USW

(29)     Texas Chemistry Council (TCC) (Petitioner)

(30)     Baker Botts L.L.P. (TCC Counsel)

(31)     Carter, Beau (TCC Counsel)

(32)     Aaron M. Streett (TCC counsel)

(33)    American Chemistry Council (ACC) (Petitioner)

(33)    Georgia Chemistry Council (GCC) (Petitioner)

(34)    Crowell and Moring (Counsel for ACC and GCC)

(35)    David Chung (Counsel for ACC and GCC)

(36)    Warren Lehrenbaum (Counsel for ACC and GCC)

(37)    United States Environmental Protection Agency (Respondent)

(38)    Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)

(39)    Garland, Merrick B., Attorney General, United States Department of Justice (Respondents' Counsel)

(40)    Todd Kim, Assistant Attorney General, US Department of Justice (Respondents' Counsel)

(41)    Laura Glickman, US Department of Justice (Respondents' Counsel)

(42)    Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection)

(43)    Olin Corporation (petitioner in No. 24-60333)

(44)    Hunton Andrews Kurth LLP (counsel for Olin)

(45)    Elbert Lin (counsel for Olin)

(46)    Matthew Z. Leopold (counsel for Olin)

Respectfully Submitted,

/s/ Robert M. Sussman
Robert M. Sussman
*Counsel for Petitioner Asbestos Disease Awareness
Organization and Petitioners in No. 24-60281*

## STATEMENT REGARDING ORAL ARGUMENT

No oral argument has been scheduled yet. Petitioners request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS………………………………..iii

STATEMENT REGARDING ORAL ARGUMENT…………………………..vi

TABLE OF AUTHORITIES…………………………………………..….ix

INTRODUCTION…………………………………………………….…1

JURISDICTIONAL STATEMENT………………………………………..1

ISSUES PRESENTED FOR REVIEW……………………………………2

STATEMENT OF THE CASE…………………………………………...2

    A. Dangers of Asbestos………………………………………………...2

    B. Regulation of Asbestos under Original TSCA…………………………...5

    C. 2016 TSCA Amendments and Focus on Asbestos………………………6

    D. Evaluation and Regulation of Chrysotile Asbestos
       Under the New Law……………………………………………...8

SUMMARY OF ARGUMENT…………………………………………....9

ARGUMENT…………………………………………………………..11

I.     EPA's Risk Evaluation and Rule Failed to Address Documented Ongoing
       Uses and Reasonably Foreseen Future Uses of Asbestos……………….11

    A. EPA Lacked Substantial Evidence to Exclude from its Rule
       Ongoing Chrysotile Uses Documented in the Record ……………..,.13

    B.  EPA's Failure to Treat Discontinued Asbestos Uses as Reasonably
       Foreseen Future COUs Subject to Section 6 Was Contrary to
       TSCA…………………………………………………..……..17 .

II.    The Rule Violates TSCA By Failing to Set a Compliance Date For Chlor-
      alkali Producers that Is As Soon as Practicable…………………..…..21

III.     The Rule Fails to Eliminate the Unreasonable Risks of Repair and Replacement of Asbestos-Containing Parts In Vehicles………………27

IV.     The Risk Evaluation And Rule Fail To Address the Risks of Asbestos Environmental Releases As Required By TSCA…………....33

V.     EPA Lacks Substantial Evidence to Conclude that Importation and Distribution in Commerce of Asbestos do not Present an Unreasonable Risk of Injury…………………………………………………...…...38

VI.     Petitioners Have Standing to Seek Review of the Part 1 Rule………..40

CONCLUSION…………………………………………………………...…...47

CERTIFICATE OF SERVICE………………………………………………….49

CERTIFICATE OF COMPLIANCE……………………………………………50

# TABLE OF AUTHORITIES

## CASES

*American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490 (1981)…………………………………………………………………24

*American Iron & Steel Institute v. OSHA*, 577 F.2d 825 (3d Cir. 1978)………...24

*Asbestos Disease Awareness Org. v. Wheeler,* 508 F. Supp. 3d 707 (N.D. Cal. 2020)…………………………………………………………………16,47

*C. and S. W. Services, Inc. v. U.S. E.P.A.*, 220 F.3d 683 (5th Cir. 2000)………...41

*Chemical Manufacturers Association v. EPA*, 859 F.2d 977 (D.C. Cir. 1988)….16

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dept. of Transportation*, 98 F.4th 178 (5th Cir. 2024)……………………………..…1,43

*Corrosion Proof Fittings* v. EPA, 947 F.2d 1201 (5th Cir. 1991)…………...6,8,19

*Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001)…………..23

*Friends of Boundary Waters Wilderness v. Thomas*, 53 F.3d 881 (8th Cir. 1995)……………………………………………………………..24

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000)…………………………41

*Fund for Animals v. Babbitt,* 903 F. Supp. 96 (D.D.C.1995)…………………...24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)………………………...41

*Inhance Technologies  v. Environmental Protection Agency,* 96 F.4th 888 (5th Cir. 2024)……………………………………………………………....20

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.* 878 F.3d 271 (D.C. Cir. 2017)…………………………………………………………26

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)……………...42,47

*Physicians Comm. For Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006). …………………………………………………………………………...6

*Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827 (5th Cir. 2023)…………………47

*United Steelworkers v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980)…………….24

**STATUTES**

**Occupational Safety and Health Act**

29 U.S.C. §655(b)(6)(A)…………………………………………………………26

**Toxic Substances Control Act**

Section 3(4), 15 U.S.C. §2602(4)……………………………………….9,17,34

section 3(12), 15 U.S.C. §2602(12)………………………………………….38

Section 5(a), 15 U.S.C. §2604(a)…………………………………………….20

Section 6, 15 U.S.C. §2605……………………………………….…..6

Section 6(a), 15 U.S.C. § 2605(a)…………………………………… 9,10,28,32

Section 6(b). 15 U.S.C. §2605(b)………………………………….…17,33,38

Section 6(d), 15 U.S.C.§2605(d)…………...………………………...10,23,26,27

Section 6(g), 15 U.S.C. §2605(g)……………………………………...26,27

Section 19(a), 15 U.S.C. § 2618(a)…………………………………………..2

Section 19(c), 15 U.S.C. § 2618(c)……………………………………………16

Section 202(3), 15 U.S.C. §2642(3)………………………………..…12

**REGULATIONS**

29 CFR §1910.1001……………………………………………………...35

40 CFR part 61………………………………………………………………..36

40 CFR §704.180………………………………………………………………16

40 CFR §721.11095…………………………………………………………….20

40 CFR §751.107(a)…………………………………………………………19

40 CFR §751.505(c)………………………………………………………...21

40 CFR §751(d)-(e). …………………………………………………………28

40 CFR §751.511**………………………………………………………..**32


## FEDERAL REGISTER NOTICES

54 Fed. Reg. 29460 (July 12, 1989)…………………………………………..6

81 Fed. Reg. 91927 (Dec. 19, 2016)...................................................................8

84 Fed. Reg. 17345 (April 25, 2019)……………………………………..19,20

85 Fed. Reg. 18954 (April 3, 2020)……………………………………………...8

86 Fed. Reg. 89 (Jan. 4. 2021)……………………………………………………..8

87 Fed. Reg. 21706 (April 12, 2022)……………………………………..28,35

88 Fed. Reg. 39652 (June 16, 2023)………………………………………19

88 Fed. Reg. 74712 (Oct. 31, 2023)……………………………………19

89 Fed. Reg. 47782 (July 23, 2023)……………………………………16

89 Fed. Reg. 21970 (March 28, 2024)………………………..9,22,25,32.36,37

89 Fed. Reg. 39254 (May 8, 2024)………………………………………..19


## LEGISLATIVE HISTORY

H.R. Rep. No. 94-1341 (1976)…………………………………………34,35

S. Rep. No. 94-698 (1976)…………………………………………..34,35

162 Cong. Rec. S326 (May 26, 2016)……………………………………..8

162 Cong. Record – Senate 3515 (June 16, 2016)………………………….. 10

162 Cong. Record -- Senate 3517 ( June 7, 2016)……………………………8

162 Cong. Record – Senate 3519 (June 16, 2016)…………………………...23

**OTHER**

EPA, New Chemical Determinations, December 2019,
https://www.epa.gov/sites/default/files/202104/documents/new_chems_
working_approach_-_12.20.19_final_with_disclaimer.pdf............................19

EPA, Draft Supplement to the Risk Evaluation for 1,4-Dioxane, July 2023
Draft Supplement to the Risk Evaluation for 1,4-Dioxane (epa.gov)………..35


Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/definition.………………………………………......23

**INTRODUCTION**

Petitioners are four public health organizations, two unions of fire fighters, and twelve leading researchers on asbestos disease and respected doctors who have devoted their careers to treating asbestos victims. The petitioners are long-standing advocates of a comprehensive national ban on asbestos -- the most hazardous substance in widespread use since the industrial revolution and the cause of millions of deaths worldwide.

Petitioners are challenging the Part 1 chrysotile asbestos rule promulgated by the U.S. Environmental Protection Agency ("EPA") under the Toxic Substances Control Act ("TSCA"). As demonstrated in this Brief, while the rule is a positive step forward, the health protections it provides are limited and incomplete and fail to fulfill EPA's responsibilities under TSCA. Because the rule cannot pass legal muster, it must be remanded by this Court and significantly strengthened by EPA.

**JURISDICTIONAL STATEMENT**

On April 19, 2024, Asbestos Disease Awareness Organization ("ADAO") filed a timely petition for review of the EPA rule entitled *Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances*, 40 C.F.R. Part 751. Another timely petition for review was filed by seventeen organizations and individuals on June 7, 2024. This Court has jurisdiction to review the rule pursuant to TSCA § 19(a)(1)(A). 15 U.S.C. § 2618(c)(1)(A).

# ISSUES PRESENTED FOR REVIEW

1.      Did EPA's Part 1 risk evaluation and rule violate TSCA by failing to address documented ongoing uses and discontinued but reasonably foreseen future uses of asbestos?

2.      Did the rule improperly fail to set a compliance date for chlor-alkali producers that was as soon as practicable?

3.      Did the rule violate section 6(a) of TSCA by failing to eliminate the unreasonable risks of repair and servicing of asbestos parts in vehicles?

4.      Did EPA's risk evaluation and rule fail to address the risks of asbestos environmental releases as required by TSCA?

5.      Did EPA lack substantial evidence to conclude that importation and distribution in commerce of asbestos do not present an unreasonable risk?

6.      Do the 18 petitioners have standing to challenge the Part 1 rule?

# STATEMENT OF THE CASE

## A.      Dangers of Asbestos

For over a century, asbestos has been known to cause widespread disease and death.[1] In a monograph on asbestos published in 2012, the International

---

[1] The footnote citations provided below are drawn from ADAO submissions to the docket, including its comments on the draft risk evaluation and proposed Part 1 rule. See ARB51.7-10 and ARC397.6-8.

Agency for Research on Cancer ("IARC") found asbestos exposure to be causally related to lung cancer, malignant mesothelioma, ovarian cancer, and cancer of the larynx in humans.[2] There is evidence of causal associations with gastrointestinal cancers and kidney cancer. Non-malignant diseases caused by asbestos include asbestosis and asbestos-related pleural thickening. "There is general agreement among scientists and health agencies . . . [that] [e]xposure to any asbestos type (i.e., serpentine [chrysotile] or amphibole) can increase the likelihood of lung cancer, mesothelioma, and nonmalignant lung and pleural disorders."[3]

IARC,[4] the Occupational Safety and Health Administration ("OSHA"),[5] the Department of Health and Human Services,[6] the National Institute for Occupational Safety and Health ("NIOSH"),[7] the World Health Organization ("WHO") and a number of other regulatory and public health bodies recognized asbestos as a demonstrated human carcinogen decades ago.

For the last 120 years, use of asbestos has been massive in scale. According to the U.S. Geological Survey ("USGS"):[8]

---

[2] IARC. Monograph 1OOC: Asbestos (Chrysotile, Amosite, Crocidolite, Actinolite· and· Anthophyllite), Lyon: International Agency for Research on Cancer (2012)
[3] Agency for Toxic Substances and Disease Registry U.S. Department of Health & Human Services. Toxicological Profile for Asbestos (2001).
[4]  http://monographs.iarc.fr/ENG/Monographs/vol100C/mono100C.pdf.
[5] https://www.osha.gov/laws-regs/federalregister/1994-08-10
[6] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/asbestos.pdf.
[7] https://www.cdc.gov/niosh/docs/2011-159/pdfs/2011-159.pdf
[8] https://www.usgs.gov/media/files/asbestos-historical-statistics-data-series-140.

- From 1900 to today, the U.S. has consumed more than 31 million metric tons of asbestos;

- From 1991 to 2002, the U.S. has mined 111,420 metric tons of asbestos until the last domestic mine closed in 2002;

- From 1991 to 2018 the EPA has allowed 280,325 metric tons of asbestos to be imported.

The human cost of asbestos exposure has been staggering and the death toll enormous. From 1991 to 2017, more than one million Americans died from preventable asbestos-caused diseases.[9] "The economic burden of lung cancer and mesothelioma associated with occupational and para-occupational asbestos exposure is substantial."[10] According to WHO, the annual global health care costs associated with the health effects of asbestos are estimated to be US $ 2.4–3.9 billion, excluding the additional costs of pain, suffering and welfare losses.[11]

The American Thoracic Society has stated that "[a]sbestos has been the largest single cause of occupational cancer in the United States and a significant cause of disease and disability from nonmalignant disease."[12] The danger extends far beyond manufacturing plants— fire fighters, construction workers, building repair and maintenance employees, auto mechanics and schoolteachers are among

[9] http://ghdx.healthdata.org/gbd-results-tool?params=gbd-api-2017 permalink/535c35ab1fc10471f721c9b58eecd3c2

[10] https://www.nera.com/publications/archive/2017/asbestos--economic-assessment-of-bans-and-declining-production-a.html

[11] http://www.euro.who.int/data/assets/pdf_file/0009/341757/Asbestos_EN_WEB_r educed.pdf?ua=1.

[12] https://www.atsjournals.org/doi/full/10.1164/rccm.200310-1436ST

the workers at increased risk for asbestos related disease. For example, a 2013 study by NIOSH of firefighters in three cities found that they "had a rate of mesothelioma two times greater than the rate in the U.S. population as a whole" and "it was likely that the[se] findings were associated with exposure to asbestos."[13] Asbestos fibers can also be carried home on the clothing, skin, and hair of workers, exposing their family members to asbestos' harmful effects. [14]

Despite the elimination of many asbestos products due to corporate liability, asbestos deaths – calculated to be over 40,000 per year in the US[15] – remain high, demonstrating that millions of Americans continue to be exposed to asbestos.

There is overwhelming consensus in the scientific community that asbestos has no safe level of exposure. In his comments on the draft EPA evaluation, petitioner Dr. Richard Lemen, formerly Assistant US Surgeon General, emphasized that "[t]he historical lessons repeatedly show we are incapable of identifying a threshold level of exposure below which individuals are not at risk of asbestos disease."

B.    Regulation of Asbestos under Original TSCA

---

[13]  https://www.cdc.gov/niosh/updates/upd-10-17-13.html
[14] Final Risk Evaluation ("FRE"), ARB117.30.
[15] ARD569; S. Furuya, O. Chimed-Ochir, K. Takahashi, A. David, and J. Takala, "Global Asbestos Disaster," *International Journal of Environmental Research and Public Health,* vol. 15, no. 5, p. 15, 2018.

"Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to . . . toxic chemical substances." *Physicians Comm. For Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006).  Central to the law is section 6, 15 U.S.C. §2605, which requires EPA to conduct rulemaking on chemicals  determined to present unreasonable risks of injury to health or the environment and to ban or restrict these chemicals where necessary to eliminate such risks.

Responding to growing evidence of the dangers of asbestos, EPA made preventing exposure under TSCA a top priority in the 1980s. The Agency issued a rule in 1989 under section 6(a) of TSCA prohibiting the manufacture, importation, processing or distribution in commerce of asbestos in almost all products.[16] However, this Court overturned the rule in 1991. *Corrosion Proof Fittings* v. EPA, 947 F.2d 1201, 1216-17, 1222-23 (5th Cir. 1991). The Court did not question the dangers of asbestos but found that EPA did not comply with TSCA requirements to balance costs and benefits and adopt the "least burdensome" regulatory alternative. For the next 33 years, asbestos  importation and use were largely unrestricted in the U.S. even though over 60 countries banned asbestos. ARB51.1.

### C.   2016 TSCA Amendments and Focus on Asbestos

---

[16] 54 Fed. Reg. 29460 (July 12, 1989).

After a multi-year effort to overhaul and strengthen its key provisions, TSCA was amended in 2016 with overwhelming bi-partisan support.  These amendments enhance the core chemical regulatory authorities in TSCA and seek to increase the pace and stringency of chemical risk management. For example, Congress strengthened section 6 by requiring EPA to evaluate a minimum number of substances for unreasonable risk, setting deadlines for completing risk evaluations and follow-up rulemakings, precluding EPA from considering costs and other non-risk factors in risk determinations, and eliminating the requirement to adopt the least burdensome alternative.[17]

These changes in TSCA  were largely spurred by EPA's inability to ban asbestos. As interest in TSCA reform gathered steam, asbestos became a poster child for the law's deficiencies. The 1991 decision provided a blueprint for how to strengthen the statute, and the 2016 amendments removed the barriers to regulation that caused this Court to overturn the 1989 asbestos ban. It was Congress' goal to "fix[] the . . . problems in the law that caused the asbestos ban to be overturned and

---

[17] Under amended section 6(a) of TSCA, "[i]f the [EPA] Administrator determines . . . that the . . . use . . . of a chemical substance . . . presents an unreasonable risk of injury to health or the environment, the Administrator *shall* by rule" impose one or more of the restrictions authorized in sections 6(a)(1)-(7). 15 U.S.C. § 2605(a)(1)-(7) (emphasis added). These restrictions apply to all phases of a chemical's life-cycle and may include prohibitions or limitations on manufacture, processing, use, distribution or disposal.  Section 6(a) directs that the rule must ban or restrict the chemical "to the extent necessary so that [it] no longer presents such [unreasonable] risk."

that paralyzed EPA and prevented them from regulating some extremely toxic chemicals."[18]

## D.  Evaluation and Regulation of Chrysotile Asbestos Under the New Law

After the new law took effect, there was strong interest in reinstating the 1989 ban. In late 2016, prodded by ADAO and other groups, EPA selected asbestos as one of the first 10 substances to undergo risk evaluations under amended TSCA. 81 Fed. Reg. 91927 (Dec. 19, 2016). EPA's Draft Risk Evaluation ('DRE") for chrysotile asbestos was made available for public comment and peer review on April 3, 2020 (85 Fed. Reg. 18954) and the Final Risk Evaluation ("FRE") was released on January 4, 2021 (86 Fed. Reg. 89). The evaluation determined that six chrysotile Conditions of Use ("COUs") present an unreasonable risk to human health. Proposed and final risk management rules for these COUs under section 6(a) followed on April 12, 2022 (87 Fed. Reg. 21706) and March 28, 2024 (89 Fed. Reg. 21970). The final rule imposed full or partial bans on the six COUs and

_____

[18] 162 Cong. Rec. S3265 (daily ed. May 26, 2016) (statement of Sen. Markey); *see also* 162 Cong. Rec. S3517 (daily ed. June 7, 2016) (explaining that, by "delet[ing] the paralyzing 'least burdensome' requirement in the existing law and instruct[ing] that EPA's rule must ensure that the chemical substance or mixture 'no longer presents' the unreasonable risk," the amended TSCA "clearly rejects the regulatory approach and framework that led to the failed asbestos ban and phase-out rule of 1989 [rejected in *Corrosion Proof Fittings*]").

required interim workplace controls for two COUs that would be phased out over time.

## SUMMARY OF ARGUMENT

The Part 1 rule is a step forward in addressing the serious risks of asbestos after three decades of inaction against this lethal threat.   However, because of its limitations and gaps, the rule falls far short of imposing a comprehensive asbestos ban and its flaws represent a failure to carry out EPA's responsibilities under TSCA. This Court should find that the rule is legally deficient in five critical areas and must be strengthened by the Agency**.**

1.  The rule restricts only six chrysotile asbestos COUs and does not address the five other asbestos fiber types. Contrary to TSCA, EPA excluded several current chrysotile uses documented in the record, claiming that they were not ongoing and did not warrant restriction under Part 1. More fundamentally, Part 1 left the door wide open to the market re-entry of numerous discontinued products containing chrysotile or other fibers. These dormant asbestos products are "known" and their resumption is "reasonably foreseen," thus satisfying the definition of "condition of use" in TSCA section 3(4) and requiring their restriction in the Part 1 rule.

2.  Section 6(d)(1) of TSCA requires EPA to set compliance dates for rules imposing ban or phaseout requirements that are "as soon as practicable." The common meaning of "practicable" is "achievable" or "feasible." Decisions under

other laws define "feasible" as "capable of being done" and recognize that if a regulatory standard is achievable by "the typical firm . . . , it is considered feasible for the entire industry." EPA's two-tier compliance schedule for chlor-alkali producers violated this principle. Instead of setting a uniform compliance deadline based on the most expeditious conversion technology, EPA gave the practitioner of this technology (Olin Corporation) five years to comply but granted twelve years to its competitor (Occidental Chemical), which chose a more time-consuming conversion technology for business reasons.

3. EPA concluded that the repair and servicing of asbestos brake linings, clutches and gaskets installed in existing vehicles presents an unreasonable cancer risks to auto mechanics and do-it-yourself ("DIY") consumers. However, it limited Part 1 requirements to the future importation and use of aftermarket asbestos parts and exempted all other servicing and repair of asbestos-containing vehicles now in use. This exemption violated section 6(a), which provides that, where it makes a finding of unreasonable risk, EPA "shall by rule . . . apply one or more of the . . .requirements" in section 6(a)(1)-(7) as needed to eliminate that risk. On remand, EPA must address the unreasonable risks of asbestos exposure during vehicle servicing as TSCA requires.

4. In its FRE, EPA claimed that TSCA did not require it "to evaluate and regulate potential exposures and risks from [environmental] media" subject to

other environmental laws. Accordingly, the Agency's unreasonable risk determinations "do not account for exposures to the general population" from air emissions, contaminated wastewater and drinking water, and waste disposal. This exclusion of environmental exposure pathways from the asbestos evaluation violated TSCA, which calls for a comprehensive accounting of all exposure sources that may affect human health.

5. EPA determined that importation and distribution in commerce of asbestos and asbestos-containing products do not present an unreasonable risk. This sweeping conclusion lacks substantial evidence in the record and is contradicted by EPA's own recognition of the danger of spills and releases when asbestos is imported and transported. The Court should vacate EPA's no unreasonable risk determination for importation and distribution and remand it for reconsideration by EPA.

6. As required by the standing decisions of this Circuit and the Supreme Court, three petitioners -- International Association of Firefighters ("IAFF") Local F-253 (Fort Myer Professional Firefighters) ("Local F-253"), American Public Health Association ("APHA") and ADAO -- have submitted declarations showing that the deficiencies of Part 1 harm both the petitioners' organizational interests and the health and professional interests of their members and supporters and that a favorable decision by this Court would redress these harms. The standing

demonstrations of these petitioners are sufficient to establish the standing of the other 15 petitioners filing this Brief.

**ARGUMENT**

## I. EPA's Risk Evaluation and Rule Failed to Address Documented Ongoing Uses and Reasonably Foreseen Future Uses of Asbestos

EPA's Part 1 rule restricts only six chrysotile asbestos conditions of use and does not address the five other asbestos fiber types despite their inclusion in TSCA's definition of asbestos.[19] Thus, the rule falls well short of the comprehensive asbestos ban that EPA tried but failed to put in place in 1989 and Congress envisioned when amending TSCA in 2016. As a result, the rule opens the door to unregulated and unsafe future exposure to asbestos in homes, commercial buildings and factories. As shown below, Part 1 is flawed because EPA lacked substantial evidence to conclude that several chrysotile asbestos uses documented in the record were not ongoing and could be omitted from Part 1. More fundamentally, EPA failed to apply the TSCA definition of "conditions of use" to

---

[19] Section 202(3) of TSCA, 15 U.S.C. §2642(3) defines "asbestos" as "asbestiform varieties of—
(A) chrysotile (serpentine),
(B) crocidolite (riebeckite),
(C) amosite (cummingtonite-grunerite),
(D) anthophyllite,
(E) tremolite, or
(F) actinolite.

currently dormant uses of chrysotile and other fibers whose resumption can be

"reasonably foreseen."

**A. EPA Lacked Substantial Evidence to Exclude From Its Rule Ongoing Chrysotile Uses Documented in the Record**

During development of the Part 1 risk evaluation and risk management rule,

public commenters and the Agency's Scientific Advisory Committee on Chemicals

("SACC") provided extensive evidence of current and recent asbestos uses

excluded from Part 1. A 2019 decision by the Northern District of California also

faulted EPA's inadequate collection of use information for Part 1. However, EPA

adamantly insisted that all ongoing asbestos uses were addressed in its rule and

disregarded extensive evidence to the contrary.

As its Part 1 evaluation progressed, government reports and public

comments identified several current or recent asbestos-containing products. The

United States Geological Service ("USGS") *2018 Minerals Yearbook* (ARC695)

listed the following imported asbestos products in 2017 and 2018: asbestos cement

products; clothing; compressed asbestos fiber jointing paper, millboard, and felt;

building materials; yarn and thread; cords and string; woven or knitted fabric; and

products for use in civil aircraft. EPA's June 2017 *Use and Market Profile for*

*Asbestos* (ARA85) identified a similar array of imported products. In comments on

the EPA scoping process, Safer Chemicals Healthy Families, a public interest

group, provided evidence of continued asbestos use in window glazing, roofing and recycled asphalt shingle scrap. ARA109.

Consistent with earlier analyses, EPA's Scoping Document (ARA86.8) likewise identified numerous current asbestos containing products:

> Remaining asbestos-containing products available for consumer use in the United States include a limited number of roof and non-roof coatings, adhesives, sealants, gaskets and imported aftermarket friction products. USGS import data suggests other asbestos- containing products (e.g., asbestos containing building materials; woven materials) are manufactured outside the United States and imported for domestic use (USGS, 2016).

EPA staff also conducted an online search identifying nine products that were either advertised as containing asbestos or had Safety Data Sheets listing asbestos as a constituent (ARA86.6-7)

EPA's 2018 Problem Formulation narrowed the COUs EPA planned to address but included asbestos cement products, other gaskets and packing equipment seals, and woven products. ARA131.

In its review of the DRE, the SACC was skeptical that it included all imported asbestos products:

> The DRE states that it is "highly certain" that import of ACM beyond the six product categories does not occur. Given USGS data on imports, the following HTS codes were not specifically addressed in the DRE: 6812.99.0004 (yarn and thread); 6812.99.0004 (crocidolite products except footwear); 6812.91.9000 (clothing except footwear); 6812.99.0025 (building materials).

ARB113.71. The SACC also indicated that:

several members searched online and found information that at least suggests that asbestos bearing products are in circulation, including chats, how-to videos, junkyard parts listings, online advertisements of wholesale quantities, etc.

(18.)  Of particular concern to the SACC was "that asbestos-containing construction materials are still in commerce" but that the DRE failed to address risks to construction workers (79). The SACC itself was able to verify the availability of asbestos-containing construction products on the Web. (Id.) It concluded that "EPA's environmental and human health risk evaluation for asbestos was not considered adequate" because  it only addressed "a narrow group of workers and consumer users" (17).

On December 22, 2020, Judge Chen (N.D. Cal.) granted summary judgment in favor of ADAO and its co-plaintiffs and found that EPA's failure to require mandatory TSCA reporting on asbestos use and exposure to inform Part 1 was arbitrary and capricious:

> "[T]he EPA has missed substantial reasonably available information. First, the asbestos-containing articles which EPA identified appear to be only the tip of the iceberg. The United States Geological Survey identifies, in its 2015 and 2017 Minerals Yearbook for asbestos, a number of asbestos-containing articles which EPA does not account for in its 2017 DRE Scoping Document or its 2019 Problem Formulation. . . . These findings by USGS indicate that EPA is not accounting for certain asbestos-containing articles that are imported into the U.S., for which quantity information is unknown."

*Asbestos Disease Awareness Org. v. Wheeler,* 508 F. Supp. 3d 707, 725 (N.D. Cal. 2020). The court added that EPA had failed to "expressly capture with any

specificity the multitude of building materials containing asbestos (*e.g.* wallboard and floor tiles, window caulking, recycled asphalt shingle scrap, adhesive mastic)." Id. at 727 (emphasis in  original).

The court directed EPA to use its TSCA reporting authority to propose a rule requiring industry to submit information on asbestos use and exposure. EPA ultimately promulgated such a rule on July 23, 2023. 89 Fed. Reg. 47782; 40 CFR §704.180. But reporting was not completed in time to impact the final Part 1 rule.

EPA's FRE (released after Judge Chen's decision) refused to add any COUs to the risk evaluation. ARB117.44. Instead, it pointed to its limited and cursory outreach to exporters and industry organizations which purported to demonstrate that Customs records, USGS reports and other documentation of ongoing uses were inaccurate (272-273). These efforts were insufficient to overcome the extensive evidence in the record of several additional ongoing COUs.  Thus, EPA's exclusion of these COUs from the FRE was not supported by "substantial evidence in the rulemaking record . . . taken as a whole" as required by section 19(c)(1)(B)  of TSCA.  *Chemical Manufacturers Association v. EPA*, 859 F.2d 977, 992 (D.C. Cir. 1988) (TSCA's "substantial evidence" review is "more searching" and "demanding" than Administrative Procedure Act substantial evidence review).

## B. EPA's Failure to Treat Discontinued Asbestos Uses as Reasonably Foreseen Future Uses Subject to its Rule Was Contrary to TSCA

EPA's limitation of Part 1 to six chrysotile COUs suffered from a more basic flaw. Uses that have been discontinued may be "known" and reasonably foreseen" within TSCA's definition of "conditions of use" and, if so, must be addressed in determining and managing unreasonable risks.[20] EPA failed to apply this requirement because it erroneously believed that its April 2019 Significant New Use Rule ("SNUR") for asbestos barred the resumption of former asbestos uses.

Under section 6(b)(4)(A), 15 U.S.C. §2605(b)(4), EPA risk evaluations must "determine whether a chemical substance presents an unreasonable risk of injury. . . under the conditions of use." TSCA section 3(4), 15 U.S.C. §2602(4), defines "conditions of use" as the "circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." This language is both retrospective and forward looking. For example, an asbestos use which has occurred in the past would be deemed "known" even if it is not

---

[20] Thus, even if the Court concluded that the uses described in section I.A. above were not ongoing, they could still comprise TSCA COUs if they are "known" or "reasonably foreseen." The evidence in the record that these asbestos products were imported regularly and in significant qualities in the recent past (even assuming importation is not occurring now) provides a basis to conclude that imports may resume and are "reasonably foreseen."

presently ongoing. Similarly, as EPA has advised in guidance for its TSCA new chemicals program, "reasonably foreseen" uses include "those future circumstances of manufacture, processing, distribution, use and disposal that EPA expects might occur."[21] This standard would be met for a long-standing use of asbestos that has been phased out but may be expected to re-enter commerce. Moreover, as EPA's new chemical guidance indicates, if a "[] chemical substance is already currently used outside the U.S., . . . it may be reasonable to foresee that such use could occur inside the U.S."[22]

At the time of TSCA's enactment, its Senate Democratic sponsors stressed that the law's COU terminology would assure that section 6(a) rules could prohibit future chemical uses. Although the TSCA amendments removed the phrase "will present" from section 6(a), the Democratic sponsors made clear that this change --

> …does not reflect an intent on the part of Congressional negotiators to remove EPA's authority to consider future or reasonably anticipated risks in evaluating whether a chemical substance or mixture presents an unreasonable risk to health or the environment. In fact, a new definition added to TSCA explicitly provides such authority and a mandate for EPA to

---

[21] EPA, New Chemical Determinations, December 2019, https://www.epa.gov/sites/default/files/202104/documents/new_chems_working_approach_-_12.20.19_final_with_disclaimer.pdf.

[22] This is the case for asbestos. It continues to be mined in Russia, China and Kazakhstan and asbestos products are used widely in India, China, Russia, Indonesia, Uzbekistan, Vietnam, Thailand, Sri Lanka, and Bangladesh. ARC695.3. The prevalence of these uses in major markets is evidence that they could return to the US if allowed under US law.

consider conditions of use that are not currently known or intended but can be anticipated to occur . . .

Cong. Record – Senate 3515 (June 16, 2016).[23]

In keeping with this legislative intent, EPA's section 6(a) rule for methylene chloride (also under review by this Court) expressly prohibits *all* consumer, commercial and industrial COUs, except those that are exempt because they do not present unreasonable risks. This prohibition includes uses that are not occurring now but were previously discontinued or may be initiated in the future. 40 CFR § 751.107(a); 89 Fed. Reg. 39254 (May 8, 2024). EPA took the same approach in proposed rules for perchloroethylene (88 Fed. Reg. 39652 (June 16, 2023)) and trichloroethylene (88 Fed. Reg. 74712 (October 31, 2023)).  This expansive approach embodies a diametrically opposite interpretation of TSCA from the Part 1 rule.

In the FRE, EPA maintained that discontinued uses of asbestos were not COUs under section 6 because it was "highly certain" that the 2019 SNUR would prevent all such uses from re-entering commerce.  ARB117.213-14. The SNUR, however, does not ban any use of asbestos and makes no findings of "unreasonable

---

[23] Based on the "will present" language, this Court in *Corrosion Proof Fittings* upheld provisions in the 1989 rule "ban[ning] products that once were, but no longer are, being produced in the United States." 947 F.2d at 228. The legislative history in the text confirms that the COU definition in the new law performs the same purpose as "will present" in the old law.

risk." 40 CFR §721.11095; 84 Fed. Reg. 17345 (April 25, 2019). Instead, in accordance with section 5(a)(1)(B), 15 U.S.C. §2604(a)(1)(B), it simply requires companies seeking to conduct activities designated as "significant new uses" to notify EPA at least 90 days before initiating them.[24] The Agency can then determine whether the notified uses present unreasonable risks and should be restricted or whether such risks are "not likely" and the new use should proceed without restriction. Contrary to EPA, the SNUR offers no "certainty" that any new use of asbestos will be blocked from commercialization.

Moreover, in its recent decision in *Inhance Technologies  v. Environmental Protection Agency,* 96 F.4th 888, 893-894 (5th Cir. 2024), this Court held that a "new use" for SNUR purposes cannot be "previously existing" and that "Section 5 is intended only to regulate significant new uses prior to first manufacture."  Under this holding, pre-existing but discontinued uses of asbestos could not be "new uses" and the SNUR would be unenforceable.[25]  Notably, the Court emphasized that, rather than using its SNUR authority, "[t]he agency can properly proceed . . . under TSCA's section 6." Id at 895.  This is the precise path EPA refused to take here.

---

[24] The SNUR identifies 14 discontinued asbestos uses as "significant new uses" plus a catch-all category of "any other use of asbestos." 84 Fed. Reg. 17347-48.
[25] Although petitioners do not necessarily agree with the reasoning of *Inhance*, it is controlling law in this Circuit.

In sum, Part 1 violated TSCA by only prohibiting a limited set of ongoing chrysotile uses and providing no protection against long-standing but dormant uses of chrysotile and other fibers resuming in the future. The Part 1 rule should be remanded to EPA to identify previous asbestos uses that qualify as TSCA COUs and must be addressed under section 6.

## II.    The Rule Violates TSCA By Failing to Set a Compliance Date For Chlor-alkali Producers that is As Soon as Practicable

EPA's Part 1 rule adopted a two-tier compliance schedule which differentiates between chlor-alkali producers based on the process they select for transitioning away from asbestos. Where the producer replaces asbestos diaphragms with non-asbestos diaphragms, the rule requires conversion in five years. However, when the producer chooses the more complex membrane process and plans to install it at three facilities, the rule provides up to 12 years to continue asbestos use. 40 CFR §751.505(c).

Two chlor-alkali producers are major users of asbestos diaphragms: Olin Corporation (the largest manufacturer of chlorine and caustic soda in the US and the world) and Occidental Chemical.[26] As EPA knew, Olin planned to convert its plants using non-asbestos diaphragms whereas Occidental intended to install

---

[26] A third, Westlake Chemical, has one asbestos diaphragm facility. 89 Fed. Reg. 21978. All but one of the eight operating asbestos diaphragm facilities are in Texas or Louisiana. ARC753.2-5

membrane technology.[27] EPA's two-tier compliance schedule gave Occidental

seven more years than Olin to continue to use asbestos diaphragms, thereby

accommodating Occidental's business interests while prolonging unreasonable

risks to its chlor-alkali workers and nearby communities.

EPA explained why conversion to non-asbestos diaphragms can be

accomplished quickly:

> The process to convert a chlor-alkali facility from asbestos diaphragms to
> non-asbestos diaphragms is not as complex as the process to convert to
> membrane technology; it requires fewer design changes, less construction,
> and may be performed over several years without significant disruption of
> facility operations or product output. Significantly, the conversion to non-
> asbestos diaphragms can proceed concurrently at several facilities.

89 Fed. Reg. at 21980. By contrast, EPA found that:

> Membrane technology conversions are more complicated than diaphragm
> technology conversions. Membrane technology conversions require new
> cells, as well as multiple other plant infrastructure changes, including
> changes to: brine processing, caustic soda handling, piping, storage tanks,
> and power supply.

Id. EPA also noted that, according to Occidental, "conversion of multiple facilities

to membrane technology . . . can only be accomplished in a sequential conversion

---

[27] Olin submitted a plan proposing 7 years for conversion using non-asbestos
diaphragms but EPA found that this was not "as soon as practicable" under TSCA
and allowed only five years for compliance. In contrast, Occidental submitted a
plan for conversion to the membrane process at three plants and requested between
12 and 15 years for compliance. EPA found that this deadline was "as soon as
practicable" for membrane technology and gave Occidental up to 12 years to
continue using asbestos diaphragms. 89 Fed. Reg. 21981-2.

process." This was because of several constraints that did not apply to non-asbestos diaphragms: "the limited global supply of essential metals, the limited capacity to produce electrode elements [and] the limited number of specialized electrochemical and technical experts for chlor-alkali facilities." Id.

Section 6(d)(1)(C)-(D) of TSCA provides that, where rules ban or phaseout substances, implementation shall start "as soon as practicable but no later than 5 years from the date of promulgation" and must be completed "as soon as practicable." According to the Democratic sponsors of the TSCA amendments, compressed compliance deadlines are critical "[t]o realize the risk reduction benefits of the rule" as expeditiously as possible: "[w]hile EPA could in unusual circumstances delay compliance for as long as five years, this should be the exception and not the norm." 162 Cong. Record – Senate 3519 (June 16, 2016).

TSCA does not define "practicable." However, according to the Merriam-Webster dictionary, "practicable" means "capable of being put into practice or of being done or accomplished."[28] The dictionary lists as synonyms achievable, attainable, doable, feasible, possible, realizable, viable, and workable. Court decisions have held that, where used in a statute, the term practicable "imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 131

---

[28] https://www.merriam-webster.com/dictionary/practicable?src=sea.

(D.D.C. 2001); *Fund for Animals v. Babbitt,* 903 F. Supp. 96, 105 (D.D.C.1995)

("the phrase 'to the maximum extent practicable' . . . imposes a clear duty on the

agency to fulfill the statutory command to the extent that it is feasible or

possible.")

Since "practicable" is synonymous with "feasible," court cases construing

this term in other laws shed light on how EPA should interpret its obligations under

section 6(d). In *American Textile Manufacturers Institute, Inc. v. Donovan,* 452

U.S. 490, 509 (1981), the Court held that "feasible" as used in the Occupational

Safety and Health Act ("OSH Act") means "capable of being done." As the Court

explained, "Congress itself defined the basic relationship between costs and

benefits, by placing the 'benefit' of worker health above all other considerations

save those making attainment of this 'benefit' unachievable." *See also Friends of*

*Boundary Waters Wilderness v. Thomas*, 53 F.3d 881, 885 (8th Cir. 1995)

("feasible" means "physically possible").

Courts of appeals have defined feasibility as both technological and

economic. *American Iron & Steel Institute v. OSHA*, 577 F.2d 825, 832 (3d Cir.

1978). To be technologically feasible, a technology must be "either already in use

or has been conceived and is reasonably capable of experimental refinement and

distribution within the standard's deadlines." *United Steelworkers v. Marshall*, 647

F.2d 1189, 1272 (D.C. Cir. 1980). The technology will be deemed economically

feasible "if it does not threaten 'massive dislocation' to, or imperil the existence of the industry." *Id*. at 1265. Thus, differences among regulated parties in technology preferences or business strategies are not relevant to economic feasibility unless the most expeditious compliance method available will endanger the industry as a whole.

Accordingly, in setting a compliance deadline that is "as soon as practicable" for chlor-alkali producers, EPA should have addressed two issues: What is the earliest date by which the elimination of asbestos by chlor-alkali plants is technically achievable? And would meeting that date cause massive dislocation or threaten the industry's viability?

Plainly, converting to non-asbestos diaphragms was the most expeditious path to phasing out asbestos in the industry and Olin's decision to transition using this process demonstrated that it was technologically and economically feasible. Neither EPA nor Occidental claimed that converting to non-asbestos diaphragms was *not* practicable for other plants in the industry. Rather, Occidental chose the membrane process for business reasons: as EPA mentions, the process reduces energy costs and produces a more profitable grade of caustic soda as well as (according to Occidental financial reports) enabling it to expand production capacity. 89 Fed. Reg. 21980; ARC490.10.

But these factors are unrelated to TSCA's goal of eliminating unreasonable risk and do not justify prolonging exposure to unsafe chemicals to accommodate one company's business plans. As the DC Circuit has held, "OSHA need not show with certainty that all firms will be able to meet the new standard in all operations." If only some plants can achieve the standard, "then the standard is considered feasible for the entire industry." *N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin*. 878 F.3d 271, 290 (D.C. Cir. 2017). Instead of establishing a level playing field for the industry, EPA accommodated the technology requiring the longest time to implement and put the producer choosing the most efficient technology at a competitive disadvantage.

Congress provided a mechanism for addressing the unique compliance challenges of individual producers in TSCA section 6(g), which creates a case-by-case process for granting time-limited exemptions from compliance dates and other provisions of section 6(a) rules.[29] Under section 6(d)(1)(C), the "as soon as practicable" requirement does not apply "in the case of a use exempted under subsection (g)." Instead, such exemptions are justified where uses of a chemical are "critical and essential" and lack a "technically and economically feasible safer alternative"; their elimination would "significantly disrupt the national economy,

---

[29] The OSH Act creates a similar case-by-case process for obtaining temporary variances to address unique compliance challenges in meeting health standards determined to be feasible for the entire industry. 29 U.S.C. §655(b)(6)(A).

national security, or critical infrastructure"; or compared to alternatives, they provide "a substantial benefit to health, the environment, or public safety." This exemption process was the statutorily-required remedy for Occidental's compliance concerns.[30] However, it did not request an exemption and EPA failed to examine whether the section 6(g) exemption criteria were met for the membrane technology.

In sum, the compliance date provisions of Part 1 should be remanded for further consideration in light of the  practicability requirement of section 6(d)(1) and the availability of exemptions under section 6(g).

### III.    The Rule Fails to Eliminate the Unreasonable Risks of Repair And Replacement of Asbestos-Containing Parts In Vehicles

The six COUs addressed in EPA's FRE include repair and replacement of asbestos-containing parts in vehicles. Among these parts are asbestos-containing brakes and clutches, other friction products and gaskets installed in certain utility vehicles. The FRE analyzes asbestos exposure pathways for repair, servicing and replacement of these vehicle components and quantifies cancer risks for exposed

---

[30] Section 6(d)(2) provides that compliance dates under section 6(d)(1) "may vary for different affected persons." However, it is doubtful that this language was intended to negate the well-established caselaw defining "practicability" and "feasibility" or to undercut the primacy of the section 6(g) exemption process in providing relief from burdensome deadlines. Most likely, section 6(d)(2) was intended merely to authorize EPA to set different compliance dates for different industry sectors subject to section 6(a) rules (which EPA in fact did in Part 1).

populations (both auto mechanics and do-it-yourself consumers). ARB117.102-200. It determines that these risks exceed the established EPA benchmarks for unreasonable cancer risks ($1 \times 10^{-4}$ for workers and $1 \times 10^{-6}$ for consumers). ARB117.241-247.  As a result, the FRE makes determinations of unreasonable risk for:

- Commercial and Consumer Use and Disposal of Aftermarket Automotive Chrysotile Asbestos-Containing Brakes/Linings

- Commercial Use and Disposal of Other Chrysotile Asbestos-Containing Vehicle Friction Products

- Commercial and Consumer Use and Disposal of Other Chrysotile Asbestos-Containing Gaskets

ARB117.248.

TSCA section 6(a) required EPA to regulate these COUs "to the extent necessary so that [they] no longer present [unreasonable] risk[s]." This goal would have been realized under EPA's Part 1 proposal, which prohibited "processing, distribution in commerce and commercial use of chrysotile asbestos , , ,  in aftermarket automotive brakes and linings; other vehicle friction products; and other gaskets." Proposed § 751.X05(b); 87 Fed. Reg. at 21738. However, the final rule greatly narrows these prohibitions by exempting "[a]ny aftermarket automotive brakes and linings, other vehicle friction products, and other gaskets which are already installed" in vehicles as of November 25, 2024.  40 §CFR 751(d)-(e).  As a result, the rule only prohibits installation of aftermarket vehicle

parts, leaving workers engaged in repair, removal or servicing of previously installed asbestos parts without protection against unreasonable risks.

This gap in protection has significant health impacts. "Asbestos was previously a component of many automobile parts, including brakes, clutches, gaskets, seam sealants, and exhaust systems."[31] ARB117.103. Thus, numerous "vehicles on the road may have asbestos-containing brakes, whether from original manufacturers (primarily for older and vintage vehicles) or aftermarket parts" installed after the vehicle was purchased. ARB117.105. Brakes must be repaired and replaced periodically and "asbestos exposure may occur during removal and disposal of used parts, while cleaning the assemblies, and during handling and installation of new parts." ARB117.106. The Bureau of Labor Statistics estimated that 749,900 workers in the United States were employed as automotive service technicians and mechanics in 2016. ARB117.108. This includes "workers at automotive repair and maintenance shops, automobile dealers, gasoline stations, and automotive parts and accessories stores." Id. While only a percentage of these workers may service asbestos vehicle components, the actual worker population engaged in these activities may be sizable.

---

[31] The FRE did not "evaluate asbestos exposure resulting from brake repair/replacement work on 'other vehicles' like motorcycles, snowmobiles or tractors" because it lacked the data to perform this analysis. ARB117.134. These other vehicles could well contain asbestos components which result in exposure by workers and consumers during service activities.

In addition to workers who directly handle asbestos-containing vehicle components, EPA found that other employees "associated with automotive repair work are expected to" have exposure to asbestos "because automotive repair and maintenance tasks often take place in large open bays with multiple concurrent activities." Id. Moreover, a large number of DIY consumers perform maintenance and repair work on their own vehicles or those of friends and relatives. As EPA explains, asbestos exposure by these consumers may occur during "removal of the old brakes or shoes containing asbestos, cleaning of the brake housing, shoes, and wheel assembly." ARB117.124.

Similar asbestos exposure occurs during servicing of clutches, where "[w]orkers typically elevate vehicles to access the clutch assembly, remove dust and debris, and perform repair and replacement tasks." ARB117.107. As EPA found, "personal breathing zone asbestos concentrations while repairing or replacing asbestos-containing clutches are comparable to the concentrations for brake repair and replacement activity" and likewise present an unreasonable risk. Id.

Finally, EPA determined that asbestos-containing gaskets have been installed in the exhaust systems of one type of utility vehicle sold in the U.S. and are removed or repaired during servicing of vehicles at dealerships, repair and maintenance shops or by DIY consumers. The Agency estimated that 4500 workers

service utility vehicle engines that contain gaskets and these worker exposures to asbestos present unreasonable cancer risks. ARB117.120-21,200-202.

Even if a *new* asbestos-containing brake, clutch or gasket cannot be installed during these tasks under the final rule, EPA's analysis indicates that repair or replacement of an *existing* asbestos part will result in significant asbestos exposure. As EPA notes, mechanics are exposed to asbestos particles in brake dust when they remove or repair existing brakes. ARB117.106-07. Thus, "one of the main sources of exposure is the dust and debris that must be removed from the brake housing." ARB117.113.[32]

In short, so long as EPA's rule exempts all repair, removal and replacement of previously installed asbestos parts after November 1, 2024 and only prohibits their replacement with an aftermarket asbestos part, the unreasonable risk EPA identified in its FRE will remain unaddressed in violation of TSCA. In fact, EPA's rationale for exempting future servicing of asbestos vehicle parts now installed in vehicles had nothing to do with risk:

---

[32] In determining risks from servicing of asbestos brakes, EPA relied on studies that measure "brake job [time-weighted average] exposures" to asbestos — or "exposures that occur over the duration of a single brake repair activity." ARB117.95. These studies do not determine exposure levels for specific tasks during the brake job but measure cumulative exposure for the entire job. As a result, they provide no basis to conclude that, by prospectively banning use of aftermarket asbestos parts, the rule eliminates risks from repair or replacement of existing asbestos parts *already present in a vehicle*.

Public comments noted the difficulty in identifying asbestos components previously installed in vehicles . . . and without existing records, it may not be possible to establish that a vehicle's brakes do not contain asbestos unless they are replaced..

89 Fed. Reg. 21986. Even if these concerns had merit,[33] section 6(a) of TSCA gives EPA no discretion to withhold action to address an unreasonable risk for non-risk reasons. Instead, it "shall by rule . . . apply one or more of the . . .requirements" listed in section 6(a)(1)-(7) as necessary to eliminate the unreasonable risk. To accomplish this goal, EPA could require dealerships and repair shops servicing vehicles with asbestos parts to implement an Existing Chemical Exposure Limit ("ECEL") for asbestos, as Part 1 does for chlor-alkali plants and titanium-dioxide manufacturing. 40 CFR §751.511.[34]  But EPA did not consider this option.

An ECEL and the accompanying compliance measures required by Part 1 would have complied with TSCA by reducing asbestos exposure levels during vehicle servicing below EPA's benchmarks for unreasonable cancer risk. However,

---

[33] Other than the unsubstantiated claims of commenters, there is no evidence in the record of the "difficulty in identifying asbestos components previously installed in vehicles." Indeed, repair shops now performing these tasks are subject to the OSHA asbestos standard and presumably are able to determine which activities involve asbestos exposure subject to the standard.  ARB117.107.

[34] EPA apparently assumes that the only way to eliminate the risk is to prohibit all use of vehicles containing asbestos brakes and other components.  89 Fed. Reg. 21985. However, an ECEL would allow continued use and repair of vehicles containing asbestos parts while reducing risks to workers during these tasks.

TSCA did not allow EPA TSCA to take *no* action to eliminate these risks.

Therefore, the Court should remand the rule and direct EPA to address the

unreasonable risks of asbestos exposure during vehicle servicing as TSCA

required.

## IV.   The Risk Evaluation and Rule Fail to Address the Risks of Asbestos Environmental Releases As Required By TSCA

In the FRE, EPA "determined that exposures to the general population via

surface water, drinking water, ambient air and disposal pathways fall under the

jurisdiction of other environmental statutes administered by EPA." ARB117.32. As

a result,  EPA decided not "to evaluate and regulate potential exposures and risks

from those media under TSCA." Accordingly,  the Agency's unreasonable risk

determinations "do not account for exposures to the general population" from air

emissions, contaminated wastewater and drinking water, and waste disposal. Id.

EPA's exclusion of environmental exposure pathways from the scope of its

risk evaluation violated TSCA.  Under section 6(b)(4)(A), 15 U.S.C.

§2605(b)(4)(A), risk evaluations must determine "whether a chemical substance

presents an unreasonable risk of injury to health or the environment." This

requirement cannot be met without examining all sources of exposure that

contribute to health and environmental risk. Similarly, section 6(b)(4)(A) provides

that a risk evaluation must determine the substance's risks under "the conditions of

use." This term is defined under section 3(4) as  "the circumstances . . . under

which a chemical substance is intended, known or reasonably foreseen to be manufactured, processed, distributed in commerce, used or disposed of." These "circumstances" clearly include environmental releases that result from a chemical's manufacture, use or disposal and pose risks to exposed populations. Thus, while other environmental laws may play a role in controlling emissions and discharges, EPA must address these human exposure pathways under TSCA.

If Congress had intended a blanket exemption for environmental releases from TSCA risk evaluations, it would have said so. However, when it enacted TSCA in 1976, Congress recognized that existing environmental laws were "clearly inadequate" to address the "serious risks of harm" to public health from chemicals. H.R. Rep. No. 94-1341, at 7 (1976). While other federal laws focused on specific media, such as air or waste, none gave EPA authority to "look comprehensively" at the hazards of a chemical "in total." S. Rep. No. 94-698, at 2 (1976). Congress designed TSCA to fill these "regulatory gaps," S. Rep. No. 94-698, at 1, through a comprehensive approach that considered "the full extent of human or environmental exposure," H.R. Rep. No. 94-1341, at 6.

After the 2020 election, EPA reconsidered the approach it had taken in earlier evaluations, determining that "the exclusion of reasonably foreseeable exposures . . . from air, water, and disposal [] was inconsistent with the plain

language of TSCA section 6 and left potential risks . . . unaccounted for."[35]  The

proposed Part 1 rule affirms this new interpretation.[36] Nonetheless, EPA did not

reopen the Part 1 FRE to address general population risks from asbestos

environmental releases. Instead, it maintained that "any potential exposures to the

general population would be adequately addressed through the proposed

prohibition[s] in the rule . . .  to address the unreasonable risk posed to workers."

87 Fed. Reg.  21714. However, EPA nowhere explained why these worker

protections would eliminate or reduce asbestos environmental releases that may

put nearby populations at risk.[37] Indeed, since the rule allows continued use of

asbestos at chlor-alkali plants for up to 12 years and installation of new asbestos

gaskets by energy and chemical plants for 5 years, environmental releases of

asbestos will continue notwithstanding the rule's interim worker protections.

_____

[35] EPA, Draft Supplement to the Risk Evaluation for 1,4-Dioxane, July 2023 at 26
Draft Supplement to the Risk Evaluation for 1,4-Dioxane (epa.gov)
[36] The Part 1 proposal  recognizes that other "EPA statutes have limitations
because they largely regulate releases to the environment, rather than direct human
exposure" and "[o]nly TSCA provides EPA . . . the authority to address chrysotile
asbestos direct exposure to humans." 87 Fed. Reg. 21733.
[37] Despite this conclusion, the Part 1 rule incorporates by reference waste disposal
requirements in OSHA's Asbestos General Industry Standard (29 CFR
§1910.1001) and EPA's Asbestos National Emission Standards for Hazardous Air
Pollutants (40 CFR part 61). However, since EPA has not analyzed available
disposal information and made well-informed unreasonable risk determinations,
there is no basis in the record to conclude that these requirements will eliminate
unreasonable disposal risks. 89 Fed. Reg. 21992.

As EPA acknowledges, its understanding of asbestos environmental releases is sketchy at best because it made virtually no effort to collect release data after determining that releases would be excluded from its evaluation. ARB117.51-54. Nevertheless, the record demonstrates that, at chlor-alkali plants and other asbestos use sites, asbestos is released to air, discharged in wastewater and disposed of on-site and off-site. During chlor-alkali production, for example, diaphragms and their parts are replaced at frequent intervals.[38] Used diaphragms are washed to remove asbestos. A significant quantity of asbestos is present in the wastewater released from a diaphragm cell plant, which originates from wash down and cell repair or cleaning. ARC23.4; ARB117.67. Asbestos from cell wash operations and precipitated solids from metal treatment also generate a solid waste (or "filter cake") which is shipped to landfills or managed on site. Id. Most disposal of asbestos waste from chlor-alkali plants is not reported for EPA's Toxic Release Inventory ("TRI").[39] However, one producer informed EPA under TRI that it had transferred off-site over 1.5 million pounds of friable asbestos during 2017-2021. ARC753.6-31. Because the Part 1 rule allows the use of asbestos diaphragms for

---

[38] One producer has estimated that it uses thousands of diaphragm cells. 89 Fed. Reg. 21980.

[39] EPA explains that "[o]nly the friable form of asbestos in concentrations at or above 0.1 percent is a TRI-reportable chemical. There is no reporting requirement for asbestos that is stabilized in products or aqueous solutions." ARC753.6-30.

up to 12 additional years, this industry will continue to generate and dispose of asbestos solid waste and wastewater well into the future.[40]

Local communities are at heightened risk from chemical manufacturing, use and disposal in areas of elevated asbestos exposure. As EPA found, chlor- alkali and sheet gasket use facilities "are often located in areas with a high concentration of industrial activities that pose a variety of environmental hazards to surrounding populations. . . For example, communities that contain affected chlor-alkali facilities have a cumulative baseline cancer risk from air toxics that is nearly twice the national average."  89 Fed. Reg. 21973, 22005. These disproportionately impacted residents are a "potentially exposed or susceptible subpopulation" under TSCA section 3(12), 15 U.S.C. §2602(12).  As a result, under TSCA section 6(b)(4)(A), EPA's risk evaluation was required to address whether residents with heightened susceptibility or exposure living near asbestos-using facilities were exposed to unreasonable risks. Yet the FRE neither addresses risks to these

---

[40] Surprisingly, the FRE makes findings of unreasonable risk for disposal during certain COUs (mainly those involving asbestos parts in vehicles) but determines that chlor-alkali production and manufacture and use of sheet gaskets do not present such risks.  ARB117.248. These determinations (whose very presence in the evaluation is at odds with EPA's policy decision not to address environmental releases in the FRE) lack support in the record. For example, EPA "assumes the absence of asbestos exposure during the . . . disposal of spent asbestos gaskets used in chemical manufacturing plants." ARB2.218. Yet EPA has no information about gasket disposal at the many chemical plants, refineries and other industrial facilities that use asbestos gaskets.

communities nor compiles and assesses available information on asbestos

environmental releases that result in general population exposure. The Part 1 rule

should be remanded for EPA to fill these unjustified gaps in its risk evaluation and

rule.

## V. EPA Lacks Substantial Evidence to Conclude that Asbestos Importation and Distribution in Commerce do not Present an Unreasonable Risk

The FRE determined that "import and distribution in commerce of asbestos

for all the conditions of use" do not present an unreasonable risk to health or the

environment and do not warrant restriction under the Part 1 rule. ARB117.233.

This sweeping conclusion has no support in the record. EPA maintained that it

"assumed the absence of exposure to asbestos" because "[r]aw asbestos and

asbestos-containing products are imported into the U.S. in a manner where

exposure to asbestos is not expected to occur." It added that "raw asbestos is

imported in bags wrapped in plastic where they are contained in securely locked

shipping containers" and asbestos "articles (or asbestos-containing products) are

assumed to be imported and distributed in commerce in a non-friable state,

enclosed in sealed boxes." Id.

Yet EPA itself acknowledges that that damaged shipping containers are

known to arrive in the US and "[p]ort and warehouse workers manage and

remediate any damaged containers." ARB2.61. "After arriving at the plant, the

shipping container with raw asbestos is inspected, and any damaged containers are shipped back to the sender." In addition, "workers' first task after opening the containers is to inspect bags for leaks. If bags are broken or loose asbestos is evident, the area is controlled to prevent accidental exposure, the bags are repaired, and the location is barricaded and treated as an area requiring cleanup." Id. The Chlorine Institute's Pamphlet 137 likewise identifies several stages of the asbestos life cycle that give rise to exposure by workers and environmental contamination. ARF67. These scenarios include losses from torn sacks in shipment, unloading, and storage of asbestos sacks and waste from vacuuming areas where torn sacks are discovered and patched.

Moreover, EPA's assumption that transportation and distribution of asbestos is without risk ignores its own extensive experience with rail and truck derailments, fires and accidents releasing toxic substances harmful to communities.[41] Should such incidents involve asbestos, shipping personnel, plant workers, train crews, truck drivers, bystanders, firefighters and other emergency responders would likely inhale asbestos fibers and be at risk for asbestos disease.

In short, damaged shipping containers and bags and spills, leaks and accidents during importation and distribution are "known" or "reasonably foreseen" circumstances during the life-cycle of imported raw asbestos and

---

[41] https://www.epa.gov/east-palestine-oh-train-derailment.

asbestos-containing products and thus fall within the definition of "conditions of use" in section 3(4) of TSCA. EPA's assumption that that these events never happen and there is no unreasonable risk during importation and distribution lacks substantial evidence and ignores plausible exposure scenarios that are uniquely dangerous given the absence of any safe level of exposure to asbestos.

The Court should vacate EPA's no unreasonable risk determination for importation and distribution of chrysotile and remand it for further proceedings.

## VI. Petitioners Have Standing to Seek Review of the Part 1 Rule

Under this Court's decisions, the "irreducible constitutional minimum" for standing is that parties challenging government action or their members and supporters: (1) have suffered threatened injuries; (2) that are fairly traceable to the challenged action; and (3) will likely be redressed if they prevail in their petitions for review. *C. and S. W. Services, Inc. v. U.S. E.P.A.*, 220 F.3d 683, 698 (5th Cir. 2000).

Petitioners have standing to challenge an agency action when they identify a threatened injury to a concrete interest that is impaired by the allegedly unlawful agency action. *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dept. of Transportation*, 98 F.4th 178, 187-88 (5th Cir. 2024) (collecting cases). A petitioner has "associational" standing to sue when at least one of its members does. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). A petitioner has

"organizational" standing when its ability to pursue its mission is "perceptibly impaired" by the defendant's conduct and it must make significant changes in its activities and divert substantial resources as a result. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

In *Citizens for Clean Air*, the environmental petitioners challenged the government's alleged failure to conduct environmental review of a proposed deepwater oil facility off the coast of Texas. *Id.* at 185. The petitioners demonstrated injury in fact because the proposed project would "carry increased risks of oil spills, unwanted noise, habitat destruction, and property devaluation." *Id.* at 188. In *OCA-Greater Houston*, a nonprofit protecting Asian American voting rights had organizational standing to challenge a Texas law harming English-limited voters because it was required to expend resources on outreach to its members in response to the law. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

Here, as in *Citizens for Clean Air*, the detailed declarations submitted by three petitioners -- IAFF Local F-253), APHA and ADAO -- document that the deficiencies of the Part 1 rule harm both the petitioners' organizational interests and the health and professional interests of their members and supporters and a favorable decision by this Court would redress these harms.

Declarant Mike Jackson is a veteran firefighter and the president of both Local F-253 and Federal Fire Fighters Joint Council, which represents 32 locals. Jackson Decl. ¶¶ 1, 8. Studies show that firefighters are at an unusually high risk of deadly cancer and mesothelioma from exposure to asbestos when performing their duties. *Id.* ¶¶ 14-17. The members of Local F-253 are on call to respond to fires and transportation incidents in the busy North-South truck and rail corridors that pass through the heart of Northern Virginia. *Id.* ¶ 13. The Part 1 Rule's unsupported determination that distribution in commerce of asbestos and asbestos-containing products does not present an unreasonable risk increases health risks to Local 253's members who respond to spills, derailments, fires and other emergencies within their areas of responsibility. *Id.* ¶¶ 18-20. Were the Court to hold that EPA must impose protections against asbestos risks during distribution in commerce, this would reduce health risks to the Local's members. *Id.*

In addition, the Local's members are harmed because the rule only bans a small number of existing asbestos-containing products currently in use and does not address other uses that are now occurring or could be foreseen to be introduced in the future. Jackson Decl. ¶ 21-23. This large gap in protections increases health risks to the Local's members because of the wide range of asbestos-containing materials (many unknown) that may be present in the buildings where they fight fires. *Id.* If many additional asbestos materials now or in the future release asbestos

during fires because they are not restricted by the rule, these firefighters will be at greater risk of serious harm. *Id.* However, these risks would be reduced if the Court directed EPA to address all known or foreseen asbestos uses in its rule. Thus, the Local has demonstrated its standing in this case. *See Citizens for Clean Air*, 98 F.4th at 187.

The declaration of APHA's President, Dr. Georges Benjamin, similarly establishes its standing. APHA is the nation's largest, oldest and most influential organization of public health professionals. Benjamin Decl. ¶¶ 7-17. Its over 23,000 members include physicians, nurses, epidemiologists, educators, first responders, industrial hygienists and public health professionals in the public and private sectors who work at health and environmental agencies, universities, non-profit organizations and unions. *Id.* ¶ 10.

As described in Dr. Benjamin's declaration, the limited health protections in EPA's rule will adversely affect APHA and its members in multiple ways, and will require APHA to expend significant resources on outreach and communications to mitigate the Rule's impacts. First, APHA has strongly advocated for a comprehensive ban on all asbestos fibers and devoted considerable time and resources to educating its members and the public about the risks of asbestos and the need to prevent exposure. *Id.* ¶¶ 18- 21. Given the inadequacy of the EPA rule, these efforts will need to be realigned and reinforced if the Court upholds the rule.

*Id.* ¶¶ 4, 22-25. Second, numerous APHA members have job responsibilities that include preventing asbestos exposure, reducing risks, advising and educating the public and treating sufferers from asbestos disease. *Id.* ¶ 4. They will be handicapped in performing these tasks if the rule is not remanded and strengthened. *Id.*

Finally, because APHA members may be exposed to asbestos during their jobs, they will be at increased risk because of the inadequate protection provided by the rule. Benjamin Decl. ¶ 4. This could occur, for example, if APHA members are exposed to environmental releases from asbestos-using or waste disposal facilities; are bystanders in auto repair shops where there is exposure to asbestos during repair of asbestos parts; or live or work in communities near chlor-alkali plants that are at increased risk because the rule allows up to 12 years to phase out asbestos. *Id.* ¶¶ 24-25. As a result, APHA will be required to spend significant resources advising its members regarding how to reduce these risks. *Id.* ¶ 4.

As described in the declaration of its President and cofounder Linda Reinstein, petitioner ADAO is the largest US-based independent non-profit dedicated to prevention of asbestos death and disease. Reinstein Decl. ¶¶ 1, 6. ADAO has a network of more than 50,000 individuals and organizations dedicated to protecting public health from the known dangers of asbestos. *Id.* ¶¶ 1-2, 9-19. Through this network, it partners with asbestos victims, exposed workers and

communities, firefighters, scientists, public officials and doctors and other health professionals on national and international education, legal action, scientific research and publications, policy advocacy, and community initiatives. *Id.* ¶¶ 35. Over two decades, ADAO has expended significant resources advancing protective, science-backed policies to protect public health from asbestos and has been the leading champion of a comprehensive US ban on asbestos mining, importation and use. *Id.* ¶¶ 9-21. Along with its partner APHA, ADAO has been deeply engaged in working with EPA, Congress and other stakeholders since the Agency began to address asbestos under TSCA in 2016, arguing in written comments, public meetings and Congressional testimony for the strongest possible risk evaluation and rule. *Id.* ¶¶ 16-17, 25-26.

The gaps in protection in the rule directly impact ADAO's supporters and partners and increase their own risk of asbestos exposure and that of their families and communities. Reinstein Decl. ¶¶ 33, 35-36. If the rule is upheld, this will force ADAO to devote additional resources to advising its supporters and partners how to reduce their risk of exposure. *Id.* ¶ 22, 36. Current and future asbestos uses not restricted in the Rule will also result in additional exposure in homes, commercial buildings, and factories, increasing risks to ADAO supporters and partners who live or work in these structures. *Id.* ¶ 23. Moreover, communities in ADAO's network could be exposed to environmental releases from asbestos use or disposal

facilities; asbestos-contaminated wastes, wastewater and air emissions from chlor-alkali plants; asbestos dust from servicing of vehicles with asbestos parts; and asbestos released from transportation accidents, fires, spills and releases. *Id.* ¶ 24. Consistent with ADAO's prevention mission, it will need to divert its limited resources to informing its supporters and partners how to minimize these pathways of asbestos exposure. *Id.* ¶¶ 35-36.

Finally, if the flaws of the rule are not remedied by this Court, ADAO will need to redouble its efforts to advocate increased protection against asbestos exposure through legislation or future rulemaking by EPA. *Id.* ¶ 36. It will also need to realign education and outreach initiatives to highlight pathways of asbestos exposure and risk that have not been effectively regulated and therefore must be addressed by additional voluntary prevention efforts. *Id.* Since ADAO has limited funds, this will hamper its ability to devote resources to other critical priorities, such as EPA's Part 2 risk evaluation on legacy asbestos. *Id.* These adverse impacts on ADAO's mission, programs and resources further demonstrates its organizational standing. *Id.*; *see OCA-Greater Houston,* 867 F.3d at 610.

Indeed, in a case involving asbestos reporting under TSCA, the court in *Asbestos Disease Awareness Org. v. Wheeler,* 508 F. Supp. 3d at 717-718, held that both ADAO and APHA had "demonstrated . . . the requisite injury-in-fact for organizational standing under *Havens*" because without access to accurate

information, "they would be hindered in their advocacy efforts for asbestos-related legislation and in their efforts to educate the public about the dangers posed by asbestos" and therefore would "spend . . . less time pursuing their stated mission of reducing asbestos-related health risks and advocating for asbestos-related legislation."

In sum, based on the standing demonstrations of Local F-253, APHA and ADAO, all 18 petitioners filing this Brief have standing to challenge the Part 1 rule.[42]

## CONCLUSION

The Court should remand the Part 1 rule and direct EPA to strengthen it to remedy the deficiencies identified by petitioners.

September 30, 2024

Respectfully submitted,

/s/Robert M. Sussman
ROBERT M. SUSSMAN

Sussman & Associates
3101 Garfield St. NW
Washington DC 20008
bobsussman1@comcast.net
202-716-0118

Lucas Williams

---

[42] When one petitioner has standing, all do. *Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827, 835 (5th Cir. 2023).

Lexington Law Group, LLP
503 Divisadero Street
San Francisco, CA 94117
(415) 913-7800
lwillims@lexlawgroup.com

*Attorneys for petitioners Asbestos
Disease Awareness Organization.
American Public Health Association,
Collegium Ramazzini, Local F-116
(Vandenberg Professional
Firefighters), International Association
of Fire Fighters; Local F-253 (Fort
Myer Professional Firefighters),
International Association of Fire
Fighters; The FealGood Foundation.
Henry A. Anderson, MD; Brad Black,
MD; Barry Castleman, ScD; Raja
Flores, MD; Arthur Frank, MD, PhD;
Phil Landrigan, MD, MSc; Richard
Lemen, PhD, MSPH; Steven
Markowitz, MD, DrPH; Jacqueline
Moline, MD, MSc; Celeste Monforton,
DrPH, MPH; Christine Oliver, MD,
MPH, MSc; and Andrea Wolf, MD,
MPH;*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) and the briefing schedule in this case because it contains 10,766 words, according to the count of Microsoft Word.

/s/ *Robert M. Sussman*
Robert M. Sussman
*Counsel for Petitioners ADAO et* al

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 30, 2024, I electronically filed the foregoing Brief with the Clerk of Court by using the appellate CM/ECF system. All participants who are registered CM/ECF users will be served by the Court's CM/ECF system.

/s/ *Robert M. Sussman*
Robert M. Sussman
*Counsel for Petitioners ADAO et al*