No. 24-60193

# In The United States Court of Appeals for the Fifth Circuit

Texas Chemistry Council; American Chemistry Council; Georgia Chemistry Council; Asbestos Disease Awareness Organization; United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO; Ohio Chemistry Technology Council,

*Petitioners,*

v.

United States Environmental Protection Agency,

*Respondent.*

_____

Consolidated with

No. 24-60281

American Public Health Association; Collegium Ramazzini; Local F-116 (Vanderberg Professional Firefighters), International Association of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters), International Association of Firefighters; The FeelGood Foundation; Henry A. Anderson, *Medical Doctor*; Brad Black, *Medical Doctor*; Barry Castleman, *Doctor of Science*; Raja Flores, *Medical Doctor*; Arthur Frank, *Medical Doctor, Doctor of Philosophy*; Phil Landrigan, *Medical Doctor, Master of Science*; Richard Lemen, *Doctor of*

*Philosophy, Master of Public Health*; Steven Markowitz, *Medical Doctor, Doctor of Public Health*; Jacqueline Moline, *Medical Doctor, Master of Public Health*; Celeste Monforton, *Doctor of Public Health, Master of Public Health*; Christine Oliver, *Medical Doctor, Master of Public Health, Master of Science*; Andrea Wolf, *Medical Doctor, Master of Public Health*,

*Petitioners,*

v.

United States Environmental Protection Agency; Michael Regan, *Administrator, United States Environmental Protectional Agency*;

*Respondents.*

_____

Consolidated with

No. 24-60333

Olin Corporation,

*Petitioner,*

v.

United States Environmental Protection Agency; Michael Regan, *Administrator, United States Environmental Protection Agency*,

*Respondents.*

Petition for Review from an Order of the Environmental Protection
Agency

Agency No. 40 CFR Part 751

Agency No. 89 Fed.Reg. 21970

## OPENING BRIEF OF PETITIONER UNITED STEEL WORKERS

Randy S. Rabinowitz, Esq.
Victoria L. Bor, Esq.
Occupational Safety & Health
Law Project, LLC
P.O. BOX 3769
Washington, DC 20027
202 256-4080

Nathan Finch, Esq.
Motley Rice LLC
401 9th Street NW
Suite 630
Washington, DC 20004
(202) 607-8998

*Attorneys for Petitioner USW*

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

**1.** Nos. 24-60193; 24-60281; and 24-60333; under consolidated title, *Texas Chemical Council v. EPA* (2024).

**2.** The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(1)   Occupational Safety & Health Law Project, LLC (counsel)

(2)   Randy S. Rabinowitz (counsel)

(3)   Victoria L. Bor (counsel)

(4)   Nathan Finch (counsel)

(5)   Motley Rice (counsel)

(6)   Robert M. Sussman, Sussman & Associates (counsel)

(7)   Henry A. Anderson, MD (petitioner)

(8)   Brad Black, MD (petitioner)

(9)   Barry Castleman, ScD (petitioner)

(10) Raja Flores, MD (petitioner)

(11) Arthur Frank, MD, PhD (petitioner)

(12) Phil Landrigan, MD, MSc (petitioner)

(13) Richard Lemen, PhD, MSPH (petitioner)

(14) Steven Markowitz, MD, DrPH (petitioner)

(15) Jacqueline Moline, MD, MSc (petitioner)

(16) Celeste Monforton, DrPH, MPH (petitioner)

(17) Christine Oliver, MD, MPH, MSc (petitioner)

(18) Dan Whu, MD, MPH (International Association of Fire Fighters) (petitioner)

(19) Andrea Wolf, MD, MPH (petitioner)

(20)  American Public Health Association (petitioner)

(21)  Collegium Ramazzini (petitioner)

(22)  IAFF Local F-116 (Vandenberg Professional Firefighters) (petitioner)

(23)  IAFF Local F-253 (Fort Myer Professional Firefighters) (petitioner)

(24)  The FeelGood Foundation (petitioner)

(25)  Asbestos Disease Awareness Organization (ADAO) (petitioner in No. 24-60193)

(26)  Linda Reinstein (President ADAO)

(27)  United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL- CIO/CLC (USW) (petitioner in No. 24-60193)

(28)  Texas Chemistry Council (TCC) (petitioner in No. 24-60193)

(29)  Baker Botts L.L.P. (TCC Counsel)

(30)  Carter, Beau (TCC Counsel)

(31)  Aaron M. Streett (TCC counsel)

(32)  American Chemistry Council (ACC) (petitioner in No. 24-60193)

(33)  Georgia Chemistry Council (GCC) (petitioner in No. 24-60193)

(34)  Crowell and Moring (Counsel for ACC and GCC)

(35)  David Chung (Counsel for ACC and GCC)

(36)  Warren Lehrenbaum (Counsel for ACC and GCC)

(37)  Ohio Chemistry Technology Council (OCTC) (petitioner in No. 24-60193)

(38)  Robert J. Karl (counsel for OCTC)

(39)  United States Environmental Protection Agency (respondent)

(40)  Regan, Michael S., Administrator, United States Environmental Protection Agency (respondent)

(41)  Garland, Merrick B., Attorney General, United States Department of Justice (Respondents' Counsel)

(42)  Todd Kim, Assistant Attorney General, US Department of Justice (Respondents' Counsel)

(43)  Laura Glickman, US Department of Justice (Respondents' Counsel)

(44)  Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection)


s/ *Randy S. Rabinowitz*

*Attorney of record for Petitioner, USW*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and Fifth Circuit Rule 28.2.3, Appellant respectfully submits that oral argument will assist the Court in resolving this appeal.

This appeal presents important questions concerning whether the United States Environmental Protection Agency ("EPA") satisfied its legal obligations under the Toxic Substances Control Act, 15 U.S.C. §2601 *et seq.* when it promulgated its final risk management rule regulating chrysotile asbestos. 40 C.F.R. § 751 *et seq.* These are important, novel questions, affecting countless American workers, and a robust discussion of the issues at oral argument will substantially assist the Court in its consideration of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............... i

STATEMENT REGARDING ORAL ARGUMENT ............... iv

TABLE OF CONTENTS ............... v

TABLE OF AUTHORITIES ............... vii

INTRODUCTION ............... 1

STATEMENT OF JURISDICTION ............... 5

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............... 5

STATEMENT OF THE CASE ............... 6

BACKGROUND ............... 6

   1  TSCA's Statutory Requirements ............... 6

   2  EPA's Determination that Chrysotile Asbestos Poses An Unreasonable Risk ............... 9

   3  EPA's Risk Evaluation Findings on Asbestos Sheet Gaskets ............... 16

   4  The Proposed Risk Management Rule ............... 19

   5  EPA's Final Risk Management Rule ............... 21

SUMMARY OF ARGUMENT ............... 22

STANDARD OF REVIEW ............... 24

ARGUMENT & AUTHORITIES ............... 25

   1  EPA's Failure to Eliminate the Unreasonable Risk Chrysotile ............... 26

Exposure Poses to Chemical Manufacturing Workers Violates TSCA.

2 EPA's Failure to Limit Exposures to Chemical Manufacturing Employees "as Soon as Practicable" Violates TSCA    29

3 The Final Rule's Application to Chemical Manufacturing Violates the Administrative Procedure Act, because it is not Logical Outgrowth of the Proposed Rule    31

CONCLUSION    34

CERTIFICATE OF COMPLIANCE    36

CERTIFICATE OF SERVICE    37

# TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Air Alliance Houston v. EPA*,
    906 F.3d 1049 (D.C. Cir. 2018)                                      4

*American Textile Mfrs. Ins. v. Donovan*,
    452 U.S. 490 (1981)                                                 16

*Borel v. Fibreboard*,
    49 F.2d 1076 (5th Cir. 1973)                                        1

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962)                                                 29

*Central & S.W. Serv. v. EPA*,
    22 F.3d 683 (5th Cir. 2000)                                         26

*Corrosion Proof Fittings v. EPA*,
    947 F.2d 1201 (5th Cir. 1991)                       1, 7, 10, 12, 25, 26

*Industrial Union Dep't v. American Petroleum Inst.*,
    448 U.S. 607 (1980)                                                 27

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007)                                                 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)                                               24, 29

*Ohio v. EPA*,
    603 U.S. ___ (2024)                                                 29

*Safer Chemicals v. EPA*,
    943 F.3d 397 (9th Cir. 2019)                                        11

**Statutes**

5 U.S.C.

    § 533 .......................................... 6

    § 553 .......................................... 32

    § 706 ..................................... 24, 25

15 U.S.C.

    § 2601 ................................ iv, 2, 8

    § 2605 ..................................... *passim*

    § 2618 ..................................... 5, 25

    § 2625 .......................................... 27

28 U.S.C.

    § 2112 .......................................... 5

<u>Regulations</u>                       <u>Pages</u>

29 C.F.R.

    § 1910 .......................................... 16

    § 1926 .......................................... 16

40 C.F.R.

    § 751.503 ..................................... 17

    § 751.505 ..................................... 3, 33

    § 751.509 ..................................... 3, 33

    § 751.511 .................... iv, 3, 4, 26, 34, 36

OSHA., "Final Rule: Occupational Exposure to
Asbestos, Tremolite, Anthophyllite, and
Actinolite," 51 Fed.Reg. 22612 (June 20, 1986) ........ 12, 16

EPA, "Final Rule: Asbestos; Manufacture,
Importation, Processing, and Distribution in
Commerce Prohibitions," 54 Fed. Reg. 29460
(July 12, 1989) ........ 1, 10, 12, 17, 18

OSHA, "Final Rule: Occupational Exposure to Asbestos," 59 Fed.Reg. 40964 (Aug. 10, 1994) ......... 16, 31

EPA, "Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain Conditions of Use Under Section 6(a) of the Toxic Substances Control Act (TSCA): Proposed Rule," 87 Fed.Reg. 21706 (Apr. 12, 2022) ......... *passim*

EPA, "Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain Conditions of Use Under Section 6(a) of the Toxic Substances Control Act (TSCA): Final Rule," 89 Fed.Reg 21970 (March 28, 2024) ......... *passim*

EPA, "Asbestos Part 2 Supplemental Evaluation Including Legacy Uses and Associated Disposals; Draft Risk Evaluation Under the Toxic Substances Control Act; Notice of Availability, Webinar and Request for Comment," 89 Fed.Reg. 27878 (Apr. 16, 2024). ......... 11

**<u>Other Authorities</u>**

S. Rep. No. 94-698 *as reprinted in* 1976 U.S.C.C.A.N. 4491 (Mar. 16, 1976) ......... 7

S. Rep. 114-67 *as reprinted in* 2016 U.S.C.C.A.N. 276 (2015) ......... 8

# INTRODUCTION

We have known for six decades that *all* asbestos fibers are deadly. This Court recognized asbestos as "ultrahazardous" in its seminal decision in *Borel v. Fibreboard*, 493 F.2d 1076 (5th Cir. 1973). Since then, hundreds of thousands of workers, their family members, and members of the public have been poisoned by and died from asbestos exposure. The failure to prevent the tragedy of asbestos exposure has cost society tens of billions of dollars.

The Environmental Protection Agency (EPA) found that asbestos poses an unreasonable risk under the Toxic Substances Control Act in 1989, 54 Fed.Reg. 29460, 29467 (July 12, 1989), a finding this Court upheld in *Corrosion Proof Fittings v. EPA,* 947 F.2d 1201, 1229 (5th Cir. 1991) (invalidating the rule on other grounds, but upholding EPA's conclusions regarding risk). Since 1989, the epidemiology and other scientific studies showing that asbestos generally, and chrysotile specifically, causes mesothelioma and lung cancer has only become more damning. EPA's determination that chrysotile asbestos poses an unreasonable risk, which underlies the regulation at issue in these

consolidated cases, is supported by overwhelming scientific evidence and is consistent with the views of every other federal agency that has evaluated asbestos risks.

In 2016, Congress amended the Toxic Substance Control Act by passing the Frank R. Lautenberg Chemical Safety for the 21ˢᵗ Century Act, 15 U.S.C. § 2601 *et. seq.* (TSCA). TSCA now requires EPA to evaluate whether the risks posed by "a chemical substance" are "unreasonable" "without consideration of costs or other nonrisk factors," 15 U.S.C. §2605(b)(4), and, if so, to adopt regulations so that "the chemical substance . . .no longer presents such risk[.]" *Id.* at § 2605(a).

This case involves EPA's determination that exposure to chrysotile asbestos poses an unreasonable risk.[1] To ensure that chrysotile no longer presents this unreasonable risk, EPA adopted a risk management rule under TSCA section 6(a), 15 U.S.C. 2605(a), entitled: "Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substance Control Act: Final Rule." 89 Fed.Reg. 21970 (March 28,

---

[1] *See* Risk Evaluation for Asbestos, Part 1: Chrysotile Asbestos (EPA-HQ-OPPT-2019-0501-0117) (hereinafter "RE"). For purposes of the risk evaluation, EPA defines asbestos six fibers: serpentine fiber chrysotile; and amphibole fibers tremolite, crocidolite, amosite, anthophyllite, and actinolite. RE at 5.

2024) (the Final Rule). The Final Rule phases out – and ultimately bans – the use of chrysotile asbestos in several stages, for six "conditions of use." *Id.* Of relevance here, the Final Rule permits installation of new sheet gaskets in the chemical industry for two years, and, in most of the chemical industry, the continued use of installed gaskets for their useful life, *id.* § 751.509(a); the continued use of sheet gaskets in one aspect of the chemical industry -- production of titanium dioxide -- for five years, *id.* § 751.509(b); and the continued use of asbestos diaphragms in the chlor-alkali industry for between five and twelve years, *id.* § 751.505. During the time owners and operators are permitted to use asbestos-containing sheet gaskets in titanium dioxide production and in the chlor-alkali industry, the Final Rule requires them to comply with interim workplace protections. *Id.* §751.511(a). But the Rule requires no such protection for workers in other parts of the chemical industry.

EPA is imposing interim workplace protections based on its finding that workers are exposed to unreasonable risks of asbestos exposure when they are "receiving new gaskets, removing old gaskets, bagging old gaskets for disposal, and inserting replacement gaskets into flanges and other process equipment." 89 Fed.Reg. 21983. In making this finding,

EPA made no distinction between risks posed to workers handling or otherwise working around asbestos-containing sheet gaskets in titanium dioxide production and to workers engaged in the same activities in other parts of the chemical industry. Nor does EPA, anywhere in the preamble to the Final Rule, explain its rationale for excluding chemical workers from workplace protections offered to similarly-situated workers. Because EPA has failed to eliminate the unreasonable risk posed to chemical workers using asbestos sheet gaskets—a risk faced by thousands of members of the United Steelworkers (USW) who work with and in proximity to these gaskets[2]—USW asks this Court to extend the interim workplace controls contained in 40 C.F.R. § 751.511 to protect all workers exposed to asbestos while handling sheet gaskets in chemical production.

---

[2] USW represents thousands of workers in the chemical manufacturing industry who are directly exposed to asbestos when installing new gaskets or removing old gaskets, or when working in the same vicinity as those directly installing or removing these gaskets. Indeed, USW is the largest union representing workers in the chemical manufacturing industry. The lack of protections against asbestos exposure puts USW members at risk. USW therefore has standing in this proceeding. *See Air Alliance Houston v. EPA,* 906 F.3d 1049, 1058-59 (D.C. Cir. 2018) (finding USW had standing to challenge EPA regulation based on its members' exposure).

## STATEMENT OF JURISDICTION

EPA adopted the Final Rule challenged here pursuant to TSCA section 6(a). 15 U.S.C. § 2605(a). TSCA section 19(a) authorizes "any person" to petition for review of "a rule promulgated under this subchapter." *Id.* § 2618(a)(1)(A). USW and various other parties filed timely petitions for review in several courts of appeals. The Joint Panel on Multidistrict Litigation selected this Court to hear all challenges to EPA's Rule, pursuant to 28 U.S.C. § 2112(a).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      After finding that chrysotile asbestos poses an unreasonable risk under its conditions of use, whether EPA violated its duty to adopt "one or more requirements" listed in TSCA section 6(a) "to the extent necessary so that [chrysotile] no longer presents such risk" when it permitted the installation of new, and continued use of existing asbestos sheet gaskets for an indefinite period of time in chemical production facilities, without adopting protections for affected workers, other than for those involved in titanium dioxide production.

II.    Whether EPA violated TSCA by failing to impose any requirements to protect chemical production workers from asbestos exposure within the five -year deadline in TSCA section 6(d).

III.    Whether EPA violated the Administrative Procedures Act, 5 U.S.C. § 533(b), by failing to give the public "fair notice" that it was considering permitting chemical manufacturing facilities to install new asbestos gaskets and leave existing asbestos gaskets in place indefinitely, without requiring those owners and operators to implement interim worker protections.

## STATEMENT OF THE CASE

### A. BACKGROUND

EPA's Final Rule is the first risk management rule the Agency has issued since Congress passed the Frank R Lautenberg Chemical Safety for the 21st Century Act. P.L. 114-182 (2016).

### I.    TSCA's Statutory Requirements

Congress enacted the Toxic Substances Control Act in 1976 to "prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S. Rep. No. 94-698 at 1, *as*

*reprinted in* 1976 U.S.C.C.A.N. 4491 (Mar. 16, 1976). Congress recognized that "[w]hile individual agencies may be authorized to regulate occupational, environmental, or direct consumer hazards," none "ha[d] the authority to look comprehensively at the hazards associated with the chemical," as opposed to those hazards within each agency's narrower jurisdiction. *Id.* at 2. The Act gave EPA "the authority to look at the hazards in total." *Id.*

EPA conducted relatively few risk evaluations under the 1976 version of the Act, which limited EPA to using the "least burdensome requirements" to regulate chemicals. *See Corrosion Proof Fittings v. EPA,* 947 F.2d at 1229-30 (remanding asbestos ban for failure to consider least burdensome alternative). In 2016, Congress amended TSCA to ensure "broad protection of human health and the environment." S. Rpt. 114-67 at 6 *reprinted in* 2016 U.S.C.C.A.N 276 (2015).

As amended, TSCA requires the Agency to follow a two-step process for evaluating and managing the health and environmental risks posed by a toxic substance. First, section 6(b)(4) directs EPA to "conduct risk evaluations … to determine whether a chemical substance presents an unreasonable risk to health or the environment, without consideration of

costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation." 15 U.S.C. § 2605(b)(4)(A). TSCA specifically identifies workers as such a subpopulation. *Id.* at § 2601(11). Congress explained that the amended section 6 "'de-couples' [EPA's] science-based risk decision about a chemical's safety under its intended conditions of use from [EPA's] decision on how to manage unreasonable risks where chemicals do not meet the safety standard under intended conditions of use." S. Rep. 114-67 at 17. In other words, EPA "must determine that a chemical meets the safety standard, or not, based solely on risk to human health and the environment—the integration of hazard and exposure information about a chemical—and not on the basis of other factors such as consideration of the costs or benefits of the substance or of possible restrictions on the substance." *Id.*[3]

Second, "[i]f [EPA] determines [in a risk evaluation] that the manufacture, processing, distribution in commerce, use, or disposal of a

---

[3] "Safety standard" as used in the Senate bill refers to the same requirements that appear in the enacted section 6(b)(4). *See* S. Rep. 114-67 at 17 (the "Safety Standard" "ensures, without taking into consideration cost or other nonrisk factors, that no unreasonable risk of injury to health or the environment will result from exposure to the chemical substance under the conditions of use.")

chemical substance or mixture, or that any combination of those activities, presents an unreasonable risk of injury to health or the environment," TSCA directs EPA to "apply one or more of [listed] requirements … to the extent necessary so that the chemical substance no longer presents such risk." 15 U.S.C. § 2605(a). The "requirements" range from flat bans to labeling and public notice requirements. *Id.* § 2605(a)(1)-(7). Unlike the Act's earlier version, TSCA no longer requires EPA to adopt the least burdensome alternative. Instead, the Agency is to "consider" several enumerated factors, including "the costs and benefits of the proposed regulatory action and of the 1 or more primary alternative regulatory actions." *Id.* § 2605(c)(2). EPA is to make the requirements of a final rule issued under section 6(a) take effect "as soon as practicable but not later than five years" after it promulgates the rule. *Id.* at 2605(d)(1).

## II.  EPA's Determination that Chrysotile Asbestos Poses An Unreasonable Risk

EPA's calculation of the cancer risks posed by chrysotile asbestos and its determination that those risks are unreasonable are both unremarkable and scientifically irrefutable. Since 1972, when the National Institute for Occupational Safety & Health (NIOSH) advised

that there is no safe level of exposure to asbestos (Rec. 450), every federal agency and international body that has evaluated the deadly effects of asbestos exposure has reached the same conclusion. *See* Asbestos Part 1: Chrysotile Asbestos" Regulation of Certain Conditions of Use Under the Toxic Substances Control Act: Proposed Rule, 87 Fed.Reg. at 21709-21711 (Proposed Rule) (describing efforts by EPA, other federal agencies, and states to regulate the effects of asbestos). [4]

EPA initially quantified the risks posed by six types of asbestos fibers in 1988. (Rec. 92). EPA's quantification of asbestos risks formed the scientific basis for its 1989 asbestos ban. *See* Asbestos: Manufacture, Importations, Processing, and Distribution in Commerce Prohibitions; Final Rule, 54 Fed.Reg. 29460 (July 12, 1989)(1989 Asbestos Ban). This Court invalidated the ban, finding that EPA had failed to fulfill the obligation the statute then imposed to weigh the costs and benefits of various less burdensome regulatory alternatives. *Corrosion Proof*

---

[4] *See* EPA 1988 (D-92); Agency for Toxic Substances and Disease Registry (D-99); National Toxicology Program 14th Report on Carcinogens (D-408); NIOSH Roadmap for Research on Asbestos (D-89); International Agency for Research on Cancer 1977 (C-577); IARC 1987 (C-593) IARC 2012 (C-592); Toxicological Review of Libby Amphibole Asbestos 2014 (D-415).

*Fittings v. EPA,* 947 F.2d at 1229-30.  While rejecting EPA's chosen risk management strategy, this Court affirmed EPA's underlying finding that exposure to all forms of asbestos poses an unreasonable cancer risk. *Id. at* 1229.

EPA designated asbestos as one of the first ten priority chemical substances it planned to evaluate under the amended Act.  When EPA began this evaluation, its policy – since declared incompatible with TSCA, *Safer Chemicals v. EPA,* 943 F. 3d 397, 425 (9th Cir. 2019) – was to evaluate only the risks posed by a chemical substance's current uses, and not by exposures to chemicals already in place.[5]  EPA concluded that the only type of asbestos that was still being imported, processed, or distributed for use in the United States was commercial chrysotile asbestos, which EPA recognized may contain trace amounts of other asbestos fibers. 87 Fed.Reg. 21706, 21709) (Proposed Rule) (RE at 23).

---

[5] In *Safer Chemicals,* the Ninth Circuit found that EPA had improperly interpreted TSCA's direction that it consider all "circumstances . . . under which a chemical substance is intended, known or reasonably foreseen to be . . . used, or disposed of" to be limited to future uses of the chemical. *Id.* As a result, EPA is conducting a supplemental risk evaluation of so-called "legacy uses" of asbestos – *i.e.,* exposure to in-place asbestos-containing materials -- and has solicited comments on its proposed draft. *See* EPA, "Asbestos Part 2 Supplemental Evaluation Including Legacy Uses and Associated Disposals; Draft Risk Evaluation Under the Toxic Substances Control Act; Notice of Availability, Webinar and Request for Comment," 89 Fed.Reg. 27878 (Apr. 16, 2024).

EPA identified six products containing chrysotile that were being used by industry or consumers: chlor-alkali diaphragms, sheet gaskets used in chemical production, oilfield brake blocks, aftermarket automotive brakes/ linings, other vehicle friction products, and other gaskets. 89 Fed.Reg. at 21974.

Industry groups have long argued that the potency of different asbestos fibers varies widely and, in the past, had urged EPA and OSHA to separately calculate fiber-specific cancer risks. Both EPA and OSHA had rejected the suggestion, in part because both agencies concluded there was inadequate dose-response data to separately evaluate the mesothelioma risk of each of the six asbestos fibers. 54 Fed.Reg. at 29470 (EPA believes that is prudent and in the public interest to consider all fiber types as having comparable carcinogenic potency in its quantitative assessment of mesothelioma risk); 51 Fed.Reg. at 22612 (1986) ("OSHA agrees with [rulemaking experts] that epidemiological and animal evidence, taken together, fail to establish a definitive risk differential for the various types of asbestos fiber"). *See also, Corrosion Proof Fittings v. EPA,* 947 F.2d at 1229 (rejecting the argument that asbestos poses different risks in different industries).

Indeed, until this rulemaking proceeding, all prior federal and international analyses of asbestos risks had looked at the combined risks from six asbestos fibers.[6] Each concluded that asbestos fibers pose a clear, unequivocal risk for mesothelioma and lung cancer; each found suggestive evidence that asbestos causes other cancers, such as laryngeal and ovarian cancer; and each identified asbestosis and pleural disease as adverse non-cancer respiratory effects. *See n.* 5, *supra.*

When it began this proceeding, EPA accordingly did not have a prior risk evaluation limited to the risks posed by chrysotile. Because EPA had determined to focus only on new uses of a chemical and had determined, for asbestos, that only chrysotile asbestos remained in use, it set out to quantify the potency of chrysotile to cause mesothelioma and

---

[6] One reason that earlier risk evaluations had not calculated fiber-by-fiber risk estimates is that commonly relied upon analytic methods for measuring asbestos fibers in air cannot distinguish between different types of asbestos fibers and most epidemiology studies of asbestos disease had evaluated cohorts of workers whose exposure had been measured with these analytic methods. In 2008, EPA published an "interim method" for determining risks from asbestos on a fiber-by-fiber basis, which attempted to circumvent this lack of fiber-specific exposure data by "converting" traditional particle counting method (PCM) measurements to fiber-specific measurements. However, EPA's Science Advisory Board rejected the "interim method" because the conversion of PCM measurements to fiber-specific values was "too speculative" and lacked a scientific basis. *See* A-492, Exhibit A (Letter from EPA SAB Asbestos Committee Chair Dr. Agnes Kane, dated November 14, 2008).

lung cancer. (RE at 149). EPA began this task by reviewing its existing 1988 risk evaluation to determine whether to update or reaffirm its calculation of an inhalation unit risk (IUR) for asbestos-induced cancer. (RE at 25).[7] In 1988, EPA had relied on fourteen asbestos epidemiology studies with enough historical exposure data to allow the Agency to construct a dose-response curve for asbestos. (RE 25). EPA had a second quantitative estimate, completed in 2014, of the risk posed by Libby Amphibole Asbestos (LAA).[8] Neither of these prior risk evaluations addressed the risks of only chrysotile asbestos.

Of the fourteen epidemiology studies on which it had based its earlier quantitative analyses of asbestos risks, EPA identified a subset of five studies that evaluated the risks posed to cohorts that had only been exposed to commercial chrysotile. (RE at 25, 153, 155). EPA found that only three of these chrysotile cohort studies had enough exposure data to

---

[7] When EPA constructs a dose-response curve for a chemical substance, it calculates an inhalation unit risk – "an estimate of the carcinogenic risk associated with a unit concentration of air." 87 Fed.Reg. at 21716.

[8] "LAA is a complex mixture of amphibole fibers—both mineralogically and morphologically. . . . The mixture primarily includes winchite, richterite, and tremolite fibers with trace amounts of magnesio-riebeckite, edenite, and magnesio-arfvedsonite." (D-415 at 1-4)

calculate a dose-response relationship. (RE at 155).[9] One study of textile workers in South Carolina, had "exceptionally detailed" exposure data (RE at 161), and EPA relied on it to calculate the cancer risk posed by chrysotile. (RE at 155, 164; SACC at 20). EPA compared the risks calculated from the South Carolina textile study to the risks from a study of Quebec chrysotile miners and found no significant difference in the potency of chrysotile between these industries. (RE at 170).

From this quantitative analysis, EPA was able to calculate the potency of chrysotile to cause mesothelioma and lung cancer. EPA recognized that chrysotile has also been associated with laryngeal, ovarian, and other cancers, but the Agency had no dose-response data to quantitatively assess this risk. 87 Fed.Reg. at 21716. EPA also acknowledged that asbestos causes asbestosis and pleural disease but did not quantitatively assess those risks either. *Id.*

After EPA quantified the potency of chrysotile, it then looked at the exposures for its identified conditions of use to determine whether each poses an unreasonable risk. EPA defines an unreasonable occupational

---

[9] The three studies included cohorts of Quebec miners, North Carolina textile workers; and South Carolina textile workers.

risk as a risk greater than 1/10,000 (or 1 x10-4). (RE at 180).[10]   For

chrysotile asbestos, this risk level translates to an exposure limit of .005

fiber per cubic centimeter (f/cc) – a level substantially below the existing

Occupational Safety and Health Administration (OSHA) exposure limit

of .1 f/cc.  29 C.F.R. § 1910.1001; *id.* § 1926.1101.[11]

## III.   EPA's Risk Evaluation Findings on Asbestos Sheet Gaskets

In its risk evaluation, EPA identified six ongoing occupational uses

of chrysotile asbestos, including in the chlor-alkali industry, and of

---

[10] This is the same level of risk that NIOSH defines as "significant."  (D- 503 – NIOSH cancer policy).

[11] In 1986, OSHA published a risk assessment of asbestos that observed a level of risk similar to the risk EPA found. Based on its quantitative risk evaluation of asbestos, in 1986 and again in 1994, OSHA determined that asbestos poses a "significant risk" of cancer and other adverse health effects and adopted increasingly lower exposure limits, coupled with ancillary monitoring, medical surveillance, and other requirements, to reduce the risk posed by asbestos. *See generally,* OSHA, "Final Rule: Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite," 51 Fed.Reg. 22612 (June 20, 1986), and OSHA, "Final Rule: Occupational Exposure to Asbestos," 59 Fed.Reg. 40964 (August 10, 1994). OSHA set the permissible exposure limit at 0.1 f/cc, 29 C.F.R. § 1910.1001 (general industry), *id.* § 1926.1101 (construction), based on considerations of feasibility. *See American Textile Mfr's Inst., Inc. v. Donovan,* 452 U.S. 490, 509 (1981) (interpreting the OSH Act to require the Agency to set the most protective standard necessary to eliminate a significant risk of material health impairment, subject to the constraints of technological and economic feasibility). In doing so, OSHA acknowledged that employees exposed at that level would remain subject to significant cancer risks. 51 Fed.Reg. at 22612; 59 Fed.Reg. at 40964.

particular interest here, sheet gaskets used in chemical production. [12] (RE at 32). EPA determined that all six of these uses of chrysotile pose unreasonable risks to workers. (RE at 26, 231-37).

Asbestos gaskets "are used mainly to seal connections and prevent leakage of fluids between solid surfaces." 54 Fed.Reg. at 29496. They are "used primarily in industrial applications with extreme operating conditions…. Such extreme operating conditions are found in many chemical manufacturing and processing operations." 89 Fed.Reg. at 21976. Exposure to asbestos occurs when installing new asbestos gaskets, removing old gaskets, and disposing of spent gaskets. *Id.* at 21983. Removal of old gaskets, during routine scheduled maintenance or when leaks or process upsets occur may involve "scraping of gaskets or on-site fabrication." 54 Fed.Reg. at 29496. The schedule for replacing gaskets largely depends on temperature and pressure conditions and whether leaks are detected. (RE at 93). In its risk evaluation, EPA opined

---

[12] EPA defines sheet gaskets in chemical production as "gaskets cut from sheeting, including asbestos -containing rubberized sheeting, that are used in facilities for extreme condition applications, such as titanium dioxide manufacturing or processing nuclear material." 40 C.F.R. § 751.503.

that installed gaskets "typically remain in operation anywhere from a few weeks to three years." (RE at 93).

In conducting its 2020 risk evaluation, EPA "attempted to identify all industrial uses of asbestos-containing gaskets." (RE 93). Based on publicly available information, as well as information provided by industry representatives, including the American Chemical Council (ACC), "the only use [of these gaskets] known to the Agency" in the United States was in two titanium dioxide manufacturing facilities. (RE at 93, 27). [13]

Based on the exposure data that was "reasonably available" (RE at 190), EPA estimated that workers using sheet gaskets faced a cancer risk that ranged from 5.2/10,000 -1.9/1,000 without respirators. (RE at 239,

_____

[13] ACC affirmed this understanding in its response to an informal request by EPA. ACC Responses to EPA Questions Regarding Asbestos-Containing Gaskets (C-31) Moreover, the information industry provided about the limited use of asbestos-containing gaskets during the 2020 risk evaluation was consistent with the information EPA amassed in 1989, when the Agency first proposed to ban asbestos. At that time, EPA found that production of asbestos sheet gaskets had dropped and "non-asbestos substitutes already possess a large share" of the gasket market. 54 Fed.Reg. at 29496. Indeed, in 1989, industry led EPA to believe "that the majority of the gasket market will be asbestos-free before the end of 1989." *Id.* Some comments received in this proceeding indicated that it has been common practice for the chemical industry to replace old asbestos gaskets with non-asbestos gaskets for several decades. Keller & Heckman Comments in Response to Notice of Data Availability (C-502) at 5.

Table 5-3).  Even with respirator use, EPA found that the risk was unreasonable.  As a result, EPA made a final risk determination, pursuant to TSCA section 6(b)(4)(A), that worker exposures in receiving, installing, and removing asbestos sheet gaskets in chemical production posed an unreasonable risk to workers.  (RE at 231-240).

## IV.   The Proposed Risk Management Rule

Once EPA determined that six occupational conditions of use of chrysotile asbestos pose an unreasonable risk to exposed workers, TSCA requires the Agency to propose a risk management rule so that chrysotile "no longer presents such risk."  15 U.S.C. § 2605(a).

EPA accordingly proposed a risk management rule, 87 Fed.Reg. 21706, that would require owners and operators to eliminate the use of asbestos sheet gaskets in the chemical industry and asbestos diaphragms in the chlor-alkali industry within two years, and to cease all other uses of chrysotile within 180 days.  Under the statutory directive that the Agency propose at least one alternative regulatory action, 15 U.S.C. § 2605(c)(2)(A), EPA alternately proposed a five-year phase-out period for asbestos sheet gaskets in chemical manufacturing and asbestos diaphragms in the chlor-alkali industry, and during that phase out

period, stringent interim worker protections, including a reduced existing chemical exposure limit (ECEL) of .005 f/cc. 87 Fed.Reg. at 21723.

During the comment period, industry representatives for the first time alerted EPA to the fact that there may be "hundreds of thousands and potentially millions" of asbestos sheet gaskets still in use in chemical manufacturing facilities. 89 Fed.Reg. at 21983.[14] Because asbestos exposure occurs when gaskets are removed, industry representatives argued that phasing out their use, and thereby requiring their removal, under a compressed time frame would create greater exposures than permitting the chemical industry to continue to use the gaskets for their useful life and then requiring their removal under controlled, protective conditions.[15] Commenters also advised the Agency that the useful life of

_____

[14] *See, e.g,* ACC Comments on Proposed Risk Management Rule (C-402) at 13 (hereinafter "ACC RM Comments") ("Across the entire chemical industry, . . . information suggests there may be thousands of gaskets yet to be removed and replaced," with "dozens and in some cases thousands of gaskets at any particular facility."); Comments of API (C - 411) ("there may be hundreds of thousands, possibly millions, of gaskets" in chemical and refinery facilities); Keller & Heckman Comments (C-502) at 5 (estimating millions of gaskets in petroleum refineries).

[15] *E.g.,* ACC RM Comments (C-402) at 15-16 (proposing to permit gaskets to remain in place for useful life then removed under "an industrial hygiene program that includes exposure monitoring, exposure controls, respiratory protection (in certain circumstances), and recordkeeping"); ACC Comment in Response to Notice of Data Availability (C-503) at 8 (proposing to permit continued use of in-place gaskets

these gaskets could be as much as twenty years and urged EPA to allow for "ongoing and regular removal during scheduled maintenance."[16] Although EPA had requested specific data "on costs and feasibility" of imposing interim worker protections, 87 Fed.Reg. at 21726, it did not receive such cost information.

## V.     EPA's Final Risk Management Rule

EPA published the Final Rule on March 28, 2024. 89 Fed.Reg. 21970. The Rule bans all current uses of chrysotile asbestos over a period of years and, for some conditions of use where chrysotile asbestos will continue to be used for longer than two years, it requires "interim workplace protections." 89 Fed.Reg. at 21971; 21987. EPA found "it necessary to issue interim controls to reduce worker exposures for the period prior to the prohibition taking effect," and designed the worker protections to align with existing OSHA requirements. *Id.* at 21988. In promulgating the Final Rule, EPA explained that its "intention is to require interim workplace controls that address the unreasonable risk

---

"within the normal course of operations," while requiring compliance with ECEL); Keller & Heckman Comments (C-502) at 13, 22-23.

[16] ACC RM Comments (C-402) at 15.

from chrysotile asbestos to workers directly handling the chemical or in the area where the chemical is being used until the relevant prohibitions go into effect." *Id.*

The interim worker protections require that, beginning six months after the Rule's effective date, owners or operators in the chlor-alkali and titanium manufacturing industries comply with an eight-hour existing chemical exposure limit (ECEL)" of .005 f/cc. *Id.*[17] However, despite permitting gaskets to remain in place indefinitely in chemical manufacturing facilities more generally, the Final Rule imposes no such worker protection requirements in those facilities when new gaskets are installed, old gaskets removed, or leaks and process upsets require maintenance of equipment with asbestos gaskets.[18] Neither the preamble to the Final Rule nor EPA's response to comments on either the

---

[17] 40 C.F.R.§ 751.511 requires owner/operators to comply with the new asbestos ECEL and to also to conduct periodic exposure monitoring, establish regulated areas when exposures may exceed the ECEL, develop a written exposure control plan, provide respirators when engineering and other controls fails to adequately control exposures, and conduct training.

[18] After publication of the proposed rule, EPA learned that asbestos sheet gaskets were in use at Savannah River Nuclear Solutions. 89 Fed.Reg. at 21983. EPA is permitting the continued use of chrysotile used in processing nuclear material, with "interim workplace controls," 89 Fed.Reg. at 21984, that differ from those required in the chlor-alkali or titanium manufacturing industries.

proposed rule (C-758) or its notice of available data (C-759) explains this omission.

## SUMMARY OF ARGUMENT

EPA has violated its statutory duty under TSCA by failing to protect workers from exposures to chrysotile asbestos in sheet gaskets, which the Agency determined pose unreasonable risks. TSCA mandates that once EPA finds a toxic substance poses an unreasonable risk, the Agency *must* take action to eliminate or reduce that risk. Here, EPA found that exposure to chrysotile asbestos causes an unreasonable risk, and that interim worker protections are necessary protect against that risk in facilities it is permitting to continue to use asbestos-containing gaskets. However, while stating its intention to protect *all* workers "directly handling the chemical or in the area where the chemical is being used until the relevant prohibitions go into effect," 89 Fed.Reg. at 21988, EPA has imposed these interim measures in the chlor-alkali and titanium dioxide manufacturing industries, but not in other chemical manufacturing facilities.

Well-settled principles of administrative law require this Court to compel EPA action when the Agency has "failed to consider important

aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). EPA has offered no explanation – no less a rational one – for failing to accord chemical manufacturing workers with the protections it has deemed necessary to protect them from the unreasonable risk of chrysotile asbestos exposure.

## ARGUMENT

### A.    STANDARD OF REVIEW

TSCA section 19 provides that "the Administrative Procedure Act's scope of review provisions, 5 U.S.C. §706, apply except that for a rule published under section 6(a), such as the Final Rule at issue here, "the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the rulemaking record taken as a whole."  15 U.S.C. § 2618(c)(1)(B)(i)(I).

Under the Administrative Procedure Act (APA), the Court must set aside agency action that is in excess of an agency's statutory authority, promulgated without "observance of procedure required by law," or

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2).

TSCA directs the Court to apply the "more rigorous" substantial evidence standard to agency findings of fact. "[A] reviewing court must give careful scrutiny to agency findings and, at the same time, accord appropriate deference to administrative decisions that are based on agency experience and expertise." *Corrosion Proof Fittings v. EPA,* 947 F.2d at 1214 (quoting *Environmental Defense Fund v. EPA*, 636 F.2d 1267, 1277 (D.C. Cir. 1980)). Substantial evidence "requires something less than the weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Central & SW Serv. v. EPA,* 220 F.3d 683, 687 (5th Cir 2000) (citations omitted). The agency, however, must "cogently explain why it has exercised its discretion in a given manner" and "must offer a rational connection between the facts found and the choice made." *Corrosion Proof Fittings,* 947 F.2d at 1214 (internal quotations and citations omitted).

## B. ARGUMENT AND AUTHORITIES

EPA's failure to require interim worker protections throughout the chemical manufacturing industry is unlawful for three reasons: First, EPA has failed to adopt a risk management rule that ensures "the chemical substance . . . no longer presents [the unreasonable] risk" EPA has identified. 15 U.S.C. § 2605(a). Second, EPA has failed to ensure that the unreasonable risk posed to chemical manufacturing employees is eliminated "as soon as practicable." *Id.* § 2605(d). Third, the Final Rule's failure to protect chemical manufacturing workers is not a logical outgrowth of the proposed rule. Each of these failings, standing alone, violates TSCA. Together they compel action by this Court to demand that EPA extend the interim worker provisions of 40 C.F.R. § 751.511 to workers throughout the chemical manufacturing industry.

> 1.    **EPA's Failure to Eliminate the Unreasonable Risk Chrysotile Exposure Poses to Chemical Manufacturing Workers Violates TSCA.**

EPA's determination that chrysotile asbestos sheet gaskets used in chemical manufacturing – and all other industrial uses of chrysotile asbestos – poses an unreasonable risk is supported by overwhelming scientific evidence. 89 Fed.Reg. at 21974-21976. Given that every federal agency and international body to have reviewed the evidence concerning

asbestos' health risks has determined that there is *no* safe level of exposure to asbestos, EPA's determination that current uses of chrysotile asbestos pose an unreasonable risk is clearly based on the "best available science" and consistent with the "weight of evidence" as required by TSCA. 15 U.S.C. § 2625(h). *See also, Industrial Union Dep't v. American Petroleum Inst.,* 448 U.S. 607, 656 (1980) (finding that OSHA may rely on a "reputable body of scientific thought" to decide whether an occupational risk is "significant"). Indeed, given the overwhelming evidence of the risks posed by asbestos generally, and chrysotile specifically, any other conclusion by EPA would be arbitrary.

Under TSCA, once EPA makes an unreasonable risk determination based on a risk evaluation, "EPA must by rule apply one or more . . . requirements to the extent necessary so that they chemical no longer presents such risk." 15 U.S.C. § 2605(a); 89 Fed.Reg. at 21970. Here, EPA found that the excess risk of cancer posed to workers who liberate chrysotile asbestos fibers during gasket fabrication or removal and replacement activities ranged from 5.2/10,000 -1.9/1,000 without respirators. (RE Table 4-17 and Tables 5-2, 5-3.). Even with respirator use, EPA found there would be an excess risk of mesothelioma or lung

cancer of 1.2/1,000 (RE at 239, Table 5-3). This risk is an order of magnitude greater than the level of risk – 1/10,000 – EPA considers unreasonable.

In response to that finding, EPA determined to phase out the use of asbestos gaskets. It further determined that while these gaskets remain in use, and workers continue to repair and remove them, stringent workplace protections are necessary to minimize the unreasonable risk. (C-758 at 40-41; C-759 at 3.2.2.).  Based on those findings, the Final Rule mandates interim worker protections for workers using asbestos sheet gaskets to manufacture titanium dioxide, as well as those working with asbestos diaphragms in chlor-alkali production.  *Id.*

Inexplicably, EPA failed to require the same protections for workers in the chemical manufacturing industry generally.  Nothing in the record suggests that installing and removing sheet gaskets in chemical manufacturing facilities presents any different or lesser risk to the health of workers than does installing and removing sheet gaskets in titanium dioxide manufacturing. Nor has EPA offered any explanation for treating these similarly situated exposure scenarios so dramatically differently. In fact, nothing in the Preamble to the Final Rule as much as

acknowledges that the Rule is treating these worker cohorts differently. This is a classic example of an agency impermissibly "ignoring an important part of the problem," *Motor Vehicle Mfrs.,* and failing to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Burlington Truck Lines v. United States,* 371 U.S. 156, 1688 (1962) (citation omitted); *Brown v. EPA,* 603 U.S. at 11-12 (2024).

  2. **EPA's Failure to Limit Exposures to Chemical Manufacturing Employees "as Soon as Practicable" Violates TSCA.**

  TSCA requires that EPA impose its risk management requirements to limit exposures "as soon as practicable," but no later than 5 years after the rule's promulgation. 15 U.S.C. § 2605(d). Bans or phase-out requirements must begin "as soon as practicable, but no later than 5 years" after the Rule's effective date. As promulgated, the Final Rule permits a phase-out period in the chemical industry (other than for titanium dioxide) that may go on for twenty years or more, while requiring no other means of protecting workers in the interim.

  EPA originally proposed to completely phase out the use of asbestos sheet gaskets throughout industry within 2 years. 87 Fed.Reg. at 21720.

As an alternative, the Agency proposed a 5-year phase out period, accompanied by interim worker protections. *Id.* at 21723. Industry representatives responded by objecting to the wholesale removal of these gaskets, arguing that because removing the gaskets carries the highest potential for exposures, such a requirement would increase the risks to workers. Industry also argued that such a requirement would be impracticable, as there were potentially millions of gaskets still in use, and owners/operators had no way to know how many there are and where they are located. (EPA Response to Public Comments, C-758 at 8.1.6; Keller & Heckman Comments, C-502)[19] They also claimed requiring large-scale replacement of these gaskets would disrupt the supply chain, and that not enough specially trained workers were available to accomplish gasket removal in five years. (C-502)

Responding to these claims, EPA adopted a Final Rule that permits chemical manufacturers to continue to install new asbestos sheet gaskets

---

[19] USW agrees with industry (*e.g.,* Keller & Heckman Comments (C-502) at 16) and EPA, 89 Fed.Reg. at 21983, that requiring all asbestos sheet gaskets be removed within a short time would increase, not decrease, the risks of exposure. That is true because sheet gasket removal is a high exposure activity, but if equipment is operating properly gaskets are enclosed in the machinery and do not generate exposures. However, OSHA's asbestos standard, which has been in effect for 30 years, requires that facility owners identify asbestos containing material and label it. *See* 59 Fed.Reg. at 41022, 41044.

for two years, and then to leave already installed gaskets in place for their useful life, well beyond five years. In the meantime, however, EPA is not requiring chemical manufacturers – other than those manufacturing titanium dioxide – to implement any measures to protect workers. Yet, nothing in the record supports a finding that it would be infeasible for owners/operators in chemical manufacturing to implement the same worker protections EPA is imposing in the chlor-alkali and titanium manufacturing industries. In fact, industry representatives who objected to EPA's proposal to remove the gaskets within two to five years instead proposed a longer phase-out period, coupled with interim worker protections.[20]

In short, EPA is granting the chemical manufacturing industry permission to expose workers indefinitely to the unreasonable risks posed by work on asbestos sheet gaskets. Its failure to protect these workers violates Section 6(d)'s requirement that the Agency impose measures to eliminate unreasonable risks "as soon as practicable."

---

[20] *See* ACC Response to Notice of Data Availability (C-503) at 8 (recommends EPA "require compliance with the ECEL"); Comment submitted by The Chemours Company (C-366); Comment submitted by U.S. Chamber of Commerce (C-389); ACC RM Comments (C-402); Keller & Heckman Comments (C-502). *See also* C-490 (Comment submitted by Asbestos Disease Awareness Organization (ADAO);

### 3. The Final Rule's Application to Chemical Manufacturing Violates the Administrative Procedures Act, because it is not a Logical Outgrowth of the Proposed Rule.

The APA requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). In *Long Island Care at Home, Ltd. v. Coke*, 551 US 158 (2007), the Supreme Court explained that courts "have generally interpreted this to mean that the final rule the agency adopts must be a logical out-growth of the rule proposed. The object, in short, is one of fair notice." *Id.* at 175 (2007) (internal quotation marks and citations omitted). EPA failed to provide the public with "fair notice" that it was considering a risk management rule that extended the deadline for removing asbestos sheet gaskets in the chemical industry beyond five years without also requiring interim worker protections against exposures above .005 f/cc.

EPA's proposed rule would have prohibited the use of asbestos sheet gaskets after two years-- a requirement industry commenters assumed would require them to remove all asbestos sheet gaskets within that timeframe. The Agency's primary regulatory alternative would have

required removing all asbestos sheet gaskets within five years and imposed interim worker protections, including a reduced exposure limit, while the gaskets remained in use. EPA requested comment "including data on costs and feasibility" on requiring compliance with an interim exposure limit. 87 Fed.Reg. at 21726. Industry comments did not suggest doing so was infeasible and offered little to no information on the cost of implementing the interim worker protections.

EPA's Final Rule for titanium dioxide manufacturing is consistent with the proposal: In that condition of use, owner/operators may continue to use asbestos-containing sheet gaskets for 5 years, while following interim workplace protections beginning six months after the Rule was published. § 751.509(b); § 751.511(a). The Final Rule's treatment of chrysotile asbestos diaphragms in the chlor-alkali industry also follows the proposal: It provides a staged phase-out period, coupled with the same worker protections. §751.505; § 751.511(a). But nothing in the proposal gave the public notice that EPA was contemplating the Final Rule it promulgated for other chemical manufacturing workers: permitting use of the gaskets to continue indefinitely, while providing *no* interim protection for workers.

Moreover, as far as we have been able to determine, no one advocated for this outcome during the rulemaking process. Indeed, many industry representatives that requested the extended timeline for phasing out the use of sheet gaskets argued that EPA could safely extend the deadline *because interim worker protections would be in place.* (0389, 402, 0366, 503 (recommends EPA "require compliance with the ECEL), 502 490). Inexplicably, EPA chose an option few – if any – commenters advocated, which provides the least protection to exposed workers.

Having failed to give the public fair notice that it was considering this starkly different and clearly inadequate approach to risk management in the chemical manufacturing industry, EPA violated the APA.

## CONCLUSION

As required by TSCA, EPA conducted a risk evaluation for chrysotile asbestos and determined that it poses an unreasonable risk to exposed workers. Given that conclusion, TSCA requires EPA to issue a risk management rule that imposes requirements so the chemical "no longer poses such risk." In developing its risk management rule, EPA determined that in those conditions of use in which workers would

continue to be exposed to chrysotile, interim worker protections were necessary to minimize the risk. However, EPA failed to extend those protections to all workers exposed to sheet gaskets in the chemical industry.

There is overwhelming record evidence that chrysotile asbestos poses an unreasonable risk – the legal finding necessary to require interim worker protections in the chemical industry. The USW accordingly respectfully requests that this Court find that EPA has failed to satisfy its obligations under TSCA and the APA and order the Agency to amend the Final Rule to extend the protections in § 751.511 to the commercial use of chrysotile asbestos gaskets in chemical production.

Respectfully submitted,

/s/Randy S. Rabinowitz
Randy S. Rabinowitz, Esq.
Victoria L. Bor, Esq.
Occupational Safety & Health Law Project, LLC
P.O. BOX 3769
Washington, DC 20027
202 256-4080

Nathan Finch, Esq.
Motley Rice LLC
401 9th Street NW

Suite 630
Washington, DC 20004
(202) 607-8998

*Attorneys for Petitioner USW*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief uses a monospaced typeface and contains 7,199 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century font using Microsoft Word.

Dated:  September 30, 2024
       Washington, DC        _s/ *Randy S. Rabinowitz*_____
                             *Attorney for Petitioner, USW*

## CERTIFICATE OF SERVICE

I hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on September 30, 2024.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 30, 2024
Washington, DC

 s/ *Randy S. Rabinowitz*
*Attorney for Petitioner, USW*