No. 24-60193

# In the United States Court of Appeals for the Fifth Circuit

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY TECHNOLOGY COUNCIL,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

---

Consolidated with No. 24-60281

---

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION; HENRY A. ANDERSON, *Medical Doctor*; BRAD BLACK, *Medical Doctor*; BARRY CASTLEMAN, *Doctor* OF SCIENCE; RAJA FLORES, *Medical Doctor*; ARTHUR FRANK, *Medical Doctor*, *Doctor* OF PHILOSOPHY; PHIL LANDRIGAN, *Medical Doctor*, MASTER OF SCIENCE; RICHARD LEMEN, *Doctor* OF PHILOSOPHY, MASTER OF PUBLIC HEALTH; STEVEN MARKOWITZ, *Medical Doctor*, *Doctor* OF PUBLIC HEALTH; JACQUELINE MOLINE, *Medical Doctor*, MASTER OF SCIENCE; CELESTE MONFORTON, *Doctor* OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, *Medical Doctor*, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE; ANDREA WOLF, *Medical Doctor*, MASTER OF PUBLIC HEALTH,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, *Administrator, United States Environmental Protection Agency*,

*Respondents.*

Consolidated with No. 24-60333

OLIN CORPORATION,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, *Administrator, United States Environmental Protection Agency*,

*Respondents.*

**On Petitions for Review of Final Agency Action of the United States Environmental Protection Agency**
89 Fed. Reg. 21,970 (Mar. 28, 2024)

**BRIEF OF *AMICUS CURIAE* ALLIANCE FOR AUTOMOTIVE INNOVATION IN SUPPORT OF INDUSTRY PETITIONERS**

David Fotouhi
  *Counsel of Record*
Nathaniel J. Tisa
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8502
dfotouhi@gibsondunn.com
ntisa@gibsondunn.com

*Counsel for Alliance for Automotive Innovation*

# CERTIFICATE OF INTERESTED PERSONS

Nos. 24-60193, 24-60281, 24-60333

TEXAS CHEMISTRY COUNCIL, ET AL.,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate potential disqualification or recusal.

1.   PARTIES

(a)  Petitioners in No. 24-60193:

   (i)    Texas Chemistry Council

   (ii)   American Chemistry Council

   (iii)  Georgia Chemistry Council

   (iv)   Asbestos Disease Awareness Organization

   (v)    United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Int'l Union, AFL-CIO

   (vi)   Ohio Chemistry Technology Council

(b)  Petitioners in No. 24-60281:

      (i)        American Public Health Association

      (ii)       Collegium Ramazzini

      (iii)      Local F-116 (Vandenberg Pro. Firefighters), Int'l Association of Fire Fighters

      (iv)      Local F-253 (Fort Myer Pro. Firefighters), Int'l Association of Fire Fighters

      (v)       The Feelgood Foundation

      (vi)      Henry A. Anderson, M.D.

      (vii)     Brad Black, M.D.

      (viii)    Barry Castleman, D.Sc.

      (ix)      Raja Flores, M.D.

      (x)       Arthur Frank, M.D., PhD

      (xi)      Phil Landrigan, M.D., M.S.

      (xii)     Richard Lemen, PhD, MPH

      (xiii)    Steven Markowitz, M.D., DrPH

      (xiv)    Jacqueline Moline, M.D., M.S.

      (xv)     Celeste Monforton, DrPH, MPH

      (xvi)    Christine Oliver, M.D., MPH, M.S.

      (xvii)   Andrea Wolf, M.D., MPH

(c)  Petitioner in No. 24-60333:

      (i)        Olin Corporation

(d)  Respondents

    (i)     United States Environmental Protection Agency

    (ii)    Michael Regan, Administrator, United States Environmental Protection Agency

(e)  Amici

    (i)     Alliance for Automotive Innovation

    (ii)    U.S. Chamber of Commerce

    (iii)   National Federation of Independent Business Small Business Legal Center, Inc.

2.  ATTORNEYS

    (i)     Baker Botts, L.L.P.

    (ii)     Crowell & Moring LLP

    (iii)   Georgia Chemistry Council

    (iv)   Lexington Law Group, LLP

    (v)    Sussman and Associates

    (vi)   OSH Law Project, L.L.C.

    (vii)   Motley Rice, L.L.C.

    (viii)  Porter, Wright, Morris & Arthur, L.L.P.

    (ix)   Lexington Law Group, LLP

    (x)     Hunton Andrews Kurth LLP

    (xi)   U.S. Department of Justice Environmental and Natural Resources Division

    (xii)   U.S. Environmental Protection Agency Office of General Counsel

(xiii)     Gibson, Dunn & Crutcher LLP

(xiv)    Vinson & Elkins LLP

3.    OTHER

    (a) Importers, processors, and industrial users of chrysotile asbestos; members of American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, and Texas Chemistry Council.

Pursuant to Fed. R. App. P. 26.1, the undersigned further certifies that Alliance for Automotive Innovation ("Auto Innovators") is a non-profit trade association with no parent company and no outstanding public stock. No publicly held corporation has a 10% or greater ownership interest in Auto Innovators.

/s/ David Fotouhi
David Fotouhi
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8502
dfotouhi@gibsondunn.com

*Counsel of Record for Alliance for Automotive Innovation*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

TABLE OF CONTENTS ............................................................................ v

TABLE OF AUTHORITIES ..................................................................... vi

INTEREST OF *AMICUS CURIAE* ......................................................... 1

INTRODUCTION .......................................................................................... 1

BACKGROUND ............................................................................................. 5

ARGUMENT .................................................................................................. 11

    I.   The Risk Evaluation Violated TSCA's Requirements ................ 11

        A.  EPA Did Not Show An "Unreasonable Risk Of Injury." ...... 12

        B.  EPA Did Not Provide For Unbiased Peer Review. .............. 18

        C.  EPA's Analysis Was Scientifically Unsound ......................... 21

    II.  EPA's Chrysotile Asbestos Ban Is Inconsistent With TSCA's Reasonable Risk-Management Requirement. ............... 29

        A.  TSCA Does Not Permit Regulation At Any Cost. ................ 30

        B.  TSCA Specifically Limited EPA's Authority To Regulate Replacement Parts And Articles. .......................... 33

CONCLUSION .............................................................................................. 35

CERTIFICATE OF SERVICE ................................................................... 37

CERTIFICATE OF COMPLIANCE ......................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bittner v. United States,*
    598 U.S. 85 (2023) ................................................................ 17

*Chem. Mfrs. Ass'n v. EPA,*
    859 F.2d 977 (D.C. Cir. 1988) .......................................... 17

*Corrosion Proof Fittings v. EPA,*
    947 F.2d 1201 (5th Cir. 1991) .......................... 3, 10, 12, 29, 31, 32, 35

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
    805 F.2d 1050 (D.C. Cir. 1986) ...................................... 32

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.,*
    448 U.S. 607 (1980) ...................................................... 4, 17

*Inhance Techs., L.L.C. v. EPA,*
    96 F.4th 888 (5th Cir. 2024) ......................................... 32

*Louisiana v. Dep't of Energy,*
    90 F.4th 461 (5th Cir. 2024) ....................................... 32, 33

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ........................................................ 31

*NRDC v. Regan,*
    67 F.4th 397 (D.C. Cir. 2023) ....................................... 31

*Sinclair Wyo. Refin. Co. v. EPA,*
    114 F.4th 693 (D.C. Cir. 2024) ..................................... 17

*Southland Mower Co. v. CPSC,*
    619 F.2d 499 (5th Cir. 1980) ...................................... 12, 18

*Vinyl Inst., Inc. v. EPA,*
    106 F.4th 1118 (D.C. Cir. 2024) ................................... 6, 32

## Statutes

15 U.S.C. § 2601......................................................5, 31

15 U.S.C. § 2603............................................................16

15 U.S.C. § 2605...............3, 5, 6, 7, 8, 9, 12, 16, 18, 21, 30, 31, 33, 34, 35

15 U.S.C. § 2618............................................................31

15 U.S.C. § 2623.............................................................8

15 U.S.C. § 2625.....................................................4, 8, 21

15 U.S.C. § 2642.............................................................9

Pub. L. No. 114-182, 130 Stat. 448 (2016)..................................6

## Legislative History

161 Cong. Rec. 10,255 (2015) ..............................................9

162 Cong. Rec. 7,989 (2016) ..............................................32

162 Cong. Rec. 7,990 (2016) ...........................................8, 21

## Regulations

29 C.F.R. § 1910.1001......................................................11

29 C.F.R. § 1926.1101......................................................11

40 C.F.R. § 702.41.........................................................21

54 Fed. Reg. 29,460 (July 12, 1989).......................................10

83 Fed. Reg. 46,487 (Sept. 13, 2018)......................................21

84 Fed. Reg. 17,345 (Apr. 25, 2019).......................................11

89 Fed. Reg. 21,970 (Mar. 28, 2024) ...................14, 15, 29, 30, 33, 34, 35

*Risk Evaluation for Asbestos Part I: Chrysotile Asbestos*
    (Dec. 2020)...................10, 11, 13, 14, 15, 16, 22, 23, 25, 26, 27, 28, 29

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ............................................ 17, 34

Risk Evaluation for Asbestos Part I: Chrysotile Asbestos
　　Response to Comments (Dec. 2020) ........................... 16, 18, 20, 23, 24

## INTEREST OF *AMICUS CURIAE*

The Alliance for Automotive Innovation ("Auto Innovators") is an association of automakers, equipment manufacturers, and auto-related technology and aftermarket-part suppliers that represents the producers of over 90% of new cars and light trucks sold in the United States. The interest of Auto Innovators and its members in the chrysotile asbestos risk evaluation and risk-management rule promulgated by the Environmental Protection Agency ("EPA")—including the final rule's potential implications for ongoing civil litigation against manufacturers regarding alleged uses of chrysotile asbestos decades in the past—are set forth in the accompanying motion for leave to file this *amicus curiae* brief.[1]

## INTRODUCTION

This case turns on EPA's application of 2016 statutory amendments to the risk-evaluation and risk-management provisions of the Toxic Substances Control Act ("TSCA"). As evidenced by the glaring flaws in the challenged risk evaluation and risk-management rule, EPA appears to

_____

[1] No counsel for any party authored this brief in whole or in part. No entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

have selected chrysotile asbestos as a test case to claim sweeping authority to identify "unreasonable risks" without requisite evidence of real-world impacts and to eliminate all risks at any cost. Because that effort is flatly inconsistent with the amended statutory scheme, this Court should grant the petitions for review.

Before this rulemaking, a vanishingly small number of companies and consumers had been using chrysotile asbestos-containing articles without incident for decades. EPA conceded that only a few hundred workers and consumers per year face *any* risk of exposure, and even its most pessimistic models predicted no actual adverse-health effects in the vast majority of scenarios. And EPA estimated that transitioning away from these uses could cost as much as $3.4 billion, far outweighing any theoretical benefits of forcing a transition.

Nevertheless, EPA charged ahead by making chrysotile asbestos the first of the "First Ten" chemicals regulated after the TSCA amendments. In 2020, over strenuous objections by chemical engineers, toxicologists, and other experts, EPA finalized a risk evaluation that used untenable assumptions to find "unreasonable risk of injury" based on virtually *no evidence* of predicted real-world adverse effects from chrysotile-

2

asbestos exposure. In 2024, EPA finalized a risk-management rule that banned chrysotile asbestos in all contexts but one—the NASA Super Guppy aircraft—for which the agency contradicted its analytical approach to find no unreasonable risk. None of this was consistent with TSCA's sound-science requirements or black-letter agency-decisionmaking principles.

Auto Innovators respectfully submits this *amicus curiae* brief to provide this Court with additional perspective on TSCA's requirements and the harmful consequences of EPA's approach to the automotive and other industries moving forward. To these ends, Auto Innovators urges the Court to grant the petitions for review and vacate the risk evaluation and risk-management rule in their entirety for three principal reasons:

*First*, EPA's risk evaluation violated TSCA by concluding that chrysotile asbestos "presents an unreasonable risk of injury to health" even after the agency's models predicted no appreciable adverse-health effects in the real world. 15 U.S.C. § 2605(a), (b)(4)(A). "Congress did not enact TSCA as a zero-risk statute," *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1215 (5th Cir. 1991), and the 2016 amendments reinforced, rather than undermined, the requirement that EPA cannot act "on the

basis of [an] absolute, no-risk policy," *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 662 (1980).

*Second*, EPA's risk evaluation violated TSCA by using multiple unsound assumptions and failing to provide for unbiased peer review. EPA overestimated exposure by assigning arbitrary values to non-detect air samples and ignored critical distinctions between long- and short-fiber chrysotile-asbestos exposure. And EPA overestimated hazard by assuming *zero* background risk of mesothelioma, using data that reflected both amphibole- and chrysotile-asbestos exposure, and applying an unjustifiable multiplier to the modelled incidences of mesothelioma. None of this was consistent with "the best available science" or the "weight of the scientific evidence." 15 U.S.C. § 2625(h)–(i).

*Third*, EPA's risk-management rule violated TSCA by imposing billions of dollars in costs without anything close to corresponding benefits. EPA asserted authority to take this approach based on a fundamental misreading of the 2016 amendments, which retained TSCA's cost-benefit balancing requirement and expressly limited EPA's power to regulate the type of "replacement parts" and "articles" at issue here, including after-market automotive parts. 15 U.S.C. § 2605(c)(2)(D)–(E).

For these reasons and those set out by Industry Petitioners, this Court should vacate the risk evaluation and risk-management rule.

**BACKGROUND**

**I.** Congress enacted TSCA in 1976 to protect against chemicals that "may present an *unreasonable risk of injury* to health or the environment." 15 U.S.C. § 2601(a) (emphasis added). From the start, TSCA expressly committed EPA to regulate risk "in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation." *Id.* § 2601(b)(3). To achieve these goals, Congress authorized EPA to regulate only "unreasonable" risks "of injury" and provided that "the Administrator shall consider the environmental, economic, and social impact of any action" and "carry out this chapter in a reasonable and prudent manner." *Id.* § 2601(c).

TSCA requires EPA to use a scientific process to determine whether a particular use of a chemical "presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a). If EPA finds an unreasonable risk, it must "apply one or more of the" requirements set out in the statute from most to least restrictive "to the extent necessary" to address the risk, *id.*, including prohibition, *id.* § 2605(a)(1)(A), (a)(2)(A),

quantity limitations, *id.* § 2605(a)(1)(B), (a)(2)(B), warning and record-keeping requirements, *id.* § 2605(a)(3)–(4), (7), commercial-use regulations, *id.* § 2605(a)(5), and disposal requirements, *id.* § 2605(a)(6).

As originally enacted, Section 2605 addressed risk evaluation and risk management together, providing that EPA must regulate when "the Administrator finds that there is a *reasonable basis* to conclude" that one or more uses of a chemical presents an "unreasonable risk." 15 U.S.C. § 2605(a) (1976) (emphasis added). In addressing unreasonable risks, Section 2605 required EPA to apply statutory restrictions "to the extent necessary *to protect adequately* against such risk using the *least burdensome* requirements." *Id.* § 2605(a) (1976) (emphases added).

Congress amended TSCA in 2016 to address concerns with EPA's pace of implementation. *See* Pub. L. No. 114-182, 130 Stat. 448; *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1122 (D.C. Cir. 2024). While retaining TSCA's "unreasonable risk" framework and associated policies, the 2016 amendments set out a separate process for risk evaluations and changed the requirements for promulgating risk-management rules.

Section 2605(b) now requires EPA to prioritize and conduct risk evaluations for a minimum number of chemicals within statutory deadlines. 15 U.S.C. § 2605(b)(1)–(3). EPA must evaluate "unreasonable risk of injury to health or the environment[] without consideration of costs or other nonrisk factors," *id.* § 2605(b)(4)(A), (b)(4)(F)(iii), and, in evaluating unreasonable risk, "shall ... integrate and assess available information on hazards and exposure," "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures," and "describe the weight of the scientific evidence for the identified hazard and exposure," *id.* § 2605(b)(4)(F)(i), (b)(4)(F)(iv)–(v).

Section 2605(a) no longer requires selecting the "least burdensome" requirement to protect against unreasonable risk. Instead, when EPA identifies "an unreasonable risk of injury," it must "apply one or more of the [existing] requirements ... to the extent necessary so that the chemical ... no longer presents *such risk*." 15 U.S.C. § 2605(a) (emphasis added). In doing so, EPA "shall factor in" cost-benefit "considerations" added to the statute by the 2016 amendments, *id.* § 2605(c)(2)(B), including the "effects" and "magnitude of the exposure" of the chemical use, the

"benefits" of the use, "the reasonably ascertainable economic consequences of the rule," *id.* § 2605(c)(2)(A)(i)–(iv), and "the potential effects on employment," *id.* § 2623(a).

Congress also included new restrictions on EPA's TSCA authorities. The 2016 amendments require EPA to conduct risk assessments "in a manner consistent with the best available science" and "based on the weight of the scientific evidence." 15 U.S.C. § 2625(h)–(i). These provisions were critical in negotiations over the final legislation. Senator David Vitter, one of the amendments' principal sponsors, explained that these provisions would "ensure that EPA uses the best available science, bases scientific decisions on the weight of the scientific evidence rather than one or two individual cherry-picked studies," and prohibit "manipulat[ing] science to fit predetermined political outcomes." 162 Cong. Rec. 7,990 (2016).

The 2016 amendments also reenacted a version of TSCA's "least burdensome" requirement for "replacement parts" and "articles" that contain regulated chemicals. Under Section 2605(c)(2)(D), EPA "shall exempt replacement parts for complex durable goods and complex con-

sumer goods that are designed prior to" the risk-management rule "unless the Administrator finds that such replacement parts *contribute significantly* to the risk." 15 U.S.C. § 2605(c)(2)(D) (emphasis added). Under Section 2605(c)(2)(E), EPA "shall apply such prohibitions or other restrictions to an article or category of articles … only to the extent necessary to address the identified risks[.]" *Id.* § 2605(c)(2)(E). Rep. John Shimkus, another principal sponsor, explained that these provisions aimed to avoid "needless, expensive regulations" because "[c]onsumers want safe choices, not no choice at all." 161 Cong. Rec. 10,255 (2015).

**II.** Chrysotile asbestos is the "serpentine" variety of asbestos, which is a group of naturally occurring mineral fibers that were long considered desirable in friction automotive applications. *See* 15 U.S.C. § 2642(3). For example, historically, commercial chrysotile-asbestos fibers were utilized in automotive brakes due to their unique performance characteristics, including superior stopping ability and reliability under a wide range of driving conditions, their shear strength, malleability, and heat-management properties. Raw chrysotile has not been mined in the United States since 2002, but the chlor-alkali industry imports small quantities for use as conductive diaphragms and gaskets in chemical

9

manufacturing. *Risk Evaluation for Asbestos Part I: Chrysotile Asbestos* 23 (Dec. 2020), EPA-HQ-OPPT-2021-0057-0007 ("Evaluation"). Articles and replacement parts containing chrysotile asbestos in the automotive context are also imported and used in limited quantities. *Id.* The remaining "amphibole" varieties of asbestos—crocidolite, amosite, anthophyllite, tremolite, and actinolite—have not been imported or used in the United States for decades. *Id.* at 37.

EPA attempted to ban asbestos under Section 2605 in 1989. *See* 54 Fed. Reg. 29,460 (July 12, 1989). This Court vacated virtually the entire rule two years later as inconsistent with TSCA's risk-evaluation and cost-benefit requirements. In *Corrosion Proof Fittings*, 947 F.2d at 1223, this Court held that EPA lacked sufficient evidence of hazardous exposure to establish an "unreasonable risk," and that proceeding with the ban—which amounted to "spending $23.7 million to save less than one-third of a life"—reflected "cavalier treatment of EPA's duty to consider the economic effects of its decisions."

EPA did not attempt to regulate asbestos under Section 2605 again until this rulemaking. Nevertheless, the use of asbestos and asbestos-

containing products has declined precipitously. Remaining uses of asbestos are limited to chrysotile asbestos and regulated extensively under EPA's air, water, and disposal authorities, *see* Evaluation 23, and under OSHA's workplace standards, *see* 29 C.F.R. §§ 1910.1001, 1926.1101. Since 2019, discontinued uses of asbestos cannot be restarted without prior approval from EPA. *See* 84 Fed. Reg. 17,345 (Apr. 25, 2019).

## ARGUMENT

## I. The Risk Evaluation Violated TSCA's Requirements.

EPA's conclusion that chrysotile asbestos presents an unreasonable risk of injury is indefensible on multiple fronts: (A) On its own terms, EPA's model did not predict *any* appreciable risk of additional cancer cases for the small number of workers and consumers potentially exposed to chrysotile asbestos; (B) EPA allowed plaintiffs'-bar litigation experts to introduce bias or the appearance of bias into the peer-review process; and (C) EPA inflated its exposure and hazard estimates by cherry-picking studies, modifying data, and adjusting the results—exactly the type of results-oriented reasoning barred by TSCA's sound-science provisions. Because these flaws cut across EPA's evaluation of all six conditions of

use—as do those identified by Industry Petitioners—this Court should vacate the evaluation in its entirety. *See* Industry Br. 5, 43–54, 75.

## A. EPA Did Not Show An "Unreasonable Risk Of Injury."

"Congress did not enact TSCA as a zero-risk statute," *Corrosion Proof Fittings*, 947 F.2d at 1215, and the 2016 amendments did not disturb this fundamental paradigm. The statute's risk-evaluation standard reflects this legislative policy by requiring EPA to determine whether the chemical "*presents* an *unreasonable* risk *of injury* to health or the environment." 15 U.S.C. § 2605(b)(4)(A) (emphases added). Models showing speculative risk that are not predicted to cause any real-world injury are not enough to carry the agency's burden of showing an unreasonable risk. *Southland Mower Co. v. CPSC*, 619 F.2d 499, 510 (5th Cir. 1980).

**1.** The risk evaluation falls short of TSCA's "unreasonable risk" threshold. Even after stacking the methodological deck in multiple ways, EPA was unable to predict *any incremental cancer cases* from chrysotile-asbestos exposure in the overwhelming majority of modelled scenarios.

To start, EPA modelled hazard and exposure for worker, consumer, and bystander cohorts broken out by use and exposure scenarios. Evaluation 202–03, 212–13. EPA assumed chronic exposures over 40 or 62

years to estimate lifetime risk, *id.* at 180, and compared the estimated lifetime risk on a cohort-by-cohort basis against acceptable-risk benchmarks of $1 \times 10^{-4}$ for workers (1 in 10,000) and $1 \times 10^{-6}$ for consumers and bystanders (1 in 1,000,000), *id.* at 235–47. Because the agency's high-end (95th percentile) estimates for lifetime risk exceeded the benchmarks (except for the NASA Super Guppy cohort, where EPA used different and more generous assumptions, *infra*, at 25–26), EPA found chrysotile asbestos presents an unreasonable risk of injury to health. *Id.* at 248.[2]

The problem is that even under these layered worst-case scenarios, EPA generally did not predict *any* incremental cancer cases for the small number of individuals potentially exposed. *See* Paustenbach Comments 9, EPA-HQ-OPPT-2019-0501-0042. EPA noted about 1,000 potentially exposed workers across all worker cohorts[3] and just over 15,900 potentially exposed consumers from DIY auto maintenance. Evaluation 81,

---

[2] EPA found that chrysotile asbestos does not present unreasonable risk to the environment, and it opted against analyzing unreasonable risk for the general population. Evaluation 231–32.

[3] Including approximately 100 workers in the chlor-alkali industry, 6 in sheet-gasket stamping, 76 in sheet-gasket use, and 375 mechanics working with chrysotile asbestos-containing replacement parts. Evaluation

89, 94, 108, 135. EPA revised these estimates downward in the risk-management rule to 500 annual worker and 400 annual consumer exposures. 89 Fed. Reg. 21,970, 21,993–94 (Mar. 28, 2024).

For many of the modelled exceedances, the predicted number of excess *cases* was below one—meaning (again, even under worst-case assumptions) the model did not predict any risk would materialize over the lifetime of the cohort. For example, the 100-worker chlor-alkali-industry cohort had an expected lifetime risk (assuming 40 years of exposure starting at age 16) between $1.6 \times 10^{-4}$ and $6.8 \times 10^{-4}$, meaning 0.16 to 0.68 predicted cases. *See* Evaluation 184. For the 375-worker mechanic cohort, the expected high-end lifetime risk was $1.9 \times 10^{-3}$, meaning 0.6 predicted cases.[4] And for the 15,900-consumer DIY auto-maintenance cohort, the

---

81, 89, 94, 108. EPA observed that as many as 128,000 workers could be exposed to chrysotile asbestos via oilfield brake blocks but lacked further information and conceded that "the magnitude of th[e] releases and resulting worker exposure levels is not known." *Id.* at 100–01.

[4] EPA's analysis of the mechanic cohort was also marred by unexplained inconsistencies. For example, to estimate 375 annual exposures, EPA assumed that 749,000 mechanics perform brake changes and applied a 0.05 adjustment factor because "asbestos brakes may represent approximately 0.05% of aftermarket automotive brakes." Evaluation 108, 241. But EPA later found based on actual data that "1,800 sets of automotive

expected high-end lifetime risk (assuming 62 years of regular outdoor brake changes) was $1.3 \times 10^{-6}$, meaning 0.2 predicted cases. *See id.* at 209.

The few scenarios for which EPA's model predicted an incremental case were marred by unreasonable assumptions. To find an exceedance for consumers despite the results of the outdoor model, for example, EPA assumed that all consumers perform DIY auto-work *indoors* on a regular basis for 62 years. Evaluation 206. EPA based its indoor scenario on a study of mechanics in a repair garage using brake-grinding techniques from the 1960s that itself found no exceedance of exposure limits. *Id.* at 131. Dr. Dennis Paustenbach—a board-certified toxicologist and industrial hygienist with decades of experience in risk assessment whose work EPA cited elsewhere in the evaluation, *id.* at 104, 107, 120—explained that the study could not be extrapolated, and that EPA's lifetime-exposure assumption was unreasonable, Paustenbach Comments 83 ("I pray

_____

brakes or brake linings containing asbestos may be imported into the U.S. each year, representing *0.002%* of the total U.S. market for aftermarket brakes." 89 Fed. Reg. at 21,995 (emphasis added). EPA never explained why it used a 25-times higher adjustment figure in its exposure analysis than the import data supported, and its analysis seriously overstated the risk as a result—an adjustment value of 0.002 yields *15* annual exposures, not 375, meaning only 0.03 predicted real-world predicted cases.

that I am not performing gasket work on my vehicles when I am 78 years of age."). EPA acknowledged its confidence in the model was low but refused to return to the more credible outdoor model. Response to Comments 115, EPA-HQ-OPPT-2019-0501-0118 ("RTC").

**2.** This Court need not determine the limits of the "unreasonable risk of injury" requirement to hold this risk evaluation missed the mark. Theoretical models that do not reliably predict *any* adverse real-world outcomes do not establish that a chemical use "presents an unreasonable risk of injury" within the meaning of TSCA Section 2605. 15 U.S.C. § 2605(a), (b)(4)(A). The plain meaning of each term makes that clear.

First, Section 2605 uses "presents," a present-tense and active verb, not the more flexible "*may* present" standard used for EPA's TSCA authority to require chemical testing. 15 U.S.C. § 2603(a)(1)(A)(i)(I) (emphasis added). Courts have interpreted even the "may present" standard to require a "more-than-theoretical basis for inferring the existence of exposure." *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 988 (D.C. Cir. 1988). And the "difference in meaning" between "presents" and "may presents" shows "that Congress self-consciously" adopted a higher standard here.

*Id.* at 986 n.10; *see Bittner v. United States*, 598 U.S. 85, 94 (2023) ("difference[s] in language … convey a difference in meaning").

Second, TSCA's specification of "risk *of injury* to health" reinforces the standard's relationship to predicted real-world effects. "Injury" means "harm or damage," Black's Law Dictionary 939 (11th ed. 2019), and the law has long recognized that risk only amounts to an injury when sufficiently concrete and non-speculative, *Indus. Union*, 448 U.S. at 662. Congress tied the standard to "risk of injury," not just "risk," and "regulatory discretion and flexibility do not permit EPA" to read this term out of the statute. *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 707 (D.C. Cir. 2024) (vacating rule that ignored statutory terms).

Third, TSCA requires more than showing *a* risk of injury—the risk must be "unreasonable." EPA asserted that because TSCA now requires the agency to evaluate risk "without consideration of non-risk factors," the agency need not take reasonableness into account when setting benchmarks and analyzing risk. RTC 209, 217–18. But the 2016 amendments *retained* Section 2605(b)'s "unreasonable risk" requirement and went further by mandating that EPA "*shall*" consider the "*frequency*, *and number* of exposures" in evaluating risk. 15 U.S.C § 2605(b)(4)(F)(iv)

(emphases added). The statute's continued use of "unreasonable" has meaning that EPA cannot simply ignore. "It must be remembered that the statutory term 'unreasonable risk' presupposes that a real, and not a speculative, risk be found to exist" before the agency may regulate. *Southland Mower*, 619 F.2d at 510 (quotation and alteration omitted).

Commenters pointed out that the small number of potentially exposed individuals meant the risk was theoretical and not unreasonable, Paustenbach Comments 9, but the agency doubled-down on its view, stating that: "Under TSCA, EPA does not need to consider the number of exposed individuals to reach a determination of unreasonable risk to health." RTC 217. That plainly violates TSCA's mandate to consider the "frequency" and "number of exposures." 15 U.S.C § 2605(b)(4)(F)(iv).

## B. EPA Did Not Provide For Unbiased Peer Review.

EPA's untenable conclusions cannot be explained by science, but as commentators pointed out—including Dennis Paustenbach, an expert who has worked with the agency for decades—they may be explained by involvement of plaintiffs'-bar litigation experts at every step of the rulemaking process. *See* Paustenbach Comments 9 ("If EPA wants to encourage future, possibly unnecessary or unwarranted litigation, I can think

of no better way to do that than issue this document as currently written."); Paustenbach Slides 12, EPA-HQ-OPPT-2019-0501-0095 ("It is apparent that experts for the plaintiff bar and plaintiff lawyers requested this analysis. It is not clear why EPA agreed to proceed.").

As the U.S. Chamber explained, a member of the TSCA Science Advisory Committee on Chemicals ("SACC") that advised EPA during this rulemaking and two of the ten ad-hoc peer reviewers selected to critique the evaluation have actively pushed for a ban on asbestos in the past and served as paid witnesses in asbestos tort actions. U.S. Chamber Comments 5–6, EPA-HQ-OPPT-2019-0501-0084. Courts have rejected at least two of these witnesses' testimony on asbestos exposure as unreliable. *Id.* Yet all three were extensively involved in the process, including at the SACC hearing on the evaluation, EPA-HQ-OPPT-2019-0501-0114 ("SACC Tr.") 2–3, and EPA modified the evaluation to include additional adverse-health assumptions based on feedback from that process, *e.g.*,

RTC 215 (referencing EPA's 1.06x upward adjustment of lung cancer estimates to reflect unmodelled additional cancers).[5]

This apparent bias was material to EPA's conclusions and has been a boon to the plaintiffs and their paid experts in ongoing asbestos litigation. TSCA risk evaluations are intended to be scientifically sound prerequisites for EPA regulation. But, by pushing EPA to adopt worst-case assumptions at every turn leading to sweeping findings of unreasonable risk, experts with an established bias and financial interest ensured that plaintiffs in other litigation could use EPA's risk evaluation to support claims for alleged exposures decades in the past. EPA was on notice of this conflict of interest, but took no action to correct it.

---

[5] At least one of these peer reviewers serves on the Science Advisory Board of Petitioner Asbestos Disease Awareness Organization ("ADAO"). U.S. Chamber Comments 5. In this case and elsewhere, ADAO has emphasized that its "goal under TSCA" has "been to reverse the years of inaction on asbestos that followed the 1991 court decision [in *Corrosion Proof Fitting*]" by "motivat[ing]" EPA "to eliminate all remaining importation and use of asbestos." Dkt. 108-2 ¶ 25. To further this goal, ADAO's advisory board members "submitted critical comments" on the evaluation and "made oral presentations to the SACC," *id.* ¶ 32, all while one of their own was responsible for reviewing the scientific validity of EPA's risk evaluation.

If the bias reflected in the regulatory development process is not sufficient to vacate the risk evaluation, then EPA's failure to follow the statute and its own policies certainly is. The SACC's role is "to provide independent advice and expert consultation," 15 U.S.C. § 2625(o)(2), and EPA committed itself to selecting peer-reviewers in a manner that avoids the "appearance of loss of impartiality" and "lack of independence," 83 Fed. Reg. 46,487, 46,487 (Sept. 13, 2018); 40 C.F.R. § 702.41. Here, EPA's scientific process failed to live up to these principles and gave rise to exactly the sound-science problem that Congress foresaw and endeavored to avoid—"manipulat[ing] science to fit" predetermined "outcomes." 162 Cong. Rec. 7,990 (statement of Sen. Vitter).

## C. EPA's Analysis Was Scientifically Unsound.

EPA was only able to predict the theoretical risk set out in the evaluation by misstating data, cherry-picking studies, and multiplying the resulting outputs by unsound adjustment factors. That violated TSCA's requirements to use "the best available science," 15 U.S.C. § 2625(h), and to "make decisions" based on "the weight of the scientific evidence," *id.* §§ 2605(b)(4)(F)(v), 2625(i); *accord* Industry Br. 44 ("EPA made a series

of compounding conservative assumptions that reflect not the actual conditions of use, but a perfect-storm, worst-case world.").

**1.** EPA's exposure analysis was a case study in statistical manipulation, in part because the agency chose not to simply order air-quality testing when it identified an information gap. *Accord* Industry Br. 45–54 (identifying examples of unreasonable assumptions in the workplace setting). Three examples are particularly telling and demonstrate why this Court should send EPA back to the drawing board.

*Air Sampling Non-Detects.* For the few cohorts that EPA made any effort to obtain air-quality testing, "more than half of the samples were non-detectable"—that is, did not reliably show chrysotile-asbestos fibers. Evaluation 82. EPA entered this data as *positive* results *at the detection level* or, in some cases, the detection level divided by two or four "depending on the skewness of the data distributions." *Id.* As noted by Dr. David Garabrant, a professor emeritus of epidemiology and occupational medicine at the University of Michigan, that means "EPA's inferred values systematically overestimate fiber counts." Garabrant Comments 1, 3, EPA-HQ-OPPT-2019-0501-0034; *see* Vinyl Inst. Comments 4, EPA-HQ-OPPT-2019-0501-0091 (raising same objection).

*Fiber Length*. EPA estimated hazard and exposure to consumers from DIY brake changes using models of adverse-health outcomes in textile mills and exposure estimates from a study of professional auto-shop mechanics in the 1960s. Evaluation 128, 164–67. But DIY brake changes involve far smaller fibers than those in textile mills.

As Dr. Paustenbach explained, the weight of the evidence shows that "fiber length" "appears to have a significant impact on the likelihood of developing an asbestos-related disease, especially for chrysotile." Paustenbach Comments 30 (summarizing research and the conclusions of an expert panel). Textile-asbestos fibers from the studied mills "were in the 40-micron range," whereas the few refined, commercial chrysotile-asbestos fibers remaining in dust from brake-wear debris is "99% [of the time] shorter than 5 microns" because chrysotile asbestos in brake pads largely burns up or degrades into other substances because of the high temperatures generated during the friction-braking process. *Id.* at 88. Even the SACC agreed that EPA should better justify its assumptions in this regard. *See* RTC 137.



EPA responded with a single study and follow-on assessment that purported to find that shorter fibers also have cancer risk. RTC 137, 169. That single citation was too thin a reed to establish the "weight of the scientific evidence," particularly on an issue so hotly contested by experts in the field. Even if EPA were entitled to rely on its preferred study in this manner, it should still have adjusted for differences in risk between the short fibers analyzed in that study and the long fibers analyzed in the textile-mill studies—but the agency did not do that, either.

*Inconsistent Analysis*. The extraordinary lengths to which EPA went to identify hazard and exposure are highlighted by the one cohort where EPA took the opposite approach—the NASA Super Guppy aircraft.

---

[6] Evaluation 104.



EPA found (per NASA's submission) that the Super Guppy uses 256 brake blocks containing 43% chrysotile asbestos and takes about 100 flights per year. Evaluation 114. Technicians replace brake pads about four times per year. *Id.* at 116. On its face, that activity was comparable to brake-block workers and consumers performing brake changes, and EPA estimated similar exposure in certain scenarios. *Id.* at 123.[8]

---

[7] Evaluation 114.

[8] With one critical difference—unlike chemical-industry workers, Super Guppy technicians "are not required to use respiratory protection." Evaluation 116. As Industry Petitioners explain, EPA's finding in a context where respiratory protection is *not* used cannot be reconciled with the agency's assumption that the risk is worse in industries that *do* use such protections. Industry Br. 34–35, 46.

But EPA reached a different conclusion by crediting information for the Super Guppy that it assumed away for every other cohort. Because the Super Guppy's brake blocks are replaced in an indoor booth (after outdoor removal), EPA assumed that "no" workers would be indirectly exposed. Evaluation 115–16. EPA credited air samples and did not, as with other occupational settings, extrapolate additional risk from unrelated studies. *E.g.*, *id.* at 99. EPA assumed respirator use was unnecessary, which it refused to do for other workers. *Id.* at 116, 200. And EPA assessed lifetime risk from "age 26 years with 20 years exposure" rather than from "age 16 years" with "40 y[ear] exposure" as it did for all other worker cohorts, *e.g.*, *id.* at 201, 234. EPA thus applied inconsistent assumptions to private versus governmental workplaces without explanation—a tell-tale sign of unreasonable, outcome-driven analysis.

**2.** EPA similarly went to great lengths to vastly overestimate the hazard. The existence of a causal pathway between exposure and cancer was largely undisputed, but EPA applied at least three unsupportable adjustments to the hazard analysis anyway until the risk was high enough to reach the agency's preferred bottom-line conclusion.

*Background Levels of Mesothelioma*. For lung cancer, EPA used a "relative risk model" that accounts for non-chrysotile-asbestos causes of disease such as smoking. Evaluation 154. For mesothelioma, however, EPA used an "absolute risk model" that attributed *all* cases to chrysotile exposure—thus, "no comparison population [was] needed to estimate the absolute risk among people exposed to asbestos." *Id.*; *see also id.* at 160.

That assumption overstated the risk and runs headlong into the evidence. EPA's own cited study stated that asbestos exposure is "the overwhelmingly dominant cause," but not the only cause, of mesothelioma. Evaluation 154. Commenters explained that 20% of mesothelioma cases involve persons with no known asbestos exposure, SACC Tr. 629:4–9, and that established alternative causes include "ionizing radiation, erionite, fluoroedenite, and age," as well as genetic mutations, Garabrant Comments 2; Paustenbach Comments 7–8, 87. By using an absolute model that ignored these alternative causes, EPA inflated its data on mesothelioma risk by a substantial margin.

*Upward Adjustment for Mesothelioma*. Next, EPA multiplied the number of mesothelioma cases in its dataset by 1.39x to account for "underascertainment" of the disease in diagnoses made before mesothelioma

received its own classification code in 1999.  Evaluation 171–72.  EPA based this number on a single 2011 study of death certificates for workers exposed to *amphibole* asbestos.  *Id.*  As Dr. Garabrant explained, this arithmetic finger-on-the-scales was indefensible—even the study relied on by EPA cautioned that the 1.39x figure was context-dependent and provided a smaller, alternative adjustment figure (which EPA ignored).  Garabrant Comments 20.  Underascertainment varies state-by-state—according to NIOSH, the range is .056x to 1.25x.  *Id.*

*Amphibole vs. Chrysotile Asbestos.*  In reaching a final hazard estimate, EPA selected health-outcome data from studies of workers at a North Carolina textile mill from 1950 to 1973.  Evaluation 164.  Because EPA limited the risk evaluation to *chrysotile* asbestos, the agency assumed that the data applied only to that type of asbestos—and its conclusion depended on that assumption, because amphibole varieties of asbestos "are at least 100-fold more potent for causing mesothelioma than chrysotile."  Paustenbach Comments at 5.

But one of the largest facilities at the North Carolina plant *did* process amphibole asbestos for 13 years, as EPA was forced to acknowledge.

Evaluation 164.  EPA pressed ahead regardless, claiming that the amphibole "operation was isolated" from other worksites and using these studies' unusually high cancer rates relative to alternative studies as *the* key input for analyzing chrysotile-asbestos hazard.  *Id.*  Commenters objected that EPA lacked any evidence for that claim based on physical and historical information about the plant's operations, Garabrant Comments 5–15; Paustenbach Comments 27, but all to no avail.

## II.    EPA's Chrysotile Asbestos Ban Is Inconsistent With TSCA's Reasonable Risk-Management Requirement.

EPA applied its statutory interpretation again in the risk-management rule, which "address[ed] the unreasonable risk" by banning the use of chrysotile asbestos (except for the NASA Super Guppy).  89 Fed. Reg. at 21,971.  EPA concluded that the estimated $3,000-$6,000 quantifiable annual benefits of the rule somehow justified its costs, which the agency estimated—without skipping a beat—as up to $43,000,000 annually and $2,800,000,0000-$3,400,000,000 in total.  *Id.*  Because that no-risk, any-cost approach plainly violates TSCA, this Court should vacate the rule.  *See* Industry Br. 5, 62–70, 75.

## A. TSCA Does Not Permit Regulation At Any Cost.

EPA's eye-popping cost-benefit ratio was possible only because the agency read the 2016 TSCA amendments as giving it *carte blanche* to regulate risk at any cost. EPA went out of its way to assert that the 2016 amendments abrogated this Court's decision in *Corrosion Proof Fittings*, which analogized TSCA's requirements to the Consumer Product Safety Act ("CPSA") and Occupational Safety and Health ("OSH") Act. 89 Fed. Reg. at 21,973. According to EPA, the "2016 amendments … alter[ed] both the manner of identifying unreasonable risk under TSCA and EPA's authority to address unreasonable risk" such that the statute "is increasingly distinct from analogous provisions of" those statutes. *Id.* at 21,999.

EPA's statutory interpretation—designed to self-aggrandize its power—is wrong. Because TSCA is not a zero-risk statute, EPA has authority *only* to address risk until it is no longer unreasonable. 15 U.S.C. § 2605(a) (upon finding that a chemical "presents an *unreasonable risk* of injury," EPA must select a remedial option that ensures the chemical "no longer presents *such risk*" in the specified conditions of use) (emphases added). But EPA exceeded its authority here. By imposing measures

that remove *all risk* rather than unreasonable risk, EPA read the critical term "unreasonable" out of the statute.[9]

Furthermore, in the 2016 amendments, Congress removed cost considerations from the risk-evaluation process but expressly retained TSCA's cost-benefit approach to risk-management rules. TSCA continues to require that EPA "shall carry out this chapter in a reasonable and prudent matter" and "shall consider the environmental, economic, and social impact of any action." 15 U.S.C. § 2601(c). Congress provided that EPA "shall factor in" a detailed set of cost considerations, including "the magnitude of the exposure," "the benefits of the chemical," "economic consequences," "costs and benefits," and "effects on employment." *Id.* §§ 2605(c)(2)(A)–(B), 2623(a). And Congress recommitted to TSCA's core policy—addressing "unreasonable risk[s] of injury." *Id.* § 2605(a).

These provisions are not discretionary—"shall" is a "mandatory" command. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007); *NRDC v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023). Congress

---

[9] Perhaps recognizing that EPA lacks statutory authority to ban asbestos without regard to identified risks or conditions of use, petitioner ADAO has "pursued a two-track strategy of working with Congress" on legislation to ban asbestos. Dkt. 108-2 ¶ 25.

again tasked the courts to enforce the statute's balanced approach under TSCA's substantial-evidence standard, 15 U.S.C. § 2618(c)(1)(B)(i), which is "more rigorous than the arbitrary and capricious standard normally applied to informal rulemaking," *Corrosion Proof Fittings*, 947 F.2d at 1214 (quotation omitted). As Senator Vitter explained, TSCA "created a higher level of judicial review," and the 2016 amendments "ma[de] no changes to the process for judicial review of rulemakings or the standard of review." 162 Cong. Rec. 7,989 (2016); *accord Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 892 n.5 (5th Cir. 2024); *Vinyl Inst.*, 106 F.4th at 1125 n.6.

EPA does not comply with TSCA's command to "consider" costs by finalizing a rule with a 10,000:1 cost-benefit ratio. "Stating that a factor was considered" is "not a substitute for considering it," *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986), and "'conclusory statements'" do "not constitute adequate agency consideration of an important aspect of a problem," *Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024) (citing *Corrosion Proof Fittings*, 947 F.2d at 1227).

Because EPA's approach is inconsistent with TSCA's requirements, vacatur of the entire risk-management rule is required. *See* Industry Br. 63–70 (raising cross-cutting arguments about EPA's statutory authority).

## B. TSCA Specifically Limited EPA's Authority To Regulate Replacement Parts And Articles.

Nowhere are the flaws in EPA's interpretation more apparent than its decision to disregard express limits imposed by the 2016 amendments on the agency's power to regulate "replacement parts" and "articles." *See* Auto Innovators Comments 3–5 (emphasizing the precedent-setting nature of this rulemaking and urging EPA to apply these provisions).

**1.** TSCA provides that EPA "shall exempt replacement parts for complex durable goods and complex consumer goods" designed before the final rule "unless … such replacement parts contribute significantly to the risk." 15 U.S.C. § 2605(c)(2)(D)(i). EPA conceded that aftermarket brakes and gaskets are "replacement parts" for "complex" goods that fall within the meaning of the exemption provision. 89 Fed. Reg. at 21,998.

Nevertheless, EPA found "that the replacement parts contribute significantly to the identified unreasonable risk" and did not "exemp[t] replacement parts from regulation in this final rule." 89 Fed. Reg. at 21,998. That's not an adequate explanation, *Louisiana*, 90 F.4th at 473,

and its implications for consumer products going forward are untenable. EPA offers no standard for denying the exemption and articulates no basis for believing the risks attributed to chrysotile-asbestos containing aftermarket parts are "significan[t]." If exposure by "approximately 400 consumers" per year is "significan[t]" enough to ban an entire category of replacement parts, 89 Fed. Reg. at 21,994, then EPA's authority is boundless and the exception has no meaning.

**2.** TSCA largely revives the "least burdensome" requirement for regulating consumer articles: EPA "shall apply such prohibitions or other restrictions to an article or category of articles containing the chemical substance or mixture *only to the extent necessary* to address the identified risks[.]" 15 U.S.C. § 2605(c)(2)(E) (emphasis added). The statute does not separately define "article," but EPA offered a definition that accords with the term's ordinary meaning. 89 Fed. Reg. at 22,006; *Article*, Black's Law Dictionary 138 (11th ed. 2019) ("a particular item or thing"). Here again, EPA conceded that "brake blocks," "brake/linings," "vehicle friction products," and additional products covered by the final rule are "articles." 89 Fed. Reg. at 21,998.

But EPA read its way around this provision as well, stating that "EPA had no feasible option to prevent these risks other than a complete prohibition" because it couldn't "assume consumers who replace their own automobile brakes will consistently use appropriate respiratory protection." 89 Fed. Reg. at 21,998. That, too, is inadequate. EPA didn't explain why less-burdensome TSCA restrictions, including warnings, labelling, use instructions, or public notices wouldn't be enough to address the "unreasonable risks" identified by the agency. 15 U.S.C. § 2605(a)(3), (7); *Corrosion Proof Fittings*, 947 F.2d at 1217 ("Under TSCA, the EPA was required to evaluate, rather than ignore, less burdensome regulatory alternatives."). The most obvious alternative follows from the risk evaluation, which found aftermarket parts present an unreasonable risk of injury to consumers only by assuming indoor DIY brake changes. Because outdoor changes presented no such risk, warnings and labels specifying outdoor (or open-garage-door) changes would address it.

## CONCLUSION

For the reasons set out above, Auto Innovators respectfully submits that this Court should vacate EPA's risk evaluation and chrysotile-asbestos rule in their entirety.

Dated: October 7, 2024          Respectfully submitted,

GIBSON, DUNN & CRUTCHER, LLP

*/s/ David Fotouhi*
David Fotouhi
  *Counsel of Record*
Nathaniel J. Tisa
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8502
dfotouhi@gibsondunn.com
ntisa@gibsondunn.com

*Counsel for Alliance for*
*Automotive Innovation*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 7, 2024, I filed the foregoing Amicus Brief using the Court's ECF system. Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

Dated:  October 7, 2024       Respectfully submitted,

*/s/ David Fotouhi*
David Fotouhi
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8502
dfotouhi@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

1. This Amicus Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because the Brief contains 6,495 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, as counted by the automated function of Microsoft Word Professional Plus 2019.

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2019 in New Century Schoolbook 14-point font.

Dated:  October 7, 2024        Respectfully submitted,

/s/ David Fotouhi
David Fotouhi
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8502
dfotouhi@gibsondunn.com