No. 24-60193

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Chemistry Council; American Chemistry Council; Georgia Chemistry Council; Asbestos Disease Awareness Organization, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO; Ohio Chemistry Technology Council,
*Petitioners*,

v.

United States Environmental Protection Agency,
*Respondent.*

Consolidated with No. 24-60281

American Public Health Association; Collegium Ramazzini; FeelGood Foundation; Local F-116 (Vandenberg Professional Firefighters), International Association of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters), International Association of Fire Fighters; Henry A. Anderson; Brad Black; Barry Castleman; Raja Flores; Arthur Frank; Phil Landrigan; Richard Lemen; Steven Markowitz; Jacqueline Moline; Celeste Monforton; Christine Oliver; Dan Whu; Andrea Wolf,
*Petitioners*,

v.

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,
*Respondents.*

Consolidated with No. 24-60333

Olin Corporation,
*Petitioner*,

v.

United States Environmental Protection Agency; Michael S. Regan, Administrator,
United States Environmental Protection Agency,
*Respondents.*

Petitions for Review of Final Action
by the U.S. Environmental Protection Agency

**RESPONDENTS' STATUTORY AND REGULATORY ADDENDUM
VOLUME 2 OF 2**

KATHERINE E. KONSCHNIK
*Acting Assistant Attorney General*

Of Counsel:

DEREK GILLIAM                    LAURA J. GLICKMAN
CAMILLE HEYBOER                  KRISTEN SARNA
*Attorneys*                      *Attorneys*
U.S. Environmental Protection Agency    Environment and Natural Resources Division
                                 U.S. Department of Justice
                                 Post Office Box 7611
                                 Washington, D.C. 20044

                                 January 17, 2025

## TABLE OF CONTENTS

162 Cong. Rec. 7939, 7980 (2016) ................................................................ Add-189

162 Cong. Rec. 7939, 7984 (2016) ................................................................ Add-193

162 Cong. Rec. 7939, 7985 (2016) ................................................................ Add-194

H.R. Rep. No. 114-176 (2015) .................................................................... Add-196

S. Rep. No. 94-698 (1976) ......................................................................... Add-200

S. Rep. No. 114-67 (1976) ......................................................................... Add-214

# SENATE—*Tuesday, June 7, 2016*

The Senate met at 10 a.m. and was called to order by the President pro tempore (Mr. HATCH).

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Eternal God, who knows what is best for us, we submit today to Your loving providence. Continue to be our refuge and strength, a very present help in the time of trouble. May we never forget that nothing in all creation can separate us from Your love.

Bless our lawmakers. Fill their hearts with such love for You that no difficulty or hardship will prevent them from obeying Your precepts. Help them to remember that those who walk in integrity travel securely.

Lord, strengthen their resolve to serve You as they should and in doing so may they become more aware of Your continuous presence.

We pray in Your great Name. Amen.

## PLEDGE OF ALLEGIANCE

The President pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## RECOGNITION OF THE MINORITY LEADER

The PRESIDING OFFICER (Mr. COTTON). The Democratic leader is recognized.

## DONALD TRUMP AND THE JUDICIARY COMMITTEE CHAIRMAN

Mr. REID. Mr. President, the Republican nominee of our great country continues to attack a Federal judge because of his Mexican heritage. This is not only wrong, it is racist and un-American. It is also a fundamental attack on the American judiciary system.

When issues like these arise, the Nation has historically looked to the Senate for leadership. In particular, throughout our history, the Senate Judiciary Committee has been a bastion of independence and bipartisanship. When Federal judges are under assault, we should expect the chairman of the Judiciary Committee to rise above politics and condemn racism—but not this Judiciary chairman who is now the chairman of the committee in the United States Senate, not the senior United States Senator from Iowa.

Instead of a bold feat of bipartisanship, we are left with yet another example of how he has become the most partisan Judiciary chairman in the history of America. Instead of rising above partisanship and condemning Trump's racist attacks on a highly qualified judge—by the way, who was born in Indiana—Senator GRASSLEY kisses Trump's ring and toes the party line. Instead of condemning Trump, GRASSLEY defended him.

His rationale is mind-boggling. Listen to this: Senator GRASSLEY says that Trump must respect the Judiciary because over the course of hundreds of lawsuits and years of litigation, Trump has actually won some cases. I can't make up something like this.

For example, a quote from a newspaper article:

Grassley also suggested Trump's propensity for filing lawsuits showed some level of respect for the judicial branch.

"He must respect the Judiciary," Grassley said. "I've seen statistics that he's won over 400 cases, only lost 30."

How about that. I find it curious that the chairman doesn't have time to read Merrick Garland's questionnaire or give him a hearing, but he has time to study Donald Trump's success rate in the courtroom. This says a lot, and one of the things it says is what Senator GRASSLEY's priorities are.

In spite of everything coming out of Donald Trump's mouth, Senator GRASSLEY remains loyal to Donald Trump. According to an Iowa newspaper, the Ames Tribune, Senator GRASSLEY told his constituents on Friday: "He isn't concerned by any of the controversial or inflammatory rhetoric coming from the Trump campaign."

I am a little disappointed, but—with what has happened the last couple of months—not surprised. I believe no Member of the Senate has done more for Donald Trump than the chairman of the Senate Judiciary Committee.

In January, when many Republicans were still trying to distance themselves from Donald Trump, Senator GRASSLEY introduced Trump at an Iowa campaign event. Since then, despite dozens of editorials against Senator GRASSLEY and pressure from his constituents, Senator GRASSLEY has done everything in his power to hold open a Supreme Court seat for Donald Trump to fill. I am surprised Senator GRASSLEY has yet to acknowledge these racist attacks on Judge Curiel because these attacks are beyond the pale. Instead, Senator GRASSLEY chose to further establish himself as a Trump cheerleader, just like the Republican leader has done.

Last week Senator GRASSLEY told his constituents:

He's building confidence with me.

Talking about Trump.

I've already said I'm going to vote for him. . . . I'd campaign with him.

But this is not the beginning of Senator GRASSLEY's campaign for Donald Trump. Senator GRASSLEY's entire chairmanship the past 6 months has been one big campaign push for Trump. His committee has become an extension of the Trump campaign. The Republican Judiciary Committee has done everything to focus on boosting Trump but has neglected to do its job in the process.

Under Chairman GRASSLEY, the committee is reporting out almost no bills, fewer judicial nominations than any time in recent history, and because of this inaction by the chairman of the Judiciary Committee, the Senate has confirmed fewer judges than in decades. We heard the report yesterday of how the Federal system of courts in our country is in disrepair. Why? Because the Judiciary Committee is processing none of the appointments President Obama has made.

What has the Judiciary Committee done instead? It has spent its time carrying out a political hit job on Secretary Clinton. Senator GRASSLEY has wasted countless dollars and staff time developing partisan opposition research that he hoped could be used to help Trump's candidacy against Secretary Clinton. It hasn't helped, but it has shortened the pocketbook of the American people. Senator GRASSLEY has been so desperate to drag Secretary Clinton's name through the mud that he even encouraged the FBI to leak an independent review of Secretary Clinton's use of email.

At every turn, the senior Senator from Iowa has used his committee for partisan purposes that benefit only one person: Donald Trump. There is no better example than the current vacancy on the Supreme Court. Rather than doing his constitutional duty and processing Merrick Garland's nomination, Chairman GRASSLEY took his marching orders from Trump, and Trump said: Delay, delay, delay. And that is exactly what the Senator from Iowa has done—delay, delay, delay.

Chairman GRASSLEY is hoping to run out the clock. He is hoping President Trump gets to nominate the next Supreme Court Justice. That is why last month Senator GRASSLEY said of Trump: "I think I would expect the right type of people to be nominated by [Trump] to the Supreme Court."

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Senate floor talking about some stupid bird. But I say this: When one sees the voyage that this bird has to make, a little shore bird used to running along the shore making this epic voyage every year—one of them has been measured, because of a tag on its ankle, to have flown the distance from here to the moon and halfway back in its life—if one can't see the hand of God in that creature, I weep for their soul.

So I thank my colleague from Delaware for his staff and the experts he brought along to help us learn about this. Like Rhode Island, Delaware has been proactive in planning for the risks that we face in a warmer and wetter future.

I yield the floor to the distinguished junior Senator from Delaware.

Mr. COONS. With that, Mr. President, I want to conclude by commenting that our day together began and ended with citizen science. The very first thing we did was to visit Delaware's national park to participate in a bio blitz, where volunteers from all over the country were identifying species and categorizing the threats to them from climate change. The very last thing we did was to count horseshoe crabs along the Cape Henlopen shore. I must say that my colleague from Rhode Island, even though there was driving rain and there were difficult conditions, was passionate and determined to do everything we could to contribute to the counting effort of the horseshoe crabs that day. It was a terrific opportunity to see a State that is engaged in planning and preparation and to witness one of the most remarkable migrations across our globe.

I want to express my gratitude to Senator WHITEHOUSE for his leadership on this issue.

Mr. WHITEHOUSE. Will the Senator yield for a question?

Mr. COONS. The Senator will yield for a question.

Mr. WHITEHOUSE. Were we, indeed, the two wettest Senators that day?

Mr. COONS. We were, indeed, the most persistently wet Senators in the entire country by the end of a very wet and very fulfilling day up and down the State of Delaware.

With that, I thank my colleague from Rhode Island.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

---

## TSCA MODERNIZATION ACT OF 2015

Mr. INHOFE. Mr. President, I ask that the Chair lay before the Senate the message to accompany H.R. 2576.

The Presiding Officer laid before the Senate the following message from the House of Representatives:

*Resolved,* That the House agree to the amendment of the Senate to the bill (H.R. 2576) entitled "An Act to modernize the Toxic Substances Control Act, and for other purposes." with an amendment to the Senate amendment.

### MOTION TO CONCUR

Mr. INHOFE. Mr. President, I move to concur in the House amendment to the Senate amendment.

I ask unanimous consent that there now be 45 minutes of debate on the motion, and that following the use or yielding back of time, the Senate vote on the motion to concur.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. INHOFE. For the information of Senators, this will allow us to pass this bill tonight by voice vote.

Mr. President, I ask unanimous consent that for that 45 minutes of debate, the Senator from California, Mrs. BOXER, be recognized for 10 minutes; followed by the Senator from Louisiana, Mr. VITTER; and then go back and forth in 5-minute increments.

The PRESIDING OFFICER. Is there objection?

The Senator from California.

Mrs. BOXER. Reserving the right to object, Mr. President, I want to make a little clarification.

Senator UDALL has asked for 10 minutes. If we could use our time, allowing this Senator 10 minutes, and then after Senator VITTER's time, we would go to Senator UDALL for 10 minutes and then back to the other side. Then Senator MARKEY wanted 5 minutes and Senator WHITEHOUSE wanted 5 minutes as well—if it would go in that order as stated, with 10 for myself, 10 for Senator UDALL, 5 for Senator MARKEY, and 5 for Senator WHITEHOUSE.

Mr. INHOFE. I believe that adds up to our 45 minutes, and I will just not speak until after the vote.

The PRESIDING OFFICER. Is there objection to modifying the request?

Mrs. BOXER. There would be 5 minutes left, if that is all right.

Mr. INHOFE. I will amend my unanimous consent request.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mrs. BOXER. Mr. President, I want to start off by thanking my dear friend, Senator INHOFE. We have had a wonderful relationship when it comes to the infrastructure issues. We have not worked terribly well together on environmental issues, but because of both of our staffs and the Members of our committee on both sides of the aisle, we were able to tough it out and come up with a bill that I absolutely believe is better than current law.

I will be entering into the RECORD additional views by four leading Democratic negotiators—myself, Senator UDALL, Senator MERKLEY, and Senator MARKEY.

I rise in support of H.R. 2576, the Frank R. Lautenberg Chemical Safety for the 21st Century Act. I spoke at length about this before, so I won't go on for a long time. But I do want to reiterate that the journey to this moment has been the most complicated journey I have ever had to take on any piece of legislation, and I have been around here for a long time.

It was a critical journey. When naming a bill after Senator Lautenberg, who fought for the environment all his life, the bill must be worthy of his name, and, finally, this bill is.

It didn't start out that way. I used every prerogative I had, every tool in my arsenal to bring it down until it got better, and it is better. It is better than current law.

Asbestos, for example, is one of the most harmful chemicals known to humankind, and it takes 15,000 lives a year. It is linked to a deadly form of lung cancer called mesothelioma. People can breathe in these fibers deep into their lungs where they cause serious damage. We have addressed asbestos in this bill. We didn't ban it on this bill, which I support—and I have standalone legislation to do that—but we have made asbestos a priority in this bill.

Flame retardants are another category of dangerous chemicals. They have been linked to a wide array of serious health problems, including cancer, reduced IQ, developmental delays, obesity, and reproductive difficulties. These harmful chemicals have been added to dozens of everyday items such as furniture and baby products. So when we are talking about TSCA reforming the toxic laws, we are not just talking about a conversation, we are not just talking about a theory, we are not talking about something you would address in a classroom. We are talking about our families.

Now, the negotiations have been challenging. Many organizations in many States stood strong despite the pressure to step back, and I am so grateful to them for their persistence. I especially want to thank the 450 organizations that were part of the Safer Chemicals, Healthy Families coalition that worked with me, as well as the Asbestos Disease Awareness Organization for their efforts. Without them, I would not have had the ability to negotiate important improvements.

Let me highlight briefly a few of the most important changes in the final bill. I can't go one more minute without thanking the two people who are sitting right behind me, Bettina Poirier, who is my chief of staff on the committee and chief counsel, and Jason Albritton, who is my senior adviser. They worked tirelessly—through the night sometimes—with Senator INHOFE's staff. Without their work, we never would have gotten to this point, and we never would have gotten to a bill worthy of Frank's name, and it means a great deal to me.

The first major area of improvement is the preemption of State restrictions

on toxic chemicals. In the final bill, we were able to make important exceptions to the preemption provisions.

First, the States are free to take whatever action they want on any chemical until EPA has taken a series of steps to study a particular chemical. Second, when EPA announces the chemicals they are studying, the States still have up to a year and a half to take action on these particular chemicals to avoid preemption until the EPA takes final action.

Third, even after EPA announces its regulation, the States have the ability to get a waiver so they can still regulate the chemical, and we have made improvements to that waiver to make it easier for States to act.

For chemicals that industry has asked EPA to study, we made sure that States are not preempted until EPA issues a final restriction on the chemical, and for that I really want to thank our friends in the House. They put a lot of effort into that.

The first 10 chemicals EPA evaluates under the bill are also exempted from preemption until the final rule is issued. Also, State or local restrictions on a chemical that were in place before April 22, 2016, will not be preempted.

So I want to say, as someone who comes from the great State of California—home to almost 40 million people and which has a good strong program—we protected you. Would I rather have written this provision myself? Of course, and if I had written it myself I would have set a floor in terms of this standard and allowed the States to take whatever action they wanted to make it tougher. But this was not to be. This was not to be. So because I couldn't get that done, what we were able to get done were those four or five improvements that I cited.

The States that may be watching this debate can really gear up and move forward right now. There is time. You can continue the work on regulations you passed before April. You can also have a year and a half once EPA announces the chemical, and if they don't announce anything, you can go back to doing what you did before. An EPA that is not funded right, I say to my dearest friend on the floor today, is not going to do anything. So the States will have the ability to do it. I would hope we would fund the EPA so we have a strong Federal program and strong State programs as well. But we will have to make sure that the EPA doesn't continually get cut.

The second area of improvement concerns asbestos. I think I have talked about that before. It is covered in this bill.

The third area of improvement concerns cancer clusters. This one is so dear to my heart and to the heart of my Republican colleague, Senator CRAPO. We wrote a bill together called the Community Disease Cluster Assist-

ance Act, or "Trevor's Law." Trevor's Law provides localities that ask for it a coordinated response to cancer clusters in their communities.

What Trevor taught us from his experience with a horrible cancer is that sometimes these outbreaks occur and no one knows why. Yet it is considered a local issue. Now, if the local community requests it—if they request it—they will get help.

Fourth, we have something called persistent chemicals. Those are chemicals that build up in your body. You just don't get rid of them. They are a priority in this legislation.

Fifth, another one that is dear to my heart and dear to the heart of Senator MANCHIN and Senator CAPITO is this provision that ensures that toxic chemicals stored neared drinking water are prioritized. This provision was prompted by the serious spill that contaminated the drinking water supplies in West Virginia in 2014, causing havoc and disruption. They didn't know what the chemical was. It got into the water. They didn't know what to do. As we all remember, it was a nightmare for the people there—no more. Now we are going to make sure that the EPA knows what is stored near drinking water supplies.

The sixth is very important and is something that got negotiated in the dead of night. I want to thank Senator INHOFE's staff for working with my staff on this. The bill enables EPA to order independent testing if there are safety concerns about a chemical, and these tests will be paid for by the chemical manufacturer. I also want to thank Members of the House who really brought this to us.

Finally, even the standard for evaluating whether a chemical is dangerous is far better than in the old TSCA. The bill requires EPA to evaluate chemicals based on risks, not costs, and considers the impact on vulnerable populations. This is really critical. The old law was useless. So all of these fixes make this bill better than current Federal law.

Looking forward, I want to make a point. This new TSCA law will only be as good as the EPA is good. With a good EPA, we can deliver a much safer environment for the American people—safer products, less exposure to harmful toxics, and better health for our people. With a bad EPA that does not value these goals, not much will get done. But, again, if a bad EPA takes no action, States will be free to act.

Mr. President, I ask for 30 additional seconds, and I will wrap this up.

Mr. INHOFE. Reserving the right to object, we do have this down with five people.

Mrs. BOXER. I ask unanimous consent for 30 seconds. I am just going to end with 30 seconds, and I will add 30 seconds to your side.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. BOXER. I say to the States: You are free to act with a bad EPA. Compared to where we started, we have a much better balance between the States and the Federal Government. It is not perfect. The bills I worked on with Frank did not do this. They did not preempt the States. But because of this challenging journey, we respected each other on both sides, we listened to each other on both sides, and today is a day we can feel good about.

We have a decent bill, a Federal program, and the States will have a lot of latitude to act.

I yield the floor.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. VITTER. Mr. President, I rise also to laud a really significant achievement that we are going to finalize tonight with the final passage of the Frank R. Lautenberg Chemical Safety for the 21st Century Act.

This much needed bill will provide updates that have been due literally for decades to the Toxic Substances Control Act of 1976, known as TSCA for short, which has been outdated and overdue for updating since almost that time. Now, getting to where we are tonight, about to pass this by an overwhelming vote, following the 403-to-12 vote in the House a few weeks ago, did not happen overnight. In fact, it took about 5-plus years.

In 2011 I started discussions with a broad array of folks, certainly including Senator Lautenberg. That is when I first sat down with Frank and started this process in a meaningful way and when we agreed that we would try to bridge the significant differences between our two viewpoints and come up with a strong bipartisan bill.

That same year I also sat down with JOHN SHIMKUS of Illinois to let him know that Frank and I were going to put in a lot of effort to come up with this framework, and we wanted him to be a full and equal and contributing partner. Over the next year and a half, we slogged through that process of trying to come up with a strong bipartisan bill. It wasn't easy. Between Senator Lautenberg and myself and our staffs and other staffs, there was an often brutal stretch of difficult negotiations and challenging times, testing everybody's patience.

Several times we walked away to come back together again. Finally, it did come together. In early 2013, that really started taking shape. Toward the end of April 2013, we were far enough along to lock a small group of staff and experts in a room to finalize that first bipartisan bill. There were folks like Bryan Zumwalt, my chief counsel then; Dimitri Karakitsos, who is my counsel and is now a key staffer who continues on the EPW Committee; Senator Lautenberg's chief counsel, Ben Dunham; and his chemical adviser, Brendan Bell.

That led finally to this first bipartisan bill that we introduced on May 23, 2013. Now, that wasn't the end of our TSCA journey. Unfortunately, in many ways, the most difficult segment of that journey was soon after that introduction on May 23, because on June 3, just a few weeks later, Frank passed. The single greatest champion of reforming how chemicals are regulated died at 89 years of age.

That was heartbreaking. But it was a moment when all of us who had been involved only redoubled our commitment to following this through to the end. Soon after Frank's unfortunate passing, our colleague TOM UDALL really stepped up to the plate in a major way to take Frank's role as the Democratic lead in this effort. We had a quiet dinner one night here on Capitol Hill to talk about our commitment to carry on this fight and get it done. We formed a partnership and a friendship that was really built around this work with an absolute commitment to get that done. I will always be so thankful to TOM and his partnership and also to his great staff, including their senior policy adviser, Jonathan Black.

As with most major undertakings, we had a lot of other help all along the way. Early on, at that stage of the process, Senators CRAPO and ALEXANDER were extremely helpful. Also, a little later on, Senators BOOKER, MERKLEY, and MARKEY did a lot to advance the ball and refine the product. Of course, at every step of the way, I continued to meet and talk with Congressman JOHN SHIMKUS. He was a persistent and a reliable partner in this process, as was his senior policy adviser, Chris Sarley.

Throughout this process, staff was absolutely essential and monumental. They did yeoman's work in very, very difficult and trying circumstances. I mentioned Bryan Zumwalt, my former chief counsel. He was a driving force behind this. I deeply appreciate and acknowledge his work, as well as someone else I mentioned, Dimitri Karakitsos, who continues to work as a key staffer on the committee and who is seeing this over the goal line.

Let me also thank Ben Dunham, the former chief counsel to Senator Lautenberg. I think in the beginning, particularly, Ben, Bryan, and Dimitri gave each other plenty of help but worked through very difficult negotiations to get it done.

Also, I want to thank Jonathan Black and Drew Wallace in Senator UDALL's office and Michal Freedhoff and Adrian Deveny in Senator MARKEY's office.

On the outside, there are a lot of experts from all sorts of stakeholders across the political spectrum, certainly including industry representatives with the American Chemistry Council. I want to thank Mike Walls, Dell Perelman, Rudy Underwood, Amy DuVall, Robert Flagg, and, of course their leader, Cal Dooley.

Finally, there is one enormous figure who is owed a great debt of gratitude and a lot of credit for seeing this over the goal line tonight; that is, Frank's better half—and I say that with deep respect and admiration to Frank, but surely his better half—Bonnie Lautenberg. She has been called the 101st Senator, particularly on this issue. She was devoted to seeing Frank's work completed. I thank her for her relentless effort reaching out to Members in the House and Senate and stakeholders to make sure this happened.

As I mentioned at the beginning, this is long overdue. All stakeholders across the political spectrum agreed for decades that this aspect of the law needed to be updated. We needed to fully protect public health and safety, which we all want to do. We also needed to ensure that American companies, which are world leaders today in science, research, and innovation remain so and do not get put behind a regulatory system which is overly burdensome and unworkable.

This TSCA reform bill, properly named after Frank Lautenberg, achieves those goals. It is a positive, workable compromise in the best sense of that term, so that we will achieve public health and safety. It ensures that our leading American companies, great scientists, great innovators, and great world leaders in this sector remain just that and that they remain the world leaders we want and need them to continue to be.

So I thank all of those who have contributed to this long but ultimately successful and worthwhile effort. With that, I look forward to our vote.

I yield the floor.

The PRESIDING OFFICER. The Senator from New Mexico.

Mr. UDALL. Mr. President, let me just initially, while Senator VITTER is still on the floor here, thank him so much. He was a great partner in terms of working on this piece of legislation thoroughly through the process over 3 years. We met, I think, about 3 years ago and had a dinner and decided, after Frank Lautenberg had died—he did a lot of work on the bill—that we would pick it up and make it happen. He has been a man of his word, and it has been a real pleasure working with him.

Let me just say about Chairman INHOFE that what they say in the Senate is that if you have a strong chairman, you can get a bill done. He has been remarkable in terms of his strength and his perseverance in terms of moving this bill. So we are at a very, very historic point today. I think I would call it a historic moment. I thank the Senator. It has been a pleasure working with the Senator. I enjoined working with the Senator when I was on the committee, and I am going to enjoy working with Chairman INHOFE in the future in terms of many other issues that come before us in the Senate.

I don't have any doubt that this is a historic moment several years and Congresses in the making. For the first time in 40 years, the United States of America will have a chemical safety program that works and that protects our families from dangerous chemicals in their daily lives. This is significant. Most Americans believe that when they buy a product at the hardware store or the grocery store, that product has been tested and determined to be safe. But that is not the case.

Americans are exposed to hundreds of chemicals from household items. We carry them around with us in our bodies and even before we are born. Some are known as carcinogens, others as highly toxic. But we don't know the full extent of how they affect us because they have never been tested. When this bill becomes law, there will finally be a cop on the beat.

Today, under the old TSCA, reviewing chemicals is discretionary. When this bill is law, the EPA will be required to methodically review all existing chemicals for safety, starting with the worst offenders. Today, the old law requires that the EPA consider the costs and benefits of regulation when studying the safety of chemicals. Very soon, EPA will have to consider only the health and environmental impacts of a chemical. If they demonstrate a risk, EPA will have to regulate.

Very soon, it will be enshrined in the law that the EPA most protect the most vulnerable people—pregnant women, infants, the elderly, and chemical workers. Today, the old TSCA puts burdensome testing requirements on the EPA. To test a chemical, the EPA has to show a chemical possesses a potential risk, and then it has to go through a long rulemaking process.

Very soon, EPA will have authority to order testing without those hurdles. Today, the old TSCA allows new chemicals to go to market without any real review, an average of 750 a year. Very soon, the EPA will be required to determine that all chemicals are safe before they go to the market.

Today, the old TSCA allows companies to hide information about their products, claiming it is confidential business information, even in an emergency. Very soon, we will ensure that companies can no longer hide this vital information.

States, medical professionals and the public will have access to the information they need to keep communities safe. Businesses will have to justify when they keep information confidential. That right will expire after 10 years. Today, the old TSCA underfunds the EPA so it doesn't have the resources to do its job.

Very soon, there will be a dedicated funding stream for TSCA. It will require industry to pay its share, $25 million a year. In addition, this new law will ensure victims can get access to the courts if they are hurt. It will revolutionize unnecessary testing on animals, and it will ensure that States can continue to take strong action on dangerous chemicals.

The Senate is about to pass this legislation. It is going to the President, and he will sign it. Over the past several days, I have gotten the same question over and over: What made this legislation different? Why was the agreement possible when other bills stalled? I thought about it quite a bit. It wasn't that the bill was simple. This was one of the most complex environmental pieces of legislation around. It certainly wasn't a lack of controversy. This process almost fell apart many times. It certainly wasn't a lack of interest from stakeholders. Many groups were involved, all with strong and passionate views and some with deep distrust. We faced countless obstacles, but I think what made this possible was the commitment and the willpower by everyone involved to see good legislation through and endure the slings and the arrows. I say a heartfelt thank-you to everyone involved.

I remember having dinner with Senator VITTER one evening early on when I was trying to decide whether I would take up Frank Lautenberg's work on this bill. There was already plenty of controversy and concern about the bill. Senator VITTER and I were not used to working with each other. In fact, we have almost always been on opposite sides. But I left that dinner with the feeling that Senator VITTER was committed, that he wanted to see this process through and was willing to do what it would take. For 3 years, I never doubted that. Both of us took more than a little heat. We both had to push hard and get important groups to the table and make sure they stayed at the table. I thank Senator VITTER. He has been a true partner in this process.

There are many others to thank, and I will, but before I do that, I want to say a few words about this bill's namesake. Frank Lautenberg was a champion for public health and a dogged, determined leader for TSCA reform. He cared so much for his children and grandchildren that he wanted to leave a better, healthier, safer environment for them. He always said that TSCA reform would save more lives than anything he ever worked on.

This is a bittersweet moment for all of us because Frank isn't here to see this happen, but I have faith that he is watching us and he is cheering us on. His wife Bonnie has been here working as the 101st Senator. She has been a force and inspiration, keeping us going, pushing us when we needed it. She helped us fulfill Frank's vision.

In the beginning, we thought the bill might not ever get introduced in the Senate. We entered this Congress after the Republicans took the majority. Many felt that strong environmental legislation was impossible. They urged us to wait. But many of us felt that 40 years was already too long to wait. We knew we could do it, make it better, and get it passed.

Senator CARPER was one of those key members on the Environment Committee. He gave us legs to get out of the gate. He and Senators MANCHIN and COONS were among our original cosponsors. They recognized that we had a great opportunity before us, and I thank them all.

They say that in order to get things done in Washington, you need a good, strong chairman, and Chairman INHOFE fits that description. I thank Chairman INHOFE and especially his staff, Ryan Jackson and Dimitri Karakitsos. Chairman INHOFE's team was instrumental in moving things forward and working with me to ensure that we built the broadest possible support. They knew that with broad support, we could do better than get it out of committee, we could get it across the finish line.

There are days when we all feel discouraged by gridlock here in Washington, but Chairman INHOFE and Senator VITTER rose above that. They saw the value of working together across party and across House and Senate.

Senators BOOKER, MERKLEY, and WHITEHOUSE all understood that we could work together. I thank them, too, for sticking with this bill and working through differences. As a result of their efforts, the bill gives States stronger protections, it helps reduce unnecessary testing on animals, and it includes a number of other improvements. Their staff—Adam Zipkin, Adrian Deveny, and Emily Enderle, among others—were key.

A strong bipartisan vote of 15 to 5 out of the committee set us up for action on floor. As many of you know, floor time is valuable and hard to come by and subject to nonpertinent issues. We needed to work to ensure the broadest possible support. We did that with Senators DURBIN and MARKEY, our 59th and 60th cosponsors of our legislation. I thank them and their staff members, Jasmine Hunt and Michal Freedhoff, for their important work to improve key aspects of the Federal program, such as fees and implementation dates, and to ensure that we could pass this bill through the Senate.

The PRESIDING OFFICER (Mr. ROUNDS). The time of the Senator has expired.

Mr. UDALL. Mr. President, has my time expired?

The PRESIDING OFFICER. Yes, it has.

Mr. UDALL. Thank you very much.

Let me just say that I am going to stay over. I thank the two Senators. I am going to stay with Senator INHOFE and thank additional people because I think it is that important, but we have this time agreement, and we need to move on.

I yield to Senator MARKEY for 5 minutes, and then we are going to Senator WHITEHOUSE for 5 minutes unless there is a Republican to intervene. Chairman INHOFE, is that correct?

Mr. INHOFE. That is right.

I would also say that I will forgo my remarks in order to give them more time until after the vote.

The PRESIDING OFFICER. Who yields time?

Mr. UDALL. I yield time to—the agreement, as I understand it, is that Senator MARKEY will speak for 5 minutes and Senator WHITEHOUSE for 5 minutes and then back to the Chair.

Mr. INHOFE. Yes, that is already a unanimous consent.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. MARKEY. Mr. President, today Congress stands ready to reform the last of the core four environmental statutes. It may do so with a stronger bipartisan vote than any other major environmental statute in recent American history.

For a generation, the American people have been guinea pigs in a terrible chemical experiment. Told that all the advances in our chemistry labs would make us healthier, happier, and safer, American families have had to suffer with decades of a law that did nothing to ensure that was true. That is because when the industry successfully overturned the EPA's proposed ban on asbestos, it also rendered the Toxic Substance Control Act all but unusable. Children shouldn't be unwitting scientific subjects. Today we have a chance to protect them by reforming this failed law.

As ranking Democrat on the Senate subcommittee of jurisdiction, I was one of a handful of Members who participated in an informal conference with the House. With Senators UDALL, BOXER, and MERKLEY, I have prepared a document that is intended to memorialize certain agreements made in the bicameral negotiations that would typically have been included in a conference report.

In our work with the House, we truly did take the best of both bills when it came to enhancing EPA's authority to regulate chemicals.

The degree to which States will be preempted as the Federal Government regulates chemicals has been a source of considerable debate since this bill was first introduced. I have always been a very strong supporter of States' rights to take actions needed to protect their own residents. For many of us, accepting preemption of our States was a difficult decision that we only made as we also secured increases to the robustness of the EPA chemical safety program.

I am particularly pleased that efforts I helped lead resulted in the assurance that Massachusetts' pending flame retardant law will not be subjected to pause preemption and that there is a mechanism in the bill to ensure that States' ongoing work on all chemicals can continue while EPA is studying those chemicals.

The fact that the bill is supported by the EPA, the chemical industry, the chamber of commerce, and the trial lawyers tells you something. The fact that a staggering 403 Members of the House of Representatives voted for this TSCA bill—more than the number who agreed to support the Clean Air Act, the Clean Water Act, or the Safe Drinking Water Act amendments when those laws were reauthorized—tells you something. What it tells you is that we worked together on a bipartisan and bicameral basis to compromise in the way Americans expect us to.

Although there are many people who helped to create this moment, I wish to thank some whose work over the past few months I especially want to recognize.

I thank Bonnie Lautenberg. On behalf of her husband Frank, she was relentless.

Senator INHOFE and his staffers, Ryan Jackson and Dimitri Karakitsos, remained as committed to agreements they made about Senate Democratic priorities as they were to their own commitment priorities throughout this process. I couldn't have imagined a stronger or more constructive partnership.

I would like to thank Senator UDALL and his staffers, Drew Wallace and Jonathan Black, whose leadership—especially during these challenging moments—was very important.

I also thank Senator MERKLEY and his staff, Adrian Deveny, whose creativity often led us to legislative breakthroughs, especially when it came to crafting certain preemption compromises.

My own staff, Michal Freedhoff, has done little but this for 1 consecutive year. This is her 20th year on my staff. With her Ph.D. in biochemistry—it was invaluable in negotiating with the American Chemistry Council and all other interests.

I want to thank many other Members: Senator BOXER; Senator WHITEHOUSE and his staff, Bettina, along with BARBARA BOXER; Senator MCCONNELL; Senator REID; Senator DURBIN—all central players in making sure this legislation was here today.

I thank the spectacular and hardworking EPA team, all of whom provided us with technical assistance and other help, often late at night and before the dawn.

I thank Gina McCarthy, Jim Jones, Wendy Cleland-Hamnet, Ryan Wallace, Priscilla Flattery, Kevin McLean, Brian Grant, David Berol, Laura Vaught, Nicole Distefano, Sven-Erik Kaiser, and Tristan Brown.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. MARKEY. Mr. President, I ask unanimous consent for 1 additional minute.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. MARKEY. I also thank Ryan Schmit, Don Sadowsky, and Scott Sherlock.

I want to thank Stephenne Harding and Andrew McConville at CEQ, whose day-to-day engagement helped us, especially in these last few weeks.

There are some outside stakeholders who worked particularly closely with my staff and with me, including Andrew Rogers, Andrew Goldberg, Richard Denison, Joanna Slaney, Mike Walls, Rich Gold, and Scott Faber.

I have enjoyed meeting, working with, and partnering with each one of these outstanding people over the last year.

This is a huge bill. It is a historic moment. It is going to make a difference in the lives of millions of Americans. It is the most significant environmental law passed in this generation.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. MARKEY. The old law did not work. This one is going to protect the American people.

I yield back the remainder of my time.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. President, as the song said, it has been a long, strange trip getting here, and it has had its share of near-death experiences, as Senator UDALL is intimately aware of. I was involved with Senator MERKLEY and Senator BOOKER in one of those near-death experiences. If this was a rocket with stages, one of the major stages was the Merkley-Booker-Whitehouse effort in the committee. I just wanted to say it was the first time the three of us worked together as a triumvirate. They were wonderful to work with. They were truly a pleasure. We had a lot on our plates. We made about a dozen major changes in the bill.

I want to take just a moment to thank Emily Enderle on my staff, who was terrific through all of the negotiations and renegotiations and counter-negotiations in that stage. But this was obviously a rocket that had many more stages than that one.

I thank Chairman INHOFE and his staff for their persistence through all of this.

Ranking Member BOXER was relentless in trying to make this bill as strong as she could make it through every single stage, and it is marked by that persistence.

Senator VITTER and Senator INHOFE forged the original notion that this compromise could be made to happen, and they have seen it through, so I congratulate them.

The House had a rather different view of how this bill should look. Between Senator INHOFE, Senator UDALL, Representative PALLONE, and Representative UPTON, they were able to work out a bicameral as well as a bipartisan compromise that we all could agree to.

There are a lot of thanks involved, but I close by offering a particular thank-you to my friend Senator UDALL. In Greek mythology there is a Titan, Prometheus, who brought fire to humankind. His penalty for bringing fire to humankind was to be strapped to the rock by chains and have Zeus send an eagle to eat his liver every single day. It is an image of persisting through pain. I do have to say Senator VITTER may have had his issues on his side—I do not know how that looked—but I can promise on our side TOM UDALL persisted through months and months of pain, always with the view that this bill could come to the place where this day could happen.

There are times when legislation is legislation, and there are times when legislation has a human story behind it. This is a human story of courage, foresight, persistence, patience, and willingness to absorb a considerable number of slings and arrows on the way to a day when slings and arrows are finally put down and everybody can shake hands and agree we have, I think, a terrific victory. While there is much credit in many places, my heart in this is with Senator TOM UDALL of New Mexico.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. MERKLEY. Mr. President, today, while the Nation has been focused on the final six primaries across the Nation, the final six State primaries across the Nation, something extraordinary is unfolding here on the floor of the Senate. The Senate is taking the final congressional act to send the Frank R. Lautenberg Chemical Safety for the 21st Century Act to the President's desk.

This is landmark legislation that honors the legacy of our dear colleague Frank Lautenberg. This is landmark legislation that will make a real difference for the health and safety of every American. This is the first significant environmental legislation to be enacted by this Chamber in 25 years.

This bill—this extraordinary bill—brought Democrats and Republicans together to take action to protect public health. I have been honored to be a part of this coalition as we have worked toward a final bill for over a year. It hasn't been easy, but things worth doing are rarely easy.

A huge thank-you to Senators UDALL and VITTER, who cosponsored this bill, lead the way; Senators BOXER and INHOFE, the chair and ranking member of the Environment Committee; and Senators MARKEY, WHITEHOUSE, and BOOKER for their leadership and contributions throughout this entire process.

Also, a special thank-you to the staff who worked day and night. I know I received calls from my staff member Adrian Deveny at a variety of hours on a variety of weekends as he worked with other staff members to work out, iron out the challenges that remained, so a special thank-you to Adrian Deveny.

Just a short time ago, I had the chance to speak to Bonnie Lautenberg, Frank Lautenberg's wife. She would have loved to have been here when we took this vote, but she is going to be down in the Capitol next week with children and grandchildren. I hope to get a chance to really thank her in person for her husband's leadership but also for her leadership, her advocacy that we reached this final moment. She said to me: It appears it takes a village to pass a bill. Well, it does. This village was a bipartisan village. This was a bicameral village. It has reached a suc-cessful conclusion.

In the most powerful Nation on Earth, we should not be powerless to protect our citizens from toxic chemicals in everyday products. Today marks a sea shift in which we finally begin to change that. For too long, we have been unable to protect our citizens from toxic chemicals that hurt pregnant women and young children, chemicals that hurt our children's development, chemicals that cause cancer.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act will tremendously improve how we regulate toxic chemicals in the United States—those that are already in products and should no longer be used and those new chemicals that are invented that should be thoroughly examined before they end up in products—and make sure that toxic chemicals don't find their way into our classrooms, into our bedrooms, into our homes, into our workplaces. Now the Environmental Protection Agency will have the tools and resources needed to evaluate the dangerous chemicals and to eliminate any unsafe uses.

My introduction to this issue began with a bill in the Oregon State Legislature about the cancer-causing flame retardants that are in our carpets and our couches and the foam in our furniture that should not be there. This bill gives us the ability to review that and to get rid of those toxic chemicals.

It was enormously disturbing to me to find out that our little babies crawling on the carpet, their noses 1 inch off the ground, were breathing in dust from the carpet that included these cancer-causing flame retardants. It should never have happened, but we did not have the type of review process that protects Americans. Now we will.

So, together, a bipartisan team has run a marathon, and today we cross the finish line. In short order, this bill will be sitting in the Oval Office, on the President's desk, and he will be putting ink to paper and creating this new and powerful tool for protecting the health of American citizens. That is an enormous accomplishment.

Mr. President, on behalf of Senator BOXER, the printing cost of the statement of additional views with respect to H.R. 2576, TSCA, will exceed the two-page rule and cost $2,111.20.

I ask unanimous consent that the Boxer statement of additional views be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

DETAILED ANALYSIS AND ADDITIONAL VIEWS OF DEMOCRATIC MEMBERS ON THE MOTION TO CONCUR IN THE HOUSE AMENDMENT TO THE SENATE AMENDMENT TO THE BILL H.R. 2576 ENTITLED "AN ACT TO MODERNIZE THE TOXIC SUBSTANCES CONTROL ACT, AND FOR OTHER PURPOSES" JUNE 7, 2016

As the Senate Democratic negotiators on H.R. 2576, (hereinafter referred to as the Frank R. Lautenberg Chemical Safety for the 21st Century Act), we submit the following additional views that describe the intent of the negotiators on elements of the final bill text.

1. "WILL PRESENT"

Existing TSCA as in effect before the date of enactment of Frank R. Lautenberg Chemical Safety for the 21st Century Act includes the authority, contained in several sections (see, for example, section 6(a)), for EPA to take regulatory actions related to chemical substances or mixtures if it determines that the chemical substance or mixture "presents or will present" an unreasonable risk to health or the environment.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act includes language that removes all instances of "will present" from existing TSCA and the amendments thereto. This does not reflect an intent on the part of Congressional negotiators to remove EPA's authority to consider future or reasonably anticipated risks in evaluating whether a chemical substance or mixture presents an unreasonable risk to health or the environment. In fact, a new definition added to TSCA explicitly provides such authority and a mandate for EPA to consider conditions of use that are not currently known or intended but can be anticipated to occur:

'(4) The term 'conditions of use' means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of';

2. MIXTURES

In section 6(b) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, EPA is directed to undertake risk evaluations on chemical substances in order to determine whether they pose an unreasonable risk to health or the environment. Some have questioned whether the failure to explicitly authorize risk evaluations on mixtures calls into question EPA's authority to evaluate the risks from chemical substances in mixtures.

The definition of 'conditions of use' described above plainly covers all uses of a chemical substance, including its incorporation in a mixture, and thus would clearly enable and require, where relevant, EPA to evaluate the risks of the chemical substance as a component of a mixture.

3. NEW CHEMICALS

While existing TSCA does not preclude EPA from reviewing new chemicals and significant new uses following notification by the manufacturer or processor, it does not require EPA to do so or to reach conclusions on the potential risks of all such chemicals before they enter the marketplace. EPA has authority to issue orders blocking or limiting production or other activities if it finds that available information is inadequate and the chemical may present an unreasonable risk, but the burden is on EPA to invoke this authority; if it fails to do so within the 90–180 day review period, manufacture of the new chemical can automatically commence. This bill makes significant changes to this passive approach under current law: For the first time, EPA will be required to review all new chemicals and significant new uses and make an affirmative finding regarding the chemical's or significant new use's potential risks as a condition for commencement of manufacture for commercial purposes and, in the absence of a finding that the chemical or significant new use is not likely to present an unreasonable risk, manufacture will not be allowed to occur. If EPA finds that it lacks sufficient information to evaluate the chemical's or significant new use's risks or that the chemical or significant new use does or may present an unreasonable risk, it is obligated to issue an order or rule that precludes market entry or imposes conditions sufficient to prevent an unreasonable risk. EPA can also require additional testing. Only chemicals and significant new uses that EPA finds are not likely to present an unreasonable risk can enter production without restriction. This affirmative approach to better ensuring the safety of new chemicals entering the market is essential to restoring the public's confidence in our chemical safety system.

4. UNREASONABLE RISK

TSCA in effect before the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act authorized EPA to regulate chemical substances if it determined that the chemical substance "presents or will present an unreasonable risk of injury to health or the environment." In its decision in Corrosion Proof Fittings vs EPA, the U.S. Court of Appeals, 5th Circuit overturned EPA's proposed ban on asbestos, in part because it believed that

"In evaluating what is "unreasonable," the EPA is required to consider the costs of any proposed actions and to "carry out this chapter in a reasonable and prudent manner [after considering] the environmental, economic, and social impact of any action." 15 U.S.C. §2601(c).

As the District of Columbia Circuit stated when evaluating similar language governing the Federal Hazardous Substances Act, "[t]he requirement that the risk be 'unreasonable' necessarily involves a balancing test like that familiar in tort law: The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the

harm the regulation itself imposes upon manufacturers and consumers." Forester v. CPSC, 559 F.2d 774 789 (D.C.Cir.1977). We have quoted this language approvingly when evaluating other statutes using similar language. See, e.g., Aqua Slide, 569 F.2d at 839."

The Frank R. Lautenberg Chemical Safety for the 21st Century Act clearly rejects that approach to determining what "unreasonable risk of injury to health or the environment" means, by adding text that directs EPA to determine whether such risks exist "without consideration of costs or other nonrisk factors" and, if they do, to promulgate a rule that ensures "that the chemical substance no longer presents such risk." In this manner, Congress has ensured that when EPA evaluates a chemical to determine whether it poses an unreasonable risk to health or the environment and regulates the chemical if it does, the Agency may not apply the sort of "balancing test" described above.

**5. PRIORITIZATION**

Section 6(b) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, defines high-priority chemical substances and low-priority chemical substances as follows:

"(i) HIGH-PRIORITY SUBSTANCES.—The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an unreasonable risk of injury to health or environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

"(ii) LOW-PRIORITY SUBSTANCES.—The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance."

The direction to EPA for the designation of low-priority substances is of note in that it requires such designations to be made only when there is "information sufficient to establish" that the standard for designating a substance as a high-priority substance is not met. Clear authority is provided under section 4(a)(2)(B), as created in the Frank R. Lautenberg Chemical Safety for the 21st Century Act, to enable EPA to obtain the information needed to prioritize chemicals for which information is initially insufficient. The bill text also goes on to state that if "the information available to the Administrator at the end of such an extension [for testing of a chemical substance in order to determine its priority designation] remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance."

These provisions are intended to ensure that the only chemicals to be designated low-priority are those for which EPA both has sufficient information and, based on that information, affirmatively concludes that the substance does not warrant a finding that it may present an unreasonable risk.

**6. INDUSTRY REQUESTED CHEMICALS**

Sec. 6(b)(4)(E) sets the percentage of risk evaluations that the Administrator shall conduct at industry's request at between 25 percent (if enough requests are submitted) and 50 percent. The Administrator should set up a system to ensure that those percentages are met and not exceeded in each fiscal year. An informal effort that simply takes requests as they come in and hopes that the percentages will work out does not meet the requirement that the Administrator "ensure" that the percentages be met. Also, clause (E)(ii) makes clear that industry requests for risk evaluations "shall be" subject to fees. Therefore, if at any point the fees imposed by the Frank Lautenberg Act (which are subject to a termination in section 26(b)(6)) are allowed to lapse, industry's opportunity to seek risk evaluations will also lapse and the minimum 25 percent requirement will not apply.

**7. PACE OF AND LONG-TERM GOAL FOR EPA SAFETY REVIEWS OF EXISTING CHEMICALS**

Existing TSCA grandfathered in tens of thousands of chemicals to the inventory without requiring any review of their safety. The Frank R. Lautenberg Chemical Safety for the 21st Century Act sets in motion a process under which EPA will for the first time systematically review the safety of chemicals in active commerce. While this will take many years, the goal of the legislation is to ensure that all chemicals on the market get such a review. The initial targets for numbers of reviews are relatively low, reflecting current EPA capacity and resources. These targets represent floors, not ceilings, and Senate Democratic negotiators expect that as EPA begins to collect fees, gets procedures established and gains experience, these targets can be exceeded in furtherance of the legislation's goals.

**8. "MAXIMUM" EXTENT PRACTICABLE**

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act include direction to EPA to take certain actions to "the extent practicable", in contrast to language in S 697 as reported by the Senate that actions be taken to "the maximum extent practicable." During House-Senate negotiations on the bill, Senate negotiators were informed that House Legislative Counsel believed the terms "extent practicable" and "maximum extent practicable" are synonymous, and ultimately Congress agreed to include "extent practicable" in the Frank R. Lautenberg Chemical Safety for the 21st Century Act with the expectation that no change in meaning from S 697 as reported by the Senate be inferred from that agreement.

**9. COST CONSIDERATIONS IN RULEMAKING**

Section 6(c)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act lists what is required in analysis intended to support an EPA rule for a chemical substance or mixture:

"(2) REQUIREMENTS FOR RULE.—"(A) STATEMENT OF EFFECTS.—In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

"(i) the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

"(ii) the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

"(iii) the benefits of the chemical substance or mixture for various uses; and

"(iv) the reasonably ascertainable economic consequences of the rule, including consideration of—

"(I) the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

"(II) the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

"(III) the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

The language above specifies the information on effects, exposures and costs that EPA is to consider in determining how to regulate a chemical substance that presents an unreasonable risk as determined in EPA's risk evaluation.

Senate Democratic negotiators clarify that sections 6(c)(2)(A)(i) and (ii) do not require EPA to conduct a second risk evaluation-like analysis to identify the specified information, but rather, can satisfy these requirements on the basis of the conclusions regarding the chemical's health and environmental effects and exposures in the risk evaluation itself.

The scope of the statement EPA is required to prepare under clauses (i)–(iv) is bounded in two important respects. First, it is to be based on information reasonably available to EPA, and hence does not require new information collection or development. Second, EPA's consideration of costs and benefits and cost-effectiveness is limited to the requirements of the rule itself and the 1 or more "primary" alternatives it considered, not every possible alternative. The role of the statement required under subparagraph (c)(2)(A) in selecting the restrictions to include in its rule is delineated in subparagraph (c)(2)(B). Under this provision, EPA must "factor in" the considerations described in the statement "to the extent practicable" and "in accordance with subsection (a)." As revised, subsection (a) deletes the paralyzing "least burdensome" requirement in the existing law and instructs that EPA's rule must ensure that the chemical substance or mixture "no longer presents" the unreasonable risk identified in the risk evaluation. Thus, it is clear that the considerations in the statement required under subparagraph (c)(2)(A) do not require EPA to demonstrate that benefits outweigh costs, to definitively determine or select the least-cost alternative, or to select an option that is demonstrably cost-effective or is the least burdensome adequately protective option. Rather, it requires only that EPA take into account the specified considerations in deciding among restrictions to impose, which must be sufficient to ensure that the subject chemical substance no longer presents the unreasonable risk EPA has identified. The Frank R. Lautenberg Chemical Safety for the 21st Century Act clearly rejects the regulatory approach and framework that led to the failed asbestos ban and phase-out rule of 1989 in Corrosion Proof Fittings v. EPA 947 F.2d 1201 (5th Cir. 1991).

**10. "MINIMUM" LABELING REQUIREMENTS**

Section 6(a) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, ensures that the requirements EPA can impose to address an unreasonable risk to health or the environment include requiring "clear and adequate minimum" warnings. The addition of the word "minimum" was intended to avoid the sort of litigation that was undertaken in Wyeth v. Levine, 555 U.S. 555 (2009), when a plaintiff won a Supreme Court decision after alleging that the harm she suffered from a

drug that had been labeled in accordance with FDA requirements had nevertheless been inadequately labeled under Vermont law. This ensures that manufacturers of processors of chemical substances and mixtures can always take additional measures, if in the interest of protecting health and the environment, it would be reasonable to do so.

**11. CRITICAL USE EXEMPTIONS**

Section 6(g) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, authorizes EPA to exempt specific conditions of use from otherwise applicable section 6(a) rule requirements, if EPA makes specified findings. Section 6(g)(4) in turn requires EPA to include in such an exemption conditions that are "necessary to protect health and the environment while achieving the purposes of the exemption." It is Congress' intent that the conditions EPA imposes will protect health and the environment to the extent feasible, recognizing that, by its nature, an exemption will allow for activities that present some degree of unreasonable risk.

**12. REGULATORY COMPLIANCE**

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarify the Congressional intent that compliance with federal EPA standards, rules or other requirements shall not preclude liability in circumstances where a reasonable manufacturer or processor or distributor of a chemical substance or mixture could or should have taken additional measures or precautions in the interest of protecting public health and the environment.

**13. TSCA AS THE PRIMARY STATUTE FOR THE REGULATION OF TOXIC SUBSTANCES**

EPA's authorities and duties under section 6 of TSCA have been significantly expanded under the Frank R. Lautenberg Chemical Safety for the 21st Century Act, now including comprehensive deadlines and throughput expectations for chemical prioritization, risk evaluation, and risk management. The interagency referral process and the intra-agency consideration process established under Section 9 of existing TSCA must now be regarded in a different light since EPA can no longer be construed as a "gap-filler" statutory authority of last resort. The changes in section 9 are consistent with this recognition and do not conflict with the fundamental expectation that, where EPA concludes that a chemical presents an unreasonable risk, the Agency should act in a timely manner to ensure that the chemical substance no longer presents such risk. Thus, once EPA has reached this conclusion, Section 9(a) is not intended to supersede or modify the Agency's obligations under Sections 6(a) or 7 to address risks from activities involving the chemical substance, except as expressly identified in a section 9(a) referral for regulation by another agency which EPA believes has sufficient authority to eliminate the risk and where the agency acts in a timely and effective manner to do so.

Regarding EPA's consideration of whether to use non-TSCA EPA authorities in order to address unreasonable chemical risks identified under TSCA, the new section 9(b)(2) merely consolidates existing language which was previously split between section 6(c) and section 9(b). It only applies where the Administrator has already determined that a risk to health or the environment associated with a chemical substance or mixture could be eliminated or reduced to a sufficient extent by additional actions taken under other EPA authorities. It allows the Administrator

substantial discretion to use TSCA nonetheless, and it certainly does not reflect that TSCA is an authority of last resort in such cases. Importantly, the provision adds a new qualification, not in original TSCA, that the required considerations are to be "based on information reasonably available to the Administrator" to ensure that such considerations do not require additional information to be collected or developed. Furthermore, none of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner.

**14. DISCLOSURE OF CONFIDENTIAL BUSINESS INFORMATION**

S. 697 as passed by the Senate included several requirements as amendments to sections 8 and 14 of existing TSCA that direct EPA to "promptly" make confidential business information public when it determines that protections against disclosure of such information should no longer apply. The Frank R. Lautenberg Chemical Safety for the 21st Century Act instead directs EPA to remove the protections against disclosure when it determines that they should no longer apply. Because EPA informed Senate negotiators that its practice is to promptly make public information that is no longer protected against disclosure, we see no difference or distinction in meaning between the language in S. 697 as passed and the Frank R. Lautenberg Chemical Safety for the 21st Century Act, and expect EPA to continue its current practice of affirmatively making public information that is not or no longer protected from disclosure as expeditiously as possible.

Subsection 14(d)(9) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, further clarifies the Congressional intent that any information required pursuant to discovery, subpoena, court order, or any other judicial process is always allowable and discoverable under State and Federal law, and not protected from disclosure.

**15. CHEMICAL IDENTITY**

Section 14(b)(2) of the bill retains TSCA's provision making clear that information from health and safety studies is not protected from disclosure. It also retains TSCA's two existing exceptions from disclosure of information from health and safety studies: for information where disclosure would disclose either how a chemical is manufactured or processed or the portion a chemical comprises in a mixture. A clarification has been added to the provision to note explicitly that the specific identity of a chemical is among the types of information that need not be disclosed, when disclosing health and safety information, if doing so would also disclose how a chemical is made or the portion a chemical comprises in a mixture. This clarification does not signal any Congressional intent to alter the meaning of the provision, only to clarify its intent.

**16. "REQUIREMENTS"**

Subsection 5(1)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

Subsection 6(j) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, clarifies the Congres-

sional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

**17. STATE-FEDERAL RELATIONSHIP**

Sections 18(a)(1)(B) and 18(b)(1) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, refer to circumstances under which a state may not establish or continue to enforce a "statute, criminal penalty, or administrative action" on a chemical substance. Section 18(b)(2) states that "this subsection does not restrict the authority of a State or political subdivision of a State to continue to enforce any statute enacted, criminal penalty assessed, or administrative action taken". In an email transmitted by Senate Republican negotiators at 11:45 AM on May 23, 2016, the Senate requested that House Legislative Counsel delete the word "assessed," but this change was not made in advance of the 12 PM deadline to file the bill text with the House Rules Committee. The Senate's clear intent was not to change or in any way limit the meaning of the phrase "criminal penalty" in section 18(b)(2).

Section 18(d)(I) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, references "risk evaluations" on chemical substances that may be conducted by states or political subdivisions of states with the clear intent to describe the circumstances in which such efforts would not be preempted by federal action. The term "Risk Evaluation" may not be universally utilized in every state or political subdivision of a state, but researching each analogous term used in each state or political subdivision of a state in order to explicitly list it was neither realistic nor possible. The use of this term is not intended to be in any way limiting.

Section 18(d)(1)(A)(ii) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, fully preserves the authority of states or political subdivisions of states to impose "information obligation" requirements on manufacturers or processors with respect to chemicals they produce or use. The provision cites examples of such obligations: reporting and monitoring or "other information obligations." These may include, but are not limited to, state requirements related to information, such as companies' obligations to disclose use information, to provide warnings or to label products or chemicals with certain information regarding risks and recommended actions to reduce exposure or environmental release.

Section 18(d)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, specifies that nothing in this section shall modify the preemptive effect of any prior rule or order by the Administrator prior to the effective date, responding to concerns that prior EPA action on substances such as polychlorinated biphenyls would be potentially immunized from liability for injury or harm.

Section 18(e) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, grandfathers existing and enacted state laws and regulatory actions, and requirements imposed now or in the future under the authority of state laws that were in effect on August 31, 2003.

Section 18(f) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, provides discretionary and mandatory waivers which exempt regulatory action by states and their political subdivisions from any federal preemptive effect. In particular, Subsection 18(f)(2)(B)

specifies that, where requested, EPA shall grant a waiver from preemption under subsection (b) upon the enactment of any statute, or the proposal or completion of a preliminary administrative action, with the intent of prohibiting or otherwise restricting a chemical substance or mixture, provided these actions occur during the 18-month period after EPA initiates the prioritization process and before EPA publishes the scope of the risk evaluation for the chemical substance (which cannot be less than 12 months after EPA initiates the prioritization process).

Section 18(g) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, specifies that no preemption of any common law or statutory causes of action for civil relief or criminal conduct shall occur, and that nothing in this Act shall be interpreted as dispositive or otherwise limiting any civil action or other claim for relief. This section also clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance. This section further clarifies Congress' intent that no express, implied, or actual conflict exists between any federal regulatory action and any state, federal, or maritime tort action, responding to the perceived conflict contemplated in Geier v. American Honda Motor Co., 529 U.S. 861 (2000) and its progeny.

### 18. FEES

Fees under section 26(b), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, are authorized to be collected so that 25% of EPA's overall costs to carry out section 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information, are defrayed, subject to a $25,000,000 cap (that itself can be adjusted for inflation or if it no longer provides 25% of EPA's costs listed above). While the collection of fees is tied to the submission of particular information under sections 4 and 5 or the manufacturing or processing of a particular chemical substance undergoing a risk evaluation under section 6, in general the use of these fees is not limited to defraying the cost of the action that was the basis for payment of the fee. The exception to this general principle is for fees to defray the cost of conducting manufacturer requested risk evaluations, which are independent of the $25 million cap or 25% limit. These amounts must be spent on the particular risk evaluation that was the basis for payment of the fee. This limitation applies only to the fee collected for the purpose of conducting the risk evaluation and does not prevent EPA from collecting further fees from such persons for other purposes for which payment of fees are authorized under the section. For example, if a manufacturer-requested risk evaluation later leads to risk management action, EPA may assign further fees to manufacturers and processors of that substance, subject to the $25,000,000 cap and the requirement to not exceed 25% of overall program costs for carrying out sections 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information.

We also note that some have raised the possibility that section 26(b)(4)(B)(i)(I), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, could be read to exclude the cost of risk evaluations, other than industry-requested risk evaluations, from the costs that can be covered by fees. This was not the intent and is not consistent with the statutory language. As clearly indicated in section 26(b)(1), the amended law provides that manufacturers and processors of chemicals subject to risk evaluations be subject to fees, and that fees be collected to defray the cost of administering sections 4, 5, and 6, and of collecting, processing, reviewing and providing access to and protecting from disclosure information. Risk evaluations are a central element of section 6. And as demonstrated by section 6(b)(4)(F)(i), the intent of the bill is that the EPA-initiated risk evaluations be defrayed at the 25% level (subject to the $25,000,000 cap), in contrast to the industry-initiated evaluations, which are funded at the 50% or 100% level. The final citation in section 26(b)(4)(B)(i) should be read as section 6(b)(4)(C)(ii), as it is in section 6(b)(4)(F)(i), not to section 6(b) generally.

### 19. SCIENTIFIC STANDARDS

The term "weight of evidence" refers to a systematic review method that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently, identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance.

This requirement is not intended to prevent the Agency from considering academic studies, or any other category of study. We expect that when EPA makes a weight of the evidence decision it will fully describe its use and methods.

### 20. PARTIAL RISK EVALUATIONS

Section 26(1)(4) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, states

"(4) CHEMICAL SUBSTANCES WITH COMPLETED RISK ASSESSMENTS.—With respect to a chemical substance listed in the 2014 update to the TSCA Work Plan for Chemical Assessments for which the Administrator has published a completed risk assessment prior to the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act, the Administrator may publish proposed and final rules under section 6(a) that are consistent with the scope of the completed risk assessment for the chemical substance and consistent with other applicable requirements of section 6."

EPA has completed risk assessments on TCE, NMP, and MC, but has not yet proposed or finalized section 6(a) rules to address the risks that were identified. The risk assessments for these chemicals were not conducted across all conditions of use. During the bi-cameral negotiations, EPA expressed the view that, rather than reexamine and perhaps broaden the scope of these assessments, it is better to proceed with proposed and final rules on the covered chemicals to avoid any delay in the imposition of important public health protections that are known to be needed. Congress shared these concerns. The language House-Senate negotiators included above is intended to allow EPA to proceed with the regulation of these substances if the scope of the proposed and final rules is consistent with the scope of the risk assessments conducted on these substances.

### 21. SNURS FOR ARTICLES

Section 5(a)(5) addresses the application of significant new use rules (SNURs) to articles or categories of articles containing substances of concern. It provides that in promulgating such SNURs, EPA must make "an affirmative finding . . . . that the reasonable potential for exposure to the chemical substance through the article or category of articles subject to the rule justifies notification." This language clarifies that potential exposure is a relevant factor in applying SNURs to articles. Exposure is a relevant factor in identifying other significant new uses of a chemical substance as well. It is not intended to require EPA to conduct an exposure assessment or provide evidence that exposure to the substance through the article or category of articles will in fact occur. Rather, since the goal of SNURs is to bring to EPA's attention and enable it to evaluate uses of chemicals that could present unreasonable risks, a reasonable expectation of possible exposure based on the nature of the substance or the potential uses of the article or category of articles will be sufficient to "warrant notification." EPA has successfully used the SNUR authority in the existing law to provide for scrutiny of imported articles (many of which are widely used consumer products) that contain unsafe chemicals that have been restricted or discontinued in the U.S. and it's critical that SNURs continue to perform this important public health function under the amended law.

### 22. COMPLIANCE DEADLINES

The amended law expands on existing section 6(d) by providing that rules under section 6 must include "mandatory compliance dates." These dates can vary somewhat with the type of restriction being imposed but, in general, call for compliance deadlines that "shall be as soon as practicable, but not later than 5 years after the promulgation of the rule." While EPA could in unusual circumstances delay compliance for as long as five years, this should be the exception and not the norm. To realize the risk reduction benefits of the rule, it is expected that compliance deadlines will be as soon as practicable after the rule's effective date as directed in new paragraph 6(d)(1).

Senator Barbara Boxer, Ranking Member, Environment and Public Works Committee.

Senator Edward J. Markey, Ranking Member, Subcommittee on Superfund, Waste Management and Regulatory Oversight, Environment and Public Works Committee, and cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Tom Udall, lead Democratic author and sponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Jeffrey A. Merkley, cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Mr. MERKLEY. I yield the floor.

Mrs. GILLIBRAND. Mr. President, I know that everyone here shares a desire to fix our chemical safety law, the Toxic Substances Control Act, and I appreciate the years of hard work that my colleagues, starting with the late Senator from New Jersey, Frank Lautenberg, put in to try to make this bill the best bipartisan compromise it could be.

So many parts of this bill strengthen the standards and review process for chemicals, and I am pleased that we will finally be able to effectively regulate chemicals on a Federal level.

However, there is one part of the bill that still concerns me: the preemption of State laws.

114TH CONGRESS  }
1st Session     }     HOUSE OF REPRESENTATIVES     {     REPORT
                                                         114–176

## TSCA MODERNIZATION ACT OF 2015

JUNE 23, 2015.—Committed to the Committee of the Whole House on the State of
the Union and ordered to be printed

Mr. UPTON, from the Committee on Energy and Commerce,
submitted the following

# R E P O R T

[To accompany H.R. 2576]

[Including cost estimate of the Congressional Budget Office]

The Committee on Energy and Commerce, to whom was referred
the bill (H.R. 2576) to modernize the Toxic Substances Control Act,
and for other purposes, having considered the same, report favor-
ably thereon with an amendment and recommend that the bill as
amended do pass.

## CONTENTS

|                                                                                  | Page |
|----------------------------------------------------------------------------------|------|
| Purpose and Summary                                                              | 12   |
| Background and Need for Legislation                                              | 12   |
| Hearings                                                                         | 13   |
| Committee Consideration                                                          | 13   |
| Committee Votes                                                                  | 14   |
| Committee Oversight Findings                                                     | 16   |
| Statement of General Performance Goals and Objectives                           | 16   |
| New Budget Authority, Entitlement Authority, and Tax Expenditures               | 16   |
| Earmark, Limited Tax Benefits, and Limited Tariff Benefits                      | 16   |
| Committee Cost Estimate                                                          | 16   |
| Congressional Budget Office Estimate                                            | 16   |
| Federal Mandates Statement                                                       | 21   |
| Duplication of Federal Programs                                                  | 21   |
| Disclosure of Directed Rule Makings                                             | 22   |
| Advisory Committee Statement                                                      | 22   |
| Applicability to Legislative Branch                                             | 22   |
| Section-by-Section Analysis of the Legislation                                  | 22   |
| Changes in Existing Law Made by the Bill, as Reported                           | 34   |

The amendment is as follows:
Strike all after the enacting clause and insert the following:

49–006

Second, this section allows EPA to require testing of a chemical substance when necessary to complete a risk evaluation of that chemical under section 6(b). The Committee intends "necessary" to mean that this grant of authority only be employed to fill a gap in the Agency's existing data on the chemical substance that otherwise precludes a determination on a chemical substance.

The increased testing authority in H.R. 2576 reflects the Committee consensus that EPA should have the information necessary to fill knowledge gaps before making regulatory decisions. Curiosity alone is insufficient to compel new testing. The Committee believes that the broader and simpler manner of requiring new test information by order or consent agreement, the new authority given to EPA to compel the creation of new data under section 4(a)(1)(C), and the Agency's existing authority under section 8 will enable EPA to close knowledge gaps.

*Section 4. Regulation of hazardous chemical substances and mixtures*

To help the Agency function more effectively in dealing with existing chemicals, the Committee reorganized TSCA section 6 to specify what is expected of the Administrator in making discrete decisions.

Section 4 makes substantive, clarifying, and structural changes to TSCA section 6. For example, where existing TSCA section 6(a) combines three undertakings—the finding of unreasonable risk, the standard for regulation, and the control measures available under any regulation, H.R. 2576 splits these actions into two separate subsections with distinct functions: section 6(a) establishes the standard for issuing regulations and the universe of available control measures for existing chemical substances and mixtures, and section 6(b) establishes a separate risk evaluation process for determining whether a chemical substance presents or will present an unreasonable risk of injury. If the Administrator makes such a determination, then a regulation to address that risk is warranted under section 6(a), and the Administrator must proceed to section 6(a) rulemaking.

Section 4(a) repeals the requirements in TSCA section 6(a) that a rule restricting a chemical substance or mixture apply the least burdensome requirements, be predicated upon the Administrator finding a "reasonable basis to conclude" an unreasonable risk is present or will be present, and "protect adequately" against the unreasonable risk. Instead, section 6(a) obliges the Administrator to apply requirements on a chemical substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents or will present an unreasonable risk, including an identified unreasonable risk, to a potentially exposed subpopulation.

The restrictions that the Administrator is authorized to impose are not changed by the TSCA Modernization Act. Because a chemical substance's intended conditions of use are important in defining the risk it presents, the Committee expects that the Administrator, in applying any requirements, will address identified circumstances of manufacturing, processing, distribution in commerce, use, or disposal of a chemical substance or mixture that presents or will present an unreasonable risk of injury to health or the environment that require control.

publish a statement about the impacts of the chemical substance or mixture are largely retained in new section 6(c)(1)(A), with the consideration of substitutes moved to section 6(c)(1)(C) and the requirements for addressing chemical risks under other statutes administered by the Agency now in section 9(b). Under new TSCA subsection (c)(1)(B), the Administrator must impose requirements under the rule that, consistent with information published under subparagraph (A), are cost-effective, unless the Administrator determines that additional or different requirements described in subsection (a) are necessary to protect against the identified risk.

The Committee chose this process to ensure that the universe of data from which the Administrator would be making a cost-effectiveness decision would be limited to only that information provided and considered as part of the rulemaking record. The Committee does not expect EPA to analyze the cost-effectiveness of an open-ended group of possible requirements, but to focus on those that meet the subsection (a) purpose of controlling an unreasonable risk of injury. The Administrator need not test each control measure in a rulemaking for its cost-effectiveness. While the Committee's preference is that selected requirements be cost-effective, if no restriction is available that the Administrator determines cost-effective in managing the risk, the identified unreasonable risk must still be addressed.

New subsection (c)(1)(C) requires the Administrator, in deciding whether to prohibit or substantially restrict a specific use of a chemical substance or mixture and in setting an appropriate transition period for such action, to determine whether a technically and economically feasible alternative to a chemical that benefits health or the environment, compared to the use proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or restriction takes effect.

New subsection (c)(1)(D) exempts replacement parts if they are designed prior to publication of the section 6(a) risk management rule in the Federal Register, unless the Administrator finds that they contribute significantly to the identified risk, including identified risks to identified potentially exposed subpopulations. Subsection (c)(1)(E) instructs the Administrator, when applying prohibitions or other restrictions to address an unreasonable risk of injury, to apply such prohibitions or restrictions to an article, on the basis of a chemical substance or mixture contained in that article, only to the extent necessary to protect against the unreasonable risk of injury from that article.

Section 4(c) repeals the requirement for informal hearings, including cross examination of witnesses, found in TSCA section 6(c)(3) and repeals the availability of compensation of attorney's fees, expert witness fees, and other costs of participating in a proceeding for the promulgation of a subsection (a) rule found in TSCA paragraph 6(c)(4).

Further, Section 4(d) adds a requirement at the end of section 6(d)(2)(B) providing for a reasonable transition period for any rule promulgated under section 6(a).

Section 4(e) of the TSCA Modernization Act adds three new subsections to the end of TSCA section 6 to address three distinct areas.

28

designating a chemical substance a PBT chemical of concern, must promulgate a rule under section 6(a), and in keeping with the rest of the factors in sections 6 and 9, to reduce, to the extent practicable, likely exposure to that PBT chemical.

These reforms to section 6 are intended to permit the Agency to identify unreasonable risks and address them effectively. To many members of the Committee, an important measure of TSCA reform proposals has been whether the proposal would enable EPA to take broader regulatory action to protect against unreasonable risks from asbestos. The Committee expects this legislation to enable that regulatory action.

Finally, while the phrase "unreasonable risk of injury" is not amended, it must be read in the context of the changes to section 6, including the functions and purposes delineated in subsections (a), (b), and (c).

*Section 5. Relationship to other Federal laws*

H.R. 2576 reinforces TSCA's original purpose of filling gaps in Federal law that otherwise did not protect against the unreasonable risks presented by chemicals. The Joint Explanatory Statement of the Committee of Conference for the legislation, which is now Title I of TSCA, clearly states that "[t]he conferees have drawn from both the Senate bill and the House amendment to assure that overlapping or duplicative regulation is avoided" and:

> If the Administrator determines that a risk to health or the environment associated with a substance or mixture could be eliminated or reduced to a sufficient extent by actions taken under authorities contained in other Federal laws, then the Administrator shall use such other authorities, unless the Administrator determines . . . it is in the public interest to use this Act.

This section adds a new paragraph to TSCA section 9(b) to help the Administrator decide whether using TSCA Title I or another Federal authority provided to the Administrator is "in the public interest." Specifically, the new paragraph requires the Administrator to consider the relevant aspects of the risks posed by the chemical substance and compare the estimated costs of actions taken under Title I of TSCA or another Federal law with the relative efficiencies of protecting against the risk presented through actions taken under such laws. This new paragraph reflects language in section 6 current law that is removed by section 4 of the bill.

The Committee believes the added language will help to focus the Administrator's exercise of discretion regarding which statute to apply and to encourage decisions that avoid confusion, complication, and duplication. For example, if the Administrator determines that a risk to health or the environment associated with disposal of a chemical substance could be eliminated or reduced to a sufficient extent under the Solid Waste Disposal Act, the Administrator should use those authorities to protect against the risk. Likewise, while section 5 makes no amendment to TSCA section 9(a), the Committee believes that the Administrator should respect the experience of, and defer to other agencies that have relevant responsibility such as the Department of Labor in cases involving occupa-

Calendar No. 668

| 94TH CONGRESS <br> 2d Session | SENATE | REPORT <br> No. 94–698 |
|---|---|---|

# TOXIC SUBSTANCES CONTROL ACT

## REPORT

OF THE

## SENATE COMMITTEE ON COMMERCE

ON

## S. 3149

together with

### ADDITIONAL VIEWS

TO REGULATE COMMERCE AND PROTECT HUMAN HEALTH
AND THE ENVIRONMENT BY REQUIRING TESTING AND
NECESSARY USE RESTRICTIONS ON CERTAIN CHEMICAL
SUBSTANCES, AND FOR OTHER PURPOSES



MARCH 16, 1976.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1976

57–010

# CONTENTS

|  | Page |
|---|---|
| Purpose and brief description | 1 |
| Background and needs | 3 |
| Description | 6 |
| Responses to arguments | 10 |
| Legislative background | 13 |
| Section-by-section analysis | 14 |
| Sec. 1. Short title and table of contents | 14 |
| Sec. 2. Findings, policy, and intent | 14 |
| Sec. 3. Definitions and exclusions | 14 |
| Sec. 4. Testing of chemical substances and mixtures | 15 |
| Sec. 5. Premarket notification of chemical substances | 17 |
| Sec. 6. Regulation of hazardous chemical substances and mixtures | 20 |
| Sec. 7. Imminent hazards | 21 |
| Sec. 8. Reporting and retention of information | 21 |
| Sec. 9. Relationship to other laws | 23 |
| Sec. 10. Research, collection, dissemination, and utilization of data | 23 |
| Sec. 11. Inspections and subpoenas | 24 |
| Sec. 12. Exports | 24 |
| Sec. 13. Entry into customs territory of the United States | 25 |
| Sec. 14. Disclosure of data | 25 |
| Sec. 15. Prohibited acts | 25 |
| Sec. 16. Penalties | 26 |
| Sec. 17. Specific enforcement and seizure | 26 |
| Sec. 18. Preemption | 27 |
| Sec. 19. Judicial review | 27 |
| Sec. 20. Citizen's civil action | 28 |
| Sec. 21. Citizen's petitions | 29 |
| Sec. 22. National defense waiver | 29 |
| Sec. 23. Employee protection | 29 |
| Sec. 24. Studies | 30 |
| Sec. 25. Administration of act | 30 |
| Sec. 26. Authorization for appropriations | 31 |
| Sec. 27. Annual report | 31 |
| Changes in existing law | 32 |
| Estimated costs | 32 |
| Record votes in Committee | 32 |
| Text of S. 3149 as reported | 33 |
| Agency comments | 73 |
| Additional views of Mr. Baker | 89 |

(III)

# Calendar No. 668

94TH CONGRESS }     SENATE     {    REPORT
*2d Session* }                     {   No. 94–698

## TOXIC SUBSTANCES CONTROL ACT

MARCH 16, 1976.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Commerce,
submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany S. 3149]

The Committee on Commerce having considered the bill (S. 3149) to regulate commerce and protect human health and the environment by requiring testing and necessary use restrictions on certain chemical substances, and for other purposes, reports favorably thereon and recommends that the bill do pass.

### PURPOSE AND BRIEF DESCRIPTION

The purpose of S. 3149 is to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances. The bill is designed to fill a number of regulatory gaps which currently exist. They are:

#### 1. PREMARKET REVIEW

While certain environmental health statutes may be used to protect health and the environment from chemical substances, only pesticides, drugs, and food additives undergo premarket scrutiny prior to first manufacture. The Clean Air Act (77 Stat. 392), the Federal Water Pollution Control Act (66 Stat. 755), the Occupational Safety and Health Act (84 Stat. 1590), and the Consumer Product Safety Act (86 Stat. 1207), do not provide for this type of premarket scrutiny.

#### 2. DIRECT REGULATION OF CHEMICALS

While air and water laws authorize limitations on discharges and emissions, the Occupational Safety and Health Act authorizes the establishment of ambient air standards for the workplace, and the Consumer Product Safety Act authorizes standards with respect to

(1)

2

consumer products, there are no existing statutes which authorize the direct control of industrial chemicals themselves for their health or environmental effect (except section 211 of the Clean Air Act, which authorizes the regulation of fuel additives).

While these other authorities will in many cases be sufficient to adequately protect health and the environment, the alternative of preventing or regulating the use of the chemical in the first instance may be a far more effective way of dealing with the hazards. If expensive sewage treatment facilities can be avoided, for example, through removing dangerous materials from household and industrial wastes, the authority to do so ought to be provided.

### 3. CONSIDERATION OF ALL THE RISKS

While individual agencies may be authorized to regulate occupational, environmental, or direct consumer hazards with respect to a chemical substance, there is no agency which has the authority to look comprehensively at the hazards associated with the chemical. Existing authority allows the agencies to only look at the hazards within their jurisdiction in isolation from other hazards associated with the same chemical. The bill would grant the Environmental Protection Agency the authority to look at the hazards in total.

### 4. COLLECTION OF TEST DATA

The committee bill also provides a mechanism whereby information with respect to health and environmental effects can be collected from manufacturers and processors of chemical substances. While other statutes provide regulatory authority, they do not place the responsibility for gathering information in support of the regulatory program squarely with persons who are responsible for the manufacture or processing of the chemical substance or mixtures.

Specifically, the bill provides:

(1) That manufacturers of *new chemical substances* give notification to EPA 90 days in advance of first manufacture and that test data accompany that notification if required by EPA. The provision is not applicable to research chemicals unless EPA specifically includes any such chemical.

(2) That the EPA Administrator require manufacturers to test or have tested those chemical substances which he determines may present an unreasonable risk of injury to health or the environment or those for which significant human or environmental exposure takes place or will take place. The provision is applicable both to new and existing chemical substances.

(3) Manufacturers and processors of chemical substances are required to maintain certain records and reports to better enable the Administrator to determine if unreasonable risks exist. Importantly, manufacturers must maintain with the Administrator lists of health and safety studies conducted, whether or not they have been conducted as a result of this legislation. The Administrator is authorized to require the submission of any study on the list.

3

(4) Citizens are authorized to bring suits to enjoin certain violations and to require the Administrator of EPA to perform his mandatory duties. A citizens' petition provision is also provided whereby citizens may receive judicial review of petitions to EPA which were denied or not acted upon.

## BACKGROUND AND NEEDS

The last century has witnessed the ever-accelerating growth of the chemical industry. Sales now exceed $100 billion a year. This industry has developed a vast new array of chemicals. In fact, it is estimated that there are presently 2 million recognized chemical compounds in existence with nearly 250,000 new compounds produced each year. While most of these compounds will never be commercialized, the Environmental Protection Agency estimates that approximately 1,000 new chemicals each year will find their way into the marketplace and subsequently into the environment through use or disposal.

As the industry has grown, we have become literally surrounded by a man-made chemical environment. We utilize chemicals in a majority of our daily activities. We continually wear, wash with, inhale, and ingest a multitude of chemical substances. Many of these chemicals are essential to protect, prolong, and enhance our lives. Yet, too frequently, we have discovered that certain of these chemicals present lethal health and environmental dangers.

In 1971, the Council on Environmental Quality in a report entitled "Toxic Substances" concluded that regulatory mechanisms to control toxic chemicals were "inadequate." This report was the impetus for the original Toxic Substances Control Act legislation.

After 15 days of hearings and extensive analysis over the last 5 years, the Toxic Substances Control Act has evolved into a comprehensive measure to protect the public and the environment from exposure to hazardous chemicals. The legislation would assure that chemicals receive careful premarket scrutiny before they are manufactured or distributed to the public. This provision would end the present situation where chemicals can be marketed without notification of any governmental body and without any requirement that they be tested for safety. Thus, this provision would no longer allow the public or the environment to be used as a testing ground for the safety of these products.

In a recent speech supporting toxic substances control legislation, Russell E. Train, the Administrator of the Environmental Protection Agency, pointed out that—

Most Americans had no idea, until relatively recently, that they were living so dangerously. They had no idea that when they went to work in the morning, or when they ate their breakfast—that when they did the things they had to do to earn a living and keep themselves alive and well—that when they did things as ordinary, as innocent and as essential to life as eat, drink, breathe or touch, they could, in fact, be laying their lives on the line. They had no idea that, without their knowledge or consent, they were often engaging in a grim game of chemical roulette whose result they would not know until many years later.

Dr. Train's view is a reflection of the fact that in the last few years the list of commonly utilized and widely dispersed chemicals that

4

have been found to be potentially significant health and environmental dangers has been constantly growing. A partial list includes:

(1) Kepone, which has been implicated in causing brain damage and other nervous system disorders;

(2) vinyl chloride, arsenic, and asbestos, all found to be potentially extremely potent cancer-causing agents in man;

(3) mercury, lead, and other heavy metals;

(4) PCB's which have been found to cause liver cancer in rats and to have contaminated numerous fish stocks throughout the United States; and

(5) fluorocarbons, propellants in aerosols and coolants in refrigerators and air-conditioners, suspected of depleting the Earth's ozone layer which protects humans from excessive ultraviolet radiation that can cause skin cancer.

Furthermore, the interaction of chemical substances in some cases, makes these dangers multiplicative rather than additive. Dr. Irving Selikoff, of the Mount Sinai Medical School, for example, pointed out that asbestos workers who are nonsmokers do not have an appreciably higher lung cancer rate than the population at large. However, Dr. Selikoff noted that if an asbestos worker smokes, his chances of getting lung cancer are eight times greater than the average cigarette smoker and are 92 times greater than an individual who is neither an asbestos worker or a smoker. Thus, the risks appear to be multiplied by these interactions.

Russell Peterson, Chairman of the Council on Environmental Quality, after analyzing these chemical dangers concluded at last year's hearings, "Toxic substances legislation is probably the most important environmental legislation now before the Congress." Many doctors and scientists concur with Dr. Peterson noting that controlling toxic chemicals in the environment is one of the crucial health requirements facing this Nation. Dr. David Rall, Director of the National Institute of Environmental Health Sciences of the National Institutes of Health, has stated, for example:

Recent experience with vinyl chloride, bischloromethyl ether, methylbutyl ketone, and sulphuric acid mist indicate that these compounds are not theoretical threats, but known causes of illness and death. Many of these compounds are toxic to man in relatively low concentrations. Man is assaulted by these compounds alone and in combination from multiple sources. *This problem constitutes possibly the major health hazard of this decade.* (Italics added.)

Cancer, which was projected to kill as many Americans in 1975 as all the battle deaths in Vietnam, Korea, and the Second World War combined, appears particularly susceptible to a preventive approach through control of toxic substances in the environment. The National Cancer Institute, for example, estimates that 60 to 90 percent of the cancers occurring in this country are a result of environmental contaminants. Furthermore, the National Cancer Institute has plotted the incidence of cancer around the industrial centers of the United States. Almost without exception the industrial centers, where industrial chemicals are obviously found in largest concentrations, had the highest incidence of cancer. Thus, the Toxic Substances Control Act, which provides authority for increased testing of chemicals for their cancer-causing effects, can serve as an early warning system to signal potential dangers before products are widely dispersed and irretrievable societal danger has been unleashed.

5

Toxic chemicals have also been implicated in causing birth defects and genetic damage. The National Foundation-March of Dimes recently wrote to Senator Magnuson in support of toxic substances legislation stating:

More than 200,000 infants are born with physical or mental damage each year, a staggering 7 percent of all births * * * A total of 15 million Americans have birth defects serious enough to drastically affect their daily lives * * * It is with alarm that our attention is drawn to some aspects of modern technology which work counter-productive to our aims. Each year billions of pounds of chemicals which are virtually untested and unregulated are produced in industrial processes and used in commercial products. Experience with vinylchloride has shown it to be a highly toxic substance which experimentally can cause cancer and birth defects; but this experience came only with its burden of proof on the public. We look now to preventative testing of toxic substances in industrial production prior to manufacture or distribution as one critical means to reduce exogenous causes of birth defects.

In order to protect against these dangers, the proposed Toxic Substances Control Act would close a number of major regulatory gaps, for while certain statutes, including the Clean Air Act, the Federal Water Pollution Control Act, the Occupational Safety and Health Act, and the Consumer Product Safety Act, may be used to protect health and the environment from chemical substances, none of these statutes provide the means for discovering adverse effects on health and environment before manufacture of new chemical substances. Under these other statutes, the Government regulator's only response to chemical dangers is to impose restrictions after manufacture begins.

The most effective and efficient time to prevent unreasonable risks to public health or the environment is prior to first manufacture. It is at this point that the costs of regulation in terms of human suffering, jobs lost, wasted capital expenditures, and other costs are lowest. Frequently, it is far more painful to take regulatory action after all of these costs have been incurred. For example, the hazards associated with vinyl chloride have made headlines in recent months. Vinyl chloride has been implicated as causing liver cancer in industrial workers. At the same time the country has grown extremely reliant on the plastics which are produced from the chemical. In fact, 1 percent of our gross national product is associated with the vinyl chloride industry. Obviously, it is far more difficult to take regulatory action against this chemical now, than it would have been had the dangers been known earlier when alternatives could have been developed and polyvinyl chloride plastics not become such an intrinsic part of our way of life in this country.

The proposed Toxic Substances Control Act also provides a far more effective mechanism to protect against dangerous chemical materials contained in consumer and industrial products. While air and water pollution laws authorize limitations on discharges and emission and the Occupational Safety and Health Act authorizes workplace ambient standards, there are no statutes (except the fuel additives provisions of the Clean Air Act) which authorize the direct control of such chemicals for their health or environmental effects.

The regulation of the discharge of excessive levels of mercury into the environment is an example of the need for such controls. Recently, there has been growing concern about mercury pollution due to industrial discharges. Yet, testimony has indicated that an even greater

S. Rept. 94-698——2

6

threat of pollution may be posed by the presence of mercury in such consumer products as paint, home thermometers. sponges, and a variety of other products. Industrial pollution often can be pinpointed and corrective action rapidly taken; however, it is nearly impossible to prevent an individual householder from disposing of products containing toxic substances either down the drain or out with the garbage. While many dangerous materials can be removed from municipal sewage, many others cannot, therefore, it seems far more prudent to provide authority to limit the amounts of dangerous materials in consumer products than to allow them to escape into a municipal sewage plant or to vainly ask the householder not to dispose of them. A prime purpose of the proposed Toxic Substances Control Act is to provide authority for such regulatory controls.

Another important provision would provide regulators timely access to information regarding health and safety studies concerning chemicals covered by the Act. The importance of this provision was demonstrated in hearings of the Subcommittee on the Environment of the Senate Commerce Committee, where witnesses made detailed allegations that certain groups within the chemical industry had knowledge of the cancer-causing potential of vinyl chloride well in advance of the time that this information was released to the Government or the public. Similar charges were made that data was suppressed which suggested that industrial workers exposed to the chemical BCME were experiencing unusually high lung cancer rates. This legislation will provide the authority for EPA to gather this kind of information with respect to existing studies as well as studies which may be begun in the future.

The time has passed where human health and the environment is protected only after serious injury has occurred. As Russell Train has stated:

It is time we started putting chemicals to the test, not people. It is time we gave the people of this country some reason to believe that every time they take a breath or eat or drink or touch, they are not taking their life into their hands.

The Committee bill, which contains provisions to regulate chemical hazards, will help provide this needed assurance.

### DESCRIPTION

#### 1. TESTING OF CHEMICAL SUBSTANCES

There are two multi-part bases under which the Administrator must require that testing be conducted on a chemical substance or mixture. First. if the manufacturer. processing. distribution in commerce, use, or disposal (a) may present an unreasonable risk. (b) there are insufficient data or experience upon which to judge the effects upon health and the environment, and (c) testing is necessary to develop data, the Administrator must require testing.

Second, if the Administrator finds that the chemical substance or mixture may present significant human or environmental exposure because it is or will be produced in substantial quantities or for other reasons. and that the substance or mixture may perhaps present an adverse effect on health and the requirements of (b) and (c) above are

7

met, the Administrator must require testing. The finding with respect to an adverse effect is to be presumed if the Administrator has no reliable data or experience available to him.

In addition, the Administrator must consider the reasonably ascertainable costs and other burdens associated with conducting tests in light of the possible risks of injury to health or the environment. These findings are to be published in the Federal Register.

An eight member Federal advisory committee is established to develop a priority list of chemicals which it recommends to the Administrator for testing. The members of the committee are made up of Federal officials who either have regulatory responsibility in the area of chemical substances or have expertise with respect to testing needs.

Within 12 months after the date of inclusion of a chemical substance or mixture on the priority list, the Administrator is required to either (a) initiate a rulemaking proceeding to require testing or (b) publish in the Federal Register his reasons for not initiating such a proceeding.

### 2. PREMARKET NOTIFICATION

At least 90 days prior to the first manufacture (for commercial purpose) of a new chemical substance, manufacturers are to give notice to the Administrator. The notice is to contain information with respect to the identity of the substance, uses, estimates of amount to be produced, description of byproducts, a list of test data, and estimates of the number of employees who will be exposed to the substance.

If a testing requirement applicable to the new chemical has been established (see discussion of "Testing of Chemical Substances" above) the notification must be accompanied by the test data required.

The 90-day premarket notification period may be extended by the Administrator for an additional 90 days for good cause shown.

During the premarket notification period, the Administrator is authorized to issue an order which may restrict or prohibit the manufacturer of a new chemical substance on either of two bases:

    (a) that a test requirement is necessary (or should be revised or added to) ; or

    (b) that a restrictive rule is appropriate.

Orders issued during the premarket notification period are to be immediately effective and will trigger the appropriate rulemaking provisions under section 6 (restrictions) or section 4 (testing requirements). A provision to expedite rulemaking under these provisions is provided.

If the Administrator determines that orders during the premarket notification period are inappropriate or that action should not be taken under the imminent hazards authority of section 7, he must publish a statement of his reasons in the Federal Register.

The premarket notification provisions would also apply to significant new uses of existing chemical substances.

Premarket notification would not take place with respect to mixtures or experimental or research chemicals unless the Administrator specifically includes any such chemical for purposes of the premarket notification.

The Administrator is also authorized to exempt persons from premarket notification for test marketing purposes or specially limited

8

purposes or with respect to chemical substances which are intermediate reaction products formed during the manufacture of other chemical substances and for which there is no exposure to human beings or the environment.

### 3. RESTRICTIVE AUTHORITY

Restrictive requirements may be prescribed for any chemical substance or mixture which presents or is likely to present an unreasonable risk of injury to health or the environment. Remedies available to the Administrator range from outright prohibitions to simple labeling requirements.

In promulgating rules, the Administrator is to consider all relevant factors and make findings with respect to them. Included are the risks to human beings and to the environment, the benefits of the substance or mixture, and the reasonably ascertainable economic consequences of the rule.

The Administrator is also authorized to seek orders in the district courts to protect against imminent hazards. Imminent hazards are defined as substances or mixtures which present an unreasonable risk of death, serious illness, or serious personal injury, or serious environmental harm prior to the completion of an administrative hearing or other proceeding authorized under the bill.

### 4. REPORTING AND RETENTION OF INFORMATION

The bill authorizes the Administrator to collect information which will prove extremely valuable in gathering information necessary to assess and take action against chemicals causing unreasonable risks. Manufacturers or processors may be required to submit pertinent information with respect to the identity, uses, amounts produced, byproducts, health effects, and exposure levels of chemical substances.

In addition, lists of health and safety studies conducted by, initiated by, or known to persons within the chemical industry must be submitted to the Administrator. The Administrator may then require the submission of any study appearing on the list. This will be valuable in avoiding the situations that have occurred in the past with chemicals like vinyl chloride and BCME where allegations have been made that the industry and trade associations withheld information which would have revealed hazards associated with these chemicals at a much earlier date.

In addition, persons within the chemical industry, and liability insurers of these persons, are required to submit any information to the Administrator which supports the conclusion that an unreasonable risk to health or the environment is presented.

### 5. RELATIONSHIP TO OTHER FEDERAL LAWS

If an unreasonable risk may be prevented or reduced sufficiently by other Federal laws, the Administrator must request the agency administering the law to issue an order declaring whether or not

9

such a risk is presented. If the agency agrees that such a risk is presented, it must determine if the risk can be prevented or reduced to a sufficient extent by action taken under the law administered by it.

If the other Federal agency issues the order declaring that there is no unreasonable risk or initiates action under the other law, the Administrator may not take action under this authority to prevent the unreasonable risk.

With respect to other laws administered by the Administrator, the Administrator is directed to coordinate his actions with actions taken under those Federal laws and to use the authority contained in those laws unless this authority would be more appropriate.

In order to insure that information is gathered and premarket notification takes place, the restriction on the Administrator's authority would not apply to section 4 (testing), section 5 (premarket notification), or section 8 (reporting and information gathering).

### 6. CITIZENS PARTICIPATION

The bill contains a citizen's suit provision which authorizes suits against the Administrator where he has failed to perform a nondiscretionary duty and against others who are alleged to be in violation of sections 4 (testing), 5 (premarket notification), or 6(a) (restrictive rules). The provision is modeled after similar provisions in the Safe Drinking Water Act (88 Stat. 1660) Consumer Product Safety Act, Clean Air Act, Federal Water Pollution Control Act, and Noise Control Act.

In addition, citizens are authorized to petition the Administrator to take action the purpose of which is to protect against unreasonable risks of injury to health or the environment. If the Administrator fails to take action within 90 days on such a petition, or denies it, judicial review of the denial or failure is authorized. After gathering evidence in a *de novo* procedure, the courts would be authorized to require the initiation of the action requested if the petitioner has shown that the action requested is justified. The citizen's petition provision is similar to that contained in the Consumer Product Safety Act.

### 7. EMPLOYEE PROTECTION

Discrimination against any employee who participates in proceedings, testifies in a proceeding, or participates in any other action necessary to carry out the purposes of the legislation is prohibited.

A procedure is provided whereby the Secretary of Labor would conduct a proceeding and may order the reinstatement of the employee if violations are found.

In addition, the Administrator is required to continually evaluate the effects on employment which may result from the issuance of rules or orders under the bill. If requested by an employee whose employer has acted against him or her because of any rule or order issued under this bill, or when such actions are threatened, the Administrator is required to investigate the matter and to make findings of fact with respect to such allegations.

10

RESPONSES TO ARGUMENTS

*1. The bill does not contain excessive authority for EPA.*

In the major regulatory provisions, section 4 (relating to test requirements) and section 6 (relating to restrictive authority), the Administrator is directed to consider costs and benefits when deriving appropriate rules.

Under section 6, the Administrator is required to make findings with respect to all relevant factors and to publish them in the Federal Register. This includes the risks to health and the environment, the benefits of the substance or mixture to be regulated, and the reasonably ascertainable economic consequences of the rule.

Under section 4, the Administrator is required to consider the reasonably ascertainable costs and other burdens associated with conducting the tests in light of the possible risks of injury to health or the environment and is required to publish these considerations in the Federal Register.

The rulemaking provisions of sections 4 and 6 provide an additional means to prevent improper action by EPA. Under section 4(b) (4) the Administrator is required to give interested persons an opportunity for the oral presentation of data, views, or arguments in addition to the opportunity to make written submissions.

Under the rulemaking provisions of section 6, an informal hearing must be provided with rights of cross-examination granted in appropriate instances.

Of course, judicial review of rules issued is available.

Finally, section 2(c) specifically states that it is the intent of Congress that the Administrator be reasonable and prudent in his administration of the bill, and that he is to consider the environmental, economic, and social impact of actions taken thereunder.

*2. The premarket notification provisions are not too broad.*

If hazards are to be discovered and prevented prior to the first manufacture of new chemical substances or prior to the imposition of significant new uses of existing substances, premarket notification is an essential provision.

Other alternatives to the committee bill now pending in the House of Representatives, would restrict premarket notification only to those chemical substances for which a finding of risk could be made. Thus, the EPA Administrator would be placed in the position of predicting not only what new chemical substances might be produced, but their level of hazard as well. The unpredictable new chemical substance would be completely missed by this procedure as would those substances for which hazards information does not exist. Thus, the premarket notification provisions of the committee bill forms the backbone of the preventive aspects of health protection sought by this legislation.

While the EPA Administrator must be given the authority to act during the premarket notification period to gather more data or to take appropriate restrictive action, the notification burden itself should not be onerous. Unless testing has been otherwise required, notification only consists of reporting routine information which should be in the hands of the manufacturer in the first place. Included is information

Calendar No. 121

<table>
<tr><td>114TH CONGRESS<br><i>1st Session</i> }</td><td>SENATE</td><td>{ REPORT<br>114–67</td></tr>
</table>

FRANK R. LAUTENBERG CHEMICAL SAFETY FOR THE
21ST CENTURY ACT

———————

JUNE 18, 2015.—Ordered to be printed

———————

Mr. INHOFE, from the Committee on Environment and Public
Works, submitted the following

R E P O R T

together with

MINORITY VIEWS

[To accompany S. 697]

[Including cost estimate of the Congressional Budget Office]

The Committee on Environment and Public Works, to which was
referred the bill (S. 697) to amend the Toxic Substances Control
Act to reauthorize and modernize that Act, and for other purposes,
having considered the same, reports favorably thereon with an
amendment in the nature of a substitute and recommends the bill,
as amended, do pass.

GENERAL STATEMENT AND BACKGROUND

S. 697, the Frank R. Lautenberg Chemical Safety for the 21st
Century Act, amends the Toxic Substances Control Act (TSCA), the
fundamental Federal law regulating the manufacture, processing,
distribution in commerce, use and disposal of chemical substances.

The Act is named for the late Frank R. Lautenberg, the Senate's
long time champion for effective reform of TSCA in order to protect
against risks to human health and the environment. Before 2012,
Senator Lautenberg (D–NJ) had introduced TSCA reform legisla-
tion in five consecutive Congresses. Beginning in early 2013, Sen-
ator Lautenberg worked closely with Senator David Vitter (R–LA)
to craft the Chemical Safety Improvement Act (CSIA), which was
introduced in May, 2013 (S. 1009). The bill represented the very

49–010

2

first bi-partisan TSCA reform proposal, and garnered the support of 26 additional members of the Senate. Sadly, Senator Lautenberg passed away shortly after S. 1009 was introduced. Although the Committee held a hearing on general TSCA reform with discussions of S. 1009, no further action on the bill was taken before the 113th Congress adjourned.

Following Senator Lautenberg's death, Senator Tom Udall (D–NM) stepped in to fill the late Senator's leadership role working to pass bipartisan TSCA reform. Senators Udall and Vitter introduced a modified version of S. 1009 on March 10, 2015, which reflected over a year of negotiations and building upon the original CSIA. The new bill, S. 697, contains many important enhancements to the framework first negotiated by Senators Lautenberg and Vitter.

On April 28, 2015, the Committee held a business meeting on S. 697. The Committee adopted an amendment in the nature of a substitute offered by Senator Vitter that won the support of Senators Whitehouse (D–RI), Merkley (D–OR), Booker (D–NJ) and Carper (D–DE). The substitute reflects additional modifications to the bill intended to address the concerns of stakeholders in several key areas. The bi-partisan substitute marks an important milestone in TSCA reform, and reflects the spirit of compromise that Frank Lautenberg championed during his tenure in the Senate.

TSCA (Pub.L. 94–469, 90 Stat. 2004, 15 U.S.C. 2601 *et seq.*) was enacted in 1976. TSCA gives EPA the authority to review new chemicals before they are manufactured, to gather information on existing chemicals in commerce, and to regulate unreasonable risks to health and the environment from the manufacture, processing, distribution in commerce, use or disposal of chemical substances. TSCA is one of many statutes that regulate chemicals; its unique focus is on industrial chemicals in commerce. TSCA does not give EPA the authority to regulate pesticides; food, drugs and cosmetics; nuclear materials, firearms and ammunition, or tobacco.

In the years since TSCA was first enacted, it has become clear that effective implementation of TSCA by the Environmental Protection Agency (EPA) has been challenged by shortcomings in the statute itself, and by several key decisions of Federal Courts and the Agency's interpretation of those decisions. S. 697, as reported by the Committee, is intended to enhance confidence in the federal chemical regulatory system, provide EPA the authority necessary for efficient and effective regulation of chemical risks, and foster safety and innovation in commercial chemistry. Importantly, S. 697 is designed to ensure that the competitive advantage of the U.S. chemical industry is not eroded by regulatory mandates and that industry is subject to a more consistent set of regulations that equally protect citizens across the nation.

S. 697 is intended to address significant concerns about the existing provisions of TSCA and its implementation.

*Testing of chemical substances and mixtures*

Section 4 of TSCA provides EPA the authority to require manufacturers to test chemicals, but requires EPA to justify a testing requirement based on either a finding that the substance may present an unreasonable risk of injury to health or the environment, or that the production of a substantial quantity of the substance may create exposures to humans or the environment. EPA

18

risk of serious or widespread injury to health or the environment before the effective date of a rule, EPA is authorized to declare a proposed rule to be effective upon publication in the Federal Register. Safety determinations and associated safety assessments are considered final agency action effective upon completion and final publication (for substances found to meet the safety standard) or the date of promulgation of the final risk management rule (for substances found to not meet the safety standard).

The substitute approved by the Committee makes several improvements to the risk management provisions of S. 697. Consistent with changes made in section 7 related to new chemicals and significant new uses, section 8 requires EPA to impose risk management restrictions on persistent, bioaccumulative and toxic (PBT) substances for uses or conditions of use found not to meet the safety standard that reduce exposures "to the maximum extent practicable." For PBT Work Plan chemicals and in assessing subsequent high priority chemicals, the Committee believes that EPA's Framework for Metals Risk Assessment (EPA 120/R–07/001) (March 2007) should be consulted for metals and metal compounds. In addition, because the application of criteria applied in the prioritization screening process is not a definitive assessment of PBT characteristics, the Agency should consider whether substances that might otherwise be considered to have PBT characteristics should be addressed in a different way (e.g., substances that bioaccumulate but do not biomagnify), or whether substances that may not meet traditional PBT criteria should nonetheless be considered PBTs (e.g., substances that bioaccumulate in blood rather than fat tissue).

EPA is to impose risk management on articles only to the extent necessary to address the identified risks of the chemical substance from the article in order for EPA to determine that the chemical substance meets the safety standard. EPA is to exempt replacement parts that are manufactured prior to the effective date of the rule for articles that are first manufactured prior to the effective date of the rule unless it finds the replacement parts contribute significantly to the identified risk.

It is critical to a workable chemical management structure that EPA be afforded some level of discretion in implementing a ban or phase-out. However, to address concerns that the compliance date for such restrictions on a chemical substance not be unduly long, the section requires EPA to make compliance with such a rule mandatory in as short a period as practicable.

Notably, the section eliminates the controversial provision of existing TSCA that requires EPA to adopt the "least burdensome" regulatory requirement. This has been viewed by the Agency as a major road block to successful TSCA implementation because of the evidentiary and analytic burdens associated with justifying that each proposed regulatory action was the least burdensome requirement needed to ensure a chemical did not pose an unreasonable risk. While this requirement has been removed, the Committee maintains a strong continued interest in ensuring any regulatory decisions under this act undergo an implementable yet robust consideration of costs and benefits. This section requires EPA to assess the costs, benefits, and feasibility of regulatory options the Administrator has considered, and describe how that assessment influ-

19

enced the choice of regulatory requirements, but is not intended to establish a least burdensome requirement. EPA is authorized to exempt certain uses of a chemical substance if compliance with the regulatory restriction would harm national security, cause significant disruption of the national economy, or interfere with critical or essential uses. In the case of a ban or phase-out of a chemical substance, any exemption adopted by EPA can only last for a period of 5 years, subject to renewal.

*Section 9. Imminent hazards*

Section 9 of S. 697 amends section 7 of TSCA. The amendments make no substantive policy change in EPA's authority to protect against unreasonable risks associated with imminent hazards from certain chemical substances. The amendment updates and conforms the section to the new authority provided under S. 697.

*Section 10: Information collection and reporting*

Section 10 of S. 697 amends section 8 of TSCA, the general information collection and reporting authorities under the Act. The section ensures that EPA's information collection and reporting requirements produce a more complete picture of chemical substances in active commerce in the United States. The section also requires EPA to review all prior claims for the protection of confidential chemical identities for active substances within 5 years of enactment. The section provides authority to apply reporting and record-keeping requirements to both manufacturers and processors.

Although TSCA currently gives authority to EPA to collect information from processors, EPA has not chosen to do so. It is the Committee's intent that manufacturers (including importers) and processors have reporting obligations only where appropriate and necessary to enable EPA to understand what chemicals are actually in active commerce, to gain access to information necessary to implement this Act, and to keep the information updated. These reporting obligations should be appropriately tailored to ensure that reporting burdens on any particular sector are equitable, undue burdens on small manufacturers and processors are minimized, and reporting requirements are applied to those persons likely to have information relevant to the effective implementation of this title. The Committee expects EPA to use the information generated by periodic reporting obligations to provide relevant information on chemical uses and possible exposures, and improve the ability of the Administrator to conduct prioritization screening, safety assessments and safety determinations, and to promulgate and implement appropriate risk management rules.

TSCA requires a chemical substance to be listed on the TSCA Inventory before it is commercialized. However, TSCA does not require EPA on an ongoing basis to identify which substances on the Inventory are actually in commerce. With approximately 84,000 substances now on the Inventory—but less than 8,000 chemical substances reported under the EPA's Chemical Data Reporting Rule as being produced in volumes above the rule's reporting threshold—it is important that EPA (and the American public) have a better picture of what substances are in actual commerce at any given time. The failure to identify active substances has created confusion.

86

*tinuing or completing such a safety assessment or safety determination that was initiated before the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act, prior to the effective date of the policies and procedures required to be established by the Administrator under section 3A or 4A.*

*(B)* INTEGRATION OF PRIOR POLICIES AND PROCEDURES.—*As policies and procedures under section 3A and 4A are established, to the maximum extent practicable, the Administrator shall integrate the policies and procedures into ongoing safety assessments and safety determinations.*

*(2)* ACTIONS COMPLETED PRIOR TO COMPLETION OF POLICIES AND PROCEDURES.—*Nothing in this Act requires the Administrator to revise or withdraw a completed safety assessment, safety determination, or rule solely because the action was completed prior to the completion of a policy or procedure established under section 3A or 4A, and the validity of a completed assessment, determination, or rule shall not be determined based on the content of such a policy or procedure.*

*(3)* NOTICE OF EXISTING INFORMATION.—

*(A)* IN GENERAL.—*The Administrator shall, where such information is available, take notice of existing information regarding hazard and exposure published by other Federal agencies and the National Academies and incorporate the information in safety assessments and safety determinations with the objective of increasing the efficiency of the safety assessments and safety determinations.*

*(B)* INCLUSION OF INFORMATION.—*Existing information described in subparagraph (A) should be included to the extent practicable and where the Administrator determines the information is relevant and scientifically reliable.*

*(c)* SAFETY DETERMINATIONS.—

*(1)* IN GENERAL.—*Based on a review of the information available to the Administrator, including draft safety assessments submitted by interested persons, and subject to section 18, the Administrator shall determine that—*

*(A) the relevant chemical substance meets the safety standard;*

*(B) the relevant chemical substance does not meet the safety standard, in which case the Administrator shall, by rule under subsection (d)—*

*(i) impose restrictions necessary to ensure that the chemical substance meets the safety standard under the conditions of use; or*

*(ii) if the safety standard cannot be met with the application of restrictions, ban or phase out the chemical substance, as appropriate; or*

*(C) additional information is necessary in order to make a determination under subparagraph (A) or (B), in which case the Administrator shall take appropriate action under paragraph (2).*

*(2)* ADDITIONAL INFORMATION.—*If the Administrator determines that additional information is necessary to make a safety*