No. 24-60193

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY TECHNOLOGY COUNCIL,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

_____

Consolidated with No. 24-60281

_____

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION; HENRY A. ANDERSON, MEDICAL DOCTOR; BRAD BLACK, MEDICAL DOCTOR; BARRY CASTLEMAN, DOCTOR OF SCIENCE; RAJA FLORES, MEDICAL DOCTOR; ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF PHILOSOPHY; PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF PUBLIC HEALTH; STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR OF PUBLIC HEALTH; JACQUELINE MOLINE, MEDICAL DOCTOR, MASTER OF SCIENCE; CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, MEDICAL

DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE;
ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; JAMES
PAYNE, *Acting Administrator, United States Environmental Protection Agency*,

*Respondents*,

CONSOLIDATED WITH

————————

Consolidated with No. 24-60333

————————

OLIN CORPORATION,

*Petitioner*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; JAMES
PAYNE, *Acting Administrator, United States Environmental Protection Agency*,

*Respondents.*

_____

On Petitions for Review of an Order of the
Environmental Protection Agency
40 CFR Part 751
89 Fed. Reg. 21970

_____

**BRIEF OF INTERVENOR-RESPONDENTS AMERICAN CHEMISTRY
COUNCIL, GEORGIA CHEMISTRY COUNCIL, OHIO CHEMISTRY
TECHNOLOGY COUNCIL, AND TEXAS CHEMISTRY COUNCIL**

_____

Laura Gooding
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002

*Counsel for the American Chemistry Council*

David Y. Chung
Warren Lehrenbaum
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
wlehrenbaum@crowell.com

*Counsel for the American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council*

Robert J. Karl, Esq.
Eric B. Gallon
PORTER, WRIGHT, MORRIS &
ARTHUR, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for the Ohio Chemistry Technology Council*

No. 24-60193

———————————————————————————————

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————————————————————

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL;
GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS
ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY
TECHNOLOGY COUNCIL,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

————————————

Consolidated with No. 24-60281

————————————

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI;
LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS),
INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253
(FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL
ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION;
HENRY A. ANDERSON, MEDICAL DOCTOR; BRAD BLACK, MEDICAL
DOCTOR; BARRY CASTLEMAN, DOCTOR OF SCIENCE; RAJA FLORES,
MEDICAL DOCTOR; ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF
PHILOSOPHY; PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF
SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF
PUBLIC HEALTH; STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR
OF PUBLIC HEALTH; JACQUELINE MOLINE, MEDICAL DOCTOR,
MASTER OF SCIENCE; CELESTE MONFORTON, DOCTOR OF PUBLIC
HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, MEDICAL

DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE;
ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; JAMES
PAYNE, *Acting Administrator, United States Environmental Protection Agency*,

*Respondents*,

CONSOLIDATED WITH

————————

Consolidated with No. 24-60333

————————

OLIN CORPORATION,

*Petitioner*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; JAMES
PAYNE, *Acting Administrator, United States Environmental Protection Agency*,

*Respondents*.

————————————————————————————————

On Petitions for Review of an Order of the
Environmental Protection Agency
40 CFR Part 751
89 Fed. Reg. 21970

————————————————————————————————————

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners**

1.    Texas Chemistry Council

2.    American Chemistry Council

3.    Georgia Chemistry Council

4.    Ohio Chemistry Technology Council

5.    United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO

6.    Asbestos Disease Awareness Organization

7.    American Public Health Association

8.    Collegium Ramazzini

9.    Local F-116 (Vandenberg Professional Firefighters), International Association of Fire Fighters

10.    Local F-253 (Fort Myer Professional Firefighters), International Association of Fire Fighters

11.    The FeelGood Foundation

12.    Henry A. Anderson, Medical Doctor

13.    Brad Black, Medical Doctor

14.    Barry Castleman, Doctor of Science

15.   Raja Flores, Medical Doctor

16.   Arthur Frank, Medical Doctor, Doctor of Philosophy

17.   Phil Landrigan, Medical Doctor, Master of Science

18.   Richard Lemen, Doctor of Philosophy, Master of Public Health

19.   Steven Markowitz, Medical Doctor, Doctor of Public Health

20.   Jacqueline Moline, Medical Doctor, Master of Science

21.   Celeste Monforton, Doctor of Public Health, Master of Public Health

22.   Christine Oliver, Medical Doctor, Master of Public Health, Master of Science

23.   Andrea Wolf, Medical Doctor, Master of Public Health

24.   Olin Corporation

**Respondents**

1.   United States Environmental Protection Agency

2.   Michael Regan, Administrator, United States Environmental Protection Agency

**Amici Curiae**

1.   Chamber of Commerce of the United States of America

2.   Professor Rachel Rothschild

3.   State of Massachusetts

4.   State of Connecticut

5.   State of Hawaii

6.   State of Illinois

7.    State of Maryland

8.    State of Minnesota

9.    State of New Jersey

10.   State of New York

11.   State of Oregon

12.   State of Rhode Island

13.   State of Vermont

14.   District of Columbia

**Counsel**

1.    *For Petitioners/Intervenors American Chemistry Council, Georgia Chemistry Counsel, and Texas Chemistry Council*: Crowell & Moring LLP: David Y. Chung, Warren Lehrenbaum

2.    *For Petitioner/Intervenor Ohio Chemistry Technology Council*: Porter, Wright, Morris & Arthur, L.L.P.: Robert J. Karl, Eric B. Gallon

3.    *For Petitioner Olin Corporation*: Hunton Andrews Kurth LLP: Elbert Lin, Matthew Z. Leopold, Erica N. Peterson, Nicholas D. Stellakis

4.    *For Petitioner/Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO: OSH Law Project, L.L.C.: Randy Sue Rabinowitz, Victoria Louise Bor; Motley Rice, L.L.C.*: Nathan David Finch

5.    *For Petitioner/Intervenor Asbestos Disease Awareness Organization*: Lexington Law Group, LLP: Lucas Williams; Sussman and Associates: Robert Matthew Sussman

6.    *For Petitioners/Intervenors American Public Health Association; Collegium Ramazzini; Local F-116 (Vandenberg Professional Firefighters), International Association of Fire Fighters; Local F- 253*

*(Fort Myer Professional Firefighters), International Association of Fire Fighters; The FeelGood Foundation; Henry A. Anderson, Medical Doctor; Brad Black, Medical Doctor; Barry Castleman, Doctor of Science; Raja Flores, Medical Doctor; Arthur Frank, Medical Doctor, Doctor of Philosophy; Phil Landrigan, Medical Doctor, Master of Science; Richard Lemen, Doctor of Philosophy, Master of Public Health; Steven Markowitz, Medical Doctor, Doctor of Public Health; Jacqueline Moline, Medical Doctor, Master of Science; Celeste Monforton, Doctor of Public Health, Master of Public Health; Christine Oliver, Medical Doctor, Master of Public Health, Master of Science; Andrea Wolf, Medical Doctor, Master of Public Health*: Lexington Law Group, LLP: Lucas Williams

7. *For Respondent United States Environmental Protection Agency: U.S. Department of Justice, Environment & Natural Resources Division*: Laura J. Glickman; EPA Office of General Counsel: Jeffrey Prieto

8. *For Amicus Curiae Chamber of Commerce of the United States of America*: Vinson & Elkins, L.L.P: Jeremy Charles Marwell

9. *For Amicus Curiae Profession Rachel Rothschild*: Spiro Harrison & Nelson, L.L.C.: Evan Noller Bianchi

10. *For Amicus Curiae State of Massachusetts*: Andrea Jow Campbell

11. *For Amicus Curiae State of Connecticut*: William Tong

12. *For Amicus Curiae State of Hawaii*: Anne E. Lopez

13. *For Amicus Curiae State of Illinois*: Kwame Raoul

14. *For Amicus Curiae State of Maryland*: Anthony G. Brown

15. *For Amicus Curiae State of Minnesota*: Keith Ellison

16. *For Amicus Curiae State of New Jersey*: Matthew J. Platkin

17. *For Amicus Curiae State of New York*: Letitia James, Barbara D. Underwood, Mark S. Bruge, Gavin McCabe, Sarah K. Kam

18. *For Amicus Curiae State of Oregon*: Dan Rayfield

19. *For Amicus Curiae State of Rhode Island*: Peter F. Neronha

20. *For Amicus Curiae State of Vermont*: Charity R. Clark

21. *For Amicus Curiae District of Columbia*: Brian L. Schwalb

*/s/ David Y. Chung*
David Y. Chung

*Counsel for American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council*

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents important and novel questions regarding the interpretation of the Toxic Substances Control Act ("TSCA") in the context of the decision of the Environmental Protection Agency ("EPA") to ban chrysotile asbestos in the chlor-alkali and chemical-production industries and whether EPA set reasonable compliance deadlines for chlor-alkali producers. Oral argument would assist the Court.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ......................................... viii

TABLE OF AUTHORITIES ................................................................................. xi

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE ISSUES ........................................................................... 4

STATUTES AND REGULATIONS ...................................................................... 4

STATEMENT OF THE CASE .............................................................................. 4

I.     Statutory and Regulatory Background. ...................................................... 4

    A.    Risk Evaluation and Management Under TSCA Section 6. ......................................................................................................... 5

    B.    Coordination of TSCA Regulation with Other EPA Regulatory Schemes Under Section 9(b). ........................................ 9

II.    Relevant Industrial Uses of Asbestos. ...................................................... 10

III.   Regulatory Proceedings Relevant to Asbestos. ........................................ 13

    A.    2020 Risk Evaluation ....................................................................... 13

    B.    EPA's Proposed Risk Management Rule and Public Comment Process ............................................................................. 15

    C.    EPA's Final Risk Management Rule. ............................................... 20

SUMMARY OF ARGUMENT ............................................................................ 24

I.     EPA Established Reasonable Compliance Dates for the Chlor-Alkali Industry in Accordance with Congress's Commands. .................... 28

    A.    The Staggered Compliance Deadlines for the Chlor-Alkali Industry Are Consistent with the Statutory Text and Congress's Intent. ..................................................................... 29

    B.    ADAO's and Olin's Challenges to the Compliance Dates Lack Merit. ...................................................................................... 35

    C.    The Compliance Deadlines Are Supported by Substantial Evidence and Well-Reasoned. ........................................................ 41

II.    EPA Appropriately Excluded Exposure Pathways Relevant to the General Population from Risk Evaluation. ......................................... 46

III. USW's Claim that EPA Failed to Eliminate Unreasonable Risk to Chemical Manufacturing Employees Lacks Merit .................................. 53

CONCLUSION .................................................................................................... 54

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ADT, L.L.C. v. Richmond*,
  18 F.4th 149 (5th Cir. 2021) ...................................................................46

*Gundy v. United States*,
  588 U.S. 128 (2019)................................................................31, 40

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
  594 U.S. 382 (2021)...............................................................30, 38

*Huntsman Petrochemical LLC v. EPA*,
  114 F.4th 727 (D.C. Cir. 2024) ...................................................42, 44

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) .......................................................40

*Pulsifer v. United States*,
  601 U.S. 124 (2024)................................................................39

*Russello v. United States*,
  464 U.S. 16 (1983)................................................................36

*State of Mississippi v. Richardson*,
  817 F.2d 1203 (5th Cir. 1987) .....................................................30

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022)................................................................46

*Texas v. EPA*,
  91 F.4th 280 (5th Cir. 2024) ......................................................42, 44

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)................................................................38

## Statutes

15 U.S.C. § 2601(b)(2).............................................................4

15 U.S.C. § 2601(c) ...............................................................32

15 U.S.C. § 2605 .................................................................................1, 5

15 U.S.C. § 2605(a) .....................................................................5, 6, 52, 54

15 U.S.C. § 2605(b)(4)(A) ...................................................................6, 46

15 U.S.C. § 2605(b)(4)(D) ...............................................6, 13, 27, 46, 48

15 U.S.C. § 2605(b)(4)(G)(i) ..................................................................47

15 U.S.C. § 2605(b)(4)(G)(ii) .................................................................47

15 U.S.C. § 2605(c)(2) ...............................................................2, 36, 42

15 U.S.C. § 2605(c)(2)(A) ...................................... 7, 8, 9, 28, 32, 35, 42

15 U.S.C. § 2605(c)(2)(B) ...........................................................................7

15 U.S.C. § 2605(c)(2)(C) ...................................................2, 9, 31, 32, 35, 37

15 U.S.C. § 2605(d)(1) ..............................................................2, 31, 36

15 U.S.C. § 2605(d)(1)-(2) ........................................................................2

15 U.S.C. § 2605(d)(1)(B)-(E) ..................................................................7

15 U.S.C. § 2605(d)(1)(C) ...............................................8, 21, 29, 41

15 U.S.C. § 2605(d)(1)(C)-(E) ...............................................1, 9, 28

15 U.S.C. § 2605(d)(1)(D) ...............................................8, 21, 29

15 U.S.C. § 2605(d)(1)(E) ............................................29, 35, 37

15 U.S.C. § 2605(d)(2).......................... 1, 2, 8, 9, 21, 29, 30, 38, 41

15 U.S.C. § 2605(g) ............................................................................41

15 U.S.C. § 2608(b)(1) ...............................................................9, 47

15 U.S.C. § 2608(b)(2)............................................................................9

15 U.S.C. § 2613(b)(3)(B) ...................................................................39

16 U.S.C. § 1533 ................................................................................37

42 U.S.C. § 7412 ................................................................50

Pub. L. No. 94-469, 90 Stat. 2003 (1976) ...............................32

Pub. L. No. 114–182, 130 Stat. 448 (2016) .............................33

**Regulations**

29 C.F.R. Part 1910 ............................................................11

40 CFR part 61, subpart M .............................................50, 52

40 C.F.R. § 61.140 ............................................................50

40 C.F.R. § 61.144 ............................................................50

40 C.F.R. Part 141 ............................................................51

40 C.F.R. § 702.41(c)(2) ......................................................49

40 C.F.R. § 751.505(b) ........................................................45

40 C.F.R. § 751.505(c) ........................................................45

**Other Authorities**

161 Cong. Rec. H4551-01 (daily ed. June 23, 2015) ...................33

162 Cong. Rec. S3511-01 (daily ed. June 7, 2016) ...............5, 6, 48

82 Fed. Reg. 33726 (July 20, 2017)........................................49

87 Fed. Reg. 21706 (Apr. 12, 2022) ..................................15, 16

88 Fed. Reg. 16389 (Mar. 17, 2023)..............................16, 17, 18

89 Fed. Reg. 21970 (Mar. 28, 2024) ....................... 1, 10, 12, 13, 20, 21,
.......................................................... 22, 23, 24, 34, 42, 43, 45

89 Fed. Reg. 37028 (May 3, 2024) .........................................49

Black's Law Dictionary (12th ed. 2024) .............................30, 31

Merriam-Webster Dictionary .......................................30, 31, 38

## INTRODUCTION

The Industry Petitioners in this case—American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, Texas Chemistry Council (together, "Chemistry Councils") and Olin Corporation—have explained how the U.S. Environmental Protection Agency ("EPA") violated the Toxic Substances Control Act ("TSCA") in issuing the challenged rule in this case. *See* Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act ("TSCA"), 89 Fed. Reg. 21970 (Mar. 28, 2024) ("Final Rule").

If, however, this Court disagrees, it should nevertheless affirm EPA's lawful exercise of authority under TSCA Section 6, 15 U.S.C. § 2605, to establish "mandatory compliance dates" that "vary for different affected persons" within the chlor-alkali industry and that are "as soon as practicable" while still "provid[ing] for a reasonable transition period." 15 U.S.C. § 2605(d)(1)(C)-(E), (d)(2).

Based on the extensive record evidence that EPA amassed through several years of rulemaking proceedings, which included multiple public comment periods and a wide range of stakeholder meetings, EPA wisely concluded that compliance dates that are "as soon as practicable" and that "provide for a reasonable transition period" necessarily vary depending on a multitude of factors. EPA took those factors into account, along with the numerous categories of information that Congress

1

directed EPA to consider in TSCA Section 6(c)(2), in setting appropriate transition periods for the phase-out of asbestos at the chlor-alkali facilities, such as the "likely effect of the rule on . . . the environment, and public health" that could result from a shortage in chlorine production for water treatment, or the "costs and benefits" of accommodating lengthy, complex facility conversions to more energy efficient non-asbestos technologies. *See* 15 U.S.C. § 2605(c)(2). Consequently, EPA finalized multiple compliance dates for full implementation of the prohibition on asbestos in chlor-alkali facilities, as Congress plainly and expressly authorized in Sections 6(d)(1) and 6(d)(2). *Id.* § 2605(d)(1)-(2).

Petitioners Olin Corporation and Asbestos Disease Awareness Organization, *et al.* ("ADAO") nevertheless argue that EPA's mandatory compliance dates violate TSCA, though neither petition disputes *any* of EPA's record-based findings supporting the varied compliance dates in the Final Rule. Both fixate on the statutory phrase "as soon as practicable," while neglecting other pertinent statutory requirements that EPA "provide for a reasonable transition period," and set appropriate transition periods based on the enumerated statutory factors in Section 6(c)(2). *See* 15 U.S.C. § 2605(d)(1), (c)(2)(C). Equally important, ADAO essentially ignores Congress's explicit authorization to set different compliance dates for "different affected persons," which is precisely what EPA did. *See id.* § 2605(d)(2). Olin, for its part, argues that this delegation of authority is unconstitutional, but

Olin's nondelegation challenge similarly depends on reading Section 6(d)(2) in isolation from surrounding provisions in TSCA that set out an intelligible principle to guide EPA's exercise of authority.

Furthermore, the Court should deny the remainder of ADAO's petition and the petition by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") for the reasons detailed in EPA's brief. Rather than duplicate those arguments, the Chemistry Councils instead emphasize that (i) ADAO's challenge to EPA's approach to environmental exposure pathways rests on a misreading of TSCA, as ADAO ignores multiple provisions that convey Congress's intent that EPA need not and should not evaluate and regulate all potential exposures and risks of a chemical substance under TSCA; and (ii) EPA lacked authority under TSCA Section 6(a) to impose worker protections with respect to the ongoing use of already installed sheet gaskets in chemical production, despite USW's contrary claims, because EPA did not find that such use presents an unreasonable risk.

For these reasons, the Court should deny Olin's petition to review the chlor-alkali compliance dates, and it should deny ADAO's and USW's petitions in their entirety.

## STATEMENT OF THE ISSUES

1.      Whether the mandatory compliance dates for chlor-alkali facilities are consistent with TSCA Section 6 and supported by substantial evidence, and whether Congress lawfully delegated authority to EPA to set compliance dates that vary for different affected persons?

2.      Whether EPA appropriately determined, based on intra-agency coordination, that exposures to the general population via water, air, and disposal pathways are addressed by other EPA-administered statutes and thus, need not be subject to TSCA risk evaluation?

3.      Whether EPA appropriately declined to impose interim worker protections for the ongoing use of already installed sheet gaskets given that the Agency did not find such use presents an unreasonable risk?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum to Respondent EPA's brief.

## STATEMENT OF THE CASE

### I.      Statutory and Regulatory Background.

In 1976, Congress enacted TSCA to "regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment[.]" 15 U.S.C. § 2601(b)(2). Congress overhauled TSCA in 2016. As relevant here, the 2016 amendments significantly altered EPA's section 6 authority

by creating a two-step process to conduct risk evaluations and, if appropriate, to manage activities involving such chemicals that present an unreasonable risk of injury to health or the environment. *See generally id.* § 2605.

## A. Risk Evaluation and Management Under TSCA Section 6.

TSCA section 6(a) commands EPA to promulgate regulations prohibiting or otherwise restricting the "manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture" if the Agency determines that any of these activities or a combination of such activities "presents an unreasonable risk of injury to health or the environment[.]" *Id.* § 2605(a). The Act explicitly directs EPA to regulate only "*to the extent necessary* so that the chemical substance or mixture no longer presents such risk." *Id.* (emphasis added). As explained in the legislative history, "'[u]nreasonable risk' does not mean *no risk*; it means that EPA must determine, on a case-by-case basis, whether the risks posed by a specific high priority substance are *reasonable* in the circumstances of exposure and use." 162 Cong. Rec. S3511-01, S3522 (daily ed. June 7, 2016) (statement of Sen. Vitter) (emphasis added).

Before it can promulgate a risk management rule under section 6(a), EPA must "conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a

potentially exposed or susceptible subpopulation . . . under the conditions of use." 15 U.S.C. § 2605(b)(4)(A). As part of the risk evaluation process, EPA must "publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations [EPA] *expects to consider*[.]" *Id.* § 2605(b)(4)(D) (emphasis added). EPA can exclude certain activities, exposures, and health or environmental hazards and to instead focus on what raises the greatest potential for risk. *See id.*; *accord* 162 Cong. Rec. S3511-01, S3519 (statement by Sen. Vitter) (EPA is "given the discretion to determine the conditions of use" to allow EPA's focus on conditions "that raise the greatest potential for risk.").

If EPA determines "that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment," it proceeds to risk management rulemaking under Section 6(a). *See* 15 U.S.C. § 2605(a). Congress made clear that EPA must consider costs, among other factors, during the risk management process. *See id.* (directing EPA to apply one or more risk management requirements "in accordance with subsection (c)(2)"). Section 6(c)(2)(A), in turn, provides that:

> *In proposing and promulgating a rule under subsection (a)* with respect to a chemical substance or mixture, the Administrator *shall consider* and publish a statement based on reasonably available information with respect to—

(i) the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

(ii) the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

(iii) the benefits of the chemical substance or mixture for various uses; and

(iv) the *reasonably ascertainable economic consequences of the rule*, including consideration of—

(I) the *likely effect of the rule on* the national economy, small business, technological innovation, *the environment, and public health*;

(II) the *costs and benefits* of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

(III) the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

15 U.S.C. § 2605(c)(2)(A) (emphasis added). Thus, in selecting among the risk management options in Section 6(a), *i.e.*, prohibitions, restrictions, or other requirements, EPA must, to the extent practicable, factor in these considerations. *See id.* § 2605(c)(2)(B).

In any TSCA Section 6(a) rule, EPA must specify "mandatory compliance dates" for the applicable risk management requirements that are "as soon as practicable" but that also "provide for a reasonable transition period." *Id.*

§ 2605(d)(1)(B)-(E). Relevant here, if EPA determines that it is necessary to ban or phase-out a chemical substance, it must "specify mandatory compliance dates for the *start* of ban or phase-out requirements . . . which shall be as soon as practicable, *but not later than 5 years after the date of promulgation* of the rule, except in the case of a use exempted under subsection (g)." *Id.* § 2605(d)(1)(C) (emphasis added). While Congress specified that a ban or phase-out must begin no later than five years after a rule's promulgation, it did not dictate when a ban or phase-out must be completed. Rather, Congress left it to EPA to "specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable." *Id.* § 2605(d)(1)(D).

Compliance dates are not one-size-fits-all for all affected entities. Rather, Section 6(d)(2) states in the plainest of language that, "[a]s determined by the Administrator, the compliance dates established under paragraph (1) *may vary for different affected persons*." *Id.* § 2605(d)(2) (emphasis added).

Elsewhere in Section 6, Congress set forth guidelines for EPA's exercise of authority to set transition periods for ban or phase-out requirements:

> *Based on the information published under [§ 2605(c)(2)(A)]*, in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, *and in setting an appropriate transition period for such action*, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or

restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

*Id.* § 2605(c)(2)(C) (emphasis added). Reading these provisions together, in deciding what compliance dates are "as soon as practicable" and that "provide for a reasonable transition period"—including, as appropriate, different compliance dates for "different affected persons"—EPA must base its decision on, among other things, likely effects on the environment and public health and the relative costs and benefits of the final rule. *See id.* § 2605(c)(2)(A) & (C), (d)(1)(C)–(E), (d)(2).

## B. Coordination of TSCA Regulation with Other EPA Regulatory Schemes Under Section 9(b).

TSCA does not operate in a vacuum and does not have primacy over any other statutes, environmental or otherwise. In Section 9(b), Congress commanded EPA to "coordinate actions" under TSCA, including *both* risk evaluation and risk management, with actions under other EPA-administered laws and further directed that EPA "shall use such authorities [in other laws] to protect against such risk" if EPA determines that a risk "could be eliminated or reduced to a sufficient extent[.]" 15 U.S.C. § 2608(b)(1). And EPA may act under TSCA *only* if it is in the public interest. That determination requires EPA to "consider, based on information reasonably available to [EPA], all relevant aspects of the risk . . . and a comparison of the estimated costs and efficiencies of the action" to be taken under TSCA versus a different federal law. *Id.* § 2608(b)(2).

## II. Relevant Industrial Uses of Asbestos.

Chlor-alkali facilities use a chemical process known as electrolysis to produce chlorine and sodium hydroxide (also known as caustic soda) from a salt solution. *See* 89 Fed. Reg. at 21975. Many chlor-alkali facilities accomplish that process using diaphragm devices that contain chrysotile asbestos. *See id.* Chrysotile asbestos diaphragms "prevent[] the reaction of the caustic soda with the chlorine and allows for the separation of both materials for further processing." *Id.*

Caustic soda from chlor-alkali facilities is used in cleaning agents, pharmaceutical products, energy production, water treatment, food production, and wood and paper products. *See* ACC Chlorine Panel Comments (July 13, 2022) ("7/13/22 ACC Comments"), AR C.398, at 3-4, JA__; *see also* Economic Analysis of the TSCA Section 6 Final Rule for Asbestos Risk Management, Part 1 (Mar. 2024) ("Economic Analysis"), AR C.753, at 2-2 to 2-3, JA__-__ (discussing caustic soda end uses). Chlorine from such facilities is used in numerous industries, including, but not limited to, water and wastewater treatment, agriculture and food production, defense and law enforcement, transportation, building and construction, energy and environment, and healthcare industries. *See* 7/13/22 ACC Comments, AR C.398, at 4, JA__. In particular, chlorine chemistry is used to help manufacture approximately 88% of all pharmaceuticals, 20% of medical plastics, 50% of all disposable medical goods, and 89% of crop protection chemicals. *Id.*; *see also*

Economic Analysis, AR C.753, at 2-2, JA__ (discussing use of chlorine in "the manufacture of polyvinyl chloride (PVC), which has many end-use applications including construction materials, automotive components, electrical and electronic products, medical devices, and consumer products" and the use of chlorine in "the manufacture of other organic and inorganic chemicals, as a component of bleach and other disinfectants, and to treat and decontaminate water supplies").

Chlor-alkali facilities operate under a comprehensive regulatory framework established under the Occupational Safety and Health Act that requires employers to, among other things: ensure that no employee is exposed to an airborne concentration of asbestos greater than 0.1 fibers/cubic centimeter of air; implement engineering controls and work practices to reduce and maintain employee exposure below the exposure limit (*e.g.*, using "wet methods" to ensure airborne fibers are below permissible limits); and require respirator use when engineering and workplace controls are not sufficient to reduce concentrations below the exposure limit. *See* 29 C.F.R. Part 1910. Moreover, activities such as receiving, inspecting, and unloading asbestos that arrives in sealed bags, as well as fabricating diaphragm cells, occur under tightly controlled conditions. *See* Risk Evaluation for Asbestos, Part I: Chrysotile Asbestos (Dec. 2020) ("Risk Eval."), AR B.117, at 76, JA__; *see also id.* at 79, JA__ (explaining how, at some facilities, sealed asbestos bags are opened and asbestos is transferred to mixing tanks through a fully automated and

enclosed process, while at other facilities, such activities occur in "glove boxes," which are sealed containers with gloves built into the walls so that workers can move objects inside the box without exposure). Equally important, asbestos in diaphragms fuses to a metallic screen or perforated plate during fabrication, thus eliminating the potential for exposure. *See id.* at 77, 79, JA__, __.

The chemical manufacturing industry uses gaskets containing chrysotile asbestos to provide durable seals and prevent equipment leaks under extreme operating conditions, such as high temperatures (*e.g.*, greater than 1,850° F), high pressures, and the presence of chlorine or other corrosive substances. Risk Eval., AR B.117, at 93, JA__. Such extreme conditions are found in many chemical manufacturing and processing operations, where chrysotile asbestos-containing sheet gaskets help to assure process safety and integrity. 89 Fed. Reg. at 21976. Such operations include the manufacture of titanium dioxide and chlorinated hydrocarbons, polymerization reactions involving chlorinated monomers, and steam cracking at petrochemical facilities. *See id.* Typically, installed gaskets remain in use from a few weeks to three years, and they are totally enclosed within the

manufacturing equipment, thus minimizing the possibility of exposure. *See id.*; *see also* 7/13/22 ACC Comments, AR C.398, at 13, JA___.

## III.    Regulatory Proceedings Relevant to Asbestos.

### A.    2020 Risk Evaluation

EPA finalized a risk evaluation in December 2020 considering six conditions of use for chrysotile asbestos, including chlor-alkali diaphragms and sheet gaskets in chemical production facilities, among other conditions of use. *See generally* Risk Eval., AR B.117, JA___.

As a threshold matter, EPA exercised its authority under TSCA "to tailor the scope of its risk evaluations, rather than focusing on environmental exposure pathways addressed under other EPA-administered statutes or regulatory programs or risks that could be eliminated or reduced to a sufficient extent by actions taken under other EPA-administered laws." *Id.* at 47-50, JA___-___ (discussing EPA's exercise of scoping authority under Section 6(b)(4)(D) and coordination requirements in Section 9(b)(1), among other TSCA provisions). Though EPA suggested that exposures to the general population could occur from the conditions of use it was evaluating due to releases to air, water, or land, based on extensive intra-agency coordination, "EPA determined that specific exposure pathways are well-regulated" by several EPA-administered statutes and regulations. *Id.* at 51, JA___. For instance, EPA discussed regulation of ambient air exposures under the

Clean Air Act; regulation of drinking water and ambient water exposures under the Safe Drinking Water Act and the Clean Water Act; and regulation of various disposal pathways under the Resource Conservation and Recovery Act, Clean Air Act, and Safe Drinking Water Act. *See id.* at 50-54, JA__-__. Accordingly, EPA declined to "evaluate hazards or exposures to the general population" in the risk evaluation, "and as such the unreasonable risk determinations for the relevant conditions of use do not account for exposures to the general population." *Id.* at 32, JA__.

EPA focused its evaluation of the processing and industrial use of diaphragms in the chlor-alkali industry and of the processing and industrial use of sheet gaskets used in chemical production on risk to workers and occupational non-users and determined that both conditions of use present an unreasonable risk. *See id.* at 32-33, JA__-__. Regarding sheet gaskets used in chemical production, EPA determined that ongoing use of already installed gaskets did not drive the unreasonable risk. Rather, EPA found that the "activities most relevant to chrysotile asbestos exposure include receiving new gaskets, removing old gaskets, bagging old gaskets for disposal, and inserting replacement gaskets into flanges and other process equipment." *Id.* at 94. Removal of old gaskets is handled by "trained maintenance workers wear[ing] respiratory protection—either an airline respirator (also known as a supplied air respirator) or cartridge respirator with P-100 HEPA filters[.]" *Id.*

**B.** **EPA's Proposed Risk Management Rule and Public Comment Process**

On April 12, 2022, EPA issued the proposed risk management rule to regulate the six conditions of use under TSCA section 6(a) to regulate those conditions of use that EPA determined present unreasonable risk in the 2020 Risk Evaluation. *See* 87 Fed. Reg. 21706 (Apr. 12, 2022). EPA proposed to prohibit the manufacture (including import), processing, distribution in commerce, and commercial use of chrysotile asbestos in bulk for or as part of chrysotile asbestos diaphragms used in the chlor-alkali industry and chrysotile asbestos-containing sheet gaskets used in chemical production two years after the effective date of the final rule. *Id.* at 21720. EPA's proposed primary alternative regulatory action was a prohibition that would take effect five years after the effective date of the final rule, coupled with compliance with an existing chemicals exposure limit prior to the prohibition taking effect. *See id.* at 21722.

Mindful of its statutory obligation to ensure that any prohibition compliance date must "be both 'as soon as practicable' and 'provide for a reasonable transition period,'" EPA invited comments on:

> [S]pecific and detailed timelines to build asbestos-free facilities or to convert existing asbestos-using facilities to asbestos-free technology and the availability of asbestos-free technology. EPA is also requesting specific information regarding potential barriers to achieving the proposed prohibition date while considering the supply of chlor-alkali chemicals. EPA is also requesting comment on the potential impact of this transition on the market price of chlor-alkali chemicals, including

the potential impact of a decrease in availability of diaphragm-grade caustic soda on both the production and cost of water treatment chemicals, including both caustic soda used directly in water treatment as well as the potential impact on the cost of other water treatment chemicals derived from caustic soda.

87 Fed. Reg. at 21726.

Multiple commenters, including ACC and its members, explained why EPA's proposed two-year compliance date would not provide a reasonable transition period for the chlor-alkali industry and that additional time was needed to avoid "economic disruptions, and public health impacts resulting from potential disruption of drinking water disinfection supplies due to fluctuations in the production of chlorine." 88 Fed. Reg. 16389, 16390 (Mar. 17, 2023) (summarizing comments); *see also* Chlorine Institute Comments (July 13, 2022), AR C.382, at 39-41, JA__-__; 7/13/22 ACC Comments, AR C.398, at 71-74, JA__-__.

Specifically, the American Water Works Association, Association of Metropolitan Water Agencies, and National Rural Water Association, whose members collectively provide safe drinking water for "more than 80 percent of the U.S. population," emphasized that chlor-alkali facilities "are an essential link in the United States' chemical supply chain for the production of chlorine, sodium hypochlorite and caustic soda" and warned that a "rulemaking that disrupts the supply of chlor-alkali products used by the water sector will adversely impact the continuity of operations at public water systems and wastewater treatment facilities

across the nation and as result, the health protections provided to consumers." AWWA, et al. Comments (July 13, 2022), AR C.355, at 1, JA__; *see also, e.g.*, Upper Darby, Pennsylvania Comments (May 18, 2022), AR C.265, at 1-2, JA__; Rio Blanco Water Conservancy District (CO) Comments (June 8, 2022), AR C.283, JA__; Southern Nevada Water Authority Comments (May 23, 2022), AR C.269, JA__.

Several commenters also raised the same concerns with EPA's alternative five-year compliance date, with some noting that Canada provided 11 years for the conversion of a single plant, while Germany allowed 14 years for a single plant conversion. *See* 88 Fed. Reg. at 16390; *see also* 7/13/22 Chlorine Institute Comments, AR C.382, at 38, JA__ ("It should be noted that in the case of both Germany and Canada, only one site was affected for their respective countries. In the U.S., eight sites, representing 33% of installed capacity, are affected.").

ACC illustrated why a single plant conversion could take 45-55 months, inclusive of project design and engineering, permitting, construction, and startup. *See* 7/13/22 ACC Comments, AR C.398, at Attach. 3 p. 6, JA__; *see also see also* 7/13/22 Chlorine Institute Comments, AR C.382, at 39, JA__ (discussing permitting timelines for facility conversions). ACC further cautioned that because of supply chain disruptions, electrolyzer market demand, and limited production capacity (there are only four electroyzer manufacturers in the world), large scale conversions

to membrane technology may only be possible every three to four years. *See* 7/13/22 ACC Comments, AR C.398, at 70-71, JA__. ACC further explained that, even if it were hypothetically possible to convert to membrane technology concurrently, shutting down existing capacity at the same time would dramatically impact the supply of chlor-alkali chemicals across many industries and public services. *See id.* at 72, JA__.

EPA also received comments noting that "it may be practicable for the compliance dates to vary for different affected persons, as comments have informed EPA that individual chlor-alkali companies may have different considerations for the timing of any transition away from chrysotile asbestos diaphragm technology, based on whether they intend to close or convert facilities, the number and size of facilities they have, and inherent technical differences in specific plant conversions." 88 Fed. Reg. at 16391; *see also* 7/13/22 Chlorine Institute Comments, AR C.382, at 40-42, JA__-__ (comparing processes for conversion to non-asbestos diaphragms and conversion to membrane technology).

In addition to comments on the proposed rule, EPA received detailed information after the close of the public comment period during stakeholder meetings. EPA thus issued a Notice of Data Availability ("NODA") in March 2023 to make non-confidential data and meeting summaries available to the public. *See* 88 Fed. Reg. at 16390. EPA reopened the comment process and solicited public

comment on any data received during and after the initial public comment period on the proposed rule, and how EPA should consider such information in developing the Final Rule. *See id.* at 16391.

In response to the NODA, EPA again received information on technical differences in different types of chlor-alkali facility conversions and how those differences impact the time needed to complete conversions. For instance, OxyChem provided detailed information on the time needed to convert a chlor-alkali facility to membrane technology through a multi-phase project (with some overlap in phases): front-end engineering development (14 months); permitting (18 months); detailed engineering (21 months); procurement (28 months); construction (31 months); and startup (6 months). *See* OxyChem Comments (Mar. 10, 2023), AR C.453, at Attach. 2, JA__. OxyChem further advocated that a 15-year phase out was needed because of: (i) limited global supply of metals for electrode elements; (ii) limited shop manufacturing capacity for electrode elements; (iii) the small number of specialized electrochemical and technical experts for chlor-alkali facilities with limited availability to support both ongoing operations and multiple conversions; and (iv) the inability to replicate schedule and procurement efficiencies across multiple, unique plant conversions at the same time. *See id.*, Attachments 1 & 3, JA__-__.

Separately, numerous organizations and state officials reiterated that EPA's proposed two-year phase-out would result in a shortage of clean drinking water. *See*

EPA, Asbestos Part 1 NODA Response to Comments (Mar. 2024), AR C.759, at 23, JA__ (summarizing comments). Several commenters warned that eliminating 33% of the nation's chlorine production in such a short time, without a viable plan to replace the lost capacity, would result in a human health crisis. *See id.*

### C.    EPA's Final Risk Management Rule.

On March 28, 2024, EPA promulgated the Final Rule under review, with an effective date of May 28, 2024. 89 Fed. Reg. 21970. EPA banned the manufacture (including import) of chrysotile asbestos for diaphragms in the chlor-alkali industry and sheet gaskets used in chemical production on the effective date. *See id.* at 22006-07. EPA concluded, however, that its proposed two-year timeline for the prohibition on processing, distribution in commerce, and commercial use of asbestos for diaphragms in the chlor-alkali industry would not be "as soon as practicable" and would not "provide for a reasonable transition period," as required under TSCA Section 6(d)(1). *See id.* at 21979. EPA extended the timeline in part because many commenters expressed the need to allow for the transition away from asbestos to occur "without causing economic disruptions or public health impacts resulting from potential disruption of drinking water disinfection and wastewater treatment supplies due to fluctuations in the production of chlorine and other chlor-alkali products." *Id.*; *see also* EPA, Asbestos Part 1: Proposed Rule Response to Public Comments (Mar. 2024) ("Resp. to Comments"), AR C.758, at 2, JA__.

Based on the significant public comments it received, EPA determined that "five years after the effective date of this final rule is as soon as practicable for this prohibition *to start*" (in accordance with 15 U.S.C. § 2605(d)(1)(C)) and that "the date by which the full implementation of this prohibition is practicable *varies for different persons* affected by this prohibition" (in accordance with 15 U.S.C. § 2605(d)(1)(D) & (d)(2)). 89 Fed. Reg. at 21979 (emphasis added); *accord* Resp. to Comments, AR C.758, at 28, JA__. EPA considered: "the technical differences in specific facility conversions and how those affect the time needed for each individual chlor-alkali company to transition away from" asbestos, such as different designs in asbestos diaphragms, whether facilities are converting to non-asbestos diaphragms or membrane technology, "the limited availability of suppliers and technical expertise required for the conversion process, as well as differences regarding permits needed for the conversion of facilities and permitting timelines based on facility location." 89 Fed. Reg. at 21981; *see also* Resp. to Comments, C.758, at 24, JA__ ("EPA understands that factors including the number and size of facilities owned by a chlor-alkali company, a company's decision to close chlor-alkali facilities or convert facilities to non-asbestos technologies, and technical differences in specific plant conversions affect the time needed for each individual chlor-alkali company to transition away from chrysotile asbestos diaphragm technology.").

In recognition of the record evidence illustrating that "conversion of multiple facilities to membrane technology cannot be performed simultaneously and can only be accomplished in a sequential conversion process," EPA found it appropriate to finalize compliance dates "that can accommodate differences among facilities to provide a reasonable transition period for each remaining chlor-alkali facility still using chrysotile asbestos diaphragms . . . without anticipated disruption to the available supply of chlor-alkali chemicals needed to treat drinking water and wastewater." 89 Fed. Reg. at 21980; *see also* Resp. to Comments, AR C.758, at 32-33, JA__-__ (explaining why "EPA is adopting an approach that can accommodate differences among facilities to provide a reasonable transition period that is as soon as practicable for each remaining chlor-alkali facility still using chrysotile asbestos diaphragms, while ensuring the associated unreasonable risk is addressed").

The Final Rule articulates the distinctions between converting to non-asbestos diaphragms versus converting to membrane technology. The former "requires fewer design changes, less construction, and may be performed over several years without significant disruption of facility operations" and "can proceed concurrently at several facilities, subject to the availability of supplies of non-asbestos diaphragm cell components." 89 Fed. Reg. at 21980. By contrast, conversions to membrane technology "are more complicated" because they "require new cells, as well as multiple other plant infrastructure changes, including changes to: brine processing,

caustic soda handling, piping, storage tanks, and power supply." *Id.* EPA further recognized that "compared to diaphragm technology, membrane technology uses less energy and produces a higher-quality product (containing less salt) for which there is greater market demand, and is therefore generally considered the current best available technology in the chlor-alkali industry." *Id.*

With these considerations in mind, EPA developed staggered mandatory compliance dates for the prohibition. Looking at the evidence in the record, EPA determined that the conversion to non-asbestos diaphragms at four facilities—two operated by Olin and two operated by OxyChem— are achievable in five years, as is the conversion of a fifth facility operated by Westlake to an unspecified non-asbestos technology. *See id.* EPA further found that allowing these facilities more time, say seven years, to complete these conversions "would not be as soon as practicable given the information received from" each of the companies. *Id.* at 21981.

Relatedly, EPA explained that it "received detailed information on the sequential conversion schedule" for three OxyChem facilities to transition to membrane technology. *Id.* EPA found that the first conversion can be completed within five years, the second conversion can be completed within eight years, and the third conversion can be completed within twelve years. *See id.* EPA emphasized that there was no basis in the record to conclude that a shorter schedule would

provide for "a reasonable transition period, given the limited global supply of essential metals, the limited capacity to produce electrode elements, the limited number of specialized electrochemical and technical experts for chlor-alkali facilities and the inability to concurrently schedule and procure for multiple, unique membrane facility conversions[.]" *Id.* EPA also found that if it mandated full implementation of the phase-out in a shorter period, such as seven years, "would force the closure of this third facility for five years before chlor-alkali production could resume" and warned that "this forced closure would have deleterious impacts on the supply of chlor-alkali chemicals for water treatment as well as the chemicals industry, and also would have significant financial impacts for the company." *Id.*

In sum, the Final Rule prohibits the processing, distribution in commerce, and commercial use of chrysotile asbestos for asbestos diaphragms effective five years after the final rule's effective date, but allows longer phase-out periods of 8- and 12-years for full implementation of the ban "in order to provide companies with a reasonable transition period for the sequential conversion to membrane technology of up to three" chlor-alkali facilities. *See id.* at 21982.

## SUMMARY OF ARGUMENT

I.     EPA lawfully set different compliance dates for different chlor-alkali companies in the Final Rule after considering detailed record evidence and the relevant factors Congress specified in TSCA Sections 6(c) and 6(d).

A.     EPA adhered to the statutory text and Congress's intent in setting different compliance dates for different affected persons in the chlor-alkali industry. Congress mandated in TSCA Section 6(d)(1) that EPA set compliance dates for ban or phase-out requirements that are "as soon as practicable" and that "provide for a reasonable transition period," so long as the phase-out *starts* within five years of the Final Rule's effective date. Congress did not dictate an end date in that section for full implementation of a phase-out, and Congress clearly and explicitly authorized EPA to set compliance dates that "vary for different affected persons" in Section 6(d)(2). Elsewhere in Section 6(c)(2), Congress directed EPA to consider factors such as the likely effect of the rule on the environment and public health and the costs and benefits of the rule in setting an appropriate transition period under Section 6(d). Based on the detailed information in the record related to the Section 6(c)(2) factors, EPA set compliance dates in the Final Rule that align closely with all of Congress's commands and authorizations.

B.     ADAO and Olin challenge the compliance dates as contrary to TSCA, but none of their arguments have merit. Both petitioners argue that EPA can only set compliance dates based on when compliance is "as soon as practicable" under TSCA Sections 6(d)(1)(C) & (D), but they ignore that Congress also mandated in Section 6(d)(1)(E) that compliance dates must "provide for a reasonable transition period" and that Congress directed EPA to consider a multitude of other factors in

Section 6(c)(2)(A) & (C) when setting such transition periods. Moreover, ADAO's attempts to equate "practicable" and "feasible" cannot be squared with TSCA's text and history. Thus, ADAO's strained analogy to case law interpreting feasibility fails.

Next, neither ADAO nor Olin can credibly dispute that a straightforward reading of TSCA Section 6(d)(2) confirms that Congress authorized exactly what EPA did in the Final Rule, which is establish compliance dates that "vary for different affected persons." ADAO baselessly speculates that Congress really meant "industry sectors" instead of "persons," but Congress's use of "industry sector" elsewhere in TSCA is enough to defeat ADAO's argument. Olin takes a different tack by arguing that Section 6(d)(2) is an unconstitutional delegation of authority, and in so doing, Olin commits the same fundamental error that permeates all of its statutory arguments challenging EPA's compliance dates: Olin reads that section in isolation from surrounding provisions in TSCA. Contrary to Olin's claim, Congress did not give EPA unfettered discretion to set different compliance dates. Congress instead provided guidance in Sections 6(d)(1) and 6(c)(2), which supply an intelligible principle to guide EPA's exercise of authority to set different compliance dates for different affected persons.

C.    Olin's substantial evidence challenge fails for largely the same reasons. Olin argues that EPA improperly considered extra-statutory factors— namely, energy efficiency and end-product quality—in setting the compliance dates

in the Final Rule, rather than focusing exclusively on when compliance is "practicable" under TSCA Section 6(d)(1). Again, that section does not exist in a vacuum, and Section 6(c)(2)(C) makes it clear that EPA appropriately considered the various factors outlined in Section 6(c)(2)(A), such as likely effects on the environment and public health and the costs and benefits of the final regulatory action, in setting appropriate transition periods. Equally important, Olin does not contest EPA's consideration of numerous other factors, or the underlying record evidence, presented in the Final Rule to support the Agency's determination that compliance dates should vary for different chlor-alkali companies. Olin's mere disagreement with the timelines EPA chose does not demonstrate a violation of the substantial evidence standard.

II.    EPA appropriately excluded exposure pathways to the general population from risk evaluation and thus, the Court should reject ADAO's request to remand the rule to EPA to address those pathways. TSCA Section 6(b)(4)(D) requires EPA to publish the scope of a risk evaluation to be conducted, including the "exposures" that EPA "expects to consider." And TSCA Section 9(b)(1) mandates that EPA "shall coordinate actions taken under this chapter," including risk evaluations, with actions taken under other EPA-administered laws. In accordance with these statutory commands, EPA conducted intra-agency coordination and determined that air, water, and disposal exposure pathways to the general population

are addressed extensively under several other laws. Thus, it appropriately and sensibly excluded those pathways from risk evaluation to avoid duplicative regulation.

III.     Because EPA found that the ongoing use of already installed sheet gaskets for chemical production does not present an unreasonable risk, EPA had no basis to exercise its TSCA Section 6(a) risk management authority to impose interim worker protections throughout the useful life of already installed gaskets. EPA may only regulate under Section 6(a) "to the extent necessary" to eliminate unreasonable risk, and USW has failed to refute the fact that EPA did not find that ongoing use of installed gaskets presents unreasonable risk.

## **ARGUMENT**

## I.     EPA Established Reasonable Compliance Dates for the Chlor-Alkali Industry in Accordance with Congress's Commands.

In the Final Rule, EPA "specif[ied] mandatory compliance dates for the start of ban or phase-out requirements" and "for full implementation of ban or phase-out requirements" for the chlor-alkali industry that are "as soon as practicable" and that "provide for a reasonable transition period." 15 U.S.C. § 2605(d)(1)(C)-(E). As Congress mandated, EPA considered the "reasonably ascertainable economic consequences of the rule" "in setting an appropriate transition period" for the phase-out requirements. *Id.* § 2605(c)(2)(A) & (C). And as Congress authorized, EPA determined that the compliance dates for the chlor-alkali industry should "vary for

different affected persons." *Id.* § 2605(d)(2). ADAO and Olin nonetheless argue that the compliance deadlines for the chlor-alkali industry violate TSCA, but their arguments fail for similar reasons: both ADAO and Olin read certain phrases in TSCA Section 6(d) in isolation, while ignoring other relevant statutory provisions, Congress's stated intent, and legislative history.

### A. The Staggered Compliance Deadlines for the Chlor-Alkali Industry Are Consistent with the Statutory Text and Congress's Intent.

In any TSCA Section 6(a) rule, EPA must "specify mandatory compliance dates *for the start* of ban or phase-out requirements . . . which shall be *as soon as practicable, but not later than 5 years* after the date of promulgation of the rule, except in the case of a use exempted under subsection (g)." 15 U.S.C. § 2605(d)(1)(C) (emphasis added). Congress did not specify any end dates for ban or phase-out requirements, and it instead left EPA to "specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable." *Id.* § 2605(d)(1)(D). In all events, the deadlines in a Section 6(a) rule must "provide for a reasonable transition period." *Id.* § 2605(d)(1)(E). Relevant here, Congress authorized differential treatment of regulated entities within the same industry that are subject to TSCA Section 6(a) rules. Indeed, Section 6(d)(2) plainly states that, "[a]s determined by

the Administrator, the compliance dates established under paragraph (1) *may vary for different affected persons*." *Id.* § 2605(d)(2) (emphasis added).

Congress did not define what it means to be "as soon as practicable," nor did it define what a "reasonable transition period" looks like. In cases like this, "[w]here Congress does not furnish a definition of its own, [courts] generally seek to afford a statutory term 'its ordinary or natural meaning.'" *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (internal quotation marks and citation omitted). As ADAO notes, "practicable" is defined as "capable of being put into practice or of being done or accomplished," and can be synonymous with achievable, attainable, doable, feasible, possible, realizable, viable, and workable. *See* ADAO Br. at 23 (quoting Merriam-Webster Dictionary). "Practicable" is also defined as "reasonably capable of being accomplished" or "feasible in a particular situation." *Practicable*, Black's Law Dictionary (12th ed. 2024). Thus, determining whether a compliance deadline is "as soon as practicable" is a multi-factor analysis in which EPA must consider achievability, feasibility, workability, and reasonableness. Indeed, as Olin agrees, "[t]he word 'practicable' imports an element of reasonableness." Indus. Br. at 74 (citing *State of Mississippi v. Richardson*, 817 F.2d 1203, 1206-07 (5th Cir. 1987), for its holding that "[t]he phrase 'as soon as practicable' means 'within a reasonable time under all the circumstances to effectuate the objects and purposes of the notice clause'").

Compliance deadlines that are "as soon as practicable" must also allow for a "reasonable transition period." *See* 15 U.S.C. § 2605(d)(1). "Reasonable" means "[r]eflecting good judgment; fair and proper under the circumstances; rational, sound, and sensible." *Reasonable*, Black's Law Dictionary (12th ed. 2024); *see also Reasonable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reasonable (last visited Feb. 5, 2025) (defining "reasonable" as "being in accordance with reason" or "not extreme or excessive" and listing rational, sensible, and sound among other synonyms). Accordingly, transition periods must not be excessively short (or long) in duration and must be well-supported, sensible, and appropriate in light of all circumstances.

Because statutory interpretation is a "holistic endeavor," this Court should determine the meaning of Section 6(d) "by looking not to isolated words, but to text in context, along with purpose and history." *Gundy v. United States*, 588 U.S. 128, 140-41 (2019) (plurality op.). Here, the deadline provisions in Section 6(d) do not exist "in a vacuum" *Id.* at 141 (citations omitted). Congress made clear that, "in deciding whether to prohibit or restrict . . . a specific condition of use . . . *and in setting an appropriate transition period for such action*, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment . . . will be reasonably available" when the prohibition or restriction takes effect. 15 U.S.C. § 2605(c)(2)(C) (emphasis

added). And EPA is to make those decisions "[b]ased on the information published under" Section 6(c)(2)(A). *Id.*

Section 6(c)(2)(A), in turn, requires EPA to consider "the reasonably ascertainable economic consequences" of any Section 6(a) rule, including "the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health," as well as the costs and benefits and the cost effectiveness of the final rule. *Id.* § 2605(c)(2)(A); *see also id.* § 2601(c) ("It is the intent of Congress that the Administrator shall carry out this chapter in a reasonable and prudent manner, and that the Administrator shall consider the environmental, economic, and social impact of any action the Administrator takes or proposes as provided under this chapter."). Reading Section 6(d) in context with these other provisions, it is clear that EPA shall consider effects on the environment and public health, and that it must also weigh costs and benefits, when deciding whether phase-out deadlines are "as soon as practicable" and whether they provide an appropriate or "reasonable transition period."

The legislative history supports this interpretation. As originally enacted, TSCA Section 6(d) stated that "[t]he Administrator shall specify in any rule under subsection (a) the date on which it shall take effect, which date shall be as soon as feasible." Pub. L. No. 94-469, § 6(d), 90 Stat. 2003 (1976). When Congress amended TSCA in 2016, it removed the term "feasible" from Section 6(d) and added the term

"practicable," signaling that the two are *not* synonymous. *See* Pub. L. No. 114–182, § 6(5)(B), 130 Stat. 448 (2016). Congress also shed light on the phrase "reasonable transition period" in TSCA Section 6(d)(1)(E): "Any regulation of a chemical will be guided by common sense. Is the regulation cost effective? . . . Is there a feasible replacement? Is the transition period fair*?* Without good answers to these questions[,] regulation will not move forward." 161 Cong. Rec. H4551-01, H4559 (daily ed. June 23, 2015) (statement of Rep. Upton). This history confirms that Congress intended EPA to consider a multitude of factors, not just feasibility or speed, when determining compliance dates that are "as soon as practicable," while providing a "reasonable transition period."

Consistent with TSCA's text and Congress's intent, EPA considered information relevant to the various statutory factors in Section 6(c)(2), such as "the economic consequences of a rule" in specifying mandatory compliance dates for the chlor-alkali industry that are "as soon as practicable" and that "provide for a reasonable transition period." *See* Resp. to Comments, AR C.758 at 6 & 30, JA__&__. EPA determined that "while transitioning to non-asbestos chlor-alkali technology is feasible, disruptions in chlorine production by providing insufficient time for conversion could have a detrimental effect on human health" and thus, EPA allowed "longer compliance timelines for the full implementation of the prohibition of the use of chrysotile asbestos in the chlor-alkali industry, while at the same time,

requiring interim controls to minimize to the extent possible chrysotile asbestos exposure to workers in that industry." *Id.* at 21, JA__.

Moreover, as Congress plainly authorized in Section 6(d)(2), EPA set varying compliance dates for "different affected persons" within the chlor-alkali industry depending on the choice of non-asbestos technology for conversion. 89 Fed. Reg. at 21979. Facilities that are converting to non-asbestos diaphragms have five years from the effective date to comply, while those converting to non-asbestos membrane technology at multiple facilities have between five and twelve years to complete the transitions sequentially. *See id.* at 22,006-07. In setting those varying deadlines, EPA acknowledged that "conversion of multiple facilities to membrane technology cannot be performed simultaneously and can only be accomplished in a sequential conversion process." *See id.* at 21980; *see also* Resp. to Comments, AR C.758, at 31, JA__ (detailing compliance dates for full implementation designed "to provide a reasonable period for sequential conversions of facilities from chrysotile asbestos diaphragm technology to membrane technology"). EPA further explained that "membrane technology uses less energy and produces a higher-quality product (containing less salt) for which there is greater market demand[.]" 89 Fed. Reg. at 21980.

For these reasons, the compliance dates for the chlor-alkali industry in the Final Rule fit comfortably within the statutory scheme.

**B.     ADAO's and Olin's Challenges to the Compliance Dates Lack Merit.**

ADAO and Olin argue that the compliance deadlines in the Final Rule applicable to membrane technology conversions are unlawful, but none of their arguments withstand scrutiny. *See* ADAO Br. at 21-27; Indus. Br. at 70-74.

*First*, ADAO and Olin incorrectly assert that EPA can only set compliance dates in Section 6(d) based on when compliance is "practicable," and although Olin rightly admits that "practicable" means within a reasonable time under all the circumstances, ADAO offers a strained definition of "practicable" that zeroes in on feasibility and ignores all other relevant factors. *See* ADAO Br. at 23-24; Indus. Br. at 73-74. As explained above, *see* Part I.A, *supra*, EPA's determination of what constitutes "as soon as practicable" necessarily involves consideration of various factors. On top of that, practicability is not the only factor Congress directed EPA to consider when setting compliance dates. ADAO and Olin ignore that Congress also mandated that EPA "provide for a reasonable transition period." *See* 15 U.S.C. § 2605(d)(1)(E). Likewise, neither ADAO nor Olin acknowledges the factors in Section 6(c)(2), such as "the likely effect of the rule on . . . the environment, and public health," and the "costs and benefits" of the final regulatory action, that Congress directed EPA to consider "in setting an appropriate transition period[.]" *See id.* § 2605(c)(2)(A), (C). Contrary to Olin's characterization, factors such as energy efficiency and air pollutants *are* "included in the statute," Indus. Br. at 73-

74, and Section 6(c)(2) confirms that EPA must consider these (and other) factors *in addition to* whether compliance dates are "as soon as practicable." *See* 15 U.S.C. § 2605(c)(2), (d)(1); *see also* EPA Br. at 114 & 146-47.

Rather than acknowledge these provisions, ADAO cherry-picks from its preferred dictionary definition of "practicable" to argue that "practicable" means feasible. *See* ADAO Br. at 23-25. ADAO also relies on cases interpreting the term "feasible" in the Occupational Safety and Health Act ("OSH Act") in arguing that EPA could only have set compliance dates in the Final Rule based on considering "the earliest date by which the elimination of asbestos by chlor-alkali plants is technically achievable" and whether "meeting that date [would] cause massive dislocation or threaten the industry's viability." *Id.* at 25. ADAO's attempts to rewrite TSCA fail. For starters, Congress *removed* the term "feasible" from Section 6(d) when it amended TSCA in 2016. Had Congress intended for EPA to set compliance dates based on feasibility alone, it could have kept that term in Section 6(d) and directed EPA not to consider the reasonableness of a technically feasible compliance date and to ignore the factors outlined in Section 6(c)(2) in setting transition periods.

Furthermore, Congress's inclusion of the term "feasible" in Section 6(c)(2)(C) and its exclusion of that term from Section 6(d)(1) must be given effect. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular

language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and citation omitted). But most importantly, even if ADAO is correct that practicable is synonymous with feasible, *see* ADAO Br. at 24, it is not enough for a compliance date to be "as soon as practicable" under TSCA. Compliance dates must also "provide for a reasonable transition period," *see* 15 U.S.C. § 2605(d)(1)(E), and EPA must consider numerous factors, not just feasibility, in setting transition periods. *See id.* § 2605(c)(2)(C). These other provisions that ADAO neglects to mention in its brief distinguish TSCA from the OSH Act. Thus, ADAO's attempts to import the OSH Act's concepts of technical and economic feasibility are misguided.[1]

Put simply, ADAO's and Olin's interpretation—that EPA must set compliance dates based solely on practicability—would render multiple other provisions within Section 6 meaningless. Such a strained interpretation runs contrary to the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word

---

[1] For the same reasons, case law interpreting the phrase "to the maximum extent practicable" in the Endangered Species Act's provision governing species recovery plans, 16 U.S.C. § 1533, sheds no light on the meaning of terms in TSCA Section 6. *See* ADAO Br. at 23-24.

shall be superfluous, void, or insignificant." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks and citation omitted).

*Second*, ADAO's and Olin's attempts to circumvent the clear meaning of Section 6(d)(2) are unconvincing for many reasons. In the plainest of language, Congress authorized EPA to set compliance dates that "vary for different *affected persons*." 15 U.S.C. § 2605(d)(2) (emphasis added). In the absence of a statutory definition, this Court should give the phrase "affected persons" its "ordinary or natural meaning." *HollyFrontier Cheyenne Refining*, 594 U.S. at 388. "Person" means "one (such as a human being, a partnership, or a corporation) that is recognized by law as the subject of rights and duties." *Person*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/person (last visited Feb. 5, 2025). Consequently, Congress authorized EPA to set compliance dates for different affected corporations, such as deadlines for corporations that choose to transition to non-asbestos diaphragms that differ from those for corporations that choose to transition to membrane technology.

In a footnote, ADAO mentions Section 6(d)(2) in passing, speculating that it is doubtful that Congress intended to negate case law on "practicability" and "feasibility" and that this section most likely intended to authorize EPA "to set different compliance dates for different *industry sectors* subject to section 6(a) rules." *See* ADAO Br. at 27 n.30. ADAO is wrong on both counts. As explained

above, case law interpreting "practicability" and "feasibility" outside of the TSCA context is of little to no relevance when interpreting TSCA Section 6, particularly given Congress's deletion of the term "feasible" from Section 6(d). And regardless of how "well-established" such cases may be, they cannot override the words *in TSCA*, which clearly authorize different compliance dates for "different affected persons." Nor should this Court entertain ADAO's speculation about whether Congress really meant "industry sector" when it used the terms "different persons." Congress used the words "industry sector" in a different TSCA provision, and it deliberately used distinct language—"different persons"—in TSCA Section 6(d)(2). *Compare* 15 U.S.C. § 2613(b)(3)(B) *with id.* 2605(d)(2). This Court must give effect to Congress's choice of words and reject ADAO's attempts to equate the two phrases. *See Pulsifer v. United States*, 601 U.S. 124, 162 (2024) (Gorsuch, J., dissenting) ("When Congress uses different terms in a statute, we normally presume it does so to convey different meanings.").

Olin does not offer a counter-textual interpretation of Section 6(d)(2), and it instead challenges that provision as an unconstitutional delegation of legislative authority. *See* Indus. Br. at 70-72. Olin's nondelegation arguments lacks merit for all the reasons EPA provides. *See* EPA Br. at 109-12. Put simply, Olin interprets Section 6(d)(2) in a vacuum, "isolated from everything else—. . . from surrounding provisions in [TSCA], and from any conception of the statute's history and purpose."

*Gundy*, 588 U.S. at 140. Despite Olin's assertions, EPA's exercise of authority in Section 6(d)(2) is not boundless; on the contrary, EPA must adhere to the requirements in Sections 6(d)(1) and 6(c)(2) if it chooses to set compliance dates that vary for different affected persons. *See supra* at 31-33.

Section 6(d)(2), read in context with neighboring provisions in TSCA, is thus readily distinguishable from the statutory provision that this Court found unconstitutional in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022). There, the Agency "agree[d] that Congress has given it *exclusive authority and absolute discretion* to decide whether to bring securities fraud enforcement actions within the agency instead of in an Article III court" and where "Congress has said nothing at all indicating how the SEC should make that call in any given case." *Id.* at 462 (emphasis added). Far from the "total absence of guidance" that drove the holding in *Jarkesy*, Congress supplied an intelligible principle in Sections 6(d)(1) and 6(c)(2) to guide EPA's determination of whether to set varying compliance dates for "different affected persons."

*Finally*, ADAO argues that TSCA Section 6(g) represents the sole mechanism "for addressing the unique compliance challenges of individual producers." ADAO Br. at 26-27. Not so. Section 6(g) authorizes EPA to "grant an exemption from a requirement of a subsection (a) rule for a specific condition of use of a chemical substance" upon making certain findings, and Congress made clear that EPA's grant

of a Section 6(g) exemption can extend the start date of ban or phase-out requirements beyond five years for all persons affected by such requirements applicable to that condition of use. *See* 15 U.S.C. § 2605(g), (d)(1)(C). But EPA's exercise of authority under Section 6(g) to exempt "a specific condition of use" such as the industrial use of chrysotile asbestos diaphragms in the chlor-alkali industry is obviously distinct from the Agency's authority to determine that "the compliance dates established under [Section 6(d)(1)] may vary different affected persons" under Section 6(d)(2). *Compare* 15 U.S.C. § 2605(g) *with id.* § 2605(d)(2). If Congress intended for Section 6(g) to be the only mechanism for relief from compliance dates that the Agency sets under Section 6(d)(1), it could have expressly conditioned the Agency's exercise of Section 6(d)(2) authority on meeting the Section 6(g) criteria. But Congress did not do that, so this Court should decline to read those requirements into the statute.

Contrary to ADAO's and Olin's assertions, EPA lawfully exercised its authority under TSCA Section 6 in setting varying compliance dates for different persons in the chlor-alkali industry.

### C. The Compliance Deadlines Are Supported by Substantial Evidence and Well-Reasoned.

Contrary to Olin's claims, EPA's varied compliance dates for different persons in the chlor-alkali industry easily satisfy TSCA's substantial evidence

standard.[2] *See* Indus. Br. at 72-74. Olin begins by arguing that EPA's reasoning for differential treatment does not meet the substantial evidence standard because it is based on "a factor not included in the statute"—namely, "energy usage and the supposedly better product that membrane technology produces."[3] *Id.* at 73. But as detailed above, EPA's consideration of energy usage (and the benefits of membrane technology generally) was not only permissible, it was mandatory under Section 6(c)(2)(C). *See supra* Argument I.A; *see also* 15 U.S.C. § 2605(c)(2) (directing EPA to set an appropriate transition period for a prohibition on a specific condition of use "[b]ased on the information published under [15 U.S.C. § 2605(c)(2)(A)]," such as "the likely effect of the rule on . . . the environment, and public health" and "the costs and benefits of the . . . final regulatory action").

Olin also grossly oversimplifies EPA's detailed rationale for setting different compliance dates. Apart from energy usage and product quality, EPA based the varied compliance dates in the Final Rule on the following findings after reviewing

---

[2] ADAO does not present any substantial evidence arguments or rebut any of EPA's record-based findings related to the chlor-alkali compliance dates and thus, it cannot do so on reply. *See, e.g.*, *Texas v. EPA*, 91 F.4th 280, 298 (5th Cir. 2024) ("Arguments not raised by a party in its opening brief are deemed waived.") (internal quotations marks and citation omitted); *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 741 (D.C. Cir. 2024) (petitioners "forfeited any challenge to [EPA's] rationale by failing to address it until their reply brief").

[3] Notably, Olin offers no evidence to rebut EPA's reasoning in the Final Rule or the Agency's underlying findings. *See* 89 Fed. Reg. at 21980; *see also* Economic Analysis, AR C.753, at 2-6 & 2-9, JA__, __.

detailed comments and information submitted by companies in the chlor-alkali industry:

- The "conversion of multiple facilities to membrane technology cannot be performed simultaneously and can only be accomplished in a sequential conversion process." 89 Fed. Reg. at 21980. Such conversions "require new cells, as well as multiple other plant infrastructure changes[.]" *Id.*

- While it is possible to convert one facility to membrane technology within five years, "EPA has no basis to conclude" that conversion of a second and third facility can be completed sooner than eight and twelve years after the rule's effective date, respectively, "given the limited global supply of essential metals, the limited capacity to produce electrode elements, the limited number of specialized electrochemical and technical experts for chlor-alkali facilities and the inability to concurrently schedule and procure for multiple, unique membrane facility conversions, as documented in extensive and detailed information provided to EPA by OxyChem." *Id.* at 21981.

- A ban that is fully implemented before OxyChem could complete the sequential conversion of multiple facilities to membrane technology "would force the closure" of one or more facilities "before chlor-alkali production could resume" which "would have deleterious impacts on the supply of chlor-alkali chemicals for water treatment as well as the chemicals industry[.]" *Id.*; *accord* EPA Br. at 147.

- Unlike conversion to membrane technology, conversion "to non-asbestos diaphragms is not as complex," because the latter "requires fewer design changes, less construction, and may be performed over several years without significant disruption of facility operations or product output." 89 Fed. Reg. at 21980. Moreover, conversion to non-asbestos diaphragms "can proceed concurrently at several facilities, subject to the availability of supplies of non-asbestos diaphragm cell components." *Id.*

- Two of three companies in the chlor-alkali industry "have told EPA or provided information to EPA that leads EPA to conclude that they can complete all of their planned conversions to non-asbestos diaphragms within five years." *Id.* at 21981.

- By contrast, "Olin's comments do not provide EPA with adequate information to establish that seven years is as soon as practicable for the company to convert its two facilities to non-asbestos diaphragms or otherwise end the use of asbestos, *or that this rule's five-year prohibition for non-membrane conversions does not provide the company with a reasonable transition period*." *Id.* at 21980 (emphasis added). For example, Olin did not provide information concerning supply chain shortages, limits on the number of technical experts, whether immediate conversion would disrupt production, etc. *See id.* at 21981.

As these findings illustrate, there was ample record evidence to support the different compliance dates in the Final Rule, which accommodate "technical differences in specific facility conversions and how those affect the time needed for each individual chlor-alkali company to transition away from chrysotile asbestos diaphragm technology[.]" *Id.* This easily satisfies TSCA's substantial evidence standard.

Tellingly, Olin does not contest *any* of EPA's rationales or offer facts to counter the record evidence supporting the staggered compliance dates, and it cannot do so on reply. *See, e.g.*, *Texas*, 91 F.4th at 298; *Huntsman Petrochemical*, 114 F.4th at 741. Olin's only retort is that EPA ignored the "competitive disadvantage to companies like Olin" and that it is unreasonable to disadvantage companies that decided to transition to non-asbestos diaphragms instead of membrane technology. *See* Indus. Br. at 74. For the reasons set forth in EPA's brief (at 116-17), the Final Rule does not put Olin at a competitive disadvantage. All chlor-alkali companies must meet the same May 28, 2029, compliance date to complete all transitions to

non-asbestos diaphragms, and if they choose to convert only one facility to membrane technology, the same five-year deadline applies. *See* 89 Fed. Reg. at 22006 (40 C.F.R. § 751.505(b)). Alternatively, Olin could be in the same boat as OxyChem if it chooses to convert both of its facilities to membrane technology: it must complete the first conversion by May 28, 2029, and the second conversion by May 28, 2032. *See id.* (40 C.F.R. § 751.505(c)). The Final Rule does not force a specific technology, nor does it treat companies differently depending on their individual business decisions.

Olin's true complaint is that EPA refused to force all companies within the chlor-alkali industry to transition away from asbestos on a seven-year timeline, which is what Olin requested in a short letter toward the end of the comment period for the Notice of Data Availability. *See* 89 Fed. Reg. at 21980. But EPA rationally explained, based on the information in the record, why seven years would not be "as soon as practicable" or a "reasonable transition period" for most conversions and why seven years would not be practicable or provide for a "reasonable transition period" to complete two or more conversions to membrane technology. *Id.* at 21981. Just as it did during the comment periods leading up to the Final Rule, Olin again fails to offer any facts to counter either of those determinations. For these reasons, the Court should reject Olin's substantial evidence challenges.

**II. EPA Appropriately Excluded Exposure Pathways Relevant to the General Population from Risk Evaluation.**

ADAO claims that EPA violated TSCA by excluding environmental exposure pathways from the scope of its risk evaluation, because EPA cannot meet the requirements of 15 U.S.C. § 2605(b)(4)(A) "without examining all sources of exposure that contribute to health and environmental risk." ADAO Br. 33. ADAO's claim rests on a misreading of the statute and a distortion of the administrative record. *See id.* at 33-38.

*First*, ADAO neglects several relevant statutory provisions that, when read together, make it clear that EPA need not consider all sources of exposure. ADAO never mentions TSCA's scoping provision, which requires EPA to publish the scope of a risk evaluation, including the "hazards, *exposures*, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator *expects to consider*[.]" 15 U.S.C. § 2605(b)(4)(D) (emphasis added). Giving the phrase "expects to consider" its ordinary meaning, Congress directed EPA to determine whether to include or exclude hazards, exposures, conditions of use, and potentially exposed or susceptible subpopulations in the scope of its risk evaluation. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (statutory language must be read according to its "ordinary, contemporary, common meaning") (internal quotation marks and citation omitted); *see also ADT, L.L.C. v. Richmond*, 18 F.4th 149, 156 (5th Cir. 2021) (statutes must be read "to give effect to their every word"). Congress

obviously contemplated that EPA would specify certain exposure pathways that it did *not* expect to consider; otherwise, Congress would have adopted ADAO's preferred wording and directed EPA to include *all* hazards, exposures, conditions of use, and potentially exposed or susceptible subpopulations in the scope of a risk evaluation. Because Congress did not do that, ADAO's argument fails on the text alone.

Elsewhere in the text, Congress mandated that EPA "shall coordinate actions taken under [TSCA] with actions taken under other Federal laws administered in whole or in part by the Administrator." 15 U.S.C. § 2608(b)(1). As EPA explained in the Risk Evaluation, this command "encompass[es] more than just risk management actions, and [] include[s] actions taken during risk evaluation as well." Risk Eval., AR B.117, at 48, JA__. EPA's intra-agency coordination pursuant to this statutory provision "includes coordination on tailoring the scope of TSCA risk evaluations to focus on areas of greatest concern rather than exposure pathways addressed by other EPA-administered statutes and regulatory programs[.]" *Id.* at 48-49, JA__-__.

Yet another relevant provision mandates that EPA complete risk evaluations "as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation[.]" 15 U.S.C. § 2605(b)(4)(G)(i). That statutory deadline affords EPA some leeway, but "for not more than 6 months." *Id.*

§ 2605(b)(4)(G)(ii). Putting this all together, EPA conducted intra-agency coordination and "determined that exposures to the general population via surface water, drinking water, ambient air and disposal pathways falls under the jurisdiction of other environmental statutes administered by EPA," and EPA appropriately excluded "hazards or exposures to the general population" from risk evaluation to advance the Agency's goals to "avoid duplicating efforts taken pursuant to other Agency programs, and meet the statutory deadline for completing risk evaluations." Risk Eval., AR B.117, at 32, JA__.

*Second*, the 1976 legislative history that ADAO relies on does not negate the statutory text. *See* ADAO Br. at 34. Congress did not add the scoping provision or the deadline for risk evaluations to TSCA Section 6 *until 2016*. *See*. Pub. L. No. 114–182, § 6(3) Thus, even assuming ADAO is correct that Congress originally wanted EPA to consider all exposure pathways during TSCA risk evaluation, that is not what TSCA currently requires. Rather, the text and legislative history of the 2016 amendments "supports the Agency's exercise of discretion to focus the risk evaluation on areas that raise the greatest potential for risk." Risk Eval., AR B.117, at 48, JA__ (citing 162 Cong. Rec. at S3519-S3520). Just as Congress intended, EPA published the scope of its risk evaluation here and made it clear that it did not "expect[] to consider" certain exposures, hazards, or subpopulations. *See* 15 U.S.C. § 2605(b)(4)(D).

*Third*, ADAO's reliance on EPA's recent policy shift—to no longer exclude reasonably foreseeable exposures to the general population from the scope of a risk evaluation—is misplaced. *See* ADAO Br. at 34-35. EPA did not codify that policy change until after it finalized the asbestos risk evaluation and the final risk management rule at issue. *See* EPA, Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act, 89 Fed. Reg. 37028 (May 3, 2024). At all relevant times here, EPA's 2017 regulations governing risk evaluations were consistent with TSCA's scoping provision by requiring EPA to publish the scope of a risk evaluation that specifies "the conditions of use," "[t]he potentially exposed populations," and "the hazards to health and the environment" that EPA plans to consider. *See* 82 Fed. Reg. 33726, 33751 (July 20, 2017) (§ 702.41(c)(2)). By not requiring consideration of all conditions of use, hazards, and exposures, those regulations helped "ensure that the Agency's focus is on the conditions of use that raise the greatest potential for risk." *Id.* at 33728.

*Finally*, ADAO's remaining contentions do little more than point out that "asbestos is released to air, discharged in wastewater and disposed of on-site and off-site" and that certain communities are located "in areas of elevated asbestos exposure." ADAO Br. at 36-37. EPA acknowledged these potential exposure pathways during the risk evaluation process and, through extensive intra-agency

coordination, determined that numerous regulatory programs already address potential exposures. EPA explained as follows:

Regarding the *ambient air pathway*, EPA has designated asbestos as a "hazardous air pollutant" under Section 112 of the Clean Air Act (CAA), 42 U.S.C. § 7412. *See* Risk Eval., AR B.117, at 51, JA__. As the CAA requires, EPA has designated asbestos emission standards for "multiple sources or potential sources of asbestos releases to the ambient air[.]" *Id.* (citing 40 CFR part 61, subpart M); *accord* 40 C.F.R. § 61.140 ("Chlorine production is considered a part of manufacturing."); *id.* § 61.144 (detailing emissions standards and other requirements applicable to "manufacture of chlorine utilizing asbestos diaphragm technology"). EPA must revise those standards as needed "to address developments in practices, processes, and control technologies," and it must also "ensure the standards adequately protect public health and the environment." Risk Eval., AR B.117, at 51, JA__. Additionally, "emissions to ambient air from municipal and industrial waste incineration and energy recovery units or associated exposures to the general population . . . are regulated under Section 129 of the Clean Air Act." *Id.* at 54, JA__. Because of these protections, EPA did not include emissions to ambient air or associated inhalation exposure of the general population or terrestrial species in the TSCA risk evaluation.

With respect to *drinking water exposures*, "EPA has promulgated National Primary Drinking Water Regulations (NPDWRs) for asbestos under" the Safe Drinking Water Act, which are codified at 40 C.F.R. Part 141, Appendix A. Risk Eval., AR B.117, at 51, JA__. In those regulations, EPA set an "enforceable Maximum Contaminant Level (MCL) as close as feasible to a health based, non-enforceable Maximum Contaminant Level Goal (MCLG)" considering public water systems' "ability to treat water to meet the MCL and the ability to monitor water quality" at that level. *Id.* Because the NPDWR addresses the drinking water pathway for asbestos, EPA excluded drinking water exposures to the general population from TSCA risk evaluation. *Id.*

Relatedly, for all other *ambient water exposures*, EPA has identified asbestos as a "priority pollutant" under the Clean Water Act (CWA), and it developed recommended water quality criteria for pollutants in surface water "that are protective of aquatic life or human health[.]" *Id.* at 52, JA__. Because EPA has taken these actions, the "CWA requires states [to] adopt numeric criteria" for asbestos and to consider asbestos exposures when determining whether asbestos-specific "permit limits are needed and at what level for a specific discharger of a pollutant[.]" *Id.* Because "[t]his is the process used under the CWA to address risk to human health and aquatic life from exposure to [asbestos] in ambient waters," EPA did not

evaluate "exposures to the general population from the surface water exposure pathway" in the TSCA risk evaluation. *Id.*

Finally, as to *disposal pathways*, EPA did not evaluate "on-site releases to land" or exposures to the general population from any such releases from either hazardous waste landfills or from municipal solid waste landfills, as these potential pathways are regulated under the Resource Conservation and Recovery Act (RCRA). *Id.* at 53, JA__. EPA found asbestos wastes could be disposed of in both types of landfills, which are subject to design standards, groundwater monitoring, corrective action requirements when releases are detected, closure and post-closure care requirements, among others. *See id.* Equally important, "landfills have special requirements for handling and securing the asbestos-containing waste regulated under the National Emission Standard for Asbestos (40 C.F.R. Part 61, Subpart M) to prevent releases of asbestos into the air." *Id.*

ADAO sidesteps these detailed explanations for why EPA did not expect to consider exposures to the general population during the Risk Evaluation. Instead, ADAO faults EPA for failing to explain why the Final Rule does not "eliminate or reduce asbestos environmental releases that may put nearby populations at risk." ADAO Br. at 35. But that is *not* what TSCA Section 6(a) requires. EPA can only regulate under Section 6(a) "to the extent necessary" to prevent "unreasonable risk[.]" 15 U.S.C. § 2605(a). The statute does not authorize EPA to regulate elevated

or heightened risks, let alone require EPA to eliminate or reduce environmental releases.

For these reasons, ADAO's arguments concerning exposures to the general population lack merit.

## III. USW's Claim that EPA Failed to Eliminate Unreasonable Risk to Chemical Manufacturing Employees Lacks Merit.

USW challenges one aspect of the Final Rule: the lack of interim worker protections for ongoing use of already installed sheet gaskets. *See* USW Br. at 26-34. In USW's view, EPA has "grant[ed] the chemical manufacturing industry permission to expose workers indefinitely to the unreasonable risks posed by work on asbestos sheet gaskets" by not imposing interim worker protections throughout the useful life of already installed gaskets. *Id.* at 31.

USW fatally undermines its own arguments by agreeing with EPA (and commenters) that ongoing use of already installed sheet gaskets does not "generate exposures." *See id.* at 30 n.19 (acknowledging that "if equipment is operating properly[,] gaskets are enclosed in the machinery and *do not generate exposures*" and that "OSHA's asbestos standard, which has been in effect for 30 years, requires that facility owners identify asbestos containing material and label it"). USW cannot point to any record evidence that calls into question the fact that "EPA did not find the ongoing use of installed gaskets presented unreasonable risk." Resp. to Comments, AR C.758, at 39, JA__. Consequently, because nothing in the record

suggests that ongoing use of already installed sheet gaskets generates exposures, much less that such use presents an unreasonable risk, ongoing use of legacy gaskets does not trigger EPA's risk management authority under TSCA Section 6(a). Absent a finding of unreasonable risk, there is simply no predicate for EPA to issue Section 6(a) risk management regulations "to the extent necessary" to eliminate "unreasonable risk[.]" 15 U.S.C. § 2605(a).

## CONCLUSION

The Petitions for Review filed by ADAO and USW should be denied.

Dated: February 7, 2025

Respectfully submitted,

Laura Gooding
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002

*Counsel for the American Chemistry Council*

/s/ David Y. Chung
David Y. Chung
Warren Lehrenbaum
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
wlehrenbaum@crowell.com

*Counsel for the American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council*

/s/ Robert J. Karl
Robert J. Karl, Esq.
Eric B. Gallon
PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for the Ohio*
*Chemistry Technology Council*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(f) and (g), I certify that this Brief of Intervenor-Respondents American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, and Texas Chemistry Council complies with this Court's August 7, 2024, Scheduling Order, because it contains 12,377 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

*/s/ David Y. Chung*
David Y. Chung