# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 24-60193

_____

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY TECHNOLOGY COUNCIL,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*,

CONSOLIDATED WITH

_____

## No. 24-60281
_____

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION; HENRY A. ANDERSON, *Medical Doctor*; BRAD BLACK, *Medical Doctor*; BARRY CASTLEMAN, *DOCTOR* OF SCIENCE; RAJA FLORES, *Medical Doctor*; ARTHUR FRANK, *Medical Doctor,* DOCTOR OF PHILOSOPHY; PHIL LANDRIGAN, *Medical Doctor*, MASTER OF SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF SCIENCE IN PUBLIC HEALTH; STEVEN MARKOWITZ, *Medical Doctor,* DOCTOR OF PUBLIC HEALTH; JACQUELINE MOLINE, *Medical Doctor*, MASTER OF SCIENCE;

CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, *Medical Doctor*, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE; ANDREA WOLF, *Medical Doctor*, MASTER OF PUBLIC HEALTH,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, *Administrator, United States Environmental Protection Agency*,

*Respondents*,

CONSOLIDATED WITH

———————

**No. 24-60333**

———————

OLIN CORPORATION,

*Petitioner*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

Petitions for Review of an Order of the
Environmental Protection Agency
Agency No. 40 CFR Part 751
Agency No. 80 Fed. Reg. 21970

————————————

**REPLY BRIEF OF PETITIONERS ASBESTOS DISEASE AWARENESS ORGANIZATION et al**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

(1)    Asbestos Disease Awareness Organization (ADAO) (petitioner in No. 24-60193)

(2)    Linda Reinstein (President ADAO)

(3)    Henry A. Anderson, MD (petitioner in No. 24-60281)

(4)    Brad Black, MD (petitioner in No. 24-60281)

(5)    Barry Castleman, ScD (petitioner in No. 24-60281)

(6)    Raja Flores, MD (petitioner in No. 24-60281)

(7)    Arthur Frank, MD, PhD (petitioner in No. 24-60281)

(8)    Phil Landrigan, MD, MSc (petitioner in No. 24-60281)

(9)    Richard Lemen, PhD, MSPH (petitioner in No. 24-60281)
(10)   Steven Markowitz, MD, DrPH (petitioner in No. 24-60281)

(11)   Jacqueline Moline, MD, MSc (petitioner in No. 24-60281)

(12)   Celeste Monforton, DrPH, MPH (petitioner in No. 24-60281)

(13)   Christine Oliver, MD, MPH, MSc (petitioner in No. 24-60281)

(14)   Andrea Wolf, MD, MPH (petitioner in No. 24-60281)

(15)    American Public Health Association (petitioner in No. 24-60281)

(16)    Dr. Georges Benjamin (Executive Director of APHA)

(17)    Collegium Ramazzini (petitioner in No. 24-60281)

(18)    IAFF Local F-116 (Vandenberg Professional Firefighters)(petitioner in 24-60193)

(19)    IAFF Local F-253 (Fort Myer Professional Firefighters)(petitioner in No. 24-6028)

(20)    Mike Jackson. President of IAFF Local F-253

(21)    The FealGood Foundation (petitioner in No. 24-60281)

(22)    Robert M. Sussman, Sussman & Associates (Counsel for petitioner ADAO in Nos. 24-60193 and petitioners in24-60281)

(23)    United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL- CIO/CLC  (USW)(Petitioner in 24-60193)

(24)    Occupational Safety & Health Law Project, LLC (Counsel for USW)

(25)    Randy S. Rabinowitz (Counsel for USW)

(26)    Victoria L. Bor (Counsel for USW)

(27)    Nathan Finch (Counsel for USW)

(28)    Motley Rice (Counsel for USW

(29)    Texas Chemistry Council (TCC) (Petitioner)

(30)    Baker Botts L.L.P. (TCC Counsel)

(31)    Carter, Beau (TCC Counsel)

(32)    Aaron M. Streett (TCC counsel)

(33)     American Chemistry Council (ACC) (Petitioner)

(34)     Georgia Chemistry Council (GCC) (Petitioner)

(35)     Crowell and Moring (Counsel for ACC and GCC)

(36)    David Chung (Counsel for ACC and GCC)

(37)   Warren Lehrenbaum (Counsel for ACC and GCC)

(38)    United States Environmental Protection Agency (Respondent)

(38)     Lee Zeldin, Administrator, United States Environmental Protection Agency (Respondent)

(39)     Pam Bondi, Attorney General, United States Department of Justice (Respondents' Counsel)

(40)     Adam R.F. Gustafson, Acting Assistant Attorney General (Respondents' Counsel)

(41)     Laura Glickman, US Department of Justice (Respondents' Counsel)

(42)     Olin Corporation (petitioner in No. 24-60333)

(43)     Hunton Andrews Kurth LLP (counsel for Olin)

(44)     Elbert Lin (counsel for Olin)

(45)     Matthew Z. Leopold (counsel for Olin)


Respectfully Submitted,

/s/ Robert M. Sussman
Robert M. Sussman

*Counsel for Petitioner Asbestos Disease Awareness Organization and Petitioners in No. 24-60281*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS…………………………..iii

TABLE OF AUTHORITIES……………………………………………viii

INTRODUCTION………………………………………………………1

I.    EPA's RISK EVALUATION AND RULE DID NOT ADDRESS ALL
      ASBESTOS FIBERS AND CONDITIONS OF USE …………………1

      A. Discontinued Asbestos Uses Whose Resumption is Reasonably
         Foreseen Are TSCA Conditions of Use Subject to Section 6
         Rules………………………………………………………………3

      B. The EPA Asbestos SNUR Does Not Justify Excluding Discontinued
         Asbestos Uses from the Part 1 Rule……………….......................4

      C. EPA Lacked Substantial Evidence to Conclude that Additional
         Chrysotile Uses were Not Ongoing and Should be Excluded from
         Part 1……………………………………………………...8   .

II.   EPA'S COMPLIANCE DEADLINES FOR CHLOR-ALKALI
      PRODUCTION WERE NOT AS SOON AS PRACTICABLE AS
      REQUIRED BY TSCA SECTION 6(d)(1) …………………………..11

      A. Sections 6(d)(1) and 6(d)(2) Must be Read As a Harmonious
         Whole………………………………………………………...12

      B. A Longer Compliance Deadline for Membrane Technology is Not
         Justified by the Analyses Required under Section 6(c)(2)…...........14

III.  THE RULE FAILED TO ADDRESS THE HUMAN HEALTH
      IMPACTS OF ASBESTOS ENVIRONMENTAL RELEASES AS
      REQUIRED BY TSCA…………………………………………….18

      A. EPA's Claim that Environmental Releases Are No Longer
         Occurring Is Contradicted by the Part 1 Rule and Record………...18

      B. The Industry Intervenors' Interpretation of TSCA Is Not Supported
         by EPA and Should Not be Considered by the Court……………..20

CONCLUSION……………………………………………………….…...23

CERTIFICATE OF COMPLIANCE…………………………………….....25

CERTIFICATE OF SERVICE……………………………………………….26

# TABLE OF AUTHORITIES

## CASES

*American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490 (1981)………………………………………………………………………..11

*Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency,* 937 F.3d 559 (D.C. Cir. 2019)………………………………………………………….........22

*Asbestos Disease Awareness Org. v. Wheeler,* 508 F. Supp. 3d 707 (N.D. Cal. 2020)……………………………………………………………………....9,11

*Corrosion Proof Fittings* v. EPA, 947 F.2d 1201 (5th Cir. 1991)…………....,...8,19

*Inhance Technologies v. Environmental Protection Agency,* 96 F.4th 888 (5th Cir. 2024)…………………………………………………………...6,7,8

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)……………………....14

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin*. 878 F.3d 271 (D.C. Cir. 2017)……………………………………………………11

*Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721 (D.C. Cir. 1994)…..22

*Ruckelshaus v. Monsanto Co*., 467 U.S. 986 (1984)……………………….…...14

*Safer Chems.,Healthy Fams. v. EPA*, 943 F.3d 397 (9th Cir. 2019)…………....10

*United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. EPA*, No. 24-1151 (D.C. Cir. 2024)…………………………………………………..22

## STATUTES

### Occupational Safety and Health Act

29 U.S.C. §655(b)(6)(A)……………………………………………………..11

### Toxic Substances Control Act

Section 3(4), 15 U.S.C. §2602(4)……………………………………………..2

Section 5, 15 U.S.C. §2604…………………………………………………...7

Section 5(a), 15 U.S.C. §2604(a)………………………………………...5,6

Section 5(e), 15 U.S.C. §2604(e)………………………………………...…6

Section 5(f), 15 U.S.C. §2604(f)………………………………………...6

Section 6, 15 U.S.C. §2605……………………………………………1,4.7,8

Section 6(a), 15 U.S.C. § 2605(a)……………………………………… ….10

Section 6(b). 15 U.S.C. §2605(b)………………………………….……………2

Section 6(c), 15 U.S.C. §2605(c)……………………….………………14,15,16

Section 6(d), 15 U.S.C. §2605(d)…………..………………...10,11,12, 13,15,17,18

Section 6(g), 15 U.S.C. §2605(g)……………………………………....17

Section 19(c), 15 U.S.C. § 2618(c)……………………………………...9

Section 202(3), 15 U.S.C. §2642(3)……………………………...…….…...2

## REGULATIONS

40 C.F.R. §702.37(a)(4)……………………………………………………3

40 CFR §704.180…………………………………………………………11

40 CFR §721.11095………………………………………………………5

40 C.F.R. § 751.305(B)(1)-(3)……………………………………………8

40 CFR §751.505 ……………………………………………...............13

40 CFR §751.509 ………………………………………………….........13

40 C.F.R. § 751.605(b)……………………………………………………8

40 C.F.R §763.163……………………………………………………....2

## FEDERAL REGISTER NOTICES

81 Fed. Reg. 91927 (Dec. 19, 2016)……………………………..............2

84 Fed. Reg. 17345 (April 25, 2019)…………………………………………5.6

87 Fed. Reg. 21706 (April 12, 2022)…………………………………………..19

88 Fed. Reg. 74292 (Oct. 30, 2023)…………………………………………22

89 Fed. Reg. 47782 (July 23, 2023)…………………………………………11

89 Fed. Reg. 37028 (May32, 9254 (May 8, 2024)…………………………..22

89 Fed. Reg. 95777 (December 3, 2024)…………………………………....10

## LEGISLATIVE HISTORY

162 Cong. Record – Senate 3515 (June 16, 2016)………………………….....8

162 Cong. Record – Senate 3519 (June 16, 2016)………………………........13

## OTHER

EPA, New Chemical Determinations, December 2019,
https://www.epa.gov/sites/default/files/202104/documents/new_chems_
working_approach_-_12.20.19_final_with_disclaimer.pdf....................................4


EPA, Risk Evaluation for Asbestos Part 2: Supplemental Evaluation Including
Legacy Uses and Associated Disposals of Asbestos,
https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-
evaluation-asbestos-part-2-supplemental-evaluation............................................10

EPA Announces Path Forward for TSCA Chemical Risk Evaluations, June 30,
2021, https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-
chemical-risk-evaluations................................................................................18.19

## INTRODUCTION

In this Reply Brief, Asbestos Disease Awareness Association (ADAO) and its seventeen co-petitioners respond to briefs of the Environmental Protection Agency (EPA) and industry intervenors opposing three critical grounds for remanding the Part I asbestos rule advanced in petitioners' opening brief. [1] As shown below, these arguments are without merit. The Court should therefore rule that:

- The rule is incomplete and under-protective because it fails to address all six asbestos fibers and all current and anticipated conditions of use in violation of section 6 of the Toxic Substances Control Act (TSCA);

- The rule fails to eliminate asbestos use in the chlor-alkali industry "as soon as practicable" as TSCA requires because it gives one producer seven more years to replace asbestos than its competitor, accommodating the producer's business interests at the expense of public health; and

- The rule fails to restrict harmful environmental releases of asbestos on the erroneous assumption that its prohibitions on asbestos use will immediately stop these releases from occurring.

## I.    EPA's RISK EVALUATION AND RULE DID NOT ADDRESS ALL ASBESTOS FIBERS AND CONDITIONS OF USE

---

[1] Although not addressed here, ADAO stands by its positions on two other aspects of the rule challenged in its opening brief.

The 2016 TSCA amendments directed EPA to initiate risk evaluations on 10 chemical substances within 180 days of the law's enactment. 15 U.S.C. §2605(b)(2)(A). On December 19, 2016, EPA selected asbestos as one of these substances. 81 Fed. Reg. 91927.  The decision to prioritize asbestos for early action followed deep Congressional concern about this Court's 1991 decision setting aside EPA's comprehensive 1989 asbestos ban under the old law as well as universal recognition of asbestos's serious and well-documented hazards to health. ADAO Opening Brief at 7-8.

As EPA prepared to conduct its risk evaluation, a threshold question was how to define "asbestos." Section 202(3) of TSCA, 15 U.S.C. §2642(3), addresses this issue, defining asbestos as the "asbestiform varieties" of six distinct fiber types. ADAO Br. at 12 n.19. 15. Relying on this definition, EPA's 1989 TSCA asbestos ban prohibited importation and use of all six fibers and nearly all products containing them.   In accordance with section 6(b)(4)(A) of TSCA, U.S.C. §2605(b)(4)(A), the new law thus required EPA to determine whether the six asbestos fibers present "an unreasonable risk of injury to health or the environment."

The law also required EPA to make this unreasonable risk determination for "the conditions of use" (COUs) of the six fibers.  TSCA section 3(4), 15 U.S.C. §2602(4), defines this term as the "circumstances . . . under which [asbestos] is

intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." If a use satisfies this definition, it *must* be addressed in EPA's risk evaluation and regulated under its section 6 rule.[2]

However, EPA's Part 1 risk evaluation and rulemaking only addressed a small portion of the asbestos universe. Unlike the 1989 rule, EPA focused only on chrysotile, disregarding the other five recognized asbestos fibers. And it only assessed the risks of six chrysotile uses that it believed were ongoing in the US. As a result, EPA made no effort to assess the dangers of discontinued uses of chrysotile and the five other fibers that could resume in the future. Accordingly, the Part 1 rule was incomplete and under-protective. Should discontinued asbestos uses return to the US, they would likely cause a significant increase in death and serious disease from lung cancer, mesothelioma and other health disorders. The Part 1 rule violates TSCA because it does not protect against these risks.

### A. Discontinued Asbestos Uses Whose Resumption is Reasonably Foreseen Are TSCA Conditions of Use Subject to Section 6 Rules

As shown in petitioners' opening brief at 17-19, former asbestos uses that may be resumed fall under the TSCA definition of "conditions of use" because their recurrence is "reasonably foreseen." According to EPA guidance for its TSCA section 5 program, "reasonably foreseen" uses include "those future

---

[2] According to its 2024 risk evaluation framework rule, "EPA will not exclude conditions of use from the scope of the risk evaluation." 40 C.F.R. §702.37(a)(4).

circumstances of manufacture, processing, distribution, use and disposal that EPA expects might occur."[3] For example, EPA might reasonably "expect" future importation, distribution and use of a long-standing asbestos-containing product that is not now entering the US but was previously imported or used in significant quantities.[4] Similarly, as EPA's guidance for new chemical reviews under TSCA section 5 also indicates,[5] if a "[] chemical substance is already currently used outside the US, . . . it may be reasonable to foresee that such use could occur inside the U.S." Both chrysotile and other asbestos fibers continue to be mined and extensively used in several countries, creating a financial incentive for foreign asbestos producers and users to try to regain access to the US market. [6]

### B. The EPA Asbestos SNUR Does Not Justify Excluding Discontinued Asbestos Uses from the Part 1 Rule

EPA's only basis for arguing that discontinued uses of chrysotile and the five other fibers do not meet TSCA's definition of "conditions of use" is that their

---

[3] EPA, New Chemical Determinations, December 2019, at 4-8. https://www.epa.gov/sites/default/files/2019-12/documents/new_chems_working_approach_-_12.20.19_final.pdf.

[4] As discussed below, this would include the many chrysotile-containing products that EPA excluded from Part 1 due to the claimed lack of current importation. Even if EPA is correct that these products are not currently imported (which ADAO disputes), customs records document that they were recently imported in significant quantities, demonstrating that future importation and use would be "reasonably foreseen." See ADAO Br. at 13-16.

[5] Id. at 18 n. 22.

[6] ARC695.3.

resumption cannot be "reasonably foreseen" in light of the restrictions of EPA's 2019 Significant New Use Rule (SNUR) for asbestos.[7] EPA Br. at 138. The SNUR designates reintroduction of certain previous asbestos COUs as a "significant new use" under section 5(a)(2) of TSCA.[8] However, in contrast to a section 6 rule, the SNUR makes no determination that these COUs would pose "an unreasonable risk of injury" if resumed. Nor does it prohibit the uses from continuing in the future, as the Part 1 rule does for the six ongoing chrysotile uses it addresses.  Under section 5(a)(1)(B)(i), 15 U.S.C. §2604(a)(1)(B)(i), the only obligation of a firm that seeks to resume a discontinued use is to file a significant new use notice (SNUN) with EPA at least 90 days before manufacture, importation or processing begins.  And under section 5(a)(1)(B)(ii), EPA's only obligation is to review the SNUN, examine the risks of the new use and take regulatory action if warranted.

As the final SNUR explains, it "require[s] timely advance notice to EPA of any future manufacturing (including importing) or processing of asbestos . . . [and] allow[s] EPA to make an appropriate determination relevant to the risks associated with [these activities] prior to the[ir] commencement. "  84 Fed. Reg. 17349. TSCA does not dictate the action EPA must take in response to this risk

---

[7] 84 Fed. Reg. 17345 (Apr. 25, 2019); 40 C.F.R. §721.11095
[8] As described below in section I.C., petitioners contest whether several of these uses have in fact been discontinued. If these uses are ongoing, this would be an additional reason why they could not be subject to the SNUR.

determination but provides multiple options. Thus, under section 5(a)(3)(C), EPA could conclude that the use is "not likely to present an unreasonable risk" and may proceed without restriction.  Or under section 5(a)(3)(A)-(B), it could make a determination that the use does or may present a unreasonable risk. While this finding would require EPA to issue an order under section 5(e) or 5(f), EPA could choose to restrict but not prohibit the use, enabling it to reenter commerce.  In short, the SNUR would not prevent a discontinued asbestos use from resuming, and would not bar EPA from finding that revival of the use is "reasonably foreseen" and subject to regulation under the Part 1 rule.

This Court's recent decision in *Inhance Technologies v. EPA,* 96 F.4th 888 (5th Cir. 2024) casts serious doubt on whether the asbestos SNUR is even a lawful exercise of EPA's authority under TSCA. EPA tries to distinguish *Inhance* because it involved a "'forty-year-old ongoing manufacturing process'" that was deemed a new use under the applicable SNUR because EPA was not notified of it before the SNUR was promulgated. EPA Br. at 139. But the Court's analysis of EPA's TSCA authority did not turn on whether the Inhance process was ongoing or dormant when EPA issued the SNUR but instead on the definition of the term "new use" in the law.

Inhance argued that "new" meant "not previously existing" under the common definition of the term. EPA countered that "new" meant "not previously

known" to the Agency at the time it proposed the SNUR. 96 F.4th at 893. The Court adopted Inhance's definition, holding that the "factors the EPA must consider in determining whether something is a significant new use are forward-looking" and therefore section 5 is only "intended to regulate covered substances prior to their initial manufacture." Id. at 894. It emphasized that "[a] forty-year-old manufacturing process is not 'new' in any pertinent sense of the word." Id. On its face, this conclusion would mean that previous uses for which asbestos was imported could not be deemed "new" for SNUR purposes, whether these uses were ongoing at the time the SNUR was issued or had been discontinued earlier. Thus, such previous uses could not lawfully be deemed "new" and the 2019 asbestos SNUR could not be valid under this Court's interpretation of TSCA in *Inhance.*

Noting the distinct purposes of sections 5 and 6, the Court underscored that "TSCA's broader structure demonstrates that Section 5 is intended only to regulate significant new uses prior to first manufacture" whereas section 6 "applies to all chemical substances" and is better suited to regulate "manufacturing processes that have previously existed." Id. Even if the SNUR authority is unavailable, the Court emphasized, EPA can "properly proceed" against previous uses under section 6. Id. at 895.

In short, under Inhance, EPA has no basis for relying on the 2019 SNUR to prevent the reintroduction of discontinued uses of the six asbestos fibers. Instead,

in this Circuit, section 6 is the only lawful vehicle for prohibiting the resumption of prior manufacture, processing and use activities that could pose future risks.[9] Indeed, three other recent section 6(a) rules impose such an unconditional ban.[10] Consistent with *Inhance* and these rules, the Court should direct EPA on remand to determine whether resumption of now dormant uses of the six fibers is "reasonable foreseen," making them "conditions of use" subject to section 6. In this event, EPA must modify the Part 1 rule to prohibit these uses from re-entering US commerce.

### C. EPA Lacked Substantial Evidence to Conclude that Additional Chrysotile Uses were Not Ongoing and Should be Excluded from Part 1

EPA asserts that it declined to address several chrysotile COUs in Part 1 that ADAO claimed were ongoing because there was "no evidence that these products

---

[9] Although the SNUR authority was available to EPA under the 1976 law, its 1989 asbestos rule relied on section 6 to prohibit the resumption of discontinued asbestos uses. Based on the "will present" language in the original version of section 6, this Court in *Corrosion Proof Fittings* v. *EPA*, 947 F.2d 1201, 1228-29 (5th Cir. 1991) upheld EPA's authority to "ban products that once were, but no longer are, being produced in the United States." As discussed in ADAO's opening brief at 18-19, while the "will present" language was removed in the 2016 amendments, Congress believed that the new COU definition would be a "mandate for EPA to consider future or reasonably anticipated risks" in applying section 6. Cong. Record – Senate 3515 (June 16, 2016).

[10] ADAO Br. at 19. Since ADAO filed its opening brief, two of these rules that were then proposed have been finalized. See 40 C.F.R. § 751.305(B)(1)-(3) (all future manufacture, processing and use of trichloroethylene prohibited); 40 C.F.R. § 751.605(b) (similar prohibitions for perchloroethylene).

were still manufactured, processed or distributed." EPA Br. at 132. The Court need not reach this issue should it conclude that, as demonstrated above, previous but now discontinued asbestos COUs must be regulated under section 6 if their resumption is "reasonably foreseen." Should it reject this argument, however, the Court should remand the Part 1 rule to EPA with instructions to reconsider its determination that the disputed chrysotile COUs are no longer ongoing.

In its opening brief at 13-16, ADAO summarized the extensive evidence in the record that several additional chrysotile asbestos products were still being imported and used at the time of the Part 1 risk evaluation and rulemaking. Indeed, in *Asbestos Disease Awareness Org. v. Wheeler,* 508 F. Supp. 3d 707, 725 (N.D. Cal. 2020), the district court found that "the EPA has missed substantial reasonably available information . . . [and] is not accounting for certain asbestos-containing articles that are imported into the US."  As the ADAO opening brief explained at 16, EPA refused to add these COUs to its chrysotile risk evaluation, pointing to limited and cursory outreach to exporters and industry organizations that was insufficient to establish that the products at issue were no longer being imported into the US. Thus, EPA failed to overcome petitioners' showing that the COUs were in fact continuing and lacked "substantial evidence in the rulemaking record" to justify their exclusion from Part 1. 15 U.S.C. §2618(c)(1)(B)(i)(II).

Further confusing the issue, EPA argues that the evidence ADAO relies on to justify including the overlooked chrysotile COUs was submitted to EPA only in relation to the Agency's Part 2 risk evaluation, which is not now "ripe" for judicial review because EPA has yet to issue a Part 2 risk management rule. EPA Br. at 134-35.

This is simply incorrect. EPA initiated the Part 2 evaluation in 2020 after the Ninth Circuit ruled in *Safer Chems.,Healthy Fams. v. EPA*, 943 F.3d 397, 424 (9th Cir. 2019) that TSCA's definition of COUs includes ongoing uses of chemicals that were no longer "manufactured for those uses." The Part 2 evaluation, released on December 3, 2024,[11] thus applied to "legacy" asbestos products that were no longer distributed in commerce but performed ongoing functions. https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluation-asbestos-part-2-supplemental-evaluation. By contrast, throughout the Part 1 evaluation and rulemaking, EPA's focus was solely on ongoing importation and use of chrysotile asbestos, not legacy products. It was in this context that ADAO maintained, and the district court in *Wheeler* agreed, that EPA had failed to justify its exclusion from Part 1 of continuing, documented imports of chrysotile-containing products. The evidence on which ADAO relied to document these imports was submitted solely during the Part 1 risk evaluation and rulemaking and

---

[11] 89 Fed. Reg. 95777.

is in the record of this case. Accordingly, there is no issue over whether EPA's

unwarranted exclusion of these chrysotile uses from Part 1 is "ripe" for

consideration by the Court.[12]

## II.     EPA'S COMPLIANCE DEADLINES FOR CHLOR-ALKALI PRODUCTION WERE NOT AS SOON AS PRACTICABLE AS REQUIRED BY TSCA SECTION 6(d)(1)

Section 6(d)(1) of TSCA, 15 U.S.C. §2605(d)(1), requires that compliance

dates for rules banning chemicals must be "as soon as practicable." As ADAO

explained in its opening brief at 23-25, the established meaning of "practicable" is

"achievable" or "feasible." Supreme Court and appellate decisions under the

Occupational Safety and Health Act, a law like TSCA for the protection of workers

from unsafe chemicals, define "feasible" as "capable of being done"[13] and

recognize that if a regulatory standard is achievable by "the typical firm . . . ,  it is

considered feasible for the entire industry."[14] The Part 1 rule departed from this

---

[12] The *Wheeler* decision ordered EPA to undertake rulemaking under TSCA section 8(a) to require reporting on ongoing importation and use of asbestos. In response, EPA promulgated a final reporting rule on July 23, 2023. 89 Fed. Reg. 47782; 40 CFR §704.180. Reports were not due until July 5, 2024 and have not yet been released to the public. EPA claims that "ADAO contends that EPA should have added [the disputed] conditions of use back into the Part 1 Risk Evaluation based on the reporting ordered in" *Wheeler.*  Br. at 132. However, this is not what ADAO argued in its opening brief, which focuses entirely on the record for the Part 1 rule, not reports submitted after Part 1 was final, which ADAO has never seen.
[13] *American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490, 509 (1981).
[14] *N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.* 878 F.3d 271, 290 (D.C. Cir. 2017).

definition by allowing one of the two leading chlor-alkali producers, OxyChem, up to 12 years to phase-out asbestos use even while finding that feasible technology adopted by its competitor, Olin, could eliminate asbestos seven years earlier.

## A. Sections 6(d)(1) and 6(d)(2) Must be Read As a Harmonious Whole

Citing the Merriam-Webster dictionary, the industry intervenors agree that "practicable" is "synonymous with achievable, attainable, doable, feasible, possible, realizable, viable, and workable." [15] Ind. Br. at 30. However, they and EPA claim that it should be "able to consider what is practicable for different conversion technologies and set the compliance dates accordingly." EPA Br. at 148. This interpretation is based on TSCA section 6(d)(2), 15 U.S.C § 2605(d)(2), which provides that "the compliance dates established under paragraph (1) may vary for different affected persons."

Neither the statute nor the legislative history explains the purpose of section 6(d)(2). However, there are a number of plausible ways to read its language that are consistent with section 6(d)(1). For example, it could authorize EPA to vary compliance dates for a section 6 rule across different industry sectors which face unique economic and technological constraints. This is in fact what EPA did in the

---

[15] At the same time, industry intervenors attach great significance to the use of "practicable" in the 2016 TSCA amendments as opposed to "feasible" in the 1976 law. Int. Br. at 31-32. It is not clear why this wording change should matter given intervenors' own recognition that "feasible" and "practicable" are synonymous.

Part 1 rule, which sets different asbestos phase-out deadlines for chlor-alkali manufacturing, oil and gas extraction, aftermarket asbestos brakes, sheet gaskets, and titanium dioxide production. 40 C.F.R. §§ 751.505, 751.509. Alternatively, section 6(d)(2) could enable EPA to differentiate among producers within a sector who are employing the *same compliance technology* by providing more time to a company facing unique technical challenges that preclude meeting the deadline by the date achievable by others. In this instance, a longer transition period would be warranted because the deadline would not be "feasible" or "achievable" for that company.  These interpretations would be consistent with the overriding goal embodied in section 6(d)(1) of achieving risk reductions under section 6(a) rules "as soon as practicable" – a goal that, according to TSCA's legislative history, is intended "[t]o realize the risk reduction benefits of the rule" in the shortest possible time. 162 Cong. Record – Senate 3519 (June 16, 2016).

However, nothing in the statutory language or legislative history suggests that section 5(d)(2) was intended to accommodate firms who choose to reject the most expeditious asbestos-replacement technology in order to advance their business interests. Under this interpretation, section 6(d)(2) would negate section 6(d)(1) because compliance deadlines set by EPA would no longer eliminate the

unreasonable risk "as soon as practicable" but would prolong unsafe asbestos exposure based on unrelated business considerations.[16]

Here, for example, OxyChem chose to replace asbestos with membrane technology rather than non-asbestos diaphragms at some plants despite knowing that the membrane process would take several more years to install. The reasons why OxyChem made this choice are not clear but there is evidence that the membrane process would produce a different grade of caustic soda that could be sold at higher prices and would lower energy and other operational costs. 89 Fed. Reg. 21971. Allowing OxyChem over twice the amount of time to eliminate asbestos as its competitor Olin would prioritize these business considerations above the protection of affected workers and communities, who would experience asbestos exposure for seven more years than Olin workers and impacted populations near its facilities. This is contrary to TSCA's "as soon as practicable" requirement and overall goal of eliminating unreasonable risks expeditiously and is therefore not the "best reading" of TSCA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

### B.  A Longer Compliance Deadline for Membrane Technology is Not Justified by the Analyses Required Under Section 6(c)(2)

---

[16] "[W]here two statutes are "'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984)

Industry intervenors (and to a lesser extent EPA) argue that compliance deadlines under section 6(d)(1)-(2) must be based not only on the speed with which the best available technology can implement the rule but on a host of economic and environmental factors. For example, intervenors point to section 6(c)(2)(A), under which EPA must issue a statement for a proposed section 6(a) rule addressing the health and environmental effects of the chemical, the magnitude of exposure, the substance's benefits and the rule's reasonably ascertainable economic consequences. Ind. Br. at 32. However, this statement has no bearing on setting compliance deadlines under section 6(d)(1) because, under section 6(c)(2)(B), it only must be considered when "selecting among prohibitions and other restrictions" for eliminating unreasonable risks under section 6(a), not compliance deadlines under section 6(d).

Intervenors also point to section 6(c)(2)(C) (id. at 31), which directs EPA to consider "whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute." [17]   In this case, however, the availability of alternatives did not justify differentiating between the non-asbestos diaphragm and membrane processes because both are "technically and

---

[17] In contrast to section 6(c)(2)(B), section 6(c)(2)(C) directs that the availability of alternatives must be considered "in setting an appropriate transition period" and thus applies to setting compliance deadlines under section 6(d).

economically feasible alternatives" that are "reasonably available as a substitute" for asbestos.[18]  Moreover, both processes "benefit health and the environment" by eliminating harmful worker exposure to asbestos and asbestos releases to air, water and waste.[19]  Thus, EPA had no reason to conclude that the membrane process deserved a longer transition period because of its greater environmental benefits. In fact, by more quickly eliminating asbestos exposure by workers and communities, the non-asbestos diaphragms process *was more environmentally beneficial* than membrane technology and thus a superior alternative under section 6(c)(2)(C).

While intervenors suggest that the Agency wanted to accommodate the membrane process because of its lower energy consumption (Ind. Br. at 42), EPA disavows this rationale for providing a longer compliance period to membrane adopters:[20] "EPA's intent in providing time for chlor-alkali companies to

---

[18] A compliance date for eliminating use of a chemical will not be "practicable" if there is no "technically and economically feasible alternative." Thus, section 6(c)(2)(C) is best viewed as assuring that the availability of alternatives is considered in applying the "as soon as practicable" requirement in section 6(d)(1).

[19] While industry intervenors claim that EPA was worried about impacts on drinking water safety from disruptions in chlorine supply, Ind. Br. at 33-34, neither the Agency nor the industry claimed that the membrane process was essential to maintain high levels of chlorine production because non-asbestos diaphragms could not produce equivalent quantities of the chemical.

[20] Even if EPA considered energy efficiency a justification for providing membrane users more time to comply, it would have to be weighed against the serious dangers to worker health from extending asbestos use and exposure for seven additional years, thereby delaying elimination of the unreasonable risk, EPA's overriding responsibility under TSCA. There is no evidence that EPA analyzed these tradeoffs.

sequentially convert to membrane cells was *not* 'to encourage the industry to switch to the most energy-efficient alternative.' . . . [T]he staggered compliance timelines in the Risk Rule provide the chlor-alkali industry *with the option to adopt the alternative of their choosing.*" EPA Br. at 114-115 (emphasis added).

Nothing more starkly epitomizes EPA's disregard of section 6(d)(1) than its admission that it gave OxyChem more time to comply so it could "adopt the alternative of [its] own choosing." If compliance deadlines are dictated by the amount of time a company needs to meet its business goals, the requirement to achieve compliance "as soon as practicable" would be meaningless. Instead, EPA would need to accommodate any and all technologies and business strategies that would eventually achieve Part 1 requirements -- no matter how long compliance would take, how many additional cancer cases would occur in the interim, and whether another technology could eliminate the unreasonable risk far sooner. This would contravene the explicit wording of section 6(d)(1) and TSCA's overriding emphasis on eliminating unreasonable risks as expeditiously as practicable.

This Court should remand the Part 1 deadlines for chlor-alkali producers and direct EPA to rework them to achieve compliance "as soon as practicable" in light of the most expeditious technology path feasible for the industry. As ADAO emphasized in its opening brief at 26-27, the Court should also recognize that section 6(g) of TSCA provides a mechanism for obtaining exemptions from

compliance deadlines based on a broader range of economic and environmental factors than section 6(d)(1) allows. If OxyChem still wants more time for compliance, it should avail itself of this remedy if it can meet the section 6(g) exemption criteria.

## III.   THE RULE FAILED TO ADDRESS THE HUMAN HEALTH IMPACTS OF ASBESTOS ENVIRONMENTAL RELEASES AS REQUIRED BY TSCA

### A.  EPA's Claim that Environmental Releases Are No Longer Occurring Is Contradicted by the Part 1 Rule and Record

The Final Risk Evaluation (FRE) for asbestos, released on January 4, 2021, "determined that exposures to the general population via surface water, drinking water, ambient air and disposal pathways fall under the jurisdiction of other environmental statutes administered by EPA." ARB117.32. Accordingly, as EPA explains, while "exposures to the general population may occur from the [asbestos] conditions of use due to releases to air, water or land," the FRE "did not evaluate these exposures to the general population" because EPA's position at the time was that they were not subject to TSCA. EPA Br. at 149.

However, on June 10, 2021, five months after releasing the FRE, EPA announced that it was longer excluding "air, water or disposal exposures to the general population" from TSCA risk evaluations. The Agency explained that it was abandoning this approach because it "fail]ed] to consistently and comprehensively address potential exposures to potentially exposed or susceptible subpopulations,

including fenceline communities (i.e., communities near industrial facilities)."

https://www.epa.gov/newsreleases/epa-announces-path-forward-tsca-chemical-risk-evaluations.  Based on its new approach, EPA reopened six final evaluations to "examine whether the policy decision to exclude certain exposure pathways . . . will lead to a failure to identify and protect fenceline communities." Id.

As EPA's opening brief confirms, when it proposed the Part 1 rule less than a year later, the Agency construed TSCA to "require[] the consideration of reasonably foreseeable exposures from air, water, and disposal." EPA Br. at 149. As the April 12, 2022 proposal explained, other "EPA statutes have limitations because they largely regulate releases to the environment, rather than direct human exposure" and "[o]nly TSCA provides EPA . . . the authority to address chrysotile asbestos direct exposure to humans." 87 Fed. Reg. 21706, 21733.

Despite this recognition, EPA did not reopen the FRE for chrysotile asbestos to address human exposures from environmental releases and they remained largely outside the scope of the Part 1 rule. EPA's only rationale for this omission was that "[b]y banning specific asbestos conditions of use, EPA eliminated the potential that these conditions of use could cause exposures to the general population." EPA Br. at 150. However, this assertion is at odds with the actual provisions of the Part 1 rule and the rulemaking record.

As demonstrated in ADAO's opening brief at 35-38, it will be several years before the rule eliminates environmental releases of asbestos. For example, the rule allows asbestos diaphragm use in chlor-alkali production to continue for up to twelve years. 40 CFR § 751.505(b)-(c). During this period, asbestos air emissions will continue and numerous diaphragms will be removed and replaced, releasing asbestos to plant wastewater and requiring disposal of scores of used diaphragms at waste sites. ADAO Br. at 36-37. The rule also allows the continued installation of asbestos sheet gaskets at titanium dioxide manufacturing facilities and nuclear processing sites for five years, and at the Savannah River nuclear site for twelve years. 40 CFR § 751.509(b)-(c). These facilities will likewise have asbestos air emissions and water discharges and dispose of hundreds (if not thousands) of used asbestos gaskets.

In short, all the evidence in the record demonstrates that the prohibitions on asbestos use in the Part 1 rule will *not* prevent asbestos environmental releases for several years after the rule took effect.  Thus, EPA's categorical dismissal of the risks presented by these release lacks substantial evidence and should be set aside by the Court.

## B. The Industry Intervenors' Interpretation of TSCA Is Not Supported by EPA and Should Not be Considered by the Court

The industry intervenors take a different tack from EPA,[21] maintaining that the FRE properly interpreted TSCA to exclude environmental releases from Part 1 and the Court should uphold this interpretation. They argue that the FRE presented a lengthy description of the application of other EPA-administered laws to asbestos environmental releases and "determined that numerous regulatory programs already address potential exposures." Ind. Br. at 49-52.

The problem with this position is that EPA repudiated it during the Part 1 rulemaking, As discussed above, the Part 1 proposal recognized that the Agency was obligated to evaluate the health risks of asbestos environmental releases because other EPA laws would not fully protect against these risks. Then, in its October 30, 2023 proposed revisions to its risk evaluation framework rule, the Agency reiterated that "the mere existence of authority to assess or regulate a[n] . . . . exposure pathway . . . under a statute other than TSCA does not equate to effective risk management of [that] exposure pathway . . . [and] cannot be used to satisfy the Agency's statutory obligations to evaluate existing chemical substances under TSCA and manage identified risks." 88 Fed. Reg. 74292, 74300. In its final framework rule, EPA reaffirmed the need to address environmental releases in

---

[21] While noting that the FRE had characterized asbestos environmental releases as "well-regulated" under other laws, EPA's brief does *not* argue (as do the industry intervenors) that this eliminated EPA's obligations to address them under TSCA. EPA Br. at 150.

TSCA risk evaluations. 89 Fed. Reg. 37028, 37033 (May 3, 2024). This interpretation still stands. Although the new EPA leadership is in the process of revisiting the 2024 framework rule, its counsel has informed the DC Circuit that rule "will remain in effect" until replaced.[22]

In short, industry intervenors are asking the Court to apply an interpretation of TSCA that EPA disavowed during the Part 1 rulemaking and in its current risk evaluation framework rule, is not defending in this Court and is not now implementing in its TSCA program. While EPA's interpretation may change again as it reexamines the current framework rule, that possibility is not a sufficient basis for upholding the Part 1 rule on grounds only advanced by intervenors. As the DC Circuit has held, "[i]ntervenors may only argue issues that have been raised by the principal parties." *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 729-730.  (D.C. Cir. 1994); *Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency,* 937 F.3d 559, 590 (D.C. Cir. 2019).

---

[22] The final framework rule was challenged by labor and industry in *United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. EPA*, No. 24-1151 (D.C. Cir. 2024). After hearing oral argument on March 21, 2025, the Court issued an order on April 30, 2025 holding the case in abeyance pending further rulemaking because the issues were no longer ripe. (Doc. #2113775). In a reply filed on March 19, 2025 (Doc. #2106629), EPA represented that it would continue to apply the current framework rule until it was replaced.

With EPA defending its rule on other grounds, the Court cannot consider intervenors' claims but must examine the rule's validity on the basis presented in the Part 1 rulemaking and now advocated by the Agency in this Court. Since EPA's rationale for disregarding asbestos environmental releases lacks substantial evidence, this aspect of the rule should be set aside and remanded for further consideration by EPA.

## CONCLUSION

The Part 1 rule should be set aside and remanded for the reasons in ADAO's opening and reply briefs.

September 17, 2025

Respectfully submitted,

/s/Robert M. Sussman
ROBERT M. SUSSMAN

Sussman & Associates
3101 Garfield St. NW
Washington DC 20008
bobsussman1@comcast.net
202-716-0118

*Attorneys for Petitioners Asbestos
Disease Awareness Organization.
American Public Health Association,
Collegium Ramazzini, Local F-116
(Vandenberg Professional
Firefighters), International Association*

*of Fire Fighters; Local F-253 (Fort
Myer Professional Firefighters),
International Association of Fire
Fighters; The FealGood Foundation.
Henry A. Anderson, MD; Brad Black,
MD; Barry Castleman, ScD; Raja
Flores, MD; Arthur Frank, MD, PhD;
Phil Landrigan, MD, MSc; Richard
Lemen, PhD, MSPH; Steven
Markowitz, MD, DrPH; Jacqueline
Moline, MD, MSc; Celeste Monforton,
DrPH, MPH; Christine Oliver, MD,
MPH, MSc; and Andrea Wolf, MD,
MPH;*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Reply Brief complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) and the briefing schedule in this case because it contains 5462 words, according to the count of Microsoft Word.

/s/ *Robert M. Sussman*
Robert M. Sussman
*Counsel for Petitioners ADAO e*t al

## CERTIFICATE OF SERVICE

I hereby certify that, on September 17, 2024, I electronically filed the foregoing Brief with the Clerk of Court by using the appellate CM/ECF system. All participants who are registered CM/ECF users will be served by the Court's CM/ECF system.

/s/ *Robert M. Sussman*
Robert M. Sussman
*Counsel for Petitioners ADAO et al*