No. 24-60193

# In the United States Court of Appeals for the Fifth Circuit

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY TECHNOLOGY COUNCIL,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

Consolidated with No. 24-60281

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION; HENRY A. ANDERSON, MEDICAL DOCTOR; BRAD BLACK, MEDICAL DOCTOR; BARRY CASTLEMAN, DOCTOR OF SCIENCE; RAJA FLORES, MEDICAL DOCTOR; ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF PHILOSOPHY; PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF PUBLIC HEALTH; STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR OF PUBLIC HEALTH; JACQUELINE MOLINE, MEDICAL DOCTOR, MASTER OF SCIENCE; CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, MEDICAL

DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE; ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

Consolidated with No. 24-60333

---

OLIN CORPORATION,

Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

On Petitions for Review from an Order of the
Environmental Protection Agency
Agency No. 40 CFR Part 751
Agency No. 89 Fed. Reg. 21,970 (Mar. 28, 2024)

---

**REPLY BRIEF OF INDUSTRY PETITIONERS OLIN CORPORATION, AMERICAN CHEMISTRY COUNCIL, GEORGIA CHEMISTRY COUNCIL, OHIO CHEMISTRY TECHNOLOGY COUNCIL, AND TEXAS CHEMISTRY COUNCIL**

---

Matthew Z. Leopold
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
mleopold@HuntonAK.com
epeterson@HuntonAK.com

Elbert Lin
Hunton Andrews Kurth LLP
951 East Byrd Street, East
Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com

Nicholas D. Stellakis
Hunton Andrews Kurth LLP
60 State Street, Suite 2400
Boston, MA 02109
(617) 648-2800
nstellakis@HuntonAK.com

*Counsel for Olin Corporation*

David Y. Chung
Warren Lehrenbaum
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)
dchung@crowell.com

*Counsel for the American
Chemistry Council, Georgia
Chemistry Council, and Texas
Chemistry Council*

Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris &
Arthur, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for the Ohio
Chemistry Technology Council*

## CERTIFICATE OF INTERESTED PERSONS

## No. 24-60193

TEXAS CHEMISTRY COUNCIL, *et al.*,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

---

**Consolidated with No. 24-60281**

---

AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents

---

**Consolidated with No. 24-60333**

---

OLIN CORPORATION,

Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents

i

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Parties**

   a. **Petitioners**:

      i. TEXAS CHEMISTRY COUNCIL

      ii. AMERICAN CHEMISTRY COUNCIL

      iii. GEORGIA CHEMISTRY COUNCIL

      iv. ASBESTOS DISEASE AWARENESS ORGANIZATION

      v. UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO

      vi. OHIO CHEMISTRY TECHNOLOGY COUNCIL

      vii. AMERICAN PUBLIC HEALTH ASSOCIATION

      viii. COLLEGIUM RAMAZZINI

      ix. LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS

      x. LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS

      xi. THE FEELGOOD FOUNDATION

      xii. HENRY A. ANDERSON, MEDICAL DOCTOR

      xiii. BRAD BLACK, MEDICAL DOCTOR

    xiv.   BARRY CASTLEMAN, DOCTOR OF SCIENCE

    xv.   RAJA FLORES, MEDICAL DOCTOR

    xvi.   ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF PHILOSOPHY

    xvii.   PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF SCIENCE

    xviii.   RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF PUBLIC HEALTH

    xix.   STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR OF PUBLIC HEALTH

    xx.   JACQUELINE MOLINE, MEDICAL DOCTOR, MASTER OF SCIENCE

    xxi.   CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH

    xxii.   CHRISTINE OLIVER, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE

    xxiii.   ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH

    xxiv.   OLIN CORPORATION

b. **Respondents**:

    i.   UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

    ii.   LEE ZELDIN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## 2. <u>Attorneys</u>

a. **For Petitioner Olin Corporation**: <u>Hunton Andrews Kurth LLP</u>: Elbert Lin, Matthew Z. Leopold, Erica N. Peterson, Nicholas D. Stellakis

b. **For Petitioner/Intervenor Ohio Chemistry Technology Council**: <u>Porter, Wright, Morris & Arthur, L.L.P.</u>: Robert J. Karl, Eric B. Gallon

c. **For Petitioner/Intervenor Texas Chemistry Council**: <u>Baker Botts, L.L.P.</u>: Aaron M. Streett, Christopher B. Carter

d. **For Petitioners/Intervenors American Chemistry Council, Georgia Chemistry Counsel, and Texas Chemistry Council**: <u>Crowell & Moring LLP</u>: David Y. Chung, Warren Lehrenbaum

e. **For Petitioner/Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO**: <u>OSH Law Project, L.L.C.</u>: Randy Sue Rabinowitz, Victoria Louise Bor; <u>Motley Rice, L.L.C.</u>: Nathan David Finch

f. **For Petitioner/Intervenor Asbestos Disease Awareness Organization:** <u>Lexington Law Group, LLP</u>: Lucas Williams; <u>Sussman and Associates</u>: Robert Matthew Sussman

g. **For Petitioners/Intervenors American Public Health Association; Collegium Ramazzini; Local F-116 (Vandenberg Professional Firefighters), International Association of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters), International Association of Fire Fighters; The FeelGood Foundation; Henry A. Anderson, Medical Doctor; Brad Black, Medical Doctor; Barry Castleman, Doctor of Science; Raja Flores, Medical Doctor; Arthur Frank, Medical Doctor, Doctor of Philosophy; Phil Landrigan, Medical Doctor, Master of Science; Richard Lemen, Doctor of Philosophy, Master of Public Health; Steven Markowitz, Medical Doctor, Doctor of Public Health; Jacqueline Moline, Medical Doctor, Master of Science; Celeste Monforton, Doctor of Public Health, Master of Public Health; Christine Oliver, Medical Doctor, Master of Public Health, Master of Science; Andrea Wolf, Medical Doctor, Master of Public Health:** <u>Lexington Law Group, LLP</u>: Lucas Williams

h. **For Respondent United States Environmental Protection Agency:** <u>U.S. Department of Justice, Environment & Natural Resources Division</u>: Laura J. Glickman; <u>EPA Office of General Counsel</u>: Jeffrey Prieto

iv

3. **Other**

    a.  Interested Non-Parties: Importers, processors, and industrial users of chrysotile asbestos, including members of Petitioners American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, and Texas Chemistry Council.

/s/ *David Y. Chung*

David Y. Chung
*Counsel for the American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ i

INTRODUCTION ................................................................ 1

ARGUMENT .................................................................... 2

I.    EPA Misstates the Standard of Review. ................................... 2

II.   EPA Exceeded Its Authority by Jumping to a Ban. ..................... 3

      A.   EPA Regulated Beyond the Extent Necessary. ................................ 4

           1.   EPA Reads "to the Extent Necessary" Out of TSCA. ........................................... 4

           2.   EPA Lacked Substantial Evidence to Support a Ban. ...................................................... 7

      B.   EPA Did Not Consider Any Alternative Regulatory Action. ..................................................... 13

III.  EPA Should Not Have Imposed Risk Management Requirements At All, Because Its Risk Evaluation Is Flawed. ................. 15

      A.   EPA Made Incorrect Assumptions About PPE Use ......................... 16

      B.   EPA Improperly Relied on the 95th Percentile of Exposure Data. ..................................................... 19

      C.   EPA Incorrectly Assumed 16 Year-Olds Are Exposed to Asbestos for 40 Years. ....................................... 21

      D.   EPA Made Incorrect Assumptions About ONUs. ......................... 22

      E.   EPA's Compounding Errors Show That EPA's Decision Fails Substantial Evidence Review. .................................. 23

IV.  Rather Than Exercise Its Risk Management Authority, EPA Should Have Referred Its Findings to OSHA. .......................... 24

      A.   EPA's Failure to Comply with Section 9(a) Is Reviewable. ..................................................... 25

           1.   Congress Did Not Prohibit Review of EPA's Failure to Make Section 9(a) Determinations. ....................... 25

2.   Section 9(a) Referrals Are Not Committed to
Agency Discretion................................................................. 27

a.   Section 9(a) Provides a Meaningful
Standard. ...................................................... 28

b.   Referral Does Not Interfere with any
Congressionally Granted Enforcement
Discretion...................................................... 30

c.   The D.C. Circuit's Environmental Defense
Fund Decision Is Not Controlling. ............................ 32

B.   EPA's Failure to Comply with Section 9(a) Is Not
"Reasonable." ................................................................... 33

V.   Vacatur is the Proper Remedy. ........................................................ 37

CONCLUSION ............................................................................... 38

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Petroleum Inst. v. OSHA*,
  581 F.2d 493 (5th Cir. 1978) ...................................................................18

*Chem. Mfrs. Ass'n v. EPA*,
  859 F.2d 977 (D.C. Cir. 1988).............................................................2, 16

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ...................................................................3

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996)................................................................26

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ...................................... 2, 4, 12, 15, 16, 17, 19, 36

*Data Mktg. P'ship v. DOL*,
  45 F.4th 846 (5th Cir. 2022) .................................................................12

*Envtl Def. Fund v. EPA*,
  598 F.2d 62 (D.C. Cir. 1978)............................................................32, 33

*FDA v. Wages & White Lion Invs., LLC*,
  604 U.S. 542 (2025)..............................................................................16

*Guilzon v. C.I.R.*,
  985 F.2d 819 (5th Cir. 1993) ...................................................................7

*Gulf Restoration Network v. McCarthy*,
  783 F.3d 227 (5th Cir. 2015) .................................................................30

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..............................................................................30

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)................................................................................3

*King v. Burwell*,
  576 U.S. 473 (2015)..............................................................................14

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)................................................................29, 30

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..................................................................4, 37

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015)........................................................25, 27, 33

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011)...........................................................................4

*Public Citizen, Inc. v. EPA*,
   343 F.3d 449 (5th Cir. 2003) ...............................................................30

*Schneidewind v. ANR Pipeline Co.*,
   485 U.S. 293 (1988).............................................................................7

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943).......................................................19, 21, 22, 23

*Texas v. EPA*,
   983 F.3d 826 (5th Cir. 2020) ................................................................29

*United States v. Lauderdale Cnty., Miss.*,
   914 F.3d 960 (5th Cir. 2019) ................................................................27

*United States v. Moore*,
   71 F.4th 392 (5th Cir. 2023) .................................................................27

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
   586 U.S. 9 (2018).................................................................................27

**Statutes**

5 U.S.C. §701(a)(2).........................................................................25, 27

15 U.S.C. §2602(4) ...............................................................................17

15 U.S.C. §2605 ......................................................................................3

15 U.S.C. §2605(b)(4)(A).......................................................................17

15 U.S.C. §2605(b)(4)(F).......................................................................17

15 U.S.C. §2605(c)(2)(A) ........................................................................5

15 U.S.C. §2605(c)(2)(C) ......................................................................37

15 U.S.C. §2605(c)(2)(E) .........................................................................5

15 U.S.C. §2606(d) ..........................................................................31, 32

15 U.S.C. §2606(f) ................................................................................31

15 U.S.C. §2608(a) ...............................................................................35

15 U.S.C. §2608(a)(1) ................................................................24, 28, 29

15 U.S.C. §2608(a)(1)-(3) .....................................................................36

15 U.S.C. §2608(b)(1) ...........................................................................28

15 U.S.C. §2615(a)(4) ...........................................................................26

15 U.S.C. §2618 ....................................................................................25

15 U.S.C. §2618(a)(1)(A) ......................................................................25

15 U.S.C. §2618(c)(1)(B)(i) ...............................................................2, 15

15 U.S.C. §2619(a)(2) ...........................................................................29

15 U.S.C. §2625(h) ..........................................................................19, 20

15 U.S.C. §2625(h)(1) ...........................................................................10

15 U.S.C. §2625(k) ..........................................................................17, 18

29 U.S.C. §654(a)(2) .............................................................................24

42 U.S.C. §7607(b)(1) ...........................................................................29

**Regulations**

29 C.F.R. §1910.1001(e)(4) ..................................................................23

40 C.F.R. §702.33 (2017) ............................................................10, 19, 20

**Other Authorities**

50 Fed. Reg. 41,393 (Oct. 10, 1985)..........................................................................24

89 Fed. Reg. 21,970 (Mar. 28, 2024).............................................8, 9, 10, 11, 12, 15

H. Rep. No. 114-176 ..................................................................................................14

**INTRODUCTION**

EPA rewrites TSCA to try to justify prohibiting certain uses of chrysotile asbestos. Although Congress unambiguously limited EPA's ability to regulate—EPA can regulate "to the extent necessary" to eliminate unreasonable risk and no more—EPA reimagines that limitation to mean it can impose whatever restrictions "are sufficient" to eliminate unreasonable risk. *See* Gov't Br. 92. EPA augments its rewrite with liberal citations to legislative history to arrive at an interpretation of TSCA that is divorced from its plain text. EPA then regulates beyond the "extent necessary" by imposing a ban without substantial evidence to support its speculative and unsubstantiated conclusion that companies will not achieve, over the long-term, the same exposure limit and workplace controls that EPA found would eliminate unreasonable risk for the first five to 12 years after promulgation. This *ultra vires* action is reason alone to vacate the Final Rule.

The Court should vacate the Final Rule for three additional reasons: (1) EPA failed to consider any meaningful alternative to a ban; (2) EPA lacked authority to impose risk management requirements at all under TSCA section 6(a), because substantial evidence does not support EPA's threshold finding that chrysotile asbestos used in the chlor-alkali and chemical industries presents an unreasonable

risk; and (3) EPA violated TSCA section 9 by failing to defer to the Occupational Safety and Health Administration ("OSHA").[1]

## ARGUMENT

## I.     EPA Misstates the Standard of Review.

EPA seeks to insulate its decision by lowering the standard of review. Congress unambiguously "went out of its way" to direct that the substantial evidence standard applies here, *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1213 (5th Cir. 1991), yet EPA invokes the inapplicable arbitrary and capricious standard. 15 U.S.C. §2618(c)(1)(B)(i); Gov't Br. 49-50. EPA also falsely states, without citation, that the substantial evidence standard is only "slightly more searching" than the arbitrary and capricious standard. Gov't Br. 50. In fact, TSCA's substantial evidence standard is particularly demanding of EPA. Industry Pet'rs' Br. 43. It imposes a "considerable burden" on EPA and "affords a considerably more generous judicial review than the arbitrary and capricious test." *Corrosion Proof Fittings*, 947 F.2d at 1214 (cleaned up); *see also Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 992 (D.C. Cir. 1988) (numerous circuits agree the TSCA standard is "particularly demanding") (internal quotation marks and citation omitted).

---

[1] Petitioner Olin Corporation no longer argues that EPA's setting of different compliance deadlines is unlawful, as discussed in section IV of the Industry Petitioners' Opening Brief (at 70-74).

2

Even as to technical or scientific decisions, "a reviewing court may not simply defer to an agency's expertise, but must steep itself in technical matters" and base its review on "more than trust and faith in EPA's experience." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 199-200 (5th Cir. 1989) (internal quotation marks and citation omitted). And while it may be permissible for EPA to "use conservative assumptions in interpreting the data with respect to carcinogens," Intervenors' Br. 4 (quoting *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 656 (1980)), EPA cannot disregard statutory limits by regulating to eliminate all or virtually all risk, as opposed to unreasonable risk. *See* 15 U.S.C. §2605; *cf. Indus. Union Dep't*, 448 U.S. at 641 & 659 (rejecting OSHA's interpretation that it must "impose standards that either guarantee workplaces that are free from any risk . . . or that come as close as possible to doing so" because the OSH Act clearly "was intended to require the elimination, as far as feasible, of *significant risks* of harm") (emphasis added).

## II.     EPA Exceeded Its Authority by Jumping to a Ban.

EPA violated TSCA section 6(a) by imposing a ban despite finding that the Existing Chemical Exposure Limit ("ECEL"), together with personal protective equipment ("PPE") and other workplace controls, eliminates unreasonable risk. In so doing, EPA read "to the extent necessary" out of TSCA, contradicted its repeated determinations that the ECEL eliminates unreasonable risk, and ignored the statutory

command to consider an alternative regulatory action rather than jump straight to prohibition.

### A.   EPA Regulated Beyond the Extent Necessary.

#### 1.   EPA Reads "to the Extent Necessary" Out of TSCA.

As Industry Petitioners showed, the "single, best meaning" of section 6(a) is that EPA cannot regulate beyond what is necessary to eliminate unreasonable risk. Industry Pet'rs' Br. 63-66; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). All of EPA's attacks on this reading fail.

EPA incorrectly asserts that Industry Petitioners' interpretation reimposes the "least burdensome" requirement that Congress removed in 2016. Gov't Br. 93-95. The phrase "to the extent necessary" carries a meaning different from "least burdensome." *See Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011) ("statutes should be read to avoid making any provision 'superfluous, void, or insignificant'") (citation omitted). The former describes the reach of regulation, which must be no more than necessary to eliminate unreasonable risk. The latter describes the onus put on those regulated. *Corrosion Proof Fittings*, 947 F.2d at 1217. These are distinct inquiries. EPA must eliminate the unreasonable risk and go no further, but EPA need not select an option that imposes the least burden on industry. Congress relieved EPA of the burden to "consider each regulatory option, beginning with the least burdensome, and the costs and benefits of regulation under each option." *Id.* But it

4

did not give EPA a blank check to regulate unrestrained or without regard for what is "the extent necessary" to eliminate unreasonable risk.

EPA draws the wrong lesson from Congress's 2016 expansion of the list of available risk-management options. Gov't Br. 97. EPA seemingly believes that expansion was inconsequential, allowing EPA to choose any option, including a ban, regardless of whether it goes further than necessary. *Id.* Not so. Congress deliberately expanded the tools available to EPA to assist EPA in tailoring its regulation. Industry Pet'rs' Br. 27. EPA must use the correct tool for the job.

Similarly, EPA cites statutory factors it must consider in selecting from available regulatory options. Gov't Br. 93-95 (citing 15 U.S.C. §2605(c)(2)(A)); *see also* Intervenors' Br. 15. EPA asserts it can select any option that meets any of those factors. Gov't Br. 93-95. Again, EPA draws the wrong lesson. Those factors must be understood together with the overarching limitation to regulate "to the extent necessary" and no more. The section 6(c)(2)(A) factors are not a license to regulate as extensively as possible, but rather to assist EPA in selecting an appropriate regulatory tool.

EPA also cites another subsection relating to "articles" (an undefined term) that contain a chemical substance or mixture. 15 U.S.C. §2605(c)(2)(E). This directs EPA to apply prohibitions or other restrictions "only to the extent necessary" to address the risks from exposure to the chemical from the article. *Id.* EPA seizes on

the word "only" and argues that the phrase "to the extent necessary" in section 6(a) must mean something less than "only to the extent necessary" in section 6(c)(2)(E). Gov't Br. 96. That is true, but does not provide EPA the lifeline it seeks. Section 6(c)(2)(E) merely clarifies that EPA's regulation, which is *already* restricted by section 6(a) "to the extent necessary," is subject to an *additional* limitation when applied to "articles" that contain the chemical: not only can EPA not regulate beyond the point of eliminating unreasonable risk, as applied to articles, EPA cannot regulate beyond the risk *from the articles to which the prohibition or restriction applies*.

At bottom, EPA's interpretation hollows out any meaning of the phrase "to the extent necessary." According to EPA, it just means that EPA cannot apply "a clearly 'unnecessary' requirement[.]" Gov't Br. 94. Congress did not grant EPA such far-reaching powers. The phrase "to the extent necessary" means to "the point or degree to which [the necessity] extends[.]" Industry Pet'rs' Br. 64. The phrase is one of limitation, not virtually unfettered discretion. *Contra* Intervenors' Br. 15-16. What is necessary to eliminate unreasonable risk is the *outer limit* of what EPA can do, not the starting point.

Finally, EPA reaches deep into legislative history to support its reading. It argues that Industry Petitioners are attempting through interpretation to enact text that Congress rejected in 2016 that would have permitted bans only if other restrictions were insufficient. Gov't Br. 97. EPA is on thin ice, as this Circuit has

6

long rejected any notion that legislative history can override unambiguous text. *Guilzon v. C.I.R.*, 985 F.2d 819, 823 n.11 (5th Cir. 1993) ("Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history."). This is especially true with respect to Congress's failure to adopt legislation because there can be many reasons that Congress rejected a proposal. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act." (collecting cases)). Indeed, those members of Congress who did not support the bill EPA identifies may have thought that the phrase "to the extent necessary" achieved the same result across the board, applicable to any regulations under TSCA, not just bans. What matters is not what Congress did *not* adopt but the language it *did* enact.

## 2.    EPA Lacked Substantial Evidence to Support a Ban.

EPA acknowledges that "each restriction" in a TSCA risk management rule must be supported by substantial evidence and that a ban would be unreasonable absent substantial evidence that it is necessary to eliminate unreasonable risk. Gov't Br. 94. Even under EPA's incorrect, overly expansive understanding of its regulatory authority, EPA's ban is unlawful because it rests on contradictory, speculative, and conclusory findings, not substantial evidence.

EPA indisputably determined that compliance with the ECEL and workplace controls eliminates unreasonable risk for at least five to 12 years. Gov't Br. 99; *accord* EPA ECEL Memo (June 8, 2021), AR C.17, at 1, JA__ ("EPA has determined, as a matter of risk management policy, that ensuring exposures remain at or below the ECEL will eliminate the unreasonable risk of cancer resulting from inhalation exposures in an occupational setting for those conditions of use identified as presenting unreasonable risk in the Risk Evaluation[.]").[2] Nor is there any dispute that EPA determined that: (1) the ECEL is "achievable," 89 Fed. Reg. at 21,982; (2) the feasibility of the ECEL was demonstrated by "personal air monitoring data" from the chlor-alkali industry, *id.* at 21,988; and (3) "when *expected use* of respirator PPE is considered . . . the risk estimates do not exceed the risk benchmark[.]" Risk Evaluation ("RE") at 235-36, JA__ (emphasis added).

Despite those determinations, EPA now insists the ECEL cannot sufficiently reduce unreasonable risk because the chlor-alkali and titanium dioxide industries are unlikely to reliably achieve that level. Gov't Br. 99 (citing 89 Fed. Reg. at 21,982). The cited preamble language, however, merely speculates that monitoring "may at

---

[2] Intervenors' claim that *all* exposure must be eliminated because there is no risk threshold, *see* Intervenors' Br. 17-20, runs counter to ADAO's prior assertion in this case that "[a]n ECEL and the accompanying compliance measures required by Part 1 would have complied with TSCA by reducing asbestos exposure levels . . . below EPA's benchmarks for unreasonable cancer risk." ADAO Pet'r Br. 32. The ECEL *is* "the exposure threshold that would protect against unreasonable risk." Gov't Br. 99.

times be problematic due to analytical and field sampling challenges." Notably, EPA's solution to these "facility-specific sampling and analytical challenges" was to "allow owners and operators to use increased respiratory protection with an appropriate [assigned protection factor] to demonstrate compliance with the ECEL." RM RTC at 57, JA\_\_. Regardless, EPA's speculation about monitoring challenges is tough to square with its determination that the ECEL is both achievable and feasible. Nor should this Court credit EPA's attempts to downplay the ECEL as merely something that "facilities must try to achieve" before the ban is effective. Gov't Br. 99. The Final Rule requires "owners or operators . . . to ensure that no person in the workplace is exposed to an airborne concentration of chrysotile asbestos in excess of" the ECEL "beginning six months after the effective date of the final rule." 89 Fed. Reg. at 21,988. EPA required industry not just to "try" to comply but to "ensure" compliance, *id.*, and EPA cannot explain why requiring compliance with the ECEL suffices for five to 12 years but not longer.

EPA further asserts that (1) industry's own monitoring data show that chlor-alkali and titanium dioxide facilities likely cannot comply with the ECEL without relying on respirators, Gov't Br. 101-02; (2) "issues with respirators like poor fit and maintenance impair their ability to adequately protect users," *id.* at 102; and (3) workers are unlikely to comply fully with respirator requirements. *Id.* at 102-04. None of these contentions hold up.

*First*, the industry data were generated to show compliance with OSHA's regulatory limit, not the orders-of-magnitude lower ECEL that industry did not even know was conceived of at that time. EPA gave no notice, either in the Scoping Document or the Draft Risk Evaluation, that it was considering an ECEL of 0.005 f/cc. It was, and remains, EPA's burden to ensure that the procedures "employed to generate the information" on which it relied were "reasonable for and consistent with the intended use of the information." 15 U.S.C. §2625(h)(1); 40 C.F.R. §702.33 (2017). Here, EPA collected data used to show compliance with one standard, moved the goalposts, and now argues that the data—a large percentage of which was "non-detectable," RE at 82, JA__—somehow proves the new ECEL cannot be achieved. EPA cites nothing for the proposition that using data collected to show compliance with the OSHA limit can be used to assess achievability of the ECEL. Gov't Br. 101.

*Second*, EPA distorts the record evidence on the efficacy of respirators. *See* Gov't Br. 102 (citing RE 74-75, JA__ & 89 Fed. Reg. at 21,983). The Risk Evaluation broadly speculates that reliance on respirators *may* not be enough "if the industrial hygiene program in place is poorly maintained," because respirator fit tests *may* be inadequate and poor maintenance of respirators can affect assigned protection factors. *See* RE at 74-75, JA__. But EPA presented no evidence suggesting this is true of chlor-alkali or titanium dioxide facilities. Instead, what EPA found for the chlor-alkali industry was that "when *expected use* of respiratory PPE

10

is considered for some worker tasks . . . the risk estimates do not exceed the risk benchmark." RE at 235-36, Table 5-1, JA__ (emphasis added). In all events, the Final Rule requires owners and operators of chlor-alkali and titanium dioxide facilities to select properly fitting respirators based on the most recent exposure monitoring, "provide, ensure use of, and maintain (in a sanitary, reliable, and undamaged condition)" appropriately designed respirators, and "provide training and retraining to all persons required to use respiratory protection[.]" 89 Fed. Reg. at 22,009 (codified at 40 C.F.R. §751.511(f)).

Similarly, the Final Rule preamble vaguely references how the Risk Evaluation discussed "studies" investigating respirator performance, *see* 89 Fed. Reg. at 21,983, but the Risk Evaluation mentions only the 1998 Riala and Riipinen study on abatement scenarios. *See* RE at 74, JA__; *see also* AR D.307, JA__. EPA acknowledged that nearly all the abatement scenarios in that study involved "very high exposures not consistent with" the conditions of use at issue here. RE at 74, JA__. As for the three abatement scenarios in that study involving exposures under 1 f/cc, EPA made no attempt to explain how those scenarios compare to activities at chlor-alkali and titanium dioxide facilities. *See* AR D.307, at 38-39, JA__. Thus, EPA does not know whether (or to what extent) respirator leakage might occur at chlor-alkali and titanium dioxide facilities or how maintenance and fit-testing at such facilities compare to whatever maintenance or fit testing, if any, occurred at the three

11

abatement sites in that 1998 study. *See id.* EPA cannot fill these data gaps through unsupported conjecture about respirator performance in the facilities it seeks to regulate.

*Third*, EPA now claims it "reasonably concluded that chlor-alkali or titanium dioxide workers and occupational non-users were not likely to fully comply with *additional* respiratory personal protective equipment requirements." Gov't Br. 103. The lack of citation support for that conclusion is telling. Nowhere in the Final Rule did EPA even hint that workers are likely to flout new requirements in a TSCA rule. In fact, EPA touted it "is also requiring owners or operators to comply with additional requirements that are needed to ensure successful implementation of the ECEL." 89 Fed. Reg. at 21,988. It is well established this Court "may consider only the reasoning articulated by the agency itself; [it] cannot consider *post hoc* rationalizations." *See Data Mktg. P'ship v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022) (citation and quotation marks omitted). Equally important, this Court has rejected comparable EPA attempts to regulate based on the assumption that "the federal government will not adequately enforce any workplace standards that the EPA might promulgate." *Corrosion Proof Fittings*, 947 F.2d at 1222, n.22. Here, EPA cannot presume longer-term noncompliance with the same ECEL that EPA believes will eliminate unreasonable risk for at least five to 12 years.

EPA and Intervenors nevertheless offer scant record citations to support their newfound claim that workers would defy newly imposed respirator requirements in the Final Rule, but EPA did not rely on those sources in the Final Rule to support the ban. *See* Gov't Br. 102-03; Intervenors' Br. 23-26. EPA's and Intervenors' reliance on unsubstantiated 2022 news reports is especially misguided. *See* Gov't Br. 103; Intervenors' Br. 23-25. Rather than try to bolster its ban with those claims (or similar public comments), EPA admitted it "has no independently verified information to confirm the allegations about the safety practices at these closed plants, or how they compare to the current practices at the chlor-alkali plants still using asbestos diaphragms." RM RTC at 113, JA__.

For these reasons, EPA's conclusion that only a ban eliminates unreasonable risk is not supported by substantial evidence. EPA cannot escape its own finding that the ECEL, respirator usage, and other workplace controls together can eliminate unreasonable risk. EPA's rejection of those measures in favor of a ban goes beyond the extent necessary to eliminate unreasonable risk and seeks to eliminate all risk.

### B.    EPA Did Not Consider Any Alternative Regulatory Action.

The Final Rule violates TSCA and should be vacated for yet another reason: EPA considered no alternative regulatory action, just a ban with different compliance dates. Industry Pet'rs' Br. 68-70. Section 6(d) plainly reflects that the effective date of a ban is not an "alternative regulatory action[]." *Id.* at 69. Yet EPA reads section

13

6(c) in isolation, ignoring statutory context, and (again) turns to legislative history to overcome the plain meaning of the statute.

EPA argues that evaluating identical alternatives that vary only in compliance dates satisfies TSCA's requirement that EPA consider "alternative regulatory action" because Congress did not define that term. Gov't Br. 107. But the provision in which the phrase appears, section 6(c), must be read in context. *See King v. Burwell*, 576 U.S. 473, 492 (2015). That context reveals that "alternative regulatory actions" in section 6(c) refers to the *type* of regulatory action taken, *i.e.*, those listed in section 6(a). Industry Pet'rs' Br. 69. The term "compliance dates" in section 6(d) refers to the *time* within which the action must be performed. *Id.*

EPA again resorts to legislative history, but as noted above, history cannot override unambiguous text. EPA cites a House Committee Report stating that the Committee "'does not expect EPA to analyze the cost-effectiveness of an open-ended group of possible requirements, but to focus on those that meet the subsection (a) purpose of controlling an unreasonable risk of injury.'" Gov't Br. 106-07 (quoting H. Rep. No. 114-176 at 26). That statement does not help EPA. It says nothing about whether different compliance dates for a ban constitute alternative regulatory actions for purposes of section 6(c). Indeed, the statement arose in the context of explaining that the universe of data from which EPA would make a cost-effectiveness decision is limited to information in the record.

14

Finally, EPA maintains that it could not consider measures like PPE, certification and training, or other workplace controls as alternatives, because it could not determine that those eliminate unreasonable risk. Gov't Br. 106-08. All but one of the record citations that EPA relies on simply restate EPA's conclusory assertion that only a ban will work in the long-term because respirators are not always sufficiently protective. *See* RM RTC at 50, 121, & 157, JA__, __ & __. As detailed above, EPA *did* find that the ECEL, with PPE and workplace controls, eliminates unreasonable risk, which is why EPA imposed those as "interim" requirements for five to 12 years. *See supra* Part II.A.2. EPA's "offhand rejection of these intermediate regulatory steps is not the stuff of which substantial evidence is made." *Corrosion Proof Fittings*, 947 F.2d at 1217 (internal quotation marks and citation omitted). The only other citation EPA offers is a statement in the Final Rule that it lacked "sufficient information" to conclude that PPE and workplace controls can eliminate unreasonable risk from use of asbestos-containing sheet gaskets *for processing nuclear material*, but that use is not at issue. Gov't Br. 107 (quoting 89 Fed. Reg. at 21,984).

## III.    EPA Should Not Have Imposed Risk Management Requirements At All, Because Its Risk Evaluation Is Flawed.

EPA's risk evaluation for asbestos diaphragms and sheet gaskets "is not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. §2618(c)(1)(B)(i). EPA's unreasonable risk determination is not based on

"the entire record," including "whatever in the record detracts" from that decision. *Corrosion Proof Fittings*, 947 F.2d at 1213; *Chem. Mfrs. Ass'n*, 859 F.2d at 992. Instead, EPA made a series of inaccurate, worst-case assumptions that collectively overestimate risk: workers never use PPE even though EPA acknowledges they do for several tasks; the 95th percentile of exposure data reflects reality even though over half of the data were non-detects; occupational non-users ("ONUs") have more exposure than the evidence shows; and workers are exposed far longer than they are. By stacking these assumptions and disregarding contrary record evidence, EPA effectively aimed at eliminating *virtually all* risk, not just unreasonable risk.

EPA responds that each of these incorrect assumptions is harmless error. But this is not a case where "an agency's decision is supported by a plethora of factual findings, only one of which is unsound." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025). Not only is EPA wrong that each individual error was harmless, the cumulative effect of these errors dooms EPA's unreasonable risk determination.

## A.    EPA Made Incorrect Assumptions About PPE Use.

EPA failed to muster substantial evidence for its assumption that workers in the chlor-alkali industry *never* use PPE. Industry Pet'rs' Br. 45-47. EPA essentially admits this assumption does not reflect real-world conditions. Gov't Br. 54. EPA's bases for relying on this contrafactual assumption are not persuasive.

16

EPA argues that assuming workers never use PPE "more closely resembles the real world" than assuming workers *always* use perfectly performing PPE. *Id.* By ignoring reality, and forcing itself to choose between these two extremes, EPA sidestepped its statutory obligation to accurately evaluate "conditions of use"— namely, the "circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen" to be used. *See* 15 U.S.C. §§2605(b)(4)(A), 2602(4). Intervenors offer an even more extreme justification, claiming that TSCA prohibits EPA from considering PPE because it is a "'nonrisk' exposure reduction method." Intervenors' Br. 10-11. That argument lacks merit. Risk is a function of hazard and exposure, and TSCA plainly requires EPA to consider "reasonably available" information on "likely duration, intensity, frequency, and number of exposures under the conditions of use[.]" *See* 15 U.S.C. §§2605(b)(4)(F), 2625(k); *accord* Gov't Br. 53-54. Intervenors cannot credibly dispute that wearing PPE is a "circumstance" under which workers use chrysotile asbestos. *See* 15 U.S.C. §2602(4).

Relatedly, EPA's conclusion that real-world conditions lie closer to the no-PPE scenario is not based on substantial evidence. EPA questions the efficacy of respirators and notes "inherent variability in adherence" to OSHA's PPE standards. Gov't Br. 55-56; *see also* Intervenors' Br. 11. But that does not excuse assuming workers *never* use PPE, particularly when EPA had ample contrary evidence. *See* Industry Pet'rs' Br. 12-16; *see also Corrosion Proof Fittings*, 947 F.2d at 1213 (EPA

must account for "whatever in the record detracts" from its position). Workers with the greatest exposure to asbestos wear respirators, and the workers who perform tasks that do not require respirators do use other OSHA-specified safety controls that OSHA to mitigate risk. *See id.* at 45-46.

EPA further asserts that it was compelled to choose between an "all-PPE" scenario and a "no-PPE" scenario because industry did not provide monitoring data showing how long workers spend on each asbestos-handling task, how often workers rotate between tasks, or whether certain workers are confined to one task or certain tasks. Gov't Br. 57. This is not a valid justification. To start, it is EPA's burden to present substantial evidence supporting its decision. *Am. Petroleum Inst. v. OSHA*, 581 F.2d 493, 504 (5th Cir. 1978) (agency must "regulate on the basis of knowledge rather than on the unknown"). EPA cannot rely on industry stakeholders to do its data-gathering for it, but regardless, EPA *did* have data showing that PPE is used some of the time. RE 236, JA__.

EPA also posits that (1) TSCA does not require EPA to determine unreasonable risk for each task within a condition of use; (2) PPE is not used for some tasks; and (3) therefore EPA can lump all tasks together and assume no PPE use for *any* tasks. Gov't Br. 58. EPA's claim that it need not find unreasonable risk on a task-by-task basis does not justify making unrealistic generalizations and ignoring "reasonably available" information, 15 U.S.C. §2625(k), particularly record evidence that

"detracts" from its position. *Corrosion Proof Fittings*, 947 F.2d at 1213. And it must use "best available science[.]" 15 U.S.C. §2625(h); 40 C.F.R. §702.33 (2017). EPA's decision to ignore evidence that PPE is used sometimes, because it arbitrarily determined that PPE is not used all of the time, violates TSCA and its demanding standard of review.

Finally, EPA references anecdotal and unverified news reports to suggest its finding of unreasonable risk is supported by substantial evidence. Gov't Br. 24, 56, 75, 103. EPA admits they were published *after* the risk-evaluation was finalized. *Id.* at 56. EPA cannot rely on them to justify its unreasonable risk determination, particularly when it later disavowed reliance on them. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); RM RTC at 113, JA__ ("EPA has no independently verified information to confirm the allegations about the safety practices at these closed plants, or how they compare to the current practices at the chlor-alkali plants still using asbestos diaphragms.").

## B.     EPA Improperly Relied on the 95th Percentile of Exposure Data.

EPA compounded its erroneous assumptions on PPE usage by basing its unreasonable risk determination on the 95th percentile of data. This argument is *not* waived, as EPA asserts. As EPA notes, Industry Petitioners commented that it was inappropriate to use the 95th percentile, rather than the mean, as the high-end

tendency, and EPA addressed those comments. Gov't Br. 62. The key point is EPA was on notice that the 95th percentile overestimates risk and is therefore an inappropriate metric. In addition, as EPA concedes (Gov't Br. 66-67), it had an *independent* duty to account for uncertainties in its data, which includes determining whether the proxy value it selected accurately reflects what EPA sought to measure.

On the merits, EPA first justifies using the 95th percentile by highlighting that the "highest asbestos exposure measurement" was six times the 95th percentile. Gov't Br 63. As Industry Petitioners explained (and EPA ignores), that was an erroneous reading far out of line with all other readings, one that EPA itself called an "atypical result." Industry Pet'rs' Br. 32. Equally important, over half of the data EPA evaluated for workers were "non-detects." RE 82, JA__. In this context, EPA's reliance on the 95th percentile was not based on substantial evidence. Industry Pet'rs' Br. 47-48.

EPA next asserts it used the 95th percentile as a proxy to protect potentially exposed or susceptible subpopulations and non-cancer risks. Gov't Br. 64-68; *see also* Intervenors' Br. 8-9. This does not excuse EPA from assessing the limitations of the information on which it relied, including its fitness for the intended use of that information. 15 U.S.C. §2625(h); 40 C.F.R. §702.33 (2017). EPA failed to do so. EPA even acknowledges that its explanation in the Risk Evaluation for choosing this methodology was "cursory," Gov't Br. 67, but flips the burden on Industry

Petitioners to explain why it is incorrect. Under TSCA, the burden of articulating a reasoned explanation lies solely with EPA. Here, EPA did not even attempt to quantify the risks, so it cannot know whether using the 95th percentile is an adequate proxy or a gross over-projection. Industry Pet'rs' Br. 47-48. Congress did not permit EPA to impose onerous burdens as a substitute for collecting good data.

Lastly, EPA asserts that it would have reached the same result even if it used the central tendency. Gov't Br. 68. This is so, EPA says, because it would have factored in some unspecified (and unsubstantiated) margin of safety that would have increased the numbers to be above the cancer benchmark. *Id.* This is a made-for-litigation assertion that lacks record support and fails for that reason. *Chenery*, 318 U.S. at 87.

### C. EPA Incorrectly Assumed 16 Year-Olds Are Exposed to Asbestos for 40 Years.

EPA further erred by assuming, without substantial evidence, that 16-year-olds are exposed to asbestos for 40 years.

EPA misstates the relevant data on the age of onset (between 16 and 19) in the chlor-alkali industry; that data did *not* specifically show that *any* were 16 years old. Gov't Br. 72; RE at 143, JA__. Consistent with what Industry Petitioners told EPA, all of these workers could have been 18 or 19. Industry Pet'rs' Br. 49. EPA also cites an anecdotal news report, but (1) this cannot be relied on for the reasons discussed

above (*supra* at 19); and (2) that report notes only that the individual dropped out of high school and not his age. NPR (2022b), AR C.617, at 11, JA__.

EPA also fails to persuasively defend its assumption that workers are exposed to asbestos for 40 years. The vast majority of workers average 15-year careers, not 40. *See* Economic Analysis at 4-23, JA__. In fact, the data also shows that over the past ten years, the median tenure with one employer of all wage and salary workers aged 25 or older has been five years. ACC Chlorine Panel Comments at 15, JA__. EPA's assertion that its analysis would not have changed if it assumed an exposure duration of 20 years is unsupported. *See* Gov't Br. 73.

### D.    EPA Made Incorrect Assumptions About ONUs.

EPA incorrectly assumed that ONUs never wear PPE. In fact, ONUs, including janitorial and maintenance staff, are governed by the OSHA Asbestos Standard; all employees must don the appropriate PPE before entering a regulated area. ACC/CCD Comments on Draft Risk Evaluation for Asbestos (June 2, 2020) at 6, JA__; Industry Pet'rs' Br. 51-52. EPA again improperly relies on news reports that it published *after* the Risk Evaluation to suggest otherwise. *See* Gov't Br. 75; *Chenery*, 318 U.S. at 87.

EPA also inaccurately evaluated the exposure level of ONUs. EPA admits that it found no instances where ONUs worked in "very close proximity" to asbestos-containing gasket removal. Gov't Br. 77. In fact, the record before EPA showed that

when maintenance and janitorial activities are conducted in asbestos-processing areas, the ONUs "us[e] respirators and other required PPE[.]" Industry Pet'rs' Br. 33. That is just as OSHA requires. 29 C.F.R. §1910.1001(e)(4).

EPA's defense of its use of "non-detects" misses wide. EPA says it is standard for it to assume that an instrument's reading of no asbestos present really means that there was some asbestos present. Gov't Br. 79. But there are two main problems with this argument. First, non-detects are not just a portion of EPA's dataset; *all* of the ONU samples were non-detects. Arbitrarily assigning a value to all results literally makes up data, which cannot be the best-available science. Industry Pet'rs' Br. 52-53. Second, the data was gathered to measure only to the OSHA Permissible Exposure Limit ("PEL"), meaning no one gathering the data had any reason to employ more sensitive instruments.

Finally, EPA claims its ONU finding was irrelevant because it would have found unreasonable risk from worker exposure standing alone. Gov't Br. 80. That remarkable assertion does not appear in EPA's Risk Evaluation and should be disregarded. *Chenery*, 318 U.S. at 87.

### E.   EPA's Compounding Errors Show That EPA's Decision Fails Substantial Evidence Review.

Each of EPA's errors itself justifies vacatur. Taken together, they significantly overestimate risk. ACC Comments on Draft Risk Evaluation, EPA-HQ-OPPT-2019-0501-0083, at 9, JA__ ("multiple conservative assumptions can skew a model or

monitoring data to high-end exposure scenarios that do not represent realistic possibilities"). EPA's analysis is supported not by substantial evidence, but a series of worst-case assumptions. Consequently, EPA's rule seeks to eliminate all risk, not just unreasonable risk.

## IV. Rather Than Exercise Its Risk Management Authority, EPA Should Have Referred Its Findings to OSHA.

Industry Petitioners explained how EPA violated TSCA section 9(a) by failing to refer its findings on asbestos diaphragms and sheet gaskets used in chemical production to OSHA. Industry Pet'rs' Br. 54-58. Section 9(a) requires EPA to send a report to another agency when an unreasonable risk from a condition of use "*may* be prevented or reduced to a sufficient extent" by action under a federal law that EPA does not administer. 15 U.S.C. §2608(a)(1) (emphasis added). OSHA is (to quote EPA) the "primary statute for protecting the health and safety of workers." Industry Pet'rs' Br. 55 (quoting 50 Fed. Reg. 41,393, 41,398 (Oct. 10, 1985)). Employers *must* comply with OSHA's regulations. 29 U.S.C. §654(a)(2). OSHA regulates the exact same risk that EPA is seeking to regulate under TSCA—the hazards of asbestos diaphragms and sheet gaskets used in chemical production, which are found *only* in OSHA-regulated workplaces. Industry Pet'rs' Br. 57. EPA does not dispute that OSHA could tighten its existing regulations governing this risk. *Id.*

EPA's principal response is that violations of section 9(a) are unreviewable, but EPA misreads the statute. EPA's backup argument is that it reasonably declined to refer to OSHA, but EPA relies on a series of inaccurate assertions.

## A.    EPA's Failure to Comply with Section 9(a) Is Reviewable.

EPA asserts that it can ignore TSCA section 9(a) because that section gives EPA complete, unrestrained discretion not to make a determination. Gov't Br. 81-82 (citing 5 U.S.C. §701(a)(2)). According to EPA, no court can ever review EPA's decision *not* to determine whether unreasonable risk may be prevented or reduced to a sufficient extent by a law that EPA does not administer; but, if EPA chooses to make that determination, *then* a court can review the results of the determination. Gov't Br. at 84 n.12. That is incorrect.

### 1.    Congress Did Not Prohibit Review of EPA's Failure to Make Section 9(a) Determinations.

EPA first argues that TSCA section 19 ("Judicial review") contains "no mention of [section 9] referral decisions" and thus, the decision not to make a section 9(a) determination is unreviewable. Gov't Br. 82 (citing 15 U.S.C. §2618). EPA ignores that TSCA does not provide for judicial review of *any* particular component of the rulemaking process, just the end result. 15 U.S.C. §2618(a)(1)(A). Section 9 is a step in section 6 rulemaking, and EPA cites nothing for the principle that judicial reviewability of a step in the rulemaking process depends on Congress's specifically enumerating that step in the judicial-review provisions. *Mach Mining, LLC v. EEOC,*

575 U.S. 480, 486 (2015) (courts apply "a 'strong presumption' favoring judicial review of administrative action," and the agency bears a "heavy burden" in showing Congress intended to prohibit review) (citations omitted).

Congress knew how to bar judicial review and did so clearly several times in TSCA. 15 U.S.C. §2615(a)(4) (barring judicial review of the validity, amount, and appropriateness of a civil penalty in post-assessment judicial proceeding by attorney general to enforce penalty); *id.* §2617(f)(9)(B) (barring judicial review when a state-requested waiver of TSCA's preemption provisions is deemed automatically approved by EPA's failure to meet deadline to grant or deny waiver); *id.* §2625(f) (barring judicial review "in any respect" of the contents and adequacy of the statement of basis and purpose that accompanies any final order issued under TSCA). Congress did not use similar language prohibiting judicial review in section 9(a).

EPA and Intervenors nevertheless claim that Industry Petitioners' interpretation of TSCA section 9(a) would "read out" the explicit grant of discretion. Gov't Br. 82-83; *see also* Intervenors' Br. 27-31. But a statutory mention of "discretion" does not automatically render the exercise of such discretion unreviewable. *E.g.*, *Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996) (reviewing agency decision despite statutory provision stating the decision was "in [the agency's] discretion"). If that were true, the "committed to agency discretion"

exception to judicial review would entirely swallow the "abuse of discretion" standard. *Compare* 5 U.S.C. §701(a)(2) *with id.* §706(2)(A).

Although the "strong presumption" of reviewability is "rebuttable . . . when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct," *Mach Mining*, 575 U.S. at 486, that is not the case here, and EPA's and Intervenors' use of legislative history to rebut the presumption (and statutory text) fails. *See* Gov't Br. 82; Intervenors' Br. 32-35 & 40-45. This is not one of those "very rare cases" where reliance on legislative history is appropriate. *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023). Because there is no ambiguity in TSCA, this Court should "evaluate the text that was actually enacted into law by both houses of Congress and the President," rather than follow EPA and Intervenors "down the rabbit hole" of legislative history to bar judicial review. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 966 n.12 (5th Cir. 2019).

> **2.    Section 9(a) Referrals Are *Not* Committed to Agency Discretion.**

EPA argues that TSCA section 9(a) referrals fit within the "rare circumstances," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9, 23 (2018), where there is no judicial review of administrative decisions traditionally regarded as committed to agency discretion. Gov't Br. 81-86. EPA argues (1) there is no meaningful standard by which to judge EPA's exercise of discretion; and (2) a

section 9(a) referral should be treated as an "enforcement action[]." *Id.* at 84-85; *accord* Intervenors' Br. 31-32. Neither is true.

a.    Section 9(a) Provides a Meaningful Standard.

TSCA section 9(a) provides a meaningful standard to guide EPA's discretion: EPA must refer when unreasonable risk "may be prevented or reduced to a sufficient extent" by action taken under a federal law another agency administers. 15 U.S.C. §2608(a)(1); *see also* Industry Pet'rs' Br. 56. EPA's response is to rewrite section 9(a). That provision, EPA says, means that "EPA may *only* refer risk management to another agency *if* that agency may be able to sufficiently prevent or reduce the risk from the chemical substance," but the statute "does not tell EPA *whether* or not to issue a determination[.]" Gov't Br. 84-85. That is not what TSCA says. Referral is *mandatory* when EPA "determines, in [EPA's] discretion, that such risk may be prevented or reduced to a sufficient extent by action taken" under another federal law. EPA's discretion is firmly moored to the determination of whether the other federal law may prevent or reduce unreasonable risk to a sufficient extent. Congress granted EPA no free-floating discretion; Congress marked the boundaries of that discretion in concrete terms. Congress knew how to grant broader discretion, as it did in section 9(b), where EPA has the discretion to determine whether using another EPA-administered law is in the "public interest." 15 U.S.C. §2608(b)(1). The Court

28

should not rewrite section 9(a) to grant EPA broader discretion than Congress imposed.

EPA's reliance on *Texas v. EPA*, 983 F.3d 826 (5th Cir. 2020) is misplaced. Gov't Br. 83. That case concerned the Clean Air Act's venue provision directing cases to the D.C. Circuit when (1) EPA determines that a local or regional action is of "nationwide scope or effect" and (2) "*if* in taking such action [EPA] finds and publishes" that determination. *Texas*, 983 F.3d at 833-34; 42 U.S.C. §7607(b)(1). The Court held that the *first* determination (whether an action is of "nationwide scope") is for courts to decide, the *second* determination (whether to publish that a local or regional action is based on a determination of nationwide effect) is for EPA to decide. *Id.* at 834-35. The language, "*if* in taking such action [EPA] finds and publishes" that determination was "not the language of legal obligation." *Id.* (emphasis by court). Here, in sharp contrast, Congress used the mandatory "shall" in TSCA: EPA "*shall* submit" a report to the other agency. 15 U.S.C. §2608(a)(1) (emphasis added).[3]

EPA also cites *Lincoln v. Vigil*, 508 U.S. 182 (1993), which held that an agency's decision to re-allocate funds from a lump-sum congressional appropriation

---

[3] EPA asserts that Industry Petitioners should have brought a district court citizen suit under TSCA section 18, 15 U.S.C. §2619(a)(2), but EPA cites no authority for that proposition. Gov't Br. 84 n.11.

is not reviewable. *Id.* at 185 & 192. To allow agencies to adapt to changing circumstances, "a fundamental principle of appropriations law is that" a lump-sum appropriation without statutory restrictions on what can be done with the funds creates a "clear inference" that there are no legally binding restrictions. *Id.* at 192. And, "indicia in committee reports and other legislative history" about how funds are expected to be used "do not establish any legal requirements." *Id.* (citation and quotation marks omitted). This case does not involve federal appropriations, and *Lincoln* underscores the error of relying on legislative history.

Finally, EPA cites *Public Citizen, Inc. v. EPA*, 343 F.3d 449 (5th Cir. 2003). Gov't Br. 83. That case is inapposite because this Court's holding turned on the fact that the decision involved whether to initiate enforcement proceedings with potential sanctions against states for noncompliance with the Clean Water Act. *See Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 236-38 (5th Cir. 2015) (distinguishing *Public Citizen* and holding that EPA's decision not to begin rulemaking was reviewable).

> b. Referral Does Not Interfere with any Congressionally Granted Enforcement Discretion.

EPA invokes the exception to judicial review for agency refusals to take enforcement action. Gov't Br. 85 (citing *Heckler v. Chaney*, 470 U.S. 821 (1985)). EPA argues that an order requiring referral to OSHA would interfere with "EPA's

decision to exercise its enforcement authority under [TSCA section 7.]" *Id.* This is incorrect.

EPA conflates enforcement with rulemaking. TSCA section 7 governs enforcement actions and rulemaking for imminently hazardous chemical substances or mixtures (defined as those presenting "an imminent and unreasonable risk of serious or widespread injury to health or the environment"). 15 U.S.C. §2606(f). Congress required EPA to prevent or reduce the risk from such substances. *Id.* §2603(f). Congress permitted EPA to do so through civil enforcement actions for seizure of the substances and for other relief to protect health or the environment (*e.g.*, recalls or replacements). *Id.* §2606(b). Congress also contemplated rulemaking, but it did *not* impose specific deadlines on EPA to begin that rulemaking. *Id.* §2606(d).[4]

Once EPA begins rulemaking, Congress directed how section 7 operates within the context of a section 9(a) referral. Throughout the referral process, EPA retains full authority to undertake enforcement. *Id.* §2606(a)(1). This authority continues, of course, if the referred-to agency fails to take the requested action. *Id.* §2608(a)(4). Only if the referred-to agency either determines that the substance does

---

[4] "Where appropriate, concurrently with the filing of [an enforcement action] or as soon thereafter as may be practicable, [EPA] shall initiate a proceeding for the promulgation of a rule under [TSCA section 6(a)]." 15 U.S.C. §2606(d).

not present the risk described in EPA's report or initiates its own rulemaking to protect against that risk does EPA lose its authority to regulate or begin enforcement proceedings "with respect to [that] risk." *Id.* §2608(a)(2). The quoted qualification is important. EPA loses authority only to the extent the other agency can adequately protect against "[that] risk." *Id.* The referral does not affect EPA's authority under section 7 "to address risks . . . that are not identified in a report issued by [EPA] under [section 9(a)(1)]." *Id.* §2608(a)(5). Even as to those risks that *are* encompassed within the referral, if EPA has already begun enforcement proceedings, the referred-to agency must consult EPA to avoid "duplication of Federal action against such risk." *Id.* §2608(a)(6).

Accordingly, section 9(a) referrals do not interfere with any congressionally granted enforcement discretion over imminently hazardous substances. EPA decides when to initiate rulemaking proceedings, EPA may continue enforcing during the rulemaking process, and EPA only loses the ability to enforce *after* an agency accepts a section 9(a) referral as to the specific risk referred to the other agency. And even then, that agency must consult with EPA.

> c.    The D.C. Circuit's *Environmental Defense Fund* Decision Is Not Controlling.

Last among EPA's arguments is its assertion that this Court should follow the D.C. Circuit's nearly fifty-year-old decision in *Environmental Defense Fund v. EPA*, 598 F.2d 62 (D.C. Cir. 1978). Gov't Br. 86. EPA's argument fails for two reasons.

32

First, that case is readily distinguishable because the court was concerned with TSCA section 9(b) *not* section 9(a). *Env't Def. Fund*, 598 F.2d at 77. Section 9(b) ties EPA's discretion to whether "it is in the public interest" to regulate under TSCA or another EPA-administered law. Petitioners there argued that TSCA section 9(b) preempted EPA's authority under the Clean Water Act (CWA) to ban discharges of certain chemicals into waterways. *Id.* at 76-77. The court simply ruled, in upholding EPA's ban, that its authority under TSCA did not limit its authority under the CWA.

Second, that case does not reflect modern jurisprudence governing judicial review of agency action. It does not discuss the "strong presumption favoring judicial review of administrative action" or the burden of rebutting that presumption with statutory "language or structure." *Mach Mining*, 575 U.S. at 486 (internal quotation marks and citation omitted). That is, of course, because this law developed in the decades since *Environmental Defense Fund*.

**B.   EPA's Failure to Comply with Section 9(a) Is Not "Reasonable."**

EPA briefly argues its failure to comply with TSCA section 9(a) was "reasonable" by making a grab-bag of misdirected arguments.

First, EPA claims it considered referral to OSHA, but declined to refer because there are "gaps" between OSHA's and EPA's authority, namely the factors that OSHA must consider before regulating chrysotile asbestos. Gov't Br. 87, 91. EPA *still* fails to articulate any reason why OSHA cannot mitigate unreasonable risk

33

merely because the OSH Act has different considerations. Industry Pet'rs' Br. 61 (noting that EPA did "not even attempt to explain how" considerations under OSH Act differ materially from those under TSCA). OSHA clearly can mitigate unreasonable risk from asbestos in the chlor-alkali industry, and it does so through the PEL. *Id.* at 61. While EPA continues to take shots at OSHA's competence (Gov't Br. 87), this fails to address the relevant question: whether OSHA "may" use its regulatory authority to take any necessary further action. Industry Pet'rs' Br. 61-62. EPA's own risk evaluation showed that OSHA could. *Id.* at 30.

Second, EPA says only a ban, which OSHA cannot impose, can eliminate unreasonable risk. Gov't Br. 87-88; *accord* Intervenors' Br. 45. This is just bootstrapping. Once EPA found unreasonable risk, the baton should have passed to OSHA to determine whether it could protect against such risk in the chlor-alkali and chemical production industries. But EPA improperly jumped to the end of the line to conclude that only a ban works.

Third, EPA argues that Industry Petitioners' interpretation of TSCA would always require referral of workplace-related risks to OSHA. Gov't Br. 88; *accord* Intervenors' Br. 29-30. This is not necessarily true, as there may be risks that OSHA cannot prevent or reduce, *e.g.*, where a chemical substance is used in workplaces beyond OSHA's jurisdiction. But that is not *this* case. Here, OSHA already regulates asbestos in chlor-alkali and chemical production facilities. It makes sense that the

two agencies would at least consult to avoid duplicative—or worse, conflicting—regulation. Section 9(c) contemplates this scenario, providing that TSCA does not preempt OSHA's authority to prescribe or enforce standards for occupational safety and health. Gov't Br. 88-89. The key question is whether OSHA's statutory authority "may" address the risk. 15 U.S.C. §2608(a). The point must be to give OSHA the opportunity to exercise that authority, if it can achieve the goal, rather than resorting immediately to TSCA regulation. EPA relatedly argues that Industry Petitioners' interpretation renders section 9(c) superfluous because EPA would always have to refer workplace-related risk findings to OSHA and therefore there was no reason for Congress to clarify that OSHA's authority to regulate workplaces is unaffected by TSCA. Even if EPA's premise were correct that it must refer all workplace-related risks to OSHA (it is not), there is no superfluity. TSCA does not mandate OSHA action in response to a referral and, if OSHA does not act, the baton passes back to EPA. In that scenario, OSHA's existing authority is unaffected.

Fourth, EPA argues that if referral was mandatory, Congress would have built extra time into the section 6(c)(1) deadlines for issuing a risk-management rule. Gov't Br. 89. EPA essentially argues there is never time for referral, but Congress disagreed and believed that EPA could meet the deadlines *and* refer when required. Indeed, Congress set numerous deadlines in Section 9(a) to ensure referrals do not

drag on and also allowed EPA to set deadlines for the other agency's response. *See* 15 U.S.C. §2608(a)(1)-(3).

Fifth, EPA again invokes section 7 and argues that it "seems unlikely" that Congress would have contemplated a lengthy referral process before EPA could address imminently hazardous chemical substances. Gov't Br. 89. Again, Congress gave EPA the ability to address these circumstances even if it refers the risk to another agency for rulemaking. Moreover, Congress declined to insert an exception to referral for such substances. EPA also assumes, wrongly, that its sister agencies will not do their statutorily mandated jobs, an assumption that parallels its assumption that industry will defy OSHA requirements. But this Court has rejected a similar attempt to regulate on the assumption that the federal government will not adequately enforce mandatory requirements. *See Corrosion Proof Fittings*, 947 F.2d at 1222, n.22.

Sixth, EPA and Intervenors argue that this Court's decision in *Corrosion Proof Fittings* proves that EPA appropriately declined to refer to OSHA. Gov't Br. 89; Intervenors' Br. 39, 41, 48. That argument undermines their contention that decisions under TSCA section 9(a) are unreviewable. For the Fifth Circuit to uphold or endorse EPA's decision not to defer, *see* Intervenors' Br. 41 & 48, it would have had to determine that such a decision was reviewable. Nonetheless, everything this Court said in that case fits well within TSCA's purpose as a gap-filler. EPA can identify

36

multi-industry problems, use TSCA as a gap-filler, and refer its findings to appropriate agencies for rulemaking within their scope.

Finally, EPA argues that non-referral was reasonable because OSHA cannot regulate other conditions of use of chrysotile asbestos. Gov't Br. 90. EPA asserts that it can make the referral decision individually for each condition of use *or for all conditions of use collectively*. *Id.* This is not the "single, best meaning" of TSCA. *Loper Bright*, 603 U.S. at 400. Congress plainly required that EPA's risk evaluation separately assess each of the conditions of use of a chemical substance. 15 U.S.C. §2605(c)(2)(C) (requiring consideration of availability of alternatives in deciding whether to prohibit or restrict in a manner that "substantially prevents a specific condition of use" of a chemical substance); *id.* §2605(g)(1) (governing exemptions for a specific condition of use). Section 9(a) is best read to require EPA to refer a specific condition of use when another agency may sufficiently prevent or reduce risk. EPA's reading of the statute, granting it *carte blanche* to decline to refer any condition of use if there is a single condition of use that cannot be sufficiently mitigated by another agency, flies in the face of the statute.

## V.     Vacatur is the Proper Remedy.

EPA acknowledges vacatur is the default remedy. Gov't Br. 151. It nevertheless asks for remand without vacatur because it would reach the same result anyway. *Id.* EPA cannot possibly know what result it would reach with all of the

errors in its proceedings. EPA makes a secondary argument, that vacatur would disrupt EPA's compliance with TSCA. *Id.* at 152. This is nonsense. Vacatur is necessary because EPA did *not* comply with TSCA. Relatedly, EPA says that vacatur would be disruptive to the regulated community. *Id.* at 153. EPA cites no evidence for this statement, and this is no excuse to retain an erroneous and illegal rule. Finally, EPA asks the Court to sever the unlawful portions of the Final Rule. Given EPA's errors, it is difficult to see how any part of the rule survives. Nevertheless, severance is highly dependent on which portions of the Final Rule are vacated.

## CONCLUSION

For the foregoing reasons, the Industry petitions should be granted and the Rule vacated.

Dated: September 17, 2025                 Respectfully submitted,

s/David Y. Chung                          s/Elbert Lin
David Y. Chung                            Elbert Lin
Warren Lehrenbaum                         Hunton Andrews Kurth LLP
Crowell & Moring LLP                      951 East Byrd Street, East Tower
1001 Pennsylvania Ave., N.W.              Richmond, VA 23219
Washington, DC 20004                      (804) 788-8200
 (202) 624-2500                           elin@HuntonAK.com
 (202) 628-5116 (fax)
dchung@crowell.com                        Matthew Z. Leopold
                                          Erica N. Peterson
*Counsel for Petitioners American*        Hunton Andrews Kurth LLP
*Chemistry Council, Georgia*              2200 Pennsylvania Avenue, NW
*Chemistry Council, and Texas*            Washington, DC 20037
*Chemistry Council*                       (202) 955-1500
                                          mleopold@HuntonAK.com

s/Robert J. Karl
Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris & Arthur,
L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for Petitioner Ohio*
*Chemistry Technology Council*

epeterson@HuntonAK.com

Nicholas D. Stellakis
Hunton Andrews Kurth LLP
60 State Street, Suite 2400
Boston, MA 02109
(617) 648-2800
nstellakis@HuntonAK.com

*Counsel for Petitioner Olin*
*Corporation*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(f) and (g), I certify that this Opening Brief of Industry Petitioners complies with this Court's August 7, 2024, Scheduling Order, because it contains 8,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

s/ David Y. Chung
David Y. Chung