# No. 24-60193

_____

In The United States Court of Appeals
for the Fifth Circuit

_____

Texas Chemistry Council; American Chemistry Council; Georgia
Chemistry Council; Asbestos Disease Awareness Organization; United
Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied
Industrial and Service Workers International Union, AFL-CIO; Ohio
Chemistry Technology Council,

*Petitioners,*

v.

United States Environmental Protection Agency,

*Respondent.*

_____

## Consolidated with

### No. 24-60281

American Public Health Association; Collegium Ramazzini; Local F-
116 (Vanderberg Professional Firefighters), International Association
of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters),
International Association of Firefighters; The FeelGood Foundation;
Henry A. Anderson, *Medical Doctor*; Brad Black, *Medical Doctor*;
Barry Castleman, *Doctor of Science*; Raja Flores, *Medical Doctor*;
Arthur Frank, *Medical Doctor, Doctor of Philosophy*; Phil Landrigan,
*Medical Doctor, Master of Science*; Richard Lemen, *Doctor of
Philosophy, Master of Public Health*; Steven Markowitz, *Medical*

*Doctor, Doctor of Public Health*; Jacqueline Moline, *Medical Doctor, Master of Public Health*; Celeste Monforton, *Doctor of Public Health, Master of Public Health*; Christine Oliver, *Medical Doctor, Master of Public Health, Master of Science*; Andrea Wolf, *Medical Doctor, Master of Public Health*,

*Petitioners,*

v.

United States Environmental Protection Agency; Lee Zeldin, *Administrator, United States Environmental Protectional Agency*;

*Respondents.*

———————————

**Consolidated with**

**No. 24-60333**

Olin Corporation,

*Petitioner,*

v.

United States Environmental Protection Agency; Lee Zeldin, *Administrator, United States Environmental Protection Agency*,

*Respondents.*

# BRIEF OF INTERVENORS, UNITED STEELWORKERS, ASBESTOS DISEASE AWARENESS ORGANIZATION, ET AL., IN SUPPORT OF RESPONDENT ENVIRONMENTAL PROTECTION AGENCY

Randy S. Rabinowitz, Esq.
Victoria L. Bor, Esq.
Occupational Safety & Health
Law Project, LLC
P.O. BOX 3769
Washington, DC 20027
202 256-4080

Nathan Finch, Esq.
Motley Rice LLC
401 9th Street NW
Suite 630
Washington, DC 20004
(202) 607-8998

*Attorneys for Petitioner USW*

Robert Sussman
Sussman & Associates
3101 Garfield St. NW
Washington, DC 20008
(202) 716-0118

Lucas Williams
Lexington Law Group, LLP
503 Divisadero Street
San Francisco, CA 94117
(415) 913-7800

*Attorneys for Petitioner Asbestos Disease Awareness Organization, et al.*

# CERTIFICATE OF INTERESTED PERSONS

1.  Nos. 24-60193; 24-60281; and 24-60333; under consolidated title, *Texas Chemical Council v. EPA* (2024).

2.  The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

   (1)   Occupational Safety & Health Law Project, LLC (counsel)

   (2)   Randy S. Rabinowitz (counsel)

   (3)   Victoria L. Bor (counsel)

   (4)   Nathan Finch (counsel)

   (5)   Motley Rice (counsel)

   (6)   Robert M. Sussman, Sussman & Associates (counsel)

   (7)   Lucas Williams (counsel)

   (8)   Henry A. Anderson, MD (petitioner/intervenor)

   (9)   Brad Black, MD (petitioner/intervenor)

   (10)  Barry Castleman, ScD (petitioner/intervenor)

   (11)  Raja Flores, MD (petitioner/intervenor)

   (12)  Arthur Frank, MD, PhD (petitioner/intervenor)

   (13)  Phil Landrigan, MD, MSc (petitioner/intervenor)

   (14)  Richard Lemen, PhD, MSPH (petitioner/intervenor)

   (15)  Steven Markowitz, MD, DrPH (petitioner/intervenor)

   (16)  Jacqueline Moline, MD, MSc (petitioner/intervenor)

(17) Celeste Monforton, DrPH, MPH (petitioner/intervenor)

(18) Christine Oliver, MD, MPH, MSc (petitioner/intervenor)

(19) Dan Whu, MD, MPH (International Association of Fire Fighters) (petitioner/intervenor)

(20) Andrea Wolf, MD, MPH (petitioner/intervenor)

(21) American Public Health Association (petitioner/intervenor)

(22) Collegium Ramazzini (petitioner/intervenor)

(23) IAFF Local F-116 (Vandenberg Professional Firefighters) (petitioner/intervenor)

(24) IAFF Local F-253 (Fort Myer Professional Firefighters) (petitioner/intervenor)

(25) The FeelGood Foundation (petitioner/intervnor)

(26) Asbestos Disease Awareness Organization (ADAO) (petitioner/intervenor)

(27) Linda Reinstein (President ADAO)

(28) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL- CIO/CLC (USW) (petitioner/intervenor)

(29) Texas Chemistry Council (TCC) (petitioner in No. 24-60193)

(30) Baker Botts L.L.P. (TCC Counsel)

(31) Carter, Beau (TCC Counsel)

(32) Aaron M. Streett (TCC counsel)

(33) American Chemistry Council (ACC) (petitioner)

(34) Georgia Chemistry Council (GCC) (petitioner)

(35) Crowell and Moring (Counsel for ACC and GCC)

(36)   David Chung (Counsel for ACC and GCC)

(37)   Warren Lehrenbaum (Counsel for ACC and GCC)

(38)   Ohio Chemistry Technology Council (OCTC) (petitioner)

(39)   Robert J. Karl (counsel for OCTC)

(40)   United States Environmental Protection Agency (respondent)

(41)   Lee Zeldin , Administrator, United States Environmental Protection Agency (respondent)

(42)   Pamela Bondi, Attorney General, United States Department of Justice (Respondents' Counsel)

(43)   Adam Gustafson, Deputy Assistant Attorney General, US Department of Justice (Respondents' Counsel)

(44)   Laura Glickman, US Department of Justice (Respondents' Counsel)

(45)   Sean Donahue, General Counsel for Respondent United States Environmental Protection

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF CONTENTS ..........................................................iv

TABLE OF AUTHORITIES......................................................vi

SUMMARY OF THE ARGUMENT ........................................... 1

ARGUMENT ...................................................................... 3

I.   Substantial Evidence in the Record Supports EPA's Determination that Chrysotile Poses Unreasonable Risks............. 3

     A.   EPA Reasonably Assumed Lifetime Exposures ..................... 5

     B.   EPA Reasonably Relied on "High End" Exposures ............... 7

     C.   EPA Reasonably Determined Exposure Values Without Regard to PPE Use.................................................. 9

II.  EPA's Ban on Chrysotile COUs was Necessary to Eliminate the Unreasonable Risk and thus was Required by TSCA............. 12

     A.   EPA Must Select Risk Management Requirements Necessary to Assure that the Regulated Chemical No Longer Presents an Unreasonable Risk .............................. 13

     B.   EPA's Judgment that Asbestos' Serious Risks Could Not Be Eliminated by the ECEL Was Amply Explained and Supported by the Record....................................... 17

          1.   The Unprecedented Death Toll of Asbestos and Lack of Any Risk Threshold Uniquely Justify Eliminating Any Exposure .......................................... 17

          2.   EPA Reasonably Found that the ECEL Would Not Fully Protect Workers from Levels of Exposure Presenting Unreasonable Risks................................. 20

III. EPA Properly Exercised its Section 9(a) Discretion...................... 26

A. TSCA's Plain Language Grants EPA Discretion Whether to Refer Risk Management to Another Agency.....27

B. The Legislative History of the 1976 Act Demonstrates Congress Deliberately Granted the Administrator Discretion Whether to Make a Referral ...............32

C. EPA Has Long Interpreted Section 9(a) to Grant it Broad Discretion Whether Referral to OSHA Is Appropriate .........................................................35

D. The 2016 Amendments Reaffirmed EPA's Obligation to Address Unreasonable Occupational Risks..........................40

E. The Administrator Properly Exercised his Discretion in this Case ...............................................................44

IV. The Court Should Ignore the Amicus Brief of the Alliance for Automotive Innovation.................................................48

A. EPA's Cancer Benchmark is Reasonable .............................49

B. The Alliance's Claim that EPA's SACC Was Biased and Sought to Manipulate the Science to Support an Asbestos Ban is Without Basis .............................................53

C. The Alliance's Position that Chrysotile Is Much Safer than Other Asbestos Fibers has Long Been Discredited by EPA and the Scientific Community ................................57

CONCLUSION ....................................................................62

CERTIFICATE OF COMPLIANCE.......................................64

CERTIFICATE OF SERVICE................................................65

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of New Orleans,*
  38 F.4th 472 (5th Cir. 2022)..........................................................48

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) ...........................................................16

*Bldg. & Constr. Trades Dep't v. Brock,*
  838 F.2d 1258 (D.C. Cir. 1988)...........................................7

*Christopher M. by Laveta McA v. Corpus Christi Indep. Sch. Dist.,*
  933 F.2d 1285 (5th Cir. 1991) ...........................................49

*City of Waukesha v. E.P.A.,*
  320 F.3d 228 (D.C. Cir. 2003) (per curiam) ..................................17

*Corrosion Proof Fittings v. E.P.A.,*
  947 F.2d 1201 (5th Cir. 1981) ................................................. passim

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ........................................................31

*Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst. (Benzene),*
  448 U.S. 607 (1980) ............................................................. passim

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ........................................................31

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) .................................................... 16, 28, 35, 44

*Michigan v. E.P.A.,*
  576 U.S. 743 (2015) ........................................................28

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990) .........................................................41

*Nat'l Mar. Safety Assoc. v. OSHA,*
  649 F.3d 743 (D.C. Cir. 2011)...........................................12

*Petteway v. Galveston Cnty.*,
    111 F.4th 596 (5th Cir. 2024) (en banc)..........................32

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ..................................................35

*Texas v. E.P.A.*,
    91 F.4th 280 (5th Cir. 2024)......................................16

**<u>Statutes</u>**

15 U.S.C. §1605 .............................................................15

15 U.S.C. §2602 .......................................................6, 7, 29

15 U.S.C. §2603 .............................................................29

15 U.S.C. §2604 .............................................................30

15 U.S.C. §2605 .......................................................passim

15 U.S.C. §2605 (2012), *amended by* 15 U.S.C. §2605 (2016) ...............14

15 U.S.C. §2608 .............................................27, 28, 29, 30

15 U.S.C. §2618 .............................................................31

15 U.S.C. §2625 ..............................................................4

18 U.S.C. §203 ..............................................................54

18 U.S.C. §205 ..............................................................54

18 U.S.C. §207 ..............................................................54

18 U.S.C. §208 ..............................................................54

18 U.S.C. §209 ..............................................................54

29 U.S.C. §654 ..............................................................11

29 U.S.C. §655 ...............................................................6

## Regulations

29 C.F.R. §1910.1001 ..............................................................................11

29 C.F.R. §1910.134 ..............................................................................10

5 C.F.R. §2635 ......................................................................................54

Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain
Conditions of Use Under Section 6(a) of the Toxic Substances
Control Act (TSCA), 87 Fed. Reg. 21706 (proposed April 12,
2022) (to be codified at 40 C.F.R. pt. 751). . . . . . . .18,19,44,46

Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain
Conditions of Use Under the Toxic Substances Control Act
(TSCA), 89 Fed. Reg. 21970 (Mar. 28, 2024) (to be codified at
40 C.F.R. pt. 751) ................................................................. passim

Asbestos; Manufacture, Importation, Processing, and Distribution
in Commerce Prohibitions, 54 Fed. Reg. 29460 (July 12,
1989) (to be codified at 40 C.F.R. pt. 763).......................................6

Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and
Actinolite, 51 Fed. Reg. 22612 (June 20, 1986) (to be codified
at 29 C.F.R. pts. 1910 and 1926)............................................. 7, 59

Perchloroethylene (PCE); Regulation Under the Toxic Substances
Control Act (TSCA), 89 Fed. Reg. 103560 (Dec. 18, 2024) (to
be codified at 40 C.F.R. pt. 751)......................................................14

Trichloroethylene (TCE); Regulation Under the Toxic Substances
Control Act (TSCA), 89 Fed. Reg 102568 (Dec. 17, 2024) (to
be codified at 40 C.F.R. pt. 751)......................................................14


## Other Authorities

"Congressional Intent Behind Specific Provisions of the Bill,"
Cong. Rec. S.3519, S.3522 (Comments of Sen. Inhofe)..................43

162 Cong. Rec. 7980 ............................................................... 15

162 Cong. Rec. S3517 (June 7, 2016) ..................................... 46

*Chrysotile Asbestos*, (World Health Organization 2014), available at https://iris.who.int/bitstream/handle/10665/143649/97892415 64816_eng.pdf (last accessed, Feb. 6, 2025) ................................. 19

Cong. Rec. S.3516 (June 7, 2016) ........................................... 41

Cong. Rec. S.3517 (June 7, 2016) ........................................... 42

EPA Ethics Advisory 2008-02: "Ethical Obligations of Special Government Employees," (Oct. 21, 2008) ...................................... 55

EPA SACC, "Asbestos Ad Hoc Peer Reviewer Biographical Sketches," May 28, 2020, EPA-HQ-2019-0501-0037 ..................... 55

EPA, Asbestos Part I: Responses to Comments on Proposed Rule (EPA-HQ-OPPT-2021-057-0758) ............................................ 45, 46

EPA, National Integrated Risk Information System (IRIS), Chemical Assessment Summary for Asbestos (1988), available at https://cfpub.epa.gov/ncea/iris/iris_documents/documents/sub st/0371_summary.pdf#nameddest=rfc..................................... 58, 59

EPA, *Proposed Approach for Estimation of Bin-Specific Cancer Potency Factors for Inhalation Exposure to Asbestos,* June 12, 2008 .............................................................................. 60

EPA, *Science Advisory Committee on Chemicals Basic Information*, (Feb. 7, 2025, 12:01 PM), https://www.epa.gov/tsca-peer-review/science-advisory-committee-chemicals-basic-information ...................................... 54

H.R. Rec. 94-1341 (1976).......................................................... 33

H.R. Rep. 94-1679 (Sept. 23, 1976) ........................................ 34

H.R. Rep. No. 14032, 94th Cong. § 9(a) (1976) ...................... 34

Memorandum of Understanding Between the Environmental
    Protection Agency and the Department of Labor (Feb. 6,
    1986), *available at* https://www.osha.gov/laws-
    regs/mou/1986-02-06 ....................................................................... 38

Michaels, "Doubt is their Product" (Oxford U. Press, 2008) ........... 53, 54

Michaels, "Triumph of Doubt" (Oxford U. Press, 2020) .................. 53, 54

NIOSH, Current Intelligence Bulletin 69: NIOSH Practices in
    Occupational Risk Assessment (2020),
    https://www.cdc.gov/niosh/docs/2020-106/pdfs/2020-
    106revised032020.pdf........................................................................ 6

Occupational Exposure to Asbestos, 48 Fed. Reg. 51086 (Nov. 4,
    1983) (to be codified at 29 C.F.R. pt. 1910).................................... 38

Public Health Service, *U.S. Department of Health & Human
    Services. Toxicological Profile for asbestos* Atlanta: Agency
    for Toxic Substances and Disease Registry; (2001) ....................... 19

Remarks by the President at Bill Signing of the Frank R.
    Lautenberg Chemical Safety for the 21st Century Act (June
    22, 2016) ........................................................................................ 44

S. 3159, 94th Cong. § 9(a) (1976) .......................................................... 34

S. Rep. No. 114-67, at 2 (2015).............................................................. 14

Senate Committee on Environment and Public Works, "Office of
    Management and Budget Interference ["OMB"] with Agency
    Regulations" (S. Rep. 99-156, Feb. 1986)....................................... 36

Statement of the President on Signing S.3149 Into Law (October
    12, 1976) ................................................................................... 32, 33

U.S. House Energy and Commerce Committee Subcommittee on
    Oversight and Investigations, "EPA's Asbestos Regulations:
    Report on a Case Study on OMB Interference in Agency
    Rulemaking" (Oct. 1985)................................................................ 37

## SUMMARY OF THE ARGUMENT

Congress amended the Toxic Substances Control Act ("TSCA") in 2016 out of deep concern with this Court's 1991 decision vacating the 1989 ban of most asbestos uses by the Environmental Protection Agency ("EPA"). Its TSCA amendments strengthened Section 6 of TSCA to give EPA the tools necessary to eliminate exposure to asbestos and other dangerous substances. Members of Congress expected that EPA would now ban this deadly toxin. EPA responded in late 2016 by including asbestos in the first 10 substances to undergo risk evaluations and risk management rulemaking. Eight years later, EPA issued its Part 1 rule banning new uses of chrysotile asbestos in six conditions of use ("COUs").

EPA's 2020 risk evaluation made a persuasive determination that these COUs present an unreasonable risk of cancer and mesothelioma to exposed workers and consumers. In its 2024 Part 1 Rule, the Agency presented a compelling case that banning the six COUs is necessary to eliminate that risk. Both EPA's unreasonable risk determination and its decision that only a ban can effectively protect against that risk are fully in accord with TSCA, and the record provides substantial evidence for the scientific and regulatory findings supporting EPA's approach.

In this brief in support of EPA, the United Steelworkers, the Asbestos Disease Awareness Organization, and 16 leading asbestos scientists and other public health petitioners amplify EPA's arguments on four points: (1) the determinations of unreasonable risk in EPA's risk evaluation properly apply TSCA, rest on technical and scientific judgments that are well within EPA's expertise, and are fully supported by the record; (2) EPA's ban on the six asbestos COUs discharges its obligation to impose restrictions "necessary" to eliminate the unreasonable risk, given EPA's expert judgment that its interim Existing Chemical Exposure Limit (ECEL) would not provide adequate long-term protection to workers; (3) EPA had unreviewable discretion whether to refer its finding of unreasonable risk to the Occupational Safety and Health Administration ("OSHA"); and (4) the Court should not consider the amicus brief of the Alliance for Automotive Innovation ("AAI"), which raises new issues that have not been presented by the industry petitioners, and in any event, makes baseless claims that misapply TSCA, misrepresent EPA's peer review process and rely on discredited science.

# ARGUMENT

## I. Substantial Evidence in the Record Supports EPA's Determination that Chrysotile Poses Unreasonable Risks

As it has since 1976, TSCA directs EPA to determine whether toxic substances cause "unreasonable risk[s] of injury to health or the environment." 15 U.S.C. §2605(a). While retaining the term "unreasonable risk," Congress in 2016 created a new risk evaluation process to apply that term to individual substances. In a significant change of focus, Congress directed EPA to make determinations of unreasonable risk without considering "costs and other nonrisk factors," but instead, to base them solely on a technical and scientific assessment of the nature and significance of the risk. 15 U.S.C. §2605(b)(4)(A). Thus, EPA is to apply its scientific expertise to interpret the available data on a chemical's adverse effects and to judge whether the magnitude of its risks to health and the environment could be considered "unreasonable."

As guideposts for applying EPA's expertise, Congress instructed the Agency to address "the likely duration, intensity, frequency, and number of exposures under the conditions of use" and to "describe the weight of the scientific evidence for the identified hazard and exposure." 15 U.S.C. §2605(b)(4)(F). EPA must also address "specific risks of injury to [the]

health [of] …. potentially exposed or susceptible subpopulations" who are more vulnerable to harm than the general population. *Id.* at §2605(b)(4)(F)(i). Finally, the methods and information EPA uses to analyze hazards and exposure must be "consistent with the best available science" and EPA's determinations must be "based on the weight of the scientific evidence." 15 U.S.C. §2625(h)-(i).

EPA is entitled to substantial deference when, based on its scientific expertise, it makes technical judgments about the nature and extent of a risk to inform its determination whether the risk is "unreasonable." As long as EPA relies on a "body of reputable scientific thought" when assessing risk, *Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst. (Benzene),* 448 U.S. 607, 656 (1980), EPA should be "free to use conservative assumptions in interpreting the data with respect to carcinogens, risking error on the side of overprotection rather than underprotection." *Id.*

The Industry Petitioners do not dispute EPA's conclusion (consistent with the findings of numerous authoritative bodies) that the "weight of evidence" demonstrates that exposure to chrysotile asbestos causes lung cancer, mesothelioma, other cancers and non-cancer

conditions. Nor do they question EPA's use of a 1 in 10,000 lifetime cancer risk as a statistical benchmark to determine whether the projected cancer risk to workers is "unreasonable." Instead, the Industry Petitioners challenge EPA's unreasonable risk determination for the six chrysotile COUs on the grounds that EPA over-estimated the risk to workers by assuming that they were exposed to chrysotile for their working lifetime, or 40 years; by relying on "high end" exposures in determining unreasonable risk; and by not assuming workers routinely wear respirators.

These are technical and scientific issues that are uniquely within EPA's expertise and on which the Agency is entitled to deference, so long as it has provided a supportable basis for its approach, which it has in this case. To the extent that EPA has leaned toward health protectiveness in its assumptions, this is the Agency's prerogative, as the Supreme Court has recognized.

## A. EPA Reasonably Assumed Lifetime Exposures

Industry Petitioners argue that EPA overestimated asbestos risk by assuming a working lifetime of exposure. Brief of Industry Petitioners ("Ind.Br.") at 49. TSCA requires EPA to protect *all* workers, including

those most exposed, not just the average worker. EPA's risk evaluation must "determine whether a chemical substance presents an unreasonable risk of injury to health . . . including an unreasonable risk to a potentially exposed or susceptible subpopulation." 15 U.S.C. §2605(b)(4)(A). A potentially exposed or susceptible subpopulation, in turn, is defined as "a group of individuals . . . who due to . . . greater exposure may be at greater risk than the general population of adverse health risks." 15 U.S.C. §2602(12).

EPA reasonably estimated asbestos cancer risk by assuming a "working lifetime" of exposure, the same approach the Agency used in calculating asbestos risks in 1989. *See* Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29460, 29473 (July 12, 1989) (to be codified at 40 C.F.R. pt. 763). OSHA routinely measures risk based on a worker's presumed lifetime exposure. 29 U.S.C. §655(b)(5). NIOSH does as well.[1]

---

[1] *See* NIOSH, Current Intelligence Bulletin 69: NIOSH Practices in Occupational Risk Assessment, 93 (2020), https://www.cdc.gov/niosh/docs/2020-106/pdfs/2020-106revised032020.pdf.

During OSHA's 1980s rulemaking to regulate asbestos, industry proffered the same argument it has raised here – that OSHA over-estimated risk by assuming a working lifetime of exposure to asbestos. OSHA explained in detail why its assumption of a 45- year working lifetime of exposure was sound, Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 51 Fed. Reg. 22612, 22648-49 (June 20, 1986) (to be codified at 29 C.F.R. pts. 1910 and 1926), and the D.C. Circuit rejected the industry's argument, holding that even if only the rare worker was exposed for a working lifetime, OSHA was authorized to protect that worker. *Bldg. & Constr. Trades Dep't v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988). Particularly in light of its obligation to consider the impact of exposures on individuals who, "due to . . . greater exposure may be at greater risk," 15 U.S.C. §2602(12), EPA' s decision to measure risk based on a presumed working lifetime of exposure is consistent with TSCA, reflects a reasonable body of scientific thought, and must be upheld.

## B. EPA Reasonably Relied on "High End" Exposures

The Industry Petitioners argue that EPA "*could* . . . have relied on the central tendency . . . value" in assessing risk. Ind.Br. 47 (emphasis

7

added). EPA's decision instead to base its risk determination on "high end" exposures was reasonable and, we submit, compelled by TSCA.

Central tendency values represent a typical exposure, such as the median (50th percentile), and high-end values represent individuals with greater exposure, such as a 95th percentile (the level exceeded by 5% of exposed people). Risk Evaluation, JA at 982. The central tendency exposure is, by definition, lower than the exposure levels for 50 percent of the worker population. Thus, designing exposure limits to protect workers exposed to asbestos at or below central tendency levels – as the Industry Petitioners urge – would fail to protect the half of the exposed population who are exposed at higher and more dangerous levels. As discussed, TSCA explicitly requires EPA to determine whether a substance presents unreasonable risks to individuals, including workers, who due to "greater exposure, may be at greater risk than the general population." 15 U.S.C. §2605(b)(4)(A). Workers whose exposure levels are above the median and therefore are at greater risk of cancer clearly fall in this category. Had EPA denied these workers with high-end exposure adequate protection, the Agency would have violated EPA's

mandate to eliminate unreasonable risks to "potentially exposed or susceptible subpopulation[s]."

It was particularly appropriate for EPA to rely on upper bound estimates in assessing sheet gasket use in chemical production facilities because the industry provided EPA with limited data from a few titanium oxide facilities during risk evaluation, only later identifying "millions" of sheet gaskets still in use throughout the chemical industry. USW Opening Br. 18-20; JA at1100-01. Since the available data was limited and unrepresentative, it was particularly important for EPA to account for the full range of exposure levels in determining whether chemical workers were at unreasonable risk.

## C. EPA Reasonably Determined Exposure Values Without Regard to PPE Use

Finally, EPA reasonably based its risk determination on exposure values that did not take personal protective equipment ("PPE"), such as respirators, into account. The alternative that the Industry Petitioners believe TSCA required would have compelled EPA to reduce the exposure levels on which it based unreasonable risk determinations by the assigned protection factor of PPE that it presumed workers were

wearing.[2]  If EPA had followed this suggestion, the Agency would have used these discounted exposure levels to estimate health risks, rather than the actual monitored airborne concentrations in the workplace – regardless whether workers were in fact using PPE or whether PPE delivered the assumed level of protection.

Industry Petitioners' argument that EPA should discount airborne exposure measurements by assuming respirator or other PPE use when evaluating risk is inconsistent with TSCA's plain language: TSCA prohibits EPA from considering "costs or other nonrisk factors" when determining whether a chemical poses unreasonable risks. 15 U.S.C. §2605(b)(4)(A). Respirators and other PPE are risk management tools, albeit tools that represent the lowest rung on the hierarchy of controls and should be relied upon only while engineering or other controls are being installed or when they are infeasible.  *See* 29 C.F.R. §1910.134(a)(1).   While EPA may consider PPE use in developing a risk

---

[2] EPA did consider "hypothetical" PPE use in evaluating risk from sheet gaskets in the chemical industry, finding that workers purportedly using respirators with an assigned protection factor (AFP) of 10, which the industry asserted it was providing, were still at significant risk at high-end risk estimates. JA at 1149.

management rule, it may not consider this "nonrisk" exposure reduction method in conducting its risk evaluation.[3]

To the extent the Industry Petitioners' argument rests on an assertion that the chlor-alkali and chemical industries provide their employees with respirators and other controls that protect them to levels "below the OSHA PEL," Ind.Br. 46, the argument is beside the point.[4] The OSH Act requires employers to comply with OSHA standards. 29 U.S.C. §654(a)(2). OSHA's asbestos standard for general industry requires employers to implement engineering and work practice controls and then—and only then—to resort to PPE if those preferred control methods cannot feasibly bring exposures to the 0.1 f/cc PEL. 29 C.F.R. §1910.1001(f)(1). But employers are not required by OSHA to implement *any* controls—PPE or other controls —to bring exposures below 0.1 f/cc, a level that is far above the 0.005 f/cc level EPA found to pose an unreasonable risk. Respirator use at exposure levels below OSHA's PEL

---

[3] As discussed *infra,* in developing its risk management rule, EPA did, in fact, consider whether reliance on PPE would eliminate the unreasonable risk posed by asbestos exposure, but concluded that it would not.

[4] This argument also conflicts with the facts because, as EPA details in its brief (EPA Br. at 35,56,102-04), there are myriad reasons why respirators provide neither consistent nor reliable protection.

would be voluntary, and EPA should not be required to rely on voluntary measures when deciding whether workplace exposures present an unreasonable risk. *See Nat'l Mar. Safety Assoc. v. OSHA,* 649 F.3d 743, 751 (D.C. Cir. 2011) (rejecting the argument that OSHA must take voluntary measures into account when determining whether workplace conditions pose a significant risk).

EPA correctly determined that chrysotile asbestos poses an unreasonable risk, and its "conservative assumptions" are consistent with TSCA and supported by substantial evidence.

## II. EPA's Ban on Chrysotile COUs was Necessary to Eliminate the Unreasonable Risk and thus was Required by TSCA

Industry Petitioners claim that EPA's bans on asbestos use in the chlor-alkali industry and in sheet gaskets used in chemical plants violate TSCA because they are more stringent than necessary to protect workers from the unreasonable risk posed by chrysotile asbestos.  Ind. Br. at 62-63. According to Petitioners, these industries could eliminate the unreasonable risks to workers by complying with the ECEL and other interim workplace protections that the Rule requires Petitioners to implement before the full bans take effect.  Accordingly, they argue, these bans go further than TSCA authorizes in addressing the risk. Industry's

claim that EPA's asbestos ban goes too far reflects a misreading of TSCA and ignores substantial evidence in the record supporting EPA's determination that reliance on the ECEL and related workplace protections, while important in *reducing* unsafe worker exposure in the near-term, is simply not sufficient to permanently *eliminate* the unreasonable risk as TSCA requires.

### A. EPA Must Select Risk Management Requirements Necessary to Assure that the Regulated Chemical No Longer Presents an Unreasonable Risk

Upon determining that a substance presents an unreasonable risk, TSCA section 6(a) directs EPA to "apply one or more of" seven enumerated requirements to address the risk. 15 U.S.C. §2605(a)(1)-(7). For example, EPA has the option to ban all manufacture and use of a chemical; to ban some, but not all, conditions of use; or to impose restrictions on any manner or method of commercial use, including protections for exposed workers. In its recent risk management rules, EPA has used all these approaches, including both bans and workplace controls, as it found appropriate to eliminate unreasonable risk.[5]

---

[5] *See, e.g.*, Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg 102568 (Dec. 17, 2024) (to

Prior to the 2016 amendments, TSCA Section 6(a) directed EPA to select the option that would "protect adequately against [the] risk using the least burdensome requirements." 15 U.S.C. §2605(a) (2012), *amended by* 15 U.S.C. §2605 (2016). In 1991, when vacating EPA's 1989 asbestos ban rule, this Court interpreted that language to require EPA to determine the costs and benefits of each requirement under consideration and to pick the option that would achieve the greatest benefits at the lowest cost. *Corrosion Proof Fittings v. E.P.A.,* 947 F.2d 1201, 1216-17 (5th Cir. 1981). As Congress came to appreciate, this task proved unworkable and effectively paralyzed EPA's TSCA risk management program for the next 25 years. S. Rep. No. 114-67, at 2 (2015). Accordingly, in the 2016 amendments, Congress eliminated the "least burdensome" requirement and instead directed EPA to regulate the substance "to the extent" that it "no longer presents [an unreasonable] risk." 15 U.S.C. §2605(a).

---

be codified at 40 C.F.R. pt. 751); and Perchloroethylene (PCE); Regulation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 103560 (Dec. 18, 2024) (to be codified at 40 C.F.R. pt. 751).

This new language reflects an overall shift from balancing costs and benefits "to consider[ing] only the health and environmental impacts" of chemicals when conducting risk evaluations and to select[ing] risk management options that eliminate the risk. 162 Cong. Rec. S3515 (June 7, 2016). Thus, as amended, section 6(b)(4)(F)(iii) bars EPA from considering "costs and other non-risk factors" in determining whether chemicals present unreasonable risks. 15 U.S.C. §2605(b)(4)(F)(iii). Similarly, during risk management, amended Section 6(a)(1) requires EPA to select the regulatory option that is "necessary" so that the substance "no longer presents such risk." *Id.* §2605(a)(1). This too calls for EPA to base its determination solely on the nature and magnitude of the risk, without regard to the burden imposed or the ratio of benefits and costs.[6]

Congress did not give EPA unlimited latitude in meeting this obligation. Instead, by directing EPA to select requirements to the

_____

[6] While these are factors EPA must consider during its risk management rulemaking under section 6(c)(2), they can influence EPA's selection of rule requirements only "to the extent practicable" and thus cannot override EPA's core obligation under section 6(a)(1) to eliminate the unreasonable risk. 15 U.S.C. §2605(c)(1), (2).

"extent necessary" to eliminate the unreasonable risk, Congress gave EPA discretion to "regulate subject to the limits imposed by [this] phrase that leaves [the Agency] with flexibility." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). The decision whether an option is "necessary" to assure that the risk has been eliminated, moreover, is a scientific and technical judgment that turns on EPA's assessment of the nature and magnitude of the risk and the relative effectiveness of different alternatives in protecting the exposed population.

Courts have consistently treated this type of scientific judgment not as a "simple finding[] of fact," but as "within [an agency's] area of special expertise, at the frontiers of science" and therefore requiring a reviewing court to "be at its most deferential." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). As this Court has recently emphasized, where the agency's determination "is based upon its evaluation of complex scientific data within its technical expertise," "[t]his court's review must be most deferential to the agency." *Texas v. E.P.A.,* 91 F.4th 280, 291 (5th Cir. 2024). "[W]e 'will give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'" *City of Waukesha v. E.P.A.*, 320 F.3d 228,

247 (D.C. Cir. 2003) (per curiam). *See also Corrosion Proof Fittings v. E.P.A.,* 947 F.2d at 1214 (courts must "accord appropriate deference to administrative decisions that are based on agency experience and expertise.")

## B. EPA's Judgment that Asbestos' Serious Risks Could Not Be Eliminated by the ECEL Was Amply Explained and Supported by the Record

The EPA made a scientific and technical determination that the unreasonable risks asbestos poses to workers in chlor-alkali plants and chemical facilities using asbestos sheet gaskets could not be effectively prevented by workplace exposure controls, and that it was therefore necessary to permanently ban asbestos use in these operations to eliminate these risks, as Section 6(a) directs the Agency to do. EPA articulated the rationale for this determination in its final rule (Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA) (Final Rule), JA at 1-41, (to be codified at 40 C.F.R. pt. 751)), and there is substantial evidence in the record supporting it.

### 1. The Unprecedented Death Toll of Asbestos and Lack of Any Risk Threshold Uniquely Justify Eliminating Any Exposure

As the record amply shows, the backdrop to the Part 1 rulemaking was the devastating and unparalleled epidemic of death and disease that was the legacy of widespread asbestos use for most of the Twentieth Century. This epidemic continues today.

The International Agency for Research on Cancer (IARC), OSHA, the Department of Health and Human Services, NIOSH, the World Health Organization (WHO), and a number of other regulatory and public health bodies have recognized asbestos as a deadly human carcinogen for decades.[7] EPA, along with these agencies, found the following cancers in humans to be causally related to asbestos exposure: lung cancer, malignant mesothelioma, ovarian cancer, cancer of the larynx. Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain Conditions of Use Under Section 6(a) of the Toxic Substances Control Act (TSCA) (Proposed Rule) JA at 24 (to be codified at 40 CFR pt. 751). EPA

---

[7] EPA 1988 (JA at 3100); Agency for Toxic Substances and Disease Registry ( JA at 3127); National Toxicology Program 14th Report on Carcinogens (JA at 3568D-408); NIOSH Roadmap for Research on Asbestos (JA at 2926); International Agency for Research on Cancer 1977; IARC 1987 (JA at 3920) IARC 2012 (JA at 3828); Toxicological Review of Libby Amphibole Asbestos 2014 (JA at 3571).

also found asbestos causes non-malignant diseases, including asbestosis and asbestos-related pleural thickening. *Id.* "There is general agreement among scientists and health agencies . . . [that e]xposure to any asbestos type (i.e., serpentine [chrysotile] or amphibole) can increase the likelihood of lung cancer, mesothelioma, and nonmalignant lung and pleural disorders."[8]

There is, moreover, overwhelming consensus in the scientific community that there is no safe level of exposure to asbestos and that eliminating exposure is the only way to effectively prevent death and disease. As the WHO has observed, because there in "no evidence for a threshold for the carcinogenic effect of asbestos, including chrysotile, . . . the most efficient way to eliminate asbestos-related diseases is to stop using all types of asbestos." [9]

---

[8] Public Health Service, *U.S. Department of Health & Human Services. Toxicological Profile for Asbestos* Atlanta: Agency for Toxic Substances and Disease Registry; (2001) (ToxProfile) JA at 3529.

[9] *Chrysotile Asbestos*, (World Health Organization 2014), available at https://iris.who.int/bitstream/handle/10665/143649/9789241564816_eng.pdf (last accessed, Feb. 6, 2025) at 4; *see also*, Comments of Richard A. Lemen, Ph.D., MSPH, on EPA's Draft Risk Evaluation for Asbestos (May 27, 2020), JA at 743.("The historical lessons repeatedly show we are incapable of identifying a threshold level of exposure below which

In short, EPA relied on a well-established body of scientific evidence that *any worker at any level of asbestos exposure over any duration* may develop cancer. Thus, while reductions in exposure may lower the odds, they provide no assurance of full protection and, as EPA found, are "not a substitute for a ban as a long-term risk management solution." Final Rule, JA at 14.

## 2. EPA Reasonably Found that the ECEL Would Not Fully Protect Workers from Levels of Exposure Presenting Unreasonable Risks

In opting to ban asbestos use in chlor-alkali and chemical production, EPA "considered all risk management approaches and the adverse health effects from chrysotile asbestos . . . as well as who is exposed and how they are exposed to chrysotile asbestos." Final Rule, JA at 13. Based on this analysis, EPA "concluded that a prohibition on use was the only requirement that would ensure that chrysotile asbestos no longer presents an unreasonable risk." *Id*. As the Agency explained, while the ECEL "can be used to minimize the exposure . . . during the

---

individuals are not at risk of asbestos disease."), and studies cited therein.

interim period before the prohibition takes effect," relying on it for permanent protection of workers was not warranted. *Id*.

Consistent compliance with the ECEL, EPA found, could not occur unless "a robust monitoring program and effective exposure controls, such as engineering controls, are in place." *Id*. However, "monitoring to and below the ECEL, while achievable, may at times be problematic due to analytical and field sampling challenges." EPA additionally pointed to "studies investigating the performance of respirators [showing that] some workers may have protection below the nominal applied protection factor for respirator use and would not be protected so that chrysotile asbestos does not present unreasonable risk." Final Rule, JA at 15. As a result, "owners or operators may be unable to reliably ensure with sufficient confidence that potentially exposed persons are not exposed to air concentrations above the ECEL." Final Rule, JA at 13. EPA noted, moreover, that "the feasibility of instituting additional engineering controls at chlor-alkali facilities [in particular] is unlikely due to the nature of the tasks that require workers handling chrysotile asbestos." *Id*. Thus, "compliance with the ECEL for workers is unlikely to be achieved without long-term reliance on the use of respirators." *Id*. Yet

they are "the least effective means of ensuring worker protection . . . , particularly in the case of protecting workers and ONUs against exposure to asbestos fiber inhalation." Final Rule, JA at 13-14.

In addition to these generally applicable shortcomings of relying on respirators, EPA also found specific evidence of the glaring deficiencies in respiratory programs at chlor-alkali plants, despite the fact that these facilities must comply with OSHA's asbestos standard. Industry monitoring data and EPA observations during chlor-alkali plant inspections demonstrated that workers did not wear respirators during high-exposure activities which exceeded the ECEL and that improper fit and physically taxing tasks frequently compromised respirator performance. EPA Br. at 54-57.

A series of investigative stories published by ProPublica and included in the record provide more graphic evidence of the absence of basic protections at chlor-alkali plants. The first piece, *The U.S. Never Banned Asbestos. These Workers Are Paying the Price* (Oct. 20, 2022)[10],

---

[10] The ProPublica articles are marked in the Administrative Record and Joint Appendix as confidential or restricted information. However, they are also available on-line. "The U.S. Never Banned Asbestos. These Workers are Paying the Price," A, is available at

JA at 3992-4012, recounted interviews with former long-time employees at recently closely asbestos diaphragm plants. The revelations of these employees included the following:

> [A]t OxyChem's plant in Niagara Falls, New York, . . . asbestos dust hung in the air, collected on the beams and light fixtures and built up until it was inches thick. Workers tramped in and out of it all day, often without protective suits or masks, and carried it around on their coveralls and boots. They implored the plant's managers to address the conditions, they said, but the dangers remained until the plant closed in late 2021 for unrelated reasons.
>
> . . . . . . . .
>
> The company would have known employees were being exposed; workers with a high risk of exposure sometimes clipped a small monitor to their bodies to measure the amount of asbestos in the air around them. At least five times in 2001 and 2002, the levels around team member Patrick Nowak exceeded OSHA's exposure limit, his company records show. "I failed so many times, they quit testing me," he said.
>
> . . . . . . . .
>
> Water-blasting the screens was like washing a car with a high-powered hose. Asbestos splattered everywhere. It wasn't a problem when the asbestos was wet. But it would dry overnight, and the next morning, it would be stuck to the ceiling and the walls. Clumps would roll across the floor like tiny tumbleweeds. Floating particles would catch the light

https://www.propublica.org/article/asbestos-poisoning-chemical-plant-niagara-falls.

when the sun poured in. There was so much asbestos in the cell-maintenance building that it was impossible to keep it all wet, said Robert Cheff, who worked at the plant from 1981 to 2007. "We were constantly swimming in this stuff."

. . . . . . .

Workers wore protective gear for certain tasks, like pressure washing and screen dipping. But they went into the building to carry out other tasks without special suits or anything protecting their faces, despite company requirements. One worker said managers enforced those rules. But a dozen others interviewed by ProPublica recalled that the bosses looked the other way. Suiting up was impractical, those workers said. It took time away from the tasks that needed to get done and was uncomfortable, especially on hot days, when the temperature inside could reach 100 degrees.

In the summer, the windows and doors were left open to keep the workers from overheating, allowing asbestos to escape outside. Wet asbestos splashed on their uniforms, coats, helmets and boots. One guy seemed to always have some on his mustache. It would dry and flake off their clothes wherever they went, they said. Saenz remembered walking into safety meetings in the administrative building with asbestos drying on his coveralls. The guys carried so much asbestos into the trailer where they ate lunch and took breaks that it needed to be replaced, former union leaders said.

After Pro Publica's initial article appeared, many people who worked at other chlorine plants across the country came forward to report similar unsafe practices. These reports were featured in a second piece, *Workers Across America Break Their Silence on Decades of Asbestos Exposure* (Dec. 7, 2022), JA at 3943-4012, which reported that:

One former engineer at a plant outside Las Vegas said the substance was difficult to control. Former lab analysts at a Texas plant said colleagues there raised issues about potential exposures with safety managers in 2018.

Inside the plant, workers struggled to keep the asbestos contained, according to the seven people who worked there. They were told they could stay safe by keeping the material wet, preventing it from becoming airborne. But that was an impossible task, several of them told ProPublica.

A slight breeze would cause the asbestos to dry, said Chris Murphy, a former union president who worked in the maintenance department from 2009 until 2020. It wasn't unusual to find it settled on machines and caked onto the beams overhead, he said. "Any areas that didn't stay wet," he said, "you'd find it."

. . . . . .

Controlling the asbestos was also a challenge at Olin's plant in Henderson, Nevada, said Dawn Henry, the plant's engineer from 2004 through 2010. Although the asbestos workers at the facility outside Las Vegas wore personal protective equipment during the most dangerous tasks and supervisors tried to enforce the safety standards, "you can only do so much," she said. "It is a messy job."
In the desert heat, Henry said, it was impossible to expect all the asbestos would stay wet. "It wasn't like it was in a clean room," she added. "It was in a room that was open to the atmosphere. The building was adjacent to the offices where the engineers worked. It was a one-minute walk away. The garage door was always open."

As these graphic accounts illustrate, chlor-alkali plants are simply

not tightly controlled environments, worker protections are often

inadequate or non-existent, respirator use is often sporadic or absent, and asbestos is often present in readily inhalable form throughout the plant. This record evidence strongly supports EPA's determination that, even if controlling exposures to the ECEL could eliminate asbestos' unreasonable risk, reliable compliance with the ECEL at these plants is unlikely and that only a ban on asbestos use will impose requirements "necessary" to eliminate the unreasonable risk chrysotile asbestos presents. The Court should uphold this determination.

## III.  EPA Properly Exercised its Section 9(a) Discretion

Industry Petitioners assert the Rule is unlawful because EPA failed to refer regulation of chrysotile asbestos' risks to OSHA, Ind. Br. 55, an argument this Court previously rejected. *Corrosion Proof Fittings v. E.P.A.,* 947 F.2d at 1209. Their argument here rests on the unsound premise that EPA had no choice but to make a Section 9(a) referral to OSHA because it is "reasonabl[y] possib[le]" that with its jurisdiction over workplace hazards, OSHA "may" prevent or reduce asbestos' risks. Ind. Br. 55, 56. They further argue that EPA failed adequately to explain its decision not to refer the chrysotile asbestos workplace risks to OSHA. Ind. Br. 55, 58-62.

Industry Petitioners' cramped reading of Section 9(a) misconstrues TSCA by ignoring EPA's unreviewable discretion whether to make section 9(a) referrals and the clear evidence that Congress intended for EPA to protect workers from unreasonable risks even if OSHA *may* also do so, Moreover, in arguing that EPA applied the wrong standard for exercising its discretion, the Industry Petitioners fail to credit EPA's rationale and argue for the a complicated and unworkable division of regulatory authority that Congress specifically sought to avoid.

## A. TSCA's Plain Language Grants EPA Discretion Whether to Refer Risk Management to Another Agency

Section 9(a) addresses the relationship between TSCA and laws that other Federal agencies administer. It provides that if EPA determines, based on its risk evaluation, that a chemical presents "an unreasonable risk of injury to health or the environment," and "determines, *in the Administrator's discretion,* that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator," EPA is to issue a report to the agency that administers that law. 15 U.S.C. §2608(a)(1) (emphasis added). If the Administrator submits such a report—*i.e.,* makes a referral—to another agency, EPA may not regulate until that

agency determines, within a specified timeframe, whether and how it will proceed; EPA may move forward only if the other agency either fails or declines to exercise its authority. *Id.* §§2608(a)(2)–(4).

Congress may lawfully empower agencies to "exercise a degree of discretion," and "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright,* 603 U.S. at 395 (citing *Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015)). Here, Congress did so expressly. TSCA emphasizes that the Administrator's power to determine whether a chemical's "unreasonable risk of injury to health" may be "prevented or reduced to a sufficient extent" by another agency's action is wholly *discretionary*. 15 U.S.C. §2608(a)(1). And it sets forth the "term[s]" or "phrase[s]" delimiting that flexibility: As a pre-requisite to such a determination, the Administrator must find that: (1) another agency may take action to address the "unreasonable risk" EPA identified; (2) such action would "prevent[] or reduce[]" the risk; and (3) it would do so "to a sufficient extent," considering TSCA's mandate that regulated chemicals "no longer present[] such risk." 15 U.S.C. §2605(a).

Industry Petitioners characterize these limitations as granting EPA only a "modicum of discretion," requiring EPA to refer regulation to

OSHA if there is any "reasonable possibility" OSHA may be able to address the unreasonable risks EPA has identified. Ind. Br. 56. This reading – which would mandate referral on a bare showing that OSHA has authority to regulate the substance in the workplace – ignores the fundamental questions Section 9 requires EPA to address: whether (1) OSHA applies the same "unreasonable risk of injury to health" standard enforced by EPA; or (2) its authority empowers it to apply rules "to a sufficient extent," that is, to ensure that the "chemical . . . no longer presents such risk." 15 U.S.C. §2605(a).

Industry Petitioners' notion that EPA is required to refer all occupational regulation of chemicals to OSHA is further belied by other sections of TSCA. TSCA requires the Administrator to: consult and coordinate with OSHA in administering the Act, 15 U.S.C. §2608(d); take account of the risk to workers in evaluating risk, 15 U.S.C. §2602(12) (defining "workers" as a "susceptible subpopulation" EPA must consider in evaluating risk); consult with the National Institute of Occupational Safety and Health ("NIOSH") in prescribing epidemiological studies, 15 U.S.C. §2603(b)(2)(A); include OSHA and NIOSH on committees to recommend chemicals for priority consideration, *id*. §2603(e)(2)(A)(ii);

and consult with OSHA before prohibiting or restricting new chemical applications that address workplace exposures, 15 U.S.C. §2604(f)(5). Finally, the statute expressly provides that—unlike action by other Federal agencies—EPA's regulation of a chemical under TSCA will not preclude OSHA from regulating the same chemical substance. *Id.* §2608(c). This provision would be superfluous if Congress intended EPA to routinely defer all rulemaking in the occupational sphere to OSHA whenever OSHA might be authorized to regulate that risk.

In short, both Section 9(a)'s language and TSCA's overall structure make clear that, as this Court recognized in *Corrosion Proof Fittings v. EPA,* "TSCA speaks of the necessity of . . . *protecting United States workers*." 947 F.2d 1209 (emphasis added). The statute obligates EPA to take worker health into account in evaluating risk and authorizes EPA to issue risk management rules that protect workers. TSCA does not require EPA to refer all regulation of workplace hazards to OSHA. Instead, as the statute's plain language explicitly states, the Administrator is to exercise *discretion* in deciding whether OSHA will "prevent[] or reduce[]" the unreasonable risks the Agency has determined a toxic substance poses "to a sufficient extent."

Congress carefully prescribed the extent of judicial review of EPA's various decisions under TSCA, providing that certain section would be reviewable under provisions of the Administrative Procedures Act and others, under a "substantial evidence" standard. 15 U.S.C. §2618(c). However, the statute does not provide any mechanism for judicial review of the Administrator's Section 9(a) discretionary determinations. *See* 15 U.S.C. §2618(a)(prescribing judicial review for specific section of TSCA, but excluding Section 9).[11] The Supreme Court has instructed that, where – as here -- Congress confers unconditional discretion on an agency, its exercise of that discretion cannot be examined by a reviewing court. *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (section 701(a)(2) of the Administrative Procedure Act "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion."); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (review is precluded because the statute provides

---

[11]  In addition, as discussed, the legislative history makes clear that Congress clearly intended the Administrator's 9(a) discretion to be unreviewable.

"no meaningful standard against which to judge the agency's exercise of discretion.").

**B. The Legislative History of the 1976 Act Demonstrates Congress Deliberately Granted the Administrator Discretion Whether to Make a Referral**

Because Section 9(a) unambiguously vests EPA with unreviewable discretion to determine referral is warranted, recourse to legislative history is unnecessary here. *See, e.g., Petteway v. Galveston Cnty.*, 111 F.4th 596, 607 (5th Cir. 2024) (en banc) (declining to address arguments concerning legislative history because "the text of [the statute] is clear").

Nevertheless, if the Court deems it necessary to consider materials beyond the statutory text, TSCA's legislative history demonstrates that Congress intended EPA to have unrestricted discretion whether to refer unreasonable risks to another agency for regulation.

In crafting the 1976 law, Congress sought to "close a gap in our current array of laws to protect the health of our people and the environment." Statement of the President on Signing S.3149 Into Law (October 12, 1976). As President Ford explained in his signing statement, "none of the existing statutes" – either administered by EPA or by any other Federal agency – "provide comprehensive protection. This Bill

provides broad discretionary authority to protect the health and environment." *Id.*[12]

In debates over the 1976 Act, the House and Senate both addressed the relationship between EPA and other Federal agencies that could potentially address risks EPA found to be unreasonable. During House deliberations, EPA urged the House explicitly to "preclude EPA from taking action . . . which the Secretary of Labor could take under the [Occupational Safety & Health] Act." H.R. Rec. 94-1341 at 74 (1976).

The House took a different path. Its bill provided that if the Administrator "has reason to believe" a chemical substance causes unreasonable risk, "and determines that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator," the Administrator shall "request that the other agency declare whether it agreed that the activity posed a

---

[12] Thus, rather than being "gap-filling" in the sense of filling the "interstices" between regulations promulgated by other agencies, as Industry Petitioners assert, Ind. Br. 17, 25-28, Congress intended TSCA to give EPA authority to issue regulations with comprehensive coverage, when other statutes would leave hazards unaddressed.

risk and, if so, whether the agency would act to address the risk." H.R. Rep. No. 14032, 94th Cong. § 9(a) (1976).[13]

The Senate bill—which included the language that eventually became law[14]— provided the Administrator more explicit discretion regarding referral. The conferees described Section 9(a) as providing that

> if the Administrator *makes a discretionary determination (which is not subject to judicial review)* that the risk of injury may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, then the Administrator must give the other agency an opportunity to protect against such risk . . . .

"Joint Explanatory Statement of the Committee of Conference," H.R. Rep. 94-1679 at 84 (Sept. 23, 1976) ("1976 Conf. Report") (emphasis added).

---

[13] H.R. Rep. No. 14032, the last of the House's various versions of TSCA, was the bill the Conference Committee considered.

[14] The Senate's version, codified in the 1976 law, stated that if the Administrator "has reasonable basis to conclude" that activity involving a toxic substance "presents or will present an unreasonable risk of injury to health or the environment, and determines, *in the Administrator's discretion*, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, the Administrator shall" refer the matter to the other agency. S. 3159, 94th Cong. § 9(a) (1976).

Accordingly, TSCA's legislative history shows that in 1976, Congress expressly rejected the "mandatory referral" reading Industry Petitioners press here, and instead took pains to preserve the Administrator's unreviewable discretion to determine whether another agency's action would "prevent[]" or "reduce[]" the risk of injury to a "sufficient extent."

**C.    EPA Has Long Interpreted Section 9(a) to Grant it Broad Discretion Whether Referral to OSHA Is Appropriate**

Consistent with the statute's unambiguous language, for forty years EPA has understood Section 9(a) to require it to look beyond any hypothetical possibility another agency *might* be able to address the risk EPA identified, and instead to consider the *probability* another agency would address those risks to a "sufficient extent" – *i.e.,* in an effective, timely, and efficient manner. The Court should afford this longstanding interpretation substantial weight. *See Loper Bright Enters.,* 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (the weight a court gives an agency's interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning,

its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.")

As early as 1984, EPA's then-Assistant Administrator Alvin Alm issued an "Interim Policy for Referring Workplace Exposure Problems to the Department of Labor," providing that EPA would not refer a chemical to OSHA if the Administrator determined OSHA could not adequately address the risk. Among the considerations that would drive EPA's determination were whether "(1) too much of the exposure lies beyond [OSHA's] reach . . . ; (2) a single rule under TSCA would be more efficient than piecemeal regulation under several authorities; or (3) a full or partial ban on the production or use of the chemical, or other remedies uniquely available under § 6 of the TSCA, provide the most effective or efficient remedy."[15]

Administrator William Ruckelshaus echoed this policy in explaining why in 1984, even though OSHA was considering an asbestos standard, EPA would not surrender its TSCA jurisdiction over asbestos

---

[15] Senate Committee on Environment and Public Works, "Office of Management and Budget Interference ["OMB"] with Agency Regulations," at 44 (S. Rep. 99-156, Feb. 1986) ("Senate OMB Report").

risks to OSHA. In a letter to Congressman Dingell, then-Chairman of the House Energy & Commerce Committee, Ruckelshaus assured the Chairman that EPA and OSHA had closely coordinated and viewed their roles as complementary, but that given OSHA's limitations—the agency cannot ban a chemical and its standards do not apply to most public employees or non-occupational populations—"there are significant residual risks [for EPA to address] after OSHA's standards are in place."[16]

In 1986, EPA and OSHA signed a memorandum of understanding ("MOU") setting out a "process for notification and consultation" to aid EPA in carrying out its Section 9(a) obligations. Implicit in the MOU is the understanding that the mere fact OSHA may be able to regulate a particular chemical's risks does not require EPA to cede jurisdiction. Instead, the policy provides that EPA will discuss any potential referral

---

[16] U.S. House Energy and Commerce Committee Subcommittee on Oversight and Investigations, "EPA's Asbestos Regulations: Report on a Case Study on OMB Interference in Agency Rulemaking," at 16 (Oct. 1985) ("House OMB Report").

with OSHA informally and will not formally refer a chemical to OSHA for regulation unless both agencies agree to that course.[17]

In the almost five decades since Congress enacted TSCA, EPA has only made *two* formal referrals to OSHA, both in the early 1980s: for 4,4'-Methylenedianiline ("MDA") and 1,3-Butadiene ("BD"). Each time, EPA and OSHA were both actively evaluating the affected chemicals' risks, and EPA made the referral based, in part, on the fact that OSHA was poised to engage in rulemaking the Administrator concluded could prevent or reduce the unreasonable risk "to a sufficient extent."

EPA considered referral in one other instance. In 1983, EPA announced that although it had already begun to address asbestos, it intended to suspend its own activity and refer the matter to the Consumer Product Safety Commission ("CPSC") and to OSHA, which had already published a notice of proposed rulemaking on asbestos. Occupational Exposure to Asbestos, 48 Fed. Reg. 51086 (Nov. 4, 1983) (to be codified at 29 C.F.R. pt. 1910). EPA never made a formal referral,

---

[17] Memorandum of Understanding Between the Environmental Protection Agency and the Department of Labor (Feb. 6, 1986), *available at* https://www.osha.gov/laws-regs/mou/1986-02-06.

however. When OSHA regulated asbestos, feasibility constraints prevented it from eliminating the significant risks asbestos posed to exposed workers. Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29460, 29467 (Jul. 12, 1989) (to be codified at 40 C.F.R. 763) (EPA asbestos ban). EPA subsequently banned asbestos products under TSCA because, as this Court observed, "no one other authority could address all the risks posed 'throughout the life cycle' by asbestos, and any other action by one or more of the other agencies still would leave an unacceptable residual risk." *Corrosion Proof Fittings,* 947 F.2d at 1216. Although this Court vacated the ban on other grounds, it found "proper" EPA's "basic decision to use TSCA as a comprehensive statute designed to fight a multi-industry problem." *Id.*

In short, since Congress passed TSCA in 1976, EPA has consistently understood and, with one short-lived exception lasting mere months in 1985, treated Section 9(a) as granting it discretion to determine whether another agency would effectively, efficiently and timely address the unreasonable risk EPA identified "to a sufficient

extent," and has exercised its discretion consistent with that interpretation.

## D. The 2016 Amendments Reaffirmed EPA's Obligation to Address Unreasonable Occupational Risks

When Congress strengthened TSCA in 2016 to reinforce EPA's authority to address toxic substances, it created a new comprehensive process directing EPA to identify high-priority chemicals, conduct risk evaluations on these chemicals establish and promulgate regulations to eliminate any unreasonable risks they presented. To assure timely action, Congress imposed tight deadlines for completing these tasks. 15 U.S.C. §2605.

Congress made minimal changes to Section 9(a)'s substance, merely aligning it with EPA's enhanced obligations[18] and, to ensure regulatory action stayed on track, specifying that any agency to which EPA made a referral must act within time limits the Administrator imposed.

---

[18] The amendments made clear EPA is to make any referral only after completing a risk evaluation and conformed the section to the revised approach to risk evaluation Congress mandated (*i.e.,* that the risk evaluation is to be conducted "without consideration of costs or other nonrisk factors" and to include "unreasonable risk to potentially exposed or susceptible subpopulation(s)").

Presumably aware of both EPA's implementation of this provision since 1976 and this Court's approval of EPA's exercise of discretion in *Corrosion Proof Fittings,* Congress made *no* changes to the language entrusting to the Administrator's discretion any decision about whether referral to another agency would "sufficient[ly]" prevent or reduce the risk.[19]

Congress did not convene a formal conference committee to reconcile the House and Senate bills amending TSCA. However, members of both chambers met to hammer out a final version of what became the Frank R. Lautenberg Chemical Safety for the 21st Century Act. The Democrats involved in the negotiations submitted a report to the record "describ[ing] the intent of the negotiators on elements of the final bill text." "Detailed Analysis and Additional Views of Democratic Members on the Motion to Concur in the House Amendment to the Senate Amendment to the Bill HR 2576 Entitled 'An Act to Modernize the Toxic Substances Control Act and for Other Purposes,'" Cong. Rec. S.3516 (June 7, 2016). The report characterized "TSCA as the primary

---

[19] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation").

statute for the regulation of toxic substances," explaining that "EPA's authorities and duties . . . have been significantly expanded . . . , now including comprehensive deadlines and throughput expectations for chemical prioritization, risk evaluation, and risk management." To the extent anyone had argued, as Industry Petitioners do here, that TSCA was "a 'gap-filler' statutory authority of last resort," the report stressed that could no longer be the case. Instead,

> [t]he changes in Section 9 are consistent . . . with the fundamental expectation that, where EPA concludes that a chemical presents an unreasonable risk, the Agency should act in a timely manner to ensure that the chemical substance no longer presents such risk. Thus, . . . Section 9(a) is not intended to supersede or modify the Agency's obligations . . . to address risks from activities involving the chemical substance, except as expressly identified in a Section 9(a) referral for regulation by another agency which EPA believes has sufficient authority to eliminate the risk and where the agency acts in a timely and effective manner to do so.

Cong. Rec. S.3517 (June 7, 2016). The Democratic Members concluded their comments on Section 9 by emphasizing that "none of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner." *Id.*

After Senator Udall entered the Democrats' report into the record, Senators Vitter and Inhofe explained the bill's "intent" from the Republicans' perspective. Addressing Section 9, the Senators did not take issue with any of the Democrats' remarks concerning Section 9(a). They instead addressed coordinating the disposal of chemicals under TSCA and other statutes EPA administers, under Section 9(b). *See* "Congressional Intent Behind Specific Provisions of the Bill," Cong. Rec. S.3519, S.3522 (Comments of Sen. Inhofe).

Therefore, nothing in the 2016 amendments casts doubt on EPA's consistent, 40-year-long interpretation of the statute, which makes clear that EPA has discretion to determine not just whether another agency has the authority to act, but whether referral to another federal agency would accomplish TSCA's objectives. Even though OSHA had issued its asbestos standards years before Congress amended TSCA, Congress expected EPA once again to address the risks asbestos poses. As President Obama noted in his signing statement, "[t]he system [under the 1976 law] was so complex, it was so burdensome, that our country hasn't even been able to uphold a ban on asbestos – a known carcinogen that kills as many as 10,000 Americans a year. . . [Now, for the first time

in our history, we'll actually be able to regulate chemicals effectively."
Remarks by the President at Bill Signing of the Frank R. Lautenberg
Chemical Safety for the 21st Century Act (June 22, 2016). This strong
expectation that EPA would finally address the risks of asbestos
contradicts any notion that EPA would forego long-overdue regulation
under section 6 and defer to OSHA.

### E.   The Administrator Properly Exercised his Discretion in this Case

The statutory text, decades of consistent agency practice, and
persuasive legislative history clearly vest the EPA Administrator with
unreviewable discretion to decide whether to refer a chemical for
regulation to another agency. However, should the Court decide to
examine how EPA has exercised its discretion, there can be no doubt that
it acted reasonably, applying factors well within the boundaries set by
Congress, *Loper Bright*, 603 U.S. at 395, in determining that no referral
was warranted under Section 9(a)'s criteria.

EPA determined that asbestos poses unreasonable risks in both
workplace and consumer settings. Final Rule, JA at 30. Contrary to the
Industry Petitioners' contention, EPA did not simply "perform a self-

assessment, asking whether *it* could do the job 'better' or more efficiently." Ind. Br. 59 (emphasis in original). Instead, the Agency examined whether either OSHA or the CPSC, using their respective statutory authorities, could "prevent or sufficiently reduce [asbestos'] cross-cutting exposures." Final Rule, JA at 30.

EPA noted that the 2016 amendments made TSCA "increasingly distinct from" either the OSH Act or the Consumer Product Safety Act ("CPSA"). *Id.* With respect to OSHA in particular, EPA found "key differences between the finding requirements of TSCA and those of the OSH Act." *Id.* Thus, the requirement that OSHA's standards be economically and technologically feasible limits its ability to regulate to the level at which a toxic substance presents an unreasonable risk. *Id.*; *see also* EPA, Asbestos Part I: Responses to Comments on Proposed Rule. JA at 2879. In particular, OSHA lacks authority to ban the use of a chemical. For these reasons, OSHA lacked authority to "prevent or sufficiently reduce" risks of asbestos to workers, a necessary precondition for a section 9(a) referral. In fact, these were the very reason EPA declined to refer asbestos regulation to OSHA in 1985. Moreover,

although OSHA regulates workplaces, it does not regulate *all* workplaces where there are potential exposures to chrysotile asbestos. *Id.*

EPA found similar limitations on CPSC's ability to address asbestos' unreasonable risks "to a sufficient extent." Thus, CSPC has jurisdiction over some, but not all, consumer products, and with particular relevance here, lacks the ability to regulate exposures to automobiles, trucks and motorcycles that may contain asbestos brake-linings and other vehicle friction components. *Id.*; *see also* Proposed Rule, JA at 68. Moreover, the CPSA requires that agency to impose the "least burdensome requirement" that addresses the identified risk, a "paralyzing . . . requirement" Congress specifically deleted from TSCA in 2016. Final Rule, JA at 30. (citing 162 Cong. Rec. S3517 (June 7, 2016)).

The Industry Petitioners contend that EPA erred in its assessment of OSHA's authority because the risks associated with exposures to "chrysotile asbestos from the chlor-alkali or sheet gasket conditions of use [are] limited to the workplace." Ind. Br. 60. In essence, the Industry Petitioners are arguing for the very kind of piece-meal regulation that Congress sought to avoid.

Under the rule the Industry Petitioners are promoting, any time EPA's risk evaluation concludes that a toxic substance poses unreasonable risks to workers, EPA should halt the TSCA process, make a referral to OSHA and wait to see whether OSHA can effectively eliminate the unreasonable risk to any subset of the workforce, and has the resources and inclination to do so in a timely manner. Given that Congress gave EPA very stringent deadlines for turning risk evaluations into risk management rules, it is inconceivable that it wanted such extended delays in protecting workers from unreasonable risks. Thus, industry petitioners' interpretation of TSCA would lead to the very kind of piece-meal, time-consuming and inefficient regulation that Congress sought to avoid in strengthening EPA's authority to protect health and the environment from unreasonable risks.

EPA rejected that approach and instead, having evaluated the ability of OSHA and CPSC to adequately address the unreasonable risks EPA had identified, concluded that "TSCA is the only regulatory authority able to prevent or reduce risks of chrysotile asbestos to a sufficient extent across the range of conditions of use, exposures and populations of concern." Final Rule, JA at 30. Indeed, this conclusion

echoes the determination that EPA reached in 1989 – and that this Court endorsed – that "no one other authority could address all the risks posed 'throughout the life cycle' by asbestos, and any other action by one or more of the other agencies still would leave an unacceptable residual risk." *Corrosion Proof Fittings,* 947 F.2d at 1216.

## IV. The Court Should Ignore the Amicus Brief of the Alliance for Automotive Innovation

The Industry Petitioners are here challenging EPA's decision "to ban chrysotile asbestos *in the chlor-alkali and chemical-production industries*." Ind.Br. at iv (emphasis added). In its amicus brief, the Alliance for Automotive Innovation seeks to introduce a panoply of issues that reach well beyond those the Industry Petitioners raise. Dkt. No. 136. This Court generally disregards issues raised solely by an amicus curiae and not raised by the parties. *See, e.g.*, *Anderson v. City of New Orleans,* 38 F.4th 472, 481 (5th Cir. 2022) ("For obvious reasons, new issues, generally, cannot be raised in an amicus brief."); *Christopher M. by Laveta McA v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("Absent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae"). The Alliance has presented no "exceptional circumstances" that warrant this Court's

attention. Accordingly, the Court should not consider the Alliance's brief. However, if the Court does consider its brief, it should reject the Alliance's arguments as lacking in merit for the reasons presented below.

### A.    EPA's Cancer Benchmark is Reasonable

The Alliance complains that EPA relied on conservative assumptions in assessing chrysotile asbestos risks and that TSCA does not authorize EPA to seek a "zero-risk" environment. AAI Br. at 12. However, as discussed earlier, the Court in *Benzene* provided guideposts on what chemical risks are acceptable. EPA's unreasonable risk benchmarks fall well within those parameters.

In *Benzene,* the Supreme Court observed "[i]t is the Agency's responsibility to determine, in the first instance, what it considers to be a 'significant' risk." 448 U.S. 607, 655. The Court made clear that restrictions on exposure are not justified simply because a chemical may theoretically cause cancer. At the same time, it emphasized that the agency is not "required[d] to wait for deaths to occur before taking any action" and "has no duty to calculate the exact probability of harm. . . with anything approaching scientific certainty." *Id.*

As an example, the Court explained that where "the odds are one in a billion that a person will die from cancer. . . . , the risk clearly could not be considered significant" but "if the odds are one in a thousand . . ., a reasonable person might well consider the risk significant." In adopting statistical risk benchmarks, "the Agency is free to use conservative assumptions in interpreting the data . . . , risking error on the side of overprotection rather than underprotection." *Id*. at 656.

Since *Benzene,* EPA and other agencies have relied on quantitative models to estimate the probability that individuals will develop cancer from exposure to chemicals. This is exactly what EPA did in its chrysotile asbestos risk evaluation. Using robust worker epidemiological studies as a foundation, it calculated statistical lifetime cancer risks to workers and consumers at measured or modeled exposure levels.

To determine whether these lifetime risks were "unreasonable" under TSCA, EPA then compared them to benchmarks of 1 in 10,000 for workers and 1 in 1,000,000 for consumers and bystanders. Risk

Evaluation, JA at 1149, Table 5-3.[20] For most workers and occupational non-users, EPA calculated that individual lifetime lung cancer and mesothelioma risks were greater than 1 in 10,000 and in many cases were above 1 in 1000. *Id.* It also determined that risks to do-it-yourself consumers exposed to asbestos brake-linings and other vehicle parts were generally above 1 in 1 million. JA at 1153-1157.

Without questioning the long-standing reliance on this risk benchmark methodology by agencies and courts, the Alliance advocates a metric for determining unreasonable cancer risk that EPA did *not* apply in its risk evaluation. The Alliance claims that its preferred metric – the estimated number of cancer cases in cohorts of exposed workers and consumers – shows that "EPA was unable to predict *any incremental cancer cases* from chrysotile-asbestos exposure in the overwhelming majority of modelled scenarios." AAI Br. at 12-16 (emphasis in original).[21]

---

[20] The EPA cancer benchmark for workers is the benchmark recommended by NIOSH. NIOSH Current Intelligence Bulletin No. 68: NIOSH Chemical Carcinogen Policy (2016).

[21] It is misleading to describe these predictions as EPA's. In fact, they were derived by the Alliance and its experts, not the Agency.

Even if the Alliance were correctly describing the data it relies on,[22] EPA and other agencies have traditionally based their regulatory decisions on cancer risks to *exposed individuals* -- presuming that the odds of developing cancer faced by an individual best measure the acceptability of the risk. This approach, which reflects EPA's experience and expertise and its health-protective approach to determining unreasonable risk, is consistent with *Benzene*, which specifically permits an agency to rely on conservative health-protective assumptions in assessing risks to public health. 448 U.S. at 656. The Alliance's critique ignores the fact that chrysotile causes other types of cancer and noncancer effects, such as asbestosis and pleural disease, which EPA did not quantify. This Court should reject the Alliance's effort to second guess EPA's technical, scientific determinations now, just as it did in *Corrosion Proof Fittings,* 947 F.2d at 1229.

---

[22] It is inaccurate to describe these data as showing "zero risk." According to the Alliance's calculations, predicted cancer cases are above .5 for several cohorts, meaning that at least one person in the cohort is more likely than not to develop cancer. Moreover, the Alliance concedes that estimated cancer cases are above 1 for some cohorts, including consumers doing DYI work with asbestos brake linings and other cohorts it does not specify. AAI Br. at 14-15.

## B. The Alliance's Claim that EPA's SACC Was Biased and Sought to Manipulate the Science to Support an Asbestos Ban is Without Basis

The Alliance claims that EPA's TSCA Science Advisory Committee on Chemicals (SACC) "failed to provide for unbiased peer review of the [Part 1] risk evaluation" because certain members "work as "plaintiffs'-bar litigation experts" and have publicly supported an asbestos ban. AAI Br. 18-20. Their argument represents the height of hypocrisy since they urge EPA to rely on their preferred asbestos expert – a known *defense* witness—Dr. Dennis Paustenbach. Companies that Dr. Paustenbach owns or directs have earned tens of millions of dollars from Alliance members Ford, GM and Chrysler to develop and publish data strengthening their defense of tort claims by cancer victims who worked with asbestos brake linings. Michaels, "Triumph of Doubt" at 9-10, 244-45 (Oxford U. Press, 2020); Michaels, "Doubt is their Product" at 51, 52, 74-76, 100, 103, 138, 193 (Oxford U. Press, 2008). No federal appellate court or the United States Supreme Court has ever adopted Dr. Paustenbach's view of the science of asbestos as it relates to the link between chrysotile and mesothelioma. Beyond asbestos, Dr. Paustenbach's work for industry has often been controversial and subject

to vocal criticism. "Triumph of Doubt" at 9-10. 32, 244-45; "Doubt Is Their Product" at 51, 52, 74-76, 100, 103, 138, 193.

While the Alliance overlooks Paustenbach's blatant financial conflicts of interest, it claims "bias" on the part of SACC members despite EPA's extensive efforts to protect the integrity of the SACC process. Scientists serving on EPA advisory committees are subject to the Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. §2635, as well as criminal conflict of interest statutes. 18 U.S.C. §§203, 205, 207, 208 and 209. The Alliance has cited nothing that suggests EPA failed to conform to these long-standing safeguards in selecting peer reviewers for the Part 1 Risk Evaluation.

It is standard SACC procedure to screen all candidate reviewers for conflicts of interest based on detailed financial information that they must submit, and to provide members of the public an opportunity to comment on the qualifications of candidates before they are chosen. EPA, *Science Advisory Committee on Chemicals Basic Information*, (Feb. 7, 2025, 12:01 PM), https://www.epa.gov/tsca-peer-review/science-advisory-committee-chemicals-basic-information. Significantly, EPA does not view testimony in private litigation as disqualifying unless it involves a

"proceeding before a court or agency of the United States in which the United States is a party or has a direct and substantial interest." EPA Ethics Advisory 2008-02: "Ethical Obligations of Special Government Employees," at 12 (Oct. 21, 2008).[23]  Thus, scientists testifying for plaintiffs or defendants in asbestos personal injury suits were eligible to serve on the asbestos SACC panel and were properly considered based on their expertise in asbestos exposure and risk issues.

The unimpeachable qualifications of the asbestos SACC members are a matter of public record.[24] Typically, they have teaching positions at prestigious universities and affiliations with major medical schools and hospitals. They have previously served on government advisory committees and have published extensively. In several cases, SACC members have widely recognized expertise on asbestos health impacts and have conducted pathbreaking asbestos-related research.  It is simply not plausible that these respected and highly-credentialed experts would withhold their impartial, science-based advice from EPA and instead

---

[23]      Available      at      https://www.epa.gov/sites/default/files/2015-02/documents/ethicsadvisory.pdf.

[24] *See* EPA SACC, "Asbestos Ad Hoc Peer Reviewer Biographical Sketches," May 28, 2020, EPA-HQ-2019-0501-0037.

slant their feedback to advance the positions of plaintiffs in future litigation.

The Alliance claims that scientists who are "actively push[ing] for a ban on asbestos" are "biased" and should be disqualified from serving on the SACC. AAI Br. At 19. However, whether chrysotile asbestos should be banned is a policy and legal issue far outside the scope of the SACC's deliberations and does not bear on the scientific issues that SACC members were asked to consider. Instead, the question how to mitigate risk is one left for EPA to make, based on the scientific record. Besides, when dealing with a chemical as widely studied and as frequently litigated as asbestos, most expert scientists will have an identifiable viewpoint. That some SACC members support an asbestos ban hardly places them outside the scientific mainstream. Such a ban has been endorsed by many members of Congress and numerous authoritative public health organizations. Dozens of countries around the world have adopted asbestos bans. If opinions on matters of public health policy could block scientists from serving on the SACC, qualified experts would be in short supply.

Rather than a disqualification, their knowledge of asbestos is what qualified the SACC members as peer reviewers. EPA is not required to select only experts with no published views on a chemical to serve as peer reviewers. Nor is it required to credit the views of someone like Dr. Paustenbach, whose views are regarded as far outside the scientific mainstream.

## C. The Alliance's Position that Chrysotile Is Much Safer than Other Asbestos Fibers has Long Been Discredited by EPA and the Scientific Community

The Alliance brief trots out the decades old, and consistently rejected, argument that chrysotile is significantly less potent for lung cancer and mesothelioma than other asbestos fibers, citing Dr. Paustenbach's opinions. Using this discredited theory, the Alliance attacks the Part 1 Risk Evaluation for relying on epidemiology studies that reflect the effects of "more potent" amphibole asbestos fibers and therefore overstate the "much lower" risks of chrysotile exposure.[25]

_____

[25] EPA's Inhalation Unit Risk for chrysotile was based on studies of workers at a North Carolina textile mill from 1950 to 1973. While exposure at this plant was predominantly to chrysotile, the Alliance maintains that a facility at the "North Carolina plant _did_ process amphibole asbestos for 13 years" and that the higher potency of amphibole would have artificially inflated EPA's risk estimates for

As USW explained in its opening brief, USW Br. at 12-13, industry groups have repeatedly urged EPA and OSHA to separately calculate fiber-specific cancer risks and treat chrysotile as significantly less hazardous. Both EPA and OSHA have repeatedly rejected the suggestion, because both agencies concluded that all the six major types of asbestos, including chrysotile, cause lung cancer and mesothelioma, and because available dose-response data does not support differentiating between the mesothelioma risks of the six asbestos fibers.

Whether to assign relative potency factors to the different fibers, with chrysotile posing by far the smallest risk, was fully debated and rejected by EPA's Science Advisory Board and by the EPA Administrator in 2008. EPA's 1988 IRIS assessment for asbestos[26] set an Inhalation Unit Risk (IUR) applicable to all asbestos fibers without differentiation and assumed that chrysotile and amphiboles are equally potent in

---

chrysotile exposure (emphasis in original). AAI. Br. at 28-29. EPA acknowledged that these plants may have had *"trace amounts"* exposure to amphiboles. Risk Evaluation, JA at 947.

[26] EPA, National Integrated Risk Information System (IRIS), Chemical Assessment Summary for Asbestos (1988), available at https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/0371_summary.pdf#nameddest=rfc.

causing both lung cancer and mesothelioma. The IRIS summary indicated that:

> There is some evidence which suggests that the different types of asbestos fibers vary in carcinogenic potency relative to one another and site specificity. It appears, for example, that the risk of mesothelioma is greater with exposure to crocidolite than with amosite or chrysotile exposure alone. This evidence is limited by the lack of information on fiber exposure by mineral type. Other data indicates that differences in fiber size distribution and other process differences may contribute at least as much to the observed variation in risk as does the fiber type itself.

Chemical Assessment Summary for Asbestos, at 9.

In 1989, when adopting its comprehensive ban on most asbestos products, EPA relied on the IRIS IUR, concluding that "it is prudent and in the public interest to consider all fiber types as having comparable carcinogenic potency in its quantitative assessment of mesothelioma risk." 54 Fed. Reg. 29460, 29470.

This Court upheld that finding when it was challenged in *Corrosion Proof Fittings*, 947 F.2d at 1229 (rejecting the argument that asbestos poses different risks in different industries). OSHA reached the same conclusion in 1986 and 1994. 51 Fed. Reg. 22612 ("OSHA agrees with [rulemaking experts] that epidemiological and animal evidence, taken

together, fail to establish a definitive risk differential for the various types of asbestos fiber"). 54 Fed. Reg. 29460, 29467.

In 2008, the EPA Superfund program proposed a departure from the IRIS IUR which used an "interim approach to account for the potential differences of cancer potency between different mineral types and particle size distributions at different human exposure conditions." EPA, *Proposed Approach for Estimation of Bin-Specific Cancer Potency Factors for Inhalation Exposure to Asbestos,* June 12, 2008, at 3.[27] The proposal would have adopted a "'multi-bin' mathematical approach to estimate cancer risk according to mineral groups (amphibole or chrysotile) and particle size (length and width) based on transmission electron microscopy."

One reason that earlier risk evaluations had not calculated fiber-by-fiber risk estimates is that commonly relied upon analytic methods for measuring asbestos fibers in air cannot distinguish between different types of asbestos fibers and most epidemiology studies of asbestos disease had evaluated cohorts of workers whose exposure had been measured

---

[27] Available at https://www.epa.gov/sites/default/files/2015-11/documents/2008_prop_asbestos_approach.pdf.

with these analytic methods. *See* USW Br. at 12-13. The SAB rejected the "interim" method because it took measurements that did not distinguish between fiber type and assigned them to fiber-specific "bins" based on theoretical modeling. After considering the strong opposition of numerous asbestos scientists to using "bins" to differentiate between the hazards of fiber types, SAB advised the Agency that its members "generally agreed that the scientific basis as laid out in the technical document in support of the proposed method is weak and inadequate" and that "the document was woefully inadequate with respect to the representation of available information on epidemiology, toxicology, mechanism of action and susceptibility." JA at 227-228.

EPA's Part 1 risk evaluation avoided these modeling weaknesses by plotting the dose-response of chrysotile based on exposure and cancer incidence data from plants that had processed only chrysotile products. USW Br. at 12-14. Based on this analysis, endorsed by its peer reviewers, EPA quantified the risks of chrysotile, and its calculations show those risks are virtually the same as the risks posed by earlier risk evaluation of the six combined asbestos fibers. Thus, EPA's analysis confirmed the long-standing consensus that *all* asbestos fibers have similar potency for

lung cancer and mesothelioma.  This finding is supported by an extensive body of scientific thought and the advice of peer reviewers and, therefore, satisfies the substantial evidence test. *Benzene,* 448 U.S. at 656.

## CONCLUSION

For the foregoing reasons, this Court should affirm the EPA's finding that chrysotile asbestos poses an unreasonable risk; its authority to ban this deadly substance; the validity of its conclusion that a ban is "necessary" to eliminate unreasonable risk; and its discretionary decision that referral of chrysotile's risks to OSHA was not warranted.

Respectfully submitted,

Randy S. Rabinowitz, Esq.
Victoria L. Bor, Esq.
Occupational Safety & Health Law Project, LLC
P.O. BOX 3769
Washington, DC 20027
202 256-4080

Nathan Finch, Esq.
Motley Rice LLC
401 9th Street NW
Suite 630
Washington, DC 20004
(202) 607-8998

*Attorneys for Petitioner USW*

Robert Sussman
Sussman & Associates
3101 Garfield St. NW
Washington, DC 20008
(202) 716-0118

Lucas Williams
Lexington Law Group, LLP
503 Divisadero Street
San Francisco, CA 94117
(415) 913-7800

*Attorneys for Petitioner ADAO*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief uses a monospaced typeface and contains 12100 excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

Dated:      January 15, 2026
              Washington, DC         */s/ Randy S. Rabinowitz*
                                     *Attorney for Petitioner USW*

## CERTIFICATE OF SERVICE

I hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on January 15, 2026.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:     January 15, 2026
           Washington, DC        */s/ Randy S. Rabinowitz*
                                 *Attorney for Petitioner USW*