No. 24-60193

# IN THE UNITED STATES COURT
# OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL;
GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS
ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO; OHIO CHEMISTRY
TECHNOLOGY COUNCIL,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

Consolidated with No. 24-60281

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI;
LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS),
INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253
(FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL
ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION;
HENRY A. ANDERSON, MEDICAL DOCTOR; BRAD BLACK, MEDICAL
DOCTOR; BARRY CASTLEMAN, DOCTOR OF SCIENCE; RAJA FLORES,
MEDICAL DOCTOR; ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF
PHILOSOPHY; PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF
SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF
PUBLIC HEALTH; STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR
OF PUBLIC HEALTH; JACQUELINE MOLINE, MEDICAL DOCTOR,
MASTER OF SCIENCE; CELESTE MONFORTON, DOCTOR OF PUBLIC
HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, MEDICAL
DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE;
ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

Consolidated with No. 24-60333

---

OLIN CORPORATION,

Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

On Petitions for Review of Final Agency Action of the United States Environmental Protection Agency
89 Fed. Reg. 21,970 (Mar. 28, 2024)

---

**FINAL BRIEF OF *AMICI CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., IN SUPPORT OF PETITIONERS TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; OHIO CHEMISTRY TECHNOLOGY COUNCIL; AND OLIN CORPORATION**

Andrew R. Varcoe
Audrey Beck
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of
Commerce of the United States of
America*

Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: (713) 758-2559
Email: gmeisman@velaw.com

*Counsel for Amici Curiae the Chamber
of Commerce of the United States of
America and the National Federation of
Independent Business Small Business
Legal Center, Inc.*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

1. Number and Style of Case: No. 24-60193, *Texas Chemistry Council v. EPA*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Certificate of Interested Persons filed with the Joint Brief of Industry Petitioners—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

- The Chamber of Commerce of the United States of America
- The National Federation of Independent Business Small Business Legal Center, Inc.
- Andrew R. Varcoe
- Audrey Beck
- Jeremy C. Marwell
- Garrett T. Meisman

The Chamber of Commerce of the United States of America ("Chamber") is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The National Federation of Independent Business Small Business Legal Center, Inc. ("NFIB Legal Center") is a 501(c)(3) public interest law firm and is affiliated with the National Federation of Independent Business, a 501(c)(6) business association. The NFIB Legal Center is incorporated in the State of Tennessee, has no parent corporation, and no publicly held company has 10% or greater ownership in the NFIB Legal Center.

Respectfully submitted,

*/s/ Jeremy C. Marwell*

*Attorney of Record for Amici Curiae the Chamber of Commerce of the United States of America and the National Federation of Independent Business Small Business Legal Center, Inc.*

# **TABLE OF CONTENTS**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.........................i

TABLE OF CONTENTS...................................................................... iii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF *AMICI CURIAE* ......................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................4

ARGUMENT .................................................................................7

**I.**    EPA's rule contravenes the limited gap-filling function manifested in Section 9 of TSCA.................................................................7

    A.    EPA's rule is inconsistent with TSCA Section 9(a). ...........8

    B.    EPA's misreading of Section 9(a) is underscored by its approach to Section 9(b). ...................................................13

**II.**   EPA's rule is arbitrary and inconsistent with the Agency's obligations to evaluate and mitigate unreasonable risks under Section 6 of TSCA. ................................................................................16

    A.    EPA's risk evaluation arbitrarily discounted risk-reducing workplace controls. ...........................................................17

    B.    EPA arbitrarily rejected more moderate risk-management measures in favor of an outright ban.................................20

CONCLUSION................................................................................26

CERTIFICATE OF SERVICE .............................................................27

CERTIFICATE OF COMPLIANCE........................................................28

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Assoc. Indus. of Mass. v. Snow*,
   898 F.2d 274 (1st Cir. 1990) .......................................................... 9-10

*Corrosion Proof Fittings v. EPA*,
   947 F.2d 1201 (5th Cir. 1991) .................................................... 20, 21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ....................................................................15

*Forester v. Consumer Prods. Safety Comm'n*,
   559 F.2d 774 (D.C. Cir. 1977) ...........................................................20

*Inhance Techs., L.L.C. v. EPA*,
   96 F.4th 888 (5th Cir. 2024) ........................................................7, 10

*Safer Chems., Healthy Fams. v. EPA*,
   943 F.3d 397 (9th Cir. 2019) ..............................................................8

*Sample v. Morrison*,
   406 F.3d 310 (5th Cir. 2005) ..............................................................7

*Southland Mower Co. v. Consumer Prods. Safety Comm'n*,
   619 F.2d 499 (5th Cir. 1980) .............................................................19


**Statutes:**

15 U.S.C. § 2601(c) ...............................................................24

15 U.S.C. § 2602(4) ........................................................... 17, 18

15 U.S.C. § 2605 ...............................................................6, 16

15 U.S.C. § 2605(a) ........................................................ 17, 20, 22

15 U.S.C. § 2605(a)(2) .............................................................21

15 U.S.C. § 2605(b)(4) ......................................................... 16, 17

15 U.S.C. § 2605(b)(4)(F)(iv) ......................................................18

**Statutes—Continued:**                                                    **Page(s)**

15 U.S.C. § 2605(c)(2) ............................................................ 12

15 U.S.C. § 2605(c)(2)(A)(iv)(II) ............................................ 23

15 U.S.C. § 2608 ............................................................. 4, 8, 14

15 U.S.C. § 2608(a) ................................................................. 8

15 U.S.C. § 2608(a)(1) ......................................................... 5, 9

15 U.S.C. § 2608(a)(2) ............................................................. 9

15 U.S.C. § 2608(b) ...................................................... 8, 13, 14

15 U.S.C. § 2608(b)(1) ............................................................. 5

15 U.S.C. § 2608(c) ................................................................. 9

15 U.S.C. § 2608(d) ............................................................... 10

15 U.S.C. § 2618(c)(1)(B)(i) .................................................. 16

29 U.S.C. § 653(b)(1) ............................................................. 9

29 U.S.C. § 655 ..................................................................... 11

Pub. L. No. 114-182, 130 Stat. 448 (2016) ............................. 8


**Regulations:**

29 C.F.R. § 1910.1001 ...................................................... 11, 17

29 C.F.R. § 1915.1001 ........................................................... 11

29 C.F.R. § 1926.1101 ........................................................... 11

40 C.F.R. § 751.505(a) ........................................................... 21

40 C.F.R. § 751.505(b) ........................................................... 21

40 C.F.R. § 751.509(a) ........................................................... 21

**Regulations—Continued:**               **Page(s)**

40 C.F.R. § 751.511 ...................................................................22


**Administrative Materials:**

82 Fed. Reg. 33,726 (July 20, 2017)......................................19

87 Fed. Reg. 21,706 (Apr. 12, 2022) .....................................18

87 Fed. Reg. 38,747 (June 29, 2022) .....................................24

87 Fed. Reg. 76,481 (Dec. 14, 2022) .....................................24

87 Fed. Reg. 77,596 (Dec. 19, 2022) .....................................24

88 Fed. Reg. 39,652 (June 16, 2023) .....................................25

89 Fed. Reg. 21,970 (Mar. 28, 2024)............................... *passim*

89 Fed. Reg. 37,028 (May 3, 2024) ........................................19

89 Fed. Reg. 51,134 (June 14, 2024) ......................................25

89 Fed. Reg. 60,420 (July 25, 2024)........................................25

Press Release, U.S. Env't Prot. Agency, Biden-Harris Administration
    Takes Latest Action Under Toxic Substances Control Act to Protect
    Public from Exposure to Harmful Chemicals (July 24, 2024)............................25


**Legislative History:**

H.R. Rep. No. 94-1341 (1976)..................................................8

S. Rep. No. 94-698 (1976) .......................................................8

S. Rep. No. 114-67 (2015) ......................................................19

# STATEMENT OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber has an interest in this case because many of its members are directly or indirectly subject to regulation under the Toxic Substances Control Act ("TSCA"), which encompasses the manufacture, processing, distribution, or use of regulated substances—and, in recent years, has been extended to regulation of substances in some finished articles.  The Chamber's members include companies across all industrial sectors that are affected (directly or indirectly) by TSCA, ranging from chemicals, coatings, petroleum, and petrochemicals to forestry, wood

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici curiae* are submitting this brief together with a motion for leave.  Pursuant to Rule 29(a)(4)(E), *amici* further state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

products, batteries, electronics, energy, and electricity—among others. Protecting the health and safety of workers and surrounding communities is a priority for the Chamber's members. At the same time, many substances regulated under TSCA are integral to the domestic economy and supply chain, contributing to the health and well-being of the American people by providing solutions to problems in health, materials, transportation, agriculture, and energy usage. To take just one example, the rule challenged here would ban the use of chrysotile asbestos diaphragms in the chlor-alkali industry. It does so notwithstanding the reality that fully a third of current U.S. chlorine production capacity depends on those diaphragms, and notwithstanding the critical role that chlor-alkali products play in a wide range of contexts essential to modern society, including public drinking water and wastewater treatment systems, medical equipment, crop protection, pharmaceuticals, and consumer goods. *See* Comments of the U.S. Chamber of Commerce at 2-3 (July 13, 2022), EPA-HQ-OPPT-2021-0057-0389, JA 2084-85.

The National Federation of Independent Business Small Business Legal Center, Inc. ("NFIB Legal Center") is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. ("NFIB"), which is the nation's leading small business association. NFIB's mission

is to promote and protect the rights of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members. NFIB Legal Center files here because it is in the interest of small businesses for the U.S. Environmental Protection Agency ("EPA" or the "Agency") to be held closely to compliance with applicable statutes.

The rule challenged in this litigation is important not only in its own right, with implications for Chamber and NFIB members in a range of industries, but also because it will set a precedent on key interpretative and other legal issues that will affect EPA's administration of TSCA going forward. *Amici curiae* believe that key aspects of EPA's approach to evaluating and managing risks in this case are inconsistent with TSCA, and could create unnecessary economic and practical burdens if those principles were applied to EPA's regulation of other substances. Because of their wide-ranging perspective on how EPA's action here may affect the U.S. business community, *amici curiae* believe that the perspectives presented in this brief will be useful to the Court's disposition of this case.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

*Amici curiae* support the important goal of implementing the Toxic Substances Control Act to eliminate unreasonable human health risks, while also preserving the use of essential substances and products that are important to the U.S. economy. Those substances and products contribute to the health and well-being of the American people and help to solve problems in health, materials, transportation, agriculture, and energy usage. *Amici* are concerned that the final rule at issue in this case exceeds the Agency's statutory authority in certain respects, distorting the balance that Congress struck in TSCA, with negative economic and practical impacts. *See* Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 21,970 (Mar. 28, 2024) ("Final Rule").

Multiple federal statutes provide agencies with authority to mitigate hazards arising from chemical substances. Congress intended that TSCA be used to regulate in a manner that fills the gaps left by these other authorities. That intent is manifested in statutory text, structure, and history—beginning with the text of TSCA Section 9 itself, 15 U.S.C. § 2608. That provision requires EPA to defer to other federal agencies that have authority to protect against the risk arising from a chemical substance, and to rely on other statutory authorities that sufficiently enable EPA to mitigate such risks.

Here, EPA departed from TSCA's gap-filling role. In justifying its decision not to submit a formal report to the Occupational Safety and Health Administration ("OSHA") or other agencies with relevant authority, EPA reasoned that no other agency has statutory authority to regulate the "totality" of "cross-cutting" chrysotile asbestos exposures that EPA seeks to address via this rule. But that rationale turns the concept of gap-filling on its head: it would enable EPA to use TSCA to encroach on another agency's domain by taking a primary role in regulating chemical exposures (as here, via sector-wide bans) whenever *some* of the activities that EPA seeks to address fall outside regulatory authority vested in other agencies. Similarly, in attempting to justify its decision not to rely on its own authorities under other statutes, the Agency reasoned that those authorities are directed toward environmental releases, not direct chemical exposure. The Agency failed to adequately explain, however, why the exercise of authority under other statutes (by EPA or other agencies) could not reduce risks "to a sufficient extent," potentially averting the need for (or the breadth of) regulation under TSCA. *See* 15 U.S.C. § 2608(a)(1), (b)(1). In short, EPA treated TSCA as a powerful primary regulatory authority, not a limited gap-filling tool. That approach represents a sea change for many businesses and other regulated entities, and an abrupt usurpation of the role of other primary regulators such as OSHA, which has long imposed and administered comprehensive asbestos regulations for the workplace.

Even apart from the unlawfulness of EPA's overriding TSCA's gap-filling function, its Final Rule is unlawful because it rests on a misreading of EPA's authority under Section 6 of TSCA, 15 U.S.C. § 2605, which empowers the Administrator to assess risks associated with a chemical substance's "conditions of use," and then to take regulatory measures "to the extent necessary" to protect against any "unreasonable risk." When evaluating the risks associated with chrysotile asbestos, EPA arbitrarily discounted the effects of workplace controls such as the use of personal protective equipment, and otherwise overstated and exaggerated the inputs for its risk estimates. And EPA did not demonstrate that its choice of an outright ban on chrysotile asbestos was "necessary," where the Agency itself had already found that it could protect against unreasonable risks by requiring employers to keep chemical exposure levels below a specified limit.

*Amici curiae* are concerned that EPA's overbroad approach to TSCA regulation, if upheld by this Court, could serve as precedent for future regulatory actions affecting other industries and sectors of the U.S. economy. Indeed, EPA is already in the process of evaluating and regulating various other chemical substances under TSCA. If the Agency takes a similarly aggressive course in those proceedings, it could unnecessarily hamper the use of these substances with negative practical and economic consequences. *Amici* thus respectfully ask that the Court correct EPA's significant interpretative and methodological errors and vacate EPA's Final Rule.

<u>**ARGUMENT**</u>

Because EPA failed to adequately coordinate with OSHA or other agencies with statutory authority to reduce risks from chrysotile asbestos, its Final Rule is inconsistent with the limited gap-filling function expressed in Section 9 of TSCA. Additionally, EPA's risk assessment failed to account for reasonably foreseeable conditions of use, and its choice of an outright ban on chrysotile asbestos followed an inadequate discussion of alternatives and was not necessary to mitigate unreasonable risk. These conclusions follow from the plain meaning of the relevant statutory provisions, as discerned from "the particular statutory language at issue, as well as the language and design of [TSCA] as a whole." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (quoting *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005)). Under these interpretative principles, EPA exceeded its authority under TSCA and otherwise acted in an arbitrary fashion, and its Final Rule should be vacated.

**I.    EPA's rule contravenes the limited gap-filling function manifested in Section 9 of TSCA.**

Congress enacted TSCA due to concerns that existing federal statutes—such as the Clean Air Act, the Federal Water Pollution Control Act, the Occupational Safety and Health Act, and the Consumer Product Safety Act—did not adequately provide for regulation of hazardous chemicals. "TSCA was 'designed to fill a number of regulatory gaps'" in "premarket review," direct regulation of chemicals,

and "information-gathering responsibility." *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 406 (9th Cir. 2019) (quoting S. Rep. No. 94-698, at 1-2 (1976)). And although the 2016 amendments to TSCA effected certain changes in how chemicals are evaluated and regulated, "Congress's policy goals reflected in the 1976 Act remained 'intact.'" *Id.* (discussing provisions and history of Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016)).

That Congress intended TSCA to fill regulatory gaps is reflected, among other things, in the text of Section 9, 15 U.S.C. § 2608. Entitled "Relationship to other Federal laws," Section 2608 sets out a process and substantive framework for the Administrator to determine whether action under TSCA is necessary in light of authority provided to other agencies and under other laws. 15 U.S.C. § 2608(a)-(b); *accord* S. Rep. No. 94-698, at 23 (Section 9 serves to "minimize overlap and duplication between [TSCA] and other Federal laws"); H.R. Rep. No. 94-1341, at 45 (1976) (expressing intent that "any overlapping or duplicatory regulation be avoided").

## A.     EPA's rule is inconsistent with TSCA Section 9(a).

Consistent with this legislative intent, Section 9(a) requires the EPA Administrator, in circumstances where activities connected with a particular substance are found to present an unreasonable risk, to consider whether that risk

"may be prevented or reduced to a sufficient extent" by action taken by another agency under laws not administered by EPA. 15 U.S.C. § 2608(a)(1). Congress carefully circumscribed EPA's discretion in this area: the Administrator must determine whether unreasonable risks "*may* be prevented or reduced" through the application of other laws—and need not find that such risks *are* in fact currently prevented or reduced in order to trigger a key mandate to consult with other agencies. *Id.* (emphasis added). Where the "*may* be prevented or reduced" condition is satisfied, the statute speaks in mandatory terms: the Administrator "*shall* submit to the agency which administers such law a report" requesting that the agency evaluate its authority to reduce or prevent that risk. *Id.* (emphasis added). If the receiving agency concludes that there is no such risk, or it takes action to protect against the risk, then EPA "may not take any action" under Section 6 of TSCA. *Id.* § 2608(a)(2).

To similar effect, Section 9(d) requires EPA to coordinate with other agencies regarding enforcement of their respective statutory authorities, with the goal of "imposing the least burdens of duplicative requirements" on those subject to TSCA.[2]

---

[2] Coordination between agencies under Section 9(d) is especially important given that Section 9(c) ensures that the EPA Administrator's exercise of authority under TSCA does not prevent OSHA from simultaneously regulating workplace conditions. 15 U.S.C. § 2608(c); *see also* 29 U.S.C. § 653(b)(1) (providing that "[n]othing" in the Occupational Safety and Health Act shall apply if another federal agency exercises authority "to prescribe or enforce standards or regulations affecting occupational safety or health"); *cf. Assoc. Indus. of Mass. v. Snow*, 898 F.2d 274,

15 U.S.C. § 2608(d). This requirement is not an empty or one-off admonition; EPA must "report annually to the Congress on actions taken to coordinate with . . . other Federal . . . agencies . . . and on actions taken to coordinate the authority under [TSCA] with the authority granted [EPA] under other Acts." *Id.* These provisions reinforce Congress's expectation, expressed in Section 9, that TSCA will serve a limited gap-filling role and will not be used to displace or duplicate regulatory authority conferred on EPA and other agencies via other statutes. The statutory coordination scheme thus has both procedural and substantive aspects: Congress prescribed a *process* for EPA to follow in making a *substantive* determination whether action under TSCA is appropriate and necessary. TSCA's text and "broader structure," *Inhance*, 96 F.4th at 894, thus point in the same direction, conferring authority that serves a fundamentally gap-filling role.

Here, however, EPA pretermitted that process almost before it began. The agency declined even to submit a report under Section 9(a) to OSHA or any other federal agency, reasoning that no other individual agency has authority, like EPA under TSCA, to regulate the "totality" of "cross-cutting" chrysotile asbestos exposures. Final Rule, 89 Fed. Reg. at 21,998-99. For example, EPA observed that OSHA may limit chrysotile asbestos exposures in the workplace, but it cannot do so

_____

280 n.6 (1st Cir. 1990) (TSCA "expressly provides that EPA regulations issued under it are not occupational safety and health standards").

in consumer settings. *Id.* at 21,999. EPA also noted that other agencies' authority to regulate may be subject to different or arguably more demanding standards, thus potentially constraining those agencies' ability to impose particular risk-management measures. *Id.*

In other words, EPA takes the position that Section 9(a) does not apply to *any* of the activities that EPA seeks to regulate under TSCA—including those undisputedly covered by other federal agencies—as long as *some* of those activities fall outside other agencies' regulatory authority. This interpretation of Section 9(a), however, sweeps too far and would elevate TSCA to the status of a primary regulatory tool, an inversion of the mandated gap-filling role and improper expansion of the limited statutory authority that Congress conferred. The same rationale articulated by EPA here could be invoked by the Agency to supplant OSHA's regulatory authority over workplace hazards (*see* 29 U.S.C. § 655) whenever a substance may create risks in other contexts. Indeed, EPA conceded here that OSHA has "three separate health standards for asbestos," one of which "applies to all occupational exposures to asbestos," and all of which impose exposure limits, with compliance monitoring. 89 Fed. Reg. at 21,999; *see also* 29 C.F.R. §§ 1910.1001, 1915.1001, 1926.1101. But EPA effectively superseded OSHA's extensive regulatory regime governing *workplace* hazards, by reasoning that there might be separate risks from asbestos exposure in other settings—even

though, in the specific circumstances of chlor-alkali and chemical production, use of chrysotile asbestos occurs only in the workplace.  89 Fed. Reg. at 21,999.  Under EPA's rationale, the Agency would rarely, if ever, be required to consult with or defer to other agencies regulating within their respective spheres of authority, so long as EPA could identify some potential category of exposures falling outside the other agency's sphere.  Section 9(a) would largely become a dead letter; EPA could assert authority to impose across-the-board bans (as it has done here) that are duplicative of—and may render effectively irrelevant—standards adopted by other agencies.

Nor can EPA justify this circumvention of Section 9(a)'s requirements simply because other agencies may exercise authority subject to different substantive standards.  *See* Final Rule, 89 Fed. Reg. at 21,999.  EPA may well believe that TSCA provides a more convenient or expedient vehicle for regulation, or may allow more stringent or arduous regulations with a lesser justification or record showing, than would be lawful under other statutes.  But EPA has not demonstrated how its authority under TSCA differs from requirements under OSHA or other statutes, or why regulation under OSHA and other statutes would be insufficient.  Indeed, TSCA itself requires EPA to weigh the benefits of particular substances and the "economic consequences" of a proposed rule, including the costs, benefits, cost-effectiveness of, and alternatives to, a proposed action.  15 U.S.C. § 2605(c)(2).  In any event,

EPA's rationale does not justify treating TSCA as a broad and primary regulatory power, given the text, structure, and purpose of Section 9.

**B.  EPA's misreading of Section 9(a) is underscored by its approach to Section 9(b).**

TSCA's gap-filling function is further embodied in Section 9(b), which requires the Administrator to rely on authority conferred on the EPA by "*other Federal laws*" if doing so could adequately "eliminate[] or reduce[]" the risk at issue, unless the Administrator determines that action under TSCA is nevertheless in the public interest.  15 U.S.C. § 2608(b) (emphasis added).  Here, EPA justified bypassing this process for these conditions of use with a single, conclusory rationale: that its authorities under other statutes such as the Clean Air Act and the Resource Conservation and Recovery Act do not protect against the risks at issue here, because those statutes allow it to "regulate releases to the environment, rather than direct human exposure."  Final Rule, 89 Fed. Reg. at 22,000.[3]

That analysis fails to explain why the risks to human health associated with chrysotile asbestos could not at least be "*reduced* to a sufficient extent" through

---

[3] EPA's Section 9(b) analysis for these conditions of use stands in contrast to its approach to *environmental* risks, where the agency determined that certain environmental exposure pathways "fall under the jurisdiction of other environmental statutes administered by EPA," and therefore "tailored" its risk evaluation to take account of those statutes, under TSCA Section 9(b).  *See* Risk Evaluation for Asbestos, Part 1: Chrysotile Asbestos at 30-31 (Dec. 2020), EPA-HQ-OPPT-2019-0501-0117, JA 940-41 ("Risk Evaluation"); Final Rule, 89 Fed. Reg. at 21,974.

EPA's exercise of its authorities over environmental releases—thereby potentially narrowing or avoiding the need for action under TSCA, or at minimum calling into question whether an outright ban is necessary to avoid an unreasonable level of risk. *See* 15 U.S.C. § 2608(b) (emphasis added). Again, by brushing aside Section 9(b)'s requirements in favor of a flat prohibition on commercial uses of chrysotile asbestos, EPA treated TSCA as a powerful primary regulatory tool, rather than a targeted means of filling regulatory gaps, triggered only after appropriate consideration of how other statutory authorities and other agency actions may mitigate those risks, in whole or in part.

\* \* \* \*

EPA's cramped reading of its consultation and coordination obligations under TSCA Section 9, and the resulting broad reading of its regulatory authority under TSCA, also run contrary to broader interpretative principles. Through Section 9, Congress took care to specify the relationship between EPA's authority under TSCA and "other Federal laws." 15 U.S.C. § 2608 (statutory title). That provision is appropriately read in context, giving weight to the comprehensive nature of those other statutory schemes, which range from OSHA, the Consumer Product Safety Act, and the Federal Hazardous Substances Act, to the Clean Air Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act. *See* Final Rule, 89 Fed. Reg. at 21,999-20. Where

Congress has crafted distinct regulatory regimes with interlocking legal authorities and practical effects, an agency cannot read one aspect of that scheme (here, TSCA) out of context, and in a way that distorts the overall balance. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000) (rejecting Food & Drug Administration's broad interpretation of its statutory authority as encompassing tobacco regulation, where, among other things, "Congress . . . ha[d] created a distinct regulatory scheme for tobacco products"). Such an interpretation would be at odds with Congress's expressed intent in conferring specific authorities on particular agencies to cover different aspects of the risks associated with the use and disposal of chemicals and other substances. EPA's reading is particularly implausible where, as here, it is predicated on unrealistic and extreme assumptions (e.g., analyzing risk without fairly accounting for baseline protective practices) to justify an expansive interpretation of one strand of the statutory scheme. *See infra* § II.

These interpretative errors have real-world consequences for *amici curiae's* members operating in industries that rely on chrysotile asbestos and other chemicals subject to regulation under TSCA. As noted above, the rule's ban on chrysotile asbestos diaphragms in the chlor-alkali industry affects fully one-third of U.S. chlorine production capacity and threatens widespread impacts on a wide range of products and services that are essential to modern society. *See supra* pp. 1-2.

Directly regulated businesses also now face a wholesale displacement of longstanding regulatory regimes. As EPA conceded, OSHA maintains "three separate health standards for asbestos," including a general industry asbestos standard and asbestos regulations specific to particular industries such as shipbuilding and construction. Final Rule, 89 Fed. Reg. at 21,999. In bypassing TSCA's coordination provisions, EPA has effectively displaced OSHA as the primary regulator of asbestos in workplaces. That decision represents a sea change for businesses and other regulated entities.

## II. EPA's rule is arbitrary and inconsistent with the Agency's obligations to evaluate and mitigate unreasonable risks under Section 6 of TSCA.

Even putting aside concerns about the unlawfulness of EPA's inversion of TSCA's gap-filling function, the Final Rule's prohibitions on chrysotile asbestos in the chlor-alkali industry and in sheet gaskets for chemical production are contrary to EPA's obligations under Section 6 of TSCA, 15 U.S.C. § 2605, and otherwise arbitrary and unsupported by substantial evidence, § 2618(c)(1)(B)(i).

The Administrator's authority under Section 6 is directed toward two general functions: risk evaluation and risk management. With respect to risk evaluation, Section 6(b) calls for EPA "to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(b)(4). This evaluation must be tailored to the chemical's specific "conditions of use"— meaning the real-world circumstances under which a chemical substance "is

intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* §§ 2602(4), 2605(b)(4). As for risk management, once EPA determines that a chemical substance poses an "unreasonable risk," Section 6(a) empowers the Administrator to implement industrial or commercial restrictions on the use of the substance "to the extent *necessary*" to address that risk. *Id.* § 2605(a) (emphasis added). Here, EPA's approach to regulating chrysotile asbestos in the chlor-alkali and chemical-production contexts departed from the limitations of Section 6 in multiple respects and lacks record support.

## A. EPA's risk evaluation arbitrarily discounted risk-reducing workplace controls.

During its risk evaluation for chrysotile asbestos in the chlor-alkali and chemical-production conditions of use, EPA did not adequately account for the reality that in these contexts, the "intended, known, [and] reasonably foreseen" conditions of use include risk-reducing workplace controls. *See* 15 U.S.C. § 2602(4). Such controls include implementation of OSHA protocols and workplace training programs, as well as the use of personal protective equipment ("PPE") such as respiratory protection, work gloves, and particulate suits. *See, e.g.*, 29 C.F.R. § 1910.1001 (providing OSHA standards for workplace asbestos protection); Risk Evaluation at 79, JA 989 (describing PPE usage in chlor-alkali production).

Yet EPA's risk evaluation arbitrarily discounted the risk-mitigating effects of these tools. In particular, EPA opted to use unrealistic "high-end exposure estimates" based on supposed "uncertainties" related to whether workers comply with workplace safety standards and follow risk-mitigating protocols. Risk Evaluation at 32, 231-32, JA 942, 1142-42. EPA also explained that it made its unreasonable-risk determinations "from a baseline scenario that is not based on an assumption of compliance with OSHA standards, including any applicable exposure limits or requirements for use of respiratory protection or other PPE." Asbestos Part 1: Chrysotile Asbestos; Regulation of Certain Conditions of Use Under Section 6(a) of the Toxic Substances Control Act (TSCA), 87 Fed. Reg. 21,706, 21,712-13 (Apr. 12, 2022).

EPA's counter-factual assumptions that workers or managers would flout safety protocols in whole or in part, and skewing of the risk-evaluation data by relying on "high-end exposure estimates," are arbitrary and contrary to TSCA Section 6. *See* Industry Petitioners' Opening Br. 45-48. Again, in evaluating a chemical's "conditions of use," EPA must consider only "intended, known, or reasonably foreseen" uses. 15 U.S.C. § 2602(4). And TSCA directs that EPA's risk assessments shall "take into account" the "*likely* duration, intensity, frequency, and number of exposures under the conditions of use." 15 U.S.C. § 2605(b)(4)(F)(iv) (emphasis added). As this Court recognized in interpreting related provisions of the

pre-2016 version of TSCA that remain in effect today, "[i]t must be remembered that [t]he statutory term 'unreasonable risk' presupposes that a real, and not a speculative, risk be found to exist." *Southland Mower Co. v. Consumer Prods. Safety Comm'n*, 619 F.2d 499, 510 (5th Cir. 1980) (internal quotation marks omitted). Consistent with the legislative history of the 2016 TSCA amendments, reasonably foreseen uses do *not* include "intentional misuse"—such as the intentional disregard of worker safety standards and protocols with respect to chrysotile asbestos. Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 37,028, 37,032-33 (May 3, 2024); *accord* S. Rep. No. 114-67, at 7 (2015). If EPA were to sweep in intentional misuses, it would eliminate any "meaningful limitation on [its] risk evaluations, and risk evaluations could present unmanageable challenges—an outcome that . . . Congress [never] intended." Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act, 82 Fed. Reg. 33,726, 33,729 (July 20, 2017). As Industry Petitioners persuasively explain, EPA relied on incorrect assumptions about worker use of PPE, particularly given evidence of industry compliance with OHSA standards; improperly based its risk assessment on high-end estimates; and employed other erroneous assumptions that overestimated potential risk. *See generally* Industry Petitioners' Opening Br. 45-54. By assuming that workplace controls surrounding chrysotile asbestos would not be properly implemented, and by

skewing the risk-evaluation data based on a set of unfounded assumptions, EPA disregarded a reasonably foreseen condition of use and instead gave weight to a deliberate misuse, thus skewing the results of its risk assessment.

## B. EPA arbitrarily rejected more moderate risk-management measures in favor of an outright ban.

EPA's actions with respect to risk management also contravene Section 6(a), which authorizes the Administrator only to issue restrictions "to the extent *necessary*" to ensure that a substance no longer presents an "unreasonable risk." 15 U.S.C. § 2605(a) (emphasis added). The word "unreasonable" imposes a threshold on the kinds and magnitude of risks that are subject to regulation under TSCA, making clear that the statute is not designed to attempt to drive all risks to zero, or even to a de minimis level. After all, as this Court and others have explained, "[t]he requirement that the risk be 'unreasonable' necessarily involves a balancing test" considering the nature and likelihood of injury from the substance, as well as the harm the regulation itself imposes on regulated industry. *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1222 (5th Cir. 1991) (quoting *Forester v. Consumer Prods. Safety Comm'n*, 559 F.2d 774, 789 (D.C. Cir. 1977)). And the statutory phrase "to the extent necessary" contemplates a regulatory action that is tailored to addressing those unreasonable risks, but which goes no further. *See* Industry Petitioners' Opening Br. 64-65. Taken together, these provisions indicate that, through TSCA,

Congress "rejected the notion that the EPA should pursue the reduction of workplace risk at any cost." *Corrosion Proof Fittings*, 947 F.2d at 1222.

Despite the limitations evident on the face of the statute, EPA chose to wield one of the most extreme measures available under TSCA: an outright ban on the manufacturing, processing, distribution, or use of chrysotile asbestos under the chlor-alkali and chemical-production conditions of use. *See* 40 C.F.R. § 751.505(a)-(b) (diaphragms in the chlor-alkali industry); *id.* § 751.509(a) (sheet gaskets for chemical production); *see also* 15 U.S.C. § 2605(a)(2). In so doing, the Agency effectively sought to eliminate *all* risks from those conditions of use, rather than adopting only those measures "necessary" to mitigate "unreasonable" risks.

As just one alternative to adopting an outright ban, EPA could have required employers to implement an existing chemical exposure limit ("ECEL") to keep asbestos exposures at or below an acceptable level. Use of an ECEL is less demanding because it allows employers to implement measures for controlling asbestos exposure without eliminating asbestos-containing products altogether.

Indeed, EPA's *own analysis* determined that, if workplace exposures are kept at or below an ECEL of 0.005 fibers per cubic centimeter (f/cc) as an eight-hour time-weighted average, workers are "protected against unreasonable risk of cancer resulting from chronic inhalation occupational exposure." Existing Chemical Exposure Limit (ECEL) for Occupational Use of Chrysotile Asbestos at 1 (June 8,

2021), EPA-HQ-OPPT-2021-0057-0017, JA 1547. On that basis, EPA allowed employers to adhere to this ECEL to provide adequate worker production, during the interim period in which they have not yet fully implemented the rule's prohibitions on chrysotile asbestos diaphragms and sheet gaskets. 40 C.F.R. § 751.511. EPA has thus accepted that, during this interim period, using an ECEL mitigates unreasonable risk "to the extent necessary" under Section 6(a). EPA's own rationale sharply undercuts the notion that an outright ban on chrysotile asbestos is "necessary" to mitigate the same risks.

Attempting to justify its choice to impose a ban *after* the interim period, EPA stated that "monitoring to and below the ECEL . . . may at times be problematic due to analytical and field sampling challenges," and that workers may need to rely on respirators to comply with the ECEL in the absence of engineering controls. Final Rule, 89 Fed. Reg. at 21,982-83. But EPA nevertheless found that such monitoring would be "achievable." *Id.* at 21,982. In fact, EPA chose *not* to rely on an "action level" of 0.0025 f/cc (which would trigger more relaxed testing requirements) because accurate testing to the ECEL alone would be more feasible. *See id.* And although relying on respirators to meet the ECEL may be less effective than other measures in the "hierarchy of controls," *id.* at 21,982-83, TSCA does not permit EPA to shun a measure that already reduces risk "to the extent necessary" merely because an even more stringent measure is potentially available. *See* 15 U.S.C.

§ 2605(a). EPA likewise failed to adequately explain why respirators would suffice to mitigate risk in complying with the ECEL in the short-term, but not in the long-term. *See generally* Industry Petitioners' Opening Br. 66-68. In this context, and given the Administrator's own prior findings, EPA did not adequately justify its decision to implement a ban on chrysotile asbestos, rather than mitigating unreasonable risk via the ECEL.

Furthermore, despite its obligation to analyze "[one] or more primary alternative regulatory actions" to the proposed rule under TSCA Section 6(c)(2), § 2605(c)(2)(A)(iv)(II), EPA failed even to *consider* alternative measures to achieve the ECEL short of a ban on chrysotile asbestos. *See* Final Rule, 89 Fed. Reg. at 21,993. Instead, EPA considered only a single regulatory approach—an outright prohibition on the manufacturing, distribution, processing, and use of chrysotile asbestos in the relevant conditions of use—with different potential effective dates. *Id.*; *see* Industry Petitioners' Opening Br. 68-70. Given that EPA had already found that the ECEL would reduce risk to a reasonable level, the Agency's failure to consider readily available and less burdensome "alternative regulatory actions" (other measures to achieve the ECEL, such as worker protective equipment, training and certification requirements, and other workplace controls) contravened not only § 2605(c)(2)(A)(iv)(II), but also Congress's directive that the Administrator

administer TSCA "in a reasonable and prudent manner," and account for the impacts of his actions, § 2601(c).

*    *    *    *

*Amici curiae* are concerned that absent robust judicial review, EPA's overbroad reading of its authority under TSCA, and disregard for key textual limitations on its exercise of that authority, would serve as precedent for future regulatory actions under TSCA. EPA has already issued final risk evaluations for multiple other chemical substances with respect to which, as here, the Agency assumed that workers would not appropriately wear personal protective equipment.[4] And where EPA has proposed risk-management rules concerning such substances, it has indicated its intent not to confer with other agencies under Section 9(a) or to rely on other statutory authorities under Section 9(b), relying on essentially the same

---

[4] *See, e.g.*, 87 Fed. Reg. 77,596, 77,600 (Dec. 19, 2022) (risk assessment for n-methylpyrrolidone, a water-miscible, organic solvent with a "unique set of physical and chemical properties that have proven useful in a range of industrial, commercial, and consumer applications," including the production of paints, as a solvent for cleaning and degreasing, and electronics manufacturing; the substance is also used in "a variety of consumer and commercial products"); 87 Fed. Reg. 76,481, 76,485 (Dec. 14, 2022) (similar approach for perchloroethylene, a chemical with "a wide range of uses," including as a solvent in dry cleaning and vapor degreasing, and used in a "variety of consumer and commercial products," including "adhesives (arts and crafts, as well as light repairs), aerosol degreasers, brake cleaners, aerosol lubricants, sealants, stone polish, stainless steel polish, and wipe cleaners"); 87 Fed. Reg. 38,747, 38,751 (June 29, 2022) (similar, for Cyclic Aliphatic Bromide Cluster, a chemical used as a flame retardant and wetting agent).

rationale that it applied here.[5] EPA also recently started a process of prioritizing several additional substances with wide commercial applications for risk evaluation under TSCA. *See* Proposed High-Priority Substance Designations Under the Toxic Substances Control Act (TSCA); Notice of Availability, 89 Fed. Reg. 60,420 (July 25, 2024). Those applications affect key commercial sectors such as the manufacture and processing of plastics, adhesives, petrochemicals, and paints.[6] If this Court were to uphold EPA's expansive approach to regulating certain conditions of use for chrysotile asbestos under TSCA in this case, it would empower the Agency to impose unnecessary and economically disruptive bans or other stringent restrictions on such chemicals, some of which may be vital to the national economy. The implications of EPA's misuse of its authority thus go far beyond this case.

---

[5] *See, e.g.*, 89 Fed. Reg. 51,134, 51,176-77 (June 14, 2024) (discussion of authority under Occupational Safety and Health Act and Consumer Product Safety Act); 88 Fed. Reg. 39,652, 39,704-05 (June 16, 2023) (similar).

[6] Press Release, U.S. Env't Prot. Agency, Biden-Harris Administration Takes Latest Action Under Toxic Substances Control Act to Protect Public from Exposure to Harmful Chemicals (July 24, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-takes-latest-action-under-toxic-substances-control-act.

## <u>CONCLUSION</u>

For the reasons explained herein, this Court should grant the Industry Petitioners' petitions for review, vacate EPA's Final Rule, and remand for further proceedings.

Dated: January 16, 2026                    Respectfully submitted,

                                           */s/ Jeremy C. Marwell*

Andrew R. Varcoe                           Jeremy C. Marwell
Audrey Beck                                VINSON & ELKINS LLP
U.S. CHAMBER LITIGATION CENTER             2200 Pennsylvania Avenue, NW
1615 H Street, NW                          Suite 500 West
Washington, DC 20062                       Washington, DC 20037
(202) 463-5337                             Phone: (202) 639-6507
                                           Email: jmarwell@velaw.com
*Counsel for the Chamber of Commerce*
*of the United States of America*          Garrett T. Meisman
                                           Vinson & Elkins LLP
                                           845 Texas Avenue
                                           Suite 4700
                                           Houston, Texas 77002
                                           Phone: (713) 758-2559
                                           Email: gmeisman@velaw.com

                                           *Counsel for the Chamber of Commerce*
                                           *of the United States of America and the*
                                           *National Federation of Independent*
                                           *Business Small Business Legal Center,*
                                           *Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 16, 2026, I caused a true and accurate copy of the foregoing document to be served by U.S. Priority mail, postage prepaid, on:

Jeffrey Prieto
Environmental Protection Agency
Office of General Counsel
Room 1448K
1200 Pennsylvania Avenue, N.W.
William Jefferson Clinton Building
Washington, DC 20460-0003

I also caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jeremy C. Marwell*

*Attorney of Record for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,863 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


*/s/ Jeremy C. Marwell*

*Attorney of Record for Amici Curiae*