No. 24-60193

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Chemistry Council; American Chemistry Council; Georgia Chemistry
Council; Asbestos Disease Awareness Organization, United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
International Union, AFL-CIO; Ohio Chemistry Technology Council,
*Petitioners*,

v.

United States Environmental Protection Agency,
*Respondent.*

Consolidated with No. 24-60281

American Public Health Association; Collegium Ramazzini; FeelGood
Foundation; Local F-116 (Vandenberg Professional Firefighters), International
Association of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters),
International Association of Fire Fighters; Henry A. Anderson; Brad Black; Barry
Castleman; Raja Flores; Arthur Frank; Phil Landrigan; Richard Lemen; Steven
Markowitz; Jacqueline Moline; Celeste Monforton; Christine Oliver; Dan Whu;
Andrea Wolf,
*Petitioners*,

v.

United States Environmental Protection Agency; Michael S. Regan, Administrator,
United States Environmental Protection Agency,
*Respondents.*

Consolidated with No. 24-60333

Olin Corporation,
*Petitioner*,

v.

United States Environmental Protection Agency; Lee M. Zeldin, Administrator,
United States Environmental Protection Agency,
*Respondents.*

Petitions for Review of Final Action
by the U.S. Environmental Protection Agency

**RESPONDENTS' BRIEF**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of Counsel:

DEREK GILLIAM
*Attorney*
U.S. Environmental Protection Agency

LAURA J. GLICKMAN
KRISTEN SARNA
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044

January 16, 2026

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to the fourth sentence of Fifth Circuit Rule 28.2.1, Respondents need not provide a certificate of interested parties as all parties are governmental entities.

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN
Counsel for Respondents

## REQUEST FOR ORAL ARGUMENT

Respondents United States Environmental Protection Agency ("EPA") and Administrator Lee M. Zeldin request oral argument. The petition involves the nuanced issues of compliance with the Toxic Substances Control Act ("TSCA"), a complex and technical statute. Adjudicating the merits of the petition for review will require the Court to consider a substantial amount of complex information with significant impacts. The Court therefore would benefit from oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

REQUEST FOR ORAL ARGUMENT ...................................................................i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................v

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION....................................................................3

STATEMENT OF THE ISSUES.........................................................................3

STATEMENT OF THE CASE............................................................................5

I.      Statutory and Regulatory History. ................................................................5

II.     Statutory Overview ...................................................................................10

        A.     Risk Evaluations.............................................................................11

        B.     Risk Management Rules..................................................................13

        C.     TSCA's Relationship to Other Laws..................................................15

III.    Factual and Procedural History ...................................................................16

        A.     OSHA's Regulation of Asbestos.......................................................16

        B.     Part 1 of the Asbestos Risk Evaluation. ...........................................18

        C.     The Risk Management Rule. ..............................................................30

        D.     The Part 2 Risk Evaluation................................................................37

SUMMARY OF ARGUMENT ...........................................................................41

STANDARD OF REVIEW ........................................................49

ARGUMENT .........................................................................51

I.   The Industry Petition for Review Should Be Denied....................51

     A.   The Risk Evaluation of Asbestos-Containing Diaphragms
          and Sheet Gaskets Is Based on Substantial Evidence ........................52

     B.   EPA's Decision Not to Issue a Section 2608(a)
          Determination Was Lawful ................................................................81

     C.   EPA's Decision to Ban Asbestos-Containing Diaphragms
          and Sheet Gaskets Complied with Section 2605 ................................91

     D.   EPA Lawfully Set Compliance Deadlines for the Chlor-
          Alkali Industry ..................................................................................108

II.  Steel Workers' Petition Should Be Denied .................................118

     A.   EPA's Decision Not to Require Interim Workplace
          Protections for the Chemical Manufacturing Industry
          Complied With TSCA. ......................................................................119

     B.   EPA Complied with Section 2605(d) Because the Ban
          Took Effect as Soon as Practicable. ..................................................122

     C.   The Final Rule Was a Logical Outgrowth of the Proposed
          Rule .....................................................................................................124

III. ADAO's Petition Should Be Denied. ..........................................128

     A.   EPA Addressed Certain Uses in Its Part 2 Risk
          Evaluation That Were Excluded from Its Part 1 Risk
          Evaluation ...........................................................................................130

     B.   ADAO's Claim that EPA Lacked Substantial Evidence to
          Conclude Importation and Distribution Did Not Present
          Unreasonable Risk Is Not Properly Before the Court ......................141

C.    The Compliance Deadlines for Chlor-Alkali Producers
Are "as Soon as Practicable."............................................................146

D.    EPA Accounted for Environmental Releases in Its Risk
Management Rule...............................................................................149

IV.    Vacatur Is Not an Appropriate Remedy ......................................................151

CONCLUSION ....................................................................................................155

CERTIFICATE OF COMPLIANCE....................................................................157

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) ........................................................131

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ........................................151

*Am. Airlines, Inc. v. Herman*,
    176 F.3d 283 (5th Cir. 1999) .................................. 134, 144

*Am. Coke & Coal Chems. Inst. v. EPA*,
    452 F.3d 930 (D.C. Cir. 2006) ........................................125

*Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*,
    182 F.3d 1261 (11th Cir. 1999) ............................... 103, 104

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ........................................134

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
    452 U.S. 490 (1981) ..........................................................50

*Anderson v. City of New Orleans*,
    38 F.4th 472 (5th Cir. 2022) .............................................52

*Asbestos Disease Awareness Org. v. Wheeler*,
    508 F. Supp. 3d 707 (N.D. Cal. 2020) ............... 38, 128, 133

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ............................................................70

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020) ........................................................154

*BCCA Appeal Grp. v. EPA*,
    355 F.3d 817 (5th Cir. 2003) ...........................................49

*Cent. & S. W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) .................................................. 151, 153

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................. 68, 69, 125

*Christopher M. by Laveta McA v. Corpus Christi Indep. Sch. Dist.*,
  933 F.2d 1285 (5th Cir. 1991) ......................................................52

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ....................................................................49

*City of Arlington v. FCC*,
  668 F.3d 229 (5th Cir. 2012) ......................................................142

*Colautti v. Franklin*,
  439 U.S. 379 (1979) ....................................................................96

*Consolo v. FMC*,
  383 U.S. 607 (1966) ....................................................................50

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 ........................................................... 8, 50, 51, 89

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
  704 F.3d 413 (5th Cir. 2013) ......................................................135

*Ctr. for Sci. in the Pub. Interest v. Regan*,
  727 F.2d 1161 (D.C. Cir. 1984) ..................................................143

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) .......................................................151

*Env't Def. Fund v. E.P.A.*,
  598 F.2d 62 (D.C. Cir. 1978) ........................................................86

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ...................................................................129

*Frew v. Young,*
    992 F.3d 391 (5th Cir. 2021) ............................................................. 142

*Grant Med. Ctr. v. Hargan,*
    875 F.3d 701 (D.C. Cir. 2017) ............................................................. 79

*Gundy v. United States,*
    588 U.S. 128 (2019) ................................................................. 109, 110

*Hamer v. Neighborhood Hous. Servs. Of Chicago,*
    583 U.S. 17 (2017) ............................................................................ 142

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..................................................................... 84, 85

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) .............................................................. 125

*Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.,*
    448 U.S. 607 (1980) ........................................................................... 16

*Inhance Techs., LLC v. EPA,*
    96 F.4th 888 (5th Cir. 2024) ........................................................... 139

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ........................................................................... 97

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ...................................................... 109, 110

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ......................................................................... 154

*Kungys v. United States,*
    485 U.S. 759 (1988) ........................................................................... 96

*Lab. Council for Latin Am. Advancement v. EPA,*
    12 F.4th 234 (2d Cir. 2021) ........................................................... 9, 94

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)..........................................................................................83

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007)........................................................................................125

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..........................................................................................94

*Lopez v. City of Houston*,
  617 F.3d 336 (5th Cir. 2010) .........................................................................131

*Mayfield v. U.S. Dep't of Lab.*,
  117 F.4th 611 (5th Cir. 2024) ........................................................................111

*Mistretta v. United States*,
  488 U.S. 361 (1989)........................................................................................110

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ..........................................................................125

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................49

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007)............................................................................ 69, 80, 152

*Northside Sanitary Landfill, Inc. v. Thomas*,
  849 F.2d 1516 (D.C. Cir. 1988) .......................................................................67

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55, (2004)...........................................................................................83

*Pub. Citizen, Inc. v. EPA*,
  343 F.3d 449 (5th Cir. 2003) ...........................................................................83

*Reno v. Cath. Soc. Servs., Inc.*,
  509 U.S. 43 (1993)..........................................................................................131

*Richardson v. Perales*,
  402 U.S. 389 (1971)..........................................................................50

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
  547 U.S. 47 (2006)........................................................................129

*Russello v. United States*,
  464 U.S. 16 (1983)..........................................................................96

*Safer Chems., Healthy Fams. v. EPA*,
  943 F.3d 397 (9th Cir. 2019) .........................................................38

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020)......................................................................112

*Shell Chem. Co. v. EPA*,
  826 F.2d 295 (5th Cir. 1987) .........................................................50

*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ........................................ 63, 83, 84, 120

*Texas v. EPA*,
  91 F.4th 280 (5th Cir. 2024) ................................................... 50, 70

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) .................................................. 125, 152

*Tex. Mun. Power Agency v. EPA*,
  799 F.2d 173 (5th Cir. 1986) .................................................. 141, 142

*Tex. Off. of Pub. Util. Counsel v. FCC*,
  183 F.3d 393 (5th Cir. 1999) .......................................................143

*United States v. Fernandez*,
  48 F.4th 405 (5th Cir. 2022) ..........................................................96

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011).........................................................................96

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
  647 F.2d 1189 (D.C. Cir. 1980) ........................................................104

*Vanderstok v. Garland*,
  86 F.4th 179 (5th Cir. 2023) ...........................................................154

*Veldhoen v. U.S. Coast Guard*,
  35 F.3d 222 (5th Cir.1994) ..................................................... 134, 144

*Whitman v. Am. Trucking Assns. Inc.*,
  531 U.S. 457 (2001)........................................................................110

**Statutes**

5 U.S.C. § 553(b)(3)...........................................................................124

5 U.S.C. § 701(a)(2)............................................................................82

5 U.S.C. § 706(2)(A)............................................................................49

15 U.S.C. § 2506(a) .............................................................................98

15 U.S.C. § 2602(4) ................................................................ 12, 58, 137

15 U.S.C. § 2602(12) ..................................................................... 12, 64

15 U.S.C. § 2604(a)(2)(A)–(D)...........................................................139

15 U.S.C. § 2605 ..................................................... 5, 6, 7, 41, 43, 105

15 U.S.C. § 2605(a) ..........................3, 6, 8, 11, 13, 92, 93, 99, 104, 122

15 U.S.C. § 2605(a) (1976)....................................................................6

15 U.S.C. § 2605(b) ...........................................................................149

15 U.S.C. § 2605(b)(1)(B) ....................................................................11

15 U.S.C. § 2605(b)(2)(A)–(B).............................................................153

15 U.S.C. § 2605(b)(2)(A)....................................................................10

15 U.S.C. § 2605(b)(2)(B) .................................................................................10

15 U.S.C. § 2605(b)(3)–(4) ...............................................................................11

15 U.S.C. § 2605(b)(3)(C) .................................................................................10

15 U.S.C. § 2605(b)(4)(A) ...................................................... 11, 57, 65, 137

15 U.S.C. § 2605(b)(4)(F)........................................................... 12, 13, 53

15 U.S.C. § 2605(b)(4)(F)(i)....................................................... 12, 19, 66, 67

15 U.S.C. § 2605(b)(4)(F)(ii) .................................................... 12, 63, 64

15 U.S.C. § 2605(b)(4)(F)(iii)...........................................................................11

15 U.S.C. § 2605(b)(4)(F)(iv)...........................................................................53

15 U.S.C. § 2605(b)(4)(F)(v) ............................................................................69

15 U.S.C. § 2605(c) ...........................................................................................11

15 U.S.C. § 2605(c)(1)(D) (1976) .......................................................................6

15 U.S.C. § 2605(c)(2)............................................................................ 93, 95

15 U.S.C. § 2605(c)(2)(A) ......................................................... 13, 92, 94, 96, 98

15 U.S.C. § 2605(c)(2)(A)(iv)(I) .....................................................................147

15 U.S.C. § 2605(c)(2)(A)(iv)(II) ............................................... 105, 107

15 U.S.C. § 2605(c)(2)(B) ....................................................................... 13, 94

15 U.S.C. § 2605(c)(2)(C) ......................................................... 14, 111, 114

15 U.S.C. § 2605(c)(2)(E)..................................................................................96

15 U.S.C. § 2605(c)(3)......................................................................................124

15 U.S.C. § 2605(d) ................................................................... 123, 124

15 U.S.C. § 2605(d)(1) ......................................................................110

15 U.S.C. § 2605(d)(1)(A)–(D) .........................................................109

15 U.S.C. § 2605(d)(1)(A)–(E) .................................................. 111, 146

15 U.S.C. § 2605(d)(1)(A) ................................................ 112, 116, 122

15 U.S.C. § 2605(d)(1)(C) ........................................................ 110, 123

15 U.S.C. § 2605(d)(1)(D) ..................................................................14

15 U.S.C. § 2605(d)(1)(E) ......................................................... 14, 100

15 U.S.C. § 2605(d)(2) ........................................ 14, 43, 51, 108, 109, 110, 146, 148

15 U.S.C. § 2605(g) ..........................................................................148

15 U.S.C. § 2605(g)(A)–(C) ..............................................................148

15 U.S.C. § 2605(i) ...........................................................................122

15 U.S.C. § 2605(i)(1) .............................................................. 15, 141, 142

15 U.S.C. § 2605(i)(2) .........................................................................15

15 U.S.C. § 2607(a) ..........................................................................133

15 U.S.C. § 2607(a)(1)(A) ..................................................................38

15 U.S.C. § 2608(a) .............................................................................15

15 U.S.C. § 2608(a)(1) .....................................................................6, 82

15 U.S.C. § 2608(a)(4)(A)–(B) ...........................................................85

15 U.S.C. § 2608(a)(4)(B) ..................................................................85

15 U.S.C. § 2608(b)(1)..................................................................7, 86

15 U.S.C. § 2608(c) ...........................................................................89

15 U.S.C. § 2608(d) ...........................................................................83

15 U.S.C. § 2618 ............................................................................3, 82

15 U.S.C. § 2618(a)(1)(A) ................................................................15

15 U.S.C. § 2618(c)(1)(B) .................................................................49

15 U.S.C. § 2618(c)(1)(B)(i) ...........................................................120

15 U.S.C. § 2618(c)(1)(B)(i)(I) ................................................... 50, 94

15 U.S.C. § 2619(a)(2) .......................................................................84

15 U.S.C. § 2625(h) ...........................................................................14

15 U.S.C. § 2625(h)(4) .......................................................................79

15 U.S.C. § 2625(i) ...................................................................... 15, 81

15 U.S.C. § 2625(k) .............................................. 15, 53, 54, 57, 67

29 U.S.C. § 655(b)(5)..........................................................................16

Pub. L. No. 94-469, 90 Stat. 2003 (1976)........................................ 13, 93

**Code of Federal Regulations**

29 C.F.R. § 1910.1001 .......................................................................33

29 C.F.R. §§ 1910.1001(b) .................................................................77

29 C.F.R. § 1910.1001(c)(1)...............................................................16

29 C.F.R. § 1910.1001(c)(2)...............................................................17

29 C.F.R. § 1910.1001(e)(1) ................................................................17

29 C.F.R. § 1910.1001(e)(3) ................................................................77

29 C.F.R. § 1910.1001(e)(4) ................................................................18

29 C.F.R. § 1910.1001(f)(1)(ii) ...........................................................17

29 C.F.R. § 1910.1001 App. A .............................................................59

29 C.F.R. § 1910.1001 App. F .............................................................18

40 C.F.R. § 702.33 ...................................................................... 12, 64

40 C.F.R. § 702.37(a)(4) ......................................................................40

40 C.F.R. § 702.39(a)(1) ......................................................................40

40 C.F.R. § 702.39(a)(3) ......................................................................40

40 C.F.R. § 751.505 ...........................................................................114

40 C.F.R. § 751.505(a) .........................................................................32

40 C.F.R. § 751.505(b) .......................................................................117

40 C.F.R. § 751.505(b)–(d) ..................................................................32

40 C.F.R. § 751.509(a) ............................................................ 32, 33, 123

40 C.F.R. § 751.509(b) .........................................................................33

40 C.F.R. § 751.509(c)(3) .....................................................................32

40 C.F.R. § 751.509(d)–(f) ...................................................................33

40 C.F.R. § 751.509(f)(1) .....................................................................33

40 C.F.R. § 751.509(f)(2) .....................................................................33

40 C.F.R. § 751.511 ................................................................ 33, 100

40 C.F.R. § 751.511(a) ....................................................................99

40 C.F.R. § 751.511(b) .............................................................. 34, 99

40 C.F.R. § 751.511(e)(1)–(2) .........................................................34

40 C.F.R. § 751.511(e)(1)(A) ..........................................................34

**Federal Registers**

36 Fed. Reg. 10466 (May 29, 1971) ................................................16

54 Fed. Reg. 29460 (July 12, 1989) ..............................................7, 8

59 Fed. Reg. 40964 (Aug. 10, 1994) ..................................... 16, 17, 87

79 Fed. Reg. 61384 (Oct. 10, 2014) ..................................... 17, 87

81 Fed. Reg. 91927 (Dec. 19, 2016) ...............................................18

82 Fed. Reg. 33726 (July 20, 2017) ................................................37

84 Fed. Reg. 17345 (Apr. 25, 2019) ..............................................137

87 Fed. Reg. 21706 (Apr. 12, 2022) ...................................... 30, 31, 34, 35, 36, 60,
................................................................ 87, 90, 95, 105, 119, 120, 121, 126

88 Fed. Reg. 47782 (July 25, 2023) .................................................38

89 Fed. Reg. 21970 (Mar. 28, 2024) ...... 3, 16, 19, 22, 31, 34, 35, 36, 82, 90, 96, 98,
.................................. 99, 100, 101, 102, 104, 105, 106, 107, 108, 112,
.................................. 113, 114, 115, 116, 117,  121, 126, 127, 145, 147, 149, 154, 155

89 Fed. Reg. 95777 (Dec. 3, 2024) .................................................40

## Legislative Materials

162 Cong. Rec. 7978 (2016) .................................................. 9, 10, 13, 15, 16, 82, 95

H. Rep. No. 114-176 (2015) .................................................... 1, 9, 92, 106

S. Rep. No. 94-698 (1976) .................................................................. 5, 153

S. Rep. No. 114-67 (2015) .................................................... 9, 14, 95, 97

## Other

Feb. 11, 1986 OSHA Letter to G. Hart, available at https://www.osha.gov/laws-regs/standardinterpretations/1986-02-11 ............................................................88

Jun. 29, 2009 OSHA letter to J. Hillman, available at https://www.osha.gov/laws-regs/standardinterpretations/2009-06-29 ............................................................88

**INTRODUCTION**

Asbestos is one of the world's most notorious carcinogens. Once inhaled, tiny airborne asbestos fibers—often invisible to the naked eye—can settle in an exposed person's lungs and other body parts. Latent over decades, the asbestos fibers can cause lung cancer, mesothelioma, other cancers, and chronic lung conditions such as asbestosis. These conditions are often fatal: asbestos exposure is estimated to kill at least 10,000 Americans every year.

Thirty-six years ago, EPA banned under TSCA nearly all uses of asbestos, including most of the uses at issue here. This Court invalidated that rule. As a result, Congress amended TSCA in 2016 with asbestos regulation specifically in mind: "[A]n important measure of TSCA reform proposals has been whether the proposal would enable EPA to take broader regulatory action to protect against unreasonable risks from asbestos." H. Rep. No. 114-176 at 28 (2015). Congress directed EPA to continually prioritize and evaluate chemical substances—starting with the worst offenders—to determine whether they pose an unreasonable risk to health or the environment and regulate to eliminate the identified unreasonable risk.

As mandated by TSCA, EPA thoroughly considered reasonably available information on risks posed by non-legacy uses of asbestos and evaluated such risks using the best available science. As mandated by TSCA, EPA made the science-

based determination that non-legacy uses of asbestos pose an unreasonable risk to human health. And as mandated by TSCA, EPA wrote a rule to eliminate that unreasonable risk.

Petitioners challenge the Rule from opposite directions. On the one hand, Olin Corporation ("Olin"), the American Chemistry Council ("ACC"), the Texas Chemistry Council, the Georgia Chemistry Council, and the Ohio Chemistry Technology Council (collectively, "Industry Petitioners") argue that the Risk Evaluation and Risk Management Rule went too far. On the other, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Steel Workers") and Asbestos Disease Awareness Organization, *et al.* ("ADAO") argue that the Risk Evaluation and Risk Management Rule did not go far enough. But Industry Petitioners, Steel Workers, and ADAO each misread TSCA and effectively ask the Court to impose requirements on EPA that Congress itself declined to impose.

Industry Petitioners, Steel Workers, and ADAO also misconstrue the record. Substantial evidence demonstrates that asbestos poses unreasonable risk to human health, and that EPA appropriately addressed that risk with the Risk Management Rule.

The crux of all three Petitioners' arguments is a disagreement with EPA's scientific and technical judgments, which Congress assigned to EPA when it

enacted and amended TSCA. Those judgments are well-supported by the scientific record here and should not be second-guessed. The petitions for review should be denied.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under TSCA, 15 U.S.C. § 2618. EPA's final rule addressing the unreasonable risk of injury to health presented by chrysotile asbestos, *Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA)*, 89 Fed. Reg. 21970 (Mar. 28, 2024) (the "Risk Management Rule" or the "Rule"), was promulgated under 15 U.S.C. § 2605(a). The seven petitions for review before the Court were timely filed and consolidated in the Fifth Circuit.[1]

## STATEMENT OF THE ISSUES

1.  Whether the Risk Evaluation meets the substantial-evidence standard because it was based on an appropriate analysis of statutory factors using reasonably available information.

2.  Whether EPA's decision not to issue a Section 2608(a) determination referring the unreasonable risk caused by asbestos to the Occupational

---

[1] While ADAO's petition is untimely to the extent it challenges EPA's determination in the Part 1 Risk Evaluation that the import and distribution of asbestos do not present an unreasonable risk, ADAO's petition was timely filed with respect to its other arguments.

Safety and Health Administration ("OSHA") is committed to agency discretion by law; and, if reviewable, whether EPA properly declined to issue a Section 2608(a) determination because only TSCA provided the statutory authority to comprehensively address the risks caused by asbestos.

3.    Whether EPA acted consistent with its authority under TSCA to eliminate asbestos' unreasonable risk by imposing a ban on asbestos-containing diaphragms and sheet gaskets in the Risk Management Rule instead of making interim controls permanent, and whether EPA properly considered regulatory alternatives to the ban imposed.

4.    Whether Congress properly delegated authority for EPA to set different compliance deadlines, and, if so, whether EPA's decision to set different compliance deadlines for chlor-alkali facilities depending on the type of conversion technology is based on substantial evidence.

5.    Whether the Risk Management Rule appropriately declined to impose interim protections for workers in the chemical manufacturing industry because there was insufficient time and information to develop and implement such controls.

6.    Whether the Risk Management Rule provided fair notice before excluding already-installed sheet gaskets from the ban on the use of asbestos sheet gaskets.

7. Whether the arguments with respect to imported asbestos-containing articles and asbestos-containing vehicle parts, which are addressed in the Part 2 Risk Evaluation, are ripe for judicial review, and whether the Risk Management Rule adequately addressed discontinued uses of asbestos.

8. Whether EPA's Risk Management Rule accounted for any risk to the general population that may be caused by environmental releases of asbestos uses evaluated in the Part 1 Risk Evaluation.

9. Whether EPA's determination that the import and distribution of asbestos present no unreasonable risk is unreviewable because the challenge is untimely; and also is moot because the use-specific determinations have been withdrawn and replaced by a determination that asbestos—as a chemical substance—presents an unreasonable risk.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory History.

#### 1. TSCA, as Originally Enacted.

Congress enacted TSCA in 1976 "to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S. Rep. No. 94-698, at 1 (1976), reprinted in 1976 U.S.C.C.A.N. 4491. To that end, Section 2605 authorized EPA to regulate chemical substances whose "manufacture, processing, distribution

in commerce, use, or disposal . . . presents an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a).

As originally enacted, if EPA found "a reasonable basis to conclude" that a chemical substance posed an unreasonable risk of injury to health or the environment, then the Agency was to regulate that chemical substance to "the extent necessary to protect adequately against such risk using the *least burdensome* requirements." 15 U.S.C. § 2605(a) (1976) (emphasis added). Section 2605 included a list of potential requirements, ranging from a ban on the manufacturing of the chemical substance to public notice requirements. *Id.* In selecting a regulatory requirement, TSCA required EPA to consider and publish a statement on the economic consequences of that requirement. *Id.* § 2605(c)(1)(D) (1976).

TSCA also addressed the statute's relationship to other laws. Section 2608(a) provided that if the EPA Administrator determines that a chemical substance poses an unreasonable risk of injury to human health or the environment and also determines, "in the Administrator's *discretion*," that such risk may be sufficiently prevented or reduced by action taken under a different law administered by a different agency, then the Administrator shall make such a referral. 15 U.S.C. § 2608(a)(1) (1976) (emphasis added). Similarly, Section 2608(b) gave EPA discretion to consider if the risk could be eliminated by another federal law administered by EPA. Specifically, Section 2608(b) provided that, if

EPA determines that a chemical substance presents risk to health or the environment, and also determines that risk "could be eliminated or reduced to a sufficient extent by actions taken under the authorities contained" in other federal laws administered by EPA, then the Administrator shall use those authorities to protect against the risk, unless the Administrator determines "in the Administrator's *discretion*" that it is in the public interest to protect against such risk using TSCA. *Id.* § 2608(b)(1) (emphasis added).

## 2.     *Corrosion Proof Fittings*.

In 1989, EPA promulgated a final rule under Section 2605 prohibiting the manufacture, importation, processing, and distribution in commerce of almost all products containing asbestos. Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29460 (July 12, 1989). The 1989 final rule involved many of the conditions of use at issue in this case, including sheet gaskets, brake blocks, and aftermarket automotive brake linings and pads. *Id.* at 29462. Because TSCA as written at the time allowed EPA to consider costs and other non-risk factors when making unreasonable risk determinations, the 1989 final rule did not regulate asbestos-containing diaphragms in the chlor-alkali industry because EPA determined: (1) insufficient information was available to determine whether suitable substitutes would be available; (2) the cost of banning asbestos-containing diaphragms would be very high; (3) asbestos-

containing diaphragms represented a small proportion of overall asbestos use; and (4) banning diaphragms would yield smaller benefits relative to prohibiting other products included in the rule, such as vinyl/asbestos floor tiles and asbestos/cement sheets. 54 Fed. Reg. at 29478, 29501.

In 1991, this Court vacated and remanded the 1989 final rule, concluding that EPA failed to comply with TSCA's then-applicable requirement that the Agency choose "the least burdensome requirements." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214–15 (quoting 15 U.S.C. § 2605(a) (1991)). The Court interpreted TSCA to require EPA to consider each regulatory option, beginning with the least burdensome, and to determine the costs and benefits of regulation under each option. *Id.* at 1217. To impose a total ban, as the 1989 rule did, the Court concluded that EPA had to show not only that the ban would reduce risk to an adequate level, but also that less burdensome regulatory options would be insufficient to reduce risks to a cost-justified level. *Id.*

Notably, however, *Corrosion Proof Fittings* affirmed "EPA's basic decision to use TSCA as a comprehensive statute designed to fight a multi-industry problem" and not to refer the rulemaking to other government agencies such as OSHA pursuant to Section 2608(a). *Id.* at 1216; *see supra* at 6 (discussing Section 2608(a)).

### 3.     Post-*Corrosion Proof Fittings*.

After *Corrosion Proof Fittings*, EPA did not finalize a new final rule to address asbestos. EPA also struggled to promulgate rules on other chemical substances. By 2016, it had "become clear that effective implementation of TSCA [] has been challenged by shortcomings in the statute itself, and by several key decisions of Federal Courts and the Agency's interpretation of those decisions." S. Rep. No. 114-67 at 2 (2015). Indeed, as Senator David Vitter (R-LA) noted, "stakeholders across the political spectrum agreed for decades" that TSCA "needed to be updated . . . to fully protect public health and safety." 162 Cong. Rec. 7978, 7980 (2016).

In response, a bipartisan, near-unanimous majority of Congress passed the Frank R. Lautenberg Chemical Safety for the 21st Century Act in 2016 ("2016 Amendments"), which, for the first time, substantially amended TSCA. The 2016 Amendments "substantially increased EPA's obligation to evaluate and regulate dangerous chemicals." *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 243 (2d Cir. 2021). Congress had asbestos regulation specifically in mind: "[A]n important measure of TSCA reform proposals has been whether the proposal would enable EPA to take broader regulatory action to protect against unreasonable risks from asbestos." H. Rep. No. 114-176 at 28. Congress also noted its intent to overturn *Corrosion Proof Fittings* and deleted references to "least

9

burdensome" in TSCA, explaining that while "the old law require[d] that the EPA consider the costs and benefits of regulation when studying the safety of chemical," the new version of TSCA requires EPA "to consider only the health and environmental impacts." 162 Cong. Rec. at 7980. As one Senator explained at the time the law was enacted, these requirements reflected the 2016 Amendment's broader purpose to require EPA "to methodically review all existing chemicals for safety, starting with the worst offenders." *Id.*

The 2016 Amendments also imposed a series of aggressive deadlines and quotas on EPA. Among these, Congress required that within six months of the 2016 Amendments' effective date, EPA had to begin the process of evaluating risk for ten chemicals selected from a pre-determined list—the first step towards potential regulation of such substances. 15 U.S.C. § 2605(b)(2)(A). Asbestos was one of the chemicals on that list. Congress also mandated that EPA continuously identify additional chemical substances for risk evaluation and conduct risk evaluations on such substances. *Id.* § 2605(b)(2)(B), (3)(C).

## II.     Statutory Overview.

TSCA, as amended, sets up a three-step process by which EPA identifies and regulates chemical substances. First, for all chemical substances other than those on the first ten list described above, EPA must prioritize chemical substances for risk evaluation. For such chemical substances, TSCA requires EPA to identify

chemical substances for evaluation through designation of a chemical substance as a "high-priority substance" that may present an unreasonable risk. 15 U.S.C. § 2605(b)(1)(B)(i). Second, for any substance designated as high-priority, EPA must then conduct a "risk evaluation" to determine whether the substance presents an unreasonable risk of injury to health or the environment, under the chemical's conditions of use. *Id.* § 2605(b)(3)–(4). Third, if, through the risk evaluation, EPA determines that the chemical presents an unreasonable risk, EPA must proceed to risk management, and ultimately regulate to eliminate any unreasonable risks. *Id.* § 2605(a), (c).

### A.    Risk Evaluations.

In conducting a risk evaluation, EPA must "determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation." 15 U.S.C. § 2605(b)(4)(A). As amended, TSCA expressly prohibits EPA from considering costs or other non-risk factors in conducting risk evaluations. *Id.* § 2605(b)(4)(F)(iii). Congress explained that it made this change to ensure that "the Agency may not apply the sort of 'balancing test'" between risks and benefits that courts, including the Court in *Corrosion Proof Fittings*, previously had read into Section 2605(b). 162 Cong. Rec. at 7984.

The statute does not define the term "unreasonable risk of injury to health or the environment" but directs EPA to assess available information on the chemical substance's hazards (the adverse human health and ecological effects) and its exposures for the chemical substance's conditions of use. 15 U.S.C. § 2605(b)(4)(F). The term "conditions of use" means "the circumstances. . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4).

In evaluating the hazards and exposures, EPA must consider potentially exposed or susceptible subpopulations, which are groups identified by EPA that, "due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure." *Id.* § 2605(b)(4)(F)(i); § 2602(12). Congress explicitly provided that potentially exposed or susceptible subpopulations can include workers. *Id.* § 2602(12).

EPA's risk evaluation must also describe whether aggregate exposures or sentinel exposures—the plausible upper bound of exposure[2]—were considered. *Id.* § 2605(b)(4)(F)(ii). The risk evaluation must consider the likely duration, intensity, frequency, and number of exposures under the conditions of use. *Id.*

---

[2] 40 C.F.R. § 702.33.

§ 2605(b)(4)(F)(ii). Finally, the risk evaluation must describe the weight of the scientific evidence of the identified hazard and exposure. *Id.* § 2605(b)(4)(F).

### B.     Risk Management Rules.

If EPA determines that a chemical substance presents an unreasonable risk, the Agency must proceed to the risk management phase under Section 2605(a). Section 2605(a) requires EPA to select among a menu of options for requirements to apply to the chemical substance "to the extent necessary so that the chemical substance . . . no longer presents such risk." *Id.* § 2605(a). That standard replaced the former text, "to the extent necessary to protect adequately against such risk *using the least burdensome requirements*." Pub. L. No. 94-469, § 6(a), 90 Stat. 2003, 2020 (1976) (emphasis added).

In selecting among potential Section 2605(a) requirements, Section 2605(c) requires EPA to "factor in, *to the extent practicable*," several considerations, including health and environmental effects from and magnitude of exposure to the chemical substance, the chemical substance's benefits for various uses, and the "reasonably ascertainable economic consequences" of the rule, including its "cost effectiveness." 15 U.S.C. § 2605(c)(2)(A), (B) (emphasis added). But the Section 2605(c) considerations do not override the requirement to eliminate the "unreasonable risk." *Id*. § 2605(a); *see* 162 Cong. Rec. at 7984 ("[Section 2605(c)(2)(A)] requires only that EPA take into account the specified

considerations in deciding among restrictions to impose, which must be sufficient to ensure that the subject chemical substance no longer presents the unreasonable risk EPA has identified."). The Senate Report for the 2016 Amendments explained that the Section 2605(c) considerations are "*not* intended to establish a least burdensome requirement." S. Rep. No. 114-67 at 18–19 (emphasis added).

Additionally, EPA must provide for a "reasonable" transition period and mandatory compliance dates that are "as soon as practicable." 15 U.S.C. § 2605(d)(1)(D), (E). In deciding whether to prohibit or restrict a chemical substance (and in setting an appropriate transition period under Section 2605(d)), EPA must "consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the prohibition or other restriction takes effect." *Id.* § 2605(c)(2)(C). The compliance dates established as part of the transition period may vary for different affected persons. *Id.* § 2605(d)(2).

In conducting risk evaluations and promulgating risk management rules under TSCA, Congress directs EPA to use scientific information "in a manner consistent with the best available science." *Id.* § 2625(h). To that end, the statute requires that, in using scientific information, procedures, measures, methods, or models, EPA consider whether: (1) they "are reasonable for and consistent with the

intended use of the information"; (2) they are "relevant for [EPA's] use in making a decision about a chemical substance or mixture"; (3) the "clarity and completeness" with which the methods employed to generate them are documented; (4) any variability and uncertainty in them has been evaluated and characterized; and (5) they have been independently verified or peer reviewed. *Id.* EPA must also consider reasonably available information and base its decisions about risk evaluations and risk management on the weight of the scientific evidence. *Id.* § 2625(i), (k).

A final risk management rule, including the associated unreasonable risk determination, is a final agency action subject to judicial review, effective on the date of promulgation of the final rule. *Id.* §§ 2605(i)(2), 2618(a)(1)(A).

## C.    TSCA's Relationship to Other Laws.

TSCA is the primary statute for the regulation of toxic substances. The 2016 Amendments make clear that "TSCA can no longer be construed as a 'gap-filler' statutory authority of last resort." 162 Cong. Rec. at 7985.

The 2016 Amendments retained Sections 2608(a) and (b), the former of which gives the Administrator discretion to consider if the risk could sufficiently be prevented or reduced by action taken under a different law administered by a different agency. 15 U.S.C. § 2608(a). Congress confirmed that the

Administrator's decision is "completely discretionary . . . and not subject to judicial review in any manner." 162 Cong. Rec. at 7985.

## III.    Factual and Procedural History.

As the scientific evidence on and public awareness of the dangers of asbestos has grown, its use has declined dramatically. 89 Fed. Reg. at 21971. Thus, although there are six types of asbestos fibers, chrysotile asbestos—the type addressed by the Risk Management Rule—is the only type where import, processing, and distribution is still known, intended, or reasonably foreseen in the United States. *Id.* at 21973.

### A.    OSHA's Regulation of Asbestos.

OSHA has set exposure limits for asbestos since 1971. 36 Fed. Reg. 10466, 10506 (May 29, 1971). Pursuant to the Occupational Safety and Health Act of 1970, OSHA sets permissible exposure limits aimed at protecting worker health. To set those limits, OSHA must first establish that the new standards are feasible. 29 U.S.C. § 655(b)(5). Feasibility has been interpreted to include both "economic and technological feasibility." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 640 (1980).

In 1994, OSHA set a permissible exposure limit of 0.1 fibers of asbestos per cubic centimeter averaged over an eight-hour period. Occupational Exposure to Asbestos, 59 Fed. Reg. 40964 (Aug. 10, 1994); *see also* 29 C.F.R.

§ 1910.1001(c)(1). OSHA also set a limit of 1.0 fibers of asbestos per cubic centimeter averaged over a 30-minute period. 29 C.F.R. § 1910.1001(c)(2).

OSHA itself acknowledged that, with respect to the asbestos permissible exposure limits specifically, the 0.1 fibers per cubic centimeter level "leaves a remaining significant risk." 59 Fed. Reg. at 40967. However, OSHA believed that this was "the practical lower limit of feasibility for measuring asbestos levels reliably." *Id.* The asbestos permissible exposure limits have not been updated since 1994. OSHA has recognized that "scientific evidence has accumulated suggesting that the current limits are not sufficiently protective." 79 Fed. Reg. 61384, 61386 (Oct. 10, 2014).

In addition to setting permissible exposure limits, OSHA regulations require the use of respiratory protection wherever feasible engineering controls and work practices are not sufficient to reduce employee exposure to or below those limits. 29 C.F.R. § 1910.1001(f)(1)(ii). Where compliance with the permissible exposure limit is not achievable, OSHA regulations instruct employers to use engineering controls and work practices to "reduce employee exposure to the lowest levels achievable by these controls" and then supplement the controls with the use of respiratory protection. *Id.* Additionally, OSHA requires employers to establish regulated areas where airborne concentrations of asbestos exceed, or there is a reasonable possibility they may exceed, the permissible exposure limits. *Id.*

§ 1910.1001(e)(1). In regulated areas, employees are required to be supplied with and use a respirator. *Id.* § 1910.1001(e)(4).

Beyond that, for specific uses of asbestos, OSHA has imposed additional regulations on work practices to reduce potential exposure. For the inspection, disassembly, repair, and assembly of automotive brakes and clutches, OSHA requires workers use a negative pressure enclosure, a wet cleaning method, or a method which can be demonstrated to be equivalent to using a negative pressure enclosure to reduce potential asbestos exposure. *Id.* § 1910.1001 App. F.

### B.     Part 1 of the Asbestos Risk Evaluation.

The TSCA Work Plan—published in 2012 and updated in 2014—listed asbestos as a priority for assessment under TSCA based on its hazard, exposure, and potential for persistence and bioaccumulation. 81 Fed. Reg. 91927, 91929 (Dec. 19, 2016). In December 2016, EPA published an initial list of ten chemicals from the 2014 TSCA Work Plan, including asbestos, for which it was initiating the TSCA risk evaluation process. *See generally id.*

EPA conducted the asbestos risk evaluation in two parts. The Part 1 Risk Evaluation, published in December 2020, evaluated non-legacy uses of asbestos— *i.e.*, uses with ongoing or prospective manufacturing, processing, and/or distribution in commerce. The Part 2 Risk Evaluation, published in November 2024, addressed all previously excluded legacy uses and all other asbestos

conditions of use which EPA was able to identify through reasonably available information.

The Part 1 Risk Evaluation concluded that conditions of use associated with six categories of asbestos-containing products posed an unreasonable risk: chlor-alkali diaphragms, sheet gaskets in chemical production, other gaskets, oilfield brake blocks, aftermarket automotive brakes/linings, and other vehicle friction products. Risk Evaluation for Asbestos, Part 1: Chrysotile Asbestos ("RE"), AR B.117, at 33–34, JA943–44. Those affected by these conditions of use include workers, occupational non-users who work in the same general vicinity as asbestos but do not handle it, and consumers. *Id.* at 70–71, JA980–81.

As with every risk evaluation under TSCA, EPA looked at both the hazards (*i.e.*, harmful effects to humans and environment) and exposures associated with the uses of the particular chemical that is at issue. 15 U.S.C. § 2605(b)(4)(F)(i). This enables EPA to characterize the risks and ultimately to determine whether a chemical presents an unreasonable risk.

For asbestos, the health endpoint driving unreasonable risk is cancer from inhalation exposure. 89 Fed. Reg. at 21975. Specifically, there are well-established

causal associations between asbestos exposure and lung cancer and mesothelioma.[3] RE, AR B.117, at 147, JA1057. Lung cancer is especially deadly in those who were exposed to asbestos. *Id.* at 151, JA1061. The Part 1 Risk Evaluation also identified a causal association with laryngeal and ovarian cancer and found suggestive evidence of a positive association with pharyngeal, stomach, and colorectal cancer. *Id.* The Part 1 Risk Evaluation compared exposure to the cancer benchmark—the level above which there is an increased risk of these cancers that it is potentially unreasonable. *Id.* at 230, JA1140.

Asbestos exposure causes various other potentially fatal lung conditions, such as: (1) asbestosis, which causes lung scarring and difficulty breathing; and (2) non-malignant respiratory disease, which includes conditions such as chronic obstructive pulmonary disease, interstitial lung disease, and bronchiectasis. *See id.* at 148, 150, JA1057, 1060. Workers who smoke, were exposed to asbestos at a younger age, have a genetic predisposition to mesothelioma, or were exposed to other sources of asbestos by DIY brake changes, for example, are more likely to suffer severe health effects from asbestos exposure—particularly lung cancer and mesothelioma. *Id.* at 175–76, 220, 226–27, JA1085–86, 1130, 1136–37.

---

[3] Mesotheliomas are tumors that grow from the thin membranes that line the chest and abdominal cavities and surround internal organs and are relatively rare in the general population. RE, AR B.117, at 151, JA1061.

### 1. Asbestos-Containing Diaphragms in the Chlor-Alkali Industry.

The Part 1 Risk Evaluation found unreasonable risk for the use of asbestos-containing diaphragms in the chlor-alkali industry.

The chlor-alkali industry produces: (1) chlorine, which is used in drinking water and wastewater disinfection; and (2) sodium hydroxide, which is a component in cleaning products. To make chlorine and sodium hydroxide, chlor-alkali manufacturers use electricity to separate sodium and chlorine molecules in salt water. RE, AR B.117, at 78, JA988. The reaction occurs in an electrolytic cell, which has a surface area of about 750 square feet. *Id.* at 77–78, JA987–88. A cell has 20 diaphragms, each of which typically contains 50 to 250 pounds of asbestos. *Id.* at 77, JA987. Diaphragms prevent a chemical reaction between the chlorine and caustic soda and allow for both products to be separated for further processing. *Id.* at 78, JA988.

To create the asbestos-containing diaphragm cells, chlor-alkali manufacturers mix asbestos with a liquid solution to form a slurry. *Id.* at 76, JA986. Cells are replaced every one to three years. *Id.* at 78, JA988. Some facilities dispose of the whole asbestos-containing diaphragm apparatus while other facilities hydroblast the asbestos coating off the spent diaphragm to reuse the screen. *Id.* While working with asbestos-containing diaphragm cells, eight tasks expose workers to asbestos: asbestos unloading/transport, glovebox weighing and

asbestos handling, asbestos slurry, depositing, cell assembly, cell disassembly, filter press, and hydroblasting. *Id.* at 83, JA993.

For the most part, the chlor-alkali industry has transitioned away from asbestos diaphragms—a trend that is expected to continue even without the Risk Management Rule. 89 Fed. Reg. at 21971. Today, just eight chlor-alkali facilities accounting for about one-third of U.S. chlor-alkali production capacity still use asbestos diaphragms, however, all have ceased importing raw asbestos. *Id.* at 21971, 21979.

To evaluate risk from asbestos-containing diaphragms, the Part 1 Risk Evaluation estimated exposure to chlor-alkali workers under two main scenarios: (1) assuming respiratory personal protective equipment is worn at all times asbestos fibers are present and performs perfectly; and (2) assuming personal protective equipment is never worn. RE, AR B.117, at 235, Table 5-1, JA1145. In the all-personal-protective-equipment scenario, EPA used exposure monitoring data provided by the chlor-alkali industry and modeled the impact of respiratory personal protective equipment—again, assuming constant use and perfect performance—on exposure. *Id.* at 185–87, JA1095–97. In the no-personal-protective-equipment scenario, EPA also used exposure monitoring data provided by industry but did not model the impact of respiratory personal protective equipment usage for any tasks.

Because of gaps in the data provided by the chlor-alkali industry, EPA could not model the effect of the partial use of personal protective equipment on worker exposures. EPA had monitoring data provided by the chlor-alkali industry, but that data did not include information like how long workers spent on each asbestos-handling task, how often workers rotated between tasks, and whether certain workers were confined to one task or certain tasks or conducted all tasks, which might have allowed EPA to model the exposure reductions from using personal protective equipment during different tasks. *See id.* at 81, JA991.

EPA concluded that the no-personal-protective-equipment scenario aligned more closely with the facts on the ground. *See id.* at 235–36, Table 5-1, JA1145–46. First, chlor-alkali workers do not wear respiratory personal protective equipment for five of the eight asbestos-handling tasks performed or during the remainder of their shifts, even though asbestos fibers continue to circulate in the air. *Id.* at 83–84, JA993–94. Second, the all-personal-protective-equipment scenario assumed perfect performance of respiratory personal protective equipment, however, in reality, respiratory personal protective equipment often is not fully protective. *Id.* at 74–75, JA984–85.

In news articles published after finalization of the Part 1 Risk Evaluation but before the Risk Management Rule, former chlor-alkali workers reported widespread failure to comply with respirator and protective clothing requirements

due to the impracticability and uncomfortableness of donning them in often scorching temperatures. NPR (2022b) *They Inhaled Asbestos for Decades on the Job. Now, Workers Break Their Silence*, AR C.617, at 12–13, 29, JA3954–55, 3971. Furthermore, even when workers tried to comply with OSHA regulations, for example through keeping asbestos wet to prevent it from becoming airborne, workers reported that it was impossible because even a slight breeze would cause the asbestos to dry. NPR (2022a) *Factory workers across the U.S. say they were exposed to asbestos on the job*, AR C.624, at 9, JA3982. Once the asbestos dried, workers would find asbestos stuck to the ceiling and walls, rolling across the floor, and floating through the air. NPR (2022b), AR C.617, at 12, JA3954. The wetted asbestos would also splash onto the workers and dry on their uniforms, coats, helmets, and boots. *Id.* at 13–14, JA3955–56.

Beyond that, workers in chemical plants who were not designated asbestos workers reported frequently being exposed to asbestos. For example, one contract janitor reported scraping dry asbestos off the locker room floor without protective gear. NPR (2022a), AR C.624, at 3–4, JA3976–77.

Ultimately, in the no-personal-protective-equipment scenario, asbestos exposure exceeded the cancer benchmark in four of six metrics. RE, AR B.117, at 235, Table 5-1, JA1145. In the all-personal protective-equipment scenario, which, again, assumed that equipment is always worn and performs perfectly, asbestos

exposure did not exceed the cancer benchmark. *See id.* However, that does not mean that the cancer benchmark would not be exceeded if workers always wore respiratory personal protective equipment.

In evaluating asbestos exposure for the chlor-alkali industry, the Part 1 Risk Evaluation considered both "central tendency" and "high-end tendency" exposure values from monitoring data provided by industry. *Id.* at 83–84, 235, Tables 2-8, 5-1, JA993–94, 1145. For the central tendency, EPA used the 50th percentile exposure value—where half the exposure data falls below that number and half falls above it. *Id.* For the high-end tendency, EPA's Exposure Factors Handbook recommends using the 90th, 95th, or 99th percentile to quantify the high-end of exposure. AR D.98 at 2–3, JA3118–19. Here, EPA used the 95th percentile exposure value. RE, AR B.117, at 83–84, 235, Tables 2-8, 5-1, JA993–94, 1145. The 95th percentile exposure value is not the same as the maximum exposure value: instead, it means that 95 percent of exposure data was below that number and five percent of exposure data was above it. As an example, for chlor-alkali cell disassembly, the 50th percentile exposure value was 0.016 fibers per cubic centimeter, the 95th percentile exposure value was 0.0732 fibers per cubic centimeter, and the highest exposure value was 0.45 fibers per cubic centimeter. *Id.* at 83, Table 2-7, JA993. EPA compared both high-end tendency and central-

tendency exposure values to the cancer benchmark and ultimately used the high-end tendency.

The Part 1 Risk Evaluation also found unreasonable risk to occupational non-users based on risk estimates, again, using area monitoring data provided by the chlor-alkali industry. Occupational non-users include workers like maintenance and janitorial workers who may be exposed to asbestos despite not directly working with it. RE, AR B.117, at 71, JA981. EPA estimated that there were 100 chlor-alkali occupational non-users. *Id.* at 81, JA991. In estimating exposure, EPA followed longstanding guidance to interpret data observations below the level of detection and divided the limit of detection by two. *Id.* at 83, JA993; ACC Comment, AR B.70, at 5, JA768. The chlor-alkali industry did not provide any data indicating to what extent janitors and maintenance workers use personal protective equipment, or what equipment is used during which janitorial and maintenance tasks. Accordingly, EPA assessed janitorial and maintenance staff exposures without assuming they use personal protective equipment.

To evaluate exposures to occupational non-users, EPA considered the extent to which the chlor-alkali industry had adopted area restrictions and other safety precautions that permit only asbestos workers wearing personal protective equipment to enter areas where asbestos diaphragms are fabricated and used. RE, AR B.117, at 81, JA991. However, as EPA explained, observations during site

visits show that asbestos exposure might occur outside of asbestos diaphragm fabrication processes and use. *Id.* Moreover, some chlor-alkali occupational non-users such as janitorial staff may work near the asbestos diaphragm fabrication processes without appropriate personal protective equipment. *Id.*

    **2.**    **Asbestos-Containing Sheet Gaskets Used in the Titanium Dioxide and Broader Chemical Production Industries.**

The Part 1 Risk Evaluation found unreasonable risk for the use and processing of asbestos-containing sheet gaskets in the titanium dioxide production industry specifically and the broader chemical production industry.[4] RE, AR B.117, at 248, JA1158. Specifically, the Part 1 Risk Evaluation found unreasonable risk for the installation and replacement of new asbestos-containing sheet gaskets.

Asbestos-containing sheet gaskets are flexible rings which form a leakproof seal between fixed components. They are used for industrial applications, like titanium dioxide manufacturing, where gasket material is exposed to extreme conditions. RE, AR B.117, at 85, JA995. The asbestos-containing gaskets for titanium dioxide production are made of at least 80 percent asbestos. *Id.* at 93, JA1003.

---

[4] The titanium dioxide industry is part of the chemical production industry.

To make gaskets, workers stamp rubberized sheeting. *Id.* at 86, JA996. During this process, workers may be exposed to asbestos through receiving asbestos-containing rubber sheeting, processing gaskets by stamping, packaging finished gaskets for shipment, and collecting asbestos-containing scrap waste. *Id.* When handling sheeting, internal procedures (not OSHA regulations) require workers to wear personal protective equipment. *Id.* at 89, JA999. Additionally, because the stamping occurs in an open floor area, other workers in the facility may be exposed to asbestos. *Id.*

Once installed, gaskets remain operational anywhere from a few weeks to three years, depending on the temperature and pressure conditions. *Id.* at 93, JA1003. One facility reported replacing approximately 4,000 asbestos-containing gaskets per year. *Id.* While replacing gaskets, workers are potentially exposed to asbestos while receiving new gaskets, removing old gaskets, bagging old gaskets for disposal, and inserting replacement gaskets. *Id.* at 94, JA1004.

To estimate exposure for processing and industrial use (*i.e.*, installation, use and replacement), EPA relied on reasonably available data from titanium dioxide manufacturers and a sheet gasket processor. *Id.* at 91–92, 95, JA1001–02, 1005. For sheet gasket industrial use and processing, the risk estimates exceeded the cancer benchmark using both the central and high-end tendencies. *Id.* at 237–39, Tables 5-2 & 5-3, JA1147–49.

Asbestos-containing sheet gaskets can also be used in other chemical production applications—that is, besides titanium dioxide production. *Id.* at 93, JA1003. The processing of asbestos-containing gaskets for use in the titanium dioxide industry appears to be typical of the processing of asbestos-containing gaskets for the general chemical production industry. *Id.* Therefore, workers handling asbestos-containing gaskets in the general chemical production are susceptible to the same potential exposure risks as similarly situated titanium dioxide workers. *Id.*

### 3.    Aftermarket Parts in Vehicles.

The Part 1 Risk Evaluation found unreasonable risk for the commercial and consumer use of asbestos-containing aftermarket auto brakes/linings and other vehicle friction products. *Id.* at 248, JA1158. Although the use of asbestos in automotive parts has declined dramatically, the maintenance, repair, inspection, and replacement of asbestos-containing brakes/linings and other vehicle friction products still in use in older vehicles can expose individuals to asbestos. *Id.* at 102–07, JA1012–17. To evaluate risk to workers, occupational non-users, and consumers of asbestos-containing aftermarket auto brakes/linings and other vehicle frictions products, EPA considered reasonably available relevant OSHA, NIOSH, and other publications and studies. *Id.* at 108–10, 112, 128–29, JA1018–20, 1022, 1038–39. EPA evaluated exposure to workers, occupational non-users, and DIY

consumers, and found exceedances of the cancer benchmark using the central tendency and high-end tendency for all uses except outdoor uses. *Id.* at 212–13, Table 4-50, JA1122–23.

### 4.     NASA's Super Guppy Turbine Aircraft.

EPA did not find unreasonable risk from the use of asbestos brakes in NASA's Super Guppy Turbine aircraft. The Super Guppy condition of use involves just one asbestos-handling task, which occurs in a ventilated booth. *Id.* at 116, JA1026. Thus, Super Guppy workers are exposed to few asbestos fibers when handling asbestos. *Id.* at 116–17, Table 2-17, JA1026–27. Super Guppy workers handle asbestos for approximately 3.3 hours per brake exchange and a maximum of 12 hours per year. *Id.* at 116–17, JA1026–27. The risk estimates for the Super Guppy all fell well below the cancer benchmark. *Id.* at 234, JA1144. Accordingly, EPA concluded that the use of asbestos brakes in the Super Guppy did not present an unreasonable risk. *Id.*

### C.     The Risk Management Rule.

### 1.     The Proposed Risk Management Rule.

In April 2022, EPA published a proposed rule to eliminate the unreasonable risk of injury to health identified for the conditions of use of chrysotile asbestos in the Part 1 Risk Evaluation. Proposed Rule, 87 Fed. Reg. 21706 (Apr. 12, 2022). Specifically, EPA proposed to prohibit all manufacture, processing, distribution in

commerce, and commercial use of chrysotile asbestos associated with conditions of use found to present unreasonable risk, with varying compliance deadlines. EPA proposed to prohibit asbestos-containing diaphragms in chlor-alkali manufacturing and sheet gaskets in chemical production with a two-year compliance deadline. *See id.* at 21737–38. EPA also proposed to prohibit asbestos-containing oil field brake blocks, aftermarket automotive brakes and linings, other vehicle friction products, and other gaskets, with a 180-day compliance deadline. *Id.* at 21738.

EPA received over 10,000 comments on the proposed rule. 89 Fed. Reg. at 21978, JA9. Petitioners in this case were among the commenters supporting a transition away from asbestos-containing products. Petitioner ACC, which represents chlor-alkali manufacturers, expressed that "ACC and its member companies support an orderly transition away from the use of chrysotile asbestos diaphragms in chlor-alkali manufacture," given sufficient time to do so. ACC Comment, AR C.503, Attach. 1, JA2409. Petitioner Olin also expressed support for banning asbestos under the chlor-alkali conditions of use, urging only that EPA provide seven years for compliance. Olin Comment, AR C.475, Attach. 1, JA2341. By the time EPA issued its final Risk Management Rule, all three chlor-alkali manufacturers had informed the Agency that they had ceased importing asbestos. 89 Fed. Reg. at 21979. Titanium dioxide manufacturer Chemours (an ACC member) also informed EPA that it had already begun transitioning away from

asbestos-containing gaskets, however requested five years instead of the two years EPA had proposed to complete this transition. Chemours Meeting Summary, AR C.442, Attach. 1, JA2279; Chemours Meeting Summary, AR C.452, Attach. 2, JA2294–96.

### 2. The Final Risk Management Rule.

EPA published its final Risk Management Rule in March 2024. The final Risk Management Rule bans most uses of chrysotile asbestos, imposes interim controls, and considers alternative regulatory actions. First, the Rule prohibits the manufacture and import of chrysotile asbestos for diaphragms in the chlor-alkali industry beginning May 28, 2024. 40 C.F.R. § 751.505(a). The Rule provides staggered compliance deadlines for specific uses to provide the chlor-alkali industry with flexibility to adopt substitute technologies. 40 C.F.R. § 751.505(b)–(d). For example, most processing, distribution, and commercial use of asbestos for diaphragms in the chlor-alkali industry is prohibited as of May 28, 2029, except that an owner of multiple chlor-alkali facilities that are converting asbestos-containing diaphragms to membrane technology may continue to use asbestos diaphragms at some facilities during their transition process. *Id.* § 751.505(b)–(d).

Second, as proposed, the final Risk Management Rule also prohibits the manufacture, import, processing, distribution in commerce, and commercial use of new asbestos-containing sheet gaskets beginning May 27, 2026. In the final Risk

Management Rule, that compliance date also comes with exceptions. *Id.*
§§ 751.509(a), (c)(3). The prohibition on the commercial use of asbestos-
containing sheet gaskets for titanium dioxide production is delayed to May 28,
2029. *Id.* § 751.509(b). The Rule also exempts asbestos-containing sheet gaskets
used in chemical production installed by May 27, 2026, from the general
prohibition on the distribution in commerce and commercial use of those gaskets.
*Id.* § 751.509(a).

Third, as proposed, the Risk Management Rule prohibits the manufacture,
import, processing, distribution in commerce, and use of new asbestos-containing
oilfield brake blocks, aftermarket automotive brakes and linings, other vehicle
friction products, and other gaskets beginning November 25, 2024. *Id.*
§§ 751.509(d)–(f). Like the approach taken for the asbestos-containing sheet
gasket prohibition, the Risk Management Rule exempts aftermarket automotive
brakes and linings and other vehicle friction products and gaskets which are
installed by November 25, 2024, from the distribution in commerce and
commercial use prohibitions described above. *Id.* §§ 751.509(f)(1), (2).

Before certain of these prohibitions take place, the final Risk Management
Rule includes interim exposure control requirements for the processing and use of
asbestos-containing diaphragms for chlor-alkali production and use of asbestos-
containing sheet gaskets for titanium dioxide production. *Id.* § 751.511. These

workplace controls are modeled after OSHA's asbestos standard, 29 C.F.R.

§ 1910.1001, but use a different exposure limit of 0.005 fibers/cubic centimeter for

inhalation exposure as an eight-hour average compared to OSHA's permissible

exposure limit of 0.1 fibers per cubic centimeter. 89 Fed. Reg. at 21988; 40 C.F.R.

§ 751.511(b).

The interim control regulations require facilities to reduce worker exposure

to asbestos using engineering controls and work practices. 40 C.F.R.

§ 751.511(e)(1)(A). If those are not feasible, they must provide workers with

respiratory personal protective equipment sufficiently protective to reduce worker

exposure below the interim inhalation limit. *Id.* § 751.511(e)(1)–(2). EPA declined

to require interim exposure controls for the broader chemical production industry

because the industry was unlikely to be able to implement those protections before

the applicable two-year ban on installing new asbestos-containing gaskets went

into effect. 87 Fed. Reg. at 21718–19.

Although EPA concluded that ensuring exposure remained at or below the

interim limit would eliminate unreasonable risk, it explained that, in practice, the

regulated industries were unlikely to achieve that limit for all workers. 89 Fed.

Reg. at 21982. In other words, the record evidence showed that control measures in

these industries were not likely to be consistent or effective enough to reliably keep

exposures below the health-based limit. So, while the Rule requires interim control

measures to mitigate risk while industries are converting to substitutes, EPA concluded that only a complete prohibition ultimately would eliminate the unreasonable risk. *Id.*

The practical problems with measures to attain the interim exposure limit are explained in EPA's preamble and response to comments. First, the record (including industry comments) confirmed that there are significant challenges in monitoring to and below the limit due to analytical and field sampling issues. *Id.*; *see also* Asbestos Part 1: Proposed Rule Response to Public Comments ("RM RTC"), AR C.758, at 60, JA2788. Thus, EPA concluded that industry may not be able to "reliably ensure" compliance with the Existing Chemical Exposure Limit. *Id.*

Second, the record evidence showed that chlor-alkali and titanium dioxide facilities likely could not comply with the limit through engineering and other control measures, without relying on respirators. RM RTC, AR C.758, at 52–53, JA2780–81; 89 Fed. Reg. at 21982. This is because monitoring data provided by industry itself showed air concentrations of asbestos above the Existing Chemical Exposure Limit. RM RTC, AR C.758, at 5, JA2733. But although the Rule permits chlor-alkali and titanium dioxide facilities to attempt to comply with the interim exposure limit by providing workers with respirators, 89 Fed. Reg. at 21982; RM RTC, AR C.758, at 61, JA2789, studies show that performance issues like poor fit

or maintenance mean respirators do not reliably provide the level of protection for which they are rated. 89 Fed. Reg. at 21983. Even with every worker and occupational non-user wearing a respirator for all asbestos-handling tasks, then, some would not be protected from unreasonable risk. 89 Fed. Reg. at 21983; RE, AR B.117, at 74–75, JA984–85. Because respirators cannot reliably reduce exposure to levels below the Existing Chemical Exposure Limit, EPA concluded that their use will not eliminate unreasonable risk and that a ban on the use of asbestos-containing diaphragms and gaskets was necessary. 89 Fed. Reg. at 21982–83.

Finally, in accordance with Section 2605(c)(2)(A), both the proposed and final Risk Management Rules also evaluated primary alternative regulatory actions. In the proposal, the primary alternative included longer compliance deadlines than those proposed for all conditions of use. For example, EPA proposed a prohibition on the commercial use of asbestos in the chlor-alkali industry with a compliance timeline of two years after the effective date of the final rule. In contrast, the primary alternative regulatory action in the proposed rule included a compliance timeline of five years after the effective date of the final rule. The primary alternative regulatory action in the proposed rule also included interim workplace exposure controls for those engaged in the processing and

commercial use of asbestos for use in diaphragms in the chlor-alkali industry and in sheet gaskets in chemical production. 87 Fed. Reg. at 21722–27.

Similarly, in the final Risk Management Rule, this primary alternative regulatory action included alternative compliance deadlines to those finalized for all conditions of use. For example, EPA finalized a prohibition on the commercial use of asbestos in the chlor-alkali industry with phased compliance timelines of five, eight, and twelve years. In contrast, the primary alternative regulatory actions in the final rule included prohibitions on this use of asbestos with non-phased compliance timelines of five years or twelve years after the effective date of the final rule. *Id.* EPA explained that its alternatives were limited to varying compliance timelines because EPA determined that nothing short of a ban would eliminate the unreasonable risk from asbestos identified in the Part 1 Risk Evaluation. RM RTC, AR C.758, at 4, JA2732.

### D.     The Part 2 Risk Evaluation.

Following EPA's initial 2017 risk evaluation framework rule, EPA conducted the Part 1 Risk Evaluation. *See* 82 Fed. Reg. 33726 (July 20, 2017). Consistent with that framework, the Part 1 Risk Evaluation does not evaluate risks created by asbestos' legacy uses—"uses without ongoing or prospective manufacturing, processing, or distribution"—and associated disposals—disposals from legacy uses—because it did not consider those to be covered "conditions of

use." RE, AR B.117, at 2–3, JA912–13. Thus, because manufacturing, import, processing, and distribution in commerce of asbestos fiber types *other than* chrysotile asbestos had ceased prior to EPA's risk evaluation, EPA did not evaluate those other asbestos fiber types in the Part 1 Risk Evaluation. *Id.* at 213, JA1123.

The 2017 framework rule that the Part 1 Risk Evaluation was based on was challenged, and the United States Court of Appeals for the Ninth Circuit held that "TSCA's definition of 'conditions of use' clearly includes uses and future disposals of chemicals even if those chemicals were only historically manufactured for those uses." *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 425 (9th Cir. 2019). The court held that "EPA's exclusion of legacy uses and associated disposals from the definition of 'conditions of use' [wa]s therefore unlawful." *Id.*

In addition to that lawsuit, other litigants sued EPA for denying a 2018 citizen petition asking EPA to initiate a rulemaking to expand the asbestos chemical data reporting requirements to inform EPA's ongoing risk evaluation of asbestos.[5] In 2020, the Northern District of California agreed with petitioners and ordered EPA to initiate a rulemaking proceeding to require reporting on asbestos under 15 U.S.C. § 2607(a)(1)(A). *Asbestos Disease Awareness Org. v. Wheeler*, 508 F. Supp. 3d 707, 735 (N.D. Cal. 2020). That rule, finalized in 2023, required

---

[5] ADAO was one of the parties in this case.

reporting for asbestos-containing articles, asbestos impurities, and asbestos-containing mixtures. *See* 88 Fed. Reg. 47782, 47790 (July 25, 2023).

With those decisions in the background, when EPA published the Part 1 Risk Evaluation in December 2020, the Agency announced that it would conduct a second risk evaluation addressing all legacy uses and associated disposals of asbestos. Together, the two parts would comprise the full risk evaluation for asbestos required under TSCA. RE, AR B.117, at 2, JA912.

ADAO filed a petition for review of the Part 1 Risk Evaluation in the Ninth Circuit in 2021. ADAO specifically sought review of EPA's decision to not "consider the risks of other asbestos fibers, conditions of use, health effects and pathways of exposure." Petition at 2, *Asbestos Disease Awareness Org, et al v. E.P.A., et al.*, No. 21-70160 (9th Cir. 2021), ECF No. 1-6. To resolve the issues raised in the petition, EPA and ADAO entered into a settlement agreement in which EPA agreed to include specified assessments and analyses in its Part 2 Risk Evaluation. Joint Motion for Abeyance at 3, *Asbestos Disease Awareness Org, et al v. E.P.A., et al.*, No. 21-70160 (9th Cir. 2021), ECF No. 19. Specifically, EPA agreed to address legacy uses and associated disposals and to consider, based on reasonably available information, all other conditions of use "not evaluated in part 1." *Id.* at 3–4. On the basis of this settlement agreement, the court ordered the case stayed while EPA developed the Part 2 Risk Evaluation. Stay Order, *Asbestos*

*Disease Awareness Org, et al v. E.P.A., et al.*, No. 21-70160 (9th Cir. 2021), ECF No. 19.

EPA finalized the Part 2 Risk Evaluation in December 2024.[6] 89 Fed. Reg. 95777 (Dec. 3, 2024). In accordance with the *Safer Chemicals* decision, the settlement agreement with ADAO, and 40 C.F.R. § 702.37(a)(4), EPA assessed all previously excluded legacy uses and all other asbestos conditions of use which EPA was able to identify through reasonably available information. Risk Evaluation for Asbestos Part 2 ("Part 2 RE"), at 18–21, App'x 206–09. The Part 2 Risk Evaluation directly incorporated the findings of the Part 1 Risk Evaluation, making a single and comprehensive determination that asbestos presents an unreasonable risk*, id.* at 201, App'x 389, as required by EPA's current risk evaluation framework rule, 40 C.F.R. § 702.39(a)(1), (3). The Part 2 Risk Evaluation Rule also used the information that EPA received in response to its Section 2607(a) reporting rule, discussed above, to evaluate new processing and importing conditions of use. Part 2 RE, at 38, App'x 226.

Finally, Part 2 also evaluates legacy components of the conditions of use addressed in Part 1. So, while the final Part 1 Risk Management Rule exempts from the use prohibitions sheet gaskets used for chemical production, aftermarket

---

[6] Review of the Part 2 Risk Evaluation is not before the Court, however it is relevant to certain of Petitioner ADAO's arguments in this case.

automotive brakes and linings, other vehicle friction products, and other gaskets that are already installed when the Rule's prohibitions take effect, the Part 2 Risk Evaluation evaluates the risks posed by those legacy gaskets, brakes, and other vehicle friction products that are permitted to remain installed. Part 2 RE, at 314–15, App'x 502–03. EPA determined in the Part 2 Risk Evaluation that the conditions of use encompassing the use, repair, or removal of these items "significantly contribute" to the unreasonable risk posed by asbestos. *Id.* at 20, 29, App'x 208, 217. The Part 2 Risk Evaluation also relied on the Part 1 Risk Evaluation's unreasonable risk determinations and underlying assessments for the aftermarket automotive brakes and the sheet gaskets in the chemical production conditions of use included in Part 1 to make a single unreasonable risk determination for asbestos. *Id.* at 214–16, App'x 402-04. Per Section 2605(c)(1), EPA must promulgate a part 2 risk management rule to address the remaining unreasonable risk.

## SUMMARY OF ARGUMENT

1. The Court should deny Industry Petitioners' petition for review. Industry Petitioners argue that the Risk Evaluation is not based on substantial evidence because of four conclusions that EPA made based on the best available science and reasonably available information. Industry Petitioners also argue that EPA should have, pursuant to Section 2608(a), referred the regulation of unreasonable risk

from asbestos to OSHA. Additionally, Industry Petitioners argue the Risk Management Rule exceeds EPA's authority under Section 2605 because EPA selected a ban instead of using workplace controls, did not consider alternatives to a ban, and set different compliance deadlines for different chlor-alkali conversion technologies. Each of these arguments lacks merit.

a. Substantial evidence supports EPA's conclusion that chlor-alkali workers' personal protective equipment usage was minor and decision to use high-end tendency exposure data to evaluate those workers' asbestos exposure. Substantial evidence also supports EPA's decisions to use 16 years old as the age of exposure onset and a 40-year exposure period for workers and conclusion that occupational non-users are exposed to asbestos by passing near or through regulated areas. EPA properly concluded that personal protective equipment was not always used because respiratory protection is not required for the majority of asbestos-handling tasks, and, even when workers wear personal protective equipment, it can fail to mitigate exposures and risk. Using the high-end estimates for determining risk, as expressly permitted by TSCA, allowed EPA to account for risks to potentially exposed or susceptible subpopulations and from non-cancer effects. EPA used a 16-year-old age of onset and forty-year exposure period based on actual data about workers in the industry, and Industry Petitioners provided no contrary data.

Finally, EPA properly determined that occupational non-users are exposed to asbestos based on site-visit observations and reasonably available information.

b. Industry Petitioners incorrectly argue that EPA was required to issue a Section 2608(a) determination referring the unreasonable risk caused by asbestos to OSHA. TSCA commits referral decisions to EPA's unreviewable discretion. Regardless, because OSHA's authority under the Occupational Safety and Health Act of 1970 requires consideration of economic and technological feasibility and leaves significant remaining risk, EPA properly used its own regulatory authority to eliminate unreasonable risk.

c. EPA did not exceed its authority under Section 2605 by imposing a ban instead of requiring worker protections to eliminate the unreasonable risk caused by asbestos. Industry Petitioners observe that EPA did not consider regulatory alternatives to a ban. But that was because only a ban will reliably reduce exposure below the Existing Chemical Exposure Limit—the level below which there would be no unreasonable risk. EPA complied with the statutory requirement to consider alternatives, however, by considering bans with different effective dates. Section 2605(c)(2)(A)(iv)(II) imposes no requirements on the degree to which alternative regulatory actions must differ from the action selected.

d. EPA properly set different compliance deadlines for chlor-alkali companies depending on whether they are replacing their asbestos-containing

diaphragms with non-asbestos diaphragms or non-asbestos membrane technology. Industry Petitioner Olin contends that Section 2605(d)(2), which allows EPA to set different compliance deadlines for different persons, violates the nondelegation doctrine because it sets forth no intelligible principle for EPA to follow. On the contrary, Section 2605(d)(1), which is specifically referenced in Section 2605(d)(2), requires that compliance dates be "as soon as practicable" and "provide for a reasonable transition period." EPA abided by those principles here, explaining that critical differences in the conversion processes for non-asbestos diaphragm and membrane cell technologies support the different schedules for the different chlor-alkali conversion technologies.

2. The Court should deny Steel Workers' petition for review. Steel Workers argue that (a) EPA failed to eliminate the unreasonable risk caused by asbestos pursuant to Section 2605(a) by declining to impose interim workplace protections for the chemical manufacturing industry; (b) EPA violated Section 2605(d) by not implementing interim controls because EPA did not eliminate the unreasonable risk as soon as practicable; and (3) EPA did not provide fair notice in the proposed rule that it was considering excepting already-installed gaskets from the ban on asbestos-containing gaskets in the chemical manufacturing industry. These arguments are not persuasive.

a. This Court should reject Steel Workers' argument that EPA failed to eliminate the unreasonable risk from asbestos because EPA did not require the same interim protections for workers in the chemical production industry as a whole that it required for workers in the titanium dioxide manufacturing industry. EPA adequately explained the key differences between the titanium dioxide industry and the broader chemical manufacturing industry that support implementing interim protections only for the titanium dioxide industry. Additionally, EPA found that, once installed, the gaskets posed no unreasonable risk to workers. The risk from removal and disposal of already-installed (*i.e.*, legacy) gaskets is addressed in the Part 2 Risk Evaluation, and EPA must address the unreasonable risk identified in the Part 2 Risk Evaluation in a future Part 2 risk management rule.

b. Steel Workers are wrong that Section 2605(d) required EPA to impose interim protections for the chemical manufacturing industry. Section 2605(d) mandates that EPA's selected form of regulation, which is a ban on the use of asbestos-containing gaskets, take effect as soon as practicable. Steel Workers do not dispute that the ban takes effect as soon as practicable. Section 2605(d) does not impose additional requirements with respect to the interim period until the asbestos-containing gaskets are replaced. Additionally, as previously mentioned,

the removal and disposal of legacy gaskets are evaluated in the Part 2 Risk Evaluation and will be addressed in a forthcoming second risk management rule.

c. The final rule was a logical outgrowth of the proposed rule. Steel Workers argue that the proposed rule failed to provide notice that EPA was considering excepting already-installed gaskets from the ban without imposing interim protections. EPA excepted already-installed gaskets from the ban for asbestos-containing gaskets in the chemical manufacturing industry because of concerns raised by commenters about how large-scale replacement would increase asbestos exposure. Because EPA raised both banning the use of asbestos-containing gaskets and declining to impose interim workplace protections in the proposed rule, Steel Workers had fair notice of the eventual final Risk Management Rule.

3. The Court should deny ADAO's petition for review. ADAO raises several arguments with respect to uses of asbestos and risks from asbestos that it contends should have been addressed in the Part 1 Risk Evaluation and Risk Management Rule. Additionally, ADAO contends that EPA's decision to set compliance deadlines for the chlor-alkali industry based on the type of technology used, instead of requiring all manufacturers to use the technology that could allow transition away from asbestos-containing diaphragms most rapidly, violated TSCA. These arguments are meritless.

a. ADAO argues that the Part 1 Risk Evaluation and Risk Management Rule failed to address ongoing and discontinued uses of asbestos. EPA promulgated a reporting rule for asbestos and has incorporated the information from that reporting rule into the Part 2 Risk Evaluation to address ongoing conditions of use of asbestos. Accordingly, ADAO's argument is not ripe because EPA has not issued a final risk management rule addressing the Part 2 Risk Evaluation. ADAO argues that EPA failed to eliminate the unreasonable risk of repair and replacement of asbestos-containing vehicle parts. This risk is also addressed in the Part 2 Risk Evaluation, and ADAO's argument is unripe. Additionally, EPA properly treated certain discontinued uses of asbestos as not reasonably foreseeable because of its 2019 Asbestos Significant New Use Rule, which prevents persons from restarting discontinued uses of asbestos without EPA first evaluating the risks.

b. ADAO argues that EPA lacked substantial evidence to determine that the import and distribution in commerce of asbestos do not present an unreasonable risk. ADAO's claim is not properly before the Court because it is untimely, as the findings of no unreasonable risk were issued in 2020. Additionally, those determinations have been withdrawn through the Part 2 Risk Evaluation, which now includes only a single determination that asbestos causes unreasonable risk on a substance-wide basis, and ADAO's argument is therefore moot. Any challenge to the withdrawal in the Part 2 Risk Evaluation would be unripe because EPA has not

taken final agency action through issuing a risk management rule. Furthermore, even if EPA had issued findings of unreasonable risk with respect to the import and distribution of asbestos, those findings would have no effect on the Risk Management Rule because EPA already banned the import and distribution of asbestos.

c. ADAO contends that the deadlines set for chlor-alkali producers were not as soon as practicable because EPA should have mandated the adoption of non-asbestos diaphragms so that conversion away from asbestos diaphragms could occur more rapidly. However, TSCA contemplates that different entities may have different compliance deadlines and requires that EPA consider environmental and health benefits of feasible alternatives when setting compliance deadlines for prohibitions on the use of a chemical substance. Here, after considering such environmental and health benefits, EPA set compliance deadlines for different conversion technologies that were as soon as practicable and provided for a reasonable transition period. EPA was not statutorily required to mandate the use of a singular conversion technology.

d. ADAO asserts that EPA failed to consider the risks to the general population from releases of asbestos into the environment. However, EPA selected a regulation that would adequately address any risks of environmental releases. By

banning specific uses of asbestos, EPA eliminated the possibility of environmental releases of asbestos associated with those uses in the future.

4. Even if this Court were to identify some deficiency in the Risk Evaluation or Risk Management Rule, it should not vacate them but instead should remand them to EPA to allow the Rule to remain in place pending prompt completion of remand proceedings. EPA could correct any such procedural or record-based deficiencies on remand. Leaving the Risk Management Rule in place also would ensure that the Rule's important and urgent public health benefits remain in place pursuant to Congress's instructions, while avoiding disruptive regulatory whiplash for regulated entities. And in any event, the Risk Management Rule should not be vacated in its entirety, as EPA made clear that each of the Risk Management Rule's elements is severable.

## STANDARD OF REVIEW

TSCA provides that judicial review, with one relevant exception, shall be under the standard set out in Section 706 of the Administrative Procedure Act. *See* 15 U.S.C. § 2618(c)(1)(B). Under the Administrative Procedure Act, a court will set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Administrative Procedure Act's "arbitrary and capricious" review, 5 U.S.C. § 706(2)(A), "is narrow." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003). Under this

standard, an action is arbitrary and capricious "only where the agency has considered impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *Id.* (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In reviewing an agency determination, the court may not "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Relevant here, the "court's review" is "most deferential" when the agency's "decision is based upon its evaluation of complex scientific data within its technical expertise." *Texas v. EPA*, 91 F.4th 280, 291 (5th Cir. 2024) (internal citations omitted).

TSCA provides a slightly more searching standard of review for risk management rules and associated unreasonable risk determinations: Courts review those rules and "hold unlawful and set aside such rule" only "if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(I). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shell Chem. Co. v. EPA*, 826 F.2d 295, 297 (5th Cir. 1987) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). But substantial evidence review is not de novo review. So, although "[t]he reviewing court must take into account contradictory

evidence in the record, . . . 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981) (quoting *Consolo v. FMC*, 383 U.S. 607, 620 (1966)). And courts must "at the same time, accord appropriate deference to administrative decisions that are based on agency experience and expertise." *Corrosion Proof Fittings*, 947 F.2d at 1214 (citation omitted). An agency must "cogently explain why it has exercised its discretion in a given manner" and offer a "rational connection between the facts found and the choice made." *Id.* (quotation omitted).

## ARGUMENT

### I.    The Industry Petition for Review Should Be Denied.

First, Industry Petitioners quibble with the technical basis for EPA's Part 1 Risk Evaluation, including how EPA took into account data on the use and effectiveness of personal protective equipment in reducing worker exposure. Second, Industry Petitioners argue that EPA was required to exercise the "discretion" conferred by Section 2608(a) to refer risk management regulations to a different federal agency. Third, Industry Petitioners assert that, despite the 2016 Amendments to TSCA, Section 2605(a) still requires EPA to adopt the least burdensome risk management measure sufficient to eliminate the unreasonable risk and that something less than a ban would have eliminated unreasonable risk.

Fourth, Petitioner Olin argues that setting different compliance deadlines for the chlor-alkali industry based on conversion technology was unlawful because Section 2605(d)(2) purportedly is an unconstitutional delegation of legislative authority and the deadlines EPA set do not comply with the statute. For the reasons explained below, each of these arguments fails.[7]

### A.    The Risk Evaluation of Asbestos-Containing Diaphragms and Sheet Gaskets Is Based on Substantial Evidence.

To evaluate unreasonable risk for asbestos-containing diaphragms and sheet gaskets, EPA analyzed the risk of adverse health effects from varying levels of asbestos exposure. As part of that evaluation, EPA compared asbestos exposure to the cancer benchmark. The evaluation process is scientifically complex and necessarily relies on estimates and modeling. To overcome gaps in the available data and uncertainties inherent in modeling necessary to evaluate risk, EPA made

---

[7] The Court should not consider the vast majority of the arguments raised by Amicus Curiae Alliance for Automotive Innovation because they were not raised by any petitioner. This Court generally disregards issues raised solely by an amicus curiae. *See, e.g.*, *Anderson v. City of New Orleans*, 38 F.4th 472, 481 (5th Cir. 2022) ("For obvious reasons, new issues, generally, cannot be raised in an amicus brief."); *Christopher M. by Laveta McA v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("Absent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae."). Because Alliance for Automotive Innovation's new arguments should not be considered by the Court, EPA does not address them in this brief.

certain technical judgments. But each of those judgments and other steps in EPA's analysis was supported by the record and Agency practice.

Industry Petitioners claim that EPA's judgments were too conservative, resulting in unrealistic evaluations of risk to workers and occupational non-users. That is wrong and misconstrues both the statute and the record.

### 1. The Risk Evaluation Appropriately Accounted for the Use of Personal Protective Equipment in the Chlor-Alkali Industry.

Industry Petitioners first object to EPA's assessment of the use and effectiveness of personal protective equipment to reduce chlor-alkali workers' exposure to asbestos. *See* Indus. Br. at 45–46; *see also* Br. of Amicus Curiae The Chamber of Commerce of the United States of America, et al. ("Chamber of Commerce") at 17–20. But EPA's evaluation of the extent to which workers wear personal protective equipment to perform daily asbestos-handling tasks was driven by and supported by substantial evidence in the record. RE, AR B.117, at 79–80, 83, JA989–90, 993. Industry Petitioners' approach, by contrast, would have ignored that evidence in favor of technically unsupported assumptions that would have dramatically underestimated risk.

TSCA requires EPA to consider information on exposures. 15 U.S.C. §§ 2605(b)(4)(F), 2625(k). This includes information on the intensity of the exposure. *Id.* § 2605(b)(4)(F)(iv). The intensity of exposures is affected by the use

and reliability of personal protective equipment. If such equipment is not used consistently or does not function properly, then people are exposed to the chemical substance at higher concentrations. Congress mandated that EPA base its risk determinations on reasonably available information about exposures. *Id.* § 2625(k). EPA's approach to personal protective equipment in the Part 1 Risk Evaluation is consistent with that mandate.

EPA modeled exposures under two main scenarios: a no-personal-protective-equipment scenario, which assumed no respiratory personal protective equipment is worn; and an all-personal-protective-equipment scenario, which assumed that chlor-alkali workers wore respiratory personal protective equipment at all times and that it always performed perfectly. *See supra* at 22–23. In making its risk determination, EPA accorded greater weight to the cancer benchmark exceedances calculated under the no-personal-protective-equipment-scenario given that workers do not wear respiratory personal protective equipment for most asbestos-handling tasks and that respiratory personal protective equipment often fails to prevent asbestos exposure.

The no-personal-protective-equipment-scenario more closely resembles the real world than the all-personal-protective-equipment scenario. Chlor-alkali workers are not required to wear respiratory personal protective equipment to perform *the majority* of daily asbestos-handling tasks. RE, AR B.117, at 80, 83,

Table 2-7, JA990, 993. And, as EPA explained, a study of real-world exposure to asbestos shows that respiratory personal protective equipment often is not fully protective. *Id.* at 74–75, JA984–85; Respirator and High Efficiency Particulate Air Filtration Unit Performance in Asbestos Abatement, AR D.307, at 1, JA4014. In that study, which tested asbestos concentrations inside respiratory personal protective equipment, just 38 percent of the tested respirators provided full protection against asbestos fibers. AR D.307, at 1, JA4014. That is because improper fit and physically taxing tasks decrease the performance of respiratory personal protective equipment. *Id.* at 7, JA4020; *see also* TSCA SACC Asbestos Meeting Minutes and Final Report, AR B.113, at 64, 79–80, JA862, 877–78 (respiratory protection programs are often inadequate). The all-personal-protective-equipment scenario, then, would have significantly underestimated workers' actual risk.

Beyond that, workers' asbestos exposure is often high when performing asbestos-handling tasks that do not require respiratory personal protective equipment: industry's own monitoring data showed that asbestos exposure is *about as high or higher* than exposure for one of the tasks where respiratory personal protective equipment is required. RE, AR B.117, at 83, 235–36, JA993, 1145–46. And workers do not wear respiratory personal protective equipment during the remainder of their shifts when they are not conducting asbestos handling tasks,

even though asbestos fibers continue to circulate in the air and present exposure risks. *Id.* at 31, 83–84, JA941, 993–94. So, the no-personal-protective-equipment-scenario more closely resembles the real world than the all-personal-protective-equipment scenario.

Furthermore, there is inherent variability in adherence to the OSHA standards that require use of personal protective equipment. In its review of the Part 1 Risk Evaluation, the Science Advisory Committee on Chemicals raised concerns about compliance with OSHA respiratory protection programs. TSCA SACC Asbestos Meeting Minutes and Final Report, AR B.113 at 64, JA862. Additionally, in news reports published after finalization of the Risk Evaluation but before finalization of the Risk Management Rule, workers reported widespread noncompliance with personal protective equipment requirements. RM RTC, AR C.758, at 112–13, JA2840–41; NPR (2022b), AR C.617, at 12–13, 29, JA3954–55, 3971. . The chlor-alkali industry's monitoring data does not reflect this variability in regulatory compliance, nor does it reflect the changes in exposure that occur during such lapses in compliance. So, again, basing a risk determination on exposure modeling that assumed that workers reliably wear respiratory personal protective equipment during their entire shifts would have dramatically underestimated their exposure to asbestos. Accordingly, in evaluating asbestos risk, EPA gave greater weight to the no-personal-protective-equipment scenario,

56

which did not reflect the chlor-alkali industry's minimal respiratory personal protective equipment usage.

In any event, the record did not include the data necessary for EPA to quantitatively account for the minimal respiratory personal protective equipment usage present in the chlor-alkali industry in its risk calculations. *See* 15 U.S.C. § 2625(k) (requiring EPA to assess "reasonably *available* information") (emphasis added). The monitoring data used in the Risk Evaluation came from the chlor-alkali industry itself, and that data did not include information regarding how long workers spent on each asbestos-handling task, how often workers rotated between tasks, and whether certain workers were confined to one task or certain tasks or conducted all tasks. *See* RE, AR B.117, at 81, JA991. Nevertheless, to better understand the range of potential exposures, EPA assessed worker exposures considering both scenarios where respiratory personal protective equipment is not worn and where it is worn for the entirety of an eight or 10-hour shift. Again, however, because respiratory personal protective equipment was not fully protective or worn whenever asbestos fibers were present, EPA properly accorded greater weight to the cancer benchmark exceedances for the no-personal-protective-equipment scenario in making its unreasonable risk determination.

Beyond the limitations of the available data, EPA's approach here is supported by the text of TSCA, which requires EPA to evaluate the unreasonable

risk posed by a chemical substance under the conditions of use. 15 U.S.C. §

2605(b)(4)(A). TSCA defines "conditions of use" as "the circumstances, as

determined by the Administrator, under which a chemical substance is intended,

known, or reasonably foreseen to be manufactured, processed, distributed in

commerce, used, or disposed of." *Id.* § 2602(4). Once EPA determines that a

circumstance meets the definition of condition of use, EPA may include all tasks

associated with an activity within a single condition of use. TSCA does not require

EPA to determine whether each individual task within a condition of use presents

unreasonable risk. The condition of use evaluated here involves the *entire* chlor-

alkali process. EPA appropriately included within the scope of the chlor-alkali

condition of use at issue all related tasks because each of these tasks occur at an

individual chlor-alkali facility, and workers at such a facility may be exposed to

asbestos from more than one of these tasks. RE, AR B.117, at 78–79, JA988–89.

Thus, EPA's approach of grouping exposure data and not assuming respiratory

personal protective equipment usage for all tasks captures the broadness of this

condition of use and aligns more closely with the entire condition of use because

most asbestos-handling tasks do not involve respiratory personal protective

equipment. The granular, task-by-task assessment that Industry Petitioners

seemingly argue EPA was obligated to perform was not only impossible with

reasonably available information, but also is not required by TSCA.

Separate from personal protective equipment, EPA appropriately considered the impact of safety controls besides respiratory personal protective equipment, such as engineering and workplace controls. *Contra* Indus. Br. at 46. This is because the chlor-alkali industry's method for collecting exposure data—affixing a small monitor to chlor-alkali workers' collar or lapel—accounted for any reduction in asbestos exposure attributable to other safety controls. *See* 29 C.F.R. § 1910.1001, App. A ¶ 7 ("Personal samples shall be taken in the "breathing zone" of the employee (*i.e.*, attached to or near the collar or lapel near the worker's face)."). Accordingly, if a non-respiratory personal protective equipment-related safety control implemented at a chlor-alkali facility reduced asbestos exposure, it would have been reflected in monitoring data provided by industry. That data shows that even when workplace controls such as "wet methods" are followed, worker exposure levels often far exceed OSHA's permissible exposure limit of 0.1 fibers per cubic centimeter. *See* ACC Comment, AR A.52, Enc. C, JA88–95; RE, AR B.117, at 80, JA990.

Industry Petitioners' argument that EPA's risk analysis for NASA's Super Guppy Turbine Aircraft was inconsistent with its risk analysis of the chlor-alkali industry is similarly a red herring, as monitoring data shows that asbestos exposure to Super Guppy workers is far lower than for chlor-alkali workers. *See* Indus. Br. at 46–47; *see also* Alliance for Automotive Innovation Br. at 25–26. First, Super

Guppy workers are exposed to fewer asbestos fibers when handling asbestos. *Compare* RE, AR B.117, at 84, Table 2-8, JA994 (chlor-alkali exposure), *with* RE, AR B.117, at 116–17, Table 2-17, JA1026–27 (Super Guppy exposure). Second, Super Guppy workers handle asbestos for a small fraction of the hours chlor-alkali workers do. Where Super Guppy workers handle asbestos for approximately 3.3 hours per brake exchange and a maximum of 12 hours per year, chlor-alkali workers are exposed to asbestos for eight to 10 hours a day for 240 days per year. *Id.* at 82, 116–17, JA992, 1026–27. Third, the Super Guppy condition of use involves just one asbestos-handling task, which occurs in a ventilated booth. RE, AR B.117, at 116, JA1026. Because of these differences, the risk estimates for the Super Guppy all fell well below the cancer benchmark. *Id.* at 234, JA1144. EPA concluded there was no unreasonable risk based on these significantly lower risk estimates and not, as Industry Petitioners suggest, simply because of the existence of other workplace controls. *See* Indus. Br. at 46–47. In any event, the chlor-alkali industry has not indicated that workers could perform asbestos-handling tasks in a ventilated booth, which Super Guppy workers use.

Nor, as Industry Petitioners claim, did EPA give greater weight to a no-personal-protective-equipment scenario in order to protect chlor-alkali workers not covered by OSHA standards. *See* Indus. Br. at 47. In support of their claim, Industry Petitioners misconstrue EPA's statement in the Notice of Proposed

Rulemaking for the Risk Management Rule that unreasonable risk may exist for workers not covered by OSHA standards. *Id.* (citing 87 Fed. Reg. at 21713). This was a general statement of policy in a proposed rulemaking published after finalization of the Risk Evaluation and did not affect how EPA dealt with the spotty use of personal protective equipment in chlor-alkali facilities. Instead, as explained above, EPA used data provided directly from industry itself to model a scenario that more closely resembles the real world than the scenario for which Industry Petitioners now advocate. No similar statement exists in the Risk Evaluation or the Risk Management Rule regarding chlor-alkali workers specifically.

For these reasons, substantial evidence supports EPA's decision to give greater weight to risk calculations that assumed chlor-alkali workers wore no respiratory personal protective equipment.

### 2. EPA Appropriately Relied Upon High-End Data to Assess Exposure to Chlor-Alkali Workers.

Industry Petitioners next contend that EPA improperly used the high-end tendency in comparing exposure to chlor-alkali workers against the cancer benchmark, when it should have used the central tendency. The high-end tendency is a way to quantify high-end asbestos exposure. EPA used the 95th percentile exposure measurement for the high-end tendency, meaning that 95 percent of exposure data was below that measurement and five percent of exposure data was

above it. By contrast, for the central tendency, EPA used the 50th percentile exposure measurement—*i.e.*, the midpoint—where half the exposure data falls below that measurement and half falls above it. Substantial evidence and the text of TSCA support EPA's decision to use the high-end tendency exposure data for comparison with the cancer benchmark.

As an initial matter, Industry Petitioners waived their claim that the Risk Evaluation improperly relied on high-end tendency exposure data because neither Industry Petitioners nor any other commenter sufficiently raised that issue in comments on the Risk Evaluation. Petitioner ACC's comments raised only that EPA should use the mean and not the 95th percentile as the basis for its high-end tendency exposure estimates—not that EPA should not have used the high-end tendency at all.[8] ACC Chlorine Chemistry Division Comments, AR B.70, at 2, JA761; ACC Comments, AR C.398, at 16–17, JA2159–60; ACC Chlorine Chemistry Division Comments, AR C.405, at 14–16, JA3753–55. EPA considered this issue and responded accordingly. Summary of External Peer Review and Public Comments for Asbestos and Disposition for Asbestos Part 1: Chrysotile Asbestos ("RE RTC"), AR B.118, at 106–07, JA1368–69. No other comments

---

[8] As discussed *supra* at 25, EPA's Exposure Factors Handbook recommends using the 90th, 95th, or 99th percentile to quantify the high-end of exposure. AR D.98 at 2-3, JA3118. Here, again, EPA used the 95th percentile exposure value. RE, AR B.117, at 83–84, 235, Tables 2-8, 5-1, JA993–94, 1145.

raised Industry Petitioners' argument that use of high-end exposure data in making

an unreasonable risk determination would violate TSCA. Thus, EPA was not put

on notice of Industry Petitioners' concerns. Accordingly, the Court should not

consider Industry Petitioners' new argument. *See Texas v. EPA*, 983 F.3d 826, 838,

n.4 (5th Cir. 2020) (failure to raise argument in proceedings before agency

typically "would preclude [petitioner] from raising the argument for the first time

on appeal.").

On the merits, EPA's use of the high-end tendency in the Risk Evaluation is

supported by the statutory text and the record evidence.

Industry Petitioners' argument suggests that the high-end tendency is some

made-up, worst-case assumption about exposure to chlor-alkali workers. Indus. Br.

at 47. Not so. As EPA explained, the high-end tendency is a real-world asbestos

exposure number derived from monitoring data provided by the chlor-alkali

industry itself. RE, AR B.117, at 83–84, 227, JA993–94, 1137. Put differently,

there are chlor-alkali workers who are being exposed to asbestos at these levels.

What's more, for any given asbestos-handling task, the 95th percentile is often far

below the highest asbestos exposure measurement. For example, for chlor-alkali

cell disassembly, the highest measured concentration of asbestos was *six times* the

95th percentile exposure measurement. *Id.* at 83, Table 2-7, JA993. So, although

the 95th percentile is the high end of exposure, it is far from a worst-case assumption.

TSCA explicitly permits EPA to base its risk evaluations on high-end exposure measurements. 15 U.S.C. § 2605(b)(4)(F)(ii). Section 2605(b)(4)(F)(ii) *requires* risk evaluations to explain whether EPA considered sentinel exposure—defined as the upper bound or high end of exposure relative to all other exposures. *Id.*; 40 C.F.R. § 702.33. EPA did just this and explained that it considered sentinel exposures through its use of the high-end—*i.e.*, 95th percentile—exposure data. RE, AR B.117, at 227, JA1137. Accepting Industry Petitioners' argument that EPA cannot consider upper-bound exposure in risk evaluations would render Section 2605(b)(4)(F)(ii) meaningless.

Substantial evidence supports EPA's use of high-end exposure data. EPA utilized high-end exposure data in part to comply with TSCA's mandate to assess hazards and exposures for potentially exposed or susceptible subpopulations and to account for non-cancer risks that are not captured by the cancer benchmark.

*First,* EPA must assess hazards and exposures for potentially exposed or susceptible subpopulations, which are groups that, "due to either susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure." 15 U.S.C. § 2602(12). TSCA specifically identifies workers as a potentially exposed or susceptible subpopulation. *Id.* Here, EPA

explained that workers are the group most exposed to asbestos in the chlor-alkali industry and that workers who are exposed to asbestos at or above the high-end numbers quantified in the Risk Evaluation have a greater risk of developing adverse health effects from asbestos. RE, AR B.117, at 29, 230, JA939, 1140. Chlor-alkali workers therefore are a potentially exposed or susceptible subpopulation, and EPA must consider the risks posed to them, as it did in the Risk Evaluation. *See* 15 U.S.C. § 2605(b)(4)(A). As EPA explained, workers who smoke, were exposed to asbestos at a younger age, have a genetic predisposition to mesothelioma, or were exposed to other sources of asbestos by DIY brake changes, for example, are more likely to suffer certain severe health effects from asbestos exposure—particularly lung cancer and mesothelioma. RE, AR B.117, at 175–76, 220, 226–27, JA1085–86, 1130, 1136–37.

Exposure monitoring data provided by the chlor-alkali industry did not provide information specific to potentially exposed or susceptible subpopulations. But this lack of information did not relieve EPA of its obligation to consider how these factors affect risks to chlor-alkali workers. As EPA has explained, the Agency often uses the high-end tendency because it is a reasonable way of ensuring that risk evaluations protect not just the average person, but also more susceptible individuals. *See* Exposure Factors Handbook, D.98, at 2-3, JA3118 (explaining that the 95th percentile captures variations in individual workers'

susceptibility); EPA, Risk Assessment Principles and Practices (2004), at 16 ("EPA usually incorporates a 'high-end' hazard and/or exposure level in order to ensure an adequate margin of safety for most of the potentially exposed, susceptible population, or ecosystem."). Industry Petitioners urge reliance on the central tendency, but do not explain how that could protect these more vulnerable populations.

*Second*, EPA must protect against the non-cancer effects of asbestos even though it lacks the data to quantify those risks. *See* 15 U.S.C. § 2605(b)(4)(F)(i) (requiring EPA to assess "risks of injury to health"). Such effects include: (1) asbestosis, which causes lung scarring and makes breathing difficult; and (2) non-malignant respiratory disease, which includes conditions such as chronic obstructive pulmonary disease, interstitial lung disease, and bronchiectasis. *See* RE, AR B.117, at 150, JA1060. These conditions can be fatal and are not captured by the cancer benchmark. *Id.* at 25, 150, 218, 237, JA935, 1060, 1128, 1147. Failing to evaluate these risks because they could not be quantified necessarily would have underestimated the risk from asbestos exposure. *Id.* at 237, JA1147. Reliance on high-end exposure data accounted for this underestimation of risk, thus ensuring that the overall risk picture was more balanced. *Id.*

Industry Petitioners suggest that the Risk Evaluation need not account for non-cancer risks because such risks cannot easily be quantified. *See* Indus. Br. at

47–48. That would violate EPA's statutory mandate to assess "specific risks of injury to health." 15 U.S.C. § 2605(b)(4)(F)(i). Nor did the fact that the data on non-cancer risks was imperfect relieve EPA of its duty to assess it. *See id.* § 2625(k) (requiring EPA to assess "reasonably available information"). EPA properly accounted for these uncertainties through its reliance on the high-end exposure data provided by the chlor-alkali industry and other reasonably available information. RE, AR B.117, at 237, JA1147. This approach satisfied the requirements set by TSCA. *See* 15 U.S.C. §§ 2605(b)(4)(F)(i), 2625(k).

Industry Petitioners argue that EPA failed to explain in sufficient detail why relying on the high-end tendency for exposure was an appropriate way to account for potentially exposed or susceptible subpopulations or non-cancer risks. Indus. Br. at 47–48. But the Risk Evaluation's cursory explanation for using the high-end tendency is due to the fact that nobody made Industry Petitioners' argument during notice and comment. *See* RE, AR B.117, at 85, 215–16, 219–20, 226–27, 232–33, JA995, 1125–26, 1129–30, 1136–37, 1142–43 (explaining rationale); Summary of External Peer Review and Public Comments and Disposition ("RE RTC"), AR B.118, at 56, 113–15, 230, JA1318, 1375–77 (same). The "dialogue" between EPA and the public "is a two-way street," and the "the agency's opportunity to respond to [] comments [is] meaningless unless the interested party clearly states its position." *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1520 (D.C.

Cir. 1988). In any event, Industry Petitioners fail to explain why the central

tendency—which disregards all exposure data above the median—is purportedly

more consistent with TSCA or the best available science. Nor do Industry

Petitioners explain why EPA should have ignored the Exposure Factors

Handbook's recommendation against using the central tendency. *See* AR D.98, at

2-3, JA3118.

Had EPA instead relied on the central tendency—*i.e.*, the midpoint of

asbestos exposure monitoring measurements—the result is unlikely to have been

different. The risk estimate for the 8-hour time-weighted average using the central

tendency was 0.99 in 10,000, which is *barely* below the cancer benchmark of 1.0

in 10,000 (which Industry Petitioners do not challenge). RE, AR B.117, at 235

Table 5-1, JA1145. The cancer benchmark does not account for potentially

exposed or susceptible subpopulations or for non-cancer effects. *See supra* at 19

(Risk Evaluation evaluates exposure and hazard to characterize risk). Thus, using

the central tendency and including even a minimal margin of safety to account for

potentially exposed or susceptible subpopulations would have brought risk

estimates above the cancer benchmark. *See id.* At bottom, this is a choice between

statistical methods that "is committed to the sound discretion of the

Administrator": whether to account for potentially exposed or susceptible

subpopulations and non-cancer effects by using the high-end tendency or by using

the central tendency and then adding a margin of safety. *See Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 227 (5th Cir. 1989). Either way, all risk estimates for chlor-alkali workers in the no-personal-protective-equipment scenario likely would have exceeded the cancer benchmark.

Even setting that aside, short-term exposure numbers *exceeded* the cancer benchmark, *even when relying on central-tendency exposure data*. *Id.* Thus, even using Industry Petitioners' preferred tendency, exposures exceeded the cancer benchmark.[9] Accordingly, even if EPA erred in its statistical analysis (which it did not), its error was harmless. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.").

In any event, as EPA explained, TSCA provides no bright line for determining the threshold for establishing unreasonable risk—instead, it requires EPA to "describe the *weight of the scientific evidence* of the identified hazard and exposure." 15 U.S.C. § 2605(b)(4)(F)(v) (emphasis added); RE, AR B.117, at 232, JA1142. Additionally, EPA has consistently stated that even its own benchmarks

---

[9]      Industry Petitioners do not appear to challenge the use of the high-end tendency for the chemical production industry's processing and use of asbestos-containing sheet gaskets. In any event, the central tendency for both the 8-hour time-weighted average and the short-term risk estimates exceeded the cancer benchmark. RE, AR B.117, at 237–39, Table 5-2, Table 5-3, JA1147–49.

do not provide a bright line for determining unreasonable risk. *Id.* at 31, 230, JA941, 1140; RE RTC, AR B.118, at 171, JA1433 ("It is important to note that $1x10^{-4}$ [1.0 in 10,000] is not a bright line, and EPA used discretion to make risk determinations based on other considerations including other risk factors, such as severity of endpoint, reversibility of effect, or exposure-related considerations."). Here, EPA explained the shortcomings of the benchmark, particularly as it relates to potentially exposed or susceptible subpopulations and non-cancer effects of asbestos. RE, AR B.117, at 218, 235–36, JA1128, 1145–46. After holistically considering this risk picture, EPA appropriately determined that the weight of the evidence shows that asbestos poses an unreasonable risk to chlor-alkali workers. As EPA's extensive scientific analyses make clear, the unreasonable risk determination is not a "simple finding[] of fact," but falls "within [EPA's] area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Where, as here, EPA's unreasonable risk determination "is based upon its evaluation of complex scientific data within its technical expertise," "[t]his court's review must be most deferential to the agency." *Texas*, 91 F.4th at 291.

Further, if anything, industry-provided monitoring data likely *underestimated* exposure to chlor-alkali workers. First, the "lack of details" provided by the chlor-alkali industry regarding their sampling methods

"undermines confidence in the sampling results." TSCA SACC Asbestos Meeting Minutes and Final Report, AR B.113, at 70, JA868. Specifically, the limited data likely underestimates the range of exposures, which suggests that the high-end exposure risks likely also are underestimated. *Id.* at 67, JA865. Second, news articles published between finalization of the Risk Evaluation and the Risk Management Rule suggest that, despite using the high-end tendency, the Risk Evaluation may have underestimated exposure. RM RTC, AR C.758, at 112–13, JA2840–41. In these news articles, former chlor-alkali workers report widespread noncompliance with requirements to wear personal protective equipment and the presence of airborne asbestos even outside of asbestos-handling tasks. *See supra* at 23–24.

For these reasons, EPA appropriately relied upon the high-end tendency for evaluating exposure. And, even if EPA had relied on the central tendency, the weight of the scientific evidence likely still would have shown that asbestos poses an unreasonable risk to chlor-alkali workers.

### 3. EPA Appropriately Evaluated the Onset and Duration of Exposure to Chlor-Alkali Workers.

Substantial evidence also supports EPA's evaluation of the onset and duration of asbestos exposure to chlor-alkali workers. *See* Indus. Br. at 49–50.

*First*, EPA evaluated the onset of exposure—*i.e.*, the age at which exposure to asbestos began—as part of its risk analysis. EPA appropriately assumed 16 years

old as the age of onset of exposure. As EPA explained, there is no evidence that asbestos-handling tasks require specialized skills and experience, and thus adolescents could work an unrestricted number of hours at a chlor-alkali facility beginning at age 16. RE RTC, AR B.118, at 71, JA1333; *see also* NPR (2022b), AR C.617, at 11, JA3953 (former worker dropped out of high school to work at chlor-alkali facility); RE, AR B.117, at 143, JA1053 (Bureau of Labor Statistics data showing 16- to 19-year-old employees in relevant sector). Although Industry Petitioners argue (Indus. Br. at 50) that industry practice requires workers to be at least 18, they did not provide any data, such as employees' ages and dates of employment, or other written documentation supporting their assertion or outweighing the contrary evidence in the record. In any event, by Industry Petitioner ACC's own admission, using 18 years as the age of first exposure would have decreased the risk estimate by only 10 percent, which has a marginal impact on risk estimation. *See* ACC Comment, AR C.405, at 81, JA3819.

*Second*, EPA evaluated the duration of exposure to asbestos—the number of years that workers are exposed to asbestos. EPA appropriately used 40 years as the duration of exposure for chlor-alkali workers. According to Bureau of Labor Statistics data, the maximum exposure duration is 46 years; the 95th percentile of the duration distribution is 40 years. Asbestos Pt. 1 TSCA 6(a) Economic Analysis, AR C.753, at 4-23, JA2564. In other words, there are some workers who are

exposed to asbestos longer than the 40-year time period used by EPA. Thus, 40 years is an appropriate high-end working years value that is supported by actual employment data. *See id.*; *see also* NPR (2022b), AR C.617, at 14, JA3956. (former chlor-alkali worker employed from 1980 through 2021).

Industry Petitioners contend that chlor-alkali workers, on average, handle asbestos for less than 20 years. But here, again, the chlor-alkali industry was unable to provide any data to support a shorter exposure duration for the high-end tendency. And, even if EPA had assumed an exposure duration of just 20 years, the Risk Evaluation still would have found exceedances of the cancer benchmark. RE, AR B.117, at 332, JA1242.

For these reasons, the Risk Evaluation appropriately evaluated the onset and duration of exposure to chlor-alkali workers.

### 4.     EPA Appropriately Evaluated Risk to Occupational Non-Users.

Finally, contrary to Industry Petitioners' arguments, EPA made appropriate assumptions about both the number of occupational non-users and the extent of their exposure.

### a.     EPA Appropriately Estimated 100 Chlor-Alkali Occupational Non-Users.

In addition to workers directly handling asbestos-containing gaskets and diaphragms, the Part 1 Risk Evaluation considered exposure to others in the

workplace. These "occupational non-users" include workers like maintenance and

janitorial workers who may be exposed to asbestos despite not directly working

with it. RE, AR B.117, at 71, JA981. EPA estimated there to be 100 occupational

non-users in the chlor-alkali industry. *Id.* at 81, JA991.

*First*, Industry Petitioners incorrectly claim that the Risk Evaluation

assumed 2,900 to 3,000 occupational non-users in the chlor-alkali industry. *See*

Indus. Br. at 50–51. The Risk Evaluation explicitly states that EPA estimated there

to be 100 chlor-alkali occupational non-users. RE, AR B.117, at 81, JA991.

Industry Petitioners' mistake seems to be because the Risk Evaluation refers

elsewhere to that higher number of occupational non-users. *See id.* at 223, JA1133.

But EPA explained that this was merely an editing error that did not ultimately

impact its exposure estimates. RM RTC, AR C.758, at 98, JA2826. Indeed,

Petitioner ACC acknowledged EPA's estimate of 100 chlor-alkali occupational

non-users in its comments on the proposed Risk Management Rule. ACC

Comment, AR C.398, at 29, JA2172.

*Second*, Industry Petitioners argue that EPA should not have counted

maintenance staff such as janitors in its estimate of the number of occupational

non-users. *See* Indus. Br. at 51. More specifically, Industry Petitioners appear to

argue that because maintenance staff wear personal protective equipment at least

some of the time, they are not occupational non-users. *See id.* While that argument

nominally is about EPA's treatment of occupational non-users, at bottom it is another meritless attack on EPA's personal protective equipment analysis, which is addressed in Argument Section I.A.1.

There is no data in the record—because the chlor-alkali industry did not provide any—indicating when maintenance or janitorial workers use personal protective equipment, or what equipment is used during which janitorial and maintenance tasks. While Industry Petitioners broadly claim these workers wear personal protective equipment at various points in their shifts, Indus. Br. at 51, they do *not* argue that maintenance and janitorial staff wear personal protective equipment for their entire shifts. *See e.g.,* Comment submitted by Judith Nordgren, Managing Director, Chlorine Chemistry Division, ACC, AR B.70, at 6, JA769. Without specific information on when and what protective equipment is worn, EPA is unable to discern whether the personal protective equipment usage is sufficiently protective. Thus, as with EPA's approach to personal protective equipment for workers, *see supra* Argument Section I.A.1, the paucity of information made it appropriate for EPA to assess janitorial and maintenance staff exposures without assuming they use personal protective equipment. A news report published after finalization of the Risk Evaluation also describes that a contract janitor at a now-closed Olin facility scraped dry asbestos off the floor without personal protective equipment. NPR (2022a), AR C.624, at 3–4, JA3976–77. This

further confirms that the Risk Evaluation appropriately assessed the extent to which maintenance staff wear personal protective equipment.

In any event, even if EPA had overcounted occupational non-users or improperly classified maintenance staff as occupational non-users—which it did not—the number of occupational non-users had no impact on the risk calculations performed by EPA. *See* RE, AR B.117, at 184, JA1094. Industry Petitioners do not argue to the contrary. This is because the number of occupational non-users is not a part of the risk calculation formula used to determine whether risks to occupational non-users exceed cancer benchmarks, and instead informs the selection of potential risk management options. *See id*. The two most consequential facts here are that there are occupational non-users present at chlor-alkali facilities and that these occupational non-users are not required to wear PPE. Industry Petitioners do not contest these facts.

### b.     EPA Appropriately Evaluated Exposure to Occupational Non-Users.

Substantial evidence also supports EPA's assessment of occupational non-user exposure in the chemical production and chlor-alkali industries. *See* Indus Br. at 51–53.

For the chemical production industry, EPA analyzed a "bystander" simulation study that modeled exposure to occupational non-users from the removal of asbestos-containing gaskets. *Id.* at 95–96. The simulation indicated that

exposure decreased by a factor of 2.5 to 9 between the gasket removal area and the bystander area approximately five to 10 feet away. *Id.* at 95. Based on that decrease, EPA estimated that exposures for occupational non-users are a factor of 5.75 lower than exposures for directly exposed workers. *Id.* at 96.

Industry Petitioners claim that this approach overstates exposure because the Risk Evaluation found that occupational non-users do not work in "very close proximity" to areas where asbestos-containing gaskets are removed. *See* Indus. Br. at 52 (quoting RE, AR B.117, at 96, JA1006). That is not accurate. The statement Industry Petitioners quote—which does not quantify the distance between occupational non-users and gasket-removal areas—was simply EPA's rationale for why it should not assume that worker and occupational non-user exposures were the same; not a statement on whether occupational non-users actually work within a 10-foot radius of gasket-removal areas. RE, AR B.117, at 96, JA1006. EPA explained that industry did not provide precise data on how close occupational non-users are to gasket-removal areas, which was necessary to more precisely estimate their exposure. *Id.* at 97, JA1007.

Additionally, Industry Petitioners mischaracterize how the OSHA asbestos standards affect occupational non-user exposure. Those standards do not in fact prevent an employer from authorizing an individual who is not directly handling asbestos to perform work duties in regulated areas. *See* Indus Br. at 52 (citing 29

C.F.R. § 1910.1001(b), (e)(3)). Rather, those provisions say that only employees authorized by their employer and required to enter to perform their work duties may be present in employer-designated areas where asbestos concentrations may exceed permissible exposure limits. In fact, elsewhere Industry Petitioners concede that individuals that do not directly handle asbestos may perform work duties in regulated areas. *See* Indus. Br. at 33 (discussing performance of janitorial activities in asbestos-processing areas). Given that, EPA reasonably concluded that occupational non-users in the chemical production industry may be present in areas where asbestos-containing gaskets are removed.

For the chlor-alkali industry, EPA considered whether area restrictions and other safety precautions help ensure that no occupational non-users (other than directly exposed workers) are near the asbestos-containing diaphragm fabrication processes and use. RE, AR B.117, at 81, JA991. However, as EPA explained, observations during site visits suggest that asbestos exposure may in fact occur outside of asbestos diaphragm fabrication processes and use. *Id.* Observations from site visits also indicate that some chlor-alkali occupational non-users, such as janitorial staff, may work near the asbestos diaphragm fabrication processes. *Id.*

Finally, Industry Petitioners' assertion that EPA created fictional exposure data for chlor-alkali occupational non-users is meritless. *See* Indus. Br. at 53; *see also* Alliance for Automotive Innovation Br. at 22. Industry Petitioners argue that

EPA should have interpreted non-detectable observations—*i.e.*, asbestos exposure measurements that fall below the level that a monitoring instrument is able to detect—in the chlor-alkali industry's monitoring data as zeros. *Id.* But a "non-detect" is not the same as zero. *See* RE, AR B.117, at 83, JA993. Instead, a non-detect means that the actual asbestos concentration was somewhere between zero and the monitoring technology's limit of detection of 0.008 asbestos fibers per cubic centimeter. *Id.* Thus, EPA could not reasonably assume that non-detectable observations mean no asbestos fibers were present.

EPA followed longstanding methodological guidance for interpreting non-detects and recorded the non-detects as 0.004 asbestos fibers per cubic centimeter—the midpoint between zero and the limit of detection. *Id.* That was a reasonable approach. *See Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 707 (D.C. Cir. 2017) ("Where 'an agency merely implements prior policy,' . . . an explanation that allows this court to discern 'the agency's path' will suffice.") (citation omitted). And it complied with TSCA's direction to consider "the extent to which the variability and uncertainty in the information [] are evaluated and characterized." 15 U.S.C. § 2625(h)(4). Indeed, EPA's approach to non-detects was the *exact approach* that Industry Petitioner ACC advocated for in its public comments on the Rule. Comment submitted by Judith Nordgren, Managing Director, Chlorine Chemistry Division, ACC, AR B.70, at 6, JA769. The Court

should reject Industry Petitioners' contrary litigating position that EPA should have excluded the non-detects entirely. *See* Indus. Br. at 53.

For these reasons, EPA appropriately assessed occupational non-user exposure. But even if EPA had erred, the unreasonable risk determinations for asbestos-containing diaphragms and sheet gaskets are based on EPA's determination of unreasonable risks to both workers and occupational non-users. Because those determinations each independently support the unreasonable risk determinations for those conditions of use, any error in the occupational non-user analysis would be harmless. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 659–60.

\* \* \*

In sum, there is no merit to Industry Petitioners' claim that the Risk Evaluation made overly conservative assumptions that identify *any* risk instead of *unreasonabl*e risk. To the contrary, EPA used "reasonably available" data to comply with TSCA's requirements and parameters for conducting risk evaluations.

Industry Petitioners do not dispute that workers and occupational non-users in the chlor-alkali and chemical production industries are exposed to asbestos. They do not dispute that asbestos is a well-established carcinogen, nor that asbestos exposure is associated with potentially fatal non-cancer health effects. RE, AR B.117, at 147–48, JA1057–58. And data and other information provided by the

chlor-alkali and chemical production industries show that workers and occupational non-users in those industries are exposed to asbestos.

Given the certainty of exposure to asbestos and significant hazards associated with such exposure—combined with factors such as uncertainties about the use and protectiveness of personal protective equipment, the non-cancer risks associated with asbestos exposures, and increased susceptibility to adverse health effects from asbestos exposures for certain populations—the "weight of the scientific evidence" supports EPA's determination that the processing and industrial use of asbestos in the chlor-alkali and chemical production industries present unreasonable risk. *See* 15 U.S.C. § 2625(i).

## B. EPA's Decision Not to Issue a Section 2608(a) Determination Was Lawful.

Industry Petitioners incorrectly claim that Section 2608(a) required EPA to refer its findings of unreasonable risk from the processing and use of asbestos in the chlor-alkali and chemical production industries to OSHA. Indus. Br. at 54–62; *see also* Chamber of Commerce Br. at 7–14. First, EPA's decision not to issue a Section 2608(a) determination is unreviewable. Second, even if it were reviewable, EPA reasonably declined to issue a Section 2608(a) determination.

### 1. EPA's Decision Not to Issue a Section 2608(a) Determination Is Unreviewable.

EPA's decision not to issue a TSCA Section 2608(a) determination is unreviewable because Congress committed EPA's decision under Section 2608(a) to the Agency's discretion. *See* 5 U.S.C. § 701(a)(2); 89 Fed. Reg. at 21999 (declining to make Section 2608(a) determination).

Section 2608(a)(1) provides that if EPA issues an unreasonable risk determination and if the Administrator "determines, *in the Administrator's discretion*, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by the Administrator, the Administrator shall submit to the agency which administers such law a report which describes such risk . . ." 15 U.S.C. § 2608(a)(1) (emphasis added).

First, TSCA's judicial review provision does not provide for review of determinations made under Section 2608(a). *See* 15 U.S.C. § 2618 (providing for judicial review of rules or orders issued pursuant to TSCA, with no mention of referral decisions pursuant to Section 2608). Indeed, Senate drafters of the 2016 Amendments explained that none of the revisions to Section 2608 are "intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner." 162 Cong. Rec. at 7985.

Industry Petitioners read out the explicit grant of discretion in Section

2608(a)(1). Indus. Br. at 56. Specifically, Section 2608(a)(1) provides that *if* the

Administrator makes a discretionary determination, *then* the Administrator is

required to refer that risk to the other agency. If Congress had sought to require

EPA to issue a determination, the statute would provide that the Administrator

*must* issue a determination when any agency may be able to prevent or reduce to a

sufficient extent an unreasonable risk from a chemical substance.[10] Given that

discretion, the Court cannot, as Industry Petitioners urge, compel EPA to refer the

management of asbestos' risk to another agency. *See Texas*, 983 F.3d at 834 ("A

court may compel purportedly withheld action . . . only when the action is 'legally

*required.*'") (emphasis in original) (quoting *Norton v. S. Utah Wilderness All.*, 542

U.S. 55, 63, (2004)); *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (Section

701(a)(2) of the Administrative Procedure Act "preclude[s] judicial review of

certain categories of administrative decisions that courts traditionally have

regarded as committed to agency discretion.") (internal quotations omitted); *see*

*also Pub. Citizen, Inc. v. EPA*, 343 F.3d 449, 463–65 (5th Cir. 2003) (decision not

---

[10] In contrast, Section 2608(d) provides that EPA "shall consult and coordinate
with the Secretary of Health and Human Services and the heads of any other
appropriate Federal executive department or agency, any relevant independent
regulatory agency, and any other appropriate instrumentality of the Federal
Government for the purpose of achieving the maximum enforcement of [TSCA]
while imposing the least burdens of duplicative requirements."

to issue a notice of deficiency was unreviewable because the Clean Air Act did not obligate EPA to make a determination that permitting authority was not adequately administering a program).[11]

Additionally, review is precluded because the statute provides "no meaningful standard against which to judge the agency's exercise of discretion." *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Industry Petitioners argue that EPA's failure to issue a Section 2608(a) determination is reviewable because EPA's discretion is cabined by whether a risk "may be prevented or reduced to a sufficient extent by action taken under a Federal law" administered by another agency. Indus. Br. at 58. But that language does not inform what criteria EPA must evaluate when considering whether to issue a determination; instead, it restricts when EPA can choose to issue a determination. EPA may *only* refer risk management to another agency *if* that agency may be able to sufficiently prevent or reduce the risk from the chemical substance.[12] However, the statute does not tell

---

[11] Industry Petitioners suggest that EPA was statutorily required to issue a Section 2608(a) determination. Indus. Br. at 57. However, as a remedy, Industry Petitioners request only that this Court remand the Asbestos Part 1 Rule for further explanation. *Id.* at 56. To the extent that Industry Petitioners believe that referral of risk management is mandatory, which it is not, they should have brought an action in district court under Section 2619(a)(2) seeking to force EPA to take such action. 15 U.S.C. § 2619(a)(2).

[12] Once EPA has exercised its discretion to issue a determination, such determination would be reviewable. But the decision not to issue a determination is

EPA *whether* or not to issue a determination and therefore provides no meaningful standard against which to judge EPA's exercise of discretion.

Congress's intent that EPA's decision regarding issuance of a Section 2608(a) determination be unreviewable is further demonstrated by the applicability of Section 2608(a) to EPA enforcement actions under Section 2606. *See* 15 U.S.C. § 2608(a)(4)(A)–(B) (referencing Sections 2605(a) and 2606). Section 2606 allows EPA to take enforcement action to address imminently hazardous chemical substances or mixtures. Under Industry Petitioners' interpretation, EPA's decision to exercise its enforcement authority under Section 2606 to address an imminently hazardous chemical substance instead of referring such imminent hazard to another agency would be judicially reviewable. *See* 15 U.S.C. § 2608(a)(4)(B). However, an agency's decision regarding whether to exercise its enforcement powers is committed to the agency's discretion and is presumptively unreviewable. *Heckler*, 470 U.S. at 832–33. Industry Petitioners have not overcome this presumption by demonstrating that Congress has "indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion." *See id.* at 834–35.

---

unreviewable. *See Texas*, 983 F.3d at 833–35 (finding that EPA's decision not to issue a determination that an action has a nationwide scope or effect, which would transfer venue to the D.C. Circuit, was unreviewable because the Clean Air Act committed whether to issue a determination to EPA's discretion).

In a similar context, the D.C. Circuit concluded that EPA's determination under TSCA Section 2608(b)(1) to use another law administered by EPA to manage unreasonable risk, which is also left to "the Administrator's discretion," 15 U.S.C. § 2608(b)(1), is unreviewable. *See Env't Def. Fund v. EPA*, 598 F.2d 62, 76 (D.C. Cir. 1978). The D.C. Circuit rejected the petitioners' argument that EPA should have used TSCA to regulate a chemical substance, stating that Section 2608 "leaves EPA the choice of regulating toxic substances under TSCA, other statutes [ ], or both." *Id.* at 77. The court further explained that "Congress determined that a choice among regulatory authorities was necessary so that EPA could use the most effective means available to combat unknown and potentially extreme risks from toxic substances, and that judicial review of EPA's choice was inappropriate." *Id.*

Because Section 2608(a) makes clear that whether to issue a determination is in the Administrator's discretion, EPA was not obligated to issue such a determination. Because EPA was not legally obligated to issue a Section 2608(a) determination and there is no standard by which to judge EPA's exercise of discretion, EPA's decision not to issue a Section 2608(a) determination is unreviewable.

### 2.     EPA's Decision Not to Issue a Section 2608(a) Determination Was Reasonable.

Even if EPA's decision not to issue a Section 2608(a) determination is reviewable, the record supports it. EPA considered OSHA's regulatory authority

extensively in the proposed rule and reasonably declined to issue a Section 2608(a) determination.

In the proposed rule, EPA explained that gaps exist between OSHA's and EPA's statutory authorities to address the risks posed by asbestos. 87 Fed. Reg. at 21732–33. EPA explained that the 2016 Amendments reduced the likelihood that an action under another statute could sufficiently reduce the unreasonable risk of asbestos because, under TSCA, EPA must ensure that a chemical substance no longer presents an unreasonable risk. *Id.* at 21733. However, when OSHA sets permissible exposure limits, OSHA must establish that the permissible exposure limits are economically and technologically feasible. *Id.* OSHA itself has acknowledged that a significant risk remains at the permissible exposure limit established for asbestos. 59 Fed. Reg. at 40967 ("The 0.1 f/cc level leaves a remaining significant risk."). EPA also noted that the permissible exposure limits are not frequently updated, even in the presence of scientific evidence suggesting a permissible exposure limit is not sufficiently protective, and that the asbestos permissible exposure limit has not been updated since 1994. 87 Fed. Reg. at 21712; *see also* 79 Fed. Reg. 61384 (OSHA's request for information discussing obstacles to updating permissible exposure limits).

Additionally, with respect to asbestos, EPA determined that a ban was necessary to eliminate the unreasonable risk, which OSHA has said it does not

have the authority to implement. *See e.g.*, Jun. 29, 2009 OSHA letter to J. Hillman, available at https://www.osha.gov/laws-regs/standardinterpretations/2009-06-29 ("[W]hile the Occupational Safety and Health Act of 1970 [] does not give OSHA authority to ban the use of hazardous materials, that authority has been delegated to [EPA] through laws such as [TSCA]."); Feb. 11, 1986 OSHA Letter to G. Hart, available at https://www.osha.gov/laws-regs/standardinterpretations/1986-02-11 ("[I]n this country only [EPA] has the authority to ban substances; [OSHA] cannot.").

Industry Petitioners argue that EPA *must* refer risk management if another federal law exists that may prevent or reduce the unreasonable risk. Indus. Br. at 56. More specifically, Industry Petitioners suggest that the use of the word "may" means that if there is *any* possibility that action taken under OSHA will prevent or reduce the unreasonable risk to a sufficient extent then EPA *must* refer the risk to OSHA. *Id.*

That interpretation proves too much. Adopting Industry Petitioners' interpretation would require EPA to refer *all* workplace-related risk findings to OSHA. If Congress had intended such an outcome, it would have excluded workers from TSCA regulation or explicitly required the referral of all workplace-related risk determinations to OSHA. Moreover, Section 2608(c), which provides that EPA's exercise of its authority under TSCA does not preempt OSHA's

authority to "prescribe or enforce standards or regulations affecting occupational safety and health," 15 U.S.C. § 2608(c), would be superfluous.

Further, if Congress had intended referral be mandatory, surely time for such referral would have been included in the deadlines for issuing a risk management rule provided in Section 2605(c)(1). Additionally, it seems unlikely that Congress would have contemplated a lengthy mandatory referral process pursuant to Section 2608(a) before EPA can regulate because that would prevent EPA from exercising its authority to address imminent hazards under Section 2606 in a timely manner. As this Court recognized in *Corrosion Proof Fittings*, TSCA was aimed at combatting multi-industry problems and thus, Congress gave EPA discretion to regulate workplace hazards without first referring risks to OSHA. *See* 947 F.2d at 1216.

Industry Petitioners' argument is also foreclosed by this Court's decision in *Corrosion Proof Fittings.* Part of that case concerned EPA's decision not to refer unreasonable risk from asbestos to other agencies, including OSHA, because EPA explained "no one other authority could address all the risks posed 'throughout the life cycle' by asbestos, and any action by one or more of the other agencies still would leave an unacceptable residual risk." *Id.* This Court validated EPA's decision "to use TSCA as a comprehensive statute designed to fight a multi-industry problem." *Id.* The opinion in *Corrosion Proof Fittings* recognized that

EPA was best positioned to make the determination about whether referral to other agencies was appropriate. Importantly, the decision to refer a risk to other agencies was not treated as mandatory simply based on the mere possibility that other agencies *may* be able to regulate that risk. While TSCA was amended after the decision in *Corrosion Proof Fittings*, the amendments to Section 2608(a) did not limit EPA's discretion to issue or decline to issue a determination.

Industry Petitioners also argue that OSHA could have regulated the chlor-alkali and sheet gasket conditions of use because EPA identified no risks outside of the workplace for those specific conditions of use. Indus. Br. at 60. However, this argument incorrectly assumes that the Section 2608(a) determination must be made for each individual condition of use. Section 2608(a) includes no such requirement—it allows EPA to refer to another agency risks from some, all, or no conditions of use of a chemical substance. Consistent with the statute, EPA considered whether OSHA could prevent or reduce the risks of asbestos "across the range of conditions of use," and reasonably determined that it could not and that a single action under TSCA would result in a "more coordinated, efficient and effective" management of the unreasonable risk posed by asbestos. 87 Fed. Reg. at 21733; 89 Fed. Reg. at 21970, 21999. In any event, as discussed above, EPA reasonably concluded that, because of the differences in EPA's and OSHA's

regulatory authorities, the workplace risk from asbestos should be regulated under TSCA.

In sum, EPA fully considered referral to OSHA and provided sufficient reasons for declining to issue a Section 2608(a) determination. Therefore, even if the decision not to issue a determination was judicially reviewable, EPA's decision not to issue a Section 2608(a) determination was reasonable.

### C.    EPA's Decision to Ban Asbestos-Containing Diaphragms and Sheet Gaskets Complied with Section 2605.

Industry Petitioners next argue that the Risk Management Rule's prohibition on manufacture, processing, distribution, and commercial use of asbestos-containing diaphragms and sheet gaskets goes beyond what is "necessary" to eliminate unreasonable risk. They read the 2016 Amendments' explicit rejection of the "least burdensome requirement" framework to be largely procedural: Congress purportedly relieved EPA of the "evidentiary and analytic burdens" of "justifying" its selected risk management restrictions, but "*retained*" and "*reinforced*" the substantive requirement that those restrictions not go a hair past what is "necessary." *See* Indus. Br. at 66.

That is wrong. The statutory text, context, and history undermine Industry Petitioners' interpretation. Besides that, Industry Petitioners' statutory argument distracts from the actual basis for EPA's action, which shows that restrictions short

of the selected prohibitions *would not* ensure that asbestos "no longer presents" unreasonable risk. 42 U.S.C. § 2605(a); *see infra* Argument Section I.C.2.

 Industry Petitioners also argue that EPA failed to analyze at least one primary regulatory alternative as required by Section 2605(c)(2)(A). For the reasons discussed below, Industry Petitioners are wrong.

### 1. TSCA Does Not Require EPA to Adopt the Least Burdensome Risk Management Measures.

TSCA Section 2605(a) directs EPA to apply restrictions "to the extent necessary so that the chemical substance or mixture no longer presents [unreasonable] risk." 15 U.S.C. § 2605(a). That provision obligates EPA to impose risk management measures that are sufficient to eliminate an identified unreasonable risk. *See* H. Rep. No. 114-176 at 23 ("[S]ection 6(a) *obliges* the Administrator to apply requirements on a chemical substance to the extent necessary so that the chemical substance or mixture no longer presents or will present an unreasonable risk.") (emphasis added).

EPA has done that here: the Risk Management Rule adopts those measures necessary to eliminate the unreasonable risk identified in the Part 1 Risk Evaluation. EPA's determination of what measures are necessary is grounded in the record evidence: control measures short of a prohibition would be inadequate to eliminate the unreasonable risk. EPA's determination is also grounded in its

assessment of the considerations Congress directed EPA to take into account under Section 2605(c)(2).

Industry Petitioners contend that the statute actually erects a delicate tightrope for EPA to walk: yes, EPA must regulate to eliminate unreasonable risk, but in doing so EPA must be sure it is doing "no more" than what is "sufficient to eliminate the identified unreasonable risk." Indus. Br. at 65. In other words, EPA must triangulate and select the single least burdensome regulatory option that eliminates unreasonable risk.

That cramped interpretation is at odds with both the statutory text and the purpose of the 2016 Amendments. Congress amended TSCA to remove the restriction that EPA must regulate only "using the least burdensome requirement*s*." *Compare* Pub. L. No. 94-469, § 6(a), 90 Stat. at 2020 (1976), *with* 15 U.S.C. § 2605(a). Instead, under Congress's revised scheme, EPA's regulation must first and foremost ensure that the regulated chemical substance "no longer presents" the unreasonable risk identified under Section 2605(b). Then, when selecting between regulatory options that do indeed eliminate that risk, EPA "shall consider" and "factor in, to the extent practicable," considerations listed in Section 2605(c)(2)(A), like health and environmental effects from and magnitude of exposure to the chemical substance, the chemical substance's benefits for various

uses, and the "reasonably ascertainable economic consequences" of the rule,

including its "cost effectiveness." 15 U.S.C. § 2605(c)(2)(A), (B).

In other words, Section 2605(a) defines the universe of minimally acceptable

restrictions, and Section 2605(c) guides EPA's selection from within that universe.

EPA must do at least what is needed to address the unreasonable risk—and

certainly cannot apply a clearly "unnecessary" requirement—but has "a degree of

discretion" to select among regulatory options that do eliminate unreasonable risk.

*See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (noting that

statutory terms such as "appropriate" and "reasonable" impose limits on an

agency's regulatory authority but also provide agencies with inherent discretion

and flexibility when regulating subject to this limit). And, of course, any rule

adopted by EPA—including each restriction in a Section 2605(a) rule—must be

"supported by substantial evidence in the rulemaking record taken as a whole." 15

U.S.C. § 2618(c)(1)(B)(i)(I); *see also Labor Council for Latin Am. Advancement v.

EPA*, 12 F.4th 234 (2d Cir. 2021) (EPA action would be unreasonable if substantial

evidence did not support the conclusion that additional measures are necessary).

The inquiry is not, as Industry Petitioners contend (Indus. Br. at 63–64), what the

phrase "to the extent necessary" means in isolation, but rather, what it means in the

context of this particular statute, where Congress included other provisions that

expressly govern how EPA is to select from among the various remedial approaches that could address the risk.

Here, for example, guided by the factors in Section 2605(c)(2), EPA declined in the Risk Management Rule to impose interim workplace protections on the broader chemical production industry before a two-year ban went into effect in part because of the burdens on industry to implement those protections. 87 Fed. Reg. at 21718. But neither these factors nor the "to the extent necessary" language in Section 2605(a) itself were intended to reestablish the "least burdensome requirement" restriction that the 2016 Amendments were explicitly designed to remove. *See* S. Rep. No. 114-67 at 19; *see also* 162 Cong. Reg. at 7985 (explaining that the Section 2605(c)(2) requirement to consider costs and benefits "do[es] not require EPA to demonstrate benefits outweigh costs, to definitively determine or select the least-cost alternative, or to select an option that is demonstrably cost-effective or is the least burdensome adequately protective option.").

Importing that rejected requirement is precisely what Industry Petitioners' interpretation would do. Their reading imposes additional, non-textual limitations on EPA's authority. Section 2605(a) does not say "only" regulate to the extent necessary and "no more." *See* Indus. Br. at 65. It affirmatively requires EPA to impose risk mitigation measures "to the extent necessary" to eliminate unreasonable risk and then cabins EPA's regulatory authority through the

considerations in Section 2605(c)(2)(A). By contrast, in Section 2605(c)(2)(E),

Congress *did* direct EPA to apply "prohibitions or other restrictions" to an article

or category of articles "*only* to the extent necessary" to address identified risks. 15

U.S.C. § 2605(c)(2)(E) (emphasis added).[13] That the limiting word "only" appears

in that section but not Section 2605(a) is significant: "Where Congress includes

particular language in one section of a statute but omits it in another section of [a

statute], it is generally presumed that Congress acts intentionally and purposely in

the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23

(1983) (citations omitted). Importing "only" into Section 2605(a) also would

render the additional restriction in Section 2605(c)(2)(E) redundant, contrary to the

"cardinal rule of statutory interpretation that no provision should be construed to

be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (citing

*Colautti v. Franklin*, 439 U.S. 379, 392 (1979)); *see also United States v. Jicarilla*

---

[13] Industry Petitioners do not argue that the Risk Management Rule is inconsistent with Section 2605(c)(2)(E), and thus any such argument is waived. *See United States v. Fernandez*, 48 F.4th 405, 412 (5th Cir. 2022) (holding a party's "fail[ure] to raise [an argument] in its opening brief," constitutes waiver of that argument) (citation omitted). Regardless, as explained *supra*, the requirements applicable to the chlor-alkali and titanium dioxide industries under the Risk Management Rule are the only measures sufficient to eliminate the unreasonable risk identified in the Part 1 Risk Evaluation. *See also* 89 Fed. Reg. at 21998 (explaining why "EPA's final regulatory action sets requirements for articles only to the extent necessary to address the identified risks from exposure to chrysotile asbestos from the article so that chrysotile asbestos does not present an unreasonable risk to health.").

*Apache Nation*, 564 U.S. 162, 185 (2011) (noting that a court should not "adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

The fact that Congress expanded the list of Section 2605(a) risk management options also should not be read to *restrict* EPA's regulatory options. *See* Indus. Br. at 65–66. Industry Petitioners seem to argue that by providing EPA a bigger regulatory toolbox, Congress meant to make it *harder* to use one of those tools: a prohibition.

The text cannot support that inference. Section 2605(a) simply lists the risk management measures available to EPA; it does not express any preference for a particular measure. So long as the selected measure ensures the chemical substance "no longer presents" unreasonable risk, Section 2605(a) is satisfied. Indeed, Congress considered a version of the 2016 Amendments that—like Industry Petitioners' interpretation here—would have permitted EPA to ban a chemical substance *only* if the "application of restrictions" could not address the identified unreasonable risk. S. Rep. No. 114-67 at 86. But that bill, S.697, was rejected. The Court should not revive the rejected text by accepting Industry Petitioners' construction of Section 2605(a). *INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987) (explaining that there are few principles of statutory interpretation "more

compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

Ultimately, Industry Petitioners' statutory argument dismisses the role of the considerations Congress *did* specify in Section 2605(c)(2)(A) in favor of a more prescriptive approach indistinguishable from the "least burdensome requirement" approach Congress deleted from the statute. The Court should reject that argument.

In any event, the crux of Industry Petitioners' objection is not that EPA misinterpreted the text, but rather that EPA *could have*—but did not—select different risk management restrictions that fully address asbestos' unreasonable risk. That is a factual dispute: EPA disagrees, as explained in the record, that risk management measures short of a prohibition would ensure asbestos "no longer presents" unreasonable risk. 15 U.S.C. § 2506(a); *see* 89 Fed. Reg. at 21982–83. As such, the question is not whether EPA applied the wrong statutory standard, but whether EPA's assessment of the record evidence was reasonable. As demonstrated below, it was.

### 2. Only a Ban Eliminates the Unreasonable Risk Posed by Asbestos in the Chlor-Alkali and Titanium Dioxide Industries.

The risk management measures EPA adopted in the Risk Management Rule were the only available measures sufficient to eliminate the unreasonable risk identified in the Part 1 Risk Evaluation. *Contra* Indus. Br.at 66–68; *see also*

Chamber of Commerce Br. at 20–24. Industry Petitioners' argument that a less-restrictive option was available misconstrues the record.

To evaluate risk management options, EPA assessed whether workplace controls could reliably achieve inhalation exposure levels below 0.005 fibers per cubic centimeter as averaged over an eight-hour period, which EPA determined would protect against the unreasonable risk of cancer and other diseases. That level corresponds to the interim Existing Chemical Exposure Limit that industrial facilities must try to achieve in the years before the Rule's ban goes into effect. 40 C.F.R. § 751.511(a), (b); 89 Fed. Reg. at 21982. Industry Petitioners do not challenge the limit itself; that is, they do not dispute that EPA accurately identified the exposure threshold that would protect against unreasonable risk. Instead, Industry Petitioners argue that the permanent adoption of interim measures "can" eliminate unreasonable risk, and thus that EPA violated Section 2605(a) by choosing to prohibit uses instead. Indus. Br. at 66–67.

Industry Petitioners are wrong. Yes, EPA concluded that *ensuring* exposure remained at or below the Existing Chemical Exposure Limit would eliminate unreasonable risk. But it also concluded that the chlor-alkali and titanium dioxide industries were unlikely to reliably achieve that limit for all workers using

respirators.[14] 89 Fed. Reg. at 21982. Given, then, that respirators would be insufficient to eliminate unreasonable risk, EPA concluded a ban was necessary. Industry Petitioners fail to recognize that an interim control measure—here, an Existing Chemical Exposure Limit and respirators—can *reduce* unreasonable risk but fall short of *eliminating* it. Those interim control measures nevertheless are appropriate in the short-term to reduce risk while "provid[ing] for a reasonable transition period" as mandated by Section 2605(d)(1)(E).

Workplace controls are insufficient for several reasons. First, as EPA explained, there are significant challenges in monitoring to and below the Existing Chemical Exposure Limit. 89 Fed. Reg. at 21982. At times, monitoring may be problematic due to analytical and field sampling challenges. *Id.* Accordingly, industry may not be able to "reliably ensure" compliance with the Existing Chemical Exposure Limit simply because they cannot accurately measure how much asbestos workers and occupational non-users are exposed to. *Id*.

Industry shares these concerns. As Petitioner ACC put it, "measuring [the] concentration of chrysotile asbestos at or below the proposed [Existing Chemical

---

[14] Industry Petitioners' argument appears to include the chemical production industry generally—instead of titanium dioxide specifically—however the Risk Management Rule did not include any interim protection measures such as an interim Existing Chemical Exposure Limit for the chemical production industry generally. 40 C.F.R. § 751.511.

Exposure Limit] of 0.005 fibers/cubic centimeter (f/cc) over 8 or more hours, while feasible, is currently not practicable." ACC Comment, AR C.503, at 5, JA2407. The Vinyl Institute commented that, "[i]n practice, personal monitoring methods cannot achieve the proposed limits" and that its "members are reporting that they cannot reliably measure the [Existing Chemical Exposure Limit] over 8-hours." The Vinyl Institute Comment, AR C.500, at 3–4, JA2376–77.

Second, chlor-alkali and titanium dioxide facilities likely could not comply with the Existing Chemical Exposure Limit without relying on respirators. RM RTC, AR C.758, at 52–53, JA2780–81; 89 Fed. Reg. at 21982. This is because monitoring data provided by industry itself showed air concentrations of asbestos above the Existing Chemical Exposure Limit. RM RTC, AR C.758, at 5, JA2733. Industry Petitioners argue without any support that "EPA is comparing apples and oranges" by considering that monitoring data because it was collected to show compliance with OSHA's permissible exposure limit. *See* Indus Br. at 66–67. But there is nothing inherent about the monitoring data being collected for another purpose that renders it unreliable here, and these data were the only data reasonably available to EPA to assess industry's ability to comply with the Existing Chemical Exposure Limit. And Industry Petitioners do not contend that additional workplace engineering controls are available beyond what those facilities already use to comply with OSHA regulations.

Petitioner ACC encouraged EPA to use industry monitoring data because "[w]orkplace monitoring data from industry sources should be considered the most accurate data related to employee exposure." Comment submitted by Judith Nordgren, Managing Director, Chlorine Chemistry Division, ACC, AR A.478, at 4, JA223. Moreover, the Chlorine Institute itself has commented that its members could not meet the Existing Chemical Exposure Limit without reliance on respirators. *See, e.g.*, The Chlorine Institute Comment, AR C.492, at 3, Attach. 1, JA2358 ("Due to the technical infeasibility of achieving the [Existing Chemical Exposure Limit], EPA should consider the assigned protection factors for respiratory protection used during tasks.").

At industry's urging, the Risk Management Rule permits chlor-alkali and titanium dioxide facilities to comply with the interim exposure limit through the use of respirators. 89 Fed. Reg. at 21982; RM RTC, AR C.758, at 61, JA2789. But issues with respirators like poor fit and maintenance impair their ability to adequately protect users. *Id.* at 21983; RE, AR B.117, at 74–75, JA984–85. Thus, as EPA explained, even with every worker wearing a respirator for all asbestos-handling tasks, some would not be protected from unreasonable risk. 89 Fed. Reg. at 21983.

Relying on respirators to eliminate unreasonable risk also assumes that chlor-alkali workers and occupational non-users wear respirators in the first place.

But evidence in the record shows that respirators can be uncomfortable, leading workers to avoid them even when they are required. Due to the coronavirus pandemic, many Americans have first-hand experience with facemasks and can attest to how uncomfortable they are. The half-face air-purifying respirators and supplied air respirator hoods chlor-alkali workers wear require a tight seal around the wearer's face and therefore are even more uncomfortable. *See* RE, AR B.117, at 182, JA1092; AFL-CIO America's Unions Comment, AR C.378, at 3, JA2036 (respirators are "notoriously uncomfortable"). Given these challenges, it is not surprising that former chlor-alkali workers report spotty compliance with even those *existing* respiratory personal protective equipment requirements. *See* RM RTC, AR C.758, at 112–13, JA2840–41; *see also* NPR (2022b), AR C.617, at 12–13, 29, JA3954–55, 3971. EPA therefore reasonably concluded that chlor-alkali or titanium dioxide workers and occupational non-users were not likely to fully comply with *additional* respiratory personal protective equipment requirements.

The reliability and comfort issues are why OSHA considers respirators the *least effective* means of ensuring worker protection of the five workplace controls included in its hierarchy of controls. RE, AR B.117, at 72, JA982. The hierarchy of controls is "an ingrained part of OSHA's regulatory framework" for air contaminants in the workplace. *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1265 (11th Cir. 1999). Under OSHA regulations,

only when feasible engineering or administrative controls are insufficient to bring contaminant levels below applicable exposure limits does OSHA permit companies to turn to PPE. *Id.* This is because engineering and administrative controls "make respiratory protection automatic, while respirators are dependent on use and constant attention and are subject to human error." *Id.* at 1269. Thus, respirators are "an inferior and inadequate means of protecting workers." *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1205 n.13 (D.C. Cir. 1980) (accepting OSHA's hierarchy of controls).

Because respirators cannot reliably reduce exposure to levels below the Existing Chemical Exposure Limit, EPA appropriately concluded that their use will not eliminate unreasonable risk. The question for the Court is not, as Industry Petitioners posit, "whether the [Existing Chemical Exposure Limit] and workplace controls *can* eliminate unreasonable risk," in some hypothetical sense, but whether they *will* eliminate unreasonable risk under real world conditions. *See* Indus. Br. at 67; 15 U.S.C. § 2605(a) (requiring EPA to regulate "to the extent necessary so that the chemical substance or mixture *no longer presents* [unreasonable] risk.") (emphasis added).

So, while the control measures and personal protective equipment needed to comply with the interim exposure limit will "minimize" asbestos exposure, EPA

appropriately conclude that long-term adoption of those measures will not eliminate unreasonable risk. 89 Fed. Reg. at 21982. Only a ban will do that.

Industry Petitioners blatantly mischaracterize the Risk Management Rule as an attempt to eliminate all risk in the chlor-alkali and titanium dioxide industries. *See* Indus. Br. at 68. As discussed, EPA determined the level—*i.e.*, the Existing Chemical Exposure Limit—below which no *unreasonable* risk would occur. It is because the chlor-alkali and titanium dioxide industries cannot reliably reduce exposure to levels below the Existing Chemical Exposure Limit that a ban is necessary here.

### 3.   EPA Adequately Considered Alternative Regulatory Actions.

As TSCA requires, EPA considered primary alternative regulatory actions that would eliminate the unreasonable risk caused by asbestos.

Section 2605 directs EPA to consider "the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator." 15 U.S.C. § 2605(c)(2)(A)(iv)(II). In the proposed Risk Management Rule, EPA considered a primary alternative regulatory action including longer compliance deadlines and interim workplace exposure controls for the chlor-alkali industry and for sheet gaskets in chemical production. 87 Fed. Reg. at 21722–27. In the final Risk Management Rule, EPA considered two primary alternative regulatory actions for the chlor-alkali industry, which were

both bans with non-phased compliance timelines, taking effect five years and 12 years after the effective date of the Risk Management Rule, as opposed to the phased compliance timelines of five, eight, and 12 years that EPA adopted. 89 Fed. Reg. at 21993. For sheet gaskets used in chemical production, EPA considered a primary alternative regulatory action that was a ban which would take effect five years after the effective date of the final rule without exception, and EPA adopted a ban that would take effect after two years for the broader chemical production industry, with already-installed gaskets excepted, and that would take effect after five years for titanium dioxide manufacturing specifically. *Id.*

Industry Petitioners argue that different compliance timeframes do not constitute alternative regulatory actions. Indus. Br. at 69. But EPA explained that only a ban on the manufacture, processing, distribution and use of asbestos would eliminate the unreasonable risk caused by asbestos. RM RTC, AR C.758, at 50, JA2778. EPA did not consider alternative regulatory actions that would not eliminate the unreasonable risk because TSCA prohibited the adoption of such options as the final Risk Management Rule. *Id.* Therefore, while EPA considered many different regulatory options in the course of its rulemaking, EPA only evaluated bans with varying compliance timeframes as the primary alternative regulatory actions for purposes of Section 2605. *Id.*

EPA's approach was consistent with the statute. Congress did not intend that EPA consider alternatives that would not control unreasonable risk. In fact, when reviewing the 2016 Amendments, the House Committee on Energy and Commerce explained that it "does not expect EPA to analyze the cost-effectiveness of an open-ended group of possible requirements, but to focus on those that meet the subsection (a) purpose of controlling an unreasonable risk of injury." H. Rep. No. 114-176 at 26. Here, EPA appropriately considered the regulatory alternatives (bans with different compliance deadlines) that would comply with its obligation to eliminate unreasonable risk.

Section 2605(c)(2)(A)(iv)(II) imposes no requirements on the ways that the alternative regulatory action must differ from the proposed regulatory action, nor does it require that the alternatives be different types of regulatory action. Therefore, EPA properly considered alternative compliance deadlines for the bans.

Industry Petitioners also contend that EPA should have considered regulatory alternatives like personal protective equipment mandates, certification and training, and other workplace controls. Indus. Br. at 70. Industry Petitioners cannot show, however, that those methods would eliminate the unreasonable risk caused by asbestos. To the contrary, the record evidence supports EPA's view that there is not "sufficient information to determine that unreasonable risk can be eliminated with [personal protective equipment] and current workplace controls

alone[.]" 89 Fed. Reg. at 21984. With respect to personal protective equipment, EPA expressly stated that it "has not concluded that [personal protective equipment] would adequately reduce workplace exposure and risk." RM RTC, AR C.758, at 121, JA2849. EPA also considered certification and training and included some elements of a certification and training program in the interim controls. 89 Fed. Reg. at 21992. However, because EPA concluded that an Existing Chemical Exposure Limit and accompanying workplace controls cannot ensure that asbestos does not present unreasonable risk to workers, workplace controls were not acceptable regulatory alternatives. RM RTC, AR C.758, at 157, JA2885; *see also* 89 Fed. Reg. at 21983.

In sum, EPA's approach is consistent with the statute and supported by substantial evidence in the record.

### D.    EPA Lawfully Set Compliance Deadlines for the Chlor-Alkali Industry.

EPA set reasonable compliance deadlines for the chlor-alkali industry in accordance with TSCA. That is because those compliance deadlines accommodate differences among facilities in a way that complies with TSCA's mandate that risk management rules take effect "as soon as practicable."

Industry Petitioner Olin[15] contends that the compliance deadlines set in the Final Rule were unlawful. *See* Indus. Br. at 71–73. Olin is wrong. *First*, TSCA Section 2605(d)(2) constitutionally delegated to EPA the power to set different compliance deadlines for affected persons. *Second*, substantial evidence supports EPA's decision to set different compliance deadlines based on the conversion technology utilized.

### 1.    Section 2605(d)(2) Is Not an Unconstitutional Delegation of Legislative Power.

TSCA lawfully gives EPA discretion to set compliance dates for its Section 2605(a) risk management regulations that vary to accommodate different industry needs. Specifically, Section 2605(d)(2) provides that "[a]s determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons." Generally, per Section 2605(d)(1), compliance dates are to be "as soon as practicable." *See* 15 U.S.C. § 2605(d)(1)(A)–(D). Section 2605(d)(2) then provides that, "[a]s determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons." *Id*. § 2605(d)(2).

Olin contends that Section 2605(d)(2)'s conferral of discretion to vary compliance dates is an unconstitutional delegation of legislative power. *See* Indus.

---

[15] Other Industry Petitioners do not join this argument. Indus. Br. at 2 n.2.

Br. at 71–73. That is wrong. Congress set forth a more than adequate "intelligible principle" to guide EPA's discretion in setting compliance dates. *See Gundy v. United States*, 588 U.S. 128, 145–46 (2019) (plurality op.); *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (affirmed on other grounds). Vesting of authority in an Executive Branch official is "constitutionally sufficient" under the intelligible principle standard "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also Jarkesy*, 34 F.4th at 461 (quoting *Mistretta*, 488 U.S. at 372).

The "intelligible principle" standard is "not demanding," and the Supreme Court explained that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Gundy*, 588 U.S. at 146. (quoting *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 474–75 (2001)) (cleaned up). The Supreme Court has only found an "intelligible principle" lacking in two statutes that "failed to articulate any policy or standard," *Gundy*, 588 U.S. at 146 (cleaned up), and has upheld statutes that authorized regulation in the "public interest," necessary "to protect the public health." *See id.* (discussing cases). However, this Court has explained that "a total absence of guidance is impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462.

Here, Congress has clearly delineated a general policy that EPA is to apply and the boundaries of EPA's authority. In Section 2605(d)(1), Congress specified that most compliance dates must be no later than five years after the rule is promulgated. Congress also established a standard to guide EPA within that narrow band of discretion: EPA must set compliance dates that are "as soon as practicable." 15 U.S.C. § 2605(d)(1)(C). Section 2605(d)(2) merely clarifies that EPA can choose to set these compliance dates on an individual basis instead of wholesale.

Olin contends that Section 2605(d)(2) provides an "unfettered delegation to EPA of the legislative authority to target particular persons with onerous deadlines and grant more generous time to others, at the whim of EPA." Indus. Br. at 73. Not so. Any deadline must be guided by the standards in subsection (d)(1): the compliance dates must be "as soon as practicable" and "provide for a reasonable transition period." 15 U.S.C. § 2605(d)(1)(A)–(E).

Other parts of the statute further guide EPA's deadline decisions. For instance, Section 2605(c)(2)(C) requires EPA to consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment will be reasonably available when the prohibition or restriction takes effect. 15 U.S.C. § 2605(c)(2)(C). Because these provisions articulate Congress's policy goals and the boundaries on EPA's authority to set deadlines to

achieve those ends, Section 2605(d)(2) is not an unconstitutional delegation of authority. *See Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 621 (5th Cir. 2024) (holding a delegation meets constitutional muster if it "provide[s] at least *some* guidance" for how the agency can exercise its authority) (emphasis in original).[16]

Congress provided boundaries for EPA's power to set deadlines—in fact, Olin relies on these boundaries to argue that EPA's deadlines do not comply with the statute (Indus. Br. at 73)—and therefore Section 2605(d)(2) is a constitutional delegation of legislative power.

### 2. Substantial Evidence Supports the Compliance Deadlines Set for the Chlor-Alkali Industry.

On the merits, Olin argues that substantial evidence does not support setting different compliance deadlines based on the technology adopted at a given facility. Indus. Br. at 73–75. Olin is wrong and its argument misrepresents both the statute and the record. Substantial evidence supports the transition period adopted by the Risk Management Rule, which provides the chlor-alkali industry with flexibility and accommodates differences among facilities in a way that complies with

---

[16] Even if Section 2605(d)(2) were unconstitutional (which it is not), that provision should be severed from the rest of the statute. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 234 (2020) ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.").

TSCA's mandate that risk management rules take effect "as soon as practicable." 89 Fed. Reg. at 21980; *see* 15 U.S.C. § 2605(d)(1)(A).

As EPA explained, there are two technologies that can replace asbestos diaphragms in chlor-alkali production: non-asbestos diaphragm cells and membrane cells. 89 Fed. Reg. at 21980. Olin plans to convert its asbestos-containing diaphragm facilities to non-asbestos diaphragms, while OxyChem plans to convert three facilities to membrane cells and two to non-asbestos diaphragm cells.[17] *Id.* at 21980–81. Non-asbestos diaphragms operate in a similar manner to asbestos diaphragms and conversion can be performed concurrently at several facilities. *Id.* at 21980.

By contrast, membrane cells operate differently from non-asbestos diaphragms and require a much more complicated conversion process, including new cells and other significant plant infrastructure changes. *Id.* Due to the limited availability of suppliers, the technical expertise required for membrane cell conversions, and different permit requirements, such conversions can only be accomplished sequentially, *i.e.*, one facility at a time. *Id.* As EPA explained, these critical differences in the conversion processes for non-asbestos diaphragm and

---

[17] The third chlor-alkali producer, Westlake, has indicated plans to convert its single facility to non-asbestos technology, but has not specified whether it intends to convert to non-asbestos diaphragms or membrane technology. 89 Fed. Reg. at 21890.

membrane cell technologies support permitting five years for conversion to non-asbestos diaphragms and a staggered schedule of five, eight and twelve years for conversion to membrane cells. *Id.* at 21980–82; 40 C.F.R. § 751.505.

Olin inexplicably claims that EPA was barred from considering the lower energy usage of membrane cell technology in assessing its suitability as a conversion technology. *See* Indus. Br. at 74. But Section 2605(c)(2)(C) requires EPA to consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment will be reasonably available when the prohibition or restriction takes effect. 15 U.S.C. § 2605(c)(2)(C). Cell membrane technology's lower energy requirements reduce air pollution, which would provide both environmental and health benefits. 89 Fed. Reg. at 21972, 21980. Thus, EPA appropriately granted chlor-alkali companies the option to sequentially convert to membrane cells "as soon as practicable" for those facilities instead of taking the approach advocated for by Olin and requiring all facilities to convert to non-asbestos diaphragms at once.[18]

Further, contrary to Olin's assertion, EPA's intent in providing time for chlor-alkali companies to sequentially convert to membrane cells was not "to

---

[18] In addition, membrane cell technology produces a higher-quality product that commands a higher price, which further supports EPA's decision not to mandate adoption of a specific conversion technology. *See* 89 Fed. Reg. at 21980.

encourage the industry to switch to the most energy-efficient alternative." *See* Indus. Br. at 74. Rather than encouraging the chlor-alkali industry to adopt a particular alternative to asbestos diaphragms, the staggered compliance timelines in the Risk Management Rule provide the chlor-alkali industry with the option to adopt the alternative of their choosing. In contrast, Olin's eleventh-hour request for a seven-year compliance timeline, discussed further below, would have forced the chlor-alkali industry to either adopt the alternative of *Olin's* choosing (non-asbestos diaphragms) or cease operation of their facilities while they transitioned to membrane cell technology. Thus, the staggered compliance timelines in the Risk Management Rule do not "encourage" the adoption of a particular technology as Olin claims—they allow the chlor-alkali industry to consider all available alternative technologies.

To the extent EPA could have acted differently, Olin itself held the keys. A full year after EPA published the Proposed Risk Management Rule, Olin proposed that *all* chlor-alkali producers be permitted to continue to install new asbestos-containing diaphragms for two years, with an additional five years to convert to either non-asbestos diaphragm or membrane cell technology. 89 Fed. Reg. at 21980. However, Olin did not explain why it required two years to continue to install new asbestos diaphragms before it could begin converting cells or respond to EPA's request for additional information. *Id.* at 21980–81; Olin Meeting

Summary 04-04-23, AR C.505, JA2411; Olin Meeting Summary 08-17-23, AR C.508, JA2412. Indeed, other chlor-alkali manufacturers told EPA or provided information suggesting that they could complete planned conversions to non-asbestos diaphragms within five years. 89 Fed. Reg. at 21981. Thus, EPA appropriately concluded that allowing seven years for conversion to non-asbestos diaphragm technology would not be "as soon as practicable." 89 Fed. Reg. at 21981; *see* 15 U.S.C. § 2605(d)(1)(A).

Olin's proposed approach would not have provided the requisite reasonable transition period for OxyChem, which is sequentially converting three facilities to membrane cell technology. 89 Fed. Reg. at 21980–81. Olin's proposal would have required OxyChem to, at minimum, close its third facility for five years before chlor-alkali production could resume. *Id.* at 21981. This would have had negative impacts on the supply of chlor-alkali chemicals for water treatment and the chemical industry. *Id.*

In any event, Olin is not without recourse. Olin could still provide the missing information to EPA and request an exemption from the five-year deadline under Section 2605(g). *Id.* at 21981. Alternatively, it could convert to membrane cell technology, which would provide it with an additional three years to convert its second asbestos-containing diaphragm facility.

Finally, Olin inexplicably claims that the different transition periods for conversion to non-asbestos diaphragm versus membrane technology place it at a competitive disadvantage. *See* Indus. Br. at 74. This ignores that OxyChem—the only company that plans to convert any facilities to membrane cell technology—also plans to convert two asbestos-containing diaphragm facilities to non-asbestos diaphragm technology, and, like Olin, it must do so within five years. 89 Fed. Reg. at 21980–81; 40 C.F.R. § 751.505(b). OxyChem also must convert one facility to membrane cell technology within five years. 40 C.F.R. § 751.505(b). Thus, to the extent Olin is harmed, so is its competitor.

Moreover, Olin fails to argue *how* exactly it will be competitively disadvantaged. Conversion of the three OxyChem facilities to membrane cell technology is much more complex and expensive than conversion to non-asbestos diaphragms. *See* RM RTC, C.758 at 89–91, JA2817–19 ("[s]ome industry sources have characterized a membrane conversion as essentially building a new plant"); Economic Analysis, C.753 at 3-19, JA2504 (estimating the cost of converting membrane cells at $1,443–$1,638 per metric ton of asbestos diaphragm cell capacity at a facility, compared to $110 to $343 for conversion to non-asbestos diaphragms); *see also* OxyChem Comment, AR C.453, JA2297–340. If extra time to complete the conversion process were critical from a competitiveness perspective, Olin could choose to adopt membrane cell technology. The fact that

Olin has not done so means that it has determined conversion to non-asbestos diaphragms is what is best for its business.

For these reasons, substantial evidence supports setting different compliance deadlines based on the conversion technology adopted.

## II.     Steel Workers' Petition Should Be Denied.

Steel Workers' challenge is narrower. First, Steel Workers contend that by declining to require interim protections for the broader chemical manufacturing industry in the two years before the ban for that industry goes into effect, EPA failed to meet Section 2605(a)'s standard to eliminate unreasonable risk. Steel Workers' Br. at 28–29. Second, Steel Workers argue that, by failing to impose interim protections through the end of the useful life of asbestos-containing gaskets, EPA violated Section 2605(d) because EPA did not limit exposure in a manner that was "as soon as practicable." *Id.* at 31. Finally, Steel Workers assert that EPA's decision to exclude already-installed gaskets from the ban for the chemical manufacturing industry was not a logical outgrowth of the Proposed Rule. *Id.* at 33–34. For the reasons set forth below, the Court should reject each of these arguments.

A.    **EPA's Decision Not to Require Interim Workplace Protections for the Chemical Manufacturing Industry Complied With TSCA.**

EPA reasonably declined to impose interim workplace protections for the chemical manufacturing industry.

EPA explained that the broader chemical production industry likely could not have implemented interim protections before the two-year ban on installing new asbestos-containing gaskets went into effect. 87 Fed. Reg. at 21718–19. Preparing for and implementing interim protections would have required significant time and resources. *Id.* This was particularly the case given that, at the time of the Risk Management Rule, EPA lacked the information necessary to craft such interim protections, especially as compared to the titanium dioxide industry, which was subject to a five-year compliance deadline. *Id.* For example, titanium dioxide manufacturing requires that gaskets be replaced as often as every few weeks due to the extreme temperature and pressure conditions involved in the manufacturing process. ACC Comment, AR C.503, at 4, JA2406. However, in the broader chemical manufacturing industry, gaskets can last decades. RM RTC, AR C.758, at 36, JA2764. Moreover, while EPA possessed exposure data and other critical information for the titanium dioxide industry, EPA lacked comparable information for the broader chemical production industry. *See, e.g.*, Meeting Summary with Chemours, AR C.18, JA1553. Thus, EPA lacked sufficient

reasonably available information at the time of the Risk Management Rule on which to base interim protections for the broader chemical production industry.

Because EPA lacked information on which to base such interim protections, if the Agency had chosen to include interim protections in the Risk Management Rule, the Rule would not have been supported by substantial evidence. 15 U.S.C. § 2618(c)(1)(B)(i). By the time EPA determined what interim protections were necessary and the broader chemical production industry implemented them, the ban on installing new asbestos-containing gaskets would already be in place.

Steel Workers argue that EPA ignored an important part of the problem by requiring interim protections for workers in the titanium dioxide industry until the ban on installing new asbestos-containing gaskets went into effect but failing to require the same interim protections for workers in the broader chemical manufacturing industry. Steel Workers' Br. at 28.

As an initial matter, Steel Workers' argument is waived. Steel Workers contend that EPA's explanation for treating the broader chemical manufacturing industry differently from the titanium dioxide industry was insufficient. *Id*. Despite having notice in the proposed rule that EPA was considering a ban that would take effect after two years with no interim protections for the chemical manufacturing industry, *see* 87 Fed. Reg. at 21718, Steel Workers did not raise any objections to the lack of interim protections in its comments. Having failed to raise its concerns

before EPA in the first instance, the Court therefore should not consider these objections now. *See State of Texas*, 983 F.3d at 838 n.4 (failure to raise argument in proceedings before agency typically "would preclude [petitioner] from raising the argument for the first time on appeal").

Even so, EPA adequately explained why key differences between the titanium dioxide industry and the broader chemical manufacturing industry and the different compliance deadlines warranted foregoing interim protections for the broader chemical manufacturing industry. Namely, that the Agency lacked sufficient time to implement interim protections for the chemical manufacturing industry and enough information to inform the interim protections. 87 Fed. Reg. at 21718–19.

Even if interim protections could have been implemented before the two-year ban went into effect, EPA explained that the ongoing use of asbestos-containing sheet gaskets in chemical production—as opposed to their installation and removal—does not present unreasonable risk. 89 Fed. Reg. at 21983. EPA accordingly concluded that interim control measures were not necessary to protect against unreasonable risk from the ongoing use of asbestos-containing sheet gaskets.

To the extent that Steel Workers suggest that, in declining to provide for interim control measures, EPA failed to address risk from the *removal* of existing

asbestos-containing gaskets, as opposed to their mere usage after installation, that is a "legacy" use addressed in the Part 2 Risk Evaluation. *See generally* Part 2 Risk Evaluation. Specifically, in the Part 2 Risk Evaluation, EPA found that the removal and disposal of legacy gaskets significantly contributed to the unreasonable risk posed by asbestos. *Id.* at 201. EPA must address the unreasonable risk in a subsequent risk management rule pursuant to Section 2605(a). 15 U.S.C. § 2605(a). Because the risk caused by removal and disposal of legacy asbestos-containing sheet gaskets is not at issue in the Asbestos Part 1 Risk Evaluation or Risk Management Rule, this issue is not ripe for review. *See infra* Argument Section III.A.1 (discussing how the Part 2 Risk Evaluation is unripe because there is no final agency action pursuant to Section 2605(i) and delaying review will cause no hardship to Petitioner ADAO).

For these reasons, substantial evidence supports EPA's decision not to require interim protections for the broader chemical production industry.

## B.    EPA Complied with Section 2605(d) Because the Ban Took Effect as Soon as Practicable.

Steel Workers also argue that, by failing to impose interim protections through the end of the useful life of asbestos-containing gaskets, EPA violated Section 2605(d) because EPA did not limit exposure in a manner that was "as soon as practicable." Steel Workers Br. at 29–31. That argument also fails: EPA is not required to impose such interim measures; it is required only to ensure that its

selected risk management restrictions take effect "as soon as practicable." 15

U.S.C. § 2605(d)(1)(A). The two-year deadline meets that standard.

As an initial matter, Steel Workers do not argue that the Risk Management

Rule's ban on installing new asbestos-containing gaskets should have taken effect

sooner. Instead, Steel Workers contend that interim worker protections should have

been implemented until all new asbestos-containing gaskets are eventually

removed at the end of their useful life. *See* Steel Workers Br. at 31. In other words,

Steel Workers request that EPA consider interim worker protections for the risks

caused by already-installed sheet gaskets. But that kind of restriction is outside the

scope of the Part 1 Risk Management Rule, which applies only to *new* asbestos-

containing gaskets, not to previously-installed sheet gaskets at the end of their

useful life. 40 C.F.R. § 751.509(a). That is because the Risk Management Rule

only addresses unreasonable risks identified in the Part 1 Risk Evaluation, which

did not encompass legacy uses. 89 Fed. Reg. at 21973. As discussed *supra* at 39–

41, the risk posed by legacy sheet gaskets, including their removal and disposal, is

a part of the unreasonable risk which EPA must address in a subsequent risk

management rule pursuant to Section 2605(a). Pt. 2 RE at 201, App'x 389; 15

U.S.C. § 2605(a).

In any event, Section 2605(d) does not require that *unreasonable risk* be

eliminated as soon as practicable, but instead requires that the *selected regulation*

promulgated pursuant to Section 2605(a) be implemented "as soon as practicable." 15 U.S.C. § 2605(d). For example, Section 2605(d)(1)(C) provides that the "dates for the start of ban or phase-out requirements" in a risk management rule promulgated under Section 2605(a) must be "as soon as practicable." Therefore, Section 2605(d) does not oblige EPA to implement interim protections; it merely requires EPA to implement the requirements selected under Section 2605(a) "as soon as practicable." And, as explained *supra* at 121, Section 2605(a) did not require EPA to implement interim controls for the chemical manufacturing industry as a whole because there was not enough time for EPA to develop such controls and for industry to implement them before the two-year ban on installing new gaskets went into effect. Therefore, EPA complied with Section 2605(d) through implementing the selected regulation—a ban—as soon as practicable.

## C.    The Final Rule Was a Logical Outgrowth of the Proposed Rule.

Finally, Steel Workers argue that EPA did not provide adequate notice that the Risk Management Rule would except already installed gaskets without requiring interim worker protections. Steel Workers Br. at 33. Steel Workers' claim is without merit because EPA provided notice of the terms of the final Risk Management Rule through the proposed rule and the change to the proposed rule was a direct response to arguments raised during the comment period.

The Administrative Procedure Act requires EPA to provide notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3); *see* 15 U.S.C. § 2605(c)(3) (noting that Section 553 applies to Section 2605(a) rules). Courts "have generally interpreted this to mean that the final rule the agency adopts must be 'a logical outgrowth of the rule proposed.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). Changes in a final rule that "responded directly" to comments are a "'logical outgrowth' of the rulemaking." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 448 (5th Cir. 2021) (citing *Chem. Mfrs. Ass'n*, 870 F.2d at 203).

The logical-outgrowth doctrine only requires a proposed rule to provide "fair notice" of the eventual final rule. *Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023). "A [proposed rule] is not required to 'specifically identify every precise proposal which the agency may ultimately adopt as a final rule.'" *Id.* at 583 (quoting *Chem. Mfrs. Ass'n*, 870 F.2d at 203). Instead, a proposed rule must "adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Id.* (quoting *Huawei Techs. USA, Inc.*, 2 F.4th at 447). If interested parties should have anticipated that the specific change to the proposed rule was possible, then the final rule is a logical outgrowth of the proposed rule. *Texas Ass'n of Mfrs. v. U.S.*

*Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–82 (5th Cir. 2021) (quoting

*Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938–39 (D.C. Cir. 2006)).

EPA made clear in both the Part 1 Risk Evaluation and the proposed Risk

Management Rule that the scope of these documents was non-legacy uses of

asbestos. *See e.g.*, RE, AR B.117, at 24, JA934 (explaining that "Part 1 of the risk

evaluation for asbestos does not reflect consideration of any legacy uses"). Thus,

Steel Workers were on notice that the Risk Management Rule would not address

legacy uses. As noted *supra* at 40–41, already-installed asbestos sheet gaskets are a

legacy use, and therefore it was clear that they were not within the scope of the

proposed Risk Management Rule.

Additionally, EPA's decision to exclude already-installed gaskets from the

final Risk Management Rule was a direct response to comments raised during the

comment period for the proposed Rule. EPA initially proposed banning the

manufacture, processing, distribution in commerce, and commercial use of

asbestos-containing sheet gaskets after two years. 87 Fed. Reg. at 21707. However,

as commenters explained, that proposal would have required replacing hundreds of

thousands of already-installed gaskets in two years. RM RTC, AR C.758, at 36–38,

JA2764–66 (summarizing comments). Because the gaskets do not pose an

exposure risk after installation and before removal, these comments raised

concerns that large-scale replacement would have increased exposure to asbestos. *Id.*

EPA agreed with the commenters and explained that the number of gaskets that would need to be replaced is much larger than it had originally estimated. *Id.* at 38–39, JA2766–67. The titanium dioxide industry also provided information indicating that two years was not a sufficient transition period for that industry specifically. *Id.* at 39, JA2767. In the final Risk Management Rule, for the chemical production industry as a whole, EPA excluded from the ban any already-installed sheet gaskets. 89 Fed. Reg. at 21983. For the titanium dioxide industry specifically, EPA extended the compliance deadline to five years and imposed interim controls but did not exclude the distribution in commerce or use of already-installed gaskets during this extended period. *Id.*

Critically, the proposed rule provided notice that EPA was not proposing interim protections in the event of a two-year compliance deadline for the broader chemical production industry. 87 Fed. Reg. at 21718 ("EPA recognizes that an [Existing Chemical Exposure Limit] will require time and resources to prepare for and therefore did not propose to include it for the two-year interim period prior to the proposed prohibition date.").

Thus, EPA provided fair notice of the final Risk Management Rule by framing the issues of banning the use of asbestos-containing gaskets and declining

to impose interim workplace protections in the proposed Risk Management Rule. The Administrative Procedure Act did not require EPA to adopt only the precise proposal that it set forth, and instead permitted the Agency to modify that proposal based on issues raised in comments. Other commenters recognized the lack of clarity with respect to whether already-installed gaskets were included and commented accordingly. Steel Workers should have anticipated that EPA's position with respect to already-installed gaskets might change.

For these reasons, EPA provided fair notice of the measures it was considering, and the final Risk Management Rule was the logical outgrowth of the proposed Risk Management Rule.

## III.    ADAO's Petition Should Be Denied.

The Part 1 Risk Evaluation and Risk Management Rule address asbestos conditions of use for which there was ongoing import, processing, or distribution in commerce at the time of the Part 1 Risk Evaluation (hereinafter referred to as "ongoing uses"). Legacy uses and associated disposals were initially excluded from the conditions of use in the Part 1 Risk Evaluation in accordance with EPA's risk evaluation framework rule that existed during the time the evaluation was being completed. Pursuant to the ruling in *Safer Chemicals* that EPA should not have excluded legacy uses or associated disposals in its framework rule, EPA is addressing legacy uses and associated disposals in the Part 2 Risk Evaluation and a

forthcoming risk management rule. Additionally, pursuant to *Asbestos Disease Awareness Org. v. Wheeler*, 508 F. Supp. 3d 707 (N.D. Cal. 2020), EPA issued a Section 2607(a) reporting rule and used the information about the import of asbestos-containing products the Agency received in response to that rule in the Part 2 Risk Evaluation. Part 2 RE at 38–40, App'x 226–28.

ADAO argues that EPA failed to address documented ongoing uses and the risks of asbestos-containing vehicle parts and should have treated discontinued uses as reasonably foreseen future uses.[19] ADAO Br. at 12–21, 27–33. Next, ADAO contends that the compliance deadlines that EPA set for chlor-alkali producers violated TSCA. *Id.* at 21–27. Third, ADAO contends that EPA failed to address environmental releases. *Id.* at 33–38. Finally, ADAO argues that EPA lacked substantial evidence to conclude that the import and distribution of asbestos do not present an unreasonable risk. *Id.* at 38–40. For the reasons explained below, these arguments lack merit.

---

[19] The individual medical doctor petitioners lack standing. *See generally FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). Because other petitioners that have filed the petition for review in Case No. 24-60281 have shown standing, EPA does not move to dismiss that petition. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (explaining that the Court need not address the standing of the other plaintiffs when one plaintiff has standing because one plaintiff satisfies Article III's case-or-controversy requirement).

### A.  EPA Addressed Certain Uses in Its Part 2 Risk Evaluation That Were Excluded from Its Part 1 Risk Evaluation.

As a preliminary matter, ADAO's claims that EPA should have assessed uses that are addressed in the Part 2 Risk Evaluation are unripe. EPA has made it clear that the Part 1 Risk Evaluation "only assessed conditions of use for chrysotile asbestos." RE, AR B.117, at 249, JA1159. EPA also said that it "will evaluate legacy uses and associated disposals and other fiber types of asbestos in Part 2 of the risk evaluation for asbestos." *Id.* EPA agrees that it has an obligation to address the other fiber types and did so in the Part 2 Risk Evaluation. Challenges to the adequacy of EPA's compliance with its obligation to address the other types and uses of asbestos are unripe because the part 2 risk management rule has not yet been finalized. ADAO should not be permitted to relitigate whether EPA should have addressed legacy uses and associated disposals; the issue of whether these may be properly considered conditions of use under TSCA was already decided in *Safer Chemicals*.

ADAO argues that EPA lacked substantial evidence to exclude certain imported asbestos products from the Part 1 Risk Evaluation. ADAO Br. at 13. But, as explained in more detail below, pursuant to the court's order in *Asbestos Disease Awareness Org. v. Wheeler*, EPA promulgated a Section 2607(a) reporting rule to gather information about asbestos-containing articles. EPA then considered the information that it received from the reporting rule in the Part 2 Risk

Evaluation. Next, ADAO contends that EPA failed to evaluate the repair and replacement of asbestos-containing vehicle parts, but the Agency addressed them in the Part 2 Risk Evaluation. Accordingly, ADAO's arguments are unripe and should be raised in the context of the part 2 risk management rule. Additionally, ADAO argues that EPA should have treated discontinued asbestos uses as reasonably foreseeable future uses. As discussed further in Argument Section III.A.2, EPA properly treated discontinued asbestos uses as unknown future uses in reliance on its 2019 Asbestos Significant New Use Rule.

> **1.    EPA Addressed Imported Asbestos-Containing Articles and the Repair and Replacement of Asbestos-Containing Vehicle Parts in the Part 2 Risk Evaluation.**

ADAO seeks review of actions—EPA's alleged failure to address imported asbestos-containing articles and the repair and replacement of asbestos-containing vehicle parts—which are not yet ripe for review. Ripeness is a justiciability doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). Ripeness doctrines "prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and also "protect the agencies from judicial interference until an administrative decision has been formalized and

its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967).

"Ripeness is a component of subject matter jurisdiction, because a court has no power to decide disputes that are not yet justiciable." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). In determining ripeness, courts evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration. *Id.*

In the Part 2 Risk Evaluation, EPA evaluated the risks revealed by information about imported asbestos-containing products it received in response to the Section 2607(a) reporting rule and information about the repair and replacement of asbestos-containing vehicle parts. The Part 2 Risk Evaluation is not currently before the Court, and EPA has not yet finalized a risk management rule that addresses the risks from the Part 2 Risk Evaluation.

First, ADAO argues that EPA lacked substantial evidence to exclude certain asbestos uses from its Risk Management Rule. ADAO Br. at 13. ADAO quotes from materials discussing the import of asbestos-containing products and then concludes these ongoing conditions of use were not addressed. *Id.* at 13–16. For example, ADAO cites to a United States Geological Service 2018 Minerals Yearbook which includes a list of imported asbestos products, including asbestos cement and woven products. *Id.* at 13. In the Part 1 Risk Evaluation, EPA

explained that it removed several conditions of use, including cement and woven products, from the scope of the draft Risk Evaluation because there was no evidence that these products were still manufactured, processed or distributed. RE, AR B.117, at 36, JA946. ADAO contends that EPA should have added these conditions of use back into the Part 1 Risk Evaluation based on the reporting ordered in *Asbestos Disease Awareness Organization v. Wheeler*. ADAO Br. at 16.

In *Wheeler*, the court found that EPA did not use all reasonably available information to address the import of asbestos-containing articles when evaluating the risks from asbestos and directed the Agency to initiate a rulemaking under Section 2607(a) of TSCA to require asbestos reporting. 508 F. Supp. 3d at 724–27, 735. EPA subsequently issued a reporting rule. 88 Fed. Reg. 47782. As ADAO acknowledges (ADAO Br. at 16), the information from the rule was not received in time to consider it for the Part 1 Risk Evaluation, so EPA could not consider the information until the Part 2 Risk Evaluation. Part 2 RE, at 38–40, App'x 226–28. Additionally, pursuant to a settlement agreement with ADAO, EPA had an obligation to address all other conditions of use "not evaluated in [P]art 1" based on reasonably available information in the Part 2 Risk Evaluation. Joint Motion for Abeyance at 3, *Asbestos Disease Awareness Org., et al v. E.P.A., et al.*, No. 21-70160 (9th Cir. 2021), ECF No. 19 at 3–4.

In the final Part 2 Risk Evaluation, EPA explained that in addition to risk from legacy asbestos, "EPA considered information on ongoing use of asbestos in manufacturing (including import and mining), processing, distribution, use, and disposal received since the Part 1 Risk Evaluation." Part 2 RE, at 189, App'x 377. "Data received under TSCA section 8(a), 15 U.S.C. 2607(a), indicates that ongoing manufacturing, importation, and processing of asbestos containing products is limited to materials with trace amounts of asbestos that are not intentionally added and less than 0.1 percent weight fraction." *Id.* "Based on the TSCA section 8(a) data, new processing and importing [conditions of use] have been added to cover the additional activities identified with the new submissions." *Id.* at 38, App'x 226.

ADAO requests a remand for EPA to identify additional uses of asbestos that would qualify as conditions of use pursuant to TSCA. ADAO Br. at 21. However, ADAO's claim fails to meet either the fitness or hardship conditions for ripeness. The "fitness" requirement "is primarily meant to protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). Review would be premature because EPA must address the information received from the reporting rule in the Part 2 Risk Evaluation and the forthcoming part 2 risk management rule. While EPA has finalized its Part 2 Risk Evaluation,

EPA has not yet taken final agency action with respect to the new information, as the Agency is still in the process of formulating a risk management rule. *See* Section 2605(i) ("a final rule promulgated under subsection (a), including the associated determination by the Administrator under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury to health or the environment, shall be considered to be a final agency action, effective beginning on the date of promulgation of the final rule."); *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) ("If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction.") (quoting *Veldhoen v. U.S. Coast Guard,* 35 F.3d 222, 225 (5th Cir. 1994)).

Because the part 2 risk management rule will be a final action subject to judicial review, ADAO will be able to seek judicial review of any alleged insufficiencies in EPA's treatment of imported asbestos-containing products once EPA has completed the part 2 risk management rule. Delaying review until EPA has finished the risk management rule will allow EPA to address the risks identified through the reporting rule, which is the relief that ADAO seeks, without judicial interference or duplicative review.[20] Therefore, ADAO will not suffer

---

[20] To the extent ADAO seeks to challenge the sufficiency of the Part 1 Risk Evaluation on the basis of EPA's failure to use all reasonably available information to address the import of asbestos-containing articles as previously litigated in

hardship by delaying review, and the issues addressed by the Part 2 Risk

Evaluation are not ripe for review.

ADAO also argues that the Part 1 Risk Management Rule failed to address

the risk of asbestos-containing vehicle parts. ADAO Br. at 27. Specifically, ADAO

contends that, because the Part 1 Rule exempts vehicle parts which were already

installed in vehicles as of November 25, 2024, the Rule leaves workers engaged in

vehicle repair without protection against unreasonable risk. *Id.* at 28–29. This

argument is also unripe.

As previously discussed, the unreasonable risk posed by asbestos will not be

fully addressed until a part 2 risk management rule is finalized. In fact, the repair

and removal of asbestos-containing appliances and machinery, including

automative brakes, is addressed in the Part 2 Risk Evaluation. Part 2 RE, at 314–

15, App'x 502–03. Additionally, the Part 1 Risk Evaluation and unreasonable risk

determination for aftermarket automotive brakes and linings are directly

incorporated into the Part 2 Evaluation and thus are a part of the unreasonable risk

that EPA must manage in its forthcoming rule. Furthermore, the Part 1 Rule

---

*Wheeler*, ADAO's argument is moot because EPA has used this information in the
Part 2 Risk Evaluation and there remains no live controversy to which this Court
could offer meaningful relief. *See Ctr. for Biological Diversity, Inc. v. BP Am.
Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) ("Mootness applies when intervening
circumstances render the court no longer capable of providing meaningful relief to
the plaintiff.").

prohibits the installation of new asbestos-containing vehicle parts as of November 25, 2024, thus eliminating exposures to asbestos from the repair or replacement of newly installed parts.

ADAO prematurely argues that EPA has violated TSCA by failing to address the unreasonable risk from legacy aftermarket automotive brakes and linings. ADAO Br. at 31. However, EPA has not yet finalized a part 2 risk management rule and has not yet had the opportunity to consider regulatory options for addressing this risk. Because EPA has not crystallized its position by taking final agency action with respect to the regulation of asbestos-containing vehicle parts, this question is not yet fit for judicial review. Again, ADAO will suffer no hardship by delaying review because the delay will enable EPA to address the risk from asbestos-containing vehicle parts in the part 2 risk management rule, which is the same relief ADAO currently seeks. *See* ADAO Br. at 33.

### 2.    EPA Properly Treated Discontinued Uses as Not Known or Reasonably Foreseeable.

Section 2605(b)(4)(A) provides that the "[t]he Administrator shall conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment . . . under the conditions of use." 15 U.S.C. § 2605(b)(4)(A). "Conditions of use" are "the circumstances, as determined by the Administrator, under which a chemical substance is intended,

known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4). In the Part 1 Risk Evaluation, EPA did not include discontinued uses as conditions of use. RE, AR B.117, at 27, JA937. In 2019, EPA issued its Asbestos Significant New Use Rule under TSCA Section 2604(a)(2). 84 Fed. Reg. 17345 (Apr. 25, 2019). The Significant New Use Rule prohibits manufacture, import, and processing of asbestos for discontinued uses from restarting without providing EPA with an opportunity to evaluate each intended use for unreasonable risks to health and the environment and to take any necessary regulatory action, which may include a prohibition. *Id.*; *see also* RE, AR B.117, at 23, JA933. Because of the Significant New Use Rule, EPA concluded in the Part 1 Risk Evaluation that it is "highly certain that manufacturing (including import), processing, or distribution of asbestos is not intended, known or reasonably foreseen for uses beyond use in the six product categories in this Part 1 of the risk evaluation for asbestos." RE, AR B.117, at 27, JA937.

ADAO argues that EPA should have treated discontinued uses as known and reasonably foreseen. ADAO Br. at 17. ADAO incorrectly suggests that the Significant New Use Rule only requires manufacturers to notify EPA of new uses of asbestos. *Id.* at 20. Rather, pursuant to Section 2604(a)(3), before manufacturing or processing for such a use could begin, EPA must review the notice and determine whether the use presents an unreasonable risk. If EPA determines that

the use may present or presents an unreasonable risk, then EPA must take action to protect against such risk under Sections 2604(e) or 2604(f), respectively. Therefore, the Significant New Use Rule prevents manufacturing, importing, or processing of asbestos for a discontinued use from restarting without EPA evaluating whether the use presents an unreasonable risk and taking any necessary action to protect against such risk. Accordingly, ADAO is wrong in its suggestion that the Significant New Use Rule offers no certainty, as EPA will be required to assess unreasonable risk and prevent such risk if it exists. Because such uses must comply with the Significant New Use Rule and be evaluated by EPA before restarting, discontinued uses are not reasonably foreseeable uses.

ADAO incorrectly argues that Section 2604 only applies to uses that did not previously exist. ADAO Br. at 20. ADAO argues that this Court's decision in *Inhance Technologies, LLC v. EPA*, 96 F.4th 888 (5th Cir. 2024) held that previously-existing uses cannot be significant new uses regulated under Section 2604. *Id.* Contrary to ADAO's representation, this Court's decision in *Inhance Technologies* addressed EPA's regulation of *ongoing* uses under TSCA Section 2604, not uses that have been discontinued.

In *Inhance Technologies*, this Court determined that EPA could not regulate "a forty-year-old ongoing manufacturing process" by deeming it a significant new use because EPA only recently discovered the use. *Id.* at 895. The Court was

139

persuaded by the language of the Section 2604, which requires a party to provide notice *before* manufacturing can begin. *Id.* at 893–94. The Court also emphasized that the factors EPA must consider in determining whether something is a significant new use, including the projected volume of manufacturing and processing of a chemical substance and the reasonably anticipated manner and methods of manufacturing, processing, distribution in commerce, and disposal of a chemical substance, are forward looking considerations. *Id.* at 894 (citing 15 U.S.C. § 2604(a)(2)(A)–(D)).

While ADAO contends that this decision held that discontinued uses are not significant new uses, the Court in *Inhance Technologies* relied on facts and rationales in its holding that the specific ongoing use was not a significant new use that clearly do not apply to discontinued uses. Because manufacturing or processing has been discontinued, parties can provide notice before manufacturing or processing begins, which aligns with the text of Section 2604. Additionally, to determine whether something would be a significant new use pursuant to the factors outlined in the statute, EPA had to conduct a forward-looking analysis because there is currently no ongoing use. Accordingly, this Court's decision in *Inhance Technologies* does not preclude EPA from using Section 2604 to regulate discontinued uses, and EPA properly treated discontinued uses as not reasonably foreseeable uses.

**B.    ADAO's Claim that EPA Lacked Substantial Evidence to Conclude Importation and Distribution Did Not Present Unreasonable Risk Is Not Properly Before the Court.**

**1.    ADAO's Claim Is Untimely.**

In the Part 1 Risk Evaluation, EPA found that the import of chrysotile asbestos and import and distribution of chrysotile asbestos-containing products do not present an unreasonable risk. EPA explained that "[t]hese determinations are considered final agency action and are being issued by order pursuant to TSCA section [2605](i)(1)." RE, AR B.117, at 34, JA944. Section 2605(i)(1) provides that "a determination by the Administrator under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury to health or the environment shall be issued by order and considered to be a final agency action, effective beginning on the date of issuance of the order." Therefore, the determination that the import and distribution of chrysotile asbestos did not present an unreasonable risk became final when EPA issued the Part 1 Risk Evaluation in December 2020.

Section 2618(a)(1)(A) conveys exclusive jurisdiction to the appellate courts over petitions for review of orders issued under Section 2605(i)(1) that are filed no later than 60 days after the order's issuance. Accordingly, challenges to the determinations that the import and distribution of chrysotile asbestos presented no

unreasonable risk must have been filed within 60 days of the issuance of the Part 1 Risk Evaluation.

ADAO argues that EPA lacked substantial evidence to conclude that the import of chrysotile asbestos and import and distribution of chrysotile asbestos-containing products do not present an unreasonable risk. ADAO Br. at 38. However, this argument is untimely and must be dismissed. This Court has explained that "[s]tatutory time limits on petitions for review of agency actions are jurisdictional in nature such that if the challenge is brought after the statutory time limit, we are powerless to review the agency's action." *Texas Mun. Power Agency v. EPA*, 799 F.2d 173, 174 (5th Cir. 1986) (dismissing a petition for review of a Clean Water Act permit for lack of subject matter jurisdiction because the petition was not filed within the 90-day statutory period). "The statutory time limitations have been strictly enforced." *Id.* (collecting cases); *see also City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012) (explaining that the 60-day statutory period for filing petitions for review in the Communications Act of 1934 is jurisdictional and cannot be judicially altered).[21]

---

[21] Even if the 60-day filing deadline is not jurisdictional, it should be strictly enforced as a mandatory claim-processing rule. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 (2017) ("If properly invoked, mandatory claim-processing rules must be enforced . . ."); *Frew v. Young*, 992 F.3d 391, 396 n.3 (5th Cir. 2021) (quoting *Hamer*, 583 U.S. at 17).

ADAO seeks to challenge the determinations in the Part 1 Risk Evaluation nearly four years after EPA took final agency action under Section 2605(i)(1) with respect to the import and distribution of chrysotile asbestos. Because this challenge is untimely, the Court is without jurisdiction to consider it.

### 2.     ADAO's Claim Is Moot.

Furthermore, any challenges to EPA's findings of no unreasonable risk with respect to specific conditions of use are moot because of the Part 2 Risk Evaluation. The Part 2 Risk Evaluation, which EPA issued in November 2024, included "an order withdrawing the [Section 2605(i)(1)] order in the December 2020 Risk Evaluation." RE Part 2, at 206, App'x 394. Accordingly, the determinations which ADAO seeks to challenge have been withdrawn.

The Asbestos Part 1 Risk Evaluation included individual risk determinations for each condition of use evaluated. In the Asbestos Part 2 Risk Evaluation, EPA "determined that a single risk determination on the chemical substance asbestos is appropriate in order to protect health and the environment." Part 2 RE, at 205, App'x 393. EPA "determined that asbestos presents an unreasonable risk of injury to health under the conditions of use." *Id.* at 206, App'x 394. The Part 2 risk determination superseded the determinations of no unreasonable risk EPA previously made based on a condition of use-specific approach to determining unreasonable risk. *Id.* Because the determinations of no unreasonable risk with

respect to the import and distribution of chrysotile asbestos have been withdrawn, there is no relief the Court can provide ADAO with respect to this claim, and ADAO's claim therefore is moot. *See Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 414 n.18 (5th Cir. 1999*)* ("Reconsideration of agency actions by the implementing agency can moot issues otherwise subject to judicial review because the reviewing court can no longer grant effective relief.") (citing *Ctr. for Science in the Pub. Interest v. Regan*, 727 F.2d 1161, 1164 (D.C. Cir. 1984)).

### 3.    Challenges to the Part 2 Risk Evaluation Are Unripe.

Because EPA issued a chemical-wide unreasonable risk determination for asbestos in the Part 2 Risk Evaluation, EPA must issue a risk management rule. As discussed *supra* Argument Section III.A.1, once EPA issues the part 2 risk management rule, then there will be final agency action that is ripe for judicial review. For the same reasons stated previously—that there has been no final agency action through the Part 2 Risk Evaluation and ADAO will suffer no hardship by delaying review—challenges to the Part 2 Risk Evaluation, including EPA's decisions to withdraw the Section 2605(i) determinations and to find unreasonable risk on a chemical-wide basis, are unripe. *See Am. Airlines, Inc.*, 176 F.3d at 287 ("If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction.") (quoting *Veldhoen*, 35 F.3d at 225). Accordingly, to the extent ADAO intends to challenge EPA's decision to

withdraw the Section 2605(i) determinations, ADAO should raise those challenges once there is a final agency action—specifically a part 2 risk management rule.

### 4. EPA Evaluated the Import and Distribution of Asbestos and Banned Its Import and Distribution for All Conditions of Use Evaluated in Part 1.

Even if ADAO's challenge to EPA's determinations that the import and distribution of chrysotile asbestos do not present an unreasonable risk is properly before this Court, it fails on the merits. EPA appropriately analyzed whether the import and distribution of asbestos present an unreasonable risk, and, in any event, EPA already banned the import and distribution of asbestos for the conditions of use evaluated in the Part 1 Risk Evaluation.

Chrysotile asbestos is shipped within sealed bags, and workers, who wear personal protective equipment and use respiratory protection, inspect bags for leaks. RE, AR B.117, at 76, JA986. EPA explained that "[s]torage areas are isolated, enclosed, labeled, secured and routinely inspected." *Id.* In response to comments raised with respect to the draft Risk Evaluation, EPA clarified that industry data showed that damaged bags containing chrysotile asbestos represent a "very rare" event. RE RTC, AR B.118, at 99, 105 JA1361, 1367. Because these spills are so rare, there are no quantitative evaluations of uncertainty for this condition of use, and EPA did not believe additional site visits would have provided further information. *Id.* Accordingly, because these spills occur so

infrequently and there is very little information about the spills, EPA determined that the import and distribution in commerce of chrysotile asbestos do not pose an unreasonable risk. RE, AR B.117, at 233, JA1143.

Additionally, for the ongoing uses of asbestos identified in Part 1, EPA banned the manufacture, import, processing, use, distribution in commerce and commercial use of asbestos. *See generally* 89 Fed. Reg. at 21970. Accordingly, even if EPA had found unreasonable risk from the import and distribution of asbestos, such risk is eliminated through the Part 1 Risk Management Rule.

### C.    The Compliance Deadlines for Chlor-Alkali Producers Are "as Soon as Practicable."

With respect to the Risk Management Rule's timelines for transitioning chlor-alkali facilities away from asbestos-containing diaphragms, ADAO argues that EPA was required to mandate adoption of non-asbestos diaphragms so that conversion away from asbestos diaphragms can be completed more quickly. ADAO Br. at 25. This argument misreads the statute.

Section 2605(a) does not permit EPA to specify what non-asbestos substitute technology affected entities must adopt. However, TSCA explicitly contemplates that different affected entities might have different compliance deadlines and grants EPA the discretion to mandate such a result. 15 U.S.C. § 2605(d)(2).

The Risk Management Rule's compliance deadlines also meet TSCA's requirement to consider environmental and health benefits, to the extent

practicable, providing for a "reasonable transition period." *See supra* at 112–14; 15 U.S.C. § 2605(d)(1)(A)–(E). Here, although OxyChem's[22] choice of cell membrane technology requires a longer conversion process, it uses less energy than non-asbestos diaphragms, which yields additional environmental and health benefits. *See supra* at 114. EPA reasonably provided OxyChem with more time to convert to cell membrane technology. *Id.*

Moreover, TSCA requires that EPA consider the "likely effect" of a Section 2605(a) rule on "public health." 15 U.S.C. § 2605(c)(2)(A)(iv)(I). Prior to finalization of the Risk Management Rule, OxyChem had already begun converting one facility to cell membrane technology and had planned conversions for two other facilities. *See* OxyChem Meeting Summary 11-16-22*,* AR C.449, Attach. 1, JA2280–93; OxyChem Comment, AR C.453, JA2297–340. Even if EPA had imposed a shorter deadline for the phase-out of asbestos diaphragms in chlor-alkali facilities, EPA could not have required OxyChem to comply with such a deadline by converting its facilities to non-asbestos diaphragms rather than membrane technology. OxyChem could have chosen instead to cease operation of its chlor-alkali facilities—either temporarily to complete the conversion to membrane technology or permanently—which would have adversely impacted the

---

[22] ADAO's reference to Occidental Chemical instead of OxyChem appears to be a typographical error.

availability of chlorine for the treatment of drinking water, creating risks to public health. *See* 89 Fed. Reg. at 21981; RM RTC, AR C.758, at 21, JA2749.

Contrary to ADAO's argument, EPA appropriately granted chlor-alkali manufacturers converting multiple facilities to membrane cell technology additional time under Section 2605(d)(2) instead of granting OxyChem an exemption under Section 2605(g). ADAO Br. at 26. Section 2605(g) provides EPA with the authority to grant exemptions from a specific requirement of a rule issued pursuant to Section 2605(a). 15 U.S.C. § 2605(g). To issue one of these exemptions, EPA must find that "the specific condition of use is a critical or essential use for which no technically and economically feasible safer alternative is available," compliance with the requirement "would significantly disrupt the national economy, national security, or critical infrastructure," or the specific condition of use "provides a substantial benefit to health, the environment, or public safety." *Id.* § 2605(g)(A)–(C). EPA is not limited to using Section 2605(g) to provide individual companies with compliance flexibility because Section 2605(d) confers separate authority to vary compliance dates for affected persons. *Id.* § 2605(d)(2). In setting compliance dates that are "as soon as practicable" as required by Section 2605(d), EPA should be able to consider what is practicable for different conversion technologies and set the compliance dates accordingly.

For these reasons, TSCA does not compel EPA to impose a compliance deadline that requires adoption of the conversion technology that can be carried out fastest, and substantial evidence supports giving chlor-alkali manufacturers their choice of conversion technology.

### D. EPA Accounted for Environmental Releases in Its Risk Management Rule.

ADAO argues that the Part 1 Risk Evaluation and Risk Management Rule failed to address the risk to the general population from asbestos environmental releases. ADAO Br. at 33. ADAO argues that EPA should have reopened the Part 1 Risk Evaluation to ensure that it reflected EPA's interpretation of TSCA adopted after publication of the Part 1 Risk Evaluation, which generally requires the consideration of reasonably foreseeable exposures from air, water, and disposal. *Id.* at 35.

In the Part 1 Risk Evaluation, "EPA found that exposures to the general population may occur from the conditions of use due to releases to air, water or land." RE, AR B.117, at 31, JA941. However, EPA did not evaluate these exposures to the general population. Instead, EPA opted to tailor the scope of the risk evaluation and explained that it did so pursuant to its authorities in Sections 2605(b) and 2608(b)(1). *Id.* at 32, JA942. In the Risk Management Rule, EPA explained that it "expects that any potential exposures to the general population would be adequately addressed through the prohibition on the manufacture

(including import), processing, distribution in commerce and commercial use of chrysotile asbestos to address the unreasonable risk posed to workers, [occupational non-users], consumers and bystanders." 89 Fed. Reg. at 21974.

ADAO argues that EPA did not explain how worker protections would eliminate or reduce the risk from asbestos to nearby populations. ADAO Br. at 35. ADAO's mischaracterization of EPA's prohibitions as mere "worker protections" belies the reality of the effect the Part 1 Risk Management Rule will have on any environmental releases and corresponding risks to nearby populations stemming from the Part 1 conditions of use. There is a clear connection between banning asbestos uses and eliminating risk to nearby populations that derives from those uses. By banning specific asbestos conditions of use, EPA eliminated the potential that these conditions of use could cause exposures to the general population.

Further, while EPA noted in the Part 1 Risk Evaluation that exposures from these pathways "may occur," EPA also noted that the specific exposure pathways including ambient air, drinking water, ambient water, and disposal were "well-regulated" under other EPA statutes. RE, AR B.117, at 30–31, 51–54, JA940–41, 961–64. ADAO does not allege that had EPA considered exposures to the general population, it would have found unreasonable risk from such releases in light of the requirements already in place to address these exposure pathways. The fact is EPA elected to prohibit all conditions of use for which it found unreasonable risk;

these prohibitions will necessarily eliminate any risk to the general population from environmental releases, and as described above, these prohibitions will be implemented as soon as practicable.

## IV.    Vacatur Is Not an Appropriate Remedy.

The Risk Evaluation and Risk Management Rule are lawful and should be upheld. But if the Court were to identify some flaw in the Risk Evaluation or Risk Management Rule, it should not vacate the Rule but instead should remand to EPA to allow the Rule to remain in place pending prompt completion of remand proceedings.

Though this Court has at times characterized vacatur as the "default" remedy for Administrative Procedure Act review, *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022), it has likewise explained that remand without vacatur "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive," *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (cleaned up); *see also Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (explaining that "[a]n inadequately supported rule ... need not necessarily be vacated"). In deciding whether to vacate unlawful agency action, this Court considers (1) the likelihood that the agency's action could be sustained on remand and (2) the disruptive

consequences that might flow from vacatur of the action. *Cent. & S. W. Servs.*, 220 F.3d at 692. Here, both prongs show that remand without vacatur is proper.

*First*, the record demonstrates that EPA likely would reach a similar result on remand. For example, Industry Petitioners challenge EPA's use of the 95th percentile for the high-end tendency, *see supra* Argument Section I.A.2, but had EPA used the central tendency instead and accounted for potentially exposed or susceptible subpopulations and non-cancer effects elsewhere in the Risk Evaluation, the outcome is unlikely to have been different. Thus, even if EPA erred in using the high-end tendency, such error was harmless. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 659–60.

Furthermore, the certainty of asbestos exposure during the processing and industrial use of asbestos in the chlor-alkali and chemical production industries, combined with the adverse health effects associated with exposure to asbestos, support EPA's unreasonable risk determinations and indicate EPA would reach the same finding on remand. Similarly, to the extent any of the petitioners argue EPA failed to address risks which the Agency has now addressed in the Part 2 Risk Evaluation, remanding the Part 1 Risk Evaluation would not change EPA's course of action. Insofar as any petitioners argue that the Rule is procedurally deficient, such as through violating the logical outgrowth doctrine, *see supra* Argument Section II.C, any such procedural deficiencies likewise could be rectified on

remand without vacatur. *See Tex. Ass'n of Mfrs.*, 989 F.3d at 389–90 (remanding

without vacatur agency rule that failed to complete proper notice-and-comment

rulemaking).

*Second*, and more critically, any vacatur of the Rule would disrupt and

impede EPA's compliance with TSCA. In particular, vacatur would delay EPA's

ongoing efforts to implement Congress's instruction that it "prevent unreasonable

risks of injury to health or the environment associated with the manufacture,

processing, distribution in commerce, use, or disposal of chemical substances." S.

Rep. No. 94-698, at 1 (1976), as reprinted in 1976 U.S.C.C.A.N. 4491. Congress

made clear, in the 2016 Amendments, that it saw the health risks posed by

chemicals as a problem in need of an urgent solution, imposing ambitious

deadlines by which EPA was required to take certain regulatory actions. *See, e.g.*,

15 U.S.C. § 2605(b)(2)(A)–(B). EPA has worked diligently to comply with that

mandate. Vacatur of the Risk Management Rule not only would unwind nearly a

decade of EPA's progress toward protecting public health, the environment, and

vulnerable subpopulations, thereby frustrating the will of Congress—but also clog

the pipeline of risk evaluations and rules for other chemical substances that TSCA

instructs EPA to maintain. Vacatur also would be disruptive to the regulated

community. *See Cent. & S. W. Servs., Inc.*, 220 F.3d at 692 (determining that

vacatur was inappropriate where rule applied to other members of a regulated

community and therefore would be disruptive). In their comments on the proposed

Risk Management Rule, chlor-alkali producers supported banning asbestos-

containing diaphragms and converting to non-asbestos technology. *See, e.g.*, ACC

Comment, AR C.503, Attach. 1, JA2403–10 ("ACC and its member companies

support an orderly transition away from the use of chrysotile asbestos diaphragms

in chlor-alkali manufacture. . ."); Olin Comment, AR C.475, Attach. 1, JA2341

("Olin Corporation would support an EPA action to ban the installation of any new

or replacement asbestos-based diaphragms"). All three chlor-alkali manufacturers

have now ceased importing asbestos. 89 Fed. Reg. at 21979. Remanding the Rule

without vacatur would enable EPA to make any necessary adjustments to the Rule

while maintaining the Rule's protections, ensuring stability for regulated parties

and the general public, and respecting Congress's desire for prompt regulation of

toxic substances.

*Finally*, no matter what remedy this Court orders, it should limit that remedy

to address only those provisions of the Rule that it deems unlawful. *See Vanderstok*

*v. Garland*, 86 F.4th 179, 196–97 (5th Cir. 2023) (concluding that vacatur of an

entire rule was improper where the court found that only two provisions of the rule

were unlawful). Regulations are presumptively severable, *see Barr v. Am. Ass'n of*

*Pol. Consultants, Inc.*, 591 U.S. 610, 625–26 (2020), and federal courts will sever

an unlawful regulation so long as severance would "not impair the function of the

statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Here, EPA explained that it "intends that each provision of this rulemaking be severable," and it therefore "crafted [the Rule] so that different risk management approaches are reflected in different provisions or elements of the rule that are capable of operating independently." 89 Fed. Reg. at 22000. And EPA further noted that it evaluated the risk management options "for each" condition of use and that "EPA's regulation of a [condition of use] to address the unreasonable risk from chrysotile asbestos functions independently from EPA's regulation of other [conditions of use]." *Id.* So, "if any provision or element of this rule is determined by judicial review or operation of law to be invalid, that partial invalidation will not render the remainder of this rule invalid." *Id.* Consequently, if this Court were to deem one or more sections of the Rule unlawful, it should remand only the offending provisions to EPA and leave the rest of the Rule in place.

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

/s/ *Laura J. Glickman*

Of Counsel:                                    LAURA J. GLICKMAN
DEREK GILLIAM                          KRISTEN SARNA
*Attorney*                                      *Attorneys*
U.S. Environmental Protection Agency     Environment and Natural Resources Division
                                                      U.S. Department of Justice

January 16, 2026

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's August 6, 2024 order (Doc. 93) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 34,646 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN

Counsel for Respondent