

**David Y. Chung**
DChung@crowell.com
(202) 624-2587  direct

Crowell & Moring LLP
600 Fifth Street NW
Washington, DC 20001
+1.202.624.2500  main
+1.202.628.5116  fax

June 10, 2026

**<u>VIA CM/ECF</u>**

Lyle W. Cayce
U.S. Court of Appeals for the Fifth Circuit
Office of the Clerk
600 S. Maestri Place
New Orleans, LA 70130-3408

Re:   *Texas Chemistry Council, et al. v. EPA*, No. 24-60193, cons. w/ 24-60281

Dear Mr. Cayce:

This letter responds to the Court's request that the parties submit simultaneous letter briefs addressing how standing must be shown, whether it has been shown here, and if not, whether each petition for review must be dismissed. As explained below, the Industry Petitioners' standing in this case is self-evident, because the U.S. Environmental Protection Agency ("EPA") rule at issue in this case bans ongoing uses of chrysotile asbestos in the chlor-alkali and chemical manufacturing industries, and the Industry Petitioners' members include companies that are directly regulated and who must prematurely stop using asbestos because of the rule.

Should this Court find, however, that standing is *never* self-evident and that a petitioner in a case involving direct appellate review of an agency action must always present specific facts to support standing, either by citing the administrative record or declarations or affidavits, the Industry Petitioners respectfully request that this Court accept their post-argument submissions on standing given the unusual circumstances in this case. Until recently, Olin Corporation[1] was a petitioner in Case 24-60333, challenging EPA's ban on use of asbestos in the chlor-alkali industry. Olin's presence in this case was "sufficient to satisfy Article

---

[1] Although Olin withdrew its petition, it is an ACC member, and its injury is relevant to ACC's associational standing. *See infra* at 6-8.



III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Neither EPA nor any of the other parties challenged the Industry Petitioners' standing in this case during briefing or when Olin withdrew its petition. And while the Court raised concerns about standing on May 27, 2026 (ECF No. 326) and during oral argument, the Court allowed the Industry Petitioners to present additional record citations to demonstrate standing immediately following oral argument. The Court should exercise its broad discretion to evaluate standing based on post-argument submissions, including the Industry Petitioners' June 1 letter (ECF No. 329), this supplemental letter brief, and their post-argument declarations.

I.      *Test for Associational Standing*

A petitioner has associational standing "when (1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 695 (5th Cir. 2025) (citation omitted). To demonstrate that an individual member has standing, an association must show that the member has (1) suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is likely caused by the defendant; and (3) the injury would likely be redressed by judicial relief. *Id.* at 695-96 (citation omitted). Those prongs are all met here.

II.      *The Industry Petitioners' Standing Is Self-Evident, Because Their Members Are the Direct Object of the Challenged EPA Rule Banning Their Ongoing Use of Asbestos.*

Petitioners challenging agency action generally must "present specific facts supporting standing through citations to the administrative record or affidavits or other evidence attached to its opening brief, *unless standing is self-evident.*" *Tex. v. Nuclear Regul. Comm'n*, 78 F.4th 827, 835 (5th Cir. 2023) (emphasis in original), *rev'd on other grounds, Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025); *accord Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (standing self-evident in a challenge to a regulation that "directly regulates the disposition of a party's property"); *but see Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 423-24 (5th Cir. 2020) (requiring a petitioner to support standing by citing specific facts in the record). Here, standing is self-evident from the challenged governmental action, because Petitioner American Chemistry Council's ("ACC") and the state chemistry council Petitioners' member companies



own and operate facilities that currently use chrysotile asbestos, and the final rule injures those companies by banning those uses. Applying "commonsense economic principles," which both the Supreme Court and EPA agree "can be useful when evaluating Article III standing," governmental bans on ongoing private activities causes injury, and that injury can be redressed by a court order vacating the bans. *See Diamond Alt. Energy v. EPA*, 606 U.S. 100, 116 (2025). In *Shrimpers*, by contrast, the petitioners—associations whose members opposed the construction of natural gas infrastructure—were *not* the direct object of the challenged governmental actions granting air permits to a project proponent. Standing was not self-evident in that case, because the challenged governmental actions did not ban ongoing activities conducted by those associations' members. *See* 968 F.3d at 424-25. Thus, those associations were required to support standing by either citing specific record facts or through declarations.

In cases like this, where a "plaintiff is himself an object of the action (or foregone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). It "is inconceivable" that an EPA rule banning chrysotile asbestos use in the chlor-alkali and chemical manufacturing industries "would fail to affect . . . even a single [ACC] member." *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895-96 (D.C. Cir. 2006). In fact, ACC participated extensively throughout EPA's rulemaking process to protect the interests of its member companies that are directly impacted by EPA's bans, as evidenced by the numerous ACC comment letters cited in the Opening Brief (at 13, 16, 33, 37, 46, 49, 51, 68). For these reasons the first two requirements of associational standing are satisfied.[2] As to the third requirement of associational standing, participation of individual members is not required in cases such as this "when an association seeks prospective or injunctive relief," as opposed to damages. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

The Supreme Court recently instructed that "[c]ourts should not make standing law more complicated than it needs to be" and that "[t]he government generally may not target a business or industry through stringent and allegedly

---

[2] The Industry Petitioners also detailed how their members are directly impacted by the challenged rule and how they have participated in rulemaking and in this case to protect their member companies' interests in their Motion to Intervene, citing various comments in the rulemaking record and relevant discussions from the Final Rule. *See* ECF No. 35 at 3-4, 6-7, 13-17.



unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Diamond Alt. Energy*, 606 U.S. at 125. But that is effectively what would happen here if the Industry Petitioners, whose members are indisputably targets of EPA's ban on ongoing uses of a chemical and who ACC sought to protect by participating throughout the rulemaking process and by filing suit, cannot challenge the ban.

III. *If the Court Finds Standing Is Never Self-Evident, It Should Find That Industry Petitioners Have Standing Based on Post-Argument Submissions.*

If, however, this Court believes standing is never self-evident and that under *Shrimpers,* a petitioner challenging a governmental action cannot support standing without either record citations or extra-record declarations, it should nonetheless exercise its discretion to allow the Industry Petitioners to support their standing in post-argument submissions, including this letter brief, the record citations provided in the Industry Petitioners' June 1 letter (ECF No. 329), and the attached declarations.

This Court, and others, have found that a petitioner that reasonably assumes that standing is self-evident and only includes an abbreviated discussion of standing in its Opening Brief does not forfeit constitutional standing. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 n.4 (5th Cir. 2019); *Am. Library Ass'n v. FCC*, 401 F.3d 489, 494 (D.C. Cir. 2005) ("Depending on the circumstances of the case, the court may allow petitioners to support their standing in their reply brief, in affidavits submitted along with the reply brief, through citations to the existing record at oral argument, or through additional briefing or affidavits submitted to the court after oral argument."). Those cases confirm this Court retains broad discretion to consider supplemental submissions when a petitioner reasonably believes that "nothing in the record alerted [them] to the possibility that their standing would be challenged." *Am. Library Ass'n*, 401 F.3d at 492.

Here, when the Industry Petitioners filed their Opening Brief, they reasonably believed their standing was self-evident. As the Opening Brief illustrates (at 7-17 & 37-39), chlor-alkali and chemical manufacturing facilities currently use asbestos, and the challenged rule bans those uses. In particular, the rule forces Olin to stop using asbestos within five years, even though Olin is on record stating that it needs seven years to convert its facilities. *See* Opening Br. at 75 n.19 (citing JA 2341). A rule that forces Olin to prematurely convert its facilities injures the company, which is precisely why Olin sought judicial relief to



set that ban aside. Because the "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," the remaining Industry Petitioners reasonably believed Olin's self-evident standing sufficed. *See Rumsfeld*, 547 U.S. at 52 n.2. Under those circumstances, "includ[ing] long jurisdictional statements" on standing for every industry petitioner "for fear that the court might find their standing less than self-evident . . . would waste, rather than conserve, judicial resources and place an unnecessary burden on litigants." *Am. Library Ass'n*, 401 F.3d at 494. Thus, the Industry Petitioners included a brief discussion of standing in their Opening Brief's Jurisdictional Statement, because they reasonably "had a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve." *Ctr. for Biological Diversity*, 937 F.3d at 542 n.4; *accord Tex. v. Nuclear Regul. Comm'n*, 78 F.4th at 835.[3]

Notably, EPA did not challenge the Industry Petitioners' standing during merits briefing; rather, EPA only questioned whether individual medical doctor petitioners have standing. *See* EPA Br. 129 n.19. "EPA's silence on standing was telling—the proverbial dog that did not bark—because EPA routinely challenges a party's standing when the agency believes that injury in fact, causation, or redressability is questionable." *Diamond Alt. Energy*, 606 U.S. at 108. And even after Olin withdrew its petition on May 6, 2026, EPA did not question whether the remaining Industry Petitioners have standing prior to oral argument.

The Industry Petitioners of course acknowledge that the Court must independently assess its standing regardless of whether any party challenges standing. In accordance with this Court's May 27 directive (ECF No. 326), the Industry Petitioners' counsel was prepared to provide citations to the administrative record during oral argument that set forth specific facts to demonstrate why, for instance, Petitioner ACC has standing to sue on behalf of member companies who are directly injured by EPA's ban on their ongoing uses of chrysotile asbestos. Those record citations are set forth in the Industry Petitioners' June 1 letter (ECF No. 329). In particular:

---

[3] At the time, the Supreme Court had not yet reversed this Court's decision in *Texas*, which held that *ultra vires* review is not available under the Hobbs Act. *See Nuclear Reg. Comm'n*, 605 U.S. at 681-82. And despite that reversal, the cases that this Court cited in agreeing that the petitioners' standing was self-evident and that petitioners never forfeited constitutional standing remain good law and are persuasive here. *See Texas*, 78 F.4th at 835.



*First*, the challenged rule makes it clear that three companies operating a total of eight chlor-alkali facilities who use asbestos and are subject to EPA's ban. *See* JA2. While EPA anticipates all three companies will convert to non-asbestos technologies "in the coming decades even without this final rule," JA2, EPA's rule indisputably speeds up those conversions and forces companies to stop using asbestos within five to twelve years. JA16. Because the Final Rule "accelerates" the timeline for transitioning away from asbestos diaphragms, EPA fully acknowledges that causes injury: EPA estimates its ban will impose incremental costs of millions of dollars per year on those companies, which are *in addition to* the approximately $2.8 billion to $3.4 billion that companies would otherwise spend to convert all eight facilities to non-asbestos technologies. JA26-27; *see also* JA2. Specifically, EPA estimated that, over a 35-year period, the "incremental annualized net effect is a cost ranging from $34 million to $43 million per year" (using a 7 percent discount rate) or "is estimated to range from an annualized cost of $7 million per year to an annualized savings of $1 million per year, depending on whether the higher grade of caustic soda produced by membrane cells continues to command a premium price" (using a 3 percent discount rate). JA2. This Court need not wade into which discount rate is more appropriate or whether EPA's estimate of possible cost savings for facilities that convert to membrane cells passes muster, because OxyChem and Olin are each converting two of their facilities to non-asbestos diaphragm cell technology, not membrane cells. *See* JA11. Both companies will incur incremental annual costs of several millions of dollars per year to convert those four facilities under EPA's accelerated timeline. As this Court has recognized, "economic injury is the quintessential injury upon which to base standing," and "even a dollar of economic harm is still an injury-in-fact for standing purposes." *Tex. Corn Producers*, 141 F.4th at 696-97.

Despite the foregoing, EPA questioned the Industry Petitioners' standing for the first time at oral argument. Although EPA conceded Olin alleged a "valid injury" by challenging the timeline for transitioning away from asbestos, EPA curiously alleged that, because the chlor-alkali and chemical manufacturing industries plan to transition away from asbestos regardless of the challenged rule, ACC has not alleged an injury-in-fact. The record belies EPA's claim. As EPA's brief explains, ACC and Olin both supported an orderly transition away from asbestos diaphragms, *but on a longer timeline than EPA has allowed*. Thus, both have alleged "valid" injuries. *See* EPA Br. at 31 (citing JA2409 & JA2341). Moreover, as detailed above, the challenged rule confirms that accelerating the timeline for moving from asbestos diaphragms to non-asbestos technologies injures chlor-alkali companies to the tune of millions of dollars each year.



*Second*, ACC advocated on behalf of its member companies throughout every stage of the rulemaking process. *See, e.g.*, JA75-95 (ACC comments on scoping); JA146-189 (ACC supplemental comments on scoping, which attached member company monitoring data); JA778-796 (ACC comments on draft risk evaluation); JA2141-2251 (ACC comments on proposed rule); JA2403-2410 (ACC comments on Notice of Data Availability). ACC explained, among other things, how it and its member companies provided a wealth of data to inform EPA's rulemaking. *See* JA2403-05. Through those submissions, ACC sought to protect its member companies' legal and economic interests, which "easily satisf[ies]" the associational standing requirement that an association seek "to vindicate interests germane to its purpose." *Tex Corn Producers*, 141 F.4th at 695.

*Third*, ACC asked EPA to allow for at least fifteen years for its member company, Occidental Chemical Corporation ("OxyChem")[4] to convert its five facilities to non-asbestos technologies. *E.g.*, JA2146; JA2148 (explaining how a shorter ban would severely harm chlor-alkali companies); JA2409. OxyChem for its part submitted detailed information to EPA providing detailed reasons why conversions would be challenging in less than 15 years. *E.g.*, JA2280-2288; JA2297-2333. EPA's rule does not provide OxyChem with the requested 15-year transition timeline. Instead, OxyChem must convert all five facilities within the next 5-12 years. *See* JA16-17. As OxyChem and ACC explained to EPA, by mandating conversions in less than 15 years, EPA's rule likely will result in a surge in demand that is expected to inflate prices of key materials (*e.g.*, metals, electrolyzers, and elements), whereas "a more gradual conversion leads to lower prices." JA2310; *see also* JA2297, JA2300, JA2302-2308, JA2333. As noted above, EPA agrees that its accelerated timeline will impose incremental costs on OxyChem and other chlor-alkali companies. *See* JA2; JA26-27. EPA also recognizes its timelines could even "result in facility closures." JA25. These economic injuries satisfy the injury-in-fact requirement, are directly caused by EPA's ban, and would be redressable by this Court. *See Tex. Corn Producers*, 141 F.4th at 696-97; *id.* at 700 ("Causation and redressability flow naturally from the injury.").

---

[4] It is clear from the record that OxyChem is an ACC member that is directly regulated and severely impacted by EPA's ban. *E.g.*, JA2208 (ACC comments referring to member company Occidental Chemical Corporation); JA2343 (Petitioner Asbestos Disease Awareness Organization's comments referencing ACC member company Occidental Chemical Corporation's requests for at least 15 years to complete the transition).



If, however, this Court finds that the foregoing record citations do not conclusively establish standing under its precedents, the Industry Petitioners respectfully request that this Court consider their post-argument declarations that further support our standing. Those declarations provide further facts to demonstrate how an individual member company would have standing in its own right to sue. *See* Decl. of Logan Harrell ¶¶ 3, 5-6 (explaining how EPA's ban shortens the timeline to move away from asbestos diaphragms, which imposes additional cost and injures Texas Chemistry Council member OxyChem); Decl. of Dr. Kimberly White ¶¶ 5-7 (explaining how EPA's ban causes economic injury to ACC members Olin and OxyChem and how both companies must prematurely stop using existing technologies and divert funds and staffing to facility conversions). Those declarations further explain how the interests that each association seeks to protect are germane to its purpose. *See* Harrell Decl. ¶¶ 1, 4, 7; White Decl. ¶¶ 1, 3, 8. Under the unusual circumstances of this case, where a company/co-petitioner that is one of the direct targets of EPA's ban on asbestos use in the chlor-alkali industry—and is discussed at length in the Final Rule and in the parties' briefs in this case—withdrew its petition roughly three weeks before oral argument but is a member of another petitioner in the case (ACC), this Court should exercise its discretion to accept these post-argument declarations.

For these reasons, the Industry Petitioners have constitutional standing, and this Court should address the merits of their petitions.

<u>s/Robert J. Karl</u>
Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris & Arthur, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for Ohio Chemistry Technology Council*

<u>/s/ David Y. Chung</u>
David Y. Chung
Crowell & Moring LLP
600 Fifth Street, N.W.
Washington, DC 20001
(202) 624-2500
dchung@crowell.com

*Counsel for American Chemistry Council, Texas Chemistry Council, and Georgia Chemistry Council*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify on June 10, 2026, I filed the foregoing Supplemental Letter Brief using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

*s/ David Y. Chung*
David Y. Chung
